DAVID B. GOLUBCHIK (State Bar No. 185520)
CARMELA T. PAGAY (State Bar No. 195603)
JOSEPH M. ROTHBERG (State Bar No. 286363)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, CA 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: DBG@LNBYG.COM; CTP@LNBYG.COM; JMR@LNBYG.com

Proposed Attorneys for Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re<br><br>ANDREW STUPIN and JULIE STUPIN,<br><br>Debtors and Debtors in Possession. | Case No. 8:26-bk-11202-SC<br><br>Chapter 11<br><br>Adv. Case No.: |
| ZIONS BANCORPORATION, N.A., dba CALIFORNIA BANK & TRUST, a National Association,<br><br>Plaintiff,<br><br>v.<br><br>ANDREW STUPIN, an individual, ANDREW STUPIN AND JULIE K. STUPIN, as trustees of The Stupin Family Trust dated April 3, 2009; GERALD J. MARCIL, an individual; GERALD J. MARCIL AND CAROL J. MARCIL, as trustees of The Marcil Family Trust dated May 9, 1997; DEBYA SHYAM, an individual and DOES 1 – 10,<br><br>Defendants. | **NOTICE OF REMOVAL OF STATE COURT ACTION**<br><br>[Los Angeles Superior Court Case No. 25STCV30165]<br><br>[Referred to Judicial Referee,  Hon. Mitchell L. Beckloff, Signature Resolution Case No. ZKQXK]<br><br>[No Hearing Required] |

1

**TO THE CLERK OF THE UNITED STATES BANKRUPTCY COURT, CENTRAL DISTRICT OF CALIFORNIA:**

PLEASE TAKE NOTICE that Andrew Stupin and Julie Stupin, debtors and debtors in possession (the "Debtors") in the above-entitled case commenced under Chapter 11 of the Bankruptcy Code (the "Bankruptcy Case"), hereby remove the following portions of the case captioned *Zions Bancorporation, N.A. dba California Bank & Trust v. Andrew Stupin et al.* currentrly pending before Los Angeles Superior Court, Case No. 25STCV30165 (the "State Court Action") pursuant to 28 U.S.C. § 1452, FRBP 9027, and LBR 9027-1.

28 U.S.C. § 1452 provides as follows:

> A party may remove any claim or cause of action in a civil action . . . to the district court for the district where such civil action is pending, *if such district court has jurisdiction of such claim or cause of action under section 1334* of this title.

*Id.* § 1452(a) (emphasis added).

28 U.S.C. § 1334, in turn, provides that the district court has "original but not exclusive jurisdiction of all civil proceedings arising under [the Bankruptcy Code], or arising in or related to cases under [the Bankruptcy Code]." *Id.* § 1334(b).

The Bankruptcy Case was commenced on April 17, 2026. The State Court Action was commenced on October 15, 2025.

The Debtors seek to remove the following portions of the State Court Action to Bankruptcy Court (collectively referred to hereinafter as the "Removed Claims"):

1.    Plaintiff Zions Bancorporation, N.A. dba California Bank & Trust ("Plaintiff" or "Zions") claim for Breach of Guaranty against Andrew Stupin in his personal capacity and against Debtors in their capacity as trustees of The Stupin Family Trust dated April 3, 2009;

2.     Plaintiff's claim for breach of Guaranty against co-defendant Gerald J. Marcil, individually, and Gerald J. Marcil and Carol J. Marcil as trustees of the Marcil Family Truste dated May 9, 1997 (the "Marcil Defendants");

3.     Debtor Andrew Stupin's counter-claims against Plaintiff, and claims against borrower Cantor Group II, LLC, borrower Cantor Group IV, borrower's manager Cantor Group Manager, LLC, and Deba Shyam, the manager of Cantor Group Manager LLC (the "Cantor Parties");

4.     Gerald J. Marcil's counterclaims against Plaintiff, and claims against the Cantor Parties; and

5.     The Cantor Parties' counterclaims against Debtors and the Marcil Defendants.

To be clear, the portions of the State Court Action not being removed are any claims Plaintiff Zions may have against co-Defendant Deba Shyam, and any counterclaims by the Cantor Parties against Plaintiff Zions.

The Removed Claims qualify for removal under 28 U.S.C. § 1452 as being related to the Bankruptcy Case, because the Removed Claims all revolve around whether Plaintiff Zions may seek to enforce certain guarantees of monetary obligations against the Debtors and the Marcil Defendants as guarantors for loans made to Cantor Group II, LLC and Cantor Group IV, LLC (the "Borrowers").  Debtors and the Marcil Defendants were only a passive minority investor and guarantors for the Borrowers.  Neither the Stupin Defendants nor the Marcil Defendants ever had any managerial role with the Borrowers.  This is unlike defendant Deba Shyam, who was directly involved in the management of the Borrowers.

Both the Stupin Defendants' and the Marcil Defendants' are identically situated regarding the following arguments, *inter alia*, against the enforcement of the guarantees.

**First**, the Debtors and Marcil Defendants share the argument that Plaintiff Zions did not loan money to Borrowers against "eligible receivables" according to the loan documents, and therefore the guarantees were never properly activated.

3

**Second**, the Debtors and the Marcil Defendants share the arguments that they should not be held liable as guarantors pursuant the holding in *Sumitomo Bank of California v. Iwasaki* (1968) 70 Cal.2d 81 ("*Sumitomo Bank*"), which held that the failure to disclose a material change to loan can relieve a surety of liability. The argument, in sum, is as follows: there are ample authorities under the law which demonstrate that the Plaintiff's conduct at issue here (failing to adhere to loan requirements prior to disbursing funds) constitute gross negligence in advancing funds without complete information about the supposed collateral pledged. Plaintiff's gross negligence changed the nature of the loans that were guaranteed by the Debtors and the Marcil Defendants. By operation of law, the guarantees signed by the Debtors were therefore discharged by Plaintiff Zions' material increase of the risk to the Debtor/guarantors by providing unsecured, rather than secured loans. Plaintiff Zions did so, and without notifying the Debtors or Marcil Defendants of the same. This implicates the holding in *Sumitomo Bank.* Under the facts here, Plaintiff Zions failed to advise Debtors and the Marcil Defendants that Zions it had substantially changed the risk profile of the guaranteed loans by knowingly accepting no security of those loans. Thus, the holding in *Sumitomo Bank* would apply, and therefore, Zions cannot enforce the guarantees against the Debtors.

Zions will almost certainly submit a claim to the Debtors' bankruptcy estate in the amount of approximately $60,000,000. These issues would likely be resolved either by claim objection, adversary proceeding, or by other contested matter before the Court.

Furthermore, Zions has presently indicated that it intends to continue to prosecute State Court Action against the Marcil Defendants even while the State Court Action against Debtors remain stayed due to the instant bankruptcy. Because the defenses shared by both the Debtors and Marcil Defendants remain nearly if not absolutely identical, there is a very real risk of prejudice against the Debtors by allowing the State Court Action to continue against the Marcil Defendants in their absence.

In addition, because the matter was referred to a private referee, for which the Debtors must pay a portion of fees and costs, there is a risk that further erosion of estate assets will occur

4

as the State Court Action continues (should the matter be remanded or Zions obtain relief from stay).

Finally, Zions previously obtained a writ of attachment as to the interests of the Debtors in certain property, and the district court has exclusive jurisdiction of all of the property of the Debtors as of the commencement of the Bankruptcy Case and of property of the estate. 28 U.S.C. § 1334(e). Thus, removal is also proper under that standard.

For all of the foregoing reasons, the Debtors submit the instant Notice of Removal of the Removed Claims from the State Court Action.

The Debtors consent to the bankruptcy court's entry of final judgment or order.

DATED: May 7, 2026

LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P

By: _____
DAVID B. GOLUBCHIK
CARMELA T. PAGAY
JOSEPH M. ROTHBERG
Proposed Attorneys for Debtors and Debtors in Possession Andrew and Julie Stupin

5

Electronically FILED by
Superior Court of California,
County of Los Angeles
10/15/2025 12:24 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By A. Villchis-David, Deputy Clerk

LOUIS R. MILLER (State Bar No. 54141)
smiller@millerbarondess.com
A. SASHA FRID (State Bar No. 216800)
sfrid@millerbarondess.com
JEFFERY B. WHITE (State Bar No. 291086)
jwhite@millerbarondess.com
MILLER BARONDESS, LLP
2121 Avenue of the Stars, Suite 2600
Los Angeles, California 90067
Telephone:    (310) 552-4400
Facsimile:    (310) 552-8400

Attorneys for Plaintiff
ZIONS BANCORPORATION, N.A., dba
CALIFORNIA BANK & TRUST

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

## [JUDICIAL REFERENCE REQUESTED]

| | |
|---|---|
| ZIONS BANCORPORATION, NATIONAL ASSOCIATION, dba CALIFORNIA BANK & TRUST,<br><br>    Plaintiff,<br><br>    v.<br><br>ANDREW STUPIN, an individual; ANDREW STUPIN AND JULIE K. STUPIN, as trustees of The Stupin Family Trust dated April 3, 2009; GERALD J. MARCIL, an individual; GERALD J. MARCIL AND CAROL L. MARCIL, as trustees of The Marcil Family Trust dated May 9, 1997; DEBA SHYAM, an individual; and DOES 1-10, inclusive,<br><br>    Defendants. | CASE NO.  25STCV30165<br><br>**COMPLAINT FOR:**<br><br>**(1) BREACH OF GUARANTY (CANTOR II GUARANTORS);**<br><br>**(2) BREACH OF GUARANTY (CANTOR IV GUARANTORS); AND**<br><br>**(3) CONSTRUCTIVE TRUST** |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
· 2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

758454.2

COMPLAINT

Plaintiff Zions Bancorporation, National Association, dba California Bank & Trust ("CB&T"), alleges in this Complaint as follows:

**NATURE OF THE ACTION**

1.    This action seeks to recover more than $60 million in unpaid loans owed to CB&T under two revolving credit facilities, and to hold Defendants—each of whom is a guarantor on the loans—personally liable for those losses.  The case arises from a sweeping betrayal of trust by sophisticated financial professional borrowers who abused CB&T's confidence, manipulated loan structures for their own enrichment, and systematically eliminated the collateral protections that were supposed to secure the bank's loans.

2.    CB&T extended over $60 million in financing to two related investment funds—Cantor Group II, LLC ("Cantor II") and Cantor Group IV, LLC ("Cantor IV")—under written agreements granting CB&T a first-priority, security interest in the underlying mortgage loans. Instead, Defendants—who controlled, managed and guaranteed those loans—caused CB&T's liens to be subordinated, reassigned or extinguished, concealing their misconduct while continuing to draw on the credit lines.  As a result, the collateral that was meant to protect CB&T's loans has been diverted and effectively eliminated, leaving CB&T exposed to tens of millions of dollars in unpaid debt.  CB&T brings this lawsuit to enforce its contractual rights, recover all amounts due and hold the guarantors—each of whom executed continuing, absolute and unconditional guaranties—fully accountable for their obligations and the substantial harm they caused.

3.    CB&T provided separate but nearly identical revolving credit facilities to Cantor II and Cantor IV, in 2016 and 2017, respectively, to finance their purchase of distressed commercial mortgage loans of unaffiliated entities.  Over time, the borrowers drew increasingly large sums on their respective lines of credit, collectively exceeding $60 million—amounts that remain unpaid.

4.    Under a revolving credit facility, a bank such as CB&T provides a revolving line of credit to a mortgage company—here, Cantor II and Cantor IV—which then draws on that credit line to purchase mortgages.  In return, the bank acquires a first-priority lien in the notes and underlying collateral.

5.    The loan documents here contained standard terms for revolving lines of credit.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

758454.2

2

COMPLAINT

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

They expressly required that CB&T "shall have and maintain a first-priority, perfected security interest" in all collateral, including each mortgage loan purchased by Cantor II or Cantor IV and all related proceeds.  This protection is fundamental to revolving lines secured by collateralized notes: if a borrower defaults, the lender can rely on the underlying collateral to recover the sums owed.

6.      The loan documents also required, as is standard, that CB&T receive complete and accurate documentation, regular reporting and ongoing financial statements from the borrowers.  In the event of a default, the agreements expressly authorize CB&T to proceed directly against the guarantors—high-net-worth individuals and entities who owned, managed, or were closely affiliated with Cantor II and Cantor IV, and who knowingly executed guaranties making themselves jointly and severally liable for all obligations of the borrowers.

7.      CB&T fully performed its obligations; Cantor II and Cantor IV did not.  It was their contractual duty to ensure that CB&T acquired and maintained first-priority, perfected security interests in the underlying mortgaged properties.  Instead, they placed CB&T at the back of the line—or eliminated its security interests altogether.  The deeds of trust that were supposed to secure tens of millions of dollars in advances were, without CB&T's knowledge, subordinated, reassigned and eliminated.  The consequences are severe.  In many cases, the notes and underlying properties were transferred to other entities, have already been foreclosed upon—or are in active foreclosure—meaning the collateral that was supposed to protect CB&T's loans has been irretrievably lost.  None of this was ever disclosed to CB&T, and none of it was permitted under the governing loan documents.

8.      The full extent of this misconduct came to light only after a related entity—Cantor Group V, LLC ("Cantor V"), managed by the same leadership team and including several of the guarantors—was sued for fraud by another bank in connection with a its $98 million lending facility.  In response, CB&T immediately initiated its own investigation, which revealed that the notes and property liens that were supposed to secure CB&T's revolving loans had been subordinated, reassigned, or never recorded at all.

9.      Many of the new senior lienholders who displaced CB&T's security interests were,

758454.2

3

COMPLAINT

in fact, entities owned or controlled by the same individuals behind Cantor II, Cantor IV and the guarantors—including Cantor V.  In effect, CB&T's losses became Defendants' gains.  Acting through a web of affiliated companies, the borrowers and guarantors orchestrated a scheme that enriched themselves while stripping CB&T of its collateral, all while keeping the bank in the dark for years about the true status of its security interests and the absence of any collateral protection for the more than $60 million plus in credit it had extended.

10.    The defaults are numerous, material and continuing.  To date, the Cantor entities have failed to: (a) maintain CB&T's required first-priority, perfected security interests in the underlying collateral; (b) disclose material adverse facts concerning the status and disposition of that collateral; (c) deliver complete and accurate loan documentation as required under the governing agreements; and (d) comply with ongoing collateral and financial information reporting obligations.  Each of these failures constitutes a separate and independent event of default under the loan documents.

11.    Cantor II, Cantor IV and the guarantors refused to cure their defaults or honor their obligations.  Before initiating this action, CB&T conducted a detailed property-by-property review of the defaults and, on September 24, 2025, issued a formal written demand for documentation to the borrowers and guarantors to which the borrowers and guarantors failed to respond, and on October 3, 2025, issued formal written correspondence to the Cantor entities and the guarantor Defendants.  That latter notice, citing the governing loan documents, declared all sums previously advanced immediately due and payable and advised that each guarantor—whose liability is expressly "unlimited" under the guaranties—is jointly and severally liable for the full indebtedness.  The guarantor Defendants, who were not passive investors but active participants, insiders and decision-makers of the Cantor entities, knew of the subordination and loss of CB&T's collateral, concealed those facts and still refused to act.  Despite having full knowledge of the defaults and their personal obligations, they ignored CB&T's notice, failed to respond and took no corrective measures, further compounding the harm to CB&T.

12.    Through this action, CB&T now exercises its contractual and legal rights to hold the guarantors ("Defendants") personally liable for the full amounts due.  The guaranties are

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

758454.2

4

COMPLAINT

continuing, absolute and unconditional, and expressly authorize CB&T to proceed directly against the guarantors without first pursuing the borrowers or the collateral. CB&T is not required to show that the guarantors personally participated in or benefited from the misconduct giving rise to the borrowers' defaults—but the evidence demonstrates that they indeed did. Having knowingly overseen and profited from the actions that destroyed CB&T's collateral, the guarantors cannot now evade their own unconditional obligations. CB&T therefore seeks judgment against each of them, jointly and severally, for all outstanding indebtedness, together with interest, fees, and all other amounts recoverable under the guaranties and governing loan documents.

13. Specifically, Defendants Andrew Stupin ("Stupin"), Gerald J. Marcil ("Marcil") and Deba Shyam ("Shyam") are members and/or managers of Cantor II or Cantor IV and are otherwise closely affiliated with the Cantor entities. Their blatant self-dealing, together with their multiple, ongoing and uncured breaches of the loan documents—and their refusal to cooperate with CB&T, respond to its notices or take any corrective action—reflect a persistent and willful disregard for their contractual obligations. These circumstances make it highly likely that assets will be dissipated, concealed or transferred absent immediate judicial intervention.

14. This is a matter of immediate and pressing urgency. Defendants' established history of financial misconduct demonstrates a clear pattern of deception and asset manipulation. As mentioned, Stupin and Marcil are currently defendants in a fraud action brought by Western Alliance Bank, arising from another lending facility in which that bank seeks to recover approximately $100 million. (*Western Alliance Bank v. Cantor Group V, Inc.*, Los Angeles Superior Court, Case No. 25STCV24263.) In addition, Marcil and Stupin were recently found liable and assessed punitive damages of $15 million each in a separate lawsuit brought by another financial institution. (*Security National Guaranty, Inc. v. Makhijani*, Orange County Superior Court, Case No. 30-2023-01347034.) These judicial findings and pending fraud proceedings confirm that the threat of asset dissipation, concealment and transfer is real and imminent.

15. In light of these facts and the ongoing risk of asset diversion, CB&T seeks immediate provisional relief to preserve and protect its rights pending final judgment. The loan documents expressly authorize such interim remedies, and the circumstances here make them both

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

758454.2

5

COMPLAINT

necessary and appropriate. Specifically, CB&T seeks a writ of attachment against the Defendants' assets and property to secure satisfaction of the amounts owed, and/or a temporary restraining order and preliminary injunction prohibiting Defendants from transferring, concealing, encumbering or otherwise disposing of any assets during the pendency of this action. These measures are essential to prevent further dissipation of assets, maintain the status quo and ensure that sufficient property remains available to satisfy CB&T's claims when judgment is entered.

16. CB&T's damages are immediate, substantial and continuing. The amounts due—including unpaid principal, accrued and accruing interest at the contractual and default rates, late charges, attorneys' fees, enforcement costs and other expenses—currently exceed $60 million and increase daily. CB&T seeks full recovery of these sums, together with all fees, costs, and additional relief authorized by the loan documents and applicable law.

**PARTIES**

17. Plaintiff Zions Bancorporation, National Association, dba California Bank & Trust, is a national banking association organized under the laws of the United States, with its principal place of business in Salt Lake City, Utah, and is authorized to do business in the State of California and transacts business in Los Angeles County.

18. Defendant Andrew Stupin is an individual who, on information and belief, is domiciled in California, and who executed the Amended and Restated Continuing Guaranty and the Second Amended and Restated Continuing Guaranty, true and correct copies of which are attached hereto as **Exhibit 1** and **Exhibit 2**, respectively.

19. Defendants Andrew Stupin and Julie K. Stupin are the duly appointed trustees of the Stupin Family Trust dated April 3, 2009, are sued herein in their capacity as trustees, and executed the Continuing Guaranty, a true and correct copy of which is attached hereto as **Exhibit 3**. On information and belief, the trust is administered in California, and the trustees are individuals domiciled in California.

20. Defendant Gerald J. Marcil is an individual who, on information and belief, is domiciled in California, and who executed the Amended and Restated Continuing Guaranty and the Second Amended and Restated Continuing Guaranty, true and correct copies of which are

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

758454.2

6

attached hereto as **Exhibit 4** and **Exhibit 5**, respectively.

21.    Defendants Gerald J. Marcil and Carol L. Marcil are the duly appointed trustees of the Marcil Family Trust dated May 9, 1997, are sued herein in their capacity as trustees, and executed the Amended and Restated Continuing Guaranty and the Second Amended and Restated Continuing Guaranty, true and correct copies of which are attached hereto as **Exhibit 6** and **Exhibit 7**, respectively.  On information and belief, the trust is administered in California, and the trustees are individuals domiciled in California.

22.    Defendant Deba Shyam is an individual who, on information and belief, is domiciled in California, and who executed the Second Amended and Restated Continuing Guaranty, a true and correct copy of which is attached hereto as **Exhibit 8**.

23.    CB&T is unaware of the true names, capacities, relationships and extent of participation in the conduct herein alleged of Defendants sued herein as DOES 1 through 10, inclusive, but on information and belief alleges that said Defendants are legally responsible to it. CB&T will amend this Complaint to allege the true names and capacities of the DOE Defendants when ascertained.

## JURISDICTION AND VENUE

24.    The Court has jurisdiction in this matter pursuant to California Code of Civil Procedure section 410.10 and California Constitution, Article VI, section 10.  Section 410.10 of the Code of Civil Procedure provides that California state courts "may exercise jurisdiction on any basis not inconsistent with the Constitution of [California] or of the United States."  The exercise of jurisdiction by California is constitutionally permitted here because (1) Defendants are domiciled in California; and (2) Defendants have consented to litigate in this forum.

25.    Each Defendant expressly consented to the jurisdiction of the courts of California in their respective guaranty agreements.  Section 29 of each guaranty provides that: "Guarantor hereby irrevocably submits and consents to the jurisdiction of any federal or state court of competent jurisdiction within California in connection with any action or proceeding arising out of or relating to this Guaranty."

26.    Defendants further agreed, pursuant to Section 27 of their respective guaranty

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

agreements, that any disputes arising out of or relating to the guaranties shall be resolved through consensual general judicial reference.  Specifically, Section 27 provides that "any claims, controversies, disputes, or questions of interpretation, whether legal or equitable, shall be heard by a single referee by consensual general judicial reference … who shall determine all issues of fact or law and report a statement of decision."  The same section further provides that "[t]he referee shall also have the power to hear and determine proceedings for ancillary relief, including, but not limited to, applications for attachment, issuance of injunctive relief, appointment of a receiver, and/or claim and delivery."

27.     Venue is proper in Los Angeles County because one or more parcels of real property securing the loans are situated in this County, a substantial portion of the obligations and performance under the loan agreements occurred or were to occur in Los Angeles County, and, on information and belief, Defendants reside in this County.  Cal. Civ. Proc. Code § 395(a).

## FACTUAL BACKGROUND

### A.     CB&T Lends $60 Million in Revolving Credit Pursuant to the Loan Agreements

28.     In 2016 and 2017, CB&T entered into separate transactions with Cantor II and Cantor IV, respectively, under which CB&T agreed to fund revolving line of credit facilities for each entity.  The facilities were to be used for the purchase of distressed residential and commercial mortgage loans in the ordinary course of their operations.

29.     The transactions were memorialized through a series of written loan documents containing standard lending terms, including: (1) Business Loan and Security Agreements; (2) Promissory Notes; and (3) Guaranties executed by Defendants, each of whom personally guaranteed the full and unconditional repayment of all obligations arising under the respective facilities.

### 1.     The Security Agreements and Notes

30.     The Business Loan and Security Agreements ("Security Agreements") set forth the general terms and conditions governing the collateral securing each lending facility, as well as the procedures by which advances on the credit line could be requested and administered. The Promissory Notes ("Notes") require the Cantor entities to repay all amounts advanced by CB&T

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

758454.2

8

under the revolving lines of credit, together with all applicable interest, fees, and other charges as provided in the loan documents.

31. The loan documents for both facilities were amended and restated in 2023 and 2024. The operative Cantor II loan documents were executed on May 10, 2023, when CB&T and Cantor II entered into the Amended and Restated Business Loan and Security Agreement (the "Cantor II Security Agreement"), attached hereto as **Exhibit 9**, and the Amended and Restated Promissory Note (the "Cantor II Note"), attached hereto as **Exhibit 10**. The operative Cantor IV loan documents were executed on March 25, 2024, when CB&T and Cantor IV entered into the Amended and Restated Business Loan and Security Agreement (the "Cantor IV Security Agreement"), attached hereto as **Exhibit 11**, and the Amended and Restated Promissory Note (the "Cantor IV Note"), attached hereto as **Exhibit 12**.

32. As amended, the loan documents provide that CB&T (the "Lender") agreed to extend to each Cantor entity (each a "Borrower") a revolving line of credit with a maximum principal amount of $30 million. In exchange, the Borrowers pledged as collateral all of their right, title and interest in and to the mortgage loans purchased with CB&T's advances, together with all related proceeds, assets and rights. The Borrowers further agreed to take all actions necessary to ensure and maintain CB&T's first-priority, perfected security interest in all such collateral, as expressly required under the governing loan documents:

> Lender's security interest in all Collateral then in existence shall have been perfected by the filing of the Financing Statement, the delivery of the original Collateral Loan Documents to Lender before the Document Delivery Deadline, and the recording of any recordable Collateral Loan Documents, and ***shall be and remain a first priority perfected security interest*** in and to all such Collateral, subject only to such action as may be required under applicable law to perfect Lender's security interest in collateral subsequently acquired by Borrower pursuant to each Collateral Loan. (Security Agreements § 4.4.6.)

33. In practical terms, the structure of the transactions required that Cantor II and Cantor IV acquire security interests in the underlying properties through deeds of trust and then pledge those assets—including the deeds of trust themselves—to CB&T as collateral. By doing so, and by properly recording the necessary instruments, CB&T would obtain and maintain a perfected, first-priority security interest in the notes secured by mortgages and all related collateral

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

758454.2

COMPLAINT

securing the revolving credit facilities.  Each borrower was required to provide CB&T with quarterly borrowing base certificates that accurately reported the status of each note and its underlying mortgage status.  Each borrower misrepresented the actual status of the notes and underlying mortgage collateral.

34.    CB&T perfected its security interests against each of the borrowers by filing financing statements in Delaware as to each.

35.    This collateral arrangement was material to the parties' relationship and is confirmed repeatedly throughout the Security Agreements.  By way of example, the Security Agreements provide as follows:

- **Section 5.1:** "To secure the payment and performance of all of the Obligations as and when due, Borrower hereby grants to Lender a first priority security interest in all Collateral.

- **Section 5.4.2:** "Borrower shall, as of the closing of each Collateral Loan, take all steps necessary and appropriate in order to perfect Borrower's security interest in and lien upon all Underlying Real Estate Collateral and to perfect Lender's security interest in and lien upon all Loan Collateral.

- **Section 5.4.10:** "Borrower shall perfect, and maintain the perfected status and priority, of all security for the Collateral Loans, including, but not limited to, all security interests in personal property and real property security."

2.    **The Guaranties**

36.    Each Defendant executed one or more guaranty agreements in which they absolutely and unconditionally guaranteed the full and prompt payment and performance of all obligations owed by the Cantor entities to CB&T under the Security Agreements, the Notes and all related loan documents.  The Guaranties further provide that Defendants' obligations are "not contingent upon and are independent of the obligations of Borrower."  (Guaranties § 16.)

37.    The Guaranties are deliberately broad in scope and impose unlimited liability on each Defendant.  Each Defendant's obligations under their respective Guaranties are expressly stated to be "unlimited" (*id*. § 3), and Defendants specifically guaranteed and agreed to pay to CB&T, on demand, any and all loans, advances, debts, obligations and liabilities of every kind and nature owed by Borrower to Lender.  (*Id*. §§ 1, 3, 21.)  Defendants further agreed to be responsible

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
: 2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

758454.2

10

for all costs and expenses incurred by CB&T in connection with enforcement of the loan agreements and the Guaranties themselves, including, without limitation, all attorneys' fees and related costs.  (*Id*. § 4; *see also id*. § 21; Notes pp. 4–5.)

38.    Each Defendant, under their respective Guaranties, expressly waived all rights and defenses that might otherwise be available to them.  Among other things, Defendants waived any rights of subrogation, reimbursement, indemnification and contribution, as well as any defenses based on the enforceability, validity or modification of the underlying loan obligations; the release, substitution or impairment of collateral or other guarantors; or CB&T's failure to first proceed against the Cantor entities or any collateral before seeking payment from Defendants. (Guaranties § 6.)

39.    In the event of a default, the Guaranties expressly authorize CB&T to pursue recovery directly from Defendants.  Under the terms of the Guaranties, CB&T may collect from Defendants without first commencing any action against Cantor II or Cantor IV, or foreclosing on any real or personal property collateral pledged or assigned by those entities.  (*Id*. § 7.)  The Guaranties are continuing, absolute and unconditional, and are specifically intended to ensure that CB&T receives full payment and performance of all obligations owed by the Cantor entities— regardless of any defenses, claims or other circumstances asserted by those borrowers.   (*Id.* § 4.)

**B.    Defaults Under the Security Agreements**

40.    An "Event of Default" occurs if (i) Cantor II or IV fail to perform or observe any term, covenant, or agreement contained in the Security Agreement or in any of the other loan documents (Security Agreements § 7.1); (ii) any warranty or representation made, or agreed to be made, in the Security Agreement or in any of the other loan documents is breached in any material respect or proves to be false or misleading in any material respect (*id.* § 7.2); and/or (iii) Cantor II or IV make material misrepresentations or fail to disclose any material fact to induce CB&T to make the loan or enter into the Security Agreement (*id.* § 7.8).

41.    CB&T has determined that, for each of the underlying collateral real properties for the notes pledged—or intended to be pledged—as collateral, CB&T's security interest was ***not*** a first-priority lien, as expressly required by the Security Agreements.  To the contrary, the deeds of

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
: 2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

trust in favor of Cantor II or Cantor IV (and, by extension, CB&T through its security interest in all collateral) were reassigned, diverted to other Cantor-affiliated entities, and/or never properly recorded.  In numerous cases, the notes have been transferred to other entities, the underlying properties have already been foreclosed upon or are currently the subject of foreclosure proceedings, as further described below and summarized in **Appendix A** attached hereto.  Indeed, CB&T has discovered that it did not hold the required "first-priority, perfected security interest" in any of the underlying properties.

### 1.  Cantor II Underlying Real Estate Collateral

42.    There are eight mortgage loans represented by Cantor II to be collateral security for the CB&T lending facility that remain outstanding.  Under the governing loan documents, CB&T was required to hold a "first-priority, perfected security interest" in all collateral, including each such mortgage loan and all related proceeds.  However, CB&T has determined that it holds no such perfected, first-priority interest in any of the underlying properties, in direct violation of the express terms of the loan documents.

### (a)  9826 Cedar St, Bellflower, CA 90706 (Collateral Loan No. 300)

43.    CB&T does not hold a first-priority, perfected interest in the property.  Instead, a deed of trust in favor of Umpqua Bank, and signed by Defendant Andrew Stupin, as Manager, was recorded on November 14, 2018, in the original principal amount of $6,470,000.  Another deed of trust, in favor of Nano Banc, signed by Defendant Andrew Stupin, as Manager, was recorded on September 16, 2024, in the original principal amount of $8,000,000.  There was a deed of trust in favor of Cantor II and recorded on January 14, 2025, but it was assigned to Cantor V, recorded on January 30, 2025, and then Cantor V subsequently assigned that instrument to Western Alliance Bank on March 6, 2025.

### (b)  153 Cedar Way, Laguna Beach, CA 92651 (Collateral Loan No. 301)

44.    CB&T does not hold a first-priority, perfected interest in the property.  No deed of trust was ever recorded in favor of Cantor II.  Instead, a deed of trust is in favor of First Choice Bank in the original principal amount of $5,583,600 was recorded on June 9, 2021.  An additional deed of trust in favor of Specialty DIP LLC in the original principal amount of $1,165,000 was

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

758454.2

12

COMPLAINT

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

recorded on July 30, 2025.  The property appears to be in foreclosure proceedings.  A notice of trustee's sale, issued by First Choice Bank was scheduled for October 1, 2025.

**(c)      2711 and 2713 E Coast Hwy, Corona Del Mar, CA 92625 (Collateral Loan No. 302)**

45.      CB&T does not have a first-priority, perfected interest in the property.  No deed of trust has been recorded in favor of Cantor II.  Instead, a current deed of trust signed by Defendant Deba Shyam is of record in favor of PMF CA REIT, L.L.C., in the original principal amount of $6,540,000, which was recorded on September 14, 2023.  An additional deed of trust is currently of record in favor of Specialty DIP LLC in the original principal amount of $1,165,000, which was recorded on July 30, 2025.  The property appears to be in foreclosure proceedings.  A notice of default and election to sell was recorded by PMF CA REIT, L.L.C, on August 18, 2025.

**(d)      150 Cliff Drive, Laguna Beach, CA 92651 (Collateral Loan No. 303)**

46.      CB&T does not hold a first-priority, perfected security interest in the property.  No deed of trust was ever recorded in favor of Cantor II.  Instead, a deed of trust in favor of First Choice Bank in the original principal amount of $5,583,600 was recorded on June 7, 2021, and a subsequent deed of trust in favor of Specialty DIP LLC in the original principal amount of $1,165,000 was recorded on July 30, 2025.  The property is presently in foreclosure proceedings; First Choice Bank issued a Notice of Trustee's Sale scheduling the sale for October 1, 2025.

**(e)      314 Harvard Blvd and 4110 West 3rd Street, Los Angeles CA 90020 (Collateral Loan No. 304)**

47.      CB&T does not have a first-priority, perfected interest in the property.  The property was foreclosed pursuant to a trustee's deed recorded August 22, 2025.  Upon information and belief, the current owner is a bona fide purchaser for value, thereby extinguishing any residual interest or claim CB&T might have otherwise asserted against the property.

**(f)      688-690 S Coast Hwy, Laguna Beach, CA 92651 (Collateral Loan No. 305)**

48.      CB&T does not have a first-priority, perfected interest in the property.  A deed of trust was recorded on May 13, 2022, in favor of Cantor V in the original principal amount of

$10,000,000. An assignment of the deed of trust in favor of Cantor II was recorded on May 17, 2022. A full release and reconveyance of the deed of trust in favor of Cantor II was recorded on December 14, 2022. Subsequently, a deed of trust signed by Defendant Deba Shyam in favor of Wilshire Quinn Income Fund, LLC, in the original principal amount of $12,500,000, was recorded against the property on November 21, 2023. A notice of default under this deed of trust was recorded on August 29, 2025.

**(g)      535 S Coast Hwy, Laguna Beach, CA 92651 (Collateral Loan No. 306)**

49.      CB&T does not have a first-priority, perfected interest in the property. The property was sold and is now owned by E.W. Merritt Farms, a partnership. A leasehold deed of trust in favor of Nano Banc was recorded on February 28, 2019, in the original principal amount of $7,000,000. An assignment of the deed of trust to Cantor V was recorded on August 23, 2021. The deed of trust was subsequently assigned back to Nano Banc on May 6, 2022.

**(h)      397 N Coast Hwy, Laguna Beach, CA (Collateral Loan No. 307)**

50.      CB&T does not have a first-priority, perfected interest in the property. No deed of trust was ever recorded in favor of Cantor II. A current deed of trust was recorded in favor of First Choice Bank (now Enterprise Bank) on June 9, 2021. An additional deed of trust, in favor of Coastline Loans, which is owned by Defendant Andrew Stupin, was recorded on June 23, 2021. The deed of trust in favor of Coastline Loans was partially released and reconveyed, but not as to this particular property. A deed of trust was recorded on January 10, 2023, in favor of Cantor IV, and was subsequently assigned to Cantor V on January 10, 2023. The deed of trust in favor of Cantor V was recorded on July 30, 2025. First Choice Bank issued a notice of trustee's sale, which was scheduled for October 1, 2025.

**2.      Cantor IV Underlying Real Estate Collateral**

51.      There are eight mortgage loans represented by Cantor IV to be collateral security for the CB&T lending facility that remain outstanding. However, CB&T has determined that it holds no such perfected, first-priority interest in any of the underlying properties, in direct violation of the express terms of the loan documents.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

758454.2

14

COMPLAINT

(a)    **600 N. Arrowhead Ave, San Bernadino, CA 92401 (Collateral Loan No. 200)**

52.    CB&T does not have a first-priority, perfected interest in the property.  The deed of trust in favor of Cantor IV and recorded on August 17, 2022 in the original principal amount of $7,500,000, was assigned to Cantor V on September 30, 2022.  A full release and reconveyance was recorded on September 30, 2024.  A deed of trust is currently of record in favor of Golden 1 Credit Union, securing an original principal amount of $3,657,000.  The deed of trust in favor of Golden 1 Credit Union was signed by Defendant Shyam.

(b)    **424-424.5 Marguerite, Corona Del Mar, CA 92625 (Collateral Loan No. 201)**

53.    CB&T does not have a first-priority, perfected interest in the property.  Two deeds of trust in favor of Cantor IV were recorded on December 20, 2021, and September 29, 2022, respectively.  Each was subsequently assigned to Cantor V on December 20, 2021, and September 30, 2022, respectively.  A prior deed of trust remains of record in favor of Banc of California, securing an original principal amount of $1,260,000.

(c)    **600 Acacia Ave, Corona Del Mar, CA 92625 (Collateral Loan No. 202)**

54.    CB&T does not hold a first-priority, perfected security interest in the property.  A deed of trust in favor of Cantor IV, securing an original principal amount of $2,436,000, was recorded on February 23, 2022.  However, a prior deed of trust recorded on October 3, 2016, remains of record in favor of Banc of California, also securing an original principal amount of $2,436,000.  As a result, the deed of trust in favor of Cantor IV is subordinate to the earlier Banc of California lien.

(d)    **2115 Winnie St., Galveston, TX 77550 (Collateral Loan No. 203)**

55.    CB&T does not have a first-priority, perfected interest in the property.  In fact, no deed of trust has been recorded in favor of Cantor IV.  Instead, a deed of trust is currently of record in favor of Standard Insurance Company, securing an original principal amount of $7,400,000.  This deed of trust was recorded on January 30, 2023, and signed by Defendant Shyam.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

758454.2

15

**(e)       3220 S Main St, Los Angeles, CA 90007 (Collateral Loan No. 204)**

56.     CB&T does not hold a first-priority, perfected security interest in the property.  A deed of trust dated January 24, 2022, in favor of Cantor IV, securing an original principal amount of $450,000, was assigned to Cantor V on February 8, 2022.  That deed of trust was modified to increase the principal amount to $5,000,000 pursuant to a modification agreement recorded on February 23, 2022.  The property was subsequently sold to MF Downtown Properties LLC on October 14, 2022.

**(f)       1201-1205 W Washington Blvd, Los Angeles, CA 90007 (Collateral Loan No. 205)**

57.     CB&T does not have a first-priority, perfected interest in the property.  No deed of trust was ever recorded in favor of Cantor IV.  Instead, a deed of trust was recorded on March 29, 2023, in favor of Nuvision Credit Union in the original principal amount of $1,000,000.  The property was sold to MF Downtown Properties LLC on October 14, 2022.

**(g)       21301-21315 Saticoy St., Canoga Park, CA 91304 (Collateral Loan No. 206)**

58.     CB&T does not have a first-priority, perfected interest in the property.  A deed of trust (recorded August 31, 2022) is currently of record in favor of Cantor V.  An assignment of this deed of trust to Cantor IV was never recorded.  Subsequently, a deed of trust in favor of Secured Income Fund-II, LLC, signed by Defendant Deba Shyam, and securing an original principal amount of $7,000,000, was recorded on February 15, 2024.

**(h)       73101 Highway 111, Palm Desert, CA 92260 (Collateral Loan No. 207)**

59.     CB&T does not have a first-priority, perfected interest in the property.  The property was transferred to a new owner, Rec5 Holdings LLC, on June 4, 2025.  A quit claim deed purportedly transferring the property was signed by Defendant Shyam.  No deed of trust has been recorded in favor of Cantor IV.  A deed of trust is of record in favor of Evergreen Advantage, LLC (recorded March 13, 2025), securing an original principal amount of $4,000,000.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**3.** **Borrower's Failure to Protect Lender's Security Interests Leads to Multiple Events of Default**

60.     Cantor II and Cantor IV were expressly required to establish and maintain CB&T's first-priority security interest in all collateral, but failed to do so.  Their failure to comply with this fundamental obligation constitutes an Event of Default under Section 7.1 of the Security Agreements.

61.     In failing to maintain CB&T's perfected, first-priority security interest, Cantor II and Cantor IV also breached multiple representations and warranties set forth in the Security Agreements, thereby giving rise to additional Events of Default under those agreements:

- All documents and information prepared and delivered by Cantor II/IV in obtaining the loan are correct and complete in all material respects.  (Security Agreements § 3.13.)

- "There is not any mortgage, deed of trust, pledge, lien, hypothecation, charge (fixed or floating), security interest or other encumbrance whatsoever on any of the Collateral Loans or any interest therein, except as permitted pursuant to this Agreement."  (*Id.* § 3.16.)

- "Subject to Permitted Exceptions…, the Mortgage creates a first lien or first priority ownership interest in an estate in fee simple estate in real property securing the related Collateral Loan Note."  (*Id.* § 5.4.6(a).)

- "The related Mortgage is a valid, subsisting, enforceable and perfected first lien on the Underlying Real Estate Collateral."  (*Id.* § 5.4.6(j).)

- "Each original Mortgage was recorded, and all subsequent assignments of the original Mortgage have been recorded in the appropriate jurisdictions in which such recordation is necessary to perfect the liens against each related Collateral Loan Obligor or are in the process of being recorded."  (*Id.* § 5.4.6(o).)

62.     Cantor II and Cantor IV's failure to disclose the true priority status of the deeds of trust on the underlying collateral constitutes both a breach of their representations and warranties and a failure to disclose material facts to CB&T.  This concealment and nondisclosure give rise to additional, independent Events of Default under the Security Agreements.

63.     Cantor II and Cantor IV also failed to disclose to CB&T the foreclosure status of the underlying properties.  Multiple properties have either been foreclosed upon or are currently subject to pre-foreclosure or foreclosure proceedings, and the Cantor entities concealed these material facts from CB&T.  This conduct breached their representation and warranty that "[e]xcept

as otherwise disclosed to Lender in writing, no foreclosure action is currently threatened or has been commenced with respect to" the underlying properties.[1]

64.    Furthermore, Cantor II and Cantor IV's failure to grant CB&T a perfected, first-priority security interest in all mortgage loans further renders those loans "Ineligible Receivables," as defined in the Security Agreements.  (*Id.* Art. 1 ("Ineligible Receivable" is "[a]ny Collateral Loan that is not secured by a deed of trust with a first (1st) lien priority on the Underlying Real Estate Collateral; provided, however, that not more than twenty-five percent (25%) of the Credit Limit may be utilized by Borrower to purchase Collateral Loans that are Eligible Receivables secured by a deed of trust (or mortgage) with a second (2nd) lien priority on the Underlying Real Estate Collateral."); *see also id.* § 4.6.1(b) (CB&T shall have no obligation to consider any Collateral Loan for approval as an Eligible Receivable unless and until "[a]ll terms and conditions of the Collateral Loan and all Collateral Loan Documents pertaining thereto shall comply with all requirements for Collateral Loans as provided in this Agreement.").)  The Security Agreements thus require that no less than seventy-five percent (75%) of the Credit Limit be utilized by the Cantor entities to purchase Collateral Loans secured by mortgages with a first lien priority.  CB&T's investigation, however, revealed that none of the Collateral Loans were secured by a mortgage with a first lien priority.  Moreover, the Cantor entities failed to disclose any second-priority liens to CB&T, as required by Section 4.6.

65.    Because the loans constitute "Ineligible Receivables," Cantor II and Cantor IV are required to immediately repay all amounts advanced by CB&T to purchase those loans.  (Security Agreements §§ 4.1.1(a), 4.6.3.)  Separately and independently, Defendants—each a guarantor—absolutely and unconditionally agreed to pay, on demand, all such amounts together with all applicable interest, fees and enforcement costs.  CB&T has elected to proceed directly against the guarantors without first proceeding against the borrowers or the collateral.  (Guaranties §§ 1, 3, 4,

---

[1] Further, if any of the properties have been foreclosed or are subject to foreclosure proceedings due to Cantor II/IV's default, then they are in breach of their representations and warranties. (Security Agreement § 3.3 ("Borrower is not in default under … any obligation, agreement, instrument, loan, or indenture, whether to Lender or otherwise.").)

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
: 2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

7, 21.) CB&T provided the guarantors with written notice of default and an opportunity to cure; they ignored the notice. To date, the guarantor Defendants have failed to make the required payments. They are in breach and are jointly and severally liable for all outstanding amounts due to CB&T.

**C.      Borrowers Submitted Inaccurate and Improper Borrowing Base Certificates**

66.      Cantor II and Cantor IV were also required to provide accurate and complete documentation to CB&T, including periodic Borrowing Base Certificates. This standard loan document identifies a borrower's collateral and related assets, enabling the lender to confirm, among other things, that sufficient collateral exists to support the outstanding loan balance and that all collateral remains in compliance with eligibility requirements.

67.      Under the loan documents, Cantor II and Cantor IV were required to execute and deliver to CB&T "a fully complete and executed Borrowing Base Certificate," substantially in the form attached as Exhibit D to the Security Agreements. (Security Agreements, Art. 1; § 4.5.4.) They were further required, as soon as available but in no event later than forty-five (45) days after the end of each calendar quarter, to "deliver to Lender a quarterly Borrowing Base Certificate covering all Collateral Loans, which Borrowing Base Certificate shall be duly certified by the authorized representative of Borrower as to the completeness and accuracy of all information contained therein, without exception." (*Id.* § 6.5.4.) Each certificate also had to be accompanied by "any and all other supporting documentation requested by Lender in its sole and absolute discretion." (*Id.*)

68.      Cantor II and Cantor IV failed to comply with these obligations. The Borrowing Base Certificates they delivered were inaccurate, incomplete and materially misleading, omitting or misstating critical information about the collateral's true status, lien priority and eligibility. This misconduct constitutes further and independent Events of Default under the Security Agreements. Moreover, because each Defendant unconditionally guaranteed the full and prompt performance of the borrowers' obligations, the guarantors are jointly and severally liable for these defaults and for all resulting losses, interest and enforcement costs owed to CB&T.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

758454.2

19

COMPLAINT

**D.      Borrowers Breached Their Reporting Obligations**

69.      Furthermore, Cantor II and Cantor IV breached their reporting obligations under Section 6.5 of the Security Agreements by failing to timely deliver the required financial and operational information to CB&T.  Specifically, they did not provide, within the timeframes mandated by the loan documents, the following:

- No later than forty-five (45) days after the end of each calendar quarter, Cantor II/IV are required to deliver to CB&T complete and accurate financial statements reflecting their financial condition as of the date such statements are prepared.  (Security Agreements, § 6.5.5.)  The second quarter of 2025 ended on June 30, 2025; accordingly, these financial statements were due no later than August 15, 2025.  To date, CB&T has not received the required statements.

- Within fifteen (15) days of CB&T's request, Cantor II/IV are required to provide current financial statements through June 30, 2025.  (*Id.* § 6.5.7.)  On September 24, 2025, CB&T requested that each Defendant provide current financial statements through June 30, 2025, by no later than October 9, 2025.  To date, CB&T has not received the required statements.

- Within fifteen (15) days after filing, but in no event later than November 1 of each calendar year, Cantor II/IV are required to deliver to CB&T copies of all signed income tax returns (together with all required Schedules K-1) for themselves and each Defendant.  (*Id.* § 6.5.8.)  Cantor II/IV provided their 2023 tax returns; however, those returns were incomplete and failed to include the required K-1 forms.  They also failed to provide their 2024 tax returns.

- Within fifteen (15) days after the end of each calendar quarter, Cantor II/IV are required to deliver to CB&T an updated summary of the collateral it owns, detailing both the status of the mortgage loans and the performance of each such loan.  (*Id.* § 6.5.12.)  Cantor II/IV last provided partial information for the period ending March 31, 2025, but failed to provide the required status and performance information.  They have also failed to provide this report for the second quarter of 2025.

- Within forty-five (45) days after the end of each calendar quarter, Cantor II/IV are required to deliver to CB&T bank and brokerage statements evidencing the liquidity of each Defendant.  (*Id.* § 6.5.13.)  They failed to provide these statements to CB&T.

- Concurrently with the delivery of the financial statements, Cantor II/IV are required to provide certifications executed by them and their attesting principal financial or accounting officer, as required under Section 6.5.14 of the Security Agreements.  They failed to provide these certifications.

- Cantor II/IV are required to provide CB&T with a written report reflecting the status of each mortgage loan as of the end of each calendar month.  (*Id.* § 5.4.11.)  They failed to provide the required reports, giving rise to a further Event of Default.

**E.      CB&T Demands Compliance and Payment from Defendants**

70.      On or about September 24, 2025, CB&T sent each of the Cantor entities and the guarantor Defendants a Demand for Compliance (the "Demands"), attached hereto as **Exhibit 13** and **Exhibit 14**, requesting that they provide the required financial and operational information described above no later than October 9, 2025.  To date, neither the Cantor entities nor any of Defendants have responded to CB&T's Demands.  Their continued silence and refusal to produce the required documentation further violate the Security Agreements and deprive CB&T of the information necessary to assess the full extent of the borrowers' and guarantors' defaults.

71.      On or about October 3, 2025, CB&T sent each of the Cantor entities and the guarantor Defendants Notice of Events of Default (the "Notices"), attached hereto as **Exhibit 15** and **Exhibit 16**.  The Notices identified in detail the multiple Events of Default described above and provided the borrowers and guarantors with an opportunity to cure those defaults.  Although neither the Security Agreements nor the Guaranties require CB&T to provide such notice prior to enforcing its rights and remedies, CB&T did so as a courtesy and in an effort to avoid litigation.

72.      In the Notices, CB&T demanded that Defendants cure the Events of Default described therein and above by paying the entire amount due and owing to CB&T no later than the close of business on Friday, October 10, 2025.  Neither the Cantor entities nor Defendants responded to the Notices, nor did they make any payment or take any action to cure the defaults.  Accordingly, the Events of Default remain ongoing and uncured, and CB&T has not received the amounts due and payable from Defendants under the Security Agreements and Guaranties.

**F.      Immediate Provisional Relief Is Necessary to Preserve Collateral**

73.      CB&T urgently seeks provisional relief in this action to protect its rights and prevent further harm.  The loan documents expressly authorize such relief, and the record here leaves no doubt it is warranted.  Defendants Stupin, Marcil and Shyam—each a principal or manager of Cantor II, Cantor IV and/or Cantor V—occupy positions of control over the very entities whose misconduct caused the defaults.  Acting through these entities, Defendants have engaged in self-dealing transactions, diverted pledged collateral and ignored repeated demands for compliance.  Their continued refusal to cooperate or take corrective action has already eroded

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

758454.2

21

COMPLAINT

CB&T's collateral protections and poses an immediate risk that remaining assets will be moved, concealed, or dissipated before judgment can be entered.

74.    The need for judicial intervention is both real and immediate.  Defendants' conduct reflects a pattern of financial abuse and disregard for lawful obligations that extends well beyond this case.  As discussed above, Stupin and Marcil are defendants in a fraud action filed by Western Alliance Bank, which seeks to recover $100 million.  They were also recently found liable and assessed punitive damages in a separate matter brought by another lender.  These proceedings reveal a pattern of deception, asset diversion and misuse of lender funds—conduct that mirrors the wrongdoing alleged here.  In light of this history, the threat that Defendants will dissipate or transfer assets to frustrate collection is both credible and imminent, making provisional relief not only justified but essential to preserve CB&T's ability to recover the substantial amounts owed.

75.    As such, CB&T seeks immediate provisional relief to prevent further dissipation or concealment of assets and to preserve its ability to enforce its rights under the loan documents and guaranties.  Such relief is expressly authorized by the governing agreements and applicable law.  Specifically, CB&T seeks a writ of attachment against the Defendants' assets and property to secure satisfaction of the amounts owed, and/or a temporary restraining order and preliminary injunction restraining Defendants from transferring, encumbering, concealing or otherwise disposing of assets pending resolution of this action.  Absent immediate judicial intervention, there is a substantial and imminent risk that Defendants will divert, dissipate or otherwise deplete available assets, leaving CB&T without an adequate remedy at law.  Provisional judicial protection is therefore both necessary and urgent to safeguard CB&T's contractual and legal rights and to ensure that the Defendants are held fully accountable for their obligations.

## FIRST CAUSE OF ACTION

***(Breach of Guaranty (Cantor II Guaranties) – Against Defendants Andrew Stupin (Individually), Gerald J. Marcil (Individually), and Gerald J. Marcil and Carol L. Marcil as Trustees of The Marcil Family Trust, Dated May 9, 1997)***

76.    Plaintiff CB&T repeats and realleges each and every foregoing and subsequent allegation contained in this Complaint, and further alleges as follows:

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

758454.2

22

COMPLAINT

77.    On or about May 10, 2023, Defendants Andrew Stupin (individually), Gerald J. Marcil (individually), and Gerald J. Marcil and Carol L. Marcil, as Trustees of the Marcil Family Trust dated May 9, 1997 (collectively, the "Cantor II Guarantors"), each executed a Guaranty in favor of CB&T.  Pursuant to these Guaranties, the Cantor II Guarantors absolutely and unconditionally guaranteed the full and prompt payment and performance of all obligations of Cantor II to CB&T under the governing loan documents, including, without limitation, all principal, interest, fees, costs and other amounts due and owing.

78.    The Guaranties are continuing, absolute and unconditional, and expressly provide that CB&T may proceed directly against the Cantor II Guarantors for payment in the event of Cantor II's default—without first proceeding against Cantor II or any collateral.  The Guaranties further provide that the Cantor II Guarantors waive all defenses, offsets and rights that might otherwise be available to a guarantor under California law.

79.    Cantor II has defaulted under the loan documents by, among other things, failing to maintain the required first-priority and perfected security interests in the underlying collateral; failing to disclose material adverse facts regarding the status of the collateral; failing to provide complete and accurate Borrowing Base Certificates; and failing to comply with its reporting and payment obligations.  As a result of these Events of Default, all amounts due under the lending facility have been accelerated and are now immediately due and payable in full.

80.    CB&T has made formal demand upon the Cantor II Guarantors for payment of all amounts due and owing under their Guaranties.  Despite such demand, the Cantor II Guarantors have failed and refused to pay the amounts owed to CB&T.

81.    The Cantor II Guarantors' failure and refusal to pay the amounts due and owing under their Guaranties constitutes a material breach of those agreements.

82.    CB&T has fully performed all covenants, conditions, and promises required to be performed by it under the loan agreements and all related documents governing the transactions with Cantor II.

83.    As a direct and proximate result of the Cantor II Guarantors' breach of the Guaranties, CB&T has suffered damages in an amount exceeding $30 million, together with

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

758454.2

23

COMPLAINT

accrued and accruing interest, late charges, attorneys' fees, costs and other amounts as provided in the loan agreements and Guaranties.

84.	Pursuant to Section 21 of the Guaranties, CB&T is entitled to recover all attorneys' fees, costs and expenses incurred in connection with (i) the collection or attempted collection of amounts due from Cantor II, and (ii) the interpretation, enforcement or attempted enforcement of the Cantor II Guaranties and any collateral related thereto.

### SECOND CAUSE OF ACTION

***(Breach of Guaranty (Cantor IV Guaranties) – Against Defendants Deba Shyam (Individually), Andrew Stupin (Individually), Andrew Stupin and Julie K. Stupin, as Trustees of The Stupin Family Trust Dated April 3, 2009, Gerald J. Marcil (Individually), and Gerald J. Marcil, as Trustee of The Marcil Family Trust dated May 9, 1997)***

85.	Plaintiff CB&T repeats and realleges each and every foregoing and subsequent allegation contained in this Complaint, and further alleges as follows:

86.	On or about March 25, 2024, Defendants Deba Shyam (individually), Andrew Stupin (individually), Andrew Stupin and Julie K. Stupin, as Trustees of the Stupin Family Trust dated April 3, 2009, Gerald J. Marcil (individually), and Gerald J. Marcil, as Trustee of the Marcil Family Trust dated May 9, 1997 (collectively, the "Cantor IV Guarantors"), each executed a Guaranty in favor of CB&T.  Pursuant to these Guaranties, the Cantor IV Guarantors absolutely and unconditionally guaranteed the full and prompt payment and performance of all obligations of Cantor IV to CB&T under the governing loan documents, including, without limitation, all principal, interest, fees, costs and other amounts due and owing.

87.	The Guaranties are continuing, absolute, and unconditional, and expressly provide that CB&T may proceed directly against the Cantor IV Guarantors for payment in the event of Cantor IV's default, without first proceeding against Cantor IV or any collateral.  The Guaranties further provide that the Cantor IV Guarantors waive all defenses, offsets and rights that might otherwise be available to a guarantor under California law.

88.	Cantor IV has defaulted under the loan documents by, among other things, failing to maintain the required first-priority and perfected security interests in the underlying collateral;

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

758454.2

24

failing to disclose material adverse facts concerning the status of that collateral; failing to provide complete and accurate Borrowing Base Certificates; and failing to comply with its reporting and payment obligations. As a result of these Events of Default, all amounts due under the lending facility have been accelerated and are now immediately due and payable in full.

89. CB&T has made formal demand upon the Cantor IV Guarantors for payment of all amounts due and owing under their Guaranties. Despite such demand, the Cantor IV Guarantors have failed and refused to pay the amounts owed to CB&T.

90. The Cantor IV Guarantors' failure and refusal to pay the amounts due and owing under their Guaranties constitutes a material breach of those agreements.

91. CB&T has fully performed all covenants, conditions and promises required to be performed by it under the terms of the loan agreements and all related agreements governing the transactions with Cantor IV.

92. As a direct and proximate result of the Cantor IV Guarantors' breach of the Guaranties, CB&T has suffered damages in an amount exceeding $30 million, together with accrued and accruing interest, late charges, attorneys' fees, costs and other amounts as provided in the loan agreements and Guaranties.

93. Pursuant to Section 21 of the Guaranties, CB&T is entitled to recover all attorneys' fees, costs, and expenses incurred in connection with (i) the collection or attempted collection of amounts due from Cantor IV, and (ii) the interpretation, enforcement, or attempted enforcement of the Cantor IV Guaranties and any collateral related thereto.

## THIRD CAUSE OF ACTION

### (*Constructive Trust – Against All Guarantor Defendants*)

94. Plaintiff CB&T repeats and realleges each and every foregoing and subsequent allegation contained in this Complaint, and further alleges as follows:

95. Each guarantor Defendant personally benefited from the wrongful conduct alleged herein. Acting as owners, managers and insiders of Cantor II and Cantor IV, Defendants diverted and subordinated CB&T's collateral, transferred pledged liens to affiliated entities and concealed the resulting loss of CB&T's first-priority security interests while continuing to draw on CB&T's

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

758454.2

25

credit facilities.

96.    Defendants' self-dealing caused CB&T's loan proceeds—totaling more than $60 million—to be used in transactions that enriched themselves and their affiliates at CB&T's expense.  The proceeds and assets derived therefrom, including loan repayments, property sale proceeds and substituted collateral constitute specific, identifiable property traceable to CB&T's funds (the "Trust Property").

97.    By reason of this misconduct, Defendants have been unjustly enriched and now hold or control the Trust Property in equity for CB&T's benefit.  Allowing them to retain such assets would unjustly reward their breaches, concealment and diversion of collateral.

98.    Because legal remedies are inadequate to recover the specific assets and proceeds wrongfully diverted, CB&T is entitled to the imposition of a constructive trust over the Trust Property and all proceeds traceable thereto, and/or an equitable lien securing CB&T's rights.

99.    CB&T therefore seeks an order: (a) identifying and tracing all property and proceeds derived from CB&T's advances; (b) imposing a constructive trust and/or equitable lien over such property and proceeds; (c) compelling turnover of all Trust Property to CB&T; and (iv) enjoining Defendants from transferring, concealing, or dissipating any such assets.

100.    Defendants hold the Trust Property as involuntary trustees for the benefit of CB&T, and CB&T is entitled to restitution, turnover and such further equitable relief as the Court deems just and proper.

**PRAYER FOR RELIEF**

**WHEREFORE,** CB&T respectfully prays for judgment against Defendants, as follows:

(1)    For entry of judgment against all Defendants, jointly and severally, in an amount to be proven at trial but presently estimated to exceed $60,000,000, representing all unpaid principal advanced under the lending facilities;

(2)    For accrued and accruing contractual interest, calculated pursuant to the governing Promissory Notes, Security Agreements and Guaranties, from the dates of default until entry of judgment;

(3)    For all late charges, charges and other amounts due under the loan documents and

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

758454.2

26

COMPLAINT

Guaranties;

(4) For recovery of all attorneys' fees, costs and enforcement expenses as provided by the loan documents and Guaranties;

(5) For an order, upon request of any party, referring all issues in this action to a referee for judicial reference pursuant to California Code of Civil Procedure section 638 *et seq.*;

(6) For issuance of immediate provisional relief to preserve assets and prevent further harm, including: (a) writ of attachment against Defendants' assets and property in an amount sufficient to secure CB&T's claims; and/or (b) temporary restraining order and preliminary injunction restraining Defendants, and all persons acting in concert with them, from transferring, encumbering, concealing, dissipating or otherwise disposing of assets pending resolution of this action;

(7) For imposition of a constructive trust over any assets or proceeds wrongfully diverted from CB&T or derived from the pledged collateral, including assets held by affiliated entities for the benefit of Defendants;

(8) For post-judgment interest from the date of judgment until paid in full; and

(9) For such other and further relief as the Court may deem just and proper

DATED: October 15, 2025          MILLER BARONDESS, LLP

By: _____
     A. SASHA FRID
     Attorneys for Plaintiff
     ZIONS BANCORPORATION, N.A., dba
     CALIFORNIA BANK & TRUST

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

758454.2

27

COMPLAINT

## APPENDIX A

**A.**    **Status of Cantor II Underlying Real Estate Collateral**

| Collateral Loan Obligor [Collateral Loan #] | Underlying Real Estate Collateral | Status |
|---|---|---|
| 1. Cedar Street Group, LLC [Collateral Loan 300] | 9826 Cedar Street, Bellflower, CA 90706 | A Deed of Trust originally in favor of Borrower has been assigned to Cantor Group V, LLC ("Cantor V"), and subsequently assigned to Western Alliance Bank.  In addition, prior Deeds of Trust are of record in favor of Nano Banc and UMPQUA Bank. |
| 2. Cliff Drive Properties DE, LLC [Collateral Loan 301] | 153 Cedar Way, Laguna Beach, CA 92651 | No Deed of Trust has been recorded in favor of Borrower.  Deeds of Trust are currently of record in favor of First Choice Bank in the original principal amount of $5,583,600, and Specialty DIP LLC in the original principal amount of $1,165,000.  First Choice Bank issued a Notice of Trustee's Sale, which was scheduled for October 1, 2025. |
| 3. The Masters Building, LLC [Collateral Loan 302] | 2711 and 2713 E. Coast Hwy., Corona Del Mar, CA 92625 | No Deed of Trust has been recorded in favor of Borrower.  Instead, current Deeds of Trust are of record in favor of PMF CA REIT, L.L.C., in the original principal amount of $6,540,000, and Specialty DIP LLC in the original principal amount of $1,165,000.  A Notice of Default has been filed by PMF CA REIT, L.L.C. |
| 4. Cliff Drive Properties DE, LLC [Collateral Loan 303] | 150 Cliff Drive, Laguna Beach, CA 92651 | No Deed of Trust has been recorded in favor of Borrower.  Deeds of Trust are currently of record in favor of First Choice Bank in the original principal amount of $5,583,600, and Specialty DIP LLC in the original principal amount of $1,165,000.  First Choice Bank issued a Notice of Trustee's Sale, which was scheduled for October 1, 2025. |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

758454.2

COMPLAINT

| Collateral Loan Obligor [Collateral Loan #] | Underlying Real Estate Collateral | Status |
|---|---|---|
| 5. 314 S Harvard DE, LLC and 4110 W 3rd St DE, LLC [Collateral Loan 304] | 314 Harvard Blvd. and 4110 West 3rd Street, Los Angeles CA 90020 | Property has been foreclosed and is no longer owned by Collateral Loan Obligor. |
| 6. Laguna HW, LLC [Collateral Loan 305] | 688-690 S. Coast Hwy., Laguna Beach, CA 92651 | The Deed of Trust in favor of Borrower was released on December 14, 2022.  Subsequently, a Deed of Trust in favor of Wilshire Quinn Income Fund, LLC, in the original principal amount of $12,550,000, was recorded against the property.  A Notice of Default under this Deed of Trust was recorded on August 29, 2025. |
| 7. Cliff Village, LLC [Collateral Loan 306] | 535 S. Coast Hwy., Laguna Beach, CA 92651 | The property is not owned by the Collateral Loan Obligor.  A Deed of Trust is of record in favor of Cantor V,  which has been assigned to Nano Banc. |
| 8. Heisler Laguna, LLC [Collateral Loan 307] | 397 N. Coast Hwy., Laguna Beach, CA 92651 | No Deed of Trust has been recorded in favor of Borrower.  Deeds of Trust are currently of record in favor of First Choice Bank (now Enterprise Bank) and Coastline Loans (owned by Andrew Stupin). First Choice Bank issued a Notice of Trustee's Sale, which was scheduled for October 1, 2025. |

**B.     Status of Cantor IV Underlying Real Estate Collateral**

| Collateral Loan Obligor [Collateral Loan #] | Underlying Real Estate Collateral | Status |
|---|---|---|
| 1. Vismaad LLC [Collateral Loan 200] | 600 N Arrowhead Ave., San Bernadino, CA 92401 | The Deed of Trust in favor of the Borrower has been released and reconveyed.  A Deed of Trust is currently of record in favor of Golden 1 Credit Union, securing an original principal amount of $3,657,000 (signed by Defendant Deba Shyam). |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

758454.2

29

| Collateral Loan Obligor [Collateral Loan #] | Underlying Real Estate Collateral | Status |
|---|---|---|
| 2. 424 Marguerite Ave., LLC [Collateral Loan 201] | 424-424.5 Marguerite, Corona Del Mar, CA 92625 | Two Deeds of Trust in favor of the Borrower were recorded on December 20, 2021, and September 29, 2022, respectively. Each was subsequently assigned to Cantor V on December 20, 2021, and September 30, 2022, respectively. A prior Deed of Trust remains of record in favor of Banc of California, securing an original principal amount of $1,260,000. The Collateral Loan Obligor is presently engaged in litigation involving allegations of fraud and the improper encumbrance of the property. The Deeds of Trust assigned by the Borrower to Cantor V are invalid, and the property is currently in pre-foreclosure. |
| 3. 424 Marguerite Ave., LLC [Collateral Loan 202] | 600 Acacia Ave., Corona Del Mar, CA 92625 | A Deed of Trust in favor of the Borrower was recorded on February 23, 2022. However, a prior Deed of Trust remains of record in favor of Banc of California, securing an original principal amount of $2,436,000. The Collateral Loan Obligor is presently engaged in litigation involving allegations of fraud and the improper encumbrance of the property. The Deed of Trust in favor of the Borrower is invalid. |
| 4. Sifat LLC [Collateral Loan 203] | 2115 Winnie Street, Galveston, TX 77550 | No Deed of Trust has been recorded in favor of the Borrower. Instead, a Deed of Trust is currently of record in favor of Standard Insurance Company, securing an original principal amount of $7,400,000. |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

758454.2

30

COMPLAINT

| Collateral Loan Obligor [Collateral Loan #] | Underlying Real Estate Collateral | Status |
|---|---|---|
| 5. Gurdip S. Malik and Nirmaljeet K. Malik, Trustees of the Malik Family Living Trust Dated August 10, 1994 [Collateral Loan 204] | 3220 S. Main Street, Los Angeles, CA 90007 | The Deed of Trust originally in favor of the Borrower was assigned to Cantor V on February 8, 2022. The Collateral Loan Obligor no longer owns the property, which was transferred to MF Downtown Properties LLC on October 14, 2022. |
| 6. Gurdip S. Malik and Nirmaljeet K. Malik, Trustees of the Malik Family Living Trust dated August 10, 1994 [Collateral Loan 205] | 1201-1205 W. Washington Blvd., Los Angeles, CA 90007 | No Deed of Trust has been recorded in favor of the Borrower.  Instead, a Deed of Trust was recorded in favor of Nuvision Credit Union in the original principal amount of $1,000,000.  The Collateral Loan Obligor no longer owns the property, which was transferred to MF Downtown Properties LLC on October 14, 2022. |
| 7. Cauchy Group, LLC [Collateral Loan 206] | 21301-21315 Saticoy Street, Canoga Park, CA 91304 | A Deed of Trust is currently of record in favor of Cantor V.  The assignment of this Deed of Trust to the Borrower has not been recorded. Subsequently, a Deed of Trust was recorded in favor of Secured Income Fund-II, LLC, securing an original principal amount of $7,000,000 (signed by Defendant Deba Shyam). |
| 8. Sifat LLC [Collateral Loan 207] | 73101 Highway 111, Palm Desert, CA 92260 | The property was transferred from the Collateral Loan Obligor to Rec5 Holdings LLC on June 4, 2025.  No Deed of Trust has been recorded in favor of the Borrower.  A Deed of Trust is of record in favor of Evergreen Advantage, LLC, securing an original principal amount of $4,000,000.  The Borrower is presently in bankruptcy proceedings. |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

758454.2

31

## INDEX OF EXHIBITS

| Exhibit No. | Description | Pg. No. |
|---|---|---|
| 1. | Amended and Restated Continuing Guaranty (Andrew Stupin) | 33-47 |
| 2. | Second Amended and Restated Continuing Guaranty (Andrew Stupin) | 48-62 |
| 3. | Continuing Guaranty (Stupin Family Trust) | 63-76 |
| 4. | Amended and Restated Continuing Guaranty (Gerald J. Marcil) | 77-91 |
| 5. | Second Amended and Restated Continuing Guaranty (Gerald J. Marcil) | 92-106 |
| 6. | Amended and Restated Continuing Guaranty (Marcil Family Trust) | 107-121 |
| 7. | Second Amended and Restated Continuing Guaranty (Marcil Family Trust) | 122-136 |
| 8. | Second Amended and Restated Continuing Guaranty (Deba Shyam) | 137-151 |
| 9. | Amended and Restated Business Loan and Security Agreement (Cantor Group II, LLC) | 152-215 |
| 10. | Amended and Restated Promissory Note (Cantor Group II, LLC) | 216-224 |
| 11. | Amended and Restated Business Loan and Security Agreement (Cantor Group IV, LLC) | 225-299 |
| 12. | Amended and Restated Promissory Note (Cantor Group IV, LLC) | 300-308 |
| 13. | Demand for Compliance (Cantor Group II, LLC) | 309-313 |
| 14. | Demand for Compliance (Cantor Group IV, LLC) | 314-318 |
| 15. | Notice of Events of Default (Cantor Group II, LLC) | 319-328 |
| 16. | Notice of Events of Default (Cantor Group IV, LLC) | 329-339 |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

758454.2

32

COMPLAINT

# EXHIBIT 1

## AMENDED AND RESTATED CONTINUING GUARANTY

The undersigned, ANDREW STUPIN, an individual (herein called "Guarantor"), at the solicitation of CANTOR GROUP II, LLC, a Delaware limited liability company ("Borrower"), requests ZIONS BANCORPORATION, N.A., dba California Bank & Trust (herein called "Lender"), to extend Credit to Borrower. In order to induce Lender to extend Credit to Borrower, and in consideration of Credit heretofore, now or hereafter granted to Borrower by Lender, Guarantor agrees as follows:

1. The term "Credit" is used throughout this Amended and Restated Continuing Guaranty ("Guaranty") in its most comprehensive sense and means and includes, without limitation, any and all loans, advances, debts, obligations and liabilities of any kind or nature owed by Borrower to Lender, heretofore, now, or hereafter made, incurred or created, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, secured or unsecured, whether on original, renewed, extended or revised terms (including, without limitation, those evidenced by new or additional instruments or agreements or those changing the applicable rate of interest or which release any obligor with respect thereto), whether principal, interest, fees, or expenses, whether Borrower may be liable individually or jointly with others, whether recovery upon such indebtedness may be or hereafter becomes barred by any statute of limitations, and whether such indebtedness may be or hereafter becomes invalid or otherwise unenforceable. In the event a petition under the United States Bankruptcy Code is filed by or against Borrower, the term "Borrower" shall also mean and include Borrower in its status as a debtor, debtor-in-possession and/or reorganized debtor under the United States Bankruptcy Code.

2. (a) If there is more than a single entity or person included in the terms "Guarantor" or "Borrower," respectively, each reference herein to such terms shall mean any and all, and one or more of such entities and persons both jointly and severally, and (b) if more than one person or entity executes this Guaranty, the obligations and liabilities hereunder of Guarantors are and shall be both joint and several. If Borrower is a corporation, partnership, limited liability company or association, each reference herein to the term "Borrower" shall include any successor entity to Borrower. If there is more than one guaranty of the obligations of Borrower, the liabilities of all Guarantors are joint and several. As used in this Guaranty, neuter terms include the masculine and feminine, and vice versa.

3. Guarantor's liability hereunder shall be unlimited. In addition to any liability hereunder, Guarantor agrees to bear and be liable to Lender for the interest and expenses enumerated in paragraph 21 hereof. Any payment by Guarantor shall not reduce the obligations of Guarantor hereunder unless written notice to that effect is actually received by Lender at or prior to the time of such payment. Any payment received by Lender from Borrower, from any other person or from proceeds of collateral granted by Borrower or any other person shall not reduce Guarantor's liability hereunder.

4. Guarantor unconditionally guarantees and agrees to pay to Lender, on demand, in lawful money of the United States of America, an amount equal to the amount of the Credit plus the fees, expenses, interest, and other amounts and charges specified in paragraphs 3 and 21 hereof, and to otherwise perform any obligations of Borrower undertaken pursuant to any Credit.

4898918v2      1

**Page 34**

This Guaranty is a guaranty of payment and not of collection. No payment received by Lender from Borrower or any other person or from proceeds of collateral granted by Borrower or any other person shall reduce Guarantor's liability hereunder.

5.      Either before or after revocation hereof, Guarantor authorizes Lender at its sole discretion, with or without notice, and without affecting Guarantor's continuing liability hereunder, from time to time to (a) change the time or manner of payment of any Credit by modification, renewal, extension, acceleration or otherwise, (b) amend or change any other provision of any Credit including the rate of interest thereon, (c) accept partial payment on any Credit, (d) accept new or additional instruments, agreements or documents relative to any Credit, (e) release, substitute or add one or more endorsers, cosigners or guarantors for any Credit, (f) enter into forbearances with Borrower even though the result of such forbearance is to increase the amount of accrued and unpaid interest, cost, fees and/or expenses attributable to the Credit, (g) amend or modify the terms of any guaranty executed by a co-guarantor, including the maximum liability thereunder, (h) obtain collateral for the payment of any Credit and/or any guaranty thereof, (i) waive, release, exchange, substitute, or modify, in whole or in part, existing, after-acquired or later acquired collateral securing payment of the Credit or any guaranty therefor on such terms as Lender at its sole discretion shall determine, (j) subordinate payment of all or any part of the Credit to other creditors of Borrower or other persons on such terms as Lender deems appropriate, (k) apply any sums received from Borrower, any other guarantor, endorser or cosigner or from the sale or collection of collateral or its proceeds to any indebtedness whatsoever in any order and regardless of whether or not such indebtedness is guaranteed hereby, is secured by collateral, or is due and payable, (l) without limiting the foregoing, apply any sums received from Guarantor or from the sale of collateral granted by Guarantor to any, all, or any portion of the Credit in any order regardless of whether or not the Credit is secured by collateral or is due and payable, and (m) exercise any right or remedy it may have with respect to any Credit or any collateral securing any Credit, this Guaranty or any other guaranty, including, without limitation, bidding and purchasing at any sale of any such collateral, and compromising, collecting or otherwise liquidating any collateral or any Credit.

6.      Guarantor acknowledges that Guarantor may have certain rights under applicable law which, if not waived by Guarantor, might provide Guarantor with defenses against Guarantor's liability under this Guaranty. Among those rights, are certain rights of subrogation, reimbursement, indemnification and contribution, and rights provided in sections 2787 to 2855, inclusive, of the California Civil Code. Guarantor waives all of Guarantor's rights of subrogation, reimbursement, indemnification, and contribution, and any other rights and defenses that are or may become available to Guarantor by reason of any or all of California Civil Code sections 2787 to 2855, inclusive, including, without limitation, Guarantor's rights:

(a)      To require Lender to notify Guarantor of any default by Borrower, provide Guarantor with notice of any sale or other disposition of security for any Credit, disclose information with respect to the Credit, Borrower, or any other guarantor, co-signer or endorser, or with respect to any collateral;

(b)      That Guarantor's obligation under this Guaranty must be commensurate with that of Borrower;

4898918v2                                    2

**Page 35**

(c)     To be discharged based upon the absence of any liability of Borrower, at any time, by virtue of operation of law, or otherwise, or due to any other disability or defense of Borrower or any other guarantor, endorser or co-signer;

(d)     To be discharged if any of the terms, conditions or provisions of the Credit are altered in any respect;

(e)     To be discharged upon acceptance by Lender of anything in partial satisfaction of the Credit, and/or if Lender designates the portion of the Credit to be satisfied;

(f)     To be discharged upon any modification of the Credit or the release by Lender of Borrower or any other guarantor, endorser or co-signer;

(g)     To require Lender to proceed against Borrower, or any other guarantor, endorser, co-signer, or other person, or to pursue or refrain from pursuing any other remedy in Lender's power;

(h)     To receive the benefit of or participate in any and all security for repayment and/or performance of the Credit;

(i)     To have any security for the Credit first applied to satisfy or discharge the Credit;

(j)     That any arbitration award rendered against Borrower not constitute an award against Guarantor;

(k)     To be discharged based upon any failure by Lender to perfect or continue perfection of any lien, use due diligence to collect all or any part of any Credit, or if recovery against Borrower becomes barred by any statute of limitations, or if Borrower is not liable for any deficiency after Lender realizes upon any collateral;

(l)     To be discharged due to the release or discharge of any collateral for any Credit or guaranty, or relating to the validity, value or enforceability of any collateral; and

(m)     To revoke this Guaranty.

7.     Guarantor also waives all rights and defenses that Guarantor may have because the Borrower's debt is secured by real property. This means, among other things: (1) Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged or assigned by Borrower; and (2) If Lender forecloses on any real property collateral pledged by the Borrower: (A) The amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price, and (B) Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower. This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because Borrower's debt is secured by real property. These rights and defenses include, but are not limited to, any rights or defenses directly or indirectly based upon Sections 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.

4898918v2                                    3

**Page 36**

8.      Guarantor also waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against the principal by the operation of Section 580d of the California Code of Civil Procedure or otherwise.

9.      Guarantor waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of acceptance, notices of the existence, creation or increase of any new or additional credit, notice of sale in regard to judicial or non-judicial foreclosure of real or personal property collateral and all other notices and demands of any kind or nature whatsoever except as expressly set forth herein.

10.     Notwithstanding any foreclosure of the lien of any security agreements, deeds of trust, mortgages or other security instruments, with respect to the Credit or any other guaranty, whether by the exercise of the power of sale contained therein, by any action for judicial foreclosure, or by any acceptance of a deed or other transfer in lieu of foreclosure, whether or not such method of foreclosure or transfer in lieu of foreclosure was for a consideration equal to or greater than the fair market value of the security property, Guarantor shall remain bound under this Guaranty for the obligations of Borrower to Lender and shall be liable to Lender for any and all of the Credit remaining unpaid after any such foreclosure.

11.     Guarantor represents and warrants to Lender that: (a) Lender has made no representation to Guarantor in regard to Borrower, the Credit or any matters pertaining thereto, upon which Guarantor is relying in giving this Guaranty; and (b) Guarantor has established adequate means and assumes the responsibility for being and keeping informed of the financial condition of Borrower and of all other circumstances bearing upon the risk of nonpayment of the Credit which diligent inquiry would reveal, and Lender shall have no duty to advise Guarantor of information known to Lender regarding such condition or any such circumstance.

12.     In addition to all liens upon and rights of setoff against monies, securities or other property of Guarantor given to Lender by law or otherwise as security for this Guaranty, Guarantor hereby pledges to Lender and grants to Lender a security interest in, and Lender shall have a right of setoff against, all monies, securities and other property of Guarantor now or hereafter in the possession of or on deposit with Lender, whether held in a general or special account or deposit or for safekeeping or otherwise; and each such security interest or right of setoff may be enforced or exercised without demand upon, or notice to, Guarantor.  No action or lack of action by Lender with respect to any security interest or right of setoff or otherwise shall be deemed a waiver thereof, and every right of setoff or security interest or otherwise shall continue in full force and effect until specifically released by Lender in writing.  The security interests created hereby shall secure all of Guarantor's obligations to Lender under this Guaranty and any subsequent guaranty executed by Guarantor.

13.     Any and all indebtedness of Borrower now or hereafter owed to Guarantor and all claims of Guarantor against Borrower, whenever arising, are hereby subordinated to the Credit and assigned to Lender as additional collateral. If Lender so requests, any note or other instrument evidencing such indebtedness and all claims of Guarantor against Borrower shall be delivered to Lender, and such indebtedness and all claims of Guarantor against Borrower shall be

collected, enforced and received by Guarantor as trustee for Lender and be paid over to Lender on account of the Credit but without reducing or affecting in any manner the liability of Guarantor hereunder. Should Guarantor fail to collect proceeds of debt owed to it by Borrower and pay the proceeds to Lender, Lender, as Guarantor's attorney-in-fact may do such acts and sign such documents in Guarantor's name as Lender considers necessary, at its discretion, to effect such collection, and Guarantor hereby irrevocably appoints Lender as Guarantor's attorney-in-fact for such purposes. If Borrower is a corporation, limited liability company, partnership or other entity, Guarantor will not withdraw or accept, without Lender's prior written consent, any return of any capital invested or equity interest in Borrower.

14.     Guarantor agrees that to the extent Borrower makes a payment or payments or is credited for any payment or payments made for the account of or on behalf of Borrower to Lender, which payment or payments, or any part thereof, are subsequently invalidated, determined to be fraudulent or preferential, voided, set aside and/or required to be repaid to any trustee, receiver, assignee or any other party whether under any bankruptcy, state or federal Law, common law or equitable cause or otherwise, then to the extent thereof, the obligation or part thereof intended to be satisfied thereby, together with the guaranty thereof hereunder, shall be revived, reinstated and continued in full force and effect as if said payment or payments had not originally been made by or for the account of or on behalf of Borrower.

15.     Guarantor agrees that to the extent Guarantor makes a payment or payments or is credited for any payment or payments made for the account of or on behalf of Guarantor to Lender, which payment or payments, or any part thereof, are subsequently invalidated, determined to be fraudulent or preferential, voided, set aside and/or required to be repaid to any trustee, receiver, assignee or any other party whether under any bankruptcy, state or federal Law, common law or equitable cause or otherwise, then to the extent thereof, the obligation or part thereof intended to be satisfied thereby, shall be revived, reinstated and continued in full force and effect as if said payment or payments had not originally been made by or for the account of or on behalf of Guarantor.

16.     Guarantor's obligations hereunder are not contingent upon and are independent of the obligations of Borrower, or any other guarantor or surety of the Credit. This Guaranty is not made in consideration of the liability of any other guarantor or surety of the Credit. The release or death of any guarantor of the Credit or the revocation of any guaranty shall not release or otherwise affect the liability of any other non-revoking guarantor. A separate action or actions may be brought and prosecuted against Guarantor whether action is brought against Borrower or any other guarantor or whether Borrower or any other guarantor be joined in any such action or actions.

17.     To the maximum extent permitted by law, Guarantor specifically waives the benefit of the statute of limitations affecting its liability hereunder or the enforcement hereof, or the collection of any Credit, including, without limiting the foregoing, any and all special statutes of limitations arising out of California Code of Civil Procedure sections 580a or 726(b). Any partial payment by Borrower which operates to toll any statute of limitations as to Borrower shall likewise toll the statute of limitations as to Guarantor.

18.     Any married person who signs this Guaranty expressly agrees that recourse may be had against his/her separate property as well as all community property over which that person has a power of management and control, for all of his/her obligations hereunder.

19.     Should any one or more provisions of this Guaranty be determined to be illegal or unenforceable, all other provisions shall remain effective.

20.     Lender may, with or without notice, assign this Guaranty in whole or in part.  This Guaranty shall inure to the benefit of Lender, its successors and assigns, and shall bind Guarantor and Guarantor's heirs, executors, administrators, representatives, successors and assigns.

21.     Guarantor agrees to pay to Lender, on demand, all attorneys' fees and all other costs and expenses which may be incurred by Lender in the collection or attempted collection from Borrower of any Credit and/or in the interpretation, enforcement or attempted enforcement by Lender of this Guaranty or any collateral therefor, including, but not limited to, proceedings in any bankruptcy or other insolvency case or other proceedings concerning the Credit or this Guaranty, or both, in any manner, whether or not legal proceedings or suit are instituted, together with interest thereon at the rate applicable to the Credit and including, without limitation, all attorneys' fees and related costs of enforcement of any and all judgments and awards and upon any appeal relating thereto.

22.     Guarantor warrants and represents to Lender that:

(a)     No representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of the Guaranty;

(b)     Guarantor has full power, right and authority to enter into the Guaranty;

(c)     The provisions of the Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor;

(d)     Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein;

(e)     Upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided;

(f)     All financial statements and other financial information furnished or to be furnished to Lender by Guarantor are and will be true and correct and do and will fairly represent the financial condition of Guarantor (including all contingent liabilities) as of the dates thereof;

(g)     There has been no material adverse change in Guarantor's financial condition since the dates of the financial statements and other information furnished to Lender, except as previously disclosed to Lender in writing;

(h)     no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened;

(i)     Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and

(j)     Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition, and  Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under the Guaranty, and Guarantor further agrees that Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of  its relationship with Borrower.

23.     Lender may declare Guarantor in default under this Guaranty upon the occurrence of any of the following events:

(a)     Guarantor fails to pay or perform any of Guarantor's obligations under this Guaranty; or

(b)     Any representation or warranty made or given by Guarantor to Lender proves to be false or misleading in any material respect; or

(c)     A petition or action for relief shall be filed by or against Guarantor, pursuant to the Federal Bankruptcy Code (Title 11, U.S. Codes) in effect from time to time, or under any other law relating to bankruptcy, insolvency, reorganization, moratorium, creditor composition, arrangement or other relief from debts; the appointment of a receiver, trustee, custodian or liquidator of or for any property of Guarantor; or upon the death, incapacity, insolvency, dissolution, or termination of the business of Guarantor; or

(d)     Guarantor revokes or attempts to revoke this Guaranty.

24.     If Borrower is a corporation, limited liability company, partnership or other entity, Lender need not inquire into the power of Borrower or the authority of its officers, directors, partners, agents, members or managers acting or purporting to act in its behalf, and any Credit granted in reliance upon the purported exercise of such power or authority is guaranteed hereunder.

25.     Receipt of a true copy of this Guaranty is hereby acknowledged by Guarantor. Guarantor understands and agrees that Lender's acceptance of this Guaranty shall not constitute a commitment of any nature whatsoever by Lender to extend, renew or hereafter extend credit to Borrower.  Guarantor agrees that this Guaranty shall be effective with or without notice from Lender of its acceptance of this Guaranty.

4898918v2                                              7

**Page 40**

26.     If Guarantor has executed more than one Guaranty of any or all indebtedness of Borrower owed to Lender, any limits of liability thereunder and hereunder shall be cumulative, and a subsequent guaranty executed by Guarantor shall not supersede or replace this Guaranty unless such subsequent guaranty so provides.

27.     JUDICIAL REFERENCE.  The parties hereby agree that any claims, controversies, disputes, or questions of interpretation, whether legal or equitable, arising out of, concerning or related to this Guaranty and all Loan Documents executed by Guarantor shall be heard by a single referee by consensual general judicial reference pursuant to the provisions of California Code of Civil Procedure sects 638 et seq., who shall determine all issues of fact or law and to report a statement of decision.  The referee shall also have the power to hear and determine proceedings for ancillary relief, including, but not limited to, applications for attachment, issuance of injunctive relief, appointment of a receiver, and/or claim and delivery. The costs of the proceeding shall be borne equally by the parties to the dispute, subject to the discretion of the referee to allocate such costs based on a determination as to the prevailing party(ies) in the proceeding.  By initialing below the parties acknowledge that they have read and understand the foregoing Judicial Reference provisions and understand that they are waiving their right to a jury trial.

_____
Guarantor's Initials

28.     Guarantor waives all rights to interpose any setoffs or counterclaims of any nature in any action or proceeding instituted by Lender with respect to this Guaranty, the collateral therefor, or any matter arising therefrom or relating thereto and the posting of any bond which may otherwise be required, and waives any and all benefits of cross-demands pursuant to section 431.70 of the California Code of Civil Procedure.

29.     Guarantor hereby irrevocably submits and consents to the jurisdiction of any federal or state court of competent jurisdiction within California in connection with any action or proceeding arising out of or relating to this Guaranty.  In any such litigation, Guarantor consents to service of process by any means authorized by California or federal law or as otherwise agreed in writing between Lender and Guarantor.

30.     All rights, remedies, powers and benefits granted to Lender under this Guaranty, the Credit, any oral or other written agreement or applicable law whether expressly granted or implied in law or otherwise, are cumulative and not exclusive, and are enforceable alternatively, successively, or concurrently on any one or more occasions at Lender's discretion.

31.     Lender shall not, by any act, delay, omission or otherwise be deemed to have expressly or impliedly waived any security interest granted to Lender hereunder or Lender's rights, powers and/or remedies hereunder (including any right of setoff) unless such waiver shall be in writing and signed by an authorized officer of Lender.  Any such waiver shall be enforceable only to the extent specifically set forth therein.  A waiver by Lender of any default, right, power and/or remedy on any one occasion shall not be construed as a bar to or waiver of any such default, right, power and/or remedy which Lender would otherwise have on any future occasion whether similar in kind or otherwise.  Any failure by Lender to file or enforce a claim

4898918v2                                    8

**Page 41**

against the estate (whether in administration, bankruptcy, probate or other proceeding) of Borrower or of any others, shall not affect Guarantor's liability hereunder.

32.     Neither this Guaranty nor any related agreement, document or instrument nor any provision hereof or thereof shall be amended, modified or discharged orally or by course of conduct, but only by a written agreement signed by an authorized officer of Lender expressly referring to this Guaranty and to the provisions so amended, modified or discharged.

33.     Lender's books and records showing the account(s) between Lender and Borrower shall be admissible in evidence in any action or proceeding as prima facie proof of the items set forth therein. Lender's statements rendered to Borrower, to the extent to which no objection is made within thirty (30) days after date thereof, shall be deemed conclusively correct and constitute an account stated absent manifest error, which shall be binding on Guarantor whether or not Guarantor receives a copy of any such statement or notice thereof.

34.     This is a continuing guaranty of the Credit, including those arising after any repayment and reborrowing and under any successive and future transactions which may increase, renew or continue the original Credit. Revocation of this Guaranty, if permitted by applicable law, shall be effective only upon the close of the next business day after written notice thereof is received by an officer of Lender by certified or registered mail, return receipt requested at 1900 Main Street, Suite 200, Irvine, California 92614, Attention: Matt Bullock, 1st Vice President, or at any other office of Lender designated in a written notice mailed by Lender to Guarantor at its address set forth below. Any such revocation shall be effective only as to the revoking party and shall not affect that party's obligations with respect to Credit existing before the revocation became effective or as to any renewals, extensions or modifications of any Credit, whether such renewal, extension or modification is made prior to or after revocation, including those evidenced by a new or additional instrument or agreement or which change the rate of interest on any Credit, or for post-revocation interest and collection expenses accruing or incurred by Lender with respect thereto. Notwithstanding any revocation hereof, this Guaranty shall not be terminated until Lender has received indefeasible payment in full of all Credit which is guaranteed hereby and, in regard to which Credit, Lender no longer has an outstanding commitment to lend. Credit existing before revocation becomes effective shall be deemed to include, without limitation, all Credit or advances which Lender has committed to make to Borrower in reliance upon this Guaranty, even though the amount of such Credit or advances has not been advanced as of the effective date of revocation, and even though Lender may have defenses or defaults which would relieve it of such commitment, if asserted.

35.     The provisions of this Guaranty shall be construed and interpreted and all rights and obligations hereunder determined in accordance with the laws of the State of California.

36.     GUARANTOR ACKNOWLEDGES THAT LENDER HAS EXTENDED OR MAY IN THE FUTURE EXTEND THE CREDIT TO BORROWER IN RELIANCE ON GUARANTOR'S UNCONDITIONAL PROMISE TO REPAY ANY AND ALL CREDIT AND LENDER IS RELYING ON THE WAIVERS, WARRANTIES AND PROMISES MADE BY GUARANTOR IN THIS GUARANTY. GUARANTOR AGREES THAT EACH OF THE WAIVERS, WARRANTIES AND PROMISES SET FORTH IN THIS GUARANTY ARE MADE WITH GUARANTOR'S UNDERSTANDING OF THEIR SIGNIFICANCE AND

CONSEQUENCES AND THAT THEY ARE REASONABLE.  IF ANY WAIVERS, WARRANTIES AND PROMISES ARE DETERMINED TO BE CONTRARY TO ANY APPLICABLE LAW OR PUBLIC POLICY, SUCH WAIVERS, WARRANTIES AND PROMISES SHALL BE EFFECTIVE TO THE MAXIMUM EXTENT PERMITTED BY LAW.  BEFORE SIGNING THE GUARANTY, GUARANTOR HAS EITHER SOUGHT THE ADVICE OF COUNSEL TO EXPLAIN THE WAIVERS OF ITS RIGHTS AND DEFENSES AS STATED HEREIN AND THE EFFECT THEREOF, OR HAS HAD THE OPPORTUNITY TO SEEK SUCH COUNSEL, AND IN ANY EVENT, INTENDS THIS GUARANTY TO BE AS UNRESTRICTED AS POSSIBLE.  GUARANTOR THEREFORE HAS CONSCIOUSLY AND INTENTIONALLY WAIVED ALL DEFENSES OF GUARANTOR AND RIGHTS WHICH COULD EXONERATE GUARANTOR HEREUNDER TO THE FULL EXTENT PERMITTED BY THE LAWS OF THE STATE OF CALIFORNIA, WHETHER OR NOT EACH AND EVERY DEFENSE, RIGHT OR WAIVER IS EXPLAINED OR DESCRIBED IN DETAIL IN THIS GUARANTY.

37.     GUARANTOR ACKNOWLEDGES THAT NEITHER LENDER NOR ANY OF LENDER'S OFFICERS OR EMPLOYEES HAVE MADE ANY PROMISE OR REPRESENTATION, NOT INCORPORATED HEREIN, WHETHER ORAL, WRITTEN OR IMPLIED, TO CAUSE GUARANTOR TO SIGN THIS GUARANTY.  GUARANTOR IS NOT SIGNING THIS GUARANTY IN RELIANCE ON ANY PROMISE, CONDITION OR THE ANTICIPATION OF THE OCCURRENCE OF ANY EVENT, AND THERE ARE NO ORAL UNDERSTANDINGS, STATEMENTS OR AGREEMENTS WHICH HAVE NOT BEEN INCLUDED IN THIS GUARANTY. GUARANTOR UNDERSTANDS THAT LENDER HAS THE RIGHT TO ENFORCE PAYMENT OF THE CREDIT AGAINST BORROWER OR GUARANTOR IN ANY ORDER AND LENDER IS NOT OBLIGATED TO OBTAIN ANY OTHER OR ADDITIONAL GUARANTORS OF THE CREDIT OR TO TAKE ANY OTHER COURSE OF ACTION.

38.     USA PATRIOT ACT ACKNOWLEDGEMENT – Guarantor acknowledges that Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account or obtains a loan.  Guarantor further acknowledges that Lender will ask for Borrower's and Guarantor's legal name, address, tax ID number or social security number and other identifying information, and that Lender may also ask for additional information or documentation or take other actions reasonably necessary to verify the identity of Borrower, Guarantor or other related persons.

39.     This Guaranty constitutes the entire agreement between the parties with respect to the subject matter of this Guaranty, and any and all previous or contemporaneous correspondence, statements, or agreements by or between the parties hereto with respect to the subject matter of this Guaranty (but not previous or other guarantees given to Lender by Guarantor) are superseded hereby.  This Guaranty may be modified only by a written instrument signed by the parties hereto.

40.     This Guaranty is not secured by any real property.

41.     Guarantor agrees and consents to Lender's (a) sale, transfer, pledge or assignment, whether now or later, of this Guaranty and/or any of the Loan Documents, or any or

all servicing rights with respect thereto, and/or (b) sale or transfer, whether now or later, of one or more participation interests in the loan guaranteed by this Guaranty ("Loan") to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Guarantor, Borrower or about any other matter relating to the Loan or this Guaranty, and Guarantor hereby waives any rights to privacy Guarantor may have with respect to such matters. Guarantor additionally waives any and all notices of sale or sale of participation interests, as well as all notices of any repurchase of participation interests. Guarantor also agrees that the purchasers of this Guaranty and/or any Loan Documents or participation interests will be considered as the absolute owners of such interests in the Guaranty and/or Loan, as applicable, and will have all the rights granted under the agreement or agreements governing the sale of such interests. Guarantor further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of this Guaranty or such Loan Documents or participant of the Loan and unconditionally agrees that either Lender or such purchaser or participant may enforce Guarantor's obligation under this Guaranty irrespective of the failure or insolvency of any holder of any interest in the Loan and/or this Guaranty. Guarantor further agrees that the purchaser of any such interests may enforce its interests irrespective of any personal claims or defenses that Guarantor may have against Lender. Upon Lender's request, Guarantor shall reasonably cooperate with Lender in connection with any of the transactions contemplated by this Section 41.

42.     General Release.

(a)     Except as to any obligations imposed upon Lender as provided herein, Guarantor, on behalf of itself, its respective successors and assigns, and each of them, does each hereby forever relieve, release, acquit and discharge Lender, and its predecessors, successors and assigns, and its past and present attorneys, accountants, insurers, representatives, affiliates, partners, subsidiaries, officers, employees, directors, and shareholders, and each of them (collectively, the "Released Parties"), from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, costs and expenses (including, but not limited to, attorneys' fees), damages, injuries, actions and causes of action, of whatever kind or nature, whether legal or equitable, known or unknown, suspected or unsuspected, contingent or fixed, which Guarantor now owns or holds or has at any time heretofore owned or held or may at any time hereafter own or hold against the Released Parties, or any of them, by reason of any acts, facts, transactions or any circumstances whatsoever occurring or existing through the date of this Guaranty, including, but not limited to, those based upon, arising out of, appertaining to, or in connection with the Credit, the Prior Guaranty, any documents executed in connection therewith, the facts pertaining to this Guaranty, any collateral heretofore granted to Lender or granted in connection herewith, or to any other obligations of Borrower and/or Guarantor to Lender.

(b)     As to the matters released herein, Guarantor expressly waives any and all rights under Section 1542 of the Civil Code of the State of California, which provides as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
THAT THE CREDITOR OR RELEASING PARTY DOES NOT
KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT
THE TIME OF EXECUTING THE RELEASE AND THAT, IF

4898918v2                              11

**Page 44**

KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY
AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR
OR RELEASED PARTY."

(c)     Guarantor expressly waives and releases any right or benefit which it has
or may have under Section 1542 of the Civil Code of the State of California, and any similar law
of any state, territory, commonwealth or possession of the United States, or the United States, to
the full extent that they may waive all such rights and benefits pertaining to the matters released
herein.  In connection with such waiver and relinquishment, Guarantor acknowledges that it is
aware that it may hereafter discover claims presently unknown or unsuspected, or facts in
addition to or different from those which they now know or believe to be true.  Nevertheless, it is
the intention of Guarantor through this Guaranty to fully, finally and forever release all such
matters, and all claims relative thereto, which do now exist, may exist, or heretofore have
existed.  In furtherance of such intention, the release herein given shall be and remain in effect as
a full and complete release of such matters notwithstanding the discovery or existence of any
such additional or different claims or facts relative thereto.

(d)     In entering into the release provided for in this Guaranty, Guarantor
recognizes that no facts or representations are ever absolutely certain; accordingly, Guarantor
assumes the risk of any misrepresentation, concealment or mistake, and if Guarantor should
subsequently discover that any fact that it relied upon in entering into these releases was untrue,
or that any fact was concealed from it, or that any understanding of the facts or of the law was
incorrect, Guarantor shall not be entitled to set aside these releases by reason thereof, regardless
of any claims of fraud, misrepresentation, promise made without the intention of performing it,
concealment of fact, mistake of fact or law, or any other circumstances whatsoever.

(e)     Guarantor is the sole and lawful owner of all right, title and interest in and
to every claim and other matter which it purports to release herein, and it has not heretofore
assigned or transferred, or purported to assign or transfer to any person or any entity claims or
other matters herein released.  Guarantor shall indemnify, defend and hold Lender, and each of
the other Released Parties, harmless from and against any claims, liabilities, actions, causes of
action, demands, injuries, costs, and expenses (including, but not limited to, attorneys' fees),
based upon or arising in connection with any such prior assignment or transfer, or any such
purported assignment or transfer, or any claims or other matters released herein.

43.     Document Imaging.  Borrower, Lender and Guarantor shall be entitled, each in its
sole discretion, to image or make copies of all or any selection of the agreements, instruments,
documents and items and records governing, arising from or relating to any of Borrower's loans,
including, without limitation, this document and the other Loan Documents, and either party may
destroy or archive the paper originals.  The parties hereto (i) waive any right to insist or require
that the other party produce paper originals, (ii) agree that such images shall be accorded the
same force and effect as the paper originals, (iii) agree that each party is entitled to use such
images in lieu of destroyed or archived originals for any purpose, including as admissible
evidence in any demand, presentment or other proceedings, and (iv) further agree that any
executed facsimile (faxed), scanned or other imaged copy of this document or any Loan
Document shall be deemed to be of the same force and effect as the originally manually executed
document.

4898918v2                                    12                                    **Page 45**

Page 46

44.    <u>Amended and Restated Guaranty</u>.  This Guaranty amends, restates, replaces and supersedes in its entirety that certain Continuing Guaranty dated May 5, 2016 (the "<u>Prior Guarantor</u>") given by Guarantor to Lender in connection with that certain Business Loan Agreement (Revolving Line of Credit) dated May 5, 2016 between Borrower and Lender.

*[SIGNATURE PAGE FOLLOWS]*

**Page 46**

IN WITNESS WHEREOF, the Guarantor has executed this Continuing Guaranty as of the 10th day of May 2023.


GUARANTOR:

_____

ANDREW STUPIN, an individual


Address: _____

_____

# EXHIBIT 2

## SECOND AMENDED AND RESTATED CONTINUING GUARANTY

The undersigned, ANDREW STUPIN, an individual (herein called "Guarantor"), at the solicitation of CANTOR GROUP IV LLC, a Delaware limited liability company ("Borrower"), requests ZIONS BANCORPORATION, N.A., dba California Bank & Trust (herein called "Lender"), to extend Credit to Borrower. In order to induce Lender to extend Credit to Borrower, and in consideration of Credit heretofore, now or hereafter granted to Borrower by Lender, Guarantor agrees as follows:

1. The term "Credit" is used throughout this Amended and Restated Continuing Guaranty ("Guaranty") in its most comprehensive sense and means and includes, without limitation, any and all loans, advances, debts, obligations and liabilities of any kind or nature owed by Borrower to Lender, heretofore, now, or hereafter made, incurred or created, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, secured or unsecured, whether on original, renewed, extended or revised terms (including, without limitation, those evidenced by new or additional instruments or agreements or those changing the applicable rate of interest or which release any obligor with respect thereto), whether principal, interest, fees, or expenses, whether Borrower may be liable individually or jointly with others, whether recovery upon such indebtedness may be or hereafter becomes barred by any statute of limitations, and whether such indebtedness may be or hereafter becomes invalid or otherwise unenforceable. In the event a petition under the United States Bankruptcy Code is filed by or against Borrower, the term "Borrower" shall also mean and include Borrower in its status as a debtor, debtor-in-possession and/or reorganized debtor under the United States Bankruptcy Code.

2. (a) If there is more than a single entity or person included in the terms "Guarantor" or "Borrower," respectively, each reference herein to such terms shall mean any and all, and one or more of such entities and persons both jointly and severally, and (b) if more than one person or entity executes this Guaranty, the obligations and liabilities hereunder of Guarantors are and shall be both joint and several. If Borrower is a corporation, partnership, limited liability company or association, each reference herein to the term "Borrower" shall include any successor entity to Borrower. If there is more than one guaranty of the obligations of Borrower, the liabilities of all Guarantors are joint and several. As used in this Guaranty, neuter terms include the masculine and feminine, and vice versa.

3. Guarantor's liability hereunder shall be unlimited. In addition to any liability hereunder, Guarantor agrees to bear and be liable to Lender for the interest and expenses enumerated in paragraph 21 hereof. Any payment by Guarantor shall not reduce the obligations of Guarantor hereunder unless written notice to that effect is actually received by Lender at or prior to the time of such payment. Any payment received by Lender from Borrower, from any other person or from proceeds of collateral granted by Borrower or any other person shall not reduce Guarantor's liability hereunder.

4. Guarantor unconditionally guarantees and agrees to pay to Lender, on demand, in lawful money of the United States of America, an amount equal to the amount of the Credit plus the fees, expenses, interest, and other amounts and charges specified in paragraphs 3 and 21 hereof, and to otherwise perform any obligations of Borrower undertaken pursuant to any Credit.

5175544v1                                   1

**Page 49**

This Guaranty is a guaranty of payment and not of collection. No payment received by Lender from Borrower or any other person or from proceeds of collateral granted by Borrower or any other person shall reduce Guarantor's liability hereunder.

5.      Either before or after revocation hereof, Guarantor authorizes Lender at its sole discretion, with or without notice, and without affecting Guarantor's continuing liability hereunder, from time to time to (a) change the time or manner of payment of any Credit by modification, renewal, extension, acceleration or otherwise, (b) amend or change any other provision of any Credit including the rate of interest thereon, (c) accept partial payment on any Credit, (d) accept new or additional instruments, agreements or documents relative to any Credit, (e) release, substitute or add one or more endorsers, cosigners or guarantors for any Credit, (f) enter into forbearances with Borrower even though the result of such forbearance is to increase the amount of accrued and unpaid interest, cost, fees and/or expenses attributable to the Credit, (g) amend or modify the terms of any guaranty executed by a co-guarantor, including the maximum liability thereunder, (h) obtain collateral for the payment of any Credit and/or any guaranty thereof, (i) waive, release, exchange, substitute, or modify, in whole or in part, existing, after-acquired or later acquired collateral securing payment of the Credit or any guaranty therefor on such terms as Lender at its sole discretion shall determine, (j) subordinate payment of all or any part of the Credit to other creditors of Borrower or other persons on such terms as Lender deems appropriate, (k) apply any sums received from Borrower, any other guarantor, endorser or cosigner or from the sale or collection of collateral or its proceeds to any indebtedness whatsoever in any order and regardless of whether or not such indebtedness is guaranteed hereby, is secured by collateral, or is due and payable, (l) without limiting the foregoing, apply any sums received from Guarantor or from the sale of collateral granted by Guarantor to any, all, or any portion of the Credit in any order regardless of whether or not the Credit is secured by collateral or is due and payable, and (m) exercise any right or remedy it may have with respect to any Credit or any collateral securing any Credit, this Guaranty or any other guaranty, including, without limitation, bidding and purchasing at any sale of any such collateral, and compromising, collecting or otherwise liquidating any collateral or any Credit.

6.      Guarantor acknowledges that Guarantor may have certain rights under applicable law which, if not waived by Guarantor, might provide Guarantor with defenses against Guarantor's liability under this Guaranty. Among those rights, are certain rights of subrogation, reimbursement, indemnification and contribution, and rights provided in sections 2787 to 2855, inclusive, of the California Civil Code. Guarantor waives all of Guarantor's rights of subrogation, reimbursement, indemnification, and contribution, and any other rights and defenses that are or may become available to Guarantor by reason of any or all of California Civil Code sections 2787 to 2855, inclusive, including, without limitation, Guarantor's rights:

(a)      To require Lender to notify Guarantor of any default by Borrower, provide Guarantor with notice of any sale or other disposition of security for any Credit, disclose information with respect to the Credit, Borrower, or any other guarantor, co-signer or endorser, or with respect to any collateral;

(b)      That Guarantor's obligation under this Guaranty must be commensurate with that of Borrower;

5175544v1                                         2

**Page 50**

(c)     To be discharged based upon the absence of any liability of Borrower, at any time, by virtue of operation of law, or otherwise, or due to any other disability or defense of Borrower or any other guarantor, endorser or co-signer;

(d)     To be discharged if any of the terms, conditions or provisions of the Credit are altered in any respect;

(e)     To be discharged upon acceptance by Lender of anything in partial satisfaction of the Credit, and/or if Lender designates the portion of the Credit to be satisfied;

(f)     To be discharged upon any modification of the Credit or the release by Lender of Borrower or any other guarantor, endorser or co-signer;

(g)     To require Lender to proceed against Borrower, or any other guarantor, endorser, co-signer, or other person, or to pursue or refrain from pursuing any other remedy in Lender's power;

(h)     To receive the benefit of or participate in any and all security for repayment and/or performance of the Credit;

(i)     To have any security for the Credit first applied to satisfy or discharge the Credit;

(j)     That any arbitration award rendered against Borrower not constitute an award against Guarantor;

(k)     To be discharged based upon any failure by Lender to perfect or continue perfection of any lien, use due diligence to collect all or any part of any Credit, or if recovery against Borrower becomes barred by any statute of limitations, or if Borrower is not liable for any deficiency after Lender realizes upon any collateral;

(l)     To be discharged due to the release or discharge of any collateral for any Credit or guaranty, or relating to the validity, value or enforceability of any collateral; and

(m)     To revoke this Guaranty.

7.     Guarantor also waives all rights and defenses that Guarantor may have because the Borrower's debt is secured by real property. This means, among other things: (1) Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged or assigned by Borrower; and (2) If Lender forecloses on any real property collateral pledged by the Borrower: (A) The amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price, and (B) Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower. This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because Borrower's debt is secured by real property. These rights and defenses include, but are not limited to, any rights or defenses directly or indirectly based upon Sections 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.

5175544v1                                    3

8.      Guarantor also waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against the principal by the operation of Section 580d of the California Code of Civil Procedure or otherwise.

9.      Guarantor waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of acceptance, notices of the existence, creation or increase of any new or additional credit, notice of sale in regard to judicial or non-judicial foreclosure of real or personal property collateral and all other notices and demands of any kind or nature whatsoever except as expressly set forth herein.

10.     Notwithstanding any foreclosure of the lien of any security agreements, deeds of trust, mortgages or other security instruments, with respect to the Credit or any other guaranty, whether by the exercise of the power of sale contained therein, by any action for judicial foreclosure, or by any acceptance of a deed or other transfer in lieu of foreclosure, whether or not such method of foreclosure or transfer in lieu of foreclosure was for a consideration equal to or greater than the fair market value of the security property, Guarantor shall remain bound under this Guaranty for the obligations of Borrower to Lender and shall be liable to Lender for any and all of the Credit remaining unpaid after any such foreclosure.

11.     Guarantor represents and warrants to Lender that: (a) Lender has made no representation to Guarantor in regard to Borrower, the Credit or any matters pertaining thereto, upon which Guarantor is relying in giving this Guaranty; and (b) Guarantor has established adequate means and assumes the responsibility for being and keeping informed of the financial condition of Borrower and of all other circumstances bearing upon the risk of nonpayment of the Credit which diligent inquiry would reveal, and Lender shall have no duty to advise Guarantor of information known to Lender regarding such condition or any such circumstance.

12.     In addition to all liens upon and rights of setoff against monies, securities or other property of Guarantor given to Lender by law or otherwise as security for this Guaranty, Guarantor hereby pledges to Lender and grants to Lender a security interest in, and Lender shall have a right of setoff against, all monies, securities and other property of Guarantor now or hereafter in the possession of or on deposit with Lender, whether held in a general or special account or deposit or for safekeeping or otherwise; and each such security interest or right of setoff may be enforced or exercised without demand upon, or notice to, Guarantor. No action or lack of action by Lender with respect to any security interest or right of setoff or otherwise shall be deemed a waiver thereof, and every right of setoff or security interest or otherwise shall continue in full force and effect until specifically released by Lender in writing. The security interests created hereby shall secure all of Guarantor's obligations to Lender under this Guaranty and any subsequent guaranty executed by Guarantor.

13.     Any and all indebtedness of Borrower now or hereafter owed to Guarantor and all claims of Guarantor against Borrower, whenever arising, are hereby subordinated to the Credit and assigned to Lender as additional collateral. If Lender so requests, any note or other instrument evidencing such indebtedness and all claims of Guarantor against Borrower shall be delivered to Lender, and such indebtedness and all claims of Guarantor against Borrower shall be

collected, enforced and received by Guarantor as trustee for Lender and be paid over to Lender on account of the Credit but without reducing or affecting in any manner the liability of Guarantor hereunder. Should Guarantor fail to collect proceeds of debt owed to it by Borrower and pay the proceeds to Lender, Lender, as Guarantor's attorney-in-fact may do such acts and sign such documents in Guarantor's name as Lender considers necessary, at its discretion, to effect such collection, and Guarantor hereby irrevocably appoints Lender as Guarantor's attorney-in-fact for such purposes. If Borrower is a corporation, limited liability company, partnership or other entity, Guarantor will not withdraw or accept, without Lender's prior written consent, any return of any capital invested or equity interest in Borrower.

14.     Guarantor agrees that to the extent Borrower makes a payment or payments or is credited for any payment or payments made for the account of or on behalf of Borrower to Lender, which payment or payments, or any part thereof, are subsequently invalidated, determined to be fraudulent or preferential, voided, set aside and/or required to be repaid to any trustee, receiver, assignee or any other party whether under any bankruptcy, state or federal Law, common law or equitable cause or otherwise, then to the extent thereof, the obligation or part thereof intended to be satisfied thereby, together with the guaranty thereof hereunder, shall be revived, reinstated and continued in full force and effect as if said payment or payments had not originally been made by or for the account of or on behalf of Borrower.

15.     Guarantor agrees that to the extent Guarantor makes a payment or payments or is credited for any payment or payments made for the account of or on behalf of Guarantor to Lender, which payment or payments, or any part thereof, are subsequently invalidated, determined to be fraudulent or preferential, voided, set aside and/or required to be repaid to any trustee, receiver, assignee or any other party whether under any bankruptcy, state or federal Law, common law or equitable cause or otherwise, then to the extent thereof, the obligation or part thereof intended to be satisfied thereby, shall be revived, reinstated and continued in full force and effect as if said payment or payments had not originally been made by or for the account of or on behalf of Guarantor.

16.     Guarantor's obligations hereunder are not contingent upon and are independent of the obligations of Borrower, or any other guarantor or surety of the Credit. This Guaranty is not made in consideration of the liability of any other guarantor or surety of the Credit. The release or death of any guarantor of the Credit or the revocation of any guaranty shall not release or otherwise affect the liability of any other non-revoking guarantor. A separate action or actions may be brought and prosecuted against Guarantor whether action is brought against Borrower or any other guarantor or whether Borrower or any other guarantor be joined in any such action or actions.

17.     To the maximum extent permitted by law, Guarantor specifically waives the benefit of the statute of limitations affecting its liability hereunder or the enforcement hereof, or the collection of any Credit, including, without limiting the foregoing, any and all special statutes of limitations arising out of California Code of Civil Procedure sections 580a or 726(b). Any partial payment by Borrower which operates to toll any statute of limitations as to Borrower shall likewise toll the statute of limitations as to Guarantor.

5175544v1                                        5

18.    Any married person who signs this Guaranty expressly agrees that recourse may be had against his/her separate property as well as all community property over which that person has a power of management and control, for all of his/her obligations hereunder.

19.    Should any one or more provisions of this Guaranty be determined to be illegal or unenforceable, all other provisions shall remain effective.

20.    Lender may, with or without notice, assign this Guaranty in whole or in part.  This Guaranty shall inure to the benefit of Lender, its successors and assigns, and shall bind Guarantor and Guarantor's heirs, executors, administrators, representatives, successors and assigns.

21.    Guarantor agrees to pay to Lender, on demand, all attorneys' fees and all other costs and expenses which may be incurred by Lender in the collection or attempted collection from Borrower of any Credit and/or in the interpretation, enforcement or attempted enforcement by Lender of this Guaranty or any collateral therefor, including, but not limited to, proceedings in any bankruptcy or other insolvency case or other proceedings concerning the Credit or this Guaranty, or both, in any manner, whether or not legal proceedings or suit are instituted, together with interest thereon at the rate applicable to the Credit and including, without limitation, all attorneys' fees and related costs of enforcement of any and all judgments and awards and upon any appeal relating thereto.

22.    Guarantor warrants and represents to Lender that:

(a)    No representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of the Guaranty;

(b)    Guarantor has full power, right and authority to enter into the Guaranty;

(c)    The provisions of the Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor;

(d)    Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein;

(e)    Upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided;

(f)    All financial statements and other financial information furnished or to be furnished to Lender by Guarantor are and will be true and correct and do and will fairly represent the financial condition of Guarantor (including all contingent liabilities) as of the dates thereof;

5175544v1                                        6

**Page 54**

(g)     There has been no material adverse change in Guarantor's financial condition since the dates of the financial statements and other information furnished to Lender, except as previously disclosed to Lender in writing;

(h)     no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened;

(i)     Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and

(j)     Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition, and Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under the Guaranty, and Guarantor further agrees that Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

23.     Lender may declare Guarantor in default under this Guaranty upon the occurrence of any of the following events:

(a)     Guarantor fails to pay or perform any of Guarantor's obligations under this Guaranty; or

(b)     Any representation or warranty made or given by Guarantor to Lender proves to be false or misleading in any material respect; or

(c)     A petition or action for relief shall be filed by or against Guarantor, pursuant to the Federal Bankruptcy Code (Title 11, U.S. Codes) in effect from time to time, or under any other law relating to bankruptcy, insolvency, reorganization, moratorium, creditor composition, arrangement or other relief from debts; the appointment of a receiver, trustee, custodian or liquidator of or for any property of Guarantor; or upon the death, incapacity, insolvency, dissolution, or termination of the business of Guarantor; or

(d)     Guarantor revokes or attempts to revoke this Guaranty.

24.     If Borrower is a corporation, limited liability company, partnership or other entity, Lender need not inquire into the power of Borrower or the authority of its officers, directors, partners, agents, members or managers acting or purporting to act in its behalf, and any Credit granted in reliance upon the purported exercise of such power or authority is guaranteed hereunder.

25.     Receipt of a true copy of this Guaranty is hereby acknowledged by Guarantor. Guarantor understands and agrees that Lender's acceptance of this Guaranty shall not constitute a commitment of any nature whatsoever by Lender to extend, renew or hereafter extend credit to Borrower. Guarantor agrees that this Guaranty shall be effective with or without notice from Lender of its acceptance of this Guaranty.

26.     If Guarantor has executed more than one Guaranty of any or all indebtedness of Borrower owed to Lender, any limits of liability thereunder and hereunder shall be cumulative, and a subsequent guaranty executed by Guarantor shall not supersede or replace this Guaranty unless such subsequent guaranty so provides.

27.     JUDICIAL REFERENCE.  The parties hereby agree that any claims, controversies, disputes, or questions of interpretation, whether legal or equitable, arising out of, concerning or related to this Guaranty and all Loan Documents executed by Guarantor shall be heard by a single referee by consensual general judicial reference pursuant to the provisions of California Code of Civil Procedure sects 638 et seq., who shall determine all issues of fact or law and to report a statement of decision.  The referee shall also have the power to hear and determine proceedings for ancillary relief, including, but not limited to, applications for attachment, issuance of injunctive relief, appointment of a receiver, and/or claim and delivery. The costs of the proceeding shall be borne equally by the parties to the dispute, subject to the discretion of the referee to allocate such costs based on a determination as to the prevailing party(ies) in the proceeding.  By initialing below the parties acknowledge that they have read and understand the foregoing Judicial Reference provisions and understand that they are waiving their right to a jury trial.

Guarantor's Initials

28.     Guarantor waives all rights to interpose any setoffs or counterclaims of any nature in any action or proceeding instituted by Lender with respect to this Guaranty, the collateral therefor, or any matter arising therefrom or relating thereto and the posting of any bond which may otherwise be required, and waives any and all benefits of cross-demands pursuant to section 431.70 of the California Code of Civil Procedure.

29.     Guarantor hereby irrevocably submits and consents to the jurisdiction of any federal or state court of competent jurisdiction within California in connection with any action or proceeding arising out of or relating to this Guaranty.  In any such litigation, Guarantor consents to service of process by any means authorized by California or federal law or as otherwise agreed in writing between Lender and Guarantor.

30.     All rights, remedies, powers and benefits granted to Lender under this Guaranty, the Credit, any oral or other written agreement or applicable law whether expressly granted or implied in law or otherwise, are cumulative and not exclusive, and are enforceable alternatively, successively, or concurrently on any one or more occasions at Lender's discretion.

31.     Lender shall not, by any act, delay, omission or otherwise be deemed to have expressly or impliedly waived any security interest granted to Lender hereunder or Lender's rights, powers and/or remedies hereunder (including any right of setoff) unless such waiver shall be in writing and signed by an authorized officer of Lender.  Any such waiver shall be enforceable only to the extent specifically set forth therein.  A waiver by Lender of any default, right, power and/or remedy on any one occasion shall not be construed as a bar to or waiver of any such default, right, power and/or remedy which Lender would otherwise have on any future occasion whether similar in kind or otherwise.  Any failure by Lender to file or enforce a claim

5175544v1                                                        8

against the estate (whether in administration, bankruptcy, probate or other proceeding) of Borrower or of any others, shall not affect Guarantor's liability hereunder.

32.     Neither this Guaranty nor any related agreement, document or instrument nor any provision hereof or thereof shall be amended, modified or discharged orally or by course of conduct, but only by a written agreement signed by an authorized officer of Lender expressly referring to this Guaranty and to the provisions so amended, modified or discharged.

33.     Lender's books and records showing the account(s) between Lender and Borrower shall be admissible in evidence in any action or proceeding as prima facie proof of the items set forth therein. Lender's statements rendered to Borrower, to the extent to which no objection is made within thirty (30) days after date thereof, shall be deemed conclusively correct and constitute an account stated absent manifest error, which shall be binding on Guarantor whether or not Guarantor receives a copy of any such statement or notice thereof.

34.     This is a continuing guaranty of the Credit, including those arising after any repayment and reborrowing and under any successive and future transactions which may increase, renew or continue the original Credit. Revocation of this Guaranty, if permitted by applicable law, shall be effective only upon the close of the next business day after written notice thereof is received by an officer of Lender by certified or registered mail, return receipt requested at 1900 Main Street, Suite 200, Irvine, California 92614, Attention: Matt Bullock, Executive Vice President, or at any other office of Lender designated in a written notice mailed by Lender to Guarantor at its address set forth below. Any such revocation shall be effective only as to the revoking party and shall not affect that party's obligations with respect to Credit existing before the revocation became effective or as to any renewals, extensions or modifications of any Credit, whether such renewal, extension or modification is made prior to or after revocation, including those evidenced by a new or additional instrument or agreement or which change the rate of interest on any Credit, or for post-revocation interest and collection expenses accruing or incurred by Lender with respect thereto. Notwithstanding any revocation hereof, this Guaranty shall not be terminated until Lender has received indefeasible payment in full of all Credit which is guaranteed hereby and, in regard to which Credit, Lender no longer has an outstanding commitment to lend. Credit existing before revocation becomes effective shall be deemed to include, without limitation, all Credit or advances which Lender has committed to make to Borrower in reliance upon this Guaranty, even though the amount of such Credit or advances has not been advanced as of the effective date of revocation, and even though Lender may have defenses or defaults which would relieve it of such commitment, if asserted.

35.     The provisions of this Guaranty shall be construed and interpreted and all rights and obligations hereunder determined in accordance with the laws of the State of California.

36.     GUARANTOR ACKNOWLEDGES THAT LENDER HAS EXTENDED OR MAY IN THE FUTURE EXTEND THE CREDIT TO BORROWER IN RELIANCE ON GUARANTOR'S UNCONDITIONAL PROMISE TO REPAY ANY AND ALL CREDIT AND LENDER IS RELYING ON THE WAIVERS, WARRANTIES AND PROMISES MADE BY GUARANTOR IN THIS GUARANTY. GUARANTOR AGREES THAT EACH OF THE WAIVERS, WARRANTIES AND PROMISES SET FORTH IN THIS GUARANTY ARE MADE WITH GUARANTOR'S UNDERSTANDING OF THEIR SIGNIFICANCE AND

5175544v1                                         9

CONSEQUENCES AND THAT THEY ARE REASONABLE. IF ANY WAIVERS, WARRANTIES AND PROMISES ARE DETERMINED TO BE CONTRARY TO ANY APPLICABLE LAW OR PUBLIC POLICY, SUCH WAIVERS, WARRANTIES AND PROMISES SHALL BE EFFECTIVE TO THE MAXIMUM EXTENT PERMITTED BY LAW. BEFORE SIGNING THE GUARANTY, GUARANTOR HAS EITHER SOUGHT THE ADVICE OF COUNSEL TO EXPLAIN THE WAIVERS OF ITS RIGHTS AND DEFENSES AS STATED HEREIN AND THE EFFECT THEREOF, OR HAS HAD THE OPPORTUNITY TO SEEK SUCH COUNSEL, AND IN ANY EVENT, INTENDS THIS GUARANTY TO BE AS UNRESTRICTED AS POSSIBLE. GUARANTOR THEREFORE HAS CONSCIOUSLY AND INTENTIONALLY WAIVED ALL DEFENSES OF GUARANTOR AND RIGHTS WHICH COULD EXONERATE GUARANTOR HEREUNDER TO THE FULL EXTENT PERMITTED BY THE LAWS OF THE STATE OF CALIFORNIA, WHETHER OR NOT EACH AND EVERY DEFENSE, RIGHT OR WAIVER IS EXPLAINED OR DESCRIBED IN DETAIL IN THIS GUARANTY.

37. GUARANTOR ACKNOWLEDGES THAT NEITHER LENDER NOR ANY OF LENDER'S OFFICERS OR EMPLOYEES HAVE MADE ANY PROMISE OR REPRESENTATION, NOT INCORPORATED HEREIN, WHETHER ORAL, WRITTEN OR IMPLIED, TO CAUSE GUARANTOR TO SIGN THIS GUARANTY. GUARANTOR IS NOT SIGNING THIS GUARANTY IN RELIANCE ON ANY PROMISE, CONDITION OR THE ANTICIPATION OF THE OCCURRENCE OF ANY EVENT, AND THERE ARE NO ORAL UNDERSTANDINGS, STATEMENTS OR AGREEMENTS WHICH HAVE NOT BEEN INCLUDED IN THIS GUARANTY. GUARANTOR UNDERSTANDS THAT LENDER HAS THE RIGHT TO ENFORCE PAYMENT OF THE CREDIT AGAINST BORROWER OR GUARANTOR IN ANY ORDER AND LENDER IS NOT OBLIGATED TO OBTAIN ANY OTHER OR ADDITIONAL GUARANTORS OF THE CREDIT OR TO TAKE ANY OTHER COURSE OF ACTION.

38. USA PATRIOT ACT ACKNOWLEDGEMENT – Guarantor acknowledges that Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account or obtains a loan. Guarantor further acknowledges that Lender will ask for Borrower's and Guarantor's legal name, address, tax ID number or social security number and other identifying information, and that Lender may also ask for additional information or documentation or take other actions reasonably necessary to verify the identity of Borrower, Guarantor or other related persons.

39. This Guaranty constitutes the entire agreement between the parties with respect to the subject matter of this Guaranty, and any and all previous or contemporaneous correspondence, statements, or agreements by or between the parties hereto with respect to the subject matter of this Guaranty (but not previous or other guarantees given to Lender by Guarantor) are superseded hereby. This Guaranty may be modified only by a written instrument signed by the parties hereto.

40. This Guaranty is not secured by any real property.

41. Guarantor agrees and consents to Lender's (a) sale, transfer, pledge or assignment, whether now or later, of this Guaranty and/or any of the Loan Documents, or any or

all servicing rights with respect thereto, and/or (b) sale or transfer, whether now or later, of one or more participation interests in the loan guaranteed by this Guaranty ("Loan") to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Guarantor, Borrower or about any other matter relating to the Loan or this Guaranty, and Guarantor hereby waives any rights to privacy Guarantor may have with respect to such matters. Guarantor additionally waives any and all notices of sale or sale of participation interests, as well as all notices of any repurchase of participation interests. Guarantor also agrees that the purchasers of this Guaranty and/or any Loan Documents or participation interests will be considered as the absolute owners of such interests in the Guaranty and/or Loan, as applicable, and will have all the rights granted under the agreement or agreements governing the sale of such interests. Guarantor further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of this Guaranty or such Loan Documents or participant of the Loan and unconditionally agrees that either Lender or such purchaser or participant may enforce Guarantor's obligation under this Guaranty irrespective of the failure or insolvency of any holder of any interest in the Loan and/or this Guaranty. Guarantor further agrees that the purchaser of any such interests may enforce its interests irrespective of any personal claims or defenses that Guarantor may have against Lender. Upon Lender's request, Guarantor shall reasonably cooperate with Lender in connection with any of the transactions contemplated by this Section 41.

42. General Release.

(a) Except as to any obligations imposed upon Lender as provided herein, Guarantor, on behalf of itself, its respective successors and assigns, and each of them, does each hereby forever relieve, release, acquit and discharge Lender, and its predecessors, successors and assigns, and its past and present attorneys, accountants, insurers, representatives, affiliates, partners, subsidiaries, officers, employees, directors, and shareholders, and each of them (collectively, the "Released Parties"), from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, costs and expenses (including, but not limited to, attorneys' fees), damages, injuries, actions and causes of action, of whatever kind or nature, whether legal or equitable, known or unknown, suspected or unsuspected, contingent or fixed, which Guarantor now owns or holds or has at any time heretofore owned or held or may at any time hereafter own or hold against the Released Parties, or any of them, by reason of any acts, facts, transactions or any circumstances whatsoever occurring or existing through the date of this Guaranty, including, but not limited to, those based upon, arising out of, appertaining to, or in connection with the Credit, the Prior Guaranty, any documents executed in connection therewith, the facts pertaining to this Guaranty, any collateral heretofore granted to Lender or granted in connection herewith, or to any other obligations of Borrower and/or Guarantor to Lender.

(b) As to the matters released herein, Guarantor expressly waives any and all rights under Section 1542 of the Civil Code of the State of California, which provides as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
> THAT THE CREDITOR OR RELEASING PARTY DOES NOT
> KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT
> THE TIME OF EXECUTING THE RELEASE AND THAT, IF

5175544v1                                        11

**Page 59**

KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY
AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR
OR RELEASED PARTY."

(c)     Guarantor expressly waives and releases any right or benefit which it has
or may have under Section 1542 of the Civil Code of the State of California, and any similar law
of any state, territory, commonwealth or possession of the United States, or the United States, to
the full extent that they may waive all such rights and benefits pertaining to the matters released
herein. In connection with such waiver and relinquishment, Guarantor acknowledges that it is
aware that it may hereafter discover claims presently unknown or unsuspected, or facts in
addition to or different from those which they now know or believe to be true. Nevertheless, it is
the intention of Guarantor through this Guaranty to fully, finally and forever release all such
matters, and all claims relative thereto, which do now exist, may exist, or heretofore have
existed. In furtherance of such intention, the release herein given shall be and remain in effect as
a full and complete release of such matters notwithstanding the discovery or existence of any
such additional or different claims or facts relative thereto.

(d)     In entering into the release provided for in this Guaranty, Guarantor
recognizes that no facts or representations are ever absolutely certain; accordingly, Guarantor
assumes the risk of any misrepresentation, concealment or mistake, and if Guarantor should
subsequently discover that any fact that it relied upon in entering into these releases was untrue,
or that any fact was concealed from it, or that any understanding of the facts or of the law was
incorrect, Guarantor shall not be entitled to set aside these releases by reason thereof, regardless
of any claims of fraud, misrepresentation, promise made without the intention of performing it,
concealment of fact, mistake of fact or law, or any other circumstances whatsoever.

(e)     Guarantor is the sole and lawful owner of all right, title and interest in and
to every claim and other matter which it purports to release herein, and it has not heretofore
assigned or transferred, or purported to assign or transfer to any person or any entity claims or
other matters herein released. Guarantor shall indemnify, defend and hold Lender, and each of
the other Released Parties, harmless from and against any claims, liabilities, actions, causes of
action, demands, injuries, costs, and expenses (including, but not limited to, attorneys' fees),
based upon or arising in connection with any such prior assignment or transfer, or any such
purported assignment or transfer, or any claims or other matters released herein.

43.     Document Imaging. Borrower, Lender and Guarantor shall be entitled, each in its
sole discretion, to image or make copies of all or any selection of the agreements, instruments,
documents and items and records governing, arising from or relating to any of Borrower's loans,
including, without limitation, this document and the other Loan Documents, and either party may
destroy or archive the paper originals. The parties hereto (i) waive any right to insist or require
that the other party produce paper originals, (ii) agree that such images shall be accorded the
same force and effect as the paper originals, (iii) agree that each party is entitled to use such
images in lieu of destroyed or archived originals for any purpose, including as admissible
evidence in any demand, presentment or other proceedings, and (iv) further agree that any
executed facsimile (faxed), scanned or other imaged copy of this document or any Loan
Document shall be deemed to be of the same force and effect as the originally manually executed
document.

5175544v1                                    12

44. <u>Amended and Restated Guaranty</u>. This Guaranty amends, restates, replaces and supersedes in its entirety that certain Amended and Restated Limited Guaranty dated October __, 2020 given by Guarantor to Lender in connection with that certain Business Loan Agreement (Revolving Line of Credit) dated July 18, 2017 between Borrower and Lender.

*[SIGNATURE PAGE FOLLOWS]*

5175544v1                                                13

IN WITNESS WHEREOF, the Guarantor has executed this Second Amended and Restated Continuing Guaranty as of the 25th day of March 2024.

GUARANTOR:

ANDREW STUPIN, an individual

Address: _____

_____

5175544v1                                           14

# EXHIBIT 3

## CONTINUING GUARANTY

The undersigned, Andrew Stupin and Julie K. Stupin, as Trustees of THE STUPIN FAMILY TRUST dated April 3, 2009 (herein called "Guarantor"), at the solicitation of CANTOR GROUP IV LLC, a Delaware limited liability company ("Borrower"), requests ZIONS BANCORPORATION, N.A., dba California Bank & Trust (herein called "Lender"), to extend Credit to Borrower. In order to induce Lender to extend Credit to Borrower, and in consideration of Credit heretofore, now or hereafter granted to Borrower by Lender, Guarantor agrees as follows:

1.	The term "Credit" is used throughout this Continuing Guaranty ("Guaranty") in its most comprehensive sense and means and includes, without limitation, any and all loans, advances, debts, obligations and liabilities of any kind or nature owed by Borrower to Lender, heretofore, now, or hereafter made, incurred or created, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, secured or unsecured, whether on original, renewed, extended or revised terms (including, without limitation, those evidenced by new or additional instruments or agreements or those changing the applicable rate of interest or which release any obligor with respect thereto), whether principal, interest, fees, or expenses, whether Borrower may be liable individually or jointly with others, whether recovery upon such indebtedness may be or hereafter becomes barred by any statute of limitations, and whether such indebtedness may be or hereafter becomes invalid or otherwise unenforceable. In the event a petition under the United States Bankruptcy Code is filed by or against Borrower, the term "Borrower" shall also mean and include Borrower in its status as a debtor, debtor-in-possession and/or reorganized debtor under the United States Bankruptcy Code.

2.	(a) If there is more than a single entity or person included in the terms "Guarantor" or "Borrower," respectively, each reference herein to such terms shall mean any and all, and one or more of such entities and persons both jointly and severally, and (b) if more than one person or entity executes this Guaranty, the obligations and liabilities hereunder of Guarantors are and shall be both joint and several. If Borrower is a corporation, partnership, limited liability company or association, each reference herein to the term "Borrower" shall include any successor entity to Borrower. If there is more than one guaranty of the obligations of Borrower, the liabilities of all Guarantors are joint and several. As used in this Guaranty, neuter terms include the masculine and feminine, and vice versa.

3.	Guarantor's liability hereunder shall be unlimited. In addition to any liability hereunder, Guarantor agrees to bear and be liable to Lender for the interest and expenses enumerated in paragraph 21 hereof. Any payment by Guarantor shall not reduce the obligations of Guarantor hereunder unless written notice to that effect is actually received by Lender at or prior to the time of such payment. Any payment received by Lender from Borrower, from any other person or from proceeds of collateral granted by Borrower or any other person shall not reduce Guarantor's liability hereunder.

4.	Guarantor unconditionally guarantees and agrees to pay to Lender, on demand, in lawful money of the United States of America, an amount equal to the amount of the Credit plus the fees, expenses, interest, and other amounts and charges specified in paragraphs 3 and 21 hereof, and to otherwise perform any obligations of Borrower undertaken pursuant to any Credit.

5175562v1	1

**Page 64**

This Guaranty is a guaranty of payment and not of collection. No payment received by Lender from Borrower or any other person or from proceeds of collateral granted by Borrower or any other person shall reduce Guarantor's liability hereunder.

5.      Either before or after revocation hereof, Guarantor authorizes Lender at its sole discretion, with or without notice, and without affecting Guarantor's continuing liability hereunder, from time to time to (a) change the time or manner of payment of any Credit by modification, renewal, extension, acceleration or otherwise, (b) amend or change any other provision of any Credit including the rate of interest thereon, (c) accept partial payment on any Credit, (d) accept new or additional instruments, agreements or documents relative to any Credit, (e) release, substitute or add one or more endorsers, cosigners or guarantors for any Credit, (f) enter into forbearances with Borrower even though the result of such forbearance is to increase the amount of accrued and unpaid interest, cost, fees and/or expenses attributable to the Credit, (g) amend or modify the terms of any guaranty executed by a co-guarantor, including the maximum liability thereunder, (h) obtain collateral for the payment of any Credit and/or any guaranty thereof, (i) waive, release, exchange, substitute, or modify, in whole or in part, existing, after-acquired or later acquired collateral securing payment of the Credit or any guaranty therefor on such terms as Lender at its sole discretion shall determine, (j) subordinate payment of all or any part of the Credit to other creditors of Borrower or other persons on such terms as Lender deems appropriate, (k) apply any sums received from Borrower, any other guarantor, endorser or cosigner or from the sale or collection of collateral or its proceeds to any indebtedness whatsoever in any order and regardless of whether or not such indebtedness is guaranteed hereby, is secured by collateral, or is due and payable, (l) without limiting the foregoing, apply any sums received from Guarantor or from the sale of collateral granted by Guarantor to any, all, or any portion of the Credit in any order regardless of whether or not the Credit is secured by collateral or is due and payable, and (m) exercise any right or remedy it may have with respect to any Credit or any collateral securing any Credit, this Guaranty or any other guaranty, including, without limitation, bidding and purchasing at any sale of any such collateral, and compromising, collecting or otherwise liquidating any collateral or any Credit.

6.      Guarantor acknowledges that Guarantor may have certain rights under applicable law which, if not waived by Guarantor, might provide Guarantor with defenses against Guarantor's liability under this Guaranty. Among those rights, are certain rights of subrogation, reimbursement, indemnification and contribution, and rights provided in sections 2787 to 2855, inclusive, of the California Civil Code. Guarantor waives all of Guarantor's rights of subrogation, reimbursement, indemnification, and contribution, and any other rights and defenses that are or may become available to Guarantor by reason of any or all of California Civil Code sections 2787 to 2855, inclusive, including, without limitation, Guarantor's rights:

(a)     To require Lender to notify Guarantor of any default by Borrower, provide Guarantor with notice of any sale or other disposition of security for any Credit, disclose information with respect to the Credit, Borrower, or any other guarantor, co-signer or endorser, or with respect to any collateral;

(b)     That Guarantor's obligation under this Guaranty must be commensurate with that of Borrower;

(c)     To be discharged based upon the absence of any liability of Borrower, at any time, by virtue of operation of law, or otherwise, or due to any other disability or defense of Borrower or any other guarantor, endorser or co-signer;

(d)     To be discharged if any of the terms, conditions or provisions of the Credit are altered in any respect;

(e)     To be discharged upon acceptance by Lender of anything in partial satisfaction of the Credit, and/or if Lender designates the portion of the Credit to be satisfied;

(f)     To be discharged upon any modification of the Credit or the release by Lender of Borrower or any other guarantor, endorser or co-signer;

(g)     To require Lender to proceed against Borrower, or any other guarantor, endorser, co-signer, or other person, or to pursue or refrain from pursuing any other remedy in Lender's power;

(h)     To receive the benefit of or participate in any and all security for repayment and/or performance of the Credit;

(i)     To have any security for the Credit first applied to satisfy or discharge the Credit;

(j)     That any arbitration award rendered against Borrower not constitute an award against Guarantor;

(k)     To be discharged based upon any failure by Lender to perfect or continue perfection of any lien, use due diligence to collect all or any part of any Credit, or if recovery against Borrower becomes barred by any statute of limitations, or if Borrower is not liable for any deficiency after Lender realizes upon any collateral;

(l)     To be discharged due to the release or discharge of any collateral for any Credit or guaranty, or relating to the validity, value or enforceability of any collateral; and

(m)     To revoke this Guaranty.

7.     Guarantor also waives all rights and defenses that Guarantor may have because the Borrower's debt is secured by real property. This means, among other things: (1) Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged or assigned by Borrower; and (2) If Lender forecloses on any real property collateral pledged by the Borrower: (A) The amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price, and (B) Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower. This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because Borrower's debt is secured by real property. These rights and defenses include, but are not limited to, any rights or defenses directly or indirectly based upon Sections 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.

5175562v1                                3

8. Guarantor also waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against the principal by the operation of Section 580d of the California Code of Civil Procedure or otherwise.

9. Guarantor waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of acceptance, notices of the existence, creation or increase of any new or additional credit, notice of sale in regard to judicial or non-judicial foreclosure of real or personal property collateral and all other notices and demands of any kind or nature whatsoever except as expressly set forth herein.

10. Notwithstanding any foreclosure of the lien of any security agreements, deeds of trust, mortgages or other security instruments, with respect to the Credit or any other guaranty, whether by the exercise of the power of sale contained therein, by any action for judicial foreclosure, or by any acceptance of a deed or other transfer in lieu of foreclosure, whether or not such method of foreclosure or transfer in lieu of foreclosure was for a consideration equal to or greater than the fair market value of the security property, Guarantor shall remain bound under this Guaranty for the obligations of Borrower to Lender and shall be liable to Lender for any and all of the Credit remaining unpaid after any such foreclosure.

11. Guarantor represents and warrants to Lender that: (a) Lender has made no representation to Guarantor in regard to Borrower, the Credit or any matters pertaining thereto, upon which Guarantor is relying in giving this Guaranty; and (b) Guarantor has established adequate means and assumes the responsibility for being and keeping informed of the financial condition of Borrower and of all other circumstances bearing upon the risk of nonpayment of the Credit which diligent inquiry would reveal, and Lender shall have no duty to advise Guarantor of information known to Lender regarding such condition or any such circumstance.

12. In addition to all liens upon and rights of setoff against monies, securities or other property of Guarantor given to Lender by law or otherwise as security for this Guaranty, Guarantor hereby pledges to Lender and grants to Lender a security interest in, and Lender shall have a right of setoff against, all monies, securities and other property of Guarantor now or hereafter in the possession of or on deposit with Lender, whether held in a general or special account or deposit or for safekeeping or otherwise; and each such security interest or right of setoff may be enforced or exercised without demand upon, or notice to, Guarantor. No action or lack of action by Lender with respect to any security interest or right of setoff or otherwise shall be deemed a waiver thereof, and every right of setoff or security interest or otherwise shall continue in full force and effect until specifically released by Lender in writing. The security interests created hereby shall secure all of Guarantor's obligations to Lender under this Guaranty and any subsequent guaranty executed by Guarantor.

13. Any and all indebtedness of Borrower now or hereafter owed to Guarantor and all claims of Guarantor against Borrower, whenever arising, are hereby subordinated to the Credit and assigned to Lender as additional collateral. If Lender so requests, any note or other instrument evidencing such indebtedness and all claims of Guarantor against Borrower shall be delivered to Lender, and such indebtedness and all claims of Guarantor against Borrower shall be

5175562v1                                          4

**Page 67**

collected, enforced and received by Guarantor as trustee for Lender and be paid over to Lender on account of the Credit but without reducing or affecting in any manner the liability of Guarantor hereunder. Should Guarantor fail to collect proceeds of debt owed to it by Borrower and pay the proceeds to Lender, Lender, as Guarantor's attorney-in-fact may do such acts and sign such documents in Guarantor's name as Lender considers necessary, at its discretion, to effect such collection, and Guarantor hereby irrevocably appoints Lender as Guarantor's attorney-in-fact for such purposes. If Borrower is a corporation, limited liability company, partnership or other entity, Guarantor will not withdraw or accept, without Lender's prior written consent, any return of any capital invested or equity interest in Borrower.

14.     Guarantor agrees that to the extent Borrower makes a payment or payments or is credited for any payment or payments made for the account of or on behalf of Borrower to Lender, which payment or payments, or any part thereof, are subsequently invalidated, determined to be fraudulent or preferential, voided, set aside and/or required to be repaid to any trustee, receiver, assignee or any other party whether under any bankruptcy, state or federal Law, common law or equitable cause or otherwise, then to the extent thereof, the obligation or part thereof intended to be satisfied thereby, together with the guaranty thereof hereunder, shall be revived, reinstated and continued in full force and effect as if said payment or payments had not originally been made by or for the account of or on behalf of Borrower.

15.     Guarantor agrees that to the extent Guarantor makes a payment or payments or is credited for any payment or payments made for the account of or on behalf of Guarantor to Lender, which payment or payments, or any part thereof, are subsequently invalidated, determined to be fraudulent or preferential, voided, set aside and/or required to be repaid to any trustee, receiver, assignee or any other party whether under any bankruptcy, state or federal Law, common law or equitable cause or otherwise, then to the extent thereof, the obligation or part thereof intended to be satisfied thereby, shall be revived, reinstated and continued in full force and effect as if said payment or payments had not originally been made by or for the account of or on behalf of Guarantor.

16.     Guarantor's obligations hereunder are not contingent upon and are independent of the obligations of Borrower, or any other guarantor or surety of the Credit. This Guaranty is not made in consideration of the liability of any other guarantor or surety of the Credit. The release or death of any guarantor of the Credit or the revocation of any guaranty shall not release or otherwise affect the liability of any other non-revoking guarantor. A separate action or actions may be brought and prosecuted against Guarantor whether action is brought against Borrower or any other guarantor or whether Borrower or any other guarantor be joined in any such action or actions.

17.     To the maximum extent permitted by law, Guarantor specifically waives the benefit of the statute of limitations affecting its liability hereunder or the enforcement hereof, or the collection of any Credit, including, without limiting the foregoing, any and all special statutes of limitations arising out of California Code of Civil Procedure sections 580a or 726(b). Any partial payment by Borrower which operates to toll any statute of limitations as to Borrower shall likewise toll the statute of limitations as to Guarantor.

5175562v1                                    5

18.     Any married person who signs this Guaranty expressly agrees that recourse may be had against his/her separate property as well as all community property over which that person has a power of management and control, for all of his/her obligations hereunder.

19.     Should any one or more provisions of this Guaranty be determined to be illegal or unenforceable, all other provisions shall remain effective.

20.     Lender may, with or without notice, assign this Guaranty in whole or in part.  This Guaranty shall inure to the benefit of Lender, its successors and assigns, and shall bind Guarantor and Guarantor's heirs, executors, administrators, representatives, successors and assigns.

21.     Guarantor agrees to pay to Lender, on demand, all attorneys' fees and all other costs and expenses which may be incurred by Lender in the collection or attempted collection from Borrower of any Credit and/or in the interpretation, enforcement or attempted enforcement by Lender of this Guaranty or any collateral therefor, including, but not limited to, proceedings in any bankruptcy or other insolvency case or other proceedings concerning the Credit or this Guaranty, or both, in any manner, whether or not legal proceedings or suit are instituted, together with interest thereon at the rate applicable to the Credit and including, without limitation, all attorneys' fees and related costs of enforcement of any and all judgments and awards and upon any appeal relating thereto.

22.     Guarantor warrants and represents to Lender that:

(a)     No representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of the Guaranty;

(b)     Guarantor has full power, right and authority to enter into the Guaranty;

(c)     The provisions of the Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor;

(d)     Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein;

(e)     Upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided;

(f)     All financial statements and other financial information furnished or to be furnished to Lender by Guarantor are and will be true and correct and do and will fairly represent the financial condition of Guarantor (including all contingent liabilities) as of the dates thereof;

(g)      There has been no material adverse change in Guarantor's financial condition since the dates of the financial statements and other information furnished to Lender, except as previously disclosed to Lender in writing;

(h)      no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened;

(i)      Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and

(j)      Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition, and  Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under the Guaranty, and Guarantor further agrees that Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of  its relationship with Borrower.

23.      Lender may declare Guarantor in default under this Guaranty upon the occurrence of any of the following events:

(a)      Guarantor fails to pay or perform any of Guarantor's obligations under this Guaranty; or

(b)      Any representation or warranty made or given by Guarantor to Lender proves to be false or misleading in any material respect; or

(c)      A petition or action for relief shall be filed by or against Guarantor, pursuant to the Federal Bankruptcy Code (Title 11, U.S. Codes) in effect from time to time, or under any other law relating to bankruptcy, insolvency, reorganization, moratorium, creditor composition, arrangement or other relief from debts; the appointment of a receiver, trustee, custodian or liquidator of or for any property of Guarantor; or upon the death, incapacity, insolvency, dissolution, or termination of the business of Guarantor; or

(d)      Guarantor revokes or attempts to revoke this Guaranty.

24.      If Borrower is a corporation, limited liability company, partnership or other entity, Lender need not inquire into the power of Borrower or the authority of its officers, directors, partners, agents, members or managers acting or purporting to act in its behalf, and any Credit granted in reliance upon the purported exercise of such power or authority is guaranteed hereunder.

25.      Receipt of a true copy of this Guaranty is hereby acknowledged by Guarantor. Guarantor understands and agrees that Lender's acceptance of this Guaranty shall not constitute a commitment of any nature whatsoever by Lender to extend, renew or hereafter extend credit to Borrower.  Guarantor agrees that this Guaranty shall be effective with or without notice from Lender of its acceptance of this Guaranty.

5175562v1                                          7

26.     If Guarantor has executed more than one Guaranty of any or all indebtedness of Borrower owed to Lender, any limits of liability thereunder and hereunder shall be cumulative, and a subsequent guaranty executed by Guarantor shall not supersede or replace this Guaranty unless such subsequent guaranty so provides.

27.     JUDICIAL REFERENCE.  The parties hereby agree that any claims, controversies, disputes, or questions of interpretation, whether legal or equitable, arising out of, concerning or related to this Guaranty and all Loan Documents executed by Guarantor shall be heard by a single referee by consensual general judicial reference pursuant to the provisions of California Code of Civil Procedure sects 638 et seq., who shall determine all issues of fact or law and to report a statement of decision.  The referee shall also have the power to hear and determine proceedings for ancillary relief, including, but not limited to, applications for attachment, issuance of  injunctive relief, appointment of a receiver, and/or claim and delivery.  The costs of the proceeding shall be borne equally by the parties to the dispute, subject to the discretion of the referee to allocate such costs based on a determination as to the prevailing party(ies) in the proceeding.  By initialing below the parties acknowledge that they have read and understand the foregoing Judicial Reference provisions and understand that they are waiving their right to a jury trial.

_____
Guarantor's Initials

28.     Guarantor waives all rights to interpose any setoffs or counterclaims of any nature in any action or proceeding instituted by Lender with respect to this Guaranty, the collateral therefor, or any matter arising therefrom or relating thereto and the posting of any bond which may otherwise be required, and waives any and all benefits of cross-demands pursuant to section 431.70 of the California Code of Civil Procedure.

29.     Guarantor hereby irrevocably submits and consents to the jurisdiction of any federal or state court of competent jurisdiction within California in connection with any action or proceeding arising out of or relating to this Guaranty.  In any such litigation, Guarantor consents to service of process by any means authorized by California or federal law or as otherwise agreed in writing between Lender and Guarantor.

30.     All rights, remedies, powers and benefits granted to Lender under this Guaranty, the Credit, any oral or other written agreement or applicable law whether expressly granted or implied in law or otherwise, are cumulative and not exclusive, and are enforceable alternatively, successively, or concurrently on any one or more occasions at Lender's discretion.

31.     Lender shall not, by any act, delay, omission or otherwise be deemed to have expressly or impliedly waived any security interest granted to Lender hereunder or Lender's rights, powers and/or remedies hereunder (including any right of setoff) unless such waiver shall be in writing and signed by an authorized officer of Lender.  Any such waiver shall be enforceable only to the extent specifically set forth therein.  A waiver by Lender of any default, right, power and/or remedy on any one occasion shall not be construed as a bar to or waiver of any such default, right, power and/or remedy which Lender would otherwise have on any future occasion whether similar in kind or otherwise.  Any failure by Lender to file or enforce a claim

against the estate (whether in administration, bankruptcy, probate or other proceeding) of Borrower or of any others, shall not affect Guarantor's liability hereunder.

32. Neither this Guaranty nor any related agreement, document or instrument nor any provision hereof or thereof shall be amended, modified or discharged orally or by course of conduct, but only by a written agreement signed by an authorized officer of Lender expressly referring to this Guaranty and to the provisions so amended, modified or discharged.

33. Lender's books and records showing the account(s) between Lender and Borrower shall be admissible in evidence in any action or proceeding as prima facie proof of the items set forth therein. Lender's statements rendered to Borrower, to the extent to which no objection is made within thirty (30) days after date thereof, shall be deemed conclusively correct and constitute an account stated absent manifest error, which shall be binding on Guarantor whether or not Guarantor receives a copy of any such statement or notice thereof.

34. This is a continuing guaranty of the Credit, including those arising after any repayment and reborrowing and under any successive and future transactions which may increase, renew or continue the original Credit. Revocation of this Guaranty, if permitted by applicable law, shall be effective only upon the close of the next business day after written notice thereof is received by an officer of Lender by certified or registered mail, return receipt requested at 1900 Main Street, Suite 200, Irvine, California 92614, Attention: Matt Bullock, Executive Vice President, or at any other office of Lender designated in a written notice mailed by Lender to Guarantor at its address set forth below. Any such revocation shall be effective only as to the revoking party and shall not affect that party's obligations with respect to Credit existing before the revocation became effective or as to any renewals, extensions or modifications of any Credit, whether such renewal, extension or modification is made prior to or after revocation, including those evidenced by a new or additional instrument or agreement or which change the rate of interest on any Credit, or for post-revocation interest and collection expenses accruing or incurred by Lender with respect thereto. Notwithstanding any revocation hereof, this Guaranty shall not be terminated until Lender has received indefeasible payment in full of all Credit which is guaranteed hereby and, in regard to which Credit, Lender no longer has an outstanding commitment to lend. Credit existing before revocation becomes effective shall be deemed to include, without limitation, all Credit or advances which Lender has committed to make to Borrower in reliance upon this Guaranty, even though the amount of such Credit or advances has not been advanced as of the effective date of revocation, and even though Lender may have defenses or defaults which would relieve it of such commitment, if asserted.

35. The provisions of this Guaranty shall be construed and interpreted and all rights and obligations hereunder determined in accordance with the laws of the State of California.

36. GUARANTOR ACKNOWLEDGES THAT LENDER HAS EXTENDED OR MAY IN THE FUTURE EXTEND THE CREDIT TO BORROWER IN RELIANCE ON GUARANTOR'S UNCONDITIONAL PROMISE TO REPAY ANY AND ALL CREDIT AND LENDER IS RELYING ON THE WAIVERS, WARRANTIES AND PROMISES MADE BY GUARANTOR IN THIS GUARANTY. GUARANTOR AGREES THAT EACH OF THE WAIVERS, WARRANTIES AND PROMISES SET FORTH IN THIS GUARANTY ARE MADE WITH GUARANTOR'S UNDERSTANDING OF THEIR SIGNIFICANCE AND

5175562v1                                  9

CONSEQUENCES AND THAT THEY ARE REASONABLE. IF ANY WAIVERS, WARRANTIES AND PROMISES ARE DETERMINED TO BE CONTRARY TO ANY APPLICABLE LAW OR PUBLIC POLICY, SUCH WAIVERS, WARRANTIES AND PROMISES SHALL BE EFFECTIVE TO THE MAXIMUM EXTENT PERMITTED BY LAW. BEFORE SIGNING THE GUARANTY, GUARANTOR HAS EITHER SOUGHT THE ADVICE OF COUNSEL TO EXPLAIN THE WAIVERS OF ITS RIGHTS AND DEFENSES AS STATED HEREIN AND THE EFFECT THEREOF, OR HAS HAD THE OPPORTUNITY TO SEEK SUCH COUNSEL, AND IN ANY EVENT, INTENDS THIS GUARANTY TO BE AS UNRESTRICTED AS POSSIBLE. GUARANTOR THEREFORE HAS CONSCIOUSLY AND INTENTIONALLY WAIVED ALL DEFENSES OF GUARANTOR AND RIGHTS WHICH COULD EXONERATE GUARANTOR HEREUNDER TO THE FULL EXTENT PERMITTED BY THE LAWS OF THE STATE OF CALIFORNIA, WHETHER OR NOT EACH AND EVERY DEFENSE, RIGHT OR WAIVER IS EXPLAINED OR DESCRIBED IN DETAIL IN THIS GUARANTY.

37.     GUARANTOR ACKNOWLEDGES THAT NEITHER LENDER NOR ANY OF LENDER'S OFFICERS OR EMPLOYEES HAVE MADE ANY PROMISE OR REPRESENTATION, NOT INCORPORATED HEREIN, WHETHER ORAL, WRITTEN OR IMPLIED, TO CAUSE GUARANTOR TO SIGN THIS GUARANTY. GUARANTOR IS NOT SIGNING THIS GUARANTY IN RELIANCE ON ANY PROMISE, CONDITION OR THE ANTICIPATION OF THE OCCURRENCE OF ANY EVENT, AND THERE ARE NO ORAL UNDERSTANDINGS, STATEMENTS OR AGREEMENTS WHICH HAVE NOT BEEN INCLUDED IN THIS GUARANTY. GUARANTOR UNDERSTANDS THAT LENDER HAS THE RIGHT TO ENFORCE PAYMENT OF THE CREDIT AGAINST BORROWER OR GUARANTOR IN ANY ORDER AND LENDER IS NOT OBLIGATED TO OBTAIN ANY OTHER OR ADDITIONAL GUARANTORS OF THE CREDIT OR TO TAKE ANY OTHER COURSE OF ACTION.

38.     USA PATRIOT ACT ACKNOWLEDGEMENT – Guarantor acknowledges that Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account or obtains a loan. Guarantor further acknowledges that Lender will ask for Borrower's and Guarantor's legal name, address, tax ID number or social security number and other identifying information, and that Lender may also ask for additional information or documentation or take other actions reasonably necessary to verify the identity of Borrower, Guarantor or other related persons.

39.     This Guaranty constitutes the entire agreement between the parties with respect to the subject matter of this Guaranty, and any and all previous or contemporaneous correspondence, statements, or agreements by or between the parties hereto with respect to the subject matter of this Guaranty (but not previous or other guarantees given to Lender by Guarantor) are superseded hereby. This Guaranty may be modified only by a written instrument signed by the parties hereto.

40.     This Guaranty is not secured by any real property.

41.     Guarantor agrees and consents to Lender's (a) sale, transfer, pledge or assignment, whether now or later, of this Guaranty and/or any of the Loan Documents, or any or

all servicing rights with respect thereto, and/or (b) sale or transfer, whether now or later, of one or more participation interests in the loan guaranteed by this Guaranty ("Loan") to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Guarantor, Borrower or about any other matter relating to the Loan or this Guaranty, and Guarantor hereby waives any rights to privacy Guarantor may have with respect to such matters. Guarantor additionally waives any and all notices of sale or sale of participation interests, as well as all notices of any repurchase of participation interests. Guarantor also agrees that the purchasers of this Guaranty and/or any Loan Documents or participation interests will be considered as the absolute owners of such interests in the Guaranty and/or Loan, as applicable, and will have all the rights granted under the agreement or agreements governing the sale of such interests. Guarantor further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of this Guaranty or such Loan Documents or participant of the Loan and unconditionally agrees that either Lender or such purchaser or participant may enforce Guarantor's obligation under this Guaranty irrespective of the failure or insolvency of any holder of any interest in the Loan and/or this Guaranty. Guarantor further agrees that the purchaser of any such interests may enforce its interests irrespective of any personal claims or defenses that Guarantor may have against Lender. Upon Lender's request, Guarantor shall reasonably cooperate with Lender in connection with any of the transactions contemplated by this Section 41.

42. General Release.

(a) Except as to any obligations imposed upon Lender as provided herein, Guarantor, on behalf of itself, its respective successors and assigns, and each of them, does each hereby forever relieve, release, acquit and discharge Lender, and its predecessors, successors and assigns, and its past and present attorneys, accountants, insurers, representatives, affiliates, partners, subsidiaries, officers, employees, directors, and shareholders, and each of them (collectively, the "Released Parties"), from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, costs and expenses (including, but not limited to, attorneys' fees), damages, injuries, actions and causes of action, of whatever kind or nature, whether legal or equitable, known or unknown, suspected or unsuspected, contingent or fixed, which Guarantor now owns or holds or has at any time heretofore owned or held or may at any time hereafter own or hold against the Released Parties, or any of them, by reason of any acts, facts, transactions or any circumstances whatsoever occurring or existing through the date of this Guaranty, including, but not limited to, those based upon, arising out of, appertaining to, or in connection with the Credit, the Prior Guaranty, any documents executed in connection therewith, the facts pertaining to this Guaranty, any collateral heretofore granted to Lender or granted in connection herewith, or to any other obligations of Borrower and/or Guarantor to Lender.

(b) As to the matters released herein, Guarantor expressly waives any and all rights under Section 1542 of the Civil Code of the State of California, which provides as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
> THAT THE CREDITOR OR RELEASING PARTY DOES NOT
> KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT
> THE TIME OF EXECUTING THE RELEASE AND THAT, IF

KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY
AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR
OR RELEASED PARTY."

(c)     Guarantor expressly waives and releases any right or benefit which it has
or may have under Section 1542 of the Civil Code of the State of California, and any similar law
of any state, territory, commonwealth or possession of the United States, or the United States, to
the full extent that they may waive all such rights and benefits pertaining to the matters released
herein.  In connection with such waiver and relinquishment, Guarantor acknowledges that it is
aware that it may hereafter discover claims presently unknown or unsuspected, or facts in
addition to or different from those which they now know or believe to be true.  Nevertheless, it is
the intention of Guarantor through this Guaranty to fully, finally and forever release all such
matters, and all claims relative thereto, which do now exist, may exist, or heretofore have
existed.  In furtherance of such intention, the release herein given shall be and remain in effect as
a full and complete release of such matters notwithstanding the discovery or existence of any
such additional or different claims or facts relative thereto.

(d)     In entering into the release provided for in this Guaranty, Guarantor
recognizes that no facts or representations are ever absolutely certain; accordingly, Guarantor
assumes the risk of any misrepresentation, concealment or mistake, and if Guarantor should
subsequently discover that any fact that it relied upon in entering into these releases was untrue,
or that any fact was concealed from it, or that any understanding of the facts or of the law was
incorrect, Guarantor shall not be entitled to set aside these releases by reason thereof, regardless
of any claims of fraud, misrepresentation, promise made without the intention of performing it,
concealment of fact, mistake of fact or law, or any other circumstances whatsoever.

(e)     Guarantor is the sole and lawful owner of all right, title and interest in and
to every claim and other matter which it purports to release herein, and it has not heretofore
assigned or transferred, or purported to assign or transfer to any person or any entity claims or
other matters herein released.  Guarantor shall indemnify, defend and hold Lender, and each of
the other Released Parties, harmless from and against any claims, liabilities, actions, causes of
action, demands, injuries, costs, and expenses (including, but not limited to, attorneys' fees),
based upon or arising in connection with any such prior assignment or transfer, or any such
purported assignment or transfer, or any claims or other matters released herein.

43.     Document Imaging.  Borrower, Lender and Guarantor shall be entitled, each in its
sole discretion, to image or make copies of all or any selection of the agreements, instruments,
documents and items and records governing, arising from or relating to any of Borrower's loans,
including, without limitation, this document and the other Loan Documents, and either party may
destroy or archive the paper originals.  The parties hereto (i) waive any right to insist or require
that the other party produce paper originals, (ii) agree that such images shall be accorded the
same force and effect as the paper originals, (iii) agree that each party is entitled to use such
images in lieu of destroyed or archived originals for any purpose, including as admissible
evidence in any demand, presentment or other proceedings, and (iv) further agree that any
executed facsimile (faxed), scanned or other imaged copy of this document or any Loan
Document shall be deemed to be of the same force and effect as the originally manually executed
document.

5175562v1                                              12

IN WITNESS WHEREOF, the Guarantor has executed this Second Amended and Restated Continuing Guaranty as of the 25th day of March 2024.

**GUARANTOR:**

_____
Andrew Stupin, as Trustee of
THE STUPIN FAMILY TRUST dated April 3, 2009

_____
Julie K. Stupin, as Trustee of THE
STUPIN FAMILY TRUST dated April 3, 2009

Address:      _____
              _____

5175562v1                           13

# EXHIBIT 4

## AMENDED AND RESTATED CONTINUING GUARANTY

The undersigned, GERALD J. MARCIL, an individual (herein called "Guarantor"), at the solicitation of CANTOR GROUP II, LLC, a Delaware limited liability company ("Borrower"), requests ZIONS BANCORPORATION, N.A., dba California Bank & Trust (herein called "Lender"), to extend Credit to Borrower. In order to induce Lender to extend Credit to Borrower, and in consideration of Credit heretofore, now or hereafter granted to Borrower by Lender, Guarantor agrees as follows:

1.      The term "Credit" is used throughout this Amended and Restated Continuing Guaranty ("Guaranty") in its most comprehensive sense and means and includes, without limitation, any and all loans, advances, debts, obligations and liabilities of any kind or nature owed by Borrower to Lender, heretofore, now, or hereafter made, incurred or created, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, secured or unsecured, whether on original, renewed, extended or revised terms (including, without limitation, those evidenced by new or additional instruments or agreements or those changing the applicable rate of interest or which release any obligor with respect thereto), whether principal, interest, fees, or expenses, whether Borrower may be liable individually or jointly with others, whether recovery upon such indebtedness may be or hereafter becomes barred by any statute of limitations, and whether such indebtedness may be or hereafter becomes invalid or otherwise unenforceable. In the event a petition under the United States Bankruptcy Code is filed by or against Borrower, the term "Borrower" shall also mean and include Borrower in its status as a debtor, debtor-in-possession and/or reorganized debtor under the United States Bankruptcy Code.

2.      (a) If there is more than a single entity or person included in the terms "Guarantor" or "Borrower," respectively, each reference herein to such terms shall mean any and all, and one or more of such entities and persons both jointly and severally, and (b) if more than one person or entity executes this Guaranty, the obligations and liabilities hereunder of Guarantors are and shall be both joint and several. If Borrower is a corporation, partnership, limited liability company or association, each reference herein to the term "Borrower" shall include any successor entity to Borrower. If there is more than one guaranty of the obligations of Borrower, the liabilities of all Guarantors are joint and several. As used in this Guaranty, neuter terms include the masculine and feminine, and vice versa.

3.      Guarantor's liability hereunder shall be unlimited. In addition to any liability hereunder, Guarantor agrees to bear and be liable to Lender for the interest and expenses enumerated in paragraph 21 hereof. Any payment by Guarantor shall not reduce the obligations of Guarantor hereunder unless written notice to that effect is actually received by Lender at or prior to the time of such payment. Any payment received by Lender from Borrower, from any other person or from proceeds of collateral granted by Borrower or any other person shall not reduce Guarantor's liability hereunder.

4.      Guarantor unconditionally guarantees and agrees to pay to Lender, on demand, in lawful money of the United States of America, an amount equal to the amount of the Credit plus the fees, expenses, interest, and other amounts and charges specified in paragraphs 3 and 21 hereof, and to otherwise perform any obligations of Borrower undertaken pursuant to any Credit.

4898912v2                                     1

This Guaranty is a guaranty of payment and not of collection. No payment received by Lender from Borrower or any other person or from proceeds of collateral granted by Borrower or any other person shall reduce Guarantor's liability hereunder.

5.      Either before or after revocation hereof, Guarantor authorizes Lender at its sole discretion, with or without notice, and without affecting Guarantor's continuing liability hereunder, from time to time to (a) change the time or manner of payment of any Credit by modification, renewal, extension, acceleration or otherwise, (b) amend or change any other provision of any Credit including the rate of interest thereon, (c) accept partial payment on any Credit, (d) accept new or additional instruments, agreements or documents relative to any Credit, (e) release, substitute or add one or more endorsers, cosigners or guarantors for any Credit, (f) enter into forbearances with Borrower even though the result of such forbearance is to increase the amount of accrued and unpaid interest, cost, fees and/or expenses attributable to the Credit, (g) amend or modify the terms of any guaranty executed by a co-guarantor, including the maximum liability thereunder, (h) obtain collateral for the payment of any Credit and/or any guaranty thereof, (i) waive, release, exchange, substitute, or modify, in whole or in part, existing, after-acquired or later acquired collateral securing payment of the Credit or any guaranty therefor on such terms as Lender at its sole discretion shall determine, (j) subordinate payment of all or any part of the Credit to other creditors of Borrower or other persons on such terms as Lender deems appropriate, (k) apply any sums received from Borrower, any other guarantor, endorser or cosigner or from the sale or collection of collateral or its proceeds to any indebtedness whatsoever in any order and regardless of whether or not such indebtedness is guaranteed hereby, is secured by collateral, or is due and payable, (l) without limiting the foregoing, apply any sums received from Guarantor or from the sale of collateral granted by Guarantor to any, all, or any portion of the Credit in any order regardless of whether or not the Credit is secured by collateral or is due and payable, and (m) exercise any right or remedy it may have with respect to any Credit or any collateral securing any Credit, this Guaranty or any other guaranty, including, without limitation, bidding and purchasing at any sale of any such collateral, and compromising, collecting or otherwise liquidating any collateral or any Credit.

6.      Guarantor acknowledges that Guarantor may have certain rights under applicable law which, if not waived by Guarantor, might provide Guarantor with defenses against Guarantor's liability under this Guaranty. Among those rights, are certain rights of subrogation, reimbursement, indemnification and contribution, and rights provided in sections 2787 to 2855, inclusive, of the California Civil Code. Guarantor waives all of Guarantor's rights of subrogation, reimbursement, indemnification, and contribution, and any other rights and defenses that are or may become available to Guarantor by reason of any or all of California Civil Code sections 2787 to 2855, inclusive, including, without limitation, Guarantor's rights:

(a)      To require Lender to notify Guarantor of any default by Borrower, provide Guarantor with notice of any sale or other disposition of security for any Credit, disclose information with respect to the Credit, Borrower, or any other guarantor, co-signer or endorser, or with respect to any collateral;

(b)      That Guarantor's obligation under this Guaranty must be commensurate with that of Borrower;

4898912v2                                          2

(c)    To be discharged based upon the absence of any liability of Borrower, at any time, by virtue of operation of law, or otherwise, or due to any other disability or defense of Borrower or any other guarantor, endorser or co-signer;

(d)    To be discharged if any of the terms, conditions or provisions of the Credit are altered in any respect;

(e)    To be discharged upon acceptance by Lender of anything in partial satisfaction of the Credit, and/or if Lender designates the portion of the Credit to be satisfied;

(f)    To be discharged upon any modification of the Credit or the release by Lender of Borrower or any other guarantor, endorser or co-signer;

(g)    To require Lender to proceed against Borrower, or any other guarantor, endorser, co-signer, or other person, or to pursue or refrain from pursuing any other remedy in Lender's power;

(h)    To receive the benefit of or participate in any and all security for repayment and/or performance of the Credit;

(i)    To have any security for the Credit first applied to satisfy or discharge the Credit;

(j)    That any arbitration award rendered against Borrower not constitute an award against Guarantor;

(k)    To be discharged based upon any failure by Lender to perfect or continue perfection of any lien, use due diligence to collect all or any part of any Credit, or if recovery against Borrower becomes barred by any statute of limitations, or if Borrower is not liable for any deficiency after Lender realizes upon any collateral;

(l)    To be discharged due to the release or discharge of any collateral for any Credit or guaranty, or relating to the validity, value or enforceability of any collateral; and

(m)    To revoke this Guaranty.

7.    Guarantor also waives all rights and defenses that Guarantor may have because the Borrower's debt is secured by real property. This means, among other things: (1) Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged or assigned by Borrower; and (2) If Lender forecloses on any real property collateral pledged by the Borrower: (A) The amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price, and (B) Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower. This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because Borrower's debt is secured by real property. These rights and defenses include, but are not limited to, any rights or defenses directly or indirectly based upon Sections 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.

4898912v2                                          3

8.      Guarantor also waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against the principal by the operation of Section 580d of the California Code of Civil Procedure or otherwise.

9.      Guarantor waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of acceptance, notices of the existence, creation or increase of any new or additional credit, notice of sale in regard to judicial or non-judicial foreclosure of real or personal property collateral and all other notices and demands of any kind or nature whatsoever except as expressly set forth herein.

10.     Notwithstanding any foreclosure of the lien of any security agreements, deeds of trust, mortgages or other security instruments, with respect to the Credit or any other guaranty, whether by the exercise of the power of sale contained therein, by any action for judicial foreclosure, or by any acceptance of a deed or other transfer in lieu of foreclosure, whether or not such method of foreclosure or transfer in lieu of foreclosure was for a consideration equal to or greater than the fair market value of the security property, Guarantor shall remain bound under this Guaranty for the obligations of Borrower to Lender and shall be liable to Lender for any and all of the Credit remaining unpaid after any such foreclosure.

11.     Guarantor represents and warrants to Lender that: (a) Lender has made no representation to Guarantor in regard to Borrower, the Credit or any matters pertaining thereto, upon which Guarantor is relying in giving this Guaranty; and (b) Guarantor has established adequate means and assumes the responsibility for being and keeping informed of the financial condition of Borrower and of all other circumstances bearing upon the risk of nonpayment of the Credit which diligent inquiry would reveal, and Lender shall have no duty to advise Guarantor of information known to Lender regarding such condition or any such circumstance.

12.     In addition to all liens upon and rights of setoff against monies, securities or other property of Guarantor given to Lender by law or otherwise as security for this Guaranty, Guarantor hereby pledges to Lender and grants to Lender a security interest in, and Lender shall have a right of setoff against, all monies, securities and other property of Guarantor now or hereafter in the possession of or on deposit with Lender, whether held in a general or special account or deposit or for safekeeping or otherwise; and each such security interest or right of setoff may be enforced or exercised without demand upon, or notice to, Guarantor. No action or lack of action by Lender with respect to any security interest or right of setoff or otherwise shall be deemed a waiver thereof, and every right of setoff or security interest or otherwise shall continue in full force and effect until specifically released by Lender in writing. The security interests created hereby shall secure all of Guarantor's obligations to Lender under this Guaranty and any subsequent guaranty executed by Guarantor.

13.     Any and all indebtedness of Borrower now or hereafter owed to Guarantor and all claims of Guarantor against Borrower, whenever arising, are hereby subordinated to the Credit and assigned to Lender as additional collateral. If Lender so requests, any note or other instrument evidencing such indebtedness and all claims of Guarantor against Borrower shall be delivered to Lender, and such indebtedness and all claims of Guarantor against Borrower shall be

4898912v2                               4

collected, enforced and received by Guarantor as trustee for Lender and be paid over to Lender on account of the Credit but without reducing or affecting in any manner the liability of Guarantor hereunder. Should Guarantor fail to collect proceeds of debt owed to it by Borrower and pay the proceeds to Lender, Lender, as Guarantor's attorney-in-fact may do such acts and sign such documents in Guarantor's name as Lender considers necessary, at its discretion, to effect such collection, and Guarantor hereby irrevocably appoints Lender as Guarantor's attorney-in-fact for such purposes. If Borrower is a corporation, limited liability company, partnership or other entity, Guarantor will not withdraw or accept, without Lender's prior written consent, any return of any capital invested or equity interest in Borrower.

14. Guarantor agrees that to the extent Borrower makes a payment or payments or is credited for any payment or payments made for the account of or on behalf of Borrower to Lender, which payment or payments, or any part thereof, are subsequently invalidated, determined to be fraudulent or preferential, voided, set aside and/or required to be repaid to any trustee, receiver, assignee or any other party whether under any bankruptcy, state or federal Law, common law or equitable cause or otherwise, then to the extent thereof, the obligation or part thereof intended to be satisfied thereby, together with the guaranty thereof hereunder, shall be revived, reinstated and continued in full force and effect as if said payment or payments had not originally been made by or for the account of or on behalf of Borrower.

15. Guarantor agrees that to the extent Guarantor makes a payment or payments or is credited for any payment or payments made for the account of or on behalf of Guarantor to Lender, which payment or payments, or any part thereof, are subsequently invalidated, determined to be fraudulent or preferential, voided, set aside and/or required to be repaid to any trustee, receiver, assignee or any other party whether under any bankruptcy, state or federal Law, common law or equitable cause or otherwise, then to the extent thereof, the obligation or part thereof intended to be satisfied thereby, shall be revived, reinstated and continued in full force and effect as if said payment or payments had not originally been made by or for the account of or on behalf of Guarantor.

16. Guarantor's obligations hereunder are not contingent upon and are independent of the obligations of Borrower, or any other guarantor or surety of the Credit. This Guaranty is not made in consideration of the liability of any other guarantor or surety of the Credit. The release or death of any guarantor of the Credit or the revocation of any guaranty shall not release or otherwise affect the liability of any other non-revoking guarantor. A separate action or actions may be brought and prosecuted against Guarantor whether action is brought against Borrower or any other guarantor or whether Borrower or any other guarantor be joined in any such action or actions.

17. To the maximum extent permitted by law, Guarantor specifically waives the benefit of the statute of limitations affecting its liability hereunder or the enforcement hereof, or the collection of any Credit, including, without limiting the foregoing, any and all special statutes of limitations arising out of California Code of Civil Procedure sections 580a or 726(b). Any partial payment by Borrower which operates to toll any statute of limitations as to Borrower shall likewise toll the statute of limitations as to Guarantor.

4898912v2

5

18.    Any married person who signs this Guaranty expressly agrees that recourse may be had against his/her separate property as well as all community property over which that person has a power of management and control, for all of his/her obligations hereunder.

19.    Should any one or more provisions of this Guaranty be determined to be illegal or unenforceable, all other provisions shall remain effective.

20.    Lender may, with or without notice, assign this Guaranty in whole or in part. This Guaranty shall inure to the benefit of Lender, its successors and assigns, and shall bind Guarantor and Guarantor's heirs, executors, administrators, representatives, successors and assigns.

21.    Guarantor agrees to pay to Lender, on demand, all attorneys' fees and all other costs and expenses which may be incurred by Lender in the collection or attempted collection from Borrower of any Credit and/or in the interpretation, enforcement or attempted enforcement by Lender of this Guaranty or any collateral therefor, including, but not limited to, proceedings in any bankruptcy or other insolvency case or other proceedings concerning the Credit or this Guaranty, or both, in any manner, whether or not legal proceedings or suit are instituted, together with interest thereon at the rate applicable to the Credit and including, without limitation, all attorneys' fees and related costs of enforcement of any and all judgments and awards and upon any appeal relating thereto.

22.    Guarantor warrants and represents to Lender that:

(a)    No representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of the Guaranty;

(b)    Guarantor has full power, right and authority to enter into the Guaranty;

(c)    The provisions of the Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor;

(d)    Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein;

(e)    Upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided;

(f)    All financial statements and other financial information furnished or to be furnished to Lender by Guarantor are and will be true and correct and do and will fairly represent the financial condition of Guarantor (including all contingent liabilities) as of the dates thereof;

4898912v2                                                  6

(g)      There has been no material adverse change in Guarantor's financial condition since the dates of the financial statements and other information furnished to Lender, except as previously disclosed to Lender in writing;

(h)      no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened;

(i)      Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and

(j)      Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition, and  Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under the Guaranty, and Guarantor further agrees that Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of  its relationship with Borrower.

23.      Lender may declare Guarantor in default under this Guaranty upon the occurrence of any of the following events:

(a)      Guarantor fails to pay or perform any of Guarantor's obligations under this Guaranty; or

(b)      Any representation or warranty made or given by Guarantor to Lender proves to be false or misleading in any material respect; or

(c)      A petition or action for relief shall be filed by or against Guarantor, pursuant to the Federal Bankruptcy Code (Title 11, U.S. Codes) in effect from time to time, or under any other law relating to bankruptcy, insolvency, reorganization, moratorium, creditor composition, arrangement or other relief from debts; the appointment of a receiver, trustee, custodian or liquidator of or for any property of Guarantor; or upon the death, incapacity, insolvency, dissolution, or termination of the business of Guarantor; or

(d)      Guarantor revokes or attempts to revoke this Guaranty.

24.      If Borrower is a corporation, limited liability company, partnership or other entity, Lender need not inquire into the power of Borrower or the authority of its officers, directors, partners, agents, members or managers acting or purporting to act in its behalf, and any Credit granted in reliance upon the purported exercise of such power or authority is guaranteed hereunder.

25.      Receipt of a true copy of this Guaranty is hereby acknowledged by Guarantor. Guarantor understands and agrees that Lender's acceptance of this Guaranty shall not constitute a commitment of any nature whatsoever by Lender to extend, renew or hereafter extend credit to Borrower.  Guarantor agrees that this Guaranty shall be effective with or without notice from Lender of its acceptance of this Guaranty.

26.     If Guarantor has executed more than one Guaranty of any or all indebtedness of Borrower owed to Lender, any limits of liability thereunder and hereunder shall be cumulative, and a subsequent guaranty executed by Guarantor shall not supersede or replace this Guaranty unless such subsequent guaranty so provides.

27.     JUDICIAL REFERENCE. The parties hereby agree that any claims, controversies, disputes, or questions of interpretation, whether legal or equitable, arising out of, concerning or related to this Guaranty and all Loan Documents executed by Guarantor shall be heard by a single referee by consensual general judicial reference pursuant to the provisions of California Code of Civil Procedure sects 638 et seq., who shall determine all issues of fact or law and to report a statement of decision. The referee shall also have the power to hear and determine proceedings for ancillary relief, including, but not limited to, applications for attachment, issuance of injunctive relief, appointment of a receiver, and/or claim and delivery. The costs of the proceeding shall be borne equally by the parties to the dispute, subject to the discretion of the referee to allocate such costs based on a determination as to the prevailing party(ies) in the proceeding. By initialing below the parties acknowledge that they have read and understand the foregoing Judicial Reference provisions and understand that they are waiving their right to a jury trial.

_____ ꙨꙄ M _____
Guarantor's Initials

28.     Guarantor waives all rights to interpose any setoffs or counterclaims of any nature in any action or proceeding instituted by Lender with respect to this Guaranty, the collateral therefor, or any matter arising therefrom or relating thereto and the posting of any bond which may otherwise be required, and waives any and all benefits of cross-demands pursuant to section 431.70 of the California Code of Civil Procedure.

29.     Guarantor hereby irrevocably submits and consents to the jurisdiction of any federal or state court of competent jurisdiction within California in connection with any action or proceeding arising out of or relating to this Guaranty. In any such litigation, Guarantor consents to service of process by any means authorized by California or federal law or as otherwise agreed in writing between Lender and Guarantor.

30.     All rights, remedies, powers and benefits granted to Lender under this Guaranty, the Credit, any oral or other written agreement or applicable law whether expressly granted or implied in law or otherwise, are cumulative and not exclusive, and are enforceable alternatively, successively, or concurrently on any one or more occasions at Lender's discretion.

31.     Lender shall not, by any act, delay, omission or otherwise be deemed to have expressly or impliedly waived any security interest granted to Lender hereunder or Lender's rights, powers and/or remedies hereunder (including any right of setoff) unless such waiver shall be in writing and signed by an authorized officer of Lender. Any such waiver shall be enforceable only to the extent specifically set forth therein. A waiver by Lender of any default, right, power and/or remedy on any one occasion shall not be construed as a bar to or waiver of any such default, right, power and/or remedy which Lender would otherwise have on any future occasion whether similar in kind or otherwise. Any failure by Lender to file or enforce a claim

4898912v2                                    8

**Page 85**

against the estate (whether in administration, bankruptcy, probate or other proceeding) of Borrower or of any others, shall not affect Guarantor's liability hereunder.

32.     Neither this Guaranty nor any related agreement, document or instrument nor any provision hereof or thereof shall be amended, modified or discharged orally or by course of conduct, but only by a written agreement signed by an authorized officer of Lender expressly referring to this Guaranty and to the provisions so amended, modified or discharged.

33.     Lender's books and records showing the account(s) between Lender and Borrower shall be admissible in evidence in any action or proceeding as prima facie proof of the items set forth therein. Lender's statements rendered to Borrower, to the extent to which no objection is made within thirty (30) days after date thereof, shall be deemed conclusively correct and constitute an account stated absent manifest error, which shall be binding on Guarantor whether or not Guarantor receives a copy of any such statement or notice thereof.

34.     This is a continuing guaranty of the Credit, including those arising after any repayment and reborrowing and under any successive and future transactions which may increase, renew or continue the original Credit. Revocation of this Guaranty, if permitted by applicable law, shall be effective only upon the close of the next business day after written notice thereof is received by an officer of Lender by certified or registered mail, return receipt requested at 1900 Main Street, Suite 200, Irvine, California 92614, Attention: Matt Bullock, Senior Vice President, or at any other office of Lender designated in a written notice mailed by Lender to Guarantor at its address set forth below. Any such revocation shall be effective only as to the revoking party and shall not affect that party's obligations with respect to Credit existing before the revocation became effective or as to any renewals, extensions or modifications of any Credit, whether such renewal, extension or modification is made prior to or after revocation, including those evidenced by a new or additional instrument or agreement or which change the rate of interest on any Credit, or for post-revocation interest and collection expenses accruing or incurred by Lender with respect thereto. Notwithstanding any revocation hereof, this Guaranty shall not be terminated until Lender has received indefeasible payment in full of all Credit which is guaranteed hereby and, in regard to which Credit, Lender no longer has an outstanding commitment to lend. Credit existing before revocation becomes effective shall be deemed to include, without limitation, all Credit or advances which Lender has committed to make to Borrower in reliance upon this Guaranty, even though the amount of such Credit or advances has not been advanced as of the effective date of revocation, and even though Lender may have defenses or defaults which would relieve it of such commitment, if asserted.

35.     The provisions of this Guaranty shall be construed and interpreted and all rights and obligations hereunder determined in accordance with the laws of the State of California.

36.     GUARANTOR ACKNOWLEDGES THAT LENDER HAS EXTENDED OR MAY IN THE FUTURE EXTEND THE CREDIT TO BORROWER IN RELIANCE ON GUARANTOR'S UNCONDITIONAL PROMISE TO REPAY ANY AND ALL CREDIT AND LENDER IS RELYING ON THE WAIVERS, WARRANTIES AND PROMISES MADE BY GUARANTOR IN THIS GUARANTY. GUARANTOR AGREES THAT EACH OF THE WAIVERS, WARRANTIES AND PROMISES SET FORTH IN THIS GUARANTY ARE MADE WITH GUARANTOR'S UNDERSTANDING OF THEIR SIGNIFICANCE AND

4898912v2                                        9

CONSEQUENCES AND THAT THEY ARE REASONABLE. IF ANY WAIVERS, WARRANTIES AND PROMISES ARE DETERMINED TO BE CONTRARY TO ANY APPLICABLE LAW OR PUBLIC POLICY, SUCH WAIVERS, WARRANTIES AND PROMISES SHALL BE EFFECTIVE TO THE MAXIMUM EXTENT PERMITTED BY LAW. BEFORE SIGNING THE GUARANTY, GUARANTOR HAS EITHER SOUGHT THE ADVICE OF COUNSEL TO EXPLAIN THE WAIVERS OF ITS RIGHTS AND DEFENSES AS STATED HEREIN AND THE EFFECT THEREOF, OR HAS HAD THE OPPORTUNITY TO SEEK SUCH COUNSEL, AND IN ANY EVENT, INTENDS THIS GUARANTY TO BE AS UNRESTRICTED AS POSSIBLE. GUARANTOR THEREFORE HAS CONSCIOUSLY AND INTENTIONALLY WAIVED ALL DEFENSES OF GUARANTOR AND RIGHTS WHICH COULD EXONERATE GUARANTOR HEREUNDER TO THE FULL EXTENT PERMITTED BY THE LAWS OF THE STATE OF CALIFORNIA, WHETHER OR NOT EACH AND EVERY DEFENSE, RIGHT OR WAIVER IS EXPLAINED OR DESCRIBED IN DETAIL IN THIS GUARANTY.

37.     GUARANTOR ACKNOWLEDGES THAT NEITHER LENDER NOR ANY OF LENDER'S OFFICERS OR EMPLOYEES HAVE MADE ANY PROMISE OR REPRESENTATION, NOT INCORPORATED HEREIN, WHETHER ORAL, WRITTEN OR IMPLIED, TO CAUSE GUARANTOR TO SIGN THIS GUARANTY. GUARANTOR IS NOT SIGNING THIS GUARANTY IN RELIANCE ON ANY PROMISE, CONDITION OR THE ANTICIPATION OF THE OCCURRENCE OF ANY EVENT, AND THERE ARE NO ORAL UNDERSTANDINGS, STATEMENTS OR AGREEMENTS WHICH HAVE NOT BEEN INCLUDED IN THIS GUARANTY. GUARANTOR UNDERSTANDS THAT LENDER HAS THE RIGHT TO ENFORCE PAYMENT OF THE CREDIT AGAINST BORROWER OR GUARANTOR IN ANY ORDER AND LENDER IS NOT OBLIGATED TO OBTAIN ANY OTHER OR ADDITIONAL GUARANTORS OF THE CREDIT OR TO TAKE ANY OTHER COURSE OF ACTION.

38.     USA PATRIOT ACT ACKNOWLEDGEMENT – Guarantor acknowledges that Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account or obtains a loan. Guarantor further acknowledges that Lender will ask for Borrower's and Guarantor's legal name, address, tax ID number or social security number and other identifying information, and that Lender may also ask for additional information or documentation or take other actions reasonably necessary to verify the identity of Borrower, Guarantor or other related persons.

39.     This Guaranty constitutes the entire agreement between the parties with respect to the subject matter of this Guaranty, and any and all previous or contemporaneous correspondence, statements, or agreements by or between the parties hereto with respect to the subject matter of this Guaranty (but not previous or other guarantees given to Lender by Guarantor) are superseded hereby. This Guaranty may be modified only by a written instrument signed by the parties hereto.

40.     This Guaranty is not secured by any real property.

41.     Guarantor agrees and consents to Lender's (a) sale, transfer, pledge or assignment, whether now or later, of this Guaranty and/or any of the Loan Documents, or any or

4898912v2                          10

all servicing rights with respect thereto, and/or (b) sale or transfer, whether now or later, of one or more participation interests in the loan guaranteed by this Guaranty ("Loan") to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Guarantor, Borrower or about any other matter relating to the Loan or this Guaranty, and Guarantor hereby waives any rights to privacy Guarantor may have with respect to such matters. Guarantor additionally waives any and all notices of sale or sale of participation interests, as well as all notices of any repurchase of participation interests. Guarantor also agrees that the purchasers of this Guaranty and/or any Loan Documents or participation interests will be considered as the absolute owners of such interests in the Guaranty and/or Loan, as applicable, and will have all the rights granted under the agreement or agreements governing the sale of such interests. Guarantor further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of this Guaranty or such Loan Documents or participant of the Loan and unconditionally agrees that either Lender or such purchaser or participant may enforce Guarantor's obligation under this Guaranty irrespective of the failure or insolvency of any holder of any interest in the Loan and/or this Guaranty. Guarantor further agrees that the purchaser of any such interests may enforce its interests irrespective of any personal claims or defenses that Guarantor may have against Lender. Upon Lender's request, Guarantor shall reasonably cooperate with Lender in connection with any of the transactions contemplated by this Section 41.

42.    General Release.

(a)    Except as to any obligations imposed upon Lender as provided herein, Guarantor, on behalf of itself, its respective successors and assigns, and each of them, does each hereby forever relieve, release, acquit and discharge Lender, and its predecessors, successors and assigns, and its past and present attorneys, accountants, insurers, representatives, affiliates, partners, subsidiaries, officers, employees, directors, and shareholders, and each of them (collectively, the "Released Parties"), from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, costs and expenses (including, but not limited to, attorneys' fees), damages, injuries, actions and causes of action, of whatever kind or nature, whether legal or equitable, known or unknown, suspected or unsuspected, contingent or fixed, which Guarantor now owns or holds or has at any time heretofore owned or held or may at any time hereafter own or hold against the Released Parties, or any of them, by reason of any acts, facts, transactions or any circumstances whatsoever occurring or existing through the date of this Guaranty, including, but not limited to, those based upon, arising out of, appertaining to, or in connection with the Credit, the Prior Guaranty, any documents executed in connection therewith, the facts pertaining to this Guaranty, any collateral heretofore granted to Lender or granted in connection herewith, or to any other obligations of Borrower and/or Guarantor to Lender.

(b)    As to the matters released herein, Guarantor expressly waives any and all rights under Section 1542 of the Civil Code of the State of California, which provides as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
THAT THE CREDITOR OR RELEASING PARTY DOES NOT
KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT
THE TIME OF EXECUTING THE RELEASE AND THAT, IF

4898912v2                                      11                                        **Page 88**

KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY
AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR
OR RELEASED PARTY."

(c)     Guarantor expressly waives and releases any right or benefit which it has or may have under Section 1542 of the Civil Code of the State of California, and any similar law of any state, territory, commonwealth or possession of the United States, or the United States, to the full extent that they may waive all such rights and benefits pertaining to the matters released herein. In connection with such waiver and relinquishment, Guarantor acknowledges that it is aware that it may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true. Nevertheless, it is the intention of Guarantor through this Guaranty to fully, finally and forever release all such matters, and all claims relative thereto, which do now exist, may exist, or heretofore have existed. In furtherance of such intention, the release herein given shall be and remain in effect as a full and complete release of such matters notwithstanding the discovery or existence of any such additional or different claims or facts relative thereto.

(d)     In entering into the release provided for in this Guaranty, Guarantor recognizes that no facts or representations are ever absolutely certain; accordingly, Guarantor assumes the risk of any misrepresentation, concealment or mistake, and if Guarantor should subsequently discover that any fact that it relied upon in entering into these releases was untrue, or that any fact was concealed from it, or that any understanding of the facts or of the law was incorrect, Guarantor shall not be entitled to set aside these releases by reason thereof, regardless of any claims of fraud, misrepresentation, promise made without the intention of performing it, concealment of fact, mistake of fact or law, or any other circumstances whatsoever.

(e)     Guarantor is the sole and lawful owner of all right, title and interest in and to every claim and other matter which it purports to release herein, and it has not heretofore assigned or transferred, or purported to assign or transfer to any person or any entity claims or other matters herein released. Guarantor shall indemnify, defend and hold Lender, and each of the other Released Parties, harmless from and against any claims, liabilities, actions, causes of action, demands, injuries, costs, and expenses (including, but not limited to, attorneys' fees), based upon or arising in connection with any such prior assignment or transfer, or any such purported assignment or transfer, or any claims or other matters released herein.

43.     Document Imaging. Borrower, Lender and Guarantor shall be entitled, each in its sole discretion, to image or make copies of all or any selection of the agreements, instruments, documents and items and records governing, arising from or relating to any of Borrower's loans, including, without limitation, this document and the other Loan Documents, and either party may destroy or archive the paper originals. The parties hereto (i) waive any right to insist or require that the other party produce paper originals, (ii) agree that such images shall be accorded the same force and effect as the paper originals, (iii) agree that each party is entitled to use such images in lieu of destroyed or archived originals for any purpose, including as admissible evidence in any demand, presentment or other proceedings, and (iv) further agree that any executed facsimile (faxed), scanned or other imaged copy of this document or any Loan Document shall be deemed to be of the same force and effect as the originally manually executed document.

44.     Amended and Restated Guaranty. This Guaranty amends, restates, replaces and supersedes in its entirety that certain Continuing Guaranty dated May 5, 2016 (the "Prior Guarantor") given by Guarantor to Lender in connection with that certain Business Loan Agreement (Revolving Line of Credit) dated May 5, 2016 between Borrower and Lender.

*[SIGNATURE PAGE FOLLOWS]*

4898912v2                                          13

IN WITNESS WHEREOF, the Guarantor has executed this Continuing Guaranty as of the 10th day of May 2023.

**GUARANTOR:**

_____
GERALD J. MARCIL, an individual

Address:     544 Paseo Del Mar
             Palos verdes Estates, CA 90274

4898912v2                                14

# EXHIBIT 5

## SECOND AMENDED AND RESTATED CONTINUING GUARANTY

The undersigned, GERALD J. MARCIL, an individual (herein called "Guarantor"), at the solicitation of CANTOR GROUP IV LLC, a Delaware limited liability company ("Borrower"), requests ZIONS BANCORPORATION, N.A., dba California Bank & Trust (herein called "Lender"), to extend Credit to Borrower. In order to induce Lender to extend Credit to Borrower, and in consideration of Credit heretofore, now or hereafter granted to Borrower by Lender, Guarantor agrees as follows:

1.	The term "Credit" is used throughout this Second Amended and Restated Continuing Guaranty ("Guaranty") in its most comprehensive sense and means and includes, without limitation, any and all loans, advances, debts, obligations and liabilities of any kind or nature owed by Borrower to Lender, heretofore, now, or hereafter made, incurred or created, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, secured or unsecured, whether on original, renewed, extended or revised terms (including, without limitation, those evidenced by new or additional instruments or agreements or those changing the applicable rate of interest or which release any obligor with respect thereto), whether principal, interest, fees, or expenses, whether Borrower may be liable individually or jointly with others, whether recovery upon such indebtedness may be or hereafter becomes barred by any statute of limitations, and whether such indebtedness may be or hereafter becomes invalid or otherwise unenforceable. In the event a petition under the United States Bankruptcy Code is filed by or against Borrower, the term "Borrower" shall also mean and include Borrower in its status as a debtor, debtor-in-possession and/or reorganized debtor under the United States Bankruptcy Code.

2.	(a) If there is more than a single entity or person included in the terms "Guarantor" or "Borrower," respectively, each reference herein to such terms shall mean any and all, and one or more of such entities and persons both jointly and severally, and (b) if more than one person or entity executes this Guaranty, the obligations and liabilities hereunder of Guarantors are and shall be both joint and several. If Borrower is a corporation, partnership, limited liability company or association, each reference herein to the term "Borrower" shall include any successor entity to Borrower. If there is more than one guaranty of the obligations of Borrower, the liabilities of all Guarantors are joint and several. As used in this Guaranty, neuter terms include the masculine and feminine, and vice versa.

3.	Guarantor's liability hereunder shall be unlimited. In addition to any liability hereunder, Guarantor agrees to bear and be liable to Lender for the interest and expenses enumerated in paragraph 21 hereof. Any payment by Guarantor shall not reduce the obligations of Guarantor hereunder unless written notice to that effect is actually received by Lender at or prior to the time of such payment. Any payment received by Lender from Borrower, from any other person or from proceeds of collateral granted by Borrower or any other person shall not reduce Guarantor's liability hereunder.

4.	Guarantor unconditionally guarantees and agrees to pay to Lender, on demand, in lawful money of the United States of America, an amount equal to the amount of the Credit plus the fees, expenses, interest, and other amounts and charges specified in paragraphs 3 and 21 hereof, and to otherwise perform any obligations of Borrower undertaken pursuant to any Credit.

5174490v1                                    1

This Guaranty is a guaranty of payment and not of collection. No payment received by Lender from Borrower or any other person or from proceeds of collateral granted by Borrower or any other person shall reduce Guarantor's liability hereunder.

5. Either before or after revocation hereof, Guarantor authorizes Lender at its sole discretion, with or without notice, and without affecting Guarantor's continuing liability hereunder, from time to time to (a) change the time or manner of payment of any Credit by modification, renewal, extension, acceleration or otherwise, (b) amend or change any other provision of any Credit including the rate of interest thereon, (c) accept partial payment on any Credit, (d) accept new or additional instruments, agreements or documents relative to any Credit, (e) release, substitute or add one or more endorsers, cosigners or guarantors for any Credit, (f) enter into forbearances with Borrower even though the result of such forbearance is to increase the amount of accrued and unpaid interest, cost, fees and/or expenses attributable to the Credit, (g) amend or modify the terms of any guaranty executed by a co-guarantor, including the maximum liability thereunder, (h) obtain collateral for the payment of any Credit and/or any guaranty thereof, (i) waive, release, exchange, substitute, or modify, in whole or in part, existing, after-acquired or later acquired collateral securing payment of the Credit or any guaranty therefor on such terms as Lender at its sole discretion shall determine, (j) subordinate payment of all or any part of the Credit to other creditors of Borrower or other persons on such terms as Lender deems appropriate, (k) apply any sums received from Borrower, any other guarantor, endorser or cosigner or from the sale or collection of collateral or its proceeds to any indebtedness whatsoever in any order and regardless of whether or not such indebtedness is guaranteed hereby, is secured by collateral, or is due and payable, (l) without limiting the foregoing, apply any sums received from Guarantor or from the sale of collateral granted by Guarantor to any, all, or any portion of the Credit in any order regardless of whether or not the Credit is secured by collateral or is due and payable, and (m) exercise any right or remedy it may have with respect to any Credit or any collateral securing any Credit, this Guaranty or any other guaranty, including, without limitation, bidding and purchasing at any sale of any such collateral, and compromising, collecting or otherwise liquidating any collateral or any Credit.

6. Guarantor acknowledges that Guarantor may have certain rights under applicable law which, if not waived by Guarantor, might provide Guarantor with defenses against Guarantor's liability under this Guaranty. Among those rights, are certain rights of subrogation, reimbursement, indemnification and contribution, and rights provided in sections 2787 to 2855, inclusive, of the California Civil Code. Guarantor waives all of Guarantor's rights of subrogation, reimbursement, indemnification, and contribution, and any other rights and defenses that are or may become available to Guarantor by reason of any or all of California Civil Code sections 2787 to 2855, inclusive, including, without limitation, Guarantor's rights:

(a) To require Lender to notify Guarantor of any default by Borrower, provide Guarantor with notice of any sale or other disposition of security for any Credit, disclose information with respect to the Credit, Borrower, or any other guarantor, co-signer or endorser, or with respect to any collateral;

(b) That Guarantor's obligation under this Guaranty must be commensurate with that of Borrower;

5174490v1 2

(c)     To be discharged based upon the absence of any liability of Borrower, at any time, by virtue of operation of law, or otherwise, or due to any other disability or defense of Borrower or any other guarantor, endorser or co-signer;

(d)     To be discharged if any of the terms, conditions or provisions of the Credit are altered in any respect;

(e)     To be discharged upon acceptance by Lender of anything in partial satisfaction of the Credit, and/or if Lender designates the portion of the Credit to be satisfied;

(f)     To be discharged upon any modification of the Credit or the release by Lender of Borrower or any other guarantor, endorser or co-signer;

(g)     To require Lender to proceed against Borrower, or any other guarantor, endorser, co-signer, or other person, or to pursue or refrain from pursuing any other remedy in Lender's power;

(h)     To receive the benefit of or participate in any and all security for repayment and/or performance of the Credit;

(i)     To have any security for the Credit first applied to satisfy or discharge the Credit;

(j)     That any arbitration award rendered against Borrower not constitute an award against Guarantor;

(k)     To be discharged based upon any failure by Lender to perfect or continue perfection of any lien, use due diligence to collect all or any part of any Credit, or if recovery against Borrower becomes barred by any statute of limitations, or if Borrower is not liable for any deficiency after Lender realizes upon any collateral;

(l)     To be discharged due to the release or discharge of any collateral for any Credit or guaranty, or relating to the validity, value or enforceability of any collateral; and

(m)     To revoke this Guaranty.

7.     Guarantor also waives all rights and defenses that Guarantor may have because the Borrower's debt is secured by real property. This means, among other things: (1) Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged or assigned by Borrower; and (2) If Lender forecloses on any real property collateral pledged by the Borrower: (A) The amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price, and (B) Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower. This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because Borrower's debt is secured by real property. These rights and defenses include, but are not limited to, any rights or defenses directly or indirectly based upon Sections 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.

5174490v1                                                 3

8.     Guarantor also waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against the principal by the operation of Section 580d of the California Code of Civil Procedure or otherwise.

9.     Guarantor waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of acceptance, notices of the existence, creation or increase of any new or additional credit, notice of sale in regard to judicial or non-judicial foreclosure of real or personal property collateral and all other notices and demands of any kind or nature whatsoever except as expressly set forth herein.

10.     Notwithstanding any foreclosure of the lien of any security agreements, deeds of trust, mortgages or other security instruments, with respect to the Credit or any other guaranty, whether by the exercise of the power of sale contained therein, by any action for judicial foreclosure, or by any acceptance of a deed or other transfer in lieu of foreclosure, whether or not such method of foreclosure or transfer in lieu of foreclosure was for a consideration equal to or greater than the fair market value of the security property, Guarantor shall remain bound under this Guaranty for the obligations of Borrower to Lender and shall be liable to Lender for any and all of the Credit remaining unpaid after any such foreclosure.

11.     Guarantor represents and warrants to Lender that: (a) Lender has made no representation to Guarantor in regard to Borrower, the Credit or any matters pertaining thereto, upon which Guarantor is relying in giving this Guaranty; and (b) Guarantor has established adequate means and assumes the responsibility for being and keeping informed of the financial condition of Borrower and of all other circumstances bearing upon the risk of nonpayment of the Credit which diligent inquiry would reveal, and Lender shall have no duty to advise Guarantor of information known to Lender regarding such condition or any such circumstance.

12.     In addition to all liens upon and rights of setoff against monies, securities or other property of Guarantor given to Lender by law or otherwise as security for this Guaranty, Guarantor hereby pledges to Lender and grants to Lender a security interest in, and Lender shall have a right of setoff against, all monies, securities and other property of Guarantor now or hereafter in the possession of or on deposit with Lender, whether held in a general or special account or deposit or for safekeeping or otherwise; and each such security interest or right of setoff may be enforced or exercised without demand upon, or notice to, Guarantor. No action or lack of action by Lender with respect to any security interest or right of setoff or otherwise shall be deemed a waiver thereof, and every right of setoff or security interest or otherwise shall continue in full force and effect until specifically released by Lender in writing. The security interests created hereby shall secure all of Guarantor's obligations to Lender under this Guaranty and any subsequent guaranty executed by Guarantor.

13.     Any and all indebtedness of Borrower now or hereafter owed to Guarantor and all claims of Guarantor against Borrower, whenever arising, are hereby subordinated to the Credit and assigned to Lender as additional collateral. If Lender so requests, any note or other instrument evidencing such indebtedness and all claims of Guarantor against Borrower shall be delivered to Lender, and such indebtedness and all claims of Guarantor against Borrower shall be

5174490v1                                              4

collected, enforced and received by Guarantor as trustee for Lender and be paid over to Lender on account of the Credit but without reducing or affecting in any manner the liability of Guarantor hereunder. Should Guarantor fail to collect proceeds of debt owed to it by Borrower and pay the proceeds to Lender, Lender, as Guarantor's attorney-in-fact may do such acts and sign such documents in Guarantor's name as Lender considers necessary, at its discretion, to effect such collection, and Guarantor hereby irrevocably appoints Lender as Guarantor's attorney-in-fact for such purposes. If Borrower is a corporation, limited liability company, partnership or other entity, Guarantor will not withdraw or accept, without Lender's prior written consent, any return of any capital invested or equity interest in Borrower.

14.     Guarantor agrees that to the extent Borrower makes a payment or payments or is credited for any payment or payments made for the account of or on behalf of Borrower to Lender, which payment or payments, or any part thereof, are subsequently invalidated, determined to be fraudulent or preferential, voided, set aside and/or required to be repaid to any trustee, receiver, assignee or any other party whether under any bankruptcy, state or federal Law, common law or equitable cause or otherwise, then to the extent thereof, the obligation or part thereof intended to be satisfied thereby, together with the guaranty thereof hereunder, shall be revived, reinstated and continued in full force and effect as if said payment or payments had not originally been made by or for the account of or on behalf of Borrower.

15.     Guarantor agrees that to the extent Guarantor makes a payment or payments or is credited for any payment or payments made for the account of or on behalf of Guarantor to Lender, which payment or payments, or any part thereof, are subsequently invalidated, determined to be fraudulent or preferential, voided, set aside and/or required to be repaid to any trustee, receiver, assignee or any other party whether under any bankruptcy, state or federal Law, common law or equitable cause or otherwise, then to the extent thereof, the obligation or part thereof intended to be satisfied thereby, shall be revived, reinstated and continued in full force and effect as if said payment or payments had not originally been made by or for the account of or on behalf of Guarantor.

16.     Guarantor's obligations hereunder are not contingent upon and are independent of the obligations of Borrower, or any other guarantor or surety of the Credit. This Guaranty is not made in consideration of the liability of any other guarantor or surety of the Credit. The release or death of any guarantor of the Credit or the revocation of any guaranty shall not release or otherwise affect the liability of any other non-revoking guarantor. A separate action or actions may be brought and prosecuted against Guarantor whether action is brought against Borrower or any other guarantor or whether Borrower or any other guarantor be joined in any such action or actions.

17.     To the maximum extent permitted by law, Guarantor specifically waives the benefit of the statute of limitations affecting its liability hereunder or the enforcement hereof, or the collection of any Credit, including, without limiting the foregoing, any and all special statutes of limitations arising out of California Code of Civil Procedure sections 580a or 726(b). Any partial payment by Borrower which operates to toll any statute of limitations as to Borrower shall likewise toll the statute of limitations as to Guarantor.

18.     Any married person who signs this Guaranty expressly agrees that recourse may be had against his/her separate property as well as all community property over which that person has a power of management and control, for all of his/her obligations hereunder.

19.     Should any one or more provisions of this Guaranty be determined to be illegal or unenforceable, all other provisions shall remain effective.

20.     Lender may, with or without notice, assign this Guaranty in whole or in part. This Guaranty shall inure to the benefit of Lender, its successors and assigns, and shall bind Guarantor and Guarantor's heirs, executors, administrators, representatives, successors and assigns.

21.     Guarantor agrees to pay to Lender, on demand, all attorneys' fees and all other costs and expenses which may be incurred by Lender in the collection or attempted collection from Borrower of any Credit and/or in the interpretation, enforcement or attempted enforcement by Lender of this Guaranty or any collateral therefor, including, but not limited to, proceedings in any bankruptcy or other insolvency case or other proceedings concerning the Credit or this Guaranty, or both, in any manner, whether or not legal proceedings or suit are instituted, together with interest thereon at the rate applicable to the Credit and including, without limitation, all attorneys' fees and related costs of enforcement of any and all judgments and awards and upon any appeal relating thereto.

22.     Guarantor warrants and represents to Lender that:

(a)     No representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of the Guaranty;

(b)     Guarantor has full power, right and authority to enter into the Guaranty;

(c)     The provisions of the Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor;

(d)     Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein;

(e)     Upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided;

(f)     All financial statements and other financial information furnished or to be furnished to Lender by Guarantor are and will be true and correct and do and will fairly represent the financial condition of Guarantor (including all contingent liabilities) as of the dates thereof;

5174490v1                                    6

(g)   There has been no material adverse change in Guarantor's financial condition since the dates of the financial statements and other information furnished to Lender, except as previously disclosed to Lender in writing;

(h)   no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened;

(i)   Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and

(j)   Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition, and  Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under the Guaranty, and Guarantor further agrees that Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of  its relationship with Borrower.

23.   Lender may declare Guarantor in default under this Guaranty upon the occurrence of any of the following events:

(a)   Guarantor fails to pay or perform any of Guarantor's obligations under this Guaranty; or

(b)   Any representation or warranty made or given by Guarantor to Lender proves to be false or misleading in any material respect; or

(c)   A petition or action for relief shall be filed by or against Guarantor, pursuant to the Federal Bankruptcy Code (Title 11, U.S. Codes) in effect from time to time, or under any other law relating to bankruptcy, insolvency, reorganization, moratorium, creditor composition, arrangement or other relief from debts; the appointment of a receiver, trustee, custodian or liquidator of or for any property of Guarantor; or upon the death, incapacity, insolvency, dissolution, or termination of the business of Guarantor; or

(d)   Guarantor revokes or attempts to revoke this Guaranty.

24.   If Borrower is a corporation, limited liability company, partnership or other entity, Lender need not inquire into the power of Borrower or the authority of its officers, directors, partners, agents, members or managers acting or purporting to act in its behalf, and any Credit granted in reliance upon the purported exercise of such power or authority is guaranteed hereunder.

25.   Receipt of a true copy of this Guaranty is hereby acknowledged by Guarantor. Guarantor understands and agrees that Lender's acceptance of this Guaranty shall not constitute a commitment of any nature whatsoever by Lender to extend, renew or hereafter extend credit to Borrower.  Guarantor agrees that this Guaranty shall be effective with or without notice from Lender of its acceptance of this Guaranty.

5174490v1

7

26. If Guarantor has executed more than one Guaranty of any or all indebtedness of Borrower owed to Lender, any limits of liability thereunder and hereunder shall be cumulative, and a subsequent guaranty executed by Guarantor shall not supersede or replace this Guaranty unless such subsequent guaranty so provides.

27. JUDICIAL REFERENCE. The parties hereby agree that any claims, controversies, disputes, or questions of interpretation, whether legal or equitable, arising out of, concerning or related to this Guaranty and all Loan Documents executed by Guarantor shall be heard by a single referee by consensual general judicial reference pursuant to the provisions of California Code of Civil Procedure sects 638 et seq., who shall determine all issues of fact or law and to report a statement of decision. The referee shall also have the power to hear and determine proceedings for ancillary relief, including, but not limited to, applications for attachment, issuance of injunctive relief, appointment of a receiver, and/or claim and delivery. The costs of the proceeding shall be borne equally by the parties to the dispute, subject to the discretion of the referee to allocate such costs based on a determination as to the prevailing party(ies) in the proceeding. By initialing below the parties acknowledge that they have read and understand the foregoing Judicial Reference provisions and understand that they are waiving their right to a jury trial.

_____
Guarantor's Initials

28. Guarantor waives all rights to interpose any setoffs or counterclaims of any nature in any action or proceeding instituted by Lender with respect to this Guaranty, the collateral therefor, or any matter arising therefrom or relating thereto and the posting of any bond which may otherwise be required, and waives any and all benefits of cross-demands pursuant to section 431.70 of the California Code of Civil Procedure.

29. Guarantor hereby irrevocably submits and consents to the jurisdiction of any federal or state court of competent jurisdiction within California in connection with any action or proceeding arising out of or relating to this Guaranty. In any such litigation, Guarantor consents to service of process by any means authorized by California or federal law or as otherwise agreed in writing between Lender and Guarantor.

30. All rights, remedies, powers and benefits granted to Lender under this Guaranty, the Credit, any oral or other written agreement or applicable law whether expressly granted or implied in law or otherwise, are cumulative and not exclusive, and are enforceable alternatively, successively, or concurrently on any one or more occasions at Lender's discretion.

31. Lender shall not, by any act, delay, omission or otherwise be deemed to have expressly or impliedly waived any security interest granted to Lender hereunder or Lender's rights, powers and/or remedies hereunder (including any right of setoff) unless such waiver shall be in writing and signed by an authorized officer of Lender. Any such waiver shall be enforceable only to the extent specifically set forth therein. A waiver by Lender of any default, right, power and/or remedy on any one occasion shall not be construed as a bar to or waiver of any such default, right, power and/or remedy which Lender would otherwise have on any future occasion whether similar in kind or otherwise. Any failure by Lender to file or enforce a claim

5174490v1                                        8

**Page 100**

against the estate (whether in administration, bankruptcy, probate or other proceeding) of Borrower or of any others, shall not affect Guarantor's liability hereunder.

32. Neither this Guaranty nor any related agreement, document or instrument nor any provision hereof or thereof shall be amended, modified or discharged orally or by course of conduct, but only by a written agreement signed by an authorized officer of Lender expressly referring to this Guaranty and to the provisions so amended, modified or discharged.

33. Lender's books and records showing the account(s) between Lender and Borrower shall be admissible in evidence in any action or proceeding as prima facie proof of the items set forth therein. Lender's statements rendered to Borrower, to the extent to which no objection is made within thirty (30) days after date thereof, shall be deemed conclusively correct and constitute an account stated absent manifest error, which shall be binding on Guarantor whether or not Guarantor receives a copy of any such statement or notice thereof.

34. This is a continuing guaranty of the Credit, including those arising after any repayment and reborrowing and under any successive and future transactions which may increase, renew or continue the original Credit. Revocation of this Guaranty, if permitted by applicable law, shall be effective only upon the close of the next business day after written notice thereof is received by an officer of Lender by certified or registered mail, return receipt requested at 1900 Main Street, Suite 200, Irvine, California 92614, Attention: Matt Bullock, Executive Vice President, or at any other office of Lender designated in a written notice mailed by Lender to Guarantor at its address set forth below. Any such revocation shall be effective only as to the revoking party and shall not affect that party's obligations with respect to Credit existing before the revocation became effective or as to any renewals, extensions or modifications of any Credit, whether such renewal, extension or modification is made prior to or after revocation, including those evidenced by a new or additional instrument or agreement or which change the rate of interest on any Credit, or for post-revocation interest and collection expenses accruing or incurred by Lender with respect thereto. Notwithstanding any revocation hereof, this Guaranty shall not be terminated until Lender has received indefeasible payment in full of all Credit which is guaranteed hereby and, in regard to which Credit, Lender no longer has an outstanding commitment to lend. Credit existing before revocation becomes effective shall be deemed to include, without limitation, all Credit or advances which Lender has committed to make to Borrower in reliance upon this Guaranty, even though the amount of such Credit or advances has not been advanced as of the effective date of revocation, and even though Lender may have defenses or defaults which would relieve it of such commitment, if asserted.

35. The provisions of this Guaranty shall be construed and interpreted and all rights and obligations hereunder determined in accordance with the laws of the State of California.

36. GUARANTOR ACKNOWLEDGES THAT LENDER HAS EXTENDED OR MAY IN THE FUTURE EXTEND THE CREDIT TO BORROWER IN RELIANCE ON GUARANTOR'S UNCONDITIONAL PROMISE TO REPAY ANY AND ALL CREDIT AND LENDER IS RELYING ON THE WAIVERS, WARRANTIES AND PROMISES MADE BY GUARANTOR IN THIS GUARANTY. GUARANTOR AGREES THAT EACH OF THE WAIVERS, WARRANTIES AND PROMISES SET FORTH IN THIS GUARANTY ARE MADE WITH GUARANTOR'S UNDERSTANDING OF THEIR SIGNIFICANCE AND

5174490v1                                        9

CONSEQUENCES AND THAT THEY ARE REASONABLE. IF ANY WAIVERS, WARRANTIES AND PROMISES ARE DETERMINED TO BE CONTRARY TO ANY APPLICABLE LAW OR PUBLIC POLICY, SUCH WAIVERS, WARRANTIES AND PROMISES SHALL BE EFFECTIVE TO THE MAXIMUM EXTENT PERMITTED BY LAW. BEFORE SIGNING THE GUARANTY, GUARANTOR HAS EITHER SOUGHT THE ADVICE OF COUNSEL TO EXPLAIN THE WAIVERS OF ITS RIGHTS AND DEFENSES AS STATED HEREIN AND THE EFFECT THEREOF, OR HAS HAD THE OPPORTUNITY TO SEEK SUCH COUNSEL, AND IN ANY EVENT, INTENDS THIS GUARANTY TO BE AS UNRESTRICTED AS POSSIBLE. GUARANTOR THEREFORE HAS CONSCIOUSLY AND INTENTIONALLY WAIVED ALL DEFENSES OF GUARANTOR AND RIGHTS WHICH COULD EXONERATE GUARANTOR HEREUNDER TO THE FULL EXTENT PERMITTED BY THE LAWS OF THE STATE OF CALIFORNIA, WHETHER OR NOT EACH AND EVERY DEFENSE, RIGHT OR WAIVER IS EXPLAINED OR DESCRIBED IN DETAIL IN THIS GUARANTY.

37. GUARANTOR ACKNOWLEDGES THAT NEITHER LENDER NOR ANY OF LENDER'S OFFICERS OR EMPLOYEES HAVE MADE ANY PROMISE OR REPRESENTATION, NOT INCORPORATED HEREIN, WHETHER ORAL, WRITTEN OR IMPLIED, TO CAUSE GUARANTOR TO SIGN THIS GUARANTY. GUARANTOR IS NOT SIGNING THIS GUARANTY IN RELIANCE ON ANY PROMISE, CONDITION OR THE ANTICIPATION OF THE OCCURRENCE OF ANY EVENT, AND THERE ARE NO ORAL UNDERSTANDINGS, STATEMENTS OR AGREEMENTS WHICH HAVE NOT BEEN INCLUDED IN THIS GUARANTY. GUARANTOR UNDERSTANDS THAT LENDER HAS THE RIGHT TO ENFORCE PAYMENT OF THE CREDIT AGAINST BORROWER OR GUARANTOR IN ANY ORDER AND LENDER IS NOT OBLIGATED TO OBTAIN ANY OTHER OR ADDITIONAL GUARANTORS OF THE CREDIT OR TO TAKE ANY OTHER COURSE OF ACTION.

38. USA PATRIOT ACT ACKNOWLEDGEMENT – Guarantor acknowledges that Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account or obtains a loan. Guarantor further acknowledges that Lender will ask for Borrower's and Guarantor's legal name, address, tax ID number or social security number and other identifying information, and that Lender may also ask for additional information or documentation or take other actions reasonably necessary to verify the identity of Borrower, Guarantor or other related persons.

39. This Guaranty constitutes the entire agreement between the parties with respect to the subject matter of this Guaranty, and any and all previous or contemporaneous correspondence, statements, or agreements by or between the parties hereto with respect to the subject matter of this Guaranty (but not previous or other guarantees given to Lender by Guarantor) are superseded hereby. This Guaranty may be modified only by a written instrument signed by the parties hereto.

40. This Guaranty is not secured by any real property.

41. Guarantor agrees and consents to Lender's (a) sale, transfer, pledge or assignment, whether now or later, of this Guaranty and/or any of the Loan Documents, or any or

all servicing rights with respect thereto, and/or (b) sale or transfer, whether now or later, of one or more participation interests in the loan guaranteed by this Guaranty ("Loan") to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Guarantor, Borrower or about any other matter relating to the Loan or this Guaranty, and Guarantor hereby waives any rights to privacy Guarantor may have with respect to such matters. Guarantor additionally waives any and all notices of sale or sale of participation interests, as well as all notices of any repurchase of participation interests. Guarantor also agrees that the purchasers of this Guaranty and/or any Loan Documents or participation interests will be considered as the absolute owners of such interests in the Guaranty and/or Loan, as applicable, and will have all the rights granted under the agreement or agreements governing the sale of such interests. Guarantor further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of this Guaranty or such Loan Documents or participant of the Loan and unconditionally agrees that either Lender or such purchaser or participant may enforce Guarantor's obligation under this Guaranty irrespective of the failure or insolvency of any holder of any interest in the Loan and/or this Guaranty. Guarantor further agrees that the purchaser of any such interests may enforce its interests irrespective of any personal claims or defenses that Guarantor may have against Lender. Upon Lender's request, Guarantor shall reasonably cooperate with Lender in connection with any of the transactions contemplated by this Section 41.

42.     General Release.

(a)     Except as to any obligations imposed upon Lender as provided herein, Guarantor, on behalf of itself, its respective successors and assigns, and each of them, does each hereby forever relieve, release, acquit and discharge Lender, and its predecessors, successors and assigns, and its past and present attorneys, accountants, insurers, representatives, affiliates, partners, subsidiaries, officers, employees, directors, and shareholders, and each of them (collectively, the "Released Parties"), from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, costs and expenses (including, but not limited to, attorneys' fees), damages, injuries, actions and causes of action, of whatever kind or nature, whether legal or equitable, known or unknown, suspected or unsuspected, contingent or fixed, which Guarantor now owns or holds or has at any time heretofore owned or held or may at any time hereafter own or hold against the Released Parties, or any of them, by reason of any acts, facts, transactions or any circumstances whatsoever occurring or existing through the date of this Guaranty, including, but not limited to, those based upon, arising out of, appertaining to, or in connection with the Credit, the Prior Guaranty, any documents executed in connection therewith, the facts pertaining to this Guaranty, any collateral heretofore granted to Lender or granted in connection herewith, or to any other obligations of Borrower and/or Guarantor to Lender.

(b)     As to the matters released herein, Guarantor expressly waives any and all rights under Section 1542 of the Civil Code of the State of California, which provides as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
THAT THE CREDITOR OR RELEASING PARTY DOES NOT
KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT
THE TIME OF EXECUTING THE RELEASE AND THAT, IF

5174490v1                                    11

KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY
AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR
OR RELEASED PARTY."

(c)    Guarantor expressly waives and releases any right or benefit which it has or may have under Section 1542 of the Civil Code of the State of California, and any similar law of any state, territory, commonwealth or possession of the United States, or the United States, to the full extent that they may waive all such rights and benefits pertaining to the matters released herein.  In connection with such waiver and relinquishment, Guarantor acknowledges that it is aware that it may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true.  Nevertheless, it is the intention of Guarantor through this Guaranty to fully, finally and forever release all such matters, and all claims relative thereto, which do now exist, may exist, or heretofore have existed.  In furtherance of such intention, the release herein given shall be and remain in effect as a full and complete release of such matters notwithstanding the discovery or existence of any such additional or different claims or facts relative thereto.

(d)    In entering into the release provided for in this Guaranty, Guarantor recognizes that no facts or representations are ever absolutely certain; accordingly, Guarantor assumes the risk of any misrepresentation, concealment or mistake, and if Guarantor should subsequently discover that any fact that it relied upon in entering into these releases was untrue, or that any fact was concealed from it, or that any understanding of the facts or of the law was incorrect, Guarantor shall not be entitled to set aside these releases by reason thereof, regardless of any claims of fraud, misrepresentation, promise made without the intention of performing it, concealment of fact, mistake of fact or law, or any other circumstances whatsoever.

(e)    Guarantor is the sole and lawful owner of all right, title and interest in and to every claim and other matter which it purports to release herein, and it has not heretofore assigned or transferred, or purported to assign or transfer to any person or any entity claims or other matters herein released.  Guarantor shall indemnify, defend and hold Lender, and each of the other Released Parties, harmless from and against any claims, liabilities, actions, causes of action, demands, injuries, costs, and expenses (including, but not limited to, attorneys' fees), based upon or arising in connection with any such prior assignment or transfer, or any such purported assignment or transfer, or any claims or other matters released herein.

43.    Document Imaging.  Borrower, Lender and Guarantor shall be entitled, each in its sole discretion, to image or make copies of all or any selection of the agreements, instruments, documents and items and records governing, arising from or relating to any of Borrower's loans, including, without limitation, this document and the other Loan Documents, and either party may destroy or archive the paper originals.  The parties hereto (i) waive any right to insist or require that the other party produce paper originals, (ii) agree that such images shall be accorded the same force and effect as the paper originals, (iii) agree that each party is entitled to use such images in lieu of destroyed or archived originals for any purpose, including as admissible evidence in any demand, presentment or other proceedings, and (iv) further agree that any executed facsimile (faxed), scanned or other imaged copy of this document or any Loan Document shall be deemed to be of the same force and effect as the originally manually executed document.

5174490v1                                      12

44.     <u>Amended and Restated Guaranty</u>.  This Guaranty amends, restates, replaces and supersedes in its entirety that certain Amended and Restated Limited Guaranty dated October __, 2020 given by Guarantor to Lender in connection with that certain Business Loan Agreement (Revolving Line of Credit) dated July 18, 2017 between Borrower and Lender.

*[SIGNATURE PAGE FOLLOWS]*

5174490v1                                                    13

IN WITNESS WHEREOF, the Guarantor has executed this Second Amended and Restated Continuing Guaranty as of the 25th day of March 2024.

**GUARANTOR:**

_____
GERALD J. MARCIL, an individual

Address:   43 D MALAGA COVE PLAZA
PALOS VERDES ESTATES, CA., 90274

5174490v1                                    14

# EXHIBIT 6

## AMENDED AND RESTATED CONTINUING GUARANTY

The undersigned, Gerald J. Marcil and Carol L. Marcil, as Trustees of the MARCIL FAMILY TRUST dated May 9, 1997, an individual (herein called "Guarantor"), at the solicitation of CANTOR GROUP II, LLC, a Delaware limited liability company ("Borrower"), requests ZIONS BANCORPORATION, N.A., dba California Bank & Trust (herein called "Lender"), to extend Credit to Borrower. In order to induce Lender to extend Credit to Borrower, and in consideration of Credit heretofore, now or hereafter granted to Borrower by Lender, Guarantor agrees as follows:

1.      The term "Credit" is used throughout this Amended and Restated Continuing Guaranty ("Guaranty") in its most comprehensive sense and means and includes, without limitation, any and all loans, advances, debts, obligations and liabilities of any kind or nature owed by Borrower to Lender, heretofore, now, or hereafter made, incurred or created, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, secured or unsecured, whether on original, renewed, extended or revised terms (including, without limitation, those evidenced by new or additional instruments or agreements or those changing the applicable rate of interest or which release any obligor with respect thereto), whether principal, interest, fees, or expenses, whether Borrower may be liable individually or jointly with others, whether recovery upon such indebtedness may be or hereafter becomes barred by any statute of limitations, and whether such indebtedness may be or hereafter becomes invalid or otherwise unenforceable. In the event a petition under the United States Bankruptcy Code is filed by or against Borrower, the term "Borrower" shall also mean and include Borrower in its status as a debtor, debtor-in-possession and/or reorganized debtor under the United States Bankruptcy Code.

2.      (a) If there is more than a single entity or person included in the terms "Guarantor" or "Borrower," respectively, each reference herein to such terms shall mean any and all, and one or more of such entities and persons both jointly and severally, and (b) if more than one person or entity executes this Guaranty, the obligations and liabilities hereunder of Guarantors are and shall be both joint and several. If Borrower is a corporation, partnership, limited liability company or association, each reference herein to the term "Borrower" shall include any successor entity to Borrower. If there is more than one guaranty of the obligations of Borrower, the liabilities of all Guarantors are joint and several. As used in this Guaranty, neuter terms include the masculine and feminine, and vice versa.

3.      Guarantor's liability hereunder shall be unlimited. In addition to any liability hereunder, Guarantor agrees to bear and be liable to Lender for the interest and expenses enumerated in paragraph 21 hereof. Any payment by Guarantor shall not reduce the obligations of Guarantor hereunder unless written notice to that effect is actually received by Lender at or prior to the time of such payment. Any payment received by Lender from Borrower, from any other person or from proceeds of collateral granted by Borrower or any other person shall not reduce Guarantor's liability hereunder.

4.      Guarantor unconditionally guarantees and agrees to pay to Lender, on demand, in lawful money of the United States of America, an amount equal to the amount of the Credit plus the fees, expenses, interest, and other amounts and charges specified in paragraphs 3 and 21

4898916v2                                          1

hereof, and to otherwise perform any obligations of Borrower undertaken pursuant to any Credit. This Guaranty is a guaranty of payment and not of collection. No payment received by Lender from Borrower or any other person or from proceeds of collateral granted by Borrower or any other person shall reduce Guarantor's liability hereunder.

5.      Either before or after revocation hereof, Guarantor authorizes Lender at its sole discretion, with or without notice, and without affecting Guarantor's continuing liability hereunder, from time to time to (a) change the time or manner of payment of any Credit by modification, renewal, extension, acceleration or otherwise, (b) amend or change any other provision of any Credit including the rate of interest thereon, (c) accept partial payment on any Credit, (d) accept new or additional instruments, agreements or documents relative to any Credit, (e) release, substitute or add one or more endorsers, cosigners or guarantors for any Credit, (f) enter into forbearances with Borrower even though the result of such forbearance is to increase the amount of accrued and unpaid interest, cost, fees and/or expenses attributable to the Credit, (g) amend or modify the terms of any guaranty executed by a co-guarantor, including the maximum liability thereunder, (h) obtain collateral for the payment of any Credit and/or any guaranty thereof, (i) waive, release, exchange, substitute, or modify, in whole or in part, existing, after-acquired or later acquired collateral securing payment of the Credit or any guaranty therefor on such terms as Lender at its sole discretion shall determine, (j) subordinate payment of all or any part of the Credit to other creditors of Borrower or other persons on such terms as Lender deems appropriate, (k) apply any sums received from Borrower, any other guarantor, endorser or cosigner or from the sale or collection of collateral or its proceeds to any indebtedness whatsoever in any order and regardless of whether or not such indebtedness is guaranteed hereby, is secured by collateral, or is due and payable, (l) without limiting the foregoing, apply any sums received from Guarantor or from the sale of collateral granted by Guarantor to any, all, or any portion of the Credit in any order regardless of whether or not the Credit is secured by collateral or is due and payable, and (m) exercise any right or remedy it may have with respect to any Credit or any collateral securing any Credit, this Guaranty or any other guaranty, including, without limitation, bidding and purchasing at any sale of any such collateral, and compromising, collecting or otherwise liquidating any collateral or any Credit.

6.      Guarantor acknowledges that Guarantor may have certain rights under applicable law which, if not waived by Guarantor, might provide Guarantor with defenses against Guarantor's liability under this Guaranty. Among those rights, are certain rights of subrogation, reimbursement, indemnification and contribution, and rights provided in sections 2787 to 2855, inclusive, of the California Civil Code. Guarantor waives all of Guarantor's rights of subrogation, reimbursement, indemnification, and contribution, and any other rights and defenses that are or may become available to Guarantor by reason of any or all of California Civil Code sections 2787 to 2855, inclusive, including, without limitation, Guarantor's rights:

(a)      To require Lender to notify Guarantor of any default by Borrower, provide Guarantor with notice of any sale or other disposition of security for any Credit, disclose information with respect to the Credit, Borrower, or any other guarantor, co-signer or endorser, or with respect to any collateral;

(b)      That Guarantor's obligation under this Guaranty must be commensurate with that of Borrower;

4898916v2                                          2

**Page 109**

(c) To be discharged based upon the absence of any liability of Borrower, at any time, by virtue of operation of law, or otherwise, or due to any other disability or defense of Borrower or any other guarantor, endorser or co-signer;

(d) To be discharged if any of the terms, conditions or provisions of the Credit are altered in any respect;

(e) To be discharged upon acceptance by Lender of anything in partial satisfaction of the Credit, and/or if Lender designates the portion of the Credit to be satisfied;

(f) To be discharged upon any modification of the Credit or the release by Lender of Borrower or any other guarantor, endorser or co-signer;

(g) To require Lender to proceed against Borrower, or any other guarantor, endorser, co-signer, or other person, or to pursue or refrain from pursuing any other remedy in Lender's power;

(h) To receive the benefit of or participate in any and all security for repayment and/or performance of the Credit;

(i) To have any security for the Credit first applied to satisfy or discharge the Credit;

(j) That any arbitration award rendered against Borrower not constitute an award against Guarantor;

(k) To be discharged based upon any failure by Lender to perfect or continue perfection of any lien, use due diligence to collect all or any part of any Credit, or if recovery against Borrower becomes barred by any statute of limitations, or if Borrower is not liable for any deficiency after Lender realizes upon any collateral;

(l) To be discharged due to the release or discharge of any collateral for any Credit or guaranty, or relating to the validity, value or enforceability of any collateral; and

(m) To revoke this Guaranty.

7. Guarantor also waives all rights and defenses that Guarantor may have because the Borrower's debt is secured by real property. This means, among other things: (1) Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged or assigned by Borrower; and (2) If Lender forecloses on any real property collateral pledged by the Borrower: (A) The amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price, and (B) Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower. This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because Borrower's debt is secured by real property. These rights and defenses include, but are not limited to, any rights or defenses directly or indirectly based upon Sections 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.

4898916v2                                        3

8.     Guarantor also waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against the principal by the operation of Section 580d of the California Code of Civil Procedure or otherwise.

9.     Guarantor waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of acceptance, notices of the existence, creation or increase of any new or additional credit, notice of sale in regard to judicial or non-judicial foreclosure of real or personal property collateral and all other notices and demands of any kind or nature whatsoever except as expressly set forth herein.

10.     Notwithstanding any foreclosure of the lien of any security agreements, deeds of trust, mortgages or other security instruments, with respect to the Credit or any other guaranty, whether by the exercise of the power of sale contained therein, by any action for judicial foreclosure, or by any acceptance of a deed or other transfer in lieu of foreclosure, whether or not such method of foreclosure or transfer in lieu of foreclosure was for a consideration equal to or greater than the fair market value of the security property, Guarantor shall remain bound under this Guaranty for the obligations of Borrower to Lender and shall be liable to Lender for any and all of the Credit remaining unpaid after any such foreclosure.

11.     Guarantor represents and warrants to Lender that: (a) Lender has made no representation to Guarantor in regard to Borrower, the Credit or any matters pertaining thereto, upon which Guarantor is relying in giving this Guaranty; and (b) Guarantor has established adequate means and assumes the responsibility for being and keeping informed of the financial condition of Borrower and of all other circumstances bearing upon the risk of nonpayment of the Credit which diligent inquiry would reveal, and Lender shall have no duty to advise Guarantor of information known to Lender regarding such condition or any such circumstance.

12.     In addition to all liens upon and rights of setoff against monies, securities or other property of Guarantor given to Lender by law or otherwise as security for this Guaranty, Guarantor hereby pledges to Lender and grants to Lender a security interest in, and Lender shall have a right of setoff against, all monies, securities and other property of Guarantor now or hereafter in the possession of or on deposit with Lender, whether held in a general or special account or deposit or for safekeeping or otherwise; and each such security interest or right of setoff may be enforced or exercised without demand upon, or notice to, Guarantor. No action or lack of action by Lender with respect to any security interest or right of setoff or otherwise shall be deemed a waiver thereof, and every right of setoff or security interest or otherwise shall continue in full force and effect until specifically released by Lender in writing. The security interests created hereby shall secure all of Guarantor's obligations to Lender under this Guaranty and any subsequent guaranty executed by Guarantor.

13.     Any and all indebtedness of Borrower now or hereafter owed to Guarantor and all claims of Guarantor against Borrower, whenever arising, are hereby subordinated to the Credit and assigned to Lender as additional collateral. If Lender so requests, any note or other instrument evidencing such indebtedness and all claims of Guarantor against Borrower shall be delivered to Lender, and such indebtedness and all claims of Guarantor against Borrower shall be

4898916v2                                   4

**Page 111**

collected, enforced and received by Guarantor as trustee for Lender and be paid over to Lender on account of the Credit but without reducing or affecting in any manner the liability of Guarantor hereunder. Should Guarantor fail to collect proceeds of debt owed to it by Borrower and pay the proceeds to Lender, Lender, as Guarantor's attorney-in-fact may do such acts and sign such documents in Guarantor's name as Lender considers necessary, at its discretion, to effect such collection, and Guarantor hereby irrevocably appoints Lender as Guarantor's attorney-in-fact for such purposes. If Borrower is a corporation, limited liability company, partnership or other entity, Guarantor will not withdraw or accept, without Lender's prior written consent, any return of any capital invested or equity interest in Borrower.

14. Guarantor agrees that to the extent Borrower makes a payment or payments or is credited for any payment or payments made for the account of or on behalf of Borrower to Lender, which payment or payments, or any part thereof, are subsequently invalidated, determined to be fraudulent or preferential, voided, set aside and/or required to be repaid to any trustee, receiver, assignee or any other party whether under any bankruptcy, state or federal Law, common law or equitable cause or otherwise, then to the extent thereof, the obligation or part thereof intended to be satisfied thereby, together with the guaranty thereof hereunder, shall be revived, reinstated and continued in full force and effect as if said payment or payments had not originally been made by or for the account of or on behalf of Borrower.

15. Guarantor agrees that to the extent Guarantor makes a payment or payments or is credited for any payment or payments made for the account of or on behalf of Guarantor to Lender, which payment or payments, or any part thereof, are subsequently invalidated, determined to be fraudulent or preferential, voided, set aside and/or required to be repaid to any trustee, receiver, assignee or any other party whether under any bankruptcy, state or federal Law, common law or equitable cause or otherwise, then to the extent thereof, the obligation or part thereof intended to be satisfied thereby, shall be revived, reinstated and continued in full force and effect as if said payment or payments had not originally been made by or for the account of or on behalf of Guarantor.

16. Guarantor's obligations hereunder are not contingent upon and are independent of the obligations of Borrower, or any other guarantor or surety of the Credit. This Guaranty is not made in consideration of the liability of any other guarantor or surety of the Credit. The release or death of any guarantor of the Credit or the revocation of any guaranty shall not release or otherwise affect the liability of any other non-revoking guarantor. A separate action or actions may be brought and prosecuted against Guarantor whether action is brought against Borrower or any other guarantor or whether Borrower or any other guarantor be joined in any such action or actions.

17. To the maximum extent permitted by law, Guarantor specifically waives the benefit of the statute of limitations affecting its liability hereunder or the enforcement hereof, or the collection of any Credit, including, without limiting the foregoing, any and all special statutes of limitations arising out of California Code of Civil Procedure sections 580a or 726(b). Any partial payment by Borrower which operates to toll any statute of limitations as to Borrower shall likewise toll the statute of limitations as to Guarantor.

4898916v2       5

18.     Any married person who signs this Guaranty expressly agrees that recourse may be had against his/her separate property as well as all community property over which that person has a power of management and control, for all of his/her obligations hereunder.

19.     Should any one or more provisions of this Guaranty be determined to be illegal or unenforceable, all other provisions shall remain effective.

20.     Lender may, with or without notice, assign this Guaranty in whole or in part. This Guaranty shall inure to the benefit of Lender, its successors and assigns, and shall bind Guarantor and Guarantor's heirs, executors, administrators, representatives, successors and assigns.

21.     Guarantor agrees to pay to Lender, on demand, all attorneys' fees and all other costs and expenses which may be incurred by Lender in the collection or attempted collection from Borrower of any Credit and/or in the interpretation, enforcement or attempted enforcement by Lender of this Guaranty or any collateral therefor, including, but not limited to, proceedings in any bankruptcy or other insolvency case or other proceedings concerning the Credit or this Guaranty, or both, in any manner, whether or not legal proceedings or suit are instituted, together with interest thereon at the rate applicable to the Credit and including, without limitation, all attorneys' fees and related costs of enforcement of any and all judgments and awards and upon any appeal relating thereto.

22.     Guarantor warrants and represents to Lender that:

(a)     No representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of the Guaranty;

(b)     Guarantor has full power, right and authority to enter into the Guaranty;

(c)     The provisions of the Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor;

(d)     Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein;

(e)     Upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided;

(f)     All financial statements and other financial information furnished or to be furnished to Lender by Guarantor are and will be true and correct and do and will fairly represent the financial condition of Guarantor (including all contingent liabilities) as of the dates thereof;

(g)    There has been no material adverse change in Guarantor's financial condition since the dates of the financial statements and other information furnished to Lender, except as previously disclosed to Lender in writing;

(h)    no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened;

(i)    Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and

(j)    Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition, and  Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under the Guaranty, and Guarantor further agrees that Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

23.    Lender may declare Guarantor in default under this Guaranty upon the occurrence of any of the following events:

(a)    Guarantor fails to pay or perform any of Guarantor's obligations under this Guaranty; or

(b)    Any representation or warranty made or given by Guarantor to Lender proves to be false or misleading in any material respect; or

(c)    A petition or action for relief shall be filed by or against Guarantor, pursuant to the Federal Bankruptcy Code (Title 11, U.S. Codes) in effect from time to time, or under any other law relating to bankruptcy, insolvency, reorganization, moratorium, creditor composition, arrangement or other relief from debts; the appointment of a receiver, trustee, custodian or liquidator of or for any property of Guarantor; or upon the death, incapacity, insolvency, dissolution, or termination of the business of Guarantor; or

(d)    Guarantor revokes or attempts to revoke this Guaranty.

24.    If Borrower is a corporation, limited liability company, partnership or other entity, Lender need not inquire into the power of Borrower or the authority of its officers, directors, partners, agents, members or managers acting or purporting to act in its behalf, and any Credit granted in reliance upon the purported exercise of such power or authority is guaranteed hereunder.

25.    Receipt of a true copy of this Guaranty is hereby acknowledged by Guarantor. Guarantor understands and agrees that Lender's acceptance of this Guaranty shall not constitute a commitment of any nature whatsoever by Lender to extend, renew or hereafter extend credit to Borrower.  Guarantor agrees that this Guaranty shall be effective with or without notice from Lender of its acceptance of this Guaranty.

26.    If Guarantor has executed more than one Guaranty of any or all indebtedness of Borrower owed to Lender, any limits of liability thereunder and hereunder shall be cumulative, and a subsequent guaranty executed by Guarantor shall not supersede or replace this Guaranty unless such subsequent guaranty so provides.

27.    <u>JUDICIAL REFERENCE</u>. The parties hereby agree that any claims, controversies, disputes, or questions of interpretation, whether legal or equitable, arising out of, concerning or related to this Guaranty and all Loan Documents executed by Guarantor shall be heard by a single referee by consensual general judicial reference pursuant to the provisions of California Code of Civil Procedure sects 638 et seq., who shall determine all issues of fact or law and to report a statement of decision. The referee shall also have the power to hear and determine proceedings for ancillary relief, including, but not limited to, applications for attachment, issuance of injunctive relief, appointment of a receiver, and/or claim and delivery. The costs of the proceeding shall be borne equally by the parties to the dispute, subject to the discretion of the referee to allocate such costs based on a determination as to the prevailing party(ies) in the proceeding. By initialing below the parties acknowledge that they have read and understand the foregoing Judicial Reference provisions and understand that they are waiving their right to a jury trial.

_____<br>Guarantor's Initials

28.    Guarantor waives all rights to interpose any setoffs or counterclaims of any nature in any action or proceeding instituted by Lender with respect to this Guaranty, the collateral therefor, or any matter arising therefrom or relating thereto and the posting of any bond which may otherwise be required, and waives any and all benefits of cross-demands pursuant to section 431.70 of the California Code of Civil Procedure.

29.    Guarantor hereby irrevocably submits and consents to the jurisdiction of any federal or state court of competent jurisdiction within California in connection with any action or proceeding arising out of or relating to this Guaranty. In any such litigation, Guarantor consents to service of process by any means authorized by California or federal law or as otherwise agreed in writing between Lender and Guarantor.

30.    All rights, remedies, powers and benefits granted to Lender under this Guaranty, the Credit, any oral or other written agreement or applicable law whether expressly granted or implied in law or otherwise, are cumulative and not exclusive, and are enforceable alternatively, successively, or concurrently on any one or more occasions at Lender's discretion.

31.    Lender shall not, by any act, delay, omission or otherwise be deemed to have expressly or impliedly waived any security interest granted to Lender hereunder or Lender's rights, powers and/or remedies hereunder (including any right of setoff) unless such waiver shall be in writing and signed by an authorized officer of Lender. Any such waiver shall be enforceable only to the extent specifically set forth therein. A waiver by Lender of any default, right, power and/or remedy on any one occasion shall not be construed as a bar to or waiver of any such default, right, power and/or remedy which Lender would otherwise have on any future occasion whether similar in kind or otherwise. Any failure by Lender to file or enforce a claim

4898916v2                                         8

against the estate (whether in administration, bankruptcy, probate or other proceeding) of Borrower or of any others, shall not affect Guarantor's liability hereunder.

32. Neither this Guaranty nor any related agreement, document or instrument nor any provision hereof or thereof shall be amended, modified or discharged orally or by course of conduct, but only by a written agreement signed by an authorized officer of Lender expressly referring to this Guaranty and to the provisions so amended, modified or discharged.

33. Lender's books and records showing the account(s) between Lender and Borrower shall be admissible in evidence in any action or proceeding as prima facie proof of the items set forth therein. Lender's statements rendered to Borrower, to the extent to which no objection is made within thirty (30) days after date thereof, shall be deemed conclusively correct and constitute an account stated absent manifest error, which shall be binding on Guarantor whether or not Guarantor receives a copy of any such statement or notice thereof.

34. This is a continuing guaranty of the Credit, including those arising after any repayment and reborrowing and under any successive and future transactions which may increase, renew or continue the original Credit. Revocation of this Guaranty, if permitted by applicable law, shall be effective only upon the close of the next business day after written notice thereof is received by an officer of Lender by certified or registered mail, return receipt requested at 1900 Main Street, Suite 200, Irvine, California 92614, Attention: Matt Bullock, Senior Vice President, or at any other office of Lender designated in a written notice mailed by Lender to Guarantor at its address set forth below. Any such revocation shall be effective only as to the revoking party and shall not affect that party's obligations with respect to Credit existing before the revocation became effective or as to any renewals, extensions or modifications of any Credit, whether such renewal, extension or modification is made prior to or after revocation, including those evidenced by a new or additional instrument or agreement or which change the rate of interest on any Credit, or for post-revocation interest and collection expenses accruing or incurred by Lender with respect thereto. Notwithstanding any revocation hereof, this Guaranty shall not be terminated until Lender has received indefeasible payment in full of all Credit which is guaranteed hereby and, in regard to which Credit, Lender no longer has an outstanding commitment to lend. Credit existing before revocation becomes effective shall be deemed to include, without limitation, all Credit or advances which Lender has committed to make to Borrower in reliance upon this Guaranty, even though the amount of such Credit or advances has not been advanced as of the effective date of revocation, and even though Lender may have defenses or defaults which would relieve it of such commitment, if asserted.

35. The provisions of this Guaranty shall be construed and interpreted and all rights and obligations hereunder determined in accordance with the laws of the State of California.

36. GUARANTOR ACKNOWLEDGES THAT LENDER HAS EXTENDED OR MAY IN THE FUTURE EXTEND THE CREDIT TO BORROWER IN RELIANCE ON GUARANTOR'S UNCONDITIONAL PROMISE TO REPAY ANY AND ALL CREDIT AND LENDER IS RELYING ON THE WAIVERS, WARRANTIES AND PROMISES MADE BY GUARANTOR IN THIS GUARANTY. GUARANTOR AGREES THAT EACH OF THE WAIVERS, WARRANTIES AND PROMISES SET FORTH IN THIS GUARANTY ARE MADE WITH GUARANTOR'S UNDERSTANDING OF THEIR SIGNIFICANCE AND

4898916v2  9

**Page 116**

CONSEQUENCES AND THAT THEY ARE REASONABLE. IF ANY WAIVERS, WARRANTIES AND PROMISES ARE DETERMINED TO BE CONTRARY TO ANY APPLICABLE LAW OR PUBLIC POLICY, SUCH WAIVERS, WARRANTIES AND PROMISES SHALL BE EFFECTIVE TO THE MAXIMUM EXTENT PERMITTED BY LAW. BEFORE SIGNING THE GUARANTY, GUARANTOR HAS EITHER SOUGHT THE ADVICE OF COUNSEL TO EXPLAIN THE WAIVERS OF ITS RIGHTS AND DEFENSES AS STATED HEREIN AND THE EFFECT THEREOF, OR HAS HAD THE OPPORTUNITY TO SEEK SUCH COUNSEL, AND IN ANY EVENT, INTENDS THIS GUARANTY TO BE AS UNRESTRICTED AS POSSIBLE. GUARANTOR THEREFORE HAS CONSCIOUSLY AND INTENTIONALLY WAIVED ALL DEFENSES OF GUARANTOR AND RIGHTS WHICH COULD EXONERATE GUARANTOR HEREUNDER TO THE FULL EXTENT PERMITTED BY THE LAWS OF THE STATE OF CALIFORNIA, WHETHER OR NOT EACH AND EVERY DEFENSE, RIGHT OR WAIVER IS EXPLAINED OR DESCRIBED IN DETAIL IN THIS GUARANTY.

37.  GUARANTOR ACKNOWLEDGES THAT NEITHER LENDER NOR ANY OF LENDER'S OFFICERS OR EMPLOYEES HAVE MADE ANY PROMISE OR REPRESENTATION, NOT INCORPORATED HEREIN, WHETHER ORAL, WRITTEN OR IMPLIED, TO CAUSE GUARANTOR TO SIGN THIS GUARANTY. GUARANTOR IS NOT SIGNING THIS GUARANTY IN RELIANCE ON ANY PROMISE, CONDITION OR THE ANTICIPATION OF THE OCCURRENCE OF ANY EVENT, AND THERE ARE NO ORAL UNDERSTANDINGS, STATEMENTS OR AGREEMENTS WHICH HAVE NOT BEEN INCLUDED IN THIS GUARANTY. GUARANTOR UNDERSTANDS THAT LENDER HAS THE RIGHT TO ENFORCE PAYMENT OF THE CREDIT AGAINST BORROWER OR GUARANTOR IN ANY ORDER AND LENDER IS NOT OBLIGATED TO OBTAIN ANY OTHER OR ADDITIONAL GUARANTORS OF THE CREDIT OR TO TAKE ANY OTHER COURSE OF ACTION.

38.  USA PATRIOT ACT ACKNOWLEDGEMENT – Guarantor acknowledges that Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account or obtains a loan.  Guarantor further acknowledges that Lender will ask for Borrower's and Guarantor's legal name, address, tax ID number or social security number and other identifying information, and that Lender may also ask for additional information or documentation or take other actions reasonably necessary to verify the identity of Borrower, Guarantor or other related persons.

39.  This Guaranty constitutes the entire agreement between the parties with respect to the subject matter of this Guaranty, and any and all previous or contemporaneous correspondence, statements, or agreements by or between the parties hereto with respect to the subject matter of this Guaranty (but not previous or other guarantees given to Lender by Guarantor) are superseded hereby.  This Guaranty may be modified only by a written instrument signed by the parties hereto.

40.  This Guaranty is not secured by any real property.

41.  Guarantor agrees and consents to Lender's (a) sale, transfer, pledge or assignment, whether now or later, of this Guaranty and/or any of the Loan Documents, or any or

4898916v2                                          10

all servicing rights with respect thereto, and/or (b) sale or transfer, whether now or later, of one or more participation interests in the loan guaranteed by this Guaranty ("Loan") to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Guarantor, Borrower or about any other matter relating to the Loan or this Guaranty, and Guarantor hereby waives any rights to privacy Guarantor may have with respect to such matters. Guarantor additionally waives any and all notices of sale or sale of participation interests, as well as all notices of any repurchase of participation interests. Guarantor also agrees that the purchasers of this Guaranty and/or any Loan Documents or participation interests will be considered as the absolute owners of such interests in the Guaranty and/or Loan, as applicable, and will have all the rights granted under the agreement or agreements governing the sale of such interests. Guarantor further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of this Guaranty or such Loan Documents or participant of the Loan and unconditionally agrees that either Lender or such purchaser or participant may enforce Guarantor's obligation under this Guaranty irrespective of the failure or insolvency of any holder of any interest in the Loan and/or this Guaranty. Guarantor further agrees that the purchaser of any such interests may enforce its interests irrespective of any personal claims or defenses that Guarantor may have against Lender. Upon Lender's request, Guarantor shall reasonably cooperate with Lender in connection with any of the transactions contemplated by this Section 41.

42.    General Release.

(a)    Except as to any obligations imposed upon Lender as provided herein, Guarantor, on behalf of itself, its respective successors and assigns, and each of them, does each hereby forever relieve, release, acquit and discharge Lender, and its predecessors, successors and assigns, and its past and present attorneys, accountants, insurers, representatives, affiliates, partners, subsidiaries, officers, employees, directors, and shareholders, and each of them (collectively, the "Released Parties"), from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, costs and expenses (including, but not limited to, attorneys' fees), damages, injuries, actions and causes of action, of whatever kind or nature, whether legal or equitable, known or unknown, suspected or unsuspected, contingent or fixed, which Guarantor now owns or holds or has at any time heretofore owned or held or may at any time hereafter own or hold against the Released Parties, or any of them, by reason of any acts, facts, transactions or any circumstances whatsoever occurring or existing through the date of this Guaranty, including, but not limited to, those based upon, arising out of, appertaining to, or in connection with the Credit, the Prior Guaranty, any documents executed in connection therewith, the facts pertaining to this Guaranty, any collateral heretofore granted to Lender or granted in connection herewith, or to any other obligations of Borrower and/or Guarantor to Lender.

(b)    As to the matters released herein, Guarantor expressly waives any and all rights under Section 1542 of the Civil Code of the State of California, which provides as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
> THAT THE CREDITOR OR RELEASING PARTY DOES NOT
> KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT
> THE TIME OF EXECUTING THE RELEASE AND THAT, IF

KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY
AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR
OR RELEASED PARTY."

(c)     Guarantor expressly waives and releases any right or benefit which it has
or may have under Section 1542 of the Civil Code of the State of California, and any similar law
of any state, territory, commonwealth or possession of the United States, or the United States, to
the full extent that they may waive all such rights and benefits pertaining to the matters released
herein. In connection with such waiver and relinquishment, Guarantor acknowledges that it is
aware that it may hereafter discover claims presently unknown or unsuspected, or facts in
addition to or different from those which they now know or believe to be true. Nevertheless, it is
the intention of Guarantor through this Guaranty to fully, finally and forever release all such
matters, and all claims relative thereto, which do now exist, may exist, or heretofore have
existed. In furtherance of such intention, the release herein given shall be and remain in effect as
a full and complete release of such matters notwithstanding the discovery or existence of any
such additional or different claims or facts relative thereto.

(d)     In entering into the release provided for in this Guaranty, Guarantor
recognizes that no facts or representations are ever absolutely certain; accordingly, Guarantor
assumes the risk of any misrepresentation, concealment or mistake, and if Guarantor should
subsequently discover that any fact that it relied upon in entering into these releases was untrue,
or that any fact was concealed from it, or that any understanding of the facts or of the law was
incorrect, Guarantor shall not be entitled to set aside these releases by reason thereof, regardless
of any claims of fraud, misrepresentation, promise made without the intention of performing it,
concealment of fact, mistake of fact or law, or any other circumstances whatsoever.

(e)     Guarantor is the sole and lawful owner of all right, title and interest in and
to every claim and other matter which it purports to release herein, and it has not heretofore
assigned or transferred, or purported to assign or transfer to any person or any entity claims or
other matters herein released. Guarantor shall indemnify, defend and hold Lender, and each of
the other Released Parties, harmless from and against any claims, liabilities, actions, causes of
action, demands, injuries, costs, and expenses (including, but not limited to, attorneys' fees),
based upon or arising in connection with any such prior assignment or transfer, or any such
purported assignment or transfer, or any claims or other matters released herein.

43.     Document Imaging. Borrower, Lender and Guarantor shall be entitled, each in its
sole discretion, to image or make copies of all or any selection of the agreements, instruments,
documents and items and records governing, arising from or relating to any of Borrower's loans,
including, without limitation, this document and the other Loan Documents, and either party may
destroy or archive the paper originals. The parties hereto (i) waive any right to insist or require
that the other party produce paper originals, (ii) agree that such images shall be accorded the
same force and effect as the paper originals, (iii) agree that each party is entitled to use such
images in lieu of destroyed or archived originals for any purpose, including as admissible
evidence in any demand, presentment or other proceedings, and (iv) further agree that any
executed facsimile (faxed), scanned or other imaged copy of this document or any Loan
Document shall be deemed to be of the same force and effect as the originally manually executed
document.

48989l6v2                                        12

44. _Amended and Restated Guaranty_. This Guaranty amends, restates, replaces and supersedes in its entirety that certain Continuing Guaranty dated May 5, 2016 (the "Prior Guarantor") given by Guarantor to Lender in connection with that certain Business Loan Agreement (Revolving Line of Credit) dated May 5, 2016 between Borrower and Lender.

*[SIGNATURE PAGE FOLLOWS]*

4898916v2                                   13

IN WITNESS WHEREOF, the Guarantor has executed this Continuing Guaranty as of the 10th day of May 2023.


**GUARANTOR:**


_____
Gerald J. Marcil as Trustee of the
MARCIL FAMILY TRUST dated May 9, 1997


Address:    544 Paseo Del Mar
Palos Verdes Estates, CA 90274


4898916v2                                14

# EXHIBIT 7

## SECOND AMENDED AND RESTATED CONTINUING GUARANTY

The undersigned, GERALD J. MARCIL, as Trustee of THE MARCIL FAMILY TRUST dated May 9, 1997 (herein called "Guarantor"), at the solicitation of CANTOR GROUP IV LLC, a Delaware limited liability company ("Borrower"), requests ZIONS BANCORPORATION, N.A., dba California Bank & Trust (herein called "Lender"), to extend Credit to Borrower. In order to induce Lender to extend Credit to Borrower, and in consideration of Credit heretofore, now or hereafter granted to Borrower by Lender, Guarantor agrees as follows:

1.      The term "Credit" is used throughout this Second Amended and Restated Continuing Guaranty ("Guaranty") in its most comprehensive sense and means and includes, without limitation, any and all loans, advances, debts, obligations and liabilities of any kind or nature owed by Borrower to Lender, heretofore, now, or hereafter made, incurred or created, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, secured or unsecured, whether on original, renewed, extended or revised terms (including, without limitation, those evidenced by new or additional instruments or agreements or those changing the applicable rate of interest or which release any obligor with respect thereto), whether principal, interest, fees, or expenses, whether Borrower may be liable individually or jointly with others, whether recovery upon such indebtedness may be or hereafter becomes barred by any statute of limitations, and whether such indebtedness may be or hereafter becomes invalid or otherwise unenforceable. In the event a petition under the United States Bankruptcy Code is filed by or against Borrower, the term "Borrower" shall also mean and include Borrower in its status as a debtor, debtor-in-possession and/or reorganized debtor under the United States Bankruptcy Code.

2.      (a) If there is more than a single entity or person included in the terms "Guarantor" or "Borrower," respectively, each reference herein to such terms shall mean any and all, and one or more of such entities and persons both jointly and severally, and (b) if more than one person or entity executes this Guaranty, the obligations and liabilities hereunder of Guarantors are and shall be both joint and several. If Borrower is a corporation, partnership, limited liability company or association, each reference herein to the term "Borrower" shall include any successor entity to Borrower. If there is more than one guaranty of the obligations of Borrower, the liabilities of all Guarantors are joint and several. As used in this Guaranty, neuter terms include the masculine and feminine, and vice versa.

3.      Guarantor's liability hereunder shall be unlimited. In addition to any liability hereunder, Guarantor agrees to bear and be liable to Lender for the interest and expenses enumerated in paragraph 21 hereof. Any payment by Guarantor shall not reduce the obligations of Guarantor hereunder unless written notice to that effect is actually received by Lender at or prior to the time of such payment. Any payment received by Lender from Borrower, from any other person or from proceeds of collateral granted by Borrower or any other person shall not reduce Guarantor's liability hereunder.

4.      Guarantor unconditionally guarantees and agrees to pay to Lender, on demand, in lawful money of the United States of America, an amount equal to the amount of the Credit plus the fees, expenses, interest, and other amounts and charges specified in paragraphs 3 and 21

5175541v1                                    1

hereof, and to otherwise perform any obligations of Borrower undertaken pursuant to any Credit. This Guaranty is a guaranty of payment and not of collection. No payment received by Lender from Borrower or any other person or from proceeds of collateral granted by Borrower or any other person shall reduce Guarantor's liability hereunder.

5.      Either before or after revocation hereof, Guarantor authorizes Lender at its sole discretion, with or without notice, and without affecting Guarantor's continuing liability hereunder, from time to time to (a) change the time or manner of payment of any Credit by modification, renewal, extension, acceleration or otherwise, (b) amend or change any other provision of any Credit including the rate of interest thereon, (c) accept partial payment on any Credit, (d) accept new or additional instruments, agreements or documents relative to any Credit, (e) release, substitute or add one or more endorsers, cosigners or guarantors for any Credit, (f) enter into forbearances with Borrower even though the result of such forbearance is to increase the amount of accrued and unpaid interest, cost, fees and/or expenses attributable to the Credit, (g) amend or modify the terms of any guaranty executed by a co-guarantor, including the maximum liability thereunder, (h) obtain collateral for the payment of any Credit and/or any guaranty thereof, (i) waive, release, exchange, substitute, or modify, in whole or in part, existing, after-acquired or later acquired collateral securing payment of the Credit or any guaranty therefor on such terms as Lender at its sole discretion shall determine, (j) subordinate payment of all or any part of the Credit to other creditors of Borrower or other persons on such terms as Lender deems appropriate, (k) apply any sums received from Borrower, any other guarantor, endorser or cosigner or from the sale or collection of collateral or its proceeds to any indebtedness whatsoever in any order and regardless of whether or not such indebtedness is guaranteed hereby, is secured by collateral, or is due and payable, (l) without limiting the foregoing, apply any sums received from Guarantor or from the sale of collateral granted by Guarantor to any, all, or any portion of the Credit in any order regardless of whether or not the Credit is secured by collateral or is due and payable, and (m) exercise any right or remedy it may have with respect to any Credit or any collateral securing any Credit, this Guaranty or any other guaranty, including, without limitation, bidding and purchasing at any sale of any such collateral, and compromising, collecting or otherwise liquidating any collateral or any Credit.

6.      Guarantor acknowledges that Guarantor may have certain rights under applicable law which, if not waived by Guarantor, might provide Guarantor with defenses against Guarantor's liability under this Guaranty. Among those rights, are certain rights of subrogation, reimbursement, indemnification and contribution, and rights provided in sections 2787 to 2855, inclusive, of the California Civil Code. Guarantor waives all of Guarantor's rights of subrogation, reimbursement, indemnification, and contribution, and any other rights and defenses that are or may become available to Guarantor by reason of any or all of California Civil Code sections 2787 to 2855, inclusive, including, without limitation, Guarantor's rights:

(a)      To require Lender to notify Guarantor of any default by Borrower, provide Guarantor with notice of any sale or other disposition of security for any Credit, disclose information with respect to the Credit, Borrower, or any other guarantor, co-signer or endorser, or with respect to any collateral;

(b)      That Guarantor's obligation under this Guaranty must be commensurate with that of Borrower;

5175541v1                                        2

(c)     To be discharged based upon the absence of any liability of Borrower, at any time, by virtue of operation of law, or otherwise, or due to any other disability or defense of Borrower or any other guarantor, endorser or co-signer;

(d)     To be discharged if any of the terms, conditions or provisions of the Credit are altered in any respect;

(e)     To be discharged upon acceptance by Lender of anything in partial satisfaction of the Credit, and/or if Lender designates the portion of the Credit to be satisfied;

(f)     To be discharged upon any modification of the Credit or the release by Lender of Borrower or any other guarantor, endorser or co-signer;

(g)     To require Lender to proceed against Borrower, or any other guarantor, endorser, co-signer, or other person, or to pursue or refrain from pursuing any other remedy in Lender's power;

(h)     To receive the benefit of or participate in any and all security for repayment and/or performance of the Credit;

(i)     To have any security for the Credit first applied to satisfy or discharge the Credit;

(j)     That any arbitration award rendered against Borrower not constitute an award against Guarantor;

(k)     To be discharged based upon any failure by Lender to perfect or continue perfection of any lien, use due diligence to collect all or any part of any Credit, or if recovery against Borrower becomes barred by any statute of limitations, or if Borrower is not liable for any deficiency after Lender realizes upon any collateral;

(l)     To be discharged due to the release or discharge of any collateral for any Credit or guaranty, or relating to the validity, value or enforceability of any collateral; and

(m)     To revoke this Guaranty.

7.     Guarantor also waives all rights and defenses that Guarantor may have because the Borrower's debt is secured by real property. This means, among other things: (1) Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged or assigned by Borrower; and (2) If Lender forecloses on any real property collateral pledged by the Borrower: (A) The amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price, and (B) Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower. This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because Borrower's debt is secured by real property. These rights and defenses include, but are not limited to, any rights or defenses directly or indirectly based upon Sections 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.

8. Guarantor also waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against the principal by the operation of Section 580d of the California Code of Civil Procedure or otherwise.

9. Guarantor waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of acceptance, notices of the existence, creation or increase of any new or additional credit, notice of sale in regard to judicial or non-judicial foreclosure of real or personal property collateral and all other notices and demands of any kind or nature whatsoever except as expressly set forth herein.

10. Notwithstanding any foreclosure of the lien of any security agreements, deeds of trust, mortgages or other security instruments, with respect to the Credit or any other guaranty, whether by the exercise of the power of sale contained therein, by any action for judicial foreclosure, or by any acceptance of a deed or other transfer in lieu of foreclosure, whether or not such method of foreclosure or transfer in lieu of foreclosure was for a consideration equal to or greater than the fair market value of the security property, Guarantor shall remain bound under this Guaranty for the obligations of Borrower to Lender and shall be liable to Lender for any and all of the Credit remaining unpaid after any such foreclosure.

11. Guarantor represents and warrants to Lender that: (a) Lender has made no representation to Guarantor in regard to Borrower, the Credit or any matters pertaining thereto, upon which Guarantor is relying in giving this Guaranty; and (b) Guarantor has established adequate means and assumes the responsibility for being and keeping informed of the financial condition of Borrower and of all other circumstances bearing upon the risk of nonpayment of the Credit which diligent inquiry would reveal, and Lender shall have no duty to advise Guarantor of information known to Lender regarding such condition or any such circumstance.

12. In addition to all liens upon and rights of setoff against monies, securities or other property of Guarantor given to Lender by law or otherwise as security for this Guaranty, Guarantor hereby pledges to Lender and grants to Lender a security interest in, and Lender shall have a right of setoff against, all monies, securities and other property of Guarantor now or hereafter in the possession of or on deposit with Lender, whether held in a general or special account or deposit or for safekeeping or otherwise; and each such security interest or right of setoff may be enforced or exercised without demand upon, or notice to, Guarantor. No action or lack of action by Lender with respect to any security interest or right of setoff or otherwise shall be deemed a waiver thereof, and every right of setoff or security interest or otherwise shall continue in full force and effect until specifically released by Lender in writing. The security interests created hereby shall secure all of Guarantor's obligations to Lender under this Guaranty and any subsequent guaranty executed by Guarantor.

13. Any and all indebtedness of Borrower now or hereafter owed to Guarantor and all claims of Guarantor against Borrower, whenever arising, are hereby subordinated to the Credit and assigned to Lender as additional collateral. If Lender so requests, any note or other instrument evidencing such indebtedness and all claims of Guarantor against Borrower shall be delivered to Lender, and such indebtedness and all claims of Guarantor against Borrower shall be

5175541v1                                              4

collected, enforced and received by Guarantor as trustee for Lender and be paid over to Lender on account of the Credit but without reducing or affecting in any manner the liability of Guarantor hereunder. Should Guarantor fail to collect proceeds of debt owed to it by Borrower and pay the proceeds to Lender, Lender, as Guarantor's attorney-in-fact may do such acts and sign such documents in Guarantor's name as Lender considers necessary, at its discretion, to effect such collection, and Guarantor hereby irrevocably appoints Lender as Guarantor's attorney-in-fact for such purposes. If Borrower is a corporation, limited liability company, partnership or other entity, Guarantor will not withdraw or accept, without Lender's prior written consent, any return of any capital invested or equity interest in Borrower.

14.     Guarantor agrees that to the extent Borrower makes a payment or payments or is credited for any payment or payments made for the account of or on behalf of Borrower to Lender, which payment or payments, or any part thereof, are subsequently invalidated, determined to be fraudulent or preferential, voided, set aside and/or required to be repaid to any trustee, receiver, assignee or any other party whether under any bankruptcy, state or federal Law, common law or equitable cause or otherwise, then to the extent thereof, the obligation or part thereof intended to be satisfied thereby, together with the guaranty thereof hereunder, shall be revived, reinstated and continued in full force and effect as if said payment or payments had not originally been made by or for the account of or on behalf of Borrower.

15.     Guarantor agrees that to the extent Guarantor makes a payment or payments or is credited for any payment or payments made for the account of or on behalf of Guarantor to Lender, which payment or payments, or any part thereof, are subsequently invalidated, determined to be fraudulent or preferential, voided, set aside and/or required to be repaid to any trustee, receiver, assignee or any other party whether under any bankruptcy, state or federal Law, common law or equitable cause or otherwise, then to the extent thereof, the obligation or part thereof intended to be satisfied thereby, shall be revived, reinstated and continued in full force and effect as if said payment or payments had not originally been made by or for the account of or on behalf of Guarantor.

16.     Guarantor's obligations hereunder are not contingent upon and are independent of the obligations of Borrower, or any other guarantor or surety of the Credit. This Guaranty is not made in consideration of the liability of any other guarantor or surety of the Credit. The release or death of any guarantor of the Credit or the revocation of any guaranty shall not release or otherwise affect the liability of any other non-revoking guarantor. A separate action or actions may be brought and prosecuted against Guarantor whether action is brought against Borrower or any other guarantor or whether Borrower or any other guarantor be joined in any such action or actions.

17.     To the maximum extent permitted by law, Guarantor specifically waives the benefit of the statute of limitations affecting its liability hereunder or the enforcement hereof, or the collection of any Credit, including, without limiting the foregoing, any and all special statutes of limitations arising out of California Code of Civil Procedure sections 580a or 726(b). Any partial payment by Borrower which operates to toll any statute of limitations as to Borrower shall likewise toll the statute of limitations as to Guarantor.

18. Any married person who signs this Guaranty expressly agrees that recourse may be had against his/her separate property as well as all community property over which that person has a power of management and control, for all of his/her obligations hereunder.

19. Should any one or more provisions of this Guaranty be determined to be illegal or unenforceable, all other provisions shall remain effective.

20. Lender may, with or without notice, assign this Guaranty in whole or in part. This Guaranty shall inure to the benefit of Lender, its successors and assigns, and shall bind Guarantor and Guarantor's heirs, executors, administrators, representatives, successors and assigns.

21. Guarantor agrees to pay to Lender, on demand, all attorneys' fees and all other costs and expenses which may be incurred by Lender in the collection or attempted collection from Borrower of any Credit and/or in the interpretation, enforcement or attempted enforcement by Lender of this Guaranty or any collateral therefor, including, but not limited to, proceedings in any bankruptcy or other insolvency case or other proceedings concerning the Credit or this Guaranty, or both, in any manner, whether or not legal proceedings or suit are instituted, together with interest thereon at the rate applicable to the Credit and including, without limitation, all attorneys' fees and related costs of enforcement of any and all judgments and awards and upon any appeal relating thereto.

22. Guarantor warrants and represents to Lender that:

(a) No representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of the Guaranty;

(b) Guarantor has full power, right and authority to enter into the Guaranty;

(c) The provisions of the Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor;

(d) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein;

(e) Upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided;

(f) All financial statements and other financial information furnished or to be furnished to Lender by Guarantor are and will be true and correct and do and will fairly represent the financial condition of Guarantor (including all contingent liabilities) as of the dates thereof;

5175541v1                                    6

(g)     There has been no material adverse change in Guarantor's financial condition since the dates of the financial statements and other information furnished to Lender, except as previously disclosed to Lender in writing;

(h)     no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened;

(i)     Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and

(j)     Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition, and  Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under the Guaranty, and Guarantor further agrees that Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of  its relationship with Borrower.

23.     Lender may declare Guarantor in default under this Guaranty upon the occurrence of any of the following events:

(a)     Guarantor fails to pay or perform any of Guarantor's obligations under this Guaranty; or

(b)     Any representation or warranty made or given by Guarantor to Lender proves to be false or misleading in any material respect; or

(c)     A petition or action for relief shall be filed by or against Guarantor, pursuant to the Federal Bankruptcy Code (Title 11, U.S. Codes) in effect from time to time, or under any other law relating to bankruptcy, insolvency, reorganization, moratorium, creditor composition, arrangement or other relief from debts; the appointment of a receiver, trustee, custodian or liquidator of or for any property of Guarantor; or upon the death, incapacity, insolvency, dissolution, or termination of the business of Guarantor; or

(d)     Guarantor revokes or attempts to revoke this Guaranty.

24.     If Borrower is a corporation, limited liability company, partnership or other entity, Lender need not inquire into the power of Borrower or the authority of its officers, directors, partners, agents, members or managers acting or purporting to act in its behalf, and any Credit granted in reliance upon the purported exercise of such power or authority is guaranteed hereunder.

25.     Receipt of a true copy of this Guaranty is hereby acknowledged by Guarantor. Guarantor understands and agrees that Lender's acceptance of this Guaranty shall not constitute a commitment of any nature whatsoever by Lender to extend, renew or hereafter extend credit to Borrower.  Guarantor agrees that this Guaranty shall be effective with or without notice from Lender of its acceptance of this Guaranty.

5175541v1                              7

26.     If Guarantor has executed more than one Guaranty of any or all indebtedness of Borrower owed to Lender, any limits of liability thereunder and hereunder shall be cumulative, and a subsequent guaranty executed by Guarantor shall not supersede or replace this Guaranty unless such subsequent guaranty so provides.

27.     JUDICIAL REFERENCE. The parties hereby agree that any claims, controversies, disputes, or questions of interpretation, whether legal or equitable, arising out of, concerning or related to this Guaranty and all Loan Documents executed by Guarantor shall be heard by a single referee by consensual general judicial reference pursuant to the provisions of California Code of Civil Procedure sects 638 et seq., who shall determine all issues of fact or law and to report a statement of decision. The referee shall also have the power to hear and determine proceedings for ancillary relief, including, but not limited to, applications for attachment, issuance of injunctive relief, appointment of a receiver, and/or claim and delivery. The costs of the proceeding shall be borne equally by the parties to the dispute, subject to the discretion of the referee to allocate such costs based on a determination as to the prevailing party(ies) in the proceeding. By initialing below the parties acknowledge that they have read and understand the foregoing Judicial Reference provisions and understand that they are waiving their right to a jury trial.

_____
Guarantor's Initials

28.     Guarantor waives all rights to interpose any setoffs or counterclaims of any nature in any action or proceeding instituted by Lender with respect to this Guaranty, the collateral therefor, or any matter arising therefrom or relating thereto and the posting of any bond which may otherwise be required, and waives any and all benefits of cross-demands pursuant to section 431.70 of the California Code of Civil Procedure.

29.     Guarantor hereby irrevocably submits and consents to the jurisdiction of any federal or state court of competent jurisdiction within California in connection with any action or proceeding arising out of or relating to this Guaranty. In any such litigation, Guarantor consents to service of process by any means authorized by California or federal law or as otherwise agreed in writing between Lender and Guarantor.

30.     All rights, remedies, powers and benefits granted to Lender under this Guaranty, the Credit, any oral or other written agreement or applicable law whether expressly granted or implied in law or otherwise, are cumulative and not exclusive, and are enforceable alternatively, successively, or concurrently on any one or more occasions at Lender's discretion.

31.     Lender shall not, by any act, delay, omission or otherwise be deemed to have expressly or impliedly waived any security interest granted to Lender hereunder or Lender's rights, powers and/or remedies hereunder (including any right of setoff) unless such waiver shall be in writing and signed by an authorized officer of Lender. Any such waiver shall be enforceable only to the extent specifically set forth therein. A waiver by Lender of any default, right, power and/or remedy on any one occasion shall not be construed as a bar to or waiver of any such default, right, power and/or remedy which Lender would otherwise have on any future occasion whether similar in kind or otherwise. Any failure by Lender to file or enforce a claim

5175541v1                                     8

against the estate (whether in administration, bankruptcy, probate or other proceeding) of Borrower or of any others, shall not affect Guarantor's liability hereunder.

32. Neither this Guaranty nor any related agreement, document or instrument nor any provision hereof or thereof shall be amended, modified or discharged orally or by course of conduct, but only by a written agreement signed by an authorized officer of Lender expressly referring to this Guaranty and to the provisions so amended, modified or discharged.

33. Lender's books and records showing the account(s) between Lender and Borrower shall be admissible in evidence in any action or proceeding as prima facie proof of the items set forth therein. Lender's statements rendered to Borrower, to the extent to which no objection is made within thirty (30) days after date thereof, shall be deemed conclusively correct and constitute an account stated absent manifest error, which shall be binding on Guarantor whether or not Guarantor receives a copy of any such statement or notice thereof.

34. This is a continuing guaranty of the Credit, including those arising after any repayment and reborrowing and under any successive and future transactions which may increase, renew or continue the original Credit. Revocation of this Guaranty, if permitted by applicable law, shall be effective only upon the close of the next business day after written notice thereof is received by an officer of Lender by certified or registered mail, return receipt requested at 1900 Main Street, Suite 200, Irvine, California 92614, Attention: Matt Bullock, Executive Vice President, or at any other office of Lender designated in a written notice mailed by Lender to Guarantor at its address set forth below. Any such revocation shall be effective only as to the revoking party and shall not affect that party's obligations with respect to Credit existing before the revocation became effective or as to any renewals, extensions or modifications of any Credit, whether such renewal, extension or modification is made prior to or after revocation, including those evidenced by a new or additional instrument or agreement or which change the rate of interest on any Credit, or for post-revocation interest and collection expenses accruing or incurred by Lender with respect thereto. Notwithstanding any revocation hereof, this Guaranty shall not be terminated until Lender has received indefeasible payment in full of all Credit which is guaranteed hereby and, in regard to which Credit, Lender no longer has an outstanding commitment to lend. Credit existing before revocation becomes effective shall be deemed to include, without limitation, all Credit or advances which Lender has committed to make to Borrower in reliance upon this Guaranty, even though the amount of such Credit or advances has not been advanced as of the effective date of revocation, and even though Lender may have defenses or defaults which would relieve it of such commitment, if asserted.

35. The provisions of this Guaranty shall be construed and interpreted and all rights and obligations hereunder determined in accordance with the laws of the State of California.

36. GUARANTOR ACKNOWLEDGES THAT LENDER HAS EXTENDED OR MAY IN THE FUTURE EXTEND THE CREDIT TO BORROWER IN RELIANCE ON GUARANTOR'S UNCONDITIONAL PROMISE TO REPAY ANY AND ALL CREDIT AND LENDER IS RELYING ON THE WAIVERS, WARRANTIES AND PROMISES MADE BY GUARANTOR IN THIS GUARANTY. GUARANTOR AGREES THAT EACH OF THE WAIVERS, WARRANTIES AND PROMISES SET FORTH IN THIS GUARANTY ARE MADE WITH GUARANTOR'S UNDERSTANDING OF THEIR SIGNIFICANCE AND

5175541v1                                        9

CONSEQUENCES AND THAT THEY ARE REASONABLE. IF ANY WAIVERS, WARRANTIES AND PROMISES ARE DETERMINED TO BE CONTRARY TO ANY APPLICABLE LAW OR PUBLIC POLICY, SUCH WAIVERS, WARRANTIES AND PROMISES SHALL BE EFFECTIVE TO THE MAXIMUM EXTENT PERMITTED BY LAW. BEFORE SIGNING THE GUARANTY, GUARANTOR HAS EITHER SOUGHT THE ADVICE OF COUNSEL TO EXPLAIN THE WAIVERS OF ITS RIGHTS AND DEFENSES AS STATED HEREIN AND THE EFFECT THEREOF, OR HAS HAD THE OPPORTUNITY TO SEEK SUCH COUNSEL, AND IN ANY EVENT, INTENDS THIS GUARANTY TO BE AS UNRESTRICTED AS POSSIBLE. GUARANTOR THEREFORE HAS CONSCIOUSLY AND INTENTIONALLY WAIVED ALL DEFENSES OF GUARANTOR AND RIGHTS WHICH COULD EXONERATE GUARANTOR HEREUNDER TO THE FULL EXTENT PERMITTED BY THE LAWS OF THE STATE OF CALIFORNIA, WHETHER OR NOT EACH AND EVERY DEFENSE, RIGHT OR WAIVER IS EXPLAINED OR DESCRIBED IN DETAIL IN THIS GUARANTY.

37. GUARANTOR ACKNOWLEDGES THAT NEITHER LENDER NOR ANY OF LENDER'S OFFICERS OR EMPLOYEES HAVE MADE ANY PROMISE OR REPRESENTATION, NOT INCORPORATED HEREIN, WHETHER ORAL, WRITTEN OR IMPLIED, TO CAUSE GUARANTOR TO SIGN THIS GUARANTY. GUARANTOR IS NOT SIGNING THIS GUARANTY IN RELIANCE ON ANY PROMISE, CONDITION OR THE ANTICIPATION OF THE OCCURRENCE OF ANY EVENT, AND THERE ARE NO ORAL UNDERSTANDINGS, STATEMENTS OR AGREEMENTS WHICH HAVE NOT BEEN INCLUDED IN THIS GUARANTY. GUARANTOR UNDERSTANDS THAT LENDER HAS THE RIGHT TO ENFORCE PAYMENT OF THE CREDIT AGAINST BORROWER OR GUARANTOR IN ANY ORDER AND LENDER IS NOT OBLIGATED TO OBTAIN ANY OTHER OR ADDITIONAL GUARANTORS OF THE CREDIT OR TO TAKE ANY OTHER COURSE OF ACTION.

38. USA PATRIOT ACT ACKNOWLEDGEMENT – Guarantor acknowledges that Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account or obtains a loan. Guarantor further acknowledges that Lender will ask for Borrower's and Guarantor's legal name, address, tax ID number or social security number and other identifying information, and that Lender may also ask for additional information or documentation or take other actions reasonably necessary to verify the identity of Borrower, Guarantor or other related persons.

39. This Guaranty constitutes the entire agreement between the parties with respect to the subject matter of this Guaranty, and any and all previous or contemporaneous correspondence, statements, or agreements by or between the parties hereto with respect to the subject matter of this Guaranty (but not previous or other guarantees given to Lender by Guarantor) are superseded hereby. This Guaranty may be modified only by a written instrument signed by the parties hereto.

40. This Guaranty is not secured by any real property.

41. Guarantor agrees and consents to Lender's (a) sale, transfer, pledge or assignment, whether now or later, of this Guaranty and/or any of the Loan Documents, or any or

all servicing rights with respect thereto, and/or (b) sale or transfer, whether now or later, of one or more participation interests in the loan guaranteed by this Guaranty ("Loan") to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Guarantor, Borrower or about any other matter relating to the Loan or this Guaranty, and Guarantor hereby waives any rights to privacy Guarantor may have with respect to such matters. Guarantor additionally waives any and all notices of sale or sale of participation interests, as well as all notices of any repurchase of participation interests. Guarantor also agrees that the purchasers of this Guaranty and/or any Loan Documents or participation interests will be considered as the absolute owners of such interests in the Guaranty and/or Loan, as applicable, and will have all the rights granted under the agreement or agreements governing the sale of such interests. Guarantor further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of this Guaranty or such Loan Documents or participant of the Loan and unconditionally agrees that either Lender or such purchaser or participant may enforce Guarantor's obligation under this Guaranty irrespective of the failure or insolvency of any holder of any interest in the Loan and/or this Guaranty. Guarantor further agrees that the purchaser of any such interests may enforce its interests irrespective of any personal claims or defenses that Guarantor may have against Lender. Upon Lender's request, Guarantor shall reasonably cooperate with Lender in connection with any of the transactions contemplated by this Section 41.

42. General Release.

(a) Except as to any obligations imposed upon Lender as provided herein, Guarantor, on behalf of itself, its respective successors and assigns, and each of them, does each hereby forever relieve, release, acquit and discharge Lender, and its predecessors, successors and assigns, and its past and present attorneys, accountants, insurers, representatives, affiliates, partners, subsidiaries, officers, employees, directors, and shareholders, and each of them (collectively, the "Released Parties"), from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, costs and expenses (including, but not limited to, attorneys' fees), damages, injuries, actions and causes of action, of whatever kind or nature, whether legal or equitable, known or unknown, suspected or unsuspected, contingent or fixed, which Guarantor now owns or holds or has at any time heretofore owned or held or may at any time hereafter own or hold against the Released Parties, or any of them, by reason of any acts, facts, transactions or any circumstances whatsoever occurring or existing through the date of this Guaranty, including, but not limited to, those based upon, arising out of, appertaining to, or in connection with the Credit, the Prior Guaranty, any documents executed in connection therewith, the facts pertaining to this Guaranty, any collateral heretofore granted to Lender or granted in connection herewith, or to any other obligations of Borrower and/or Guarantor to Lender.

(b) As to the matters released herein, Guarantor expressly waives any and all rights under Section 1542 of the Civil Code of the State of California, which provides as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
THAT THE CREDITOR OR RELEASING PARTY DOES NOT
KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT
THE TIME OF EXECUTING THE RELEASE AND THAT, IF

5175541v1            11

**Page 133**

KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY
AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR
OR RELEASED PARTY."

(c) Guarantor expressly waives and releases any right or benefit which it has or may have under Section 1542 of the Civil Code of the State of California, and any similar law of any state, territory, commonwealth or possession of the United States, or the United States, to the full extent that they may waive all such rights and benefits pertaining to the matters released herein. In connection with such waiver and relinquishment, Guarantor acknowledges that it is aware that it may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true. Nevertheless, it is the intention of Guarantor through this Guaranty to fully, finally and forever release all such matters, and all claims relative thereto, which do now exist, may exist, or heretofore have existed. In furtherance of such intention, the release herein given shall be and remain in effect as a full and complete release of such matters notwithstanding the discovery or existence of any such additional or different claims or facts relative thereto.

(d) In entering into the release provided for in this Guaranty, Guarantor recognizes that no facts or representations are ever absolutely certain; accordingly, Guarantor assumes the risk of any misrepresentation, concealment or mistake, and if Guarantor should subsequently discover that any fact that it relied upon in entering into these releases was untrue, or that any fact was concealed from it, or that any understanding of the facts or of the law was incorrect, Guarantor shall not be entitled to set aside these releases by reason thereof, regardless of any claims of fraud, misrepresentation, promise made without the intention of performing it, concealment of fact, mistake of fact or law, or any other circumstances whatsoever.

(e) Guarantor is the sole and lawful owner of all right, title and interest in and to every claim and other matter which it purports to release herein, and it has not heretofore assigned or transferred, or purported to assign or transfer to any person or any entity claims or other matters herein released. Guarantor shall indemnify, defend and hold Lender, and each of the other Released Parties, harmless from and against any claims, liabilities, actions, causes of action, demands, injuries, costs, and expenses (including, but not limited to, attorneys' fees), based upon or arising in connection with any such prior assignment or transfer, or any such purported assignment or transfer, or any claims or other matters released herein.

43. Document Imaging. Borrower, Lender and Guarantor shall be entitled, each in its sole discretion, to image or make copies of all or any selection of the agreements, instruments, documents and items and records governing, arising from or relating to any of Borrower's loans, including, without limitation, this document and the other Loan Documents, and either party may destroy or archive the paper originals. The parties hereto (i) waive any right to insist or require that the other party produce paper originals, (ii) agree that such images shall be accorded the same force and effect as the paper originals, (iii) agree that each party is entitled to use such images in lieu of destroyed or archived originals for any purpose, including as admissible evidence in any demand, presentment or other proceedings, and (iv) further agree that any executed facsimile (faxed), scanned or other imaged copy of this document or any Loan Document shall be deemed to be of the same force and effect as the originally manually executed document.

5175541v1                              12

44.      Amended and Restated Guaranty.  This Guaranty amends, restates, replaces and supersedes in its entirety that certain Amended and Restated Limited Guaranty dated October __, 2020 given by Guarantor to Lender in connection with that certain Business Loan Agreement (Revolving Line of Credit) dated July 18, 2017 between Borrower and Lender.


*[SIGNATURE PAGE FOLLOWS]*


5175541v1                                            13

IN WITNESS WHEREOF, the Guarantor has executed this Second Amended and Restated Continuing Guaranty as of the 25th day of March 2024.


**GUARANTOR:**


_Gerald J. Marcil_

Gerald J. Marcil, as Trustee of THE MARCIL
FAMILY TRUST dated May 9, 1997


Address: _43 D MALAGA COVE PLAZA
PALOS VERDES ESTATES, CA., 90274_


5175541v1                                    14

# EXHIBIT 8

## SECOND AMENDED AND RESTATED CONTINUING GUARANTY

The undersigned, DEBA SHYAM, an individual (herein called "Guarantor"), at the solicitation of CANTOR GROUP IV LLC, a Delaware limited liability company ("Borrower"), requests ZIONS BANCORPORATION, N.A., dba California Bank & Trust (herein called "Lender"), to extend Credit to Borrower. In order to induce Lender to extend Credit to Borrower, and in consideration of Credit heretofore, now or hereafter granted to Borrower by Lender, Guarantor agrees as follows:

1.     The term "Credit" is used throughout this Second Amended and Restated Continuing Guaranty ("Guaranty") in its most comprehensive sense and means and includes, without limitation, any and all loans, advances, debts, obligations and liabilities of any kind or nature owed by Borrower to Lender, heretofore, now, or hereafter made, incurred or created, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, secured or unsecured, whether on original, renewed, extended or revised terms (including, without limitation, those evidenced by new or additional instruments or agreements or those changing the applicable rate of interest or which release any obligor with respect thereto), whether principal, interest, fees, or expenses, whether Borrower may be liable individually or jointly with others, whether recovery upon such indebtedness may be or hereafter becomes barred by any statute of limitations, and whether such indebtedness may be or hereafter becomes invalid or otherwise unenforceable. In the event a petition under the United States Bankruptcy Code is filed by or against Borrower, the term "Borrower" shall also mean and include Borrower in its status as a debtor, debtor-in-possession and/or reorganized debtor under the United States Bankruptcy Code.

2.     (a) If there is more than a single entity or person included in the terms "Guarantor" or "Borrower," respectively, each reference herein to such terms shall mean any and all, and one or more of such entities and persons both jointly and severally, and (b) if more than one person or entity executes this Guaranty, the obligations and liabilities hereunder of Guarantors are and shall be both joint and several. If Borrower is a corporation, partnership, limited liability company or association, each reference herein to the term "Borrower" shall include any successor entity to Borrower. If there is more than one guaranty of the obligations of Borrower, the liabilities of all Guarantors are joint and several. As used in this Guaranty, neuter terms include the masculine and feminine, and vice versa.

3.     Guarantor's liability hereunder shall be unlimited. In addition to any liability hereunder, Guarantor agrees to bear and be liable to Lender for the interest and expenses enumerated in paragraph 21 hereof. Any payment by Guarantor shall not reduce the obligations of Guarantor hereunder unless written notice to that effect is actually received by Lender at or prior to the time of such payment. Any payment received by Lender from Borrower, from any other person or from proceeds of collateral granted by Borrower or any other person shall not reduce Guarantor's liability hereunder.

4.     Guarantor unconditionally guarantees and agrees to pay to Lender, on demand, in lawful money of the United States of America, an amount equal to the amount of the Credit plus the fees, expenses, interest, and other amounts and charges specified in paragraphs 3 and 21 hereof, and to otherwise perform any obligations of Borrower undertaken pursuant to any Credit.

5175589v1                                        1

This Guaranty is a guaranty of payment and not of collection. No payment received by Lender from Borrower or any other person or from proceeds of collateral granted by Borrower or any other person shall reduce Guarantor's liability hereunder.

5.    Either before or after revocation hereof, Guarantor authorizes Lender at its sole discretion, with or without notice, and without affecting Guarantor's continuing liability hereunder, from time to time to (a) change the time or manner of payment of any Credit by modification, renewal, extension, acceleration or otherwise, (b) amend or change any other provision of any Credit including the rate of interest thereon, (c) accept partial payment on any Credit, (d) accept new or additional instruments, agreements or documents relative to any Credit, (e) release, substitute or add one or more endorsers, cosigners or guarantors for any Credit, (f) enter into forbearances with Borrower even though the result of such forbearance is to increase the amount of accrued and unpaid interest, cost, fees and/or expenses attributable to the Credit, (g) amend or modify the terms of any guaranty executed by a co-guarantor, including the maximum liability thereunder, (h) obtain collateral for the payment of any Credit and/or any guaranty thereof, (i) waive, release, exchange, substitute, or modify, in whole or in part, existing, after-acquired or later acquired collateral securing payment of the Credit or any guaranty therefor on such terms as Lender at its sole discretion shall determine, (j) subordinate payment of all or any part of the Credit to other creditors of Borrower or other persons on such terms as Lender deems appropriate, (k) apply any sums received from Borrower, any other guarantor, endorser or cosigner or from the sale or collection of collateral or its proceeds to any indebtedness whatsoever in any order and regardless of whether or not such indebtedness is guaranteed hereby, is secured by collateral, or is due and payable, (l) without limiting the foregoing, apply any sums received from Guarantor or from the sale of collateral granted by Guarantor to any, all, or any portion of the Credit in any order regardless of whether or not the Credit is secured by collateral or is due and payable, and (m) exercise any right or remedy it may have with respect to any Credit or any collateral securing any Credit, this Guaranty or any other guaranty, including, without limitation, bidding and purchasing at any sale of any such collateral, and compromising, collecting or otherwise liquidating any collateral or any Credit.

6.    Guarantor acknowledges that Guarantor may have certain rights under applicable law which, if not waived by Guarantor, might provide Guarantor with defenses against Guarantor's liability under this Guaranty. Among those rights, are certain rights of subrogation, reimbursement, indemnification and contribution, and rights provided in sections 2787 to 2855, inclusive, of the California Civil Code. Guarantor waives all of Guarantor's rights of subrogation, reimbursement, indemnification, and contribution, and any other rights and defenses that are or may become available to Guarantor by reason of any or all of California Civil Code sections 2787 to 2855, inclusive, including, without limitation, Guarantor's rights:

(a)    To require Lender to notify Guarantor of any default by Borrower, provide Guarantor with notice of any sale or other disposition of security for any Credit, disclose information with respect to the Credit, Borrower, or any other guarantor, co-signer or endorser, or with respect to any collateral;

(b)    That Guarantor's obligation under this Guaranty must be commensurate with that of Borrower;

5175589v1                    2

(c)    To be discharged based upon the absence of any liability of Borrower, at any time, by virtue of operation of law, or otherwise, or due to any other disability or defense of Borrower or any other guarantor, endorser or co-signer;

(d)    To be discharged if any of the terms, conditions or provisions of the Credit are altered in any respect;

(e)    To be discharged upon acceptance by Lender of anything in partial satisfaction of the Credit, and/or if Lender designates the portion of the Credit to be satisfied;

(f)    To be discharged upon any modification of the Credit or the release by Lender of Borrower or any other guarantor, endorser or co-signer;

(g)    To require Lender to proceed against Borrower, or any other guarantor, endorser, co-signer, or other person, or to pursue or refrain from pursuing any other remedy in Lender's power;

(h)    To receive the benefit of or participate in any and all security for repayment and/or performance of the Credit;

(i)    To have any security for the Credit first applied to satisfy or discharge the Credit;

(j)    That any arbitration award rendered against Borrower not constitute an award against Guarantor;

(k)    To be discharged based upon any failure by Lender to perfect or continue perfection of any lien, use due diligence to collect all or any part of any Credit, or if recovery against Borrower becomes barred by any statute of limitations, or if Borrower is not liable for any deficiency after Lender realizes upon any collateral;

(l)    To be discharged due to the release or discharge of any collateral for any Credit or guaranty, or relating to the validity, value or enforceability of any collateral; and

(m)    To revoke this Guaranty.

7.    Guarantor also waives all rights and defenses that Guarantor may have because the Borrower's debt is secured by real property. This means, among other things: (1) Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged or assigned by Borrower; and (2) If Lender forecloses on any real property collateral pledged by the Borrower: (A) The amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price, and (B) Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower. This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because Borrower's debt is secured by real property. These rights and defenses include, but are not limited to, any rights or defenses directly or indirectly based upon Sections 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.

5175589v1    3

8.      Guarantor also waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against the principal by the operation of Section 580d of the California Code of Civil Procedure or otherwise.

9.      Guarantor waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of acceptance, notices of the existence, creation or increase of any new or additional credit, notice of sale in regard to judicial or non-judicial foreclosure of real or personal property collateral and all other notices and demands of any kind or nature whatsoever except as expressly set forth herein.

10.      Notwithstanding any foreclosure of the lien of any security agreements, deeds of trust, mortgages or other security instruments, with respect to the Credit or any other guaranty, whether by the exercise of the power of sale contained therein, by any action for judicial foreclosure, or by any acceptance of a deed or other transfer in lieu of foreclosure, whether or not such method of foreclosure or transfer in lieu of foreclosure was for a consideration equal to or greater than the fair market value of the security property, Guarantor shall remain bound under this Guaranty for the obligations of Borrower to Lender and shall be liable to Lender for any and all of the Credit remaining unpaid after any such foreclosure.

11.      Guarantor represents and warrants to Lender that: (a) Lender has made no representation to Guarantor in regard to Borrower, the Credit or any matters pertaining thereto, upon which Guarantor is relying in giving this Guaranty; and (b) Guarantor has established adequate means and assumes the responsibility for being and keeping informed of the financial condition of Borrower and of all other circumstances bearing upon the risk of nonpayment of the Credit which diligent inquiry would reveal, and Lender shall have no duty to advise Guarantor of information known to Lender regarding such condition or any such circumstance.

12.      In addition to all liens upon and rights of setoff against monies, securities or other property of Guarantor given to Lender by law or otherwise as security for this Guaranty, Guarantor hereby pledges to Lender and grants to Lender a security interest in, and Lender shall have a right of setoff against, all monies, securities and other property of Guarantor now or hereafter in the possession of or on deposit with Lender, whether held in a general or special account or deposit or for safekeeping or otherwise; and each such security interest or right of setoff may be enforced or exercised without demand upon, or notice to, Guarantor.  No action or lack of action by Lender with respect to any security interest or right of setoff or otherwise shall be deemed a waiver thereof, and every right of setoff or security interest or otherwise shall continue in full force and effect until specifically released by Lender in writing.  The security interests created hereby shall secure all of Guarantor's obligations to Lender under this Guaranty and any subsequent guaranty executed by Guarantor.

13.      Any and all indebtedness of Borrower now or hereafter owed to Guarantor and all claims of Guarantor against Borrower, whenever arising, are hereby subordinated to the Credit and assigned to Lender as additional collateral. If Lender so requests, any note or other instrument evidencing such indebtedness and all claims of Guarantor against Borrower shall be delivered to Lender, and such indebtedness and all claims of Guarantor against Borrower shall be

5175589v1                                    4

collected, enforced and received by Guarantor as trustee for Lender and be paid over to Lender on account of the Credit but without reducing or affecting in any manner the liability of Guarantor hereunder.  Should Guarantor fail to collect proceeds of debt owed to it by Borrower and pay the proceeds to Lender, Lender, as Guarantor's attorney-in-fact may do such acts and sign such documents in Guarantor's name as Lender considers necessary, at its discretion, to effect such collection, and Guarantor hereby irrevocably appoints Lender as Guarantor's attorney-in-fact for such purposes.  If Borrower is a corporation, limited liability company, partnership or other entity, Guarantor will not withdraw or accept, without Lender's prior written consent, any return of any capital invested or equity interest in Borrower.

14.    Guarantor agrees that to the extent Borrower makes a payment or payments or is credited for any payment or payments made for the account of or on behalf of Borrower to Lender, which payment or payments, or any part thereof, are subsequently invalidated, determined to be fraudulent or preferential, voided, set aside and/or required to be repaid to any trustee, receiver, assignee or any other party whether under any bankruptcy, state or federal Law, common law or equitable cause or otherwise, then to the extent thereof, the obligation or part thereof intended to be satisfied thereby, together with the guaranty thereof hereunder, shall be revived, reinstated and continued in full force and effect as if said payment or payments had not originally been made by or for the account of or on behalf of Borrower.

15.    Guarantor agrees that to the extent Guarantor makes a payment or payments or is credited for any payment or payments made for the account of or on behalf of Guarantor to Lender, which payment or payments, or any part thereof, are subsequently invalidated, determined to be fraudulent or preferential, voided, set aside and/or required to be repaid to any trustee, receiver, assignee or any other party whether under any bankruptcy, state or federal Law, common law or equitable cause or otherwise, then to the extent thereof, the obligation or part thereof intended to be satisfied thereby, shall be revived, reinstated and continued in full force and effect as if said payment or payments had not originally been made by or for the account of or on behalf of Guarantor.

16.    Guarantor's obligations hereunder are not contingent upon and are independent of the obligations of Borrower, or any other guarantor or surety of the Credit.  This Guaranty is not made in consideration of the liability of any other guarantor or surety of the Credit.  The release or death of any guarantor of the Credit or the revocation of any guaranty shall not release or otherwise affect the liability of any other non-revoking guarantor.  A separate action or actions may be brought and prosecuted against Guarantor whether action is brought against Borrower or any other guarantor or whether Borrower or any other guarantor be joined in any such action or actions.

17.    To the maximum extent permitted by law, Guarantor specifically waives the benefit of the statute of limitations affecting its liability hereunder or the enforcement hereof, or the collection of any Credit, including, without limiting the foregoing, any and all special statutes of limitations arising out of California Code of Civil Procedure sections 580a or 726(b).  Any partial payment by Borrower which operates to toll any statute of limitations as to Borrower shall likewise toll the statute of limitations as to Guarantor.

5175589v1                                    5

18.     Any married person who signs this Guaranty expressly agrees that recourse may be had against his/her separate property as well as all community property over which that person has a power of management and control, for all of his/her obligations hereunder.

19.     Should any one or more provisions of this Guaranty be determined to be illegal or unenforceable, all other provisions shall remain effective.

20.     Lender may, with or without notice, assign this Guaranty in whole or in part.  This Guaranty shall inure to the benefit of Lender, its successors and assigns, and shall bind Guarantor and Guarantor's heirs, executors, administrators, representatives, successors and assigns.

21.     Guarantor agrees to pay to Lender, on demand, all attorneys' fees and all other costs and expenses which may be incurred by Lender in the collection or attempted collection from Borrower of any Credit and/or in the interpretation, enforcement or attempted enforcement by Lender of this Guaranty or any collateral therefor, including, but not limited to, proceedings in any bankruptcy or other insolvency case or other proceedings concerning the Credit or this Guaranty, or both, in any manner, whether or not legal proceedings or suit are instituted, together with interest thereon at the rate applicable to the Credit and including, without limitation, all attorneys' fees and related costs of enforcement of any and all judgments and awards and upon any appeal relating thereto.

22.     Guarantor warrants and represents to Lender that:

(a)     No representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of the Guaranty;

(b)     Guarantor has full power, right and authority to enter into the Guaranty;

(c)     The provisions of the Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor;

(d)     Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein;

(e)     Upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided;

(f)     All financial statements and other financial information furnished or to be furnished to Lender by Guarantor are and will be true and correct and do and will fairly represent the financial condition of Guarantor (including all contingent liabilities) as of the dates thereof;

(g)     There has been no material adverse change in Guarantor's financial condition since the dates of the financial statements and other information furnished to Lender, except as previously disclosed to Lender in writing;

(h)     no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened;

(i)     Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and

(j)     Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition, and  Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under the Guaranty, and Guarantor further agrees that Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of  its relationship with Borrower.

23.     Lender may declare Guarantor in default under this Guaranty upon the occurrence of any of the following events:

(a)     Guarantor fails to pay or perform any of Guarantor's obligations under this Guaranty; or

(b)     Any representation or warranty made or given by Guarantor to Lender proves to be false or misleading in any material respect; or

(c)     A petition or action for relief shall be filed by or against Guarantor, pursuant to the Federal Bankruptcy Code (Title 11, U.S. Codes) in effect from time to time, or under any other law relating to bankruptcy, insolvency, reorganization, moratorium, creditor composition, arrangement or other relief from debts; the appointment of a receiver, trustee, custodian or liquidator of or for any property of Guarantor; or upon the death, incapacity, insolvency, dissolution, or termination of the business of Guarantor; or

(d)     Guarantor revokes or attempts to revoke this Guaranty.

24.     If Borrower is a corporation, limited liability company, partnership or other entity, Lender need not inquire into the power of Borrower or the authority of its officers, directors, partners, agents, members or managers acting or purporting to act in its behalf, and any Credit granted in reliance upon the purported exercise of such power or authority is guaranteed hereunder.

25.     Receipt of a true copy of this Guaranty is hereby acknowledged by Guarantor. Guarantor understands and agrees that Lender's acceptance of this Guaranty shall not constitute a commitment of any nature whatsoever by Lender to extend, renew or hereafter extend credit to Borrower.  Guarantor agrees that this Guaranty shall be effective with or without notice from Lender of its acceptance of this Guaranty.

5175589v1                                   7

26. If Guarantor has executed more than one Guaranty of any or all indebtedness of Borrower owed to Lender, any limits of liability thereunder and hereunder shall be cumulative, and a subsequent guaranty executed by Guarantor shall not supersede or replace this Guaranty unless such subsequent guaranty so provides.

27. <u>JUDICIAL REFERENCE</u>. The parties hereby agree that any claims, controversies, disputes, or questions of interpretation, whether legal or equitable, arising out of, concerning or related to this Guaranty and all Loan Documents executed by Guarantor shall be heard by a single referee by consensual general judicial reference pursuant to the provisions of California Code of Civil Procedure sects 638 et seq., who shall determine all issues of fact or law and to report a statement of decision. The referee shall also have the power to hear and determine proceedings for ancillary relief, including, but not limited to, applications for attachment, issuance of injunctive relief, appointment of a receiver, and/or claim and delivery. The costs of the proceeding shall be borne equally by the parties to the dispute, subject to the discretion of the referee to allocate such costs based on a determination as to the prevailing party(ies) in the proceeding. By initialing below the parties acknowledge that they have read and understand the foregoing Judicial Reference provisions and understand that they are waiving their right to a jury trial.

DS
Guarantor's Initials

28. Guarantor waives all rights to interpose any setoffs or counterclaims of any nature in any action or proceeding instituted by Lender with respect to this Guaranty, the collateral therefor, or any matter arising therefrom or relating thereto and the posting of any bond which may otherwise be required, and waives any and all benefits of cross-demands pursuant to section 431.70 of the California Code of Civil Procedure.

29. Guarantor hereby irrevocably submits and consents to the jurisdiction of any federal or state court of competent jurisdiction within California in connection with any action or proceeding arising out of or relating to this Guaranty. In any such litigation, Guarantor consents to service of process by any means authorized by California or federal law or as otherwise agreed in writing between Lender and Guarantor.

30. All rights, remedies, powers and benefits granted to Lender under this Guaranty, the Credit, any oral or other written agreement or applicable law whether expressly granted or implied in law or otherwise, are cumulative and not exclusive, and are enforceable alternatively, successively, or concurrently on any one or more occasions at Lender's discretion.

31. Lender shall not, by any act, delay, omission or otherwise be deemed to have expressly or impliedly waived any security interest granted to Lender hereunder or Lender's rights, powers and/or remedies hereunder (including any right of setoff) unless such waiver shall be in writing and signed by an authorized officer of Lender. Any such waiver shall be enforceable only to the extent specifically set forth therein. A waiver by Lender of any default, right, power and/or remedy on any one occasion shall not be construed as a bar to or waiver of any such default, right, power and/or remedy which Lender would otherwise have on any future occasion whether similar in kind or otherwise. Any failure by Lender to file or enforce a claim

5175589v1 8

against the estate (whether in administration, bankruptcy, probate or other proceeding) of Borrower or of any others, shall not affect Guarantor's liability hereunder.

32.     Neither this Guaranty nor any related agreement, document or instrument nor any provision hereof or thereof shall be amended, modified or discharged orally or by course of conduct, but only by a written agreement signed by an authorized officer of Lender expressly referring to this Guaranty and to the provisions so amended, modified or discharged.

33.     Lender's books and records showing the account(s) between Lender and Borrower shall be admissible in evidence in any action or proceeding as prima facie proof of the items set forth therein.  Lender's statements rendered to Borrower, to the extent to which no objection is made within thirty (30) days after date thereof, shall be deemed conclusively correct and constitute an account stated absent manifest error, which shall be binding on Guarantor whether or not Guarantor receives a copy of any such statement or notice thereof.

34.     This is a continuing guaranty of the Credit, including those arising after any repayment and reborrowing and under any successive and future transactions which may increase, renew or continue the original Credit.  Revocation of this Guaranty, if permitted by applicable law, shall be effective only upon the close of the next business day after written notice thereof is received by an officer of Lender by certified or registered mail, return receipt requested at 1900 Main Street, Suite 200, Irvine, California 92614, Attention: Matt Bullock, Executive Vice President, or at any other office of Lender designated in a written notice mailed by Lender to Guarantor at its address set forth below.  Any such revocation shall be effective only as to the revoking party and shall not affect that party's obligations with respect to Credit existing before the revocation became effective or as to any renewals, extensions or modifications of any Credit, whether such renewal, extension or modification is made prior to or after revocation, including those evidenced by a new or additional instrument or agreement or which change the rate of interest on any Credit, or for post-revocation interest and collection expenses accruing or incurred by Lender with respect thereto.  Notwithstanding any revocation hereof, this Guaranty shall not be terminated until Lender has received indefeasible payment in full of all Credit which is guaranteed hereby and, in regard to which Credit, Lender no longer has an outstanding commitment to lend.  Credit existing before revocation becomes effective shall be deemed to include, without limitation, all Credit or advances which Lender has committed to make to Borrower in reliance upon this Guaranty, even though the amount of such Credit or advances has not been advanced as of the effective date of revocation, and even though Lender may have defenses or defaults which would relieve it of such commitment, if asserted.

35.     The provisions of this Guaranty shall be construed and interpreted and all rights and obligations hereunder determined in accordance with the laws of the State of California.

36.     GUARANTOR ACKNOWLEDGES THAT LENDER HAS EXTENDED OR MAY IN THE FUTURE EXTEND THE CREDIT TO BORROWER IN RELIANCE ON GUARANTOR'S UNCONDITIONAL PROMISE TO REPAY ANY AND ALL CREDIT AND LENDER IS RELYING ON THE WAIVERS, WARRANTIES AND PROMISES MADE BY GUARANTOR IN THIS GUARANTY.  GUARANTOR AGREES THAT EACH OF THE WAIVERS, WARRANTIES AND PROMISES SET FORTH IN THIS GUARANTY ARE MADE WITH GUARANTOR'S UNDERSTANDING OF THEIR SIGNIFICANCE AND

CONSEQUENCES AND THAT THEY ARE REASONABLE. IF ANY WAIVERS, WARRANTIES AND PROMISES ARE DETERMINED TO BE CONTRARY TO ANY APPLICABLE LAW OR PUBLIC POLICY, SUCH WAIVERS, WARRANTIES AND PROMISES SHALL BE EFFECTIVE TO THE MAXIMUM EXTENT PERMITTED BY LAW. BEFORE SIGNING THE GUARANTY, GUARANTOR HAS EITHER SOUGHT THE ADVICE OF COUNSEL TO EXPLAIN THE WAIVERS OF ITS RIGHTS AND DEFENSES AS STATED HEREIN AND THE EFFECT THEREOF, OR HAS HAD THE OPPORTUNITY TO SEEK SUCH COUNSEL, AND IN ANY EVENT, INTENDS THIS GUARANTY TO BE AS UNRESTRICTED AS POSSIBLE. GUARANTOR THEREFORE HAS CONSCIOUSLY AND INTENTIONALLY WAIVED ALL DEFENSES OF GUARANTOR AND RIGHTS WHICH COULD EXONERATE GUARANTOR HEREUNDER TO THE FULL EXTENT PERMITTED BY THE LAWS OF THE STATE OF CALIFORNIA, WHETHER OR NOT EACH AND EVERY DEFENSE, RIGHT OR WAIVER IS EXPLAINED OR DESCRIBED IN DETAIL IN THIS GUARANTY.

37.    GUARANTOR ACKNOWLEDGES THAT NEITHER LENDER NOR ANY OF LENDER'S OFFICERS OR EMPLOYEES HAVE MADE ANY PROMISE OR REPRESENTATION, NOT INCORPORATED HEREIN, WHETHER ORAL, WRITTEN OR IMPLIED, TO CAUSE GUARANTOR TO SIGN THIS GUARANTY. GUARANTOR IS NOT SIGNING THIS GUARANTY IN RELIANCE ON ANY PROMISE, CONDITION OR THE ANTICIPATION OF THE OCCURRENCE OF ANY EVENT, AND THERE ARE NO ORAL UNDERSTANDINGS, STATEMENTS OR AGREEMENTS WHICH HAVE NOT BEEN INCLUDED IN THIS GUARANTY. GUARANTOR UNDERSTANDS THAT LENDER HAS THE RIGHT TO ENFORCE PAYMENT OF THE CREDIT AGAINST BORROWER OR GUARANTOR IN ANY ORDER AND LENDER IS NOT OBLIGATED TO OBTAIN ANY OTHER OR ADDITIONAL GUARANTORS OF THE CREDIT OR TO TAKE ANY OTHER COURSE OF ACTION.

38.    USA PATRIOT ACT ACKNOWLEDGEMENT – Guarantor acknowledges that Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account or obtains a loan. Guarantor further acknowledges that Lender will ask for Borrower's and Guarantor's legal name, address, tax ID number or social security number and other identifying information, and that Lender may also ask for additional information or documentation or take other actions reasonably necessary to verify the identity of Borrower, Guarantor or other related persons.

39.    This Guaranty constitutes the entire agreement between the parties with respect to the subject matter of this Guaranty, and any and all previous or contemporaneous correspondence, statements, or agreements by or between the parties hereto with respect to the subject matter of this Guaranty (but not previous or other guarantees given to Lender by Guarantor) are superseded hereby. This Guaranty may be modified only by a written instrument signed by the parties hereto.

40.    This Guaranty is not secured by any real property.

41.    Guarantor agrees and consents to Lender's (a) sale, transfer, pledge or assignment, whether now or later, of this Guaranty and/or any of the Loan Documents, or any or

5175589v1                                      10

all servicing rights with respect thereto, and/or (b) sale or transfer, whether now or later, of one or more participation interests in the loan guaranteed by this Guaranty ("Loan") to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Guarantor, Borrower or about any other matter relating to the Loan or this Guaranty, and Guarantor hereby waives any rights to privacy Guarantor may have with respect to such matters. Guarantor additionally waives any and all notices of sale or sale of participation interests, as well as all notices of any repurchase of participation interests. Guarantor also agrees that the purchasers of this Guaranty and/or any Loan Documents or participation interests will be considered as the absolute owners of such interests in the Guaranty and/or Loan, as applicable, and will have all the rights granted under the agreement or agreements governing the sale of such interests. Guarantor further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of this Guaranty or such Loan Documents or participant of the Loan and unconditionally agrees that either Lender or such purchaser or participant may enforce Guarantor's obligation under this Guaranty irrespective of the failure or insolvency of any holder of any interest in the Loan and/or this Guaranty. Guarantor further agrees that the purchaser of any such interests may enforce its interests irrespective of any personal claims or defenses that Guarantor may have against Lender. Upon Lender's request, Guarantor shall reasonably cooperate with Lender in connection with any of the transactions contemplated by this Section 41.

42.    General Release.

(a)    Except as to any obligations imposed upon Lender as provided herein, Guarantor, on behalf of itself, its respective successors and assigns, and each of them, does each hereby forever relieve, release, acquit and discharge Lender, and its predecessors, successors and assigns, and its past and present attorneys, accountants, insurers, representatives, affiliates, partners, subsidiaries, officers, employees, directors, and shareholders, and each of them (collectively, the "Released Parties"), from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, costs and expenses (including, but not limited to, attorneys' fees), damages, injuries, actions and causes of action, of whatever kind or nature, whether legal or equitable, known or unknown, suspected or unsuspected, contingent or fixed, which Guarantor now owns or holds or has at any time heretofore owned or held or may at any time hereafter own or hold against the Released Parties, or any of them, by reason of any acts, facts, transactions or any circumstances whatsoever occurring or existing through the date of this Guaranty, including, but not limited to, those based upon, arising out of, appertaining to, or in connection with the Credit, the Prior Guaranty, any documents executed in connection therewith, the facts pertaining to this Guaranty, any collateral heretofore granted to Lender or granted in connection herewith, or to any other obligations of Borrower and/or Guarantor to Lender.

(b)    As to the matters released herein, Guarantor expressly waives any and all rights under Section 1542 of the Civil Code of the State of California, which provides as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
THAT THE CREDITOR OR RELEASING PARTY DOES NOT
KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT
THE TIME OF EXECUTING THE RELEASE AND THAT, IF

KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

(c)    Guarantor expressly waives and releases any right or benefit which it has or may have under Section 1542 of the Civil Code of the State of California, and any similar law of any state, territory, commonwealth or possession of the United States, or the United States, to the full extent that they may waive all such rights and benefits pertaining to the matters released herein.  In connection with such waiver and relinquishment, Guarantor acknowledges that it is aware that it may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true.  Nevertheless, it is the intention of Guarantor through this Guaranty to fully, finally and forever release all such matters, and all claims relative thereto, which do now exist, may exist, or heretofore have existed.  In furtherance of such intention, the release herein given shall be and remain in effect as a full and complete release of such matters notwithstanding the discovery or existence of any such additional or different claims or facts relative thereto.

(d)    In entering into the release provided for in this Guaranty, Guarantor recognizes that no facts or representations are ever absolutely certain; accordingly, Guarantor assumes the risk of any misrepresentation, concealment or mistake, and if Guarantor should subsequently discover that any fact that it relied upon in entering into these releases was untrue, or that any fact was concealed from it, or that any understanding of the facts or of the law was incorrect, Guarantor shall not be entitled to set aside these releases by reason thereof, regardless of any claims of fraud, misrepresentation, promise made without the intention of performing it, concealment of fact, mistake of fact or law, or any other circumstances whatsoever.

(e)    Guarantor is the sole and lawful owner of all right, title and interest in and to every claim and other matter which it purports to release herein, and it has not heretofore assigned or transferred, or purported to assign or transfer to any person or any entity claims or other matters herein released.  Guarantor shall indemnify, defend and hold Lender, and each of the other Released Parties, harmless from and against any claims, liabilities, actions, causes of action, demands, injuries, costs, and expenses (including, but not limited to, attorneys' fees), based upon or arising in connection with any such prior assignment or transfer, or any such purported assignment or transfer, or any claims or other matters released herein.

43.    Document Imaging.  Borrower, Lender and Guarantor shall be entitled, each in its sole discretion, to image or make copies of all or any selection of the agreements, instruments, documents and items and records governing, arising from or relating to any of Borrower's loans, including, without limitation, this document and the other Loan Documents, and either party may destroy or archive the paper originals.  The parties hereto (i) waive any right to insist or require that the other party produce paper originals, (ii) agree that such images shall be accorded the same force and effect as the paper originals, (iii) agree that each party is entitled to use such images in lieu of destroyed or archived originals for any purpose, including as admissible evidence in any demand, presentment or other proceedings, and (iv) further agree that any executed facsimile (faxed), scanned or other imaged copy of this document or any Loan Document shall be deemed to be of the same force and effect as the originally manually executed document.

5175589v1                              12

44.     Amended and Restated Guaranty.  This Guaranty amends, restates, replaces and supersedes in its entirety that certain Amended and Restated Limited Guaranty dated October __, 2020 given by Guarantor to Lender in connection with that certain Business Loan Agreement (Revolving Line of Credit) dated July 18, 2017 between Borrower and Lender.

*[SIGNATURE PAGE FOLLOWS]*

5175589v1                                   13

IN WITNESS WHEREOF, the Guarantor has executed this Second Amended and Restated Continuing Guaranty as of the 25th day of March 2024.


**GUARANTOR:**


_____
DEBA SHYAM, an individual


Address:    520 NEWPORT CENTER DR SUITE 480
NEWPORT BEACH, CA 92660

5175589v1                                  14

# EXHIBIT 9

## AMENDED AND RESTATED BUSINESS LOAN AND SECURITY AGREEMENT
## (REVOLVING LINE OF CREDIT)

This AMENDED AND RESTATED BUSINESS LOAN AND SECURITY AGREEMENT (REVOLVING LINE OF CREDIT) (this "Agreement") is made as of May 10, 2023, by and between CANTOR GROUP II, LLC, a Delaware limited liability company ("Borrower"), and ZIONS BANCORPORATION, N.A., dba California Bank & Trust ("Lender"):

A.  Borrower is engaged in the business of acquiring (i) various performing and non-performing promissory notes and (ii) real estate, from third-party lenders.

B.  Lender heretofore extended to Borrower a revolving line of credit in the original maximum principal amount of Fifteen Million and No/100 Dollars ($15,000,000.00) (the "Existing Loan") pursuant to that certain Business Loan Agreement (Revolving Line of Credit) dated as of May 5, 2016, between Borrower and Lender (together with any and all amendments thereto or modifications thereof, the "Prior Agreement").

C.  Borrower and Lender now desire, among other provisions, to (i) amend and restate the Prior Agreement and the related Loan Documents in their entirety, (ii) supersede and replace in their entirety the Prior Loan Agreement with this Agreement, and (iii) make certain other changes to the Existing Loan as more particularly set forth herein.

D.  As of the Effective Date, the outstanding principal amount of the Existing Loan is Eighteen Million Three Hundred Seventy-Two Thousand Four Hundred Seven and 47/100 Dollars ($18,372,407.47).

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE 1.
## DEFINITIONS.

The definitions set forth in the Recitals are incorporated herein by reference. Capitalized terms not defined in this Agreement have the meanings given them in the California Uniform Commercial Code. For purposes of this Agreement, the following terms shall have the following meanings:

"Account" has the meaning set forth in Section 9102(a)(2) of the Code.

"Advance" means any advance or disbursement of Loan Proceeds pursuant to this Agreement.

"Advance Rate" shall mean the lesser of (i) the Applicable Advance Rate applied to the unpaid principal balance of the Eligible Receivables under the Borrowing Base, or (ii) 60% of the value of the Underlying Real Estate Collateral of the Eligible Receivables in the Borrowing Base as reflected in an Appraisal acceptable to Lender.

4897573v4 | 031205-0098

**Page 153**

"Applicable Advance Rate" shall mean:

70% where the Underlying Real Estate Collateral for the Eligible Receivable is single family investor property;

70% where the Underlying Real Estate Collateral for the Eligible Receivable is multi-family commercial property;

70% where the Underlying Real Estate Collateral for the Eligible Receivable is industrial, mixed-use, hospitality, and retail property; and

50% where the Underlying Real Estate Collateral for the Eligible Receivable is office property.

"Affiliate" means with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such Person, into which the Persons is merged, or which acquires all or substantially all of the assets of the Person.

"Allonge" means an attachment to a Collateral Loan Note (and included in the Collateral Loan Document Package) containing the endorsement by Borrower of the Collateral Loan Note, substantially in the form attached hereto as Exhibit B and incorporated herein by this reference, or in form otherwise approved by Lender in writing.

"Agreement" means this Amended and Restated Business Loan and Security Agreement (Revolving Line of Credit), as originally executed or as it may be modified, supplemented, extended, renewed or amended from time to time.

"Affiliate" means with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such Person, into which the Persons is merged, or which acquires all or substantially all of the assets of the Person.

"Anti-Money Laundering Laws" shall mean the USA Patriot Act of 2001, the Bank Secrecy Act, as amended through the date hereof, Executive Order 1 3324—Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, as amended through the date hereof, and other federal laws and regulations and executive orders administered by OFAC which prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals (such individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanction and embargo programs), and such additional laws and programs administered by OFAC which prohibit dealing with individuals or entities in certain countries regardless of whether such individuals or entities appear on any of the OFAC lists.

"Appraisal" means an appraisal or brokers opinion of value of the Underlying Real Estate Collateral, or such other report acceptable to Lender in its sole opinion and judgment, performed and prepared for Lender at Borrower's sole expense. In the event an Appraisal is provided, it

shall be prepared by a duly licensed or certified appraiser approved by Lender and possessing all qualifications required by Lender and applicable Laws, setting forth the appraiser's opinion and determination of the fair market value of the Underlying Real Estate Collateral; said Appraisal shall be prepared in full narrative form meeting all requirements and approaches to value as shall be necessary or appropriate in order to comply with all customary and generally accepted appraisal standards within the appraisal industry and in accordance with Lender's requirements, and to Lender's satisfaction and all applicable Laws governing Lender's operations (including, but not limited to, the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA) and Uniform Standards of Professional Appraisal Practice (USPAP)). In the event Lender accepts a brokers opinion of value of the Underlying Real Estate Collateral, such brokers opinion of value shall be acceptable to Lender in its sole and absolute opinion and judgment..

"Assets" has the meaning usually given that term in accordance with GAAP, including subordinated debts owed by a Person to holders of equity in the Person if the Person is a business entity, but excluding sums due to the Person from Affiliates.

"Assignment of Mortgage" means each Collateral Assignment of Mortgage [or Deed of Trust] and Related Documents, if required by Lender, executed and delivered by Borrower to Lender in connection with any Collateral Loan to be secured by real property and included in the Collateral Loan Document Package, substantially in the form attached hereto as Exhibit C and incorporated herein by this reference, or in form as otherwise approved by Lender in writing (with such modifications to such form as may be required in order for such form to be recorded in the real property records of the applicable jurisdiction).

"Authorized Person" shall mean any person duly authorized by a general borrowing resolution of the Borrower, or in the absence of such a resolution, board minutes. As of the date hereof, the following persons currently, individually or collectively, are authorized to request Advances and authorize payments until the Lender receives from the Borrower, at the Lender's address, written notice of revocation of their authority: Mahender Makhijani.

"Availability" means the lesser of (a) the Credit Limit, and (b) the Borrowing Base.

"Borrower's Loan Portfolio" means those Collateral Loans held by Borrower for Borrower's own account.

"Borrowing Base" shall mean the aggregate sum of the amounts calculated by Lender for each individual Eligible Receivable based on its Advance Rate.

"Borrowing Base Certificate" means a Borrowing Base Certificate substantially in the form of Exhibit D attached hereto.

"Business Day" means Monday through Friday, excluding any day of the year on which banks are required or authorized to close in California.

"Code" means the Uniform Commercial Code as adopted and in effect in the State of California, from time to time.

"Collateral" means all real property and personal property security for the Loan, including as more particularly described in Sections 4.10 and 5 herein.

"Collateral Loan" means any loan purchased by Borrower, and/or made by Borrower to third-party borrowers, and secured by real property collateral located in the States of California, Arizona, Nevada, Texas and Utah which Borrower has granted to Lender a security interest and has been pledged to Lender as Collateral.

"Collateral Loan Documents" means all instruments, agreements, and documents evidencing and securing all covenants, terms, and conditions of a Collateral Loan, in form and content satisfactory to Lender in its sole opinion and judgment, duly executed by a Collateral Loan Obligor to and in favor of Borrower and pledged to Lender as security for the obligations of Borrower hereunder and under the other Loan Documents.

"Collateral Loan Document Package" means all instruments, agreements, and documents evidencing and/or Securing a Collateral Loan, including, but not limited to , the Collateral Loan Note, an Assignment of Mortgage, Allonge, loan agreement, deed of trust, environmental agreement, environmental reports (only for Collateral Loans secured by commercial property) fixture filing, financing statement, borrowing authorization, loan application, title policy, certificates of insurance, escrow instructions, organizational documents for the Collateral Loan Obligor, flood search, and any other documents requested by Lender in its sole and absolute discretion, all in original form.

"Collateral Loan Note" means the promissory note executed or to be executed by each Collateral Loan Obligor to evidence a Collateral Loan, in form and content satisfactory to Lender in its sole opinion and judgment.

"Collateral Loan Obligor" means a Person which is obligated by contract or by operation of law to pay and/or perform any or all of the indebtedness and other obligations of the borrower under and arising out of a Collateral Loan and Collateral Loan Documents evidencing and securing the same, including, without limitation, a Person designated as borrower or co-borrower thereunder and a Person guaranteeing said indebtedness and/or other obligations, whether by pledge of collateral or by agreeing to be personally liable therefor.

"Collateral Mortgage" means any deed of trust or mortgage, as applicable, and assignment of rents executed and delivered by a Collateral Loan Obligor to secure repayment of a Collateral Loan, in form and content satisfactory to Lender in its sole opinion and judgment.

"Commitment Term" means that period during which Loan Proceeds may be disbursed under this Agreement, which is a period commencing on the date of this Agreement and expiring May 1, 2026.

"Continuing Guaranty" shall mean that certain Amended and Restated Continuing Guaranty, duly executed by Guarantor, unconditionally and irrevocably guaranteeing payment and performance of Borrower's obligations to Lender in connection with the Loan, as such agreement or agreements are originally executed and as such agreement or agreements may from time to time be reaffirmed, supplemented, modified or amended.

.

"Credit Limit" means Thirty Million and No/100 Dollars ($30,000,000.00).

"Eligible Receivables" means those Collateral Loans which Lender, in its sole and absolute opinion and judgment, shall deem eligible for inclusion in the Borrowing Base, based on such considerations as Lender may from time to time deem appropriate. Without limitation, Eligible Receivables shall not include the following (with any receivable other than an Eligible Receivable being deemed an "Ineligible Receivable"):

(i)    Any Collateral Loan that is not secured by a deed of trust with a first (1st) lien priority on the Underlying Real Estate Collateral; provided, however, that not more than twenty-five percent (25%) of the Credit Limit may be utilized by Borrower to purchase Collateral Loans that are Eligible Receivables secured by a deed of trust (or mortgage) with a second (2nd) lien priority on the Underlying Real Estate Collateral;

(ii)   Any Collateral Loan which has Underlying Real Estate Collateral which is raw land or an owner-occupied single family residence;

(iii)  Any Collateral Loan which has incomplete loan documentation or for which any loan documentation is not fully executed;

(iv)   Any Collateral Loan in which Borrower is not the sole lender;

(v)    Any Collateral Loan in which the Underlying Real Estate Collateral for such Collateral Loan is not located in the States of California, Arizona, Nevada, Texas or Utah;

(vi)   Any Collateral Loan for which any executory obligation(s) remain to be performed by Borrower or any subsequent holder or assignee of the Collateral Loan Documents;

(vii)  Any Collateral Loan to any Affiliate or principal of Borrower, or to any other entities where any Affiliates of Borrower or principals of Borrower are the beneficial owners;

(viii) Any Collateral Loan that has been included in the Borrowing Base for more than twenty-four (24) months;

(ix)   Any Collateral Loan which is deemed ineligible by Lender in its sole and absolute discretion; or

(x)    Any Collateral Loan that is required to be removed as part of the Borrowing Base pursuant to the terms of this Agreement.

"Equipment" has the meaning set forth in Section 9102(a)(33) of the Code and includes, without limitation, all of Borrower's furniture, fixtures, trade fixtures, tenant improvements owned by Borrower, all attachments, accessories, accessions, replacements, substitutions, additions or improvements to any of the foregoing, wherever located.

"Event of Default" means any of those occurrences specified in Section 7, or as otherwise specified in the Loan Documents.

"Financial Statements" means balance sheets, income statements, reconciliations of capital structure, statements of sources and applications of funds, and true and complete copies of income tax returns (bearing the original signature of the relevant taxpayer), all prepared in accordance with GAAP.

"Financing Statement" means one or more financing statements (Form UCC-1) given by Borrower to Lender covering the Collateral.

"GAAP" means generally accepted accounting principles consistently applied and maintained throughout the period indicated and consistent with the prior financial practice of Borrower, except for changes mandated by the Financial Accounting Standards Board or any similar accounting authority of comparable standing.

"General Intangibles" has the meaning set forth in Section 9102(a)(42) of the Code and shall include, without limitation, payment intangibles, all choses in action, causes of action, corporate or other business records, inventions, designs, drawings, blueprints, patents, patent applications, trademarks and the goodwill of the business symbolized thereby, names, trade names, trade secrets, goodwill, copyrights, registrations, licenses, franchises, customer lists, security and other deposits, rights in all litigation presently or hereafter pending for any cause or claim (whether in contract, tort or otherwise), and all judgments now or hereafter arising therefrom, all claims of Borrower against Lender, rights to purchase or sell real or personal property, rights as a licensor or licensee of any kind, royalties, telephone numbers, proprietary information, purchase orders, and all insurance policies and claims (including without limitation, life insurance, key man insurance, credit insurance, liability insurance, property insurance and other insurance), tax refunds and claims, software, discs, tapes and tape files, claims under guaranties, security interests or other security held by or granted to Borrower, all rights to indemnification and all other intangible property of every kind and nature (other than Receivables).

"Goods" has the meaning set forth in section 9102(a)(44) of the Code.

"Governmental Agency" means any federal, state or local governmental or quasi-governmental agency.

"Guarantor" shall mean, individually and collectively, (i) Andrew Stupin, an individual, (ii) Gerald Marcil, an individual, and (iii) Gerald J. Marcil and Carol L. Marcil, Trustees, the Marcil Family Trust, dated May 9, 1997.

"Initial Advance" means that certain advance or disbursement of Loan Proceeds by Lender to Borrower, in the amount specified in a Request for Advance, upon satisfaction of the terms and conditions in this Agreement for the making of the Initial Advance, including without limitation pledging the Initial Loan Collateral to Lender.

"Initial Loan Collateral" means those Collateral Loans set forth on Exhibit E attached hereto, which shall be pledged to Lender as Collateral for the Loan.

4897573v4 | 031205-0098                                6

**Page 158**

"Initial Loan Collateral Document Package" means, for the Initial Loan Collateral, applicable documents in the Collateral Loan Document Package.

"Inventory" means all of Borrower's now owned and hereafter acquired goods, including software embedded in such goods, merchandise or other personal property, wherever located, to be furnished under any contract of service or held for sale or lease (including without limitation all raw materials, work in process, finished goods and goods in transit, and, including without limitation, all farm products), and all materials and supplies of every kind, nature and description which are or might be used or consumed in Borrower's business or used in connection with the manufacture, packing, shipping, advertising, selling or finishing of such goods, merchandise or other personal property, and all warehouse receipts, documents of title and other documents representing any of the foregoing.

"Investment Property" has the meaning set forth in Section 9102(a)(49) of the Code.

"Laws" means all federal, state, and local laws, rules, regulations, ordinances, and codes.

"Loan" means the total amount of Advances, as described in Section 4 of this Agreement in a principal amount not to exceed the Availability at any one time.

"Loan Closing" shall mean the date on which of all covenants and conditions of the Loan as hereinafter provided are satisfied by Borrower.

"Loan Collateral" means all of the following real and personal property and related rights of Borrower, whether now existing or hereafter acquired or arising, whether now owned or hereafter acquired, and wherever located: (1) each Collateral Loan and all Collateral Loan Documents, (2) all of Borrower's right, title and interest in and to all Underlying Real Estate Collateral, including, without limitation, all Underlying Real Estate Collateral repossessed and acquired by Borrower by foreclosure or by transfer or retention in lieu of foreclosure, (3) the books, records and files pertaining to the Collateral Loan Documents and Underlying Real Estate Collateral, and (4) all proceeds of the foregoing, including, without limitation, all proceeds in the form of accounts, instruments, chattel paper, contract rights, general intangibles, deposit accounts, insurance policies, insurance proceeds and returned premiums for insurance.

"Loan Documents" means this Agreement, the Note, and such other documents as Lender may require Borrower to give to Lender as evidence of and/or security for the Loan, together with each Assignment of Mortgage, Allonge, Financing Statement, and all other instruments, agreements, and documents evidencing and securing the Advances made and to be made by Lender hereunder and all obligations of Borrower hereunder and herein described.

"Loan Fee" means the sum of $112,500.00 payable by Borrower to Lender for the making of the Loan, which shall be paid by Borrower to Lender prior to and as a condition precedent to Loan Closing and fully earned by Lender upon receipt.

"Loan Proceeds" means all funds advanced by Lender as an Advance to Borrower under this Agreement.

"Maturity Date" means May 1, 2026, but subject to earlier acceleration upon the terms and conditions provided in the Note.

"Mortgage" means each mortgage, assignment of rents, security agreement and fixture filing, or deed of trust, assignment of rents, security agreement and fixture filing, deed to secure debt, assignment of rents, security agreement and fixture filing, or similar instrument creating and evidencing a first lien on real property and other property and rights incidental thereto.

"Note" means the Amended and Restated Promissory Note of even date herewith, in the face amount of the Loan, executed by Borrower in favor of and payable to Lender, or order, which shall be in form and content satisfactory to Lender, in its sole discretion.

"Obligations" means all present and future Advances, loans, overdrafts, debts, liabilities, obligations, including, without limitation, all obligations of Borrower under any guaranties, covenants, duties and indebtedness at any time owing by Borrower to Lender, whether evidenced by this Agreement or any note or other instrument or document or the Loan Documents, whether arising from an extension of credit, opening of a letter of credit, banker's acceptance, trust receipt, loan, overdraft, guaranty, indemnification or otherwise, whether direct or indirect (including, without limitation, those acquired by assignment and any participation by Lender in Borrower's debts owing to others), absolute or contingent, due or to become due, including, without limitation, all interest, charges, expenses, fees, attorneys' fees (including attorneys' fees and expenses incurred in bankruptcy), expert witness fees and expenses, fees and expenses of consultants, audit fees, letter of credit fees, closing fees, facility fees, termination fees, and any other sums chargeable to Borrower under this Agreement or the Loan Documents.

"OFAC" shall mean the United States Department of the Treasury, Office of Foreign Assets Control.

"OFAC Prohibited Person" shall mean a country, territory, individual or person (i) listed on, included within or associated with any of the countries, territories, individuals or entities referred to on The Office of Foreign Assets Control's List of Specially Designated Nationals and Blocked Persons or any other prohibited person lists maintained by governmental authorities, or otherwise included within or associated with any of the countries, territories, individuals or entities referred to in or prohibited by OFAC or any other Anti-Money Laundering Laws, or (ii) which is obligated or has any interest to pay, donate, transfer or otherwise assign any property, money, goods, services, or other benefits from the Property directly or indirectly, to any countries, territories, individuals or entities on or associated with anyone on such list or in such laws.

"Operating Account" means, individually and collectively, Borrower's demand deposit accounts with Lender, bearing the account numbers to be advised by Lender, into which all of Borrower's receipts from its operations are deposited and from which all of Borrower's disbursements for its operations are made.

"Outstanding Balance" means, as applicable to the credit facility described in this Agreement, the aggregate sum of (a) all outstanding, unpaid Advances due and owing under the

Loan, plus (b) the aggregate amount(s) of all committed but undisbursed Advances to be made under this Agreement.

"Person" means an individual, corporation, partnership, limited liability company, joint venture, trust or unincorporated organization or a Governmental Agency.

"Receivables" means all of Borrower's now owned and hereafter acquired Accounts, letter of credit rights, license fees, contract rights, chattel paper (including tangible chattel paper, electronic chattel paper, and intangible chattel paper), instruments (including promissory notes), drafts, securities, documents, securities accounts, security entitlements, commodity contracts, commodity accounts, Investment Property, supporting obligations and all other forms of obligations at any time owing to Borrower, all guaranties and other security therefor, all merchandise returned to or repossessed by Borrower, and all rights of stoppage in transit and all other rights or remedies of an unpaid vendor, lienor or secured party.

"Request for Advance" means each request either written or via electronic mail, for an Advance under this Agreement delivered by Borrower to Lender in the form and with the information requested by Lender and substantially as set forth in the attached Exhibit A hereto, which request shall be deemed to constitute Borrower's representation and warranty to Lender that all conditions to the Advance therein requested have been satisfied.

"Section" means a numbered or lettered paragraph, sub-paragraph or other division of this Agreement, and all references in this Agreement to a Section (other than references to statutes) are to Sections of this Agreement.

"Underlying Real Estate Collateral" means the real property and any and all other assets of any Collateral Loan Obligor, or of other Persons, pledged or otherwise assigned to Borrower as collateral security for repayment of any Collateral Loan, as more fully described in the Collateral Loan Documents; and including all land and improvements described in the Collateral Loan Document Package, including, without limitation, all fixtures, rights, rights of way, easements, rents, income, and profits, and all policies and proceeds of insurance and other interests appurtenant thereto which shall be encumbered by a Collateral Mortgage constituting a valid and enforceable trust deed or mortgage lien of record thereon.

"Unused Fee" means that certain fee in the amount of one-half of one percent (0.50%) per annum (0.125% per quarterly period) multiplied by the amount equal to the difference between the Credit Limit and the "Average Annualized Semi-Annual Borrowed Loan Amount" (as hereinafter defined), if the Average Annualized Semi-Annual Borrowed Loan Amount falls below forty percent (40%) of the Credit Limit. The Unused Fee shall be calculated on a semi-annual basis (commencing from the first day of the seventh (7th) calendar month following the date of Loan Closing) and due and payable quarterly in arrears (i) within ten (10) days following the end of each applicable quarterly period, (ii) on the Maturity Date, and (iii) on the date the Loan has been terminated. As used herein "Average Annualized Semi-Annual Borrowed Loan Amount" shall mean, for each quarterly period (or portion thereof), the annualized average-daily cumulative Outstanding Balance under the Loan over the prior three (3) calendar months as determined by Lender in its reasonable discretion. Lender's determination of the Average Annualized Semi-Annual Borrowed Loan Amount shall be conclusive against Borrower absent

manifest error. If the Unused Fee is being computer for less than a full three (3) month period, the percentages and figures used above will be computed on a daily basis for the number of days for which such fee is being computed. The Unused Fee shall be payable as provided in Section 4.1.1(d).

**ARTICLE 2.**
**INTERPRETATIONS**

2.1 NUMBER. GENDER. Any defined terms used in the plural shall include the singular and such terms shall encompass all members of the relevant class.

2.2 SCHEDULES AND EXHIBITS. All schedules and exhibits to this Agreement are incorporated herein by reference.

2.3 OTHER TERMS. Capitalized terms other than accounting terms, and not defined herein, have the meanings given them in the California Uniform Commercial Code. The term "document" is used in its broadest sense and encompasses agreements, certificates, opinions, consents, instruments and other written material of every kind. The terms "including" and "include" mean "including (include), without limitation."

**ARTICLE 3.**
**REPRESENTATIONS AND WARRANTIES OF BORROWER**

Borrower hereby represents and warrants to Lender as of the date of this Agreement, the date any Loan Proceeds are disbursed to Borrower, and each and every date during the term of the Loan, or any portion thereof, as the context admits or requires, that:

3.1 BORROWER'S CAPACITY. Borrower is a limited liability company, formed under the laws of Delaware and duly qualified to do business in the State of California and in any state in which the nature of its business requires it to be so qualified and is lawfully empowered and possesses the capacity to enter into and carry out the terms and provisions of this Agreement.

3.2 VALIDITY OF LOAN DOCUMENTS. The Loan Documents are and shall continue to be in all respects valid and binding upon Borrower according to their terms, The execution and delivery by Borrower of and the performance by Borrower of all its obligations under the Loan Documents have been duly authorized by all necessary action and do not and will not:

3.2.1 Require any consent or approval not heretofore obtained or any other Person.

3.2.2 Violate any provision of other agreements to which Borrower is bound.

3.2.3 Result in or require the creation or imposition of any mortgage, deed of trust, pledge, lien, security interest, claim, charge, right of others or other encumbrance of any nature (other than under the Loan Documents) upon or with respect to any property now owned or leased or hereafter acquired by Borrower.

4897573v4 | 031205-0098          10

**Page 162**

3.2.4   Violate any provision of any Laws, or of any order, writ, judgment, injunction, decree, determination, or award.

3.2.5   Result in a breach of or constitute a default under, cause or permit the acceleration of any obligation owed under, or require any consent under any indenture or loan or credit agreement or any other agreement, lease, or instrument to which Borrower is a party or by which Borrower or any property of Borrower is bound or affected

3.3   BORROWER NOT IN DEFAULT OR VIOLATION.   Borrower is not in default under or in violation of any Laws, order, writ, judgment, injunction, decree, determination or award or under any obligation, agreement, instrument, loan, or indenture, whether to Lender or otherwise, or any lease, and no event has occurred and is continuing, or would result from the making of any Advance, which constitutes an Event of Default, or would constitute an Event of Default but for the requirement that notice be given or time elapse or both.

3.4   NO GOVERNMENTAL APPROVALS REQUIRED.   Borrower does not require any authorization, consent, approval, order, license, exemption from, or filing, registration, or qualification with, any Governmental Agency in connection with the execution and delivery by Borrower, and the performance by Borrower, of all or any of its obligations under the Loan Documents.

3.5   TAX LIABILITY.   Borrower has filed and shall file all tax and related information returns (federal, state, and local) required to be filed and has paid and shall pay all taxes shown thereon to be due and all property taxes due, including interest and penalties, if any.

3.6   FINANCIAL STATEMENTS.   All Financial Statements, tax returns and other financial information of Borrower and Guarantor which have heretofore been submitted to Lender fairly present the financial position of Borrower and Guarantor at the respective dates of their preparation.   Since the dates of such Financial Statements, tax returns and other financial information, there has been no material adverse change in the financial condition of Borrower and Guarantor.

3.7   PENDING LITIGATION.   There are no actions, suits, or proceedings pending, or to the knowledge of Borrower threatened, against or affecting the Borrower, or involving the validity or enforceability of any of the Loan Documents, except actions, suits, and proceedings that are fully covered by insurance or which, if adversely determined, would not substantially impair the ability of Borrower to perform its obligations under the Loan Documents, and Borrower is not in default with respect to any order, writ, injunction, decree or demand of any court or any Governmental Agency.

3.8   COMPLIANCE WITH ENVIRONMENTAL LAWS.   Borrower does not presently, and will not in the future, use, store, manufacture, generate, transport to or from, or dispose of any toxic substances, hazardous materials, hazardous wastes, radioactive materials, flammable explosives or related material on or in connection with any property, or the business of Borrower on any property.   Borrower does not presently, and will not in the future, permit any lessee on any property to use, including any Collateral Loan Obligor and any other occupancy of any Underlying Real Estate Collateral real property, store, manufacture, generate, transport to or

4897573v4 | 031205-0098                          11

from, or dispose of any hazardous materials on or in connection with any property, or the business on any property. ("Hazardous materials," and "hazardous waste" shall include, but not be limited to, such substances, materials and wastes which are or become regulated under applicable Laws or which are classified as hazardous or toxic under applicable Laws.)

3.9 SOLVENCY. Borrower is and shall continue to be able to pay its debts as they mature and the realizable value of its Assets is, and at all times that it may have obligations hereunder shall continue to be, sufficient to satisfy any and all obligations hereunder.

3.10 PRINCIPAL PLACE OF BUSINESS. If Borrower hereafter intends to move its principal place of business, it shall first give at least thirty (30) days' prior written notice to Lender of its intention so to move, the date that such move is anticipated, and its new address.

3.11 PERMITS. Borrower possesses all licenses, permits, franchises, patents, copyrights, trademarks, and trade names, or rights thereto, that are necessary to conduct its business and Borrower is not in material violation of any valid rights of others with respect to any of the foregoing.

3.12 NO ERISA PLAN. Borrower does not maintain a plan under the Employee Retirement Income Security Act of 1974.

3.13 FULL DISCLOSURE. All information in the loan application, financial statements, certificates, or other documents and all information prepared and delivered by Borrower or its Affiliates to Lender in obtaining the Loan is correct and complete in all material respects, and there are no omissions therefrom that result in such information being incomplete, incorrect, or misleading in any material adverse respect as of the date thereof. To the best knowledge of Borrower, all information in any loan application, financial statement, certificate or other document prepared and delivered to Lender on behalf of Borrower by Persons other than Borrower or its Affiliates, and all other information prepared and delivered to Lender on behalf of Borrower by Persons other than Borrower or its Affiliates in applying for the Loan is correct and complete in all material respects, and there are no omissions therefrom that result in any such information being incomplete, incorrect, or misleading in any material adverse respect as of the date thereof.

3.14 USE OF PROCEEDS: MARGIN STOCK. The proceeds of each Advance will be used by Borrower solely for the purposes specified in this Agreement. None of such proceeds will be used for the purpose of purchasing or carrying any "margin stock" as defined in Regulation U or G of the Board of Governors of the Federal Reserve System (12 C.F.R. Part 221 and 207), or for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase or carry a margin stock or for any other purpose which might constitute this transaction a "purpose credit" within the meaning of such Regulation U or G. Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock. Neither Borrower nor any Person acting on behalf of Borrower has taken or will take any action which might cause any Loan Documents to violate Regulation U or G or any other regulations of the Board of Governors of the Federal Reserve System or to violate Section 7 of the Securities Exchange Act of 1934, or any rule or regulation thereunder, in each case as now in

effect or as the same may hereafter be in effect. Borrower and Borrower's Affiliates own no "margin stock".

3.15 GOVERNMENTAL REGULATION. Borrower is not subject to regulation under the Public Utility Holding Company Act of 1935, the Federal Power Act, the Investment Company Act of 1940, the Interstate Commerce Act (as any of the preceding have been amended), or any other Law which regulates the incurring by Borrower of indebtedness, including but not limited to laws relating to common or contract carriers or the sale of electricity, gas, steam, water, or other public utility services.

3.16 NO FURTHER ENCUMBRANCE. There is not any mortgage, deed of trust, pledge, lien, hypothecation, charge (fixed or floating), security interest or other encumbrance whatsoever on any of the Collateral Loans or any interest therein, except as permitted pursuant to this Agreement.

## ARTICLE 4.
## THE LOAN

4.1 REVOLVING LINE OF CREDIT.

4.1.1 Revolving Line of Credit. Upon the request of Borrower, in the form of a Request for Advance, made at any time and from time to time during the Commitment Term, and so long as there is no Event of Default under the Loan Documents, Lender shall make Advances to Borrower, subject to the covenants, terms and conditions of the Loan Documents; provided that Lender shall (not be obligated to make (i) Advances to Borrower whenever the aggregate principal amount of all Advances outstanding at any time exceeds or would exceed, at any one time, the Availability, and (ii) an Advance on any single Collateral Loan in excess of $10,000,000.00. Borrower may repay Advances and obtain new Advances within the Availability, subject to the provisions of this Agreement, provided such Advances are quested and complete Collateral Loan Document Packages are submitted to Lender prior to the expiration of the Commitment Term. This is a revolving line of credit providing for Advances. During the Commitment Term, Borrower may repay principal amounts and re-borrow them. Borrower agrees not to permit the outstanding principal balance of Advances under the line of credit to exceed the Availability. Subject to the other terms and conditions of this Agreement, Borrower agrees as follows:

(a) The total amount of Advances available to Borrower is limited to the Borrowing Base, which shall be calculated by Lender, in Lender's sole determination, upon receipt of the Borrowing Base Certificate as set forth herein. Borrower acknowledges that an Eligible Receivable may become an Ineligible Receivable as a result of events occurring after an Advance is made. In the event that any Eligible Receivable used in calculating the Borrowing Base becomes an Ineligible Receivable, Lender may, at its option, and in its sole discretion, re-calculate the Borrowing Base. At no time shall the aggregate outstanding Advances exceed the Availability. If, at any time, the aggregate outstanding amount of Advances exceeds the Borrowing Base or the Availability, then Borrower shall repay Lender immediately such amount as may be necessary to eliminate such excess.

4897573v4 | 031205-0098

13

(b)      Each Request for an Advance under the Loan shall be made by an Authorized Person completing and delivering a Request for Advance to Lender.  Each Request for Advance shall be deemed delivered only upon actual receipt by Lender at the address specified herein of such Request for Advance.  Lender shall have the right, but not the obligation to conduct any preliminary due diligence desired by Lender, all at Borrower's expense.  If Lender makes a preliminary determination in Lender's sole and absolute opinion that (a) the requested Advance does not satisfy Lender's underwriting criteria or (b) any of the conditions precedent set forth in Section 4 or elsewhere in this Agreement have not been satisfied, Lender shall have no obligation to make the requested Advance.  From the Loan Closing to the Maturity Date, Borrower may borrow and repay the Advances in whole or in part, and re-borrow, all in accordance with the terms and conditions of this Agreement.  Borrower shall have no right to borrow on or after the Maturity Date.  The Lender shall incur no liability to the Borrower in acting upon any request referred to herein which the Lender believes in good faith to have been made by an Authorized Person.

(c)      From and after the expiration of the Commitment Term, Borrower shall not be entitled to request or obtain any Advances of Loan Proceeds.

(d)      Unused Fee.  For each three (3) month period during the term of the Loan, Borrower shall pay to Lender, from its own funds, the Unused Fee.  The Unused Fee shall be calculated on a quarterly basis by Bank for the preceding calendar quarter, and shall be due and payable by Borrower to Lender in arrears on the last day of February, May, August and November, commencing on August 1, 2023.  The Unused Fee shall be non-refundable, and shall be deemed fully earned by Lender upon the expiration of each three (3) month period during the term of the Loan.

4.2      NOTE: PAYMENTS: INTEREST RATE.

4.2.1    Each Advance shall be evidenced by the Note, and shall accrue interest at the rate provided therein.

4.2.2    Borrower shall timely make all payments of principal and interest when due under the terms of the Note.

4.2.3    Borrower will repay in full all principal under the Note and all interest accrued thereon on the Maturity Date, subject to earlier acceleration upon the terms and conditions set forth in the Note.

4.3      PURPOSE OF ADVANCES: LOAN FEE.

4.3.1    Loan Proceeds of each Advance under this Agreement shall be used by Borrower exclusively to purchase Collateral Loans by Borrower.

4.3.2    The Loan Fee shall be paid by Borrower to Lender at Loan Closing.  The Loan Fee will be in addition to all other fees mentioned in this Agreement, and shall be deemed fully earned and non refundable when paid, whether or not any Loan Proceeds are disbursed at any time.

4897573v4 | 031205-0098                        14

4.4 <u>CONDITIONS PRECEDENT</u>. In addition to all other conditions of the effectiveness of this Agreement, the obligations of Lender pursuant to this Agreement shall be subject to the satisfaction or waiver by Lender of the following conditions:

4.4.1 Borrower, at its sole expense, shall deliver to Lender, at its office located at 1900 Main Street, Suite 200, Irvine, California, on or before the date of the Loan Closing the following, in form and substance satisfactory to Lender, in Lender's sole opinion and judgment:

(a) This Agreement;

(b) The Note;

(c) The Continuing Guaranty;

(d) Resolutions and/or other authorizations of Borrower, Borrower's manager and such other Persons as Lender shall request, evidencing, without limitation, approval and authorization of the transactions contemplated hereunder and the documents and instruments to be executed by Borrower in connection herewith; and

(e) Such additional assignment, agreements, certificates, reports, approvals, instruments, documents, financing statements, consents, and opinions as Lender may request.

4.4.2 Borrower shall have opened the Operating Account with Lender;

4.4.3 Lender shall have approved the Financial Statements of Borrower and Guarantor.

4.4.4 No suit, action, or other proceeding of material consequence shall be pending or threatened which seeks to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or to obtain damages or other relief in connection therewith.

4.4.5 Borrower shall have paid to Lender the Loan Fee and any and all other fees and charges due under the terms of the Loan Documents.

4.4.6 Lender's security interest in all Collateral then in existence shall have been perfected by the filing of the Financing Statement, the delivery of the original Collateral Loan Documents to Lender before the Document Delivery Deadline, and the recording of any recordable Collateral Loan Documents, and shall be and remain a first priority perfected security interest in and to all such Collateral, subject only to such action as may be required under applicable law to perfect Lender's security interest in collateral subsequently acquired by Borrower pursuant to each Collateral Loan;

4.4.7 There shall be no breach of any warranty or representation of Borrower.

4.4.8 There shall be no event or circumstance which constitutes, or would upon the giving of notice or passage of time, constitute an Event of Default under this Agreement.

4.5 <u>CONDITIONS OF ADVANCES</u>. Lender's obligation to make each Advance shall be subject to the following additional conditions precedent, in addition to all other conditions of each Advance provided elsewhere in this Agreement and in the other Loan Documents:

4.5.1 All conditions to this Agreement under Section 4.4, above, shall be satisfied in full;

4.5.2 Borrower shall have delivered to Lender a Request for Advance;

4.5.3 Lender shall have determined that the Collateral Loan for which the Advance is sought is an Eligible Receivable;

4.5.4 Concurrent with each Request for an Advance, Borrower shall execute and deliver to Lender (i) a fully complete and executed Borrowing Base Certificate and (ii) an updated summary, in form and detail satisfactory to Lender, of the Collateral Loans in Borrower's Loan Portfolio detailing the status of such Collateral Loans, including without limitation, outstanding amounts due, status of performance, status of real property collateral and other information that may be required by Lender for each Collateral Loan;

4.5.5 No event or circumstance shall have occurred or be continuing which constitutes, or would upon the giving of notice or passage of time, constitute an Event of Default or failure of any condition under the Loan Documents; and

4.5.6 Lender shall have received payment of the fees and costs of Lender in connection with each Advance and the preparation of the Loan Documents, including, but not limited to, reasonable attorneys' fees.

4.6 <u>ELIGIBLE RECEIVABLES</u>.

4.6.1 <u>Approval of Eligible Receivables</u>. Lender shall have no obligation to consider any Collateral Loan for approval as an Eligible Receivable unless and until the following conditions precedent are satisfied in Lender's sole and absolute opinion and judgment, in addition to all other conditions to approval of any Eligible Receivable provided elsewhere in this Agreement and in the other Loan Documents:

(a) Borrower shall prepare and deliver to Lender, for Lender's review and approval, a complete Collateral Loan Document Package by the Document Delivery Deadline, in form and content acceptable to Lender in its sole opinion and judgment evidencing and otherwise pertaining to the Collateral Loan between Borrower and its Collateral Loan Obligor;

(b) All terms and conditions of the Collateral Loan and all Collateral Loan Documents pertaining thereto shall comply with all requirements for Collateral Loans as provided in this Agreement;

(c) Borrower's security interest in all Underlying Real Estate Collateral shall then, or thereafter concurrently with actual disbursement of Loan Proceeds to or

for the account of a Collateral Loan Obligor, constitute a valid, enforceable, and duly perfected security interest in the Underlying Real Estate Collateral, and all proceeds and products thereof;

(d)     No event or circumstance shall have occurred or be continuing which constitutes, or would upon the giving of notice or passage of time, constitute an Event of Default or failure of any condition under the Loan Documents;

(e)     Borrower shall deliver to Lender the Collateral Loan Document Package, including, without limitation, an executed Assignment of Mortgage, Allonge and any other documents related to or evidencing any Collateral Loan as requested by Lender in its reasonable discretion;

(f)     Borrower shall execute and deliver to Lender an Allonge and an Assignment of Mortgage (which shall be retained by Lender and not recorded unless an Event of Default occurs under this Agreement or any other Loan Document, or Lender otherwise decides to record the Assignment of Mortgage, in its sole discretion) for each Collateral Loan, and Lender's security interest in all Loan Collateral and related rights of Borrower with respect to each Collateral Loan shall then, or thereafter concurrently with actual disbursement of Loan Proceeds to or for the account of Borrower, be a valid, enforceable and first priority perfected security interest in and to all such Loan Collateral, and all proceeds thereof;

(g)     Any title policy included within any Collateral Loan Document Package shall include such endorsement(s) as Lender deems necessary or appropriate, in its reasonable judgment, including, without limitation, mechanic's lien coverage, insuring the validity, priority and enforceability of Borrower's security interest in the Collateral Mortgage; and

(h)     All conditions of the funding of the Collateral Loan shall have been satisfied in accordance with the provisions of the Collateral Loan Documents and the Collateral Loan shall be fully funded, or the Loan Proceeds shall be used to fund the Collateral Loan.

4.6.2   Review of Collateral Loan Document Package: Approval of Eligible Receivables.  Lender shall have a period of five (5) Business Days following submission by Borrower of a completed Collateral Loan Document Package for any Collateral Loan within which to review and approve, or not approve, Borrower's request to approve such Collateral Loan as an Eligible Receivable.  If, within such five (5) Business Day period, Lender has not notified Borrower in writing that such Collateral Loan is approved as an Eligible Receivable, then Lender shall be deemed to have not approved such Collateral Loan and such Collateral Loan shall not be an Eligible Receivable at Lender's sole discretion.

4.6.3   Withdrawal and Termination of Approval of Eligible Receivables.  Notwithstanding any approval by Lender of any Collateral Loan as an Eligible Receivable, any such approval shall be deemed withdrawn and terminated if, at any time, any such Collateral Loan fails to satisfy the conditions for being an Eligible Receivable (including, without limitation, if any default occurs in the payment or performance of any obligations of the Collateral Loan Obligor under the Collateral Loan Documents for such Collateral Loan).  Upon

any such withdrawal and termination of an approval as an Eligible Receivable, the applicable Collateral Loan shall automatically cease to be an Eligible Receivable and be removed from the Borrowing Base and, Borrower shall, after notice from Lender, repay the Advances in such amount as may be required pursuant to Section 4.1.1(a). Notwithstanding the removal of any such Collateral Loan from the Borrowing Base, such Collateral Loan shall remain a "Collateral Loan" until, and unless, such Collateral Loan is released pursuant to Section 4.7.

4.6.4    Appraisals. The initial Appraisal of any underlying real property collateral securing any Collateral Loan (including, without limitation, any Appraisals of the underlying real property collateral securing the Collateral Loans comprising the Initial Loan Collateral) shall be provided by Borrower to Lender, at Borrower's expense.

4.7    RELEASE OF COLLATERAL LOANS. In the event a Collateral Loan is paid off by a Collateral Loan Obligor, or if a Collateral Loan is otherwise sold or disposed of by Borrower, Borrower may request that any Collateral Loan be released from Lender's liens and security interests therein, and, if such Collateral Loan is also an Eligible Receivable, that such Collateral Loan cease to be an Eligible Receivable, provided, that:

4.7.1    Borrower shall provide Lender a written request to remove such Collateral Loan, which request shall specify the requested date for the removal of such Collateral from Lender's lien and security interest;

4.7.2    Lender shall have received at least five (5) Business Days prior to the requested date of removal of such Collateral Loan from Lender's liens and security interests therein, a Borrowing Base Certificate presenting Borrower's computation of the Borrowing Base as of the requested date of removal and after giving effect to the removal of such Collateral Loan and, if such Collateral Loan is also an Eligible Receivable, after giving effect to such Collateral Loan ceasing to be an Eligible Receivable;

4.7.3    Any process from the payoff or sale of such Collateral Loan shall be paid to Lender and applied by Lender to the outstanding principal balance of the Loan.

4.7.4    After giving effect to the payment contemplated in Section 4.7.3 above, and the removal of such Collateral Loan from Lender's liens and security interests therein, and, if such Collateral Loan is also an Eligible Receivable, after giving effect to such Collateral Loan ceasing to be an Eligible Receivable, the outstanding Advances shall not exceed the Borrowing Base;

4.7.5    No event or circumstance which constitutes, or would upon the giving of notice or passage of time, constitute an Event of Default under this Agreement shall exist prior to or after giving effect to the removal of such Collateral Loan from Lender's liens and security interests therein;

4.7.6    Lender shall have received a certificate signed by an Authorized Person certifying that the conditions in subsections 4.7.1 through 4.7.5 of this Section 4.7 are satisfied; and

4.7.7   Borrower shall have provided to Lender such documents, in form and substance satisfactory to Lender in its reasonable discretion, as may be necessary to release Lender's liens and security interests in the Collateral Loan Documents.

4.8   [RESERVED].

4.9   REPAYMENT. In addition to other provisions set forth herein, repayment of the Loan will be required as follows:

4.9.1   Interest and principal payments under the Loan shall be due and payable to Lender pursuant to the provisions of the Note.

4.9.2   Borrower hereby authorizes Lender, if and to the extent any payment of principal or interest or sum otherwise due hereunder is not promptly made pursuant to the Note, and to the extent of any obligation of Borrower to Lender under this Agreement or any other agreement, to charge against any account of Borrower with Lender an amount equal to the principal and accrued interest from time to time due and payable to Lender under the Note or otherwise; provided, however, that the foregoing shall not limit in any way Borrower's obligation to pay such amounts as and when due.

4.9.3   All payments hereunder or under the Note shall be made by Borrower without any offset or deduction for or on account of any present or future taxes, imposts or duties, of whatever nature, imposed or levied by or on behalf of any Governmental Agency. If at any time, whether by reason of any present or future Law or other requirement, Borrower shall be compelled by such Law or other requirement to deduct or withhold such taxes, imposts or duties, Borrower shall pay such additional amounts to Lender as may be necessary such that every net payment under this Agreement and the Note on which Borrower is obligated, after such deduction or withholding, will not be less than the amount required hereunder or thereunder.

4.9.4   Whenever any payment to be made under this Agreement and the Note shall be due on a day other than a Business Day of Lender, such payment may be made on the next succeeding Business Day, and such extension of time shall in such cases be included in the computation of payment of interest hereunder and under the Note.

4.10   DEPOSIT ACCOUNTS. Borrower hereby grants, assigns, pledges and hypothecates to Lender all of Borrower's right, title and interest in and to all deposit accounts maintained by Borrower with Lender, as security for each and all of the obligations of Borrower to Lender under the Loan Documents, including without limitation, the Operating Account.

4.11   NO AUTOMATIC SET-OFF. The existence of any sum or sums being on deposit with Lender shall in no way constitute a set off against or be deemed to compensate the obligations of the Loan or any payment or performance due under the Loan Documents or this Agreement, unless and until Lender, by affirmative action, shall so apply said accounts or any portion thereof, and then only to the extent thereof as so designated by Lender.

4.12   RELIANCE BY LENDER AND ACQUITTANCE. Lender may conclusively assume that the statements, facts, information, and representations contained herein and/or in any affidavits, orders, receipts, or other written instrument(s) that are filed with Lender or exhibited

to it, are true and correct, and Lender may rely thereon without any investigation or inquiry, and any payment made by Lender in reliance thereon shall be a complete release in its favor for all sums so paid.

## ARTICLE 5.
## THE COLLATERAL

5.1 GRANT OF SECURITY INTEREST. To secure the payment and performance of all of the Obligations as and when due, Borrower hereby grants to Lender a first priority security interest in all Collateral.

5.2 COLLATERAL. The Collateral shall constitute all of Borrower's right, title and interest in all of the following assets whether now owned or hereafter acquired, and wherever located:

5.2.1 All Accounts, Receivables, Goods, contract rights, chattel paper, instruments, deposit accounts, letter of credit rights, payment intangibles and General Intangibles, including, without limitation, all of Borrower's cash, money, warehouse receipts, bills of lading, purchase orders, letters of credit, letter of credit rights, any client lists, any and all trade secrets, receipts of any kind or nature, documents, contracts and contract rights, invoices, licenses, insurance, and other tangible or intangible property of Borrower resulting from the sale or disposition of all of the foregoing, and all other personal property (including, without limitation, all of Borrower's money, all personal property now or at any time in the future in Lender's possession and credit balances); and all returned or repossessed goods which, on sale or lease, resulted in an account or chattel paper;

5.2.2 All Inventory, including all materials, work in process and finished goods;

5.2.3 All Equipment, including all machinery, furniture, and fixtures of every type now owned or hereafter acquired by Borrower;

5.2.4 All of Borrower's deposit accounts with Lender. The Collateral shall include any renewals or rollovers of the deposit accounts, any successor accounts, and any general intangibles and choses in action arising therefrom or related thereto;

5.2.5 All instruments, notes, chattel paper, documents, certificates of deposit, securities and Investment Property of every type. The Collateral shall include all liens, security agreements, leases and other contracts securing or otherwise relating to the foregoing;

5.2.6 (i) All patents, and all unpatented or unpatentable inventions; (ii) all trademarks, service marks, and trade names; (iii) all copyrights and literary rights; (iv) all computer software programs; (v) all mask works of semiconductor chip products; (vi) all trade secrets, proprietary information, customer lists, manufacturing, engineering and production plans, drawings, specifications, processes and systems. The Collateral shall include all good will connected with or symbolized by any of such general intangibles; all contract rights, documents, applications, licenses, materials and other matters related to such general intangibles; all tangible property embodying or incorporating any such general intangibles; and all chattel paper and instruments relating to such general intangibles;

4897573v4 | 031205-0098                    20

**Page 172**

5.2.7 All negotiable and nonnegotiable documents of title covering any Collateral;

5.2.8 All accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral;

5.2.9 All Supporting Obligations related to any of the foregoing;

5.2.10 All of Borrower's Collateral Loans and Collateral Loan Documents, including, without limitation, the right to receive all payments, proceeds, and recoveries thereunder, collections and cash collateral of the Collateral Loan Documents, any casualty insurance or condemnation proceeds payable to Borrower thereunder, any and all policies of title insurance issued in connection with any Collateral Mortgage, and the proceeds and products of any of the foregoing;

5.2.11 All substitutes or replacements for any Collateral, all cash or non-cash proceeds, product, rents and profits of any Collateral, all income, benefits and property receivable on account of the Collateral, all rights under warranties and insurance contracts, letters of credit, guaranties or other supporting obligations covering the Collateral, and any causes of action relating to the Collateral;

5.2.12 All proceeds and products of any of the foregoing (including proceeds of any insurance policies, proceeds of proceeds, and claims against third parties); and

5.2.13 All books and records related to any of the foregoing including but not limited to any computer-readable memory and any computer hardware or software necessary to process such memory (all of the foregoing, together with all other property in which Lender may now or in the future be granted a lien or security interest, is referred to herein, collectively, as the "Collateral").

5.3    PERFECTION.

5.3.1    Lender may file or amend one or more financing statements disclosing Lender's security interest in the Collateral. Borrower agrees that a photographic, photostatic or other reproduction of this Agreement or of a financing statement is sufficient as a financing statement. Borrower approves, authorizes and ratifies any filings or recordings made by or on behalf of Lender in connection with the perfection and continuation of Lender's security interest with respect to the Collateral.

5.3.2    Lender may file UCC-1 financing statements against specific items of Equipment, (or amend existing UCC-1 financing statements) in Lender's sole discretion, and Borrower agrees to furnish to Lender sufficient identifying information, such as make, model and serial numbers, as Lender may request. Lender may also file a fixture filing in the real property records of the applicable county in California, to perfect its security interest in such items of Equipment as are or become fixtures.

5.3.3   Upon demand, Borrower will deliver to Lender such other items of Collateral or will execute such documents as are appropriate to grant Lender possession or control of such Collateral as necessary to further perfect Lender's security interest therein.

### 5.4   THE COLLATERAL LOANS.

5.4.1   From and after the occurrence of an Event of Default and during the continuance thereof, Lender shall have the exclusive right to (a) receive and enforce the Collateral Loan Documents, (b) exercise the Borrower's decision-making authority as lender thereunder, and (c) collect all payments and recoveries thereon and all proceeds thereof, to be applied by Lender to payment of the Loan and all fees, costs, and expenses incurred by Lender in connection with the Loan. Lender's rights hereunder shall include, from and after the occurrence of an Event of Default and only during the continuance thereof, the exclusive right to collect and receive all payments, proceeds, and recoveries under and with respect to the Collateral Loan Documents, including, without limitation, the exclusive right to enforce the provisions of the Collateral Loan Documents in any manner Lender shall determine to be necessary or appropriate, including, without limitation, by judicial action or nonjudicial proceedings, and to otherwise bill for and account to Borrower for any and all payments, proceeds, and recoveries thereon as herein provided. Notwithstanding the foregoing assignment, Borrower, alone, and not Lender, shall be obligated to fulfill all of the monetary and non-monetary obligations of the lender to the Collateral Loan Obligor under the Collateral Note, Collateral Mortgage and additional Collateral Loan Documents.

5.4.2   Borrower shall fully and faithfully perform and satisfy all covenants and conditions of the Collateral Loan Documents, and Borrower shall, as of the closing of each Collateral Loan, take all steps necessary and appropriate in order to perfect Borrower's security interest in and lien upon all Underlying Real Estate Collateral and to perfect Lender's security interest in and lien upon all Loan Collateral. Borrower shall service (or caused to be serviced) the Collateral Loans in accordance with this Agreement and all applicable Laws and, to the extent not expressly governed thereby, will, at a minimum, exercise the same degree of care as Borrower exercises with respect to the servicing and administration of loans held by Borrower for its own account.

5.4.3   Each Collateral Loan shall be identified by Lender with (i) the date and amount of each Collateral Note, (ii) the name of the Collateral Loan Obligor, (iii) the identification of the Collateral Mortgage, and (iv) the identification of the Collateral. Such records of Collateral Loans shall be maintained at Lender's office, and the records of Lender shall, absent manifest error, be binding and conclusive upon Borrower.

5.4.4   Collection.   Borrower shall diligently and promptly take all steps necessary and/or appropriate under the circumstances to cause all Collateral Loan Obligors to make full and timely payment of all obligations due under the Collateral Loan Documents.

5.4.5   Monitoring Compliance; No Modifications.   Borrower shall at all times monitor and verify compliance by Collateral Loan Obligors with all obligations under the Collateral Loan Documents. Borrower shall service and administer (or caused to be serviced and administered by a servicer under a servicing agreement approved by Lender in writing, in

**Page 174**

Lender's reasonable discretion) the Collateral Loans in accordance with servicing practices and procedures (including collection procedures) that are in all respects legal, proper and customary in the mortgage servicing industry in accordance with (a) the accepted mortgage servicing practices of prudent mortgage lending institutions that service mortgage loans of the same type as the Collateral Loans in the jurisdiction where the real Property secured by the related Collateral Mortgage is located, (b) applicable law, (c) the terms of the related Collateral Loan Documents, and (d) the servicing practices that Borrower customarily employs and exercises in servicing and administering mortgage loans of the same type as the Collateral Loans for its own account (to the extent not conflicting with clauses (a) through (c) above) and shall have full power and authority, acting alone or through subservicers or agents, to do or cause to be done any and all things in connection with such servicing and administration which Borrower may deem necessary or desirable and consistent with the terms of this Agreement. Borrower hereby authorizes Lender, in Lender's reasonable discretion, to perform a collateral audit on any Collateral Loan upon reasonable notice during the term of the Loan, utilizing an auditor acceptable to Lender, and the audit shall be at Borrower's sole expense.

5.4.6   Representations and Warranties Regarding Collateral Loans.   Borrower makes the following representations and warranties to Lender with respect to each Collateral Loan as of the date such Collateral Loan is pledged as Collateral:

(a)   Subject to Permitted Exceptions (as defined below), the Mortgage creates a first lien or a first priority ownership interest in an estate in fee simple estate in real property securing the related Collateral Loan Note.

(b)   To the best of Borrower's knowledge, all buildings and improvements which were included for the purpose of determining the appraised value of the Underlying Real Estate Collateral lie wholly within the boundaries and building restriction lines of the Underlying Real Estate Collateral and no buildings or improvements on adjoining properties encroach upon the Mortgaged Property. No improvement located on or being part of the Underlying Real Estate Collateral is in violation of any applicable zoning law, subdivision law, ordinance or regulation.

(c)   The Collateral Loan is covered by an American Land Title Association or California Land Title Association mortgage title insurance policy, or such other generally acceptable form of policy or insurance pursuant to insurance policies, and the issuer thereof is qualified to do business in the jurisdiction where the Underlying Real Estate Collateral is located, and which insures the holder of such Collateral Loan, its successors and assigns, as to the first priority lien of the Collateral Mortgage in the original principal amount of the Collateral Loan and against any loss by reason of the invalidity or unenforceability of the lien resulting from the provisions of the Collateral Mortgage.

(d)   The Underlying Real Estate Collateral (including all buildings and improvements thereon) are insured by an insurer, against loss by fire, hazards of extended coverage and such other hazards as are customary in the area where the Underlying Real Estate Collateral is located. If required by the Flood Disaster Protection Act of 1973 ("FDPA"), the Collateral Loan is covered by a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration, in an amount not less than the amount

required by the FDPA, with such flood policy being issued by a generally acceptable insurer. The Collateral Mortgage obligates the Collateral Loan Obligor thereunder to maintain all such insurance at the Collateral Loan Obligor's cost and expense, and upon the Collateral Loan Obligor's failure to do so, authorizes the holder of the Mortgage to obtain and maintain such insurance at the Collateral Loan Obligor's cost and expense and to seek reimbursement therefore from the related Collateral Loan Obligor. Any such hazard insurance policy shall be a valid and binding obligation of the insurer, be in full force and effect, and be in full force and effect.

(e)     To the best of Borrower's knowledge, the Collateral Loan Note or Mortgage is not subject to any right of rescission, set-off, counterclaim or defense, including, without limitation, the defense of usury, nor will the operation of any of the terms of the Collateral Loan Note or the Mortgage, or the exercise of any right thereunder, render either the Collateral Loan Note or the Mortgage unenforceable, in whole or in part, or subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury, and no such right of rescission, set-off, counterclaim or defense has been asserted with respect thereto, and no Collateral Loan Obligor in respect of the Collateral Loan was a debtor in any state or federal bankruptcy or insolvency proceeding at the time the Collateral Loan was originated.

(f)     The Collateral Loans were, and will have been, at all times serviced in accordance with the terms of the related Collateral Loan Note and in accordance with applicable Law. There exists no escrow deposit with respect to the Collateral Loan Note.

(g)     There is no action, suit, proceeding or investigation pending, or to the best of Borrower's knowledge threatened, that is related to the Collateral Loan and likely to affect materially and adversely such Collateral Loan.

(h)     The documents required to be delivered on or before the related closing date with respect to such Collateral Loan have been delivered to Lender. The Collateral Loan Document Package contains each of the documents and instruments specified to be included therein duly executed and in due and proper form, and each such document or instrument is in form acceptable to the applicable federal or state regulatory agency.

(i)     The Collateral Loan Note, the related Mortgage and any intervening assignments of the Mortgage are genuine, and each is the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms, except as enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization or other similar Laws relating to or affecting the enforcement of creditors' rights and (ii) by general principles of equity. All parties to the Collateral Loan Note, the Mortgage and any intervening assignments had legal capacity to execute the Collateral Loan Note, the Mortgage and such assignments, and the Collateral Loan Note, Mortgage and such assignments have been duly and properly executed by such parties.

(j)     The related Mortgage is a valid, subsisting, enforceable and perfected first lien on the Underlying Real Estate Collateral, subject only to Permitted Exceptions, including all buildings on the Underlying Real Estate Collateral, and all mechanical, electrical, plumbing, heating and air conditioning systems affixed to such buildings. The Mortgage and the Collateral Loan Note do not contain any evidence of any security interest or

4897573v4 | 031205-0098                              24

**Page 176**

other interest or right thereto. Such lien is free and clear of all adverse clams, liens and encumbrances having priority over the first lien of the Mortgage subject only to (1) the lien of non-delinquent current real property taxes and assessments not yet due and payable, (2) covenants, conditions and restrictions, rights of way, easements and other matters of the public record as of the date of recording which are acceptable to mortgage lending institutions generally and specifically referred to in the lender's title insurance policy and either (A) which are referred to or otherwise considered in the appraisal made in connection with the origination of the Collateral Loan, or (B) which do not adversely affect the appraised value of the Underlying Real Estate Collateral as set forth in such appraisal and (3) other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Underlying Real Estate Collateral (collectively, "Permitted Exceptions").  Any security agreement, chattel mortgage or equivalent document related to and delivered in connection with the Collateral Loan establishes and creates a valid, subsisting, enforceable and perfected first lien and first priority security interest on the property described therein.

(k)     The Mortgage and the related Collateral Loan Note contain customary and enforceable provisions which render the rights and remedies of the holder thereof adequate for the realization against the Underlying Real Estate Collateral of the benefits of the security provided thereby, including, (i) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (ii) otherwise by judicial foreclosure, subject only to rights of redemption, seizure and other Laws that would not materially interfere with the ultimate realization of the benefits of the security.

(l)     Except as otherwise disclosed to Lender in writing, the terms of the Collateral Loan Note and the Mortgage have not been impaired, waived, altered or modified in any respect from the date of origination; except by a written agreement, which has been delivered to the Lender. No Collateral Loan Obligor in respect of the Collateral Loan has been released, in whole or in part, except in connection with an assumption agreement approved by the title insurer, to the extent required by such policy, and which assumption agreement is part of the Collateral Loan Document Package delivered to the Lender.

(m)     To the best of Borrower's knowledge, there are no mechanics' or similar liens or claims which have been filed for work, labor or material (and no rights are outstanding that under law could give rise to such lien) materially and adversely affecting the Underlying Real Estate Collateral which are, or may be, liens prior or equal to, or coordinate with, the lien of the related Mortgage.

(n)     Except as otherwise disclosed to Lender in writing, there is no default, breach, violation or event of acceleration existing under the Mortgage or the related Collateral Loan Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration; and neither the Borrower nor any prior owner of such Collateral Loan has waived any default, breach, violation or event permitting acceleration. Except as otherwise disclosed to Lender in writing, neither the Borrower nor any such prior owner has waived the performance by any Collateral Loan Obligor of any action, if such party's failure to perform such action would cause the Collateral Loan to be in default. Except as otherwise disclosed to Lender in writing, no

foreclosure action is currently threatened or has been commenced with respect to any Underlying Real Estate Collateral.

(o) Each original Mortgage was recorded, and all subsequent assignments of the original Mortgage have been recorded in the appropriate jurisdictions in which such recordation is necessary to perfect the liens against each related Collateral Loan Obligor or are in the process of being recorded.

(p) The Collateral Loan has been closed and the proceeds of the Collateral Loan have been fully disbursed, except for (a) advances to be made for any renovation of the Underlying Real Estate Collateral, and (b) monetary reserves being held back from being advanced to the Collateral Loan Obligor or otherwise being held by Borrower pursuant to the terms of the Collateral Loan. All costs, fees and expenses incurred in making or closing Collateral Loans and the recording of the Mortgage were paid, and each Collateral Loan Obligor is not entitled to any refund of any amounts paid or due under the Collateral Loan Note or Mortgage. All points and fees related to the Collateral Loan were disclosed in writing to each Collateral Loan Obligor in accordance with all applicable Laws.

(q) No loan payment has been escrowed as part of the loan proceeds on behalf of the Collateral Loan Obligor.

(r) To the best of Borrower's knowledge, all taxes, governmental assessments, insurance premiums and water, sewer and municipal charges which previously became due and owing have been paid by each Collateral Loan Obligor, or an escrow of funds from such Collateral Loan Obligor has been established in an amount sufficient to pay for every such item which remains unpaid and which has been assessed but is not yet due and payable.

(s) To the best of Borrower's knowledge, all inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Underlying Real Estate Collateral and, with respect to the use and occupancy of the same, have been made or obtained from the appropriate authorities and the Underlying Real Estate Collateral is lawfully occupied under applicable Law.

(t) In the event the Mortgage is a deed of trust, a trustee, authorized and duly qualified under applicable law to serve as such, has been properly designated, is named in the Mortgage and currently so serves, and no fees or expenses are or will become payable by the holder thereof to the trustee under the deed of trust, except in connection with a trustee's sale after default by the Collateral Loan Obligor.

(u) Except as disclosed to Lender in writing, no Collateral Loan is secured by a leasehold interest.

(v) The Borrower is the sole legal, beneficial and equitable owner and holder of the Collateral Loan and the indebtedness evidenced by the Collateral Loan Note. The Borrower has good, and marketable title to and is the sole owner thereof has full right and authority to pledge and assign the Collateral Loan to the Lender free and clear of any encumbrance, equity, lien, pledge, charge, claim (including, but not limited to, any preference or fraudulent transfer claim) or security interest.

4897573v4 | 031205-0098                                        26

(w) All parties which have had any interest in the Collateral Loan, whether as mortgagee, assignee, pledgee or otherwise, are (or, during the period in which they held and disposed of such interest, were) in compliance with any and all applicable licensing requirements of the Laws of the state wherein the Underlying Real Estate Collateral is located, except to the extent that failure to be so licensed would not give rise to any claim against the holder.

5.4.7 Maintenance of Insurance: Settlement. Borrower shall (a) cause the Collateral Loan Obligors to at all times insure the Underlying Real Estate Collateral against loss or damage by fire and other risks as shall be required pursuant to the Collateral Loan Documents, with Borrower to be the loss payable beneficiary and/or additional insured or (b) force place such insurance if any Collateral Loan Obligor fails to so comply with the Collateral Loan Documents. In the event of any damage or destruction of the Underlying Real Estate Collateral, or any taking of all or a portion of the Underlying Real Estate Collateral by power of eminent domain, Borrower shall take any and all action as may be necessary or appropriate to make a timely claim for proceeds or an award to which the holder of the Collateral Loan Documents is or may then be entitled; provided, however, that Borrower shall not settle or compromise the amount of any claim, settlement, payment, or award without the prior written approval of Lender, which approval Lender may give or withhold in its reasonable opinion and judgment, and the amount of such settlement or award shall be paid first to Lender to be applied to repay the Advances made by Lender with respect to the Underlying Real Estate Collateral which is the subject of such claim.

5.4.8 Management of Property. If Borrower acquires title to the Underlying Real Estate Collateral, Borrower (i) shall take all commercially reasonable steps necessary to cause the Underlying Real Estate Collateral to be properly managed, maintained, repaired, and adequately insured, (ii) to the extent provided by Law, shall cause all rents and other income and proceeds and other rights generated from the Underlying Real Estate Collateral and any insurance proceeds to be properly collected and applied for the account and benefit of Borrower and/or Lender according to their respective interests in the Underlying Real Estate Collateral, and (iii) maintain insurance on the Underlying Real Estate Collateral consistent with Section 5.4.7. If required by Lender, Lender shall obtain, at Borrower's expense, an updated Appraisal or broker's price opinion for such Underlying Real Estate Collateral and Borrower shall have paid to Lender, in addition to any other fees required under this Agreement or any of the other Loan Documents, an appraisal review fee in an amount to be determined by Lender in its sole discretion, for review of such updated Appraisal.

5.4.9 Reporting. Should Borrower at any time become aware of the occurrence of any loss, damage, destruction, waste, presence or release of any hazardous substance, or nuisance upon or from the Underlying Real Estate Collateral, Borrower shall promptly report in writing to Lender Borrower's findings and such other information related to such occurrence as Lender may request.

5.4.10 Maintenance of Security Interest in Collateral Loans. Borrower shall perfect, and maintain the perfected status and priority, of all security for the Collateral Loans, including, but not limited to, all security interests in personal property and real property security. Without limiting the generality of the foregoing, Borrower shall cause to be filed at all

appropriate locations all such financing statements as shall be required or permitted pursuant to the Collateral Loan Documents, and all continuation statements extending the financing statements.

5.4.11 Reporting and Remittance. Within thirty (30) days following the end of each calendar month, Borrower shall prepare and deliver to Lender a written report of the status of each Collateral Loan as of the end of such calendar month, which report shall include the following and all other information regarding each Collateral Loan as Lender may request from time to time: (a) the name and address of the Collateral Loan Obligors, and the loan number; (b) the principal amount of all advances, and all accrued and unpaid interest, on each Collateral Loan, and the date last paid and next due date; and (c) the existence of any breach or default by Collateral Loan Obligors under the Collateral Loan Documents and, if so, any actions taken by Borrower to enforce the Collateral Loan Documents.

5.4.12 Default by Collateral Loan Obligors; Third-Party Claims.

(a)      In the event of any breach or default by any Collateral Loan Obligor in the payment or performance of any obligations under the Collateral Loan Documents, then, so long as no Event of Default shall have then occurred and be continuing, Borrower shall have the right and obligation to promptly and diligently exercise and enforce any and all rights and remedies available to Borrower under the Collateral Loan Documents and by operation of law in order to collect all indebtedness thereunder and to realize upon and liquidate all Underlying Real Estate Collateral in payment thereof, including, without limitation, by commencing and pursuing to completion foreclosure, whether judicial or nonjudicial, of all liens and security interests encumbering the Underlying Real Estate Collateral. Borrower shall also timely file and pursue any and all claims which the holder of the Collateral Loan Documents shall be entitled to assert against third parties as may be necessary or appropriate in order to prevent losses to the Underlying Real Estate Collateral or to the Loan Collateral, including, without limitation, all claims against any title insurance company with respect to any policy of title insurance issued in connection with a Collateral Loan. All actions taken by Borrower in the exercise and enforcement of the Collateral Loan Documents shall be undertaken and carried out by Borrower at its sole expense and risk, and in full compliance with applicable Law and in a commercially reasonable manner. Borrower hereby indemnifies and shall defend and hold harmless Lender from and against any and all claims, liabilities, losses, actions, suits, proceedings, damages, and expense of whatever kind or description in connection with any and all actions taken by Borrower and its agents and attorneys in the exercise and enforcement of Borrower's rights, remedies, and obligations under this Agreement or as a result of any failure by Borrower to perform its obligations hereunder, including, without limitation, all related expenses and reasonable attorneys' fees incurred by Lender in connection with any such matters. Any and all payments, proceeds, and recoveries received and/or recovered by Borrower with respect to any and all such claims, actions and proceedings shall be paid first to Lender to the extent of the unpaid principal balance of any Collateral Loan Note which is the subject of any such matter; provided, however, Borrower shall not settle or compromise the amount of any claim, settlement, payment, or award without the prior written approval of Lender, which approval Lender may give or withhold its sole opinion and judgment.

(b)    Notwithstanding anything herein to the contrary, in the event that any Collateral Loan that is an Eligible Receivable becomes an Ineligible Receivable, then (i) Lender's approval of such Collateral Loan as an Eligible Receivable shall automatically terminate, (ii) such Collateral Loan shall automatically cease to be an Eligible Receivable and shall be removed from the Borrowing Base, and (iii) Borrower shall make such repayment of the Loan as may be required pursuant to Sections 4.1.1(a) or 4.6.3.

(c)    Nothing herein contained shall be construed as a waiver by Lender of any obligation or duty of Borrower hereunder or under any other Loan Documents, including, without limitation, Borrower's duty to enforce all Collateral Loan Documents in a diligent and timely manner.

5.4.13  Continuous and Replacement Security.  In the event Borrower commences a judicial or nonjudicial foreclosure action or proceeding against a Collateral Loan Obligor pursuant to the provisions of Section 5.4.12 above, and intends to proceed to sell or otherwise dispose, or to cause a sale or other disposition to be made, of any Underlying Real Estate Collateral pursuant to any such action or proceedings in liquidation of the indebtedness under a Collateral Loan, then Borrower shall sell or cause a sale of the Underlying Real Estate Collateral in accordance with applicable Law and standards of commercial reasonableness.  If Borrower acquires title to the Underlying Real Estate Collateral in such a sale or through the acceptance of a deed in lieu ("DIL Transaction"), then Lender's security interest under the Loan Documents shall attach to, and continue in, all such property purchased by Borrower, and all such Underlying Real Estate Collateral purchased by Borrower shall automatically become and be deemed to constitute Collateral for any and all unpaid indebtedness and other obligations owing by Borrower to Lender hereunder or under the other Loan Documents, having a first lien priority and subject to the provisions of this Agreement.  Notwithstanding any provision to the contrary herein contained, and without limiting the validity and effectiveness of the foregoing provisions, Borrower shall notify Lender of each such proposed sale or DIL Transaction concerning Underlying Real Estate Collateral in writing at least ten (10) Business Days prior to the scheduled date of sale or DIL Transaction, and shall execute and deliver to Lender prior to such sale all such security instruments, in recordable form, as Lender shall require in order to create, continue, and perfect Lender's lien upon and security interest in such Underlying Real Estate Collateral, to be effective and perfected as of the time Borrower acquires title thereto as herein provided, including, without limitation, a deed of trust and assignment of rents (or mortgage, as applicable) in form and content required by Lender, encumbering any and all interests in real property which may then be the subject of such sale or DIL Transaction ("Lender Deed of Trust").  Lender may, in its sole discretion, cause such security agreements, financing statements or Lender Deeds of Trust to be duly filed or recorded prior to, concurrently with, or subsequent to, the completion of such sale or DIL Transaction and, in the case of any sale or DIL Transaction concerning Underlying Real Estate Collateral constituting interests in real property, may condition such sale or DIL Transaction and acquisition by Borrower upon the issuance of a title insurance policy to Lender, as the sole insured with respect to each Lender Deed of Trust, following Borrower's acquisition of title to said property and at Borrower's sole expense, in the amount of the then unpaid principal balance of the Collateral Loan Note secured thereby and in form and content otherwise substantially identical to the title insurance policy issued to Borrower in connection with the original Collateral Loan.

5.4.14 <u>Insurance</u>.  Borrower shall obtain and at all times maintain hazard and liability insurance with respect to any and all tangible Loan Collateral which may have been repossessed or otherwise acquired by Borrower in the exercise and enforcement of its rights under the Collateral Loan Documents, in amounts reasonably necessary to protect the interests of Borrower and Lender, as their interests may appear, and issued by companies acceptable to Lender in its sole discretion.  Upon Lender's request, a certificate of insurance acceptable to Lender shall be delivered to Lender together with evidence of payment of premium thereon and an agreement to give Lender at least thirty (30) Business Days' prior notice of any material changes, termination, or expiration of the policies.

5.4.15 <u>Right of Entry</u>.  Lender and Lender's employees or agents shall have the right at all times to enter upon any and all real property collateral repossessed or acquired by foreclosure or deed in lieu of foreclosure for whatever purpose Lender deems appropriate, including, without limitation, inspection of the premises and the posting of such notices and other written or printed material thereon as Lender may deem appropriate or desirable.

5.4.16 <u>Enforcement Upon Event of Default</u>.  Unless and until all obligations to Lender have been fully and finally satisfied and discharged (other than contingent indemnification obligations for which no claims have been asserted at the time the Loan is paid in full and the commitment of Lender to make any further Advances has been terminated (herein referred to as "<u>Surviving Indemnity Requirements</u>")), upon the occurrence of an Event of Default and only during the continuance thereof, Lender shall have the sole right to receive any and all payments, proceeds and recoveries under or in connection with the Collateral Loan, and Lender shall have the right to notify Collateral Loan Obligors to make all payments under the Collateral Loans to Lender.  Notwithstanding the foregoing or any other provision of this Agreement to the contrary, so long as there exists no uncured Event of Default, Borrower shall have the sole and exclusive right to bill and collect all payments due under and pursuant to all Collateral Loans and otherwise to communicate in any manner or for any purpose with any Collateral Loan Obligor or guarantors under the Collateral Loans.  Borrower shall observe reasonable loan servicing practices with respect to collection of such obligations in the ordinary course of its business. Borrower shall at all times diligently monitor and verify compliance by the Collateral Loan Obligor with all obligations under the Collateral Loan in accordance with reasonable loan servicing policies, practices, and procedures.

(a)     Lender shall have the right to take any and all other actions as Lender determines to be necessary or appropriate in order to establish and perfect its rights and interests in and to the Collateral Loan Documents and in all payments, proceeds, and recoveries thereon; provided, however, notwithstanding the foregoing or any other provision of this Agreement or applicable law to the contrary, no Assignment of Collateral Mortgage delivered by Borrower hereunder shall be recorded in the Official Records of any county unless and until there occurs an Event of Default that has not already been cured prior to such recordation.

(b)     In addition to any other power of attorney provided in the Loan Documents, Borrower hereby appoints Lender as Borrower's attorney in fact, with full power of substitution, to endorse and otherwise negotiate payment in any form made by Collateral Loan Obligor under the Collateral Loan to or for the account of Lender, subject to the provisions of this Agreement; provided, however, Lender shall only be entitled to exercise the appointment

from and after an Event of Default and during the continuance thereof. Collateral Loan Obligor may conclusively rely upon all instructions, notices, requests for payment, and receipts given by Lender in connection with collection of the Collateral Loan.

(c) In addition to any other indemnity herein provided, Borrower hereby indemnifies, releases and holds harmless Lender from and against any and all losses, damages, claims, costs, and expenses, including attorneys' fees and related costs, suffered or incurred by Lender as a result of any action or proceeding taken by Lender in the collection and enforcement of the provisions of the Collateral Loan Documents as herein provided, or as a result of any nonaction by Lender in connection therewith.

### ARTICLE 6.
### BORROWER'S COVENANTS

In addition to anything else herein stated:

6.1 <u>LENDER MAY EXAMINE BOOKS AND RECORDS</u>. Lender shall have the right, at any time, acting by and through its employees or agents, to examine the books, records, and accounting data of Borrower, and to make extracts therefrom or copies thereof. Borrower shall promptly (but in no event later than one (1) Business Day after the request) make such books, records, and accounting data available to Lender, as stated above, upon written request, and upon like request shall promptly advise Lender, in writing, of the location of such books, records, and accounting data. Borrower shall at all times permit Lender to review, audit and examine all such books and records, either directly or through one or more auditors designated by Lender, including independent contractors.

6.2 <u>PAYMENT OF TAXES AND OTHER DEBT</u>. Borrower shall pay, or cause to be paid, and discharge, or cause to be discharged, (a) before delinquency all taxes, assessments, and governmental charges or levies imposed upon it, upon its income or profits, or upon any property belonging to it (including, without limitation, the Collateral); (b) when due all lawful claims (including, without limitation, claims for labor, materials, and supplies), which, if unpaid, might become a lien, charge or encumbrance upon any of its assets or property (including, without limitation, the Collateral); and (c) all its other obligations and indebtedness when due; provided, however, that Borrower may contest any of the foregoing in good faith and by appropriate proceedings diligently prosecuted by Borrower as long as Borrower has adequate reserves to pay any adverse determination or has otherwise provided Lender evidence of a surety or bond to pay any adverse determination.

6.3 <u>COMPLY WITH APPLICABLE LAWS</u>. Borrower shall comply with all applicable Laws, including without limitation, all health and environmental Laws, and all other directions, orders and notices of violations issued by any Governmental Agency relating to or affecting Borrower, the Collateral Loans or the Collateral. Further, Borrower shall indemnify and hold Lender harmless from the failure by Borrower to comply with such Laws to the full extent provided for herein.

6.4 <u>MAINTENANCE OF PROPERTIES AND PRESERVE EXISTENCE</u>. Borrower shall use its best efforts to maintain and preserve, or cause to be maintained and preserved, all of

its properties, necessary or useful in the proper conduct of its business, including such as may be under lease, in good working order and condition, ordinary wear and tear excepted. Borrower, so long as Borrower remains obligated on the Loan, shall do all things necessary to preserve and keep in full force and effect Borrower's organizational status, and will comply with all Laws, orders and decrees of any Governmental Agency or court applicable to Borrower or to the Collateral Loans.

6.5     REPORTING REQUIREMENTS. So long as Borrower shall have any obligation to Lender under this Agreement and/or the Loan Documents, Borrower shall prepare, or cause to be prepared, and deliver, or cause to be delivered, to Lender the following Financial Statements and reports:

6.5.1     As soon as practicable and in any event within seven (7) days after Borrower knows or should have known of the commencement of any legal action against it, except actions seeking money judgment that are fully insured or bonded, a report of the commencement of such action containing a statement signed by the chief financial officer of Borrower setting forth details of such legal action and any action Borrower proposes to take with respect thereto;

6.5.2     Within seven (7) days of the occurrence of any Event of Default or event which, with the giving of notice or lapse of time, or both, would constitute an Event of Default, a report regarding such Event of Default or event setting forth details and describing any action which Borrower proposes to take with respect thereto, signed by the manager of Borrower;

6.5.3     Any change in name of Borrower or use of any trade names or trade styles;

6.5.4     As soon as available, and in any event no later than forty-five (45) days following the end of each calendar quarter (e.g. December 31, March 30, June 30, and September 31), commencing on the calendar quarter ending on June 30, 2023, Borrower shall deliver to Lender a quarterly Borrowing Base Certificate covering all Collateral Loans, which Borrowing Base Certificate shall be duly certified by the authorized representative of Borrower as to the completeness and accuracy of all information contained therein, without exception, and which Borrowing Base Certificate shall be accompanied by any and all other supporting documentation requested by Lender in its sole and absolute discretion, including without limitation, (a) the name and address of the Collateral Loan Obligors, and the loan number; (b) the principal amount of all advances, and all accrued and unpaid interest, on each Collateral Loan, and the date last paid and next due date, (c) any assertion by any Collateral Loan Obligator of a right of rescission, set-off, counterclaim or defense as to any Collateral Loan, (d) upon Borrower's knowledge, any mechanic's liens filed against any Underlying Collateral securing any Collateral Loan, and (e) the existence of any other breach or default by Collateral Loan Obligors under the Collateral Loan Documents and, if so, any actions taken by Borrower to enforce the Collateral Loan Documents

6.5.5     As soon as available, and in any event no later than forty-five (45) days following the end of each calendar quarter commencing on June 30, 2023, Borrower shall provide to Lender complete and accurate Financial Statements representing the financial condition of Borrower as of the date such Financial Statements are prepared and delivered to

Lender, including balance sheets, income statements, sources and uses of funds, detailed schedule of real estate of Borrower, and such other supplemental reports and schedules as Lender shall require, in its sole and absolute discretion. All such Financial Statements may be company prepared and shall contain a certification signed by any individual providing a Financial Statement or by one or more authorized representatives of any corporation, partnership, limited liability company or other entity providing a Financial Statement, certifying to the completeness and accuracy of all information, without exception. All such Financial Statements shall be prepared and presented in accordance with GAAP, consistently applied, or in such other form and content as Lender may permit, in its sole and absolute opinion and judgment;

6.5.6   As soon as available, and in any event no later than one hundred twenty (120) days following the end of each calendar year commencing with the calendar year ending on December 31, 2023, Borrower shall provide to Lender complete and accurate Financial Statements representing the financial condition of Borrower as of the date such Financial Statements are prepared and delivered to Lender, including balance sheets, income statements, sources and uses of funds, detailed schedule of real estate of Borrower, and such other supplemental reports and schedules as Lender shall require, in its sole and absolute discretion. All such Financial Statements shall be prepared by an independent certified public accountant acceptable to Lender, and such Financial Statements shall be audited. Such Financial Statements shall contain a certification signed by any individual providing a Financial Statement or by one or more authorized representatives of any corporation, partnership, limited liability company or other entity providing a Financial Statement, certifying to the completeness and accuracy of all information, without exception. All such Financial Statements shall be prepared and presented in accordance with GAAP, consistently applied, or in such other form and content as Lender may permit, in its sole and absolute opinion and judgment;

6.5.7   Borrower shall cause each Guarantor to furnish to Lender within fifteen (15) calendar days of Lender's request, complete and accurate Financial Statements representing the financial condition of such Guarantor as of the date such Financial Statements are prepared and delivered to Lender, including, but not limited to, profit and loss statements, balance sheets, income statements, sources and uses of funds, real estate schedules and such other supplemental reports and schedules as Lender shall require, in its sole and absolute discretion. All such Financial Statements may be self-prepared; and all such Financial Statements shall contain a certification signed by any individual providing a Financial Statement or by one or more authorized representatives of any corporation, partnership, limited liability company, trust or other entity providing a Financial Statement, certifying to the completeness and accuracy of all information, without exception. All such Financial Statements shall be prepared and presented in accordance with GAAP, consistently applied, or in such other form and content as Lender may permit, in its sole and absolute opinion and judgment;

6.5.8   Borrower shall furnish to Lender copies of all signed income tax returns (with all forms K-1 attached) of Borrower, together with any extensions if applicable, within fifteen (15) days after they are filed with the relevant taxing authorities, but in no event later than November 1 of each calendar year. All such tax returns shall be prepared by an independent certified public accountant acceptable to Lender;

6.5.9   Borrower shall cause each Guarantor to furnish to Lender copies of (i) all signed income tax returns (with all forms K-1 attached) of such Guarantor within fifteen (15) days after they are filed with the relevant taxing authorities, but in no event later than November 1 of each calendar year and (ii) all signed income tax returns of each corporate entity in which any Guarantor owns an ownership interest within fifteen (15) days after they are filed with the relevant taxing authorities, but in no event later than November 1 of each calendar year. All such tax returns shall be prepared by an independent certified public accountant acceptable to Lender;

6.5.10   Promptly upon receipt thereof, one (1) copy of any other report submitted to Borrower by independent accountants in connection with any annual, interim or special audit made by them of the books of Borrower;

6.5.11   Within seven (7) days of (i) any contact from any Governmental Agency concerning any environmental protection Laws, including any notice of any proceeding or inquiry with respect to the presence of any hazardous materials on any Underlying Real Estate Collateral or the migration thereof from or to other property, (ii) any and all claims made or threatened by any third party against or relating to said property concerning any loss or injury resulting from hazardous materials, or (iii) Borrower's discovery of any occurrence or condition on any property adjoining or in the vicinity of said property that could cause said property, or any part thereof, to be subject to any restrictions on the ownership, occupancy, transferability, or loss of the property under any Law,  Borrower shall deliver to Lender a report regarding such contact and setting forth in detail and describing any action which Borrower proposes to take with respect thereto, signed by an officer of Borrower;

6.5.12   Within fifteen (15) days of the end of each calendar quarter (e.g., December 31, March 30, June 30, and September 31) commencing on June 30, 2023, an updated summary, in form and detail satisfactory to Lender, of the Collateral Loans owned by Borrower detailing the status of the Collateral Loans, including without limitation, (i) outstanding amounts due under each Collateral Loan, (ii) Borrower's cost of acquisition of each Collateral Loan, (iii) Borrower's estimate of value of the Underlying Real Estate Collateral for each Collateral Loan, (iv) status of performance of each Collateral Loan, and (v) address of Underlying Real Estate Collateral for each Collateral Loan, and other information that may be required by Lender for each Collateral Loan;

6.5.13   Within forty-five (45) days of the end of each calendar quarter (e.g., December 31, March 30, June 30, and September 31) commencing on June 30, 2023, Borrower shall cause each Guarantor to furnish to Lender bank and brokerage statements evidencing Liquidity of Guarantor;

6.5.14   Concurrently with the delivery of the Financial Statements set forth in Section 5.4.7 above, and at such intervals and in such format as Lender may require from time to time, Borrower shall delivery to Lender written certification(s) by Borrower and its attesting principal financial or accounting officer that (i) all representations and warranties under this Agreement continue to be true, accurate and complete in all material respects, (ii) Borrower is in compliance with all of its affirmative covenants, negative covenants, financial covenants, reporting covenants and other covenants in described in this Agreement, (iii) that the information in all of Borrower's Financial Statements submitted to Lender, and the computations provided

**Page 186**

with Borrower's current and prior certificates accurately represent Borrower's financial position as of the dates thereof, (iv) Borrower's submitted financial statements were prepared in accordance with GAAP (except as otherwise disclosed to, and agreed by, Lender); and (v) no event has occurred and no condition exists that constitutes (or with the passage of time and giving of any necessary notice would constitute) an Event of Default.

6.5.15 Within seven (7) days of (i) any contact from any Governmental Agency concerning the condemnation or report deeming any Underlying Real Estate Collateral being deemed uninhabitable or the equivalent, Borrower shall deliver to Lender a report regarding such contact and setting forth in detail and describing any action which Borrower proposes to take with respect thereto, signed by an officer of Borrower.

6.6      DISTRIBUTIONS  Borrower shall not make, declare or permit any distribution to any officer, member, manager, partner or other direct or indirect beneficial owner of Borrower at any time that an Event of Default (or event that with the giving of notice or passage of time, or both, would constitute an Event of Default) has occurred and is continuing or if any such distribution would cause or contribute to an Event of Default (or event that with the giving of notice or passage of time, or both, would constitute an Event of Default).

6.7      TERRORISM AND ANTI-MONEY LAUNDERING.  Borrower warrants and agrees as follows:

6.7.1   As of the date hereof and throughout the term of the Loan: (i) Borrower; (ii) any Person controlled by Borrower; (iii) any Person for whom Borrower is acting as agent or nominee in connection with this transaction, is not an OFAC Prohibited Person.

6.7.2   To comply with applicable U.S. Anti-Money Laundering Laws and regulations, all payments by Borrower to Lender or from Lender to Borrower will only be made in Borrower's name and to and from a bank account of a bank based or incorporated in or formed under the laws of the United States or a bank that is not a "foreign shell bank " within the meaning of the U.S. Bank Secrecy Act (31 U.S.C. § 5311 et seq.), as amended, and the regulations promulgated thereunder by the U.S. Department of the Treasury, as such regulations may be amended from time to time.

6.7.3   To provide Lender at any time and from time to time during the term of the Loan with such information as Lender determines to be necessary or appropriate to comply with the Anti-Money Laundering Laws and regulations of any applicable jurisdiction, or to respond to requests for information concerning the identity of Borrower, or any Person controlled by Borrower, from any governmental authority, self-regulatory organization or financial institution in connection with its anti-money laundering compliance procedures, or to update such information.

6.7.4   The representations and warranties set forth in this Section 6.7 shall be deemed repeated and reaffirmed by Borrower as of each date that Lender makes an Advance to Borrower and each date that Borrower makes a payment to Lender under the Note, this Agreement and the other Loan Documents or receives any payment from Lender.  Borrower

agrees promptly to notify Lender in writing should Borrower become aware of any change in the information set forth in these representations.

6.8 CHANGE OF OWNERSHIP. Borrower shall not cause, permit, or suffer any change, direct or indirect, in Borrower's capital ownership without Lender's prior written consent; provided, however, that membership interests constituting less than twenty-five percent (25%) of Borrower may be transferred without Lender's prior written consent but Borrower shall provide Lender with notice of any such transfers as soon as reasonably practicable following any such transfer; provided, further, that (i) Guarantor shall at all times during the term of the Loan maintain an ownership interest in Borrower and (ii) Mahender Makhijani shall at all times during the term of the Loan remain as sole member of Cantor Group Manager, LLC, the managing member of Borrower.

6.9 CHANGE OF MANAGEMENT. Borrower shall not cause, permit or suffer any change in its present executive or management personnel.

6.10 COOPERATION. Borrower shall take any and all action reasonably requested by Lender to carry out the intent of this Agreement.

6.11 SITE VISITS, OBSERVATIONS AND TESTING. Subject to the terms of the Collateral Loan Documents, Lender and its agents and representatives will have the right at any reasonable time, after giving reasonable notice to Borrower, to enter and visit any Underlying Real Estate Collateral for any Collateral Loan for the purposes of observing such real estate. No site visit, observation or testing or any report or findings made as a result thereof (a) will result in a waiver of any default of Borrower; (b) impose any liability on Lender; or be a representation or warranty of any kind regarding any Underlying Real Estate Collateral for any Collateral Loan (including its condition or value or compliance with any laws) or any environmental report (including its accuracy or completeness).

6.12 NO TRANSFER OR FURTHER ENCUMBRANCE. Borrower shall not, without the prior written consent of Lender:

6.12.1 Create, incur, assume, permit or suffer to exist, any mortgage, deed of trust, pledge, lien, hypothecation, charge (fixed or floating), security interest or other encumbrance whatsoever on any Assets of Borrower, including, without limitation, the Collateral Loans, or any interest therein, except as permitted pursuant to this Agreement; provided, however, the foregoing shall not apply to taxes, assessments or governmental charges or levies on property of Borrower, or in respect of a judgment or award against Borrower, if the same shall not at the time be delinquent or thereafter can be paid without penalty, or if Borrower shall have set aside adequate reserves therefor as determined or approved by its certified independent accounting firm, or, if in the case of a judgments or award, execution on the same shall have been effectively stayed pending appeal or review or insured or bonded to the extent of Borrower's liability in respect thereof, and in the case of all of the foregoing, the same are being contested in good faith and by appropriate proceedings.

6.12.2 Permit the transfer, conveyance, hypothecation, or sale of any membership interest or any other interests in Borrower, except as specifically permitted herein; or

6.12.3 Permit the change in the manager or managing member of Borrower.

6.13   NAME. FISCAL YEAR. ACCOUNTING METHOD. AND LINES OF BUSINESS. Borrower will not change its name, Fiscal Year, or method of accounting. Borrower will not directly or indirectly engage in any business other than the business in which Borrower is engaged on the date of this Agreement, discontinue any existing lines of business that are material to the business or operations of Borrower, or substantially alter its method of doing business.

6.14   LOANS. Borrower will not directly or indirectly (a) make any loan or advance to any other Person other than advances made in the ordinary course of Borrower's business; (b) purchase or otherwise acquire any capital stock or any securities of any other Person, any limited liability company interest or partnership interest in any other Person, or any warrants or other options or rights to acquire any capital stock or securities of any other Person or any limited liability company interest or partnership interest in any other Person; (c) make any capital contribution to any other Person; (d) otherwise invest in or acquire any interest in any other Person or establish any subsidiaries,  or (e) subordinate any claim against or obligation of any other Person to Borrower to any other indebtedness of such Person.

6.15   INDEBTEDNESS. Without Lender's prior written consent, Borrower shall not assume, create, incur, or permit to exist any obligations or indebtedness, including, without limitation, loan obligations, in favor of any Person (except trade obligations and normal accruals in the ordinary course of business not yet due and payable), and under no circumstances shall Borrower maintain or establish any credit facilities with any other Person. Borrower shall not assume, create, incur, or permit to exist any contingent liabilities, including, without limitation, contingent reimbursement obligations under letters of credit. TRANSACTIONS WITH AFFILIATES. Borrower will not enter into, or cause, suffer or permit to exist, any arrangement or contract with any of its Affiliates, including, without limitation, any management contract, unless such transaction is on terms that are no less favorable to Borrower than those that could have been obtained in a comparable transaction on an arms' length basis from a Person that is not an Affiliate.

6.16   MINIMUM DEBT SERVICE COVERAGE RATIO. At all times during the term of the Loan, Borrower shall maintain a Debt Service Coverage Ratio of not less than 1.25 to 1.00, measured as of the end of each calendar year during the term of the Loan, commencing on the calendar year ending on December 31, 2023. For purposes of this Section 6.17, Borrower shall provide and shall cause Guarantor to provide to Lender such information and documentation as Lender may reasonably request, certified by Borrower, for the period required by Lender. As used herein, "Debt Service Coverage Ratio" means the ratio of Borrower's net operating income over Borrower's aggregate debt service payments, all as determined by GAAP.

6.17   MAINTAINING MINIMUM LIQUIDITY. Guarantor, on an aggregate basis, shall maintain Liquidity at a minimum of $10,000,000.00 tested by Lender on a quarterly basis as of March 31, June 30, September 30 and December 31 of each calendar year, as verified by Lender pursuant to bank and/or brokerage statements furnished to Lender by Guarantor. As used herein, minimum Liquidity will only be measured based on bank or brokerage accounts held

personally by Guarantor. As used herein, "Liquidity" means, for any date of determination, an amount equal to the sum of Guarantor's aggregate (1) verifiable unencumbered and unrestricted cash, and (2) unencumbered and unrestricted cash equivalents (to the extent consisting of readily marketable securities (excluding "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System, restricted stock and stock subject to the provisions of Rule 144 of the Securities and Exchange Commission)), deemed by Lender in its sole and absolute discretion to be liquid.

6.18 MAXIMUM DEBT TO TANGIBLE NET WORTH. At all times during the term of the Loan, Borrower shall maintain a ratio of Debt to Tangible Net Worth of not more than 3.25 to 1.00, measured on a quarterly basis as of March 31, June 30, September 30 and December 31 of each calendar year, commencing on the calendar quarter ending June 30, 2023. As used herein, "Debt" means the sum of Borrower's short term debt plus long term debt plus fixed payment obligations as of the date of measurement. As used herein, "Tangible Net Worth" means the excess of Borrower's Assets over Liabilities, excluding, however, from the determination thereof: (a) all assets that would be classified as intangible assets under GAAP, including, without limitation, goodwill (whether representing the excess of cost over book value of assets acquired or otherwise), negative goodwill, patents, trademarks, trade names, copyrights, franchises and deferred charges (including, without limitation, unamortized debt discount and expense, organization costs and research and development costs); and (b) net related or subordinated debt owed to creditors other than Lender.

6.19 OPERATING ACCOUNT.

6.19.1 at all times during the term of the loan, Borrower shall maintain the Operating Account with Lender.

6.19.2 Borrower shall (i) use the Operating Account as the sole operating account for Borrower, (ii) deposit into the Operating Account, on a monthly or more frequent basis, any and all Net Income (as defined in GAAP) of Borrower, and (iii) pay from the Operating Account any and all Operating Expenses (as defined in GAAP) of Borrower.

6.20 ENVIRONMENTAL INDEMNITY. Borrower does and shall at all times indemnify and hold harmless Lender against and from any and all claims, liability, suits, actions, debts, damages, costs, losses, obligations, judgments, charges, and expenses, of every and any nature whatsoever suffered or incurred by Lender in connection with the discharge of hazardous materials or hazardous waste, the presence of any hazardous materials or hazardous waste, or any violation of applicable Laws concerning hazardous materials or hazardous waste regarding or concerning any underlying real property serving as security for any Collateral Loan.

6.21 BENEFICIAL OWNERSHIP. Borrower agrees to promptly notify Lender (A) of any change in direct or indirect ownership interests in the Borrower as reported in the Beneficial Ownership Certification or other similar certification provided to Lender prior to or in connection with the execution of this Agreement (the "Certification"), or (B) if the individual with significant managerial responsibility identified in the Certification ceases to have that responsibility or if the information reported about that individual changes. Borrower hereby

4897573v4 | 031205-0098                          38

**Page 190**

agrees to provide such information and documentation as Lender may request during the term of the Loan to confirm or update the continued accuracy of the any information provided in connection with the foregoing.

## ARTICLE 7.
## EVENTS OF DEFAULT

There shall be an "Event of Default" under this Agreement if:

7.1   DEFAULT UNDER LOAN DOCUMENTS.   Borrower shall fail to pay any principal or interest, or both, when due under the terms of the Note; or Borrower shall fail to pay any other amount owing under this Agreement or any of the other Loan Documents when due; or Borrower shall fail to perform or observe any term, covenant, or agreement contained in this Agreement or in any of the other Loan Documents.

7.2   BREACH OF WARRANTY.   Any warranties or representations made or agreed to be made in this Agreement or in any of the other Loan Documents are breached in any material respect or shall prove to be false or misleading in any respect when made.

7.3   LITIGATION AGAINST BORROWER.   Any suit is filed against Borrower, which, if adversely determined against Borrower in a final non-appealable judgment, could substantially impair the ability of Borrower to perform any or all of its obligations under and by virtue of this Agreement or any of the other Loan Documents, unless Borrower's counsel furnishes to Lender its opinion, to the satisfaction of Lender and Lender's counsel, that, in its judgment the suit is essentially without merit.

7.4   ACCELERATION OF OTHER DEBTS.   Borrower does, or omits to do, any act, or any event occurs, as a result of which any material obligation of Borrower, including, but not limited to, the occurrence of any breach or default by Borrower under the terms of any other agreement between Lender and Borrower, whether or not arising hereunder and/or relating to Borrower's ability to perform hereunder, may be declared immediately due and payable by the holder thereof.

7.5   BANKRUPTCY.   Borrower fails to pay its debts as they become due, or makes an assignment for the benefit of its creditors, or admits, in writing, its inability to pay its debts as they become due, or files a petition under any chapter of the Federal Bankruptcy Code or any similar law, now or hereafter existing, or becomes "insolvent" as that term is generally defined under the Federal Bankruptcy Code, or shall in any involuntary bankruptcy case commenced against it file an answer admitting insolvency or inability to pay its debts as they become due, or fails to obtain a dismissal of such case within sixty (60) calendar days after its commencement or convert the case from one chapter of the Federal Bankruptcy Code to another chapter, or be the subject of an order for relief in such bankruptcy case, or be adjudged a bankrupt or insolvent, or has a custodian, trustee, or receiver appointed for, or has any court take jurisdiction of, its properties, or any part thereof, in any voluntary or involuntary proceeding, including those for the purpose of reorganization, arrangement, dissolution, or liquidation, and such custodian, trustee, or receiver shall not be discharged, or such jurisdiction shall not be relinquished, vacated, or stayed within sixty (60) days after the appointment.

7.6     BORROWER STATUS. Borrower is liquidated, dissolved, or fails to maintain its status as a going concern.

7.7     ATTACHMENT. Any proceeding is brought to make any part of the Lender's commitment to make the Advances subject or liable to attachment or levy by any creditor of Borrower.

7.8     MISREPRESENTATION AND/OR NON-DISCLOSURE. Borrower has made certain statements and disclosures in order to induce Lender to make the Loan and enter into this Agreement, and, if Borrower has made material misrepresentations or failed to disclose any material fact, Lender may treat such misrepresentation or omission as a breach of this Agreement.

7.9     FINANCIAL CONDITION. There is a material adverse change in Borrower's or Guarantor's financial condition.

7.10    CROSS DEFAULT; OTHER OBLIGATIONS. Borrower or Guarantor commits a breach or default in the payment or performance of any other obligation of Borrower or Guarantor, or breaches any warranty or representation of Borrower or Guarantor, under the provisions of any other instrument, agreement, guaranty, or document evidencing, supporting, or securing any other loan or credit extended by Lender, or by any Affiliate of Lender, to Borrower, Guarantor, or to any Affiliate of Borrower or Guarantor, including, but not limited to, any and all term loans, revolving credits, or lines of credit extended from time to time to Borrower or Guarantor (or any Person signing this Agreement on behalf of Borrower), or any other Person with which Borrower or Guarantor is affiliated.

7.11    GUARANTOR. Guarantor defaults under the Guaranty or revokes or attempts to revoke the Guaranty.

## ARTICLE 8.
## REMEDIES

Upon an Event of Default Lender shall have the following remedies:

8.1     CEASE PAYMENT AND/OR ACCELERATE. Upon, or at any time after, the occurrence of an Event of Default or upon the occurrence of a default in any other joint and/or several obligation or obligations of Borrower to Lender, Lender shall have no obligation to make any further Advances, all sums disbursed or advanced by Lender and all accrued and unpaid interest thereon shall, at the option of Lender, become immediately due and payable, and Lender shall be released from any and all obligations to Borrower under the terms of this Agreement.

8.2     ENFORCEMENT OF RIGHTS. Upon, or at any time after, the occurrence of an Event of Default, Lender may enforce any and all rights and remedies under the Loan Documents, and all other documents delivered in connection therewith and against any or all Collateral and may pursue all rights and remedies available at Law or in equity. In addition to all the rights and remedies of a secured party under the UCC, Lender shall have the right, at any time and without demand of performance or other demand, advertisement or notice of any kind (except the notice specified below of time and place of public or private sale) to or upon

4897573v4 | 031205-0098                    40

Borrower or any other person (all and each of which demand, advertisements and/or notices are hereby expressly waived to the extent permitted by law), to proceed immediately to collect, redeem, receive, appropriate, sell, or otherwise dispose of and deliver the Collateral or any part thereof in one or more lots at public or private sale or sales at Lender's offices or elsewhere at such prices and on such terms as Lender may deem commercially reasonable. The foregoing disposition(s) must be for cash or on credit or for future delivery without assumption of any credit risk by Lender, with Lender having the right to purchase all or any part of said Collateral so sold at any such sale or sales, public or private, free of any right or equity of redemption in Borrower, which right or equity is hereby expressly waived or released by Borrower. The proceeds of any such collection, redemption, recovery, receipt, appropriation, realization, sale or other disposition, after deducting all costs and expenses of every kind incurred relative thereto or incidental to the care, safekeeping or otherwise of any and all Collateral or in any way relating to the rights of Lender hereunder (including, without limitation, reasonable attorneys' fees and legal expenses, including, without limitation, an estimate of the allocated cost of Lender's in house counsel and legal staff) shall be applied first to the satisfaction of the Obligations (in such order as Lender may elect and whether or not due) and then to the payment of any amounts required by applicable law, including Section 9610 of the UCC. Borrower shall be liable to Lender for the payment on demand of all such costs and expenses, together with interest at the default rate set forth in the Note, together with any attorneys' fees if placed with an attorney for collection or enforcement. Borrower agrees that ten (10) days' prior notice by Lender of the date after which a private sale may take place or a public auction may be held is reasonable notification of such matters and shall be deemed commercially reasonable under the UCC.

8.3     RIGHTS AND REMEDIES NON-EXCLUSIVE. In addition to the specific rights and remedies hereinabove mentioned, Lender shall have the right to avail itself of any other rights or remedies to which it may be entitled, at Law or in equity, including, but not limited to, the right to have a receiver appointed over Borrower and/or its assets, the right to realize upon any or all of its security, and to do so in any order. Furthermore, the rights and remedies set forth above are not exclusive, and Lender may avail itself of any individual right or remedy set forth in this Agreement, or available at Law or in equity, without utilizing any other right or remedy.

**ARTICLE 9.**
**GENERAL CONDITIONS AND MISCELLANEOUS**

9.1     NONLIABILITY OF LENDER. Borrower acknowledges and agrees that by accepting or approving anything required to be observed, performed, fulfilled, or given to Lender pursuant to this Agreement or the other Loan Documents, including any certificate, Financial Statement, appraisal or insurance policy, Lender shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision, or condition thereof, and such acceptance or approval thereof shall not be or constitute any warranty or representation to anyone with respect thereto by Lender.

9.2     NO THIRD PARTIES BENEFITTED. This Agreement is made for the purpose of defining and setting forth certain obligations, rights, and duties of Borrower and Lender in connection with the Loan. It shall be deemed a supplement to each Note and the other Loan Documents, and shall not be construed as a modification of any Note or other Loan Documents,

4897573v4 | 031205-0098          41

except as provided herein. It is made for the sole protection of Borrower and Lender, and Lender's successors and assigns. No other person shall have any rights of any nature hereunder or by reason hereof or the right to rely hereon.

9.3    TIME IS OF THE ESSENCE. Time is of the essence of this Agreement and of each and every provision hereof. The waiver by Lender of any breach hereof shall not be deemed, nor shall the same constitute, a waiver of any subsequent breach or breaches.

9.4    NOTICES. All notices, requests, demands, directions, and other communications provided for hereunder and under any other Loan Document (a "Notice"), must be in writing and must be mailed, personally delivered or sent by facsimile to the appropriate party at its respective address set forth below or, as to any party, at any other address as may be designated by it in a written notice sent to the other parties in accordance with this Section.

Any notice given by facsimile must be confirmed within forty-eight (48) hours by letter mailed or delivered to the appropriate party at its respective address. If any notice is given by mail, it will be effective three (3) calendar days after being deposited in the mails with first- class or air mail postage prepaid; if given by facsimile when sent; or if given by personal delivery, when delivered.

Such notices will be given to the following:

> To Lender:    CALIFORNIA BANK & TRUST
> 1900 Main Street, Suite 200
> Irvine, California 92614
> Attention: Matt Bullock, 1st Vice President
> Facsimile: (949) 862-7333

> To Borrower:  CANTOR GROUP II, LLC
> 520 Newport Center Drive, Suite 480
> Newport Beach, CA 92660
> Attention: Mahender Makhijani

9.5    USA PATRIOT ACT NOTICE. Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account or obtains a loan. Lender will ask for Borrower's legal name, address, tax ID number or social security number and other identifying information. Lender may also ask for additional information or documentation or take other actions reasonably necessary to verify the identity of Borrower, Guarantor or other related persons.

9.6    INDEMNITY BY BORROWER. Borrower hereby indemnifies and agrees to hold Lender and its directors, officers, agents, attorneys, and employees (individually and collectively, the "Indemnitee(s)") harmless from and against:

9.6.1    Any and all claims, demands, actions, or causes of action that are asserted against any Indemnitee by any Person if the claim, demand, action, or cause of action, directly or

4897573v4 | 031205-0098        42

indirectly, relates to a claim, demand, action, or cause of action that the Person has or asserts against Borrower; and

9.6.2   Any and all liabilities, losses, costs, or expenses (including court costs and reasonable attorneys' fees) that any Indemnitee suffers or incurs as a result of the assertion of any claim, demand, action, or cause of action specified in this Section 8.6.

9.7   CHANGE IN LAWS.   In the event of the enactment, after the date of this Agreement, of any Laws:  (a) deducting from the value of property for the purpose of taxation any lien or security interest thereon; (b) imposing upon Lender the payment of the whole or any part of the taxes or assessments or charges or liens herein required to be paid by Borrower; (c) changing in any way the Laws relating to the taxation of deeds of trust or mortgages or security agreements, or debts secured by deeds of trust or mortgages or security agreements, or the interest of the mortgagee or secured party in the property covered thereby; or (d) changing the manner of collection of such taxes; then, to the extent any of the foregoing may affect the Collateral or the indebtedness secured thereby or Lender, then, and in any such event, Borrower, upon demand by Lender, shall pay such taxes, assessments, charges, or liens, or reimburse Lender therefor.   If Borrower shall be prohibited from paying such tax or from reimbursing Lender for the amount thereof, Borrower shall execute a modification to the Loan Documents and the Note, which modification shall increase the interest rate payable pursuant to the Note so as to permit Lender to maintain its yield as if such tax had not been imposed.  If Borrower shall be prohibited from executing the above-referenced modifications, Lender may, in Lender's sole discretion, declare the principal of all amounts disbursed and owing under the Note, this Agreement, and the other Loan Documents (including all obligations secured by the Loan Documents) and all other indebtedness of Borrower to Lender, together with interest thereon, to be forthwith due and payable, regardless of any other specified maturity or due date.

9.8   POWER OF ATTORNEY.   Borrower does hereby irrevocably appoint, designate, empower, and authorize Lender, as Borrower's agent, under power of attorney, coupled with an interest, to sign and file for record any financing statements, notices of completion, notices of cessation of labor, or any other notice or written document that it may deem necessary to file or record to protect Lender's interests.

9.9   NONRESPONSIBILITY.   Lender shall in no way be liable for any acts or omissions of Borrower or Borrower's agents or employees.

9.10   TIME IS OF THE ESSENCE.   Time is of the essence of this Agreement and of each and every provision hereof.  The waiver by Lender of any breach or breaches hereof shall not be deemed, nor shall the same constitute, a waiver of any subsequent breach or breaches.

9.11   BINDING EFFECTS: ASSIGNMENT.   This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns, except that Borrower may not assign its rights hereunder or any interest herein without the prior written consent of Lender.  Lender shall have the right to assign its rights under this Agreement and to grant participations in the Loan to others, but all waivers or abridgements of Borrower's obligations that may be granted from time to time by Lender shall be binding upon such assignees or participants, but any such waivers or agreements, to be effective, must be in writing

and signed by Lender. In that regard, Borrower agrees that Lender may disclose to each prospective and actual transferee or participant any and all documents relating to the Loan and Borrower. Borrower shall, promptly upon demand, provide Lender or any such purchaser or participant, one or more written statements confirming Borrower's indebtedness to Lender and all obligations in connection with the Loan, including the existence of any default thereunder.

9.12 EXECUTION IN COUNTERPARTS. This Agreement and any other Loan Documents, except the Note, may be executed in any number of counterparts, and any party hereto or thereto may execute any counterpart, each of which, when executed and delivered, will be deemed to be an original, and all of which counterparts of this Agreement or any other Loan Document, as the case may be, taken together will be deemed to be but one and the same instrument. The execution of this Agreement or any other Loan Document by any party or parties hereto or thereto will not become effective until counterparts hereof or thereof, as the case may be, have been executed by all the parties hereto or thereto.

9.13 INTEGRATION: AMENDMENTS: CONSENTS. This Agreement, together with the documents referred to herein constitutes the entire agreement of the parties touching upon the subject matter hereof, and supersedes any prior negotiations or agreements on such subject matter. No amendment, modification, or supplement of any provision of this Agreement or any of the other Loan Documents shall be effective unless in writing, signed by Lender and Borrower; and no waiver of any of Borrower's obligations under this Agreement or any of the other Loan Documents or consent to any departure by Borrower therefrom shall be effective unless in writing, signed by Lender, and then only in the specific instance and for the specific purpose given.

9.14 NEUTRAL INTERPRETATION. This Agreement is the product of the negotiations between the parties, and in the interpretation and/or enforcement hereof is not to be interpreted more strongly in favor of one party or the other.

9.15 COSTS. EXPENSES. AND TAXES. Borrower shall pay to Lender, on demand:

9.15.1 All reasonable attorneys' fees and out-of-pocket expenses incurred by Lender in connection with the negotiation, preparation, execution, delivery, and administration of this Agreement and any other Loan Document and any matter related thereto, including, but not limited to, any and all Appraisals of any Underlying Collateral, and any and all other appraisals, inspections, audits and/or examinations of or relating to any Collateral;

9.15.2 The costs and expenses of Lender in connection with the enforcement of this Agreement and any other Loan Document and any matter related thereto, including the out-of-pocket expenses and reasonable attorney's fees of any legal counsel, independent public accountants, and other outside experts retained by Lender and including all costs and expenses of enforcing any judgment or prosecuting any appeal of any judgment, order or award arising out of or in any way related to the Loan, this Agreement, or the Loan Documents; and

9.15.3 All costs, expenses, fees, premiums, and other charges relating to or arising from the Loan Documents or any transactions contemplated thereby or the compliance with any of the terms and conditions thereof, including, but not limited to, recording fees, filing

4897573v4 | 031205-0098                                    44

fees, credit report fees, release or reconveyance fees, title insurance premiums, audit fees and appraisal fees.

All sums paid or expended by Lender under the terms of this Agreement shall be considered to be, and shall be, a part of the Loan. All such sums, together with all amounts to be paid by Borrower pursuant to this Agreement, shall bear interest from the date of expenditure at the rate provided in the Note, shall be secured by the Loan Documents, and shall be immediately due and payable by Borrower upon demand.

9.16 SURVIVAL OF REPRESENTATIONS AND WARRANTIES. All representations and warranties of Borrower contained herein or in any and all other Loan Documents shall survive the making of the Loan and the execution and delivery of the Note, and are material and have been or will be relied upon by Lender, notwithstanding any investigation made by Lender or on behalf of Lender. For the purpose of this Agreement, all statements contained in any certificate, agreement, financial statement, appraisal or other writing delivered by or on behalf of Borrower pursuant hereto or to any other Loan Document or in connection with the transactions contemplated hereby or thereby shall be deemed to be representations and warranties of Borrower contained herein or in the other Loan Documents, as the case may be.

9.17 FURTHER ASSURANCES. Borrower shall, at its sole expense and without expense to Lender, do, execute, and deliver such further acts and documents as Lender from time to time may reasonably require for the purpose of assuring and confirming unto Lender the rights hereby created or intended, now or hereafter so to be, or for carrying out the intention or facilitating the performance of the terms of any Loan Document, or for assuring the validity of any security interest.

9.18 GOVERNING LAW. The Loan shall be deemed to have been made in California, and the Loan Documents shall be governed by and construed and enforced in accordance with the Laws of the State of California. If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts, state or federal, of Los Angeles County, California.

9.19 SEVERABILITY OF PROVISIONS. Any provision in any Loan Document that is held to be inoperative, unenforceable, or invalid shall be inoperative, unenforceable, or invalid without affecting the remaining provisions, and to this end the provisions of all Loan Documents are declared to be severable.

9.20 JOINT AND SEVERAL OBLIGATIONS. If this Agreement is executed by more than one Person as Borrower, the obligations of each of such Persons hereunder shall be joint and several obligations.

9.21 DISPUTE RESOLUTION PROVISION. **This Dispute Resolution Provision contains a jury waiver, a class action waiver, and an arbitration clause (or judicial reference agreement, as applicable), set out in three Sections. READ IT CAREFULLY.**

9.21.1 General Provisions Governing All Disputes.

(a)    This Dispute Resolution Provision shall supersede and replace any prior "Jury Waiver," "Judicial Reference," "Class Action Waiver," "Arbitration," "Dispute Resolution," or similar alternative dispute agreement or provision between or among the parties.

(b)    As used herein, the word "Dispute" includes, without limitation, any claim by either party against the other party related to this Agreement, any Loan Document, and the Loan evidenced hereby. In addition, **"Dispute" also includes any claim by either party against the other party regarding any other agreement or business relationship between any of them, whether or not related to the Loan or other subject matter of this Agreement.** "Dispute" includes, but is not limited to, matters arising from or relating to a deposit account, an application for or denial of credit, warranties and representations made by a party, the adequacy of a party's disclosures, enforcement of any and all of the obligations a party hereto may have to another party, compliance with applicable laws and/or regulations, performance or services provided under any agreement by a party, including without limitation disputes based on or arising from any alleged tort or matters involving the employees, officers, agents, affiliates, or assigns of a party hereto.

(c)    If a third party is a party to a Dispute (such as a credit reporting agency, merchant accepting a credit card, junior lienholder or title company), each party hereto agrees to consent to including that third party in any arbitration or judicial reference proceeding for resolving the Dispute with that party.

9.21.2 <u>Jury Trial Waiver</u>. Each party **waives their respective rights to a trial before a jury in connection with any Dispute,** and all **Disputes shall be resolved by a judge sitting without a jury.** If a court determines that this jury trial waiver is not enforceable for any reason, then **at any time prior to trial of the Dispute, but not later than 30 days after entry of the order determining this provision is unenforceable,** any party shall be entitled to move the court for an order, as applicable: (A) compelling arbitration and staying or dismissing such litigation pending arbitration ("Arbitration Order") under Section 2 hereof, or (B) staying such litigation and compelling judicial reference under Section 9.21.5 hereof.

9.21.3 <u>Class Action Waiver</u>. If permitted by applicable law, **each party waives the right to litigate in court or an arbitration proceeding any Dispute as a class action, either as a member of a class or as a representative, or to act as a private attorney general.**

9.21.4 <u>Judicial Reference if Jury Trial Waiver is Unenforceable</u>. If (but only if) a Dispute is filed in a state or federal court located within the state of California, and said court determines for any reason that the jury trial waiver in this Dispute Resolution Provision is not enforceable with respect to that Dispute, then any party hereto may require that Dispute be resolved by judicial reference in accordance with California Code of Civil Procedure, Sections 638, et seq., including without limitation whether the Dispute is subject to a judicial reference proceeding. **By agreeing to resolve Disputes by judicial reference, each party is giving up any right that party may have to a jury trial.** The referee shall be a retired judge, agreed upon by the parties, from either the American Arbitration Association (AAA) or Judicial Arbitration and Mediation Service, Inc. (JAMS). If the parties cannot agree on the referee, the party who initially selected the reference procedure shall request a panel of ten retired judges from either AAA or JAMS, and the court shall select the referee from that panel. (If AAA and JAMS are

unavailable to provide this service, the court may select a referee by such other procedures as are used by that court.) The referee shall be appointed to sit with all of the powers provided by law, including the power to hear and determine any or all of the issues in the proceeding, whether of fact or of law, and to report a statement of decision. The parties agree that time is of the essence in conducting the judicial reference proceeding set forth herein. The costs of the judicial reference proceeding, including the fee for the court reporter, shall be borne equally by the parties as the costs are incurred, unless otherwise awarded by the referee. The referee shall hear all pre-trial and post-trial matters (including without limitation requests for equitable relief), prepare a statement of decision with written findings of fact and conclusions of law, and apportion costs as appropriate. The referee shall be empowered to enter equitable relief as well as legal relief, provide all temporary or provisional remedies, enter equitable orders that are binding on the parties and rule on any motion that would be authorized in a trial, including without limitation motions for summary adjudication. Only for this Section 9.21.4, (i) "Dispute" includes matters regarding the validity, enforceability, meaning, or scope of this Section, and (ii) class action claims brought by either party as a class representative on behalf of others and claims by a class representative on either party's behalf as a class member. Judgment upon the award shall be entered in the court in which such proceeding was commenced and all parties shall have full rights of appeal. This provision will not be deemed to limit or constrain Lender's right of offset, to obtain provisional or ancillary remedies, to interplead funds in the event of a dispute, to exercise any security interest or lien Lender may hold in property or to comply with legal process involving accounts or other property held by Lender.

Nothing herein shall preclude a party from moving (prior to the court ordering judicial reference) to dismiss, stay or transfer the suit to a forum outside California on grounds that California is an improper, inconvenient or less suitable venue. If such motion is granted, this Section 9.21.4 shall not apply to any proceedings in the new forum.

This Section 9.21.4 may be invoked only with regard to Disputes filed in state or federal courts located in the State of California. In no event shall the provisions in this Section 2 diminish the force or effect of any venue selection or jurisdiction provision in this Agreement or any other Loan Document.

9.21.5 Reliance. Each party (i) certifies that no one has represented to such party that the other party would not seek to enforce a jury waiver, class action waiver, arbitration provision or judicial reference provision in the event of suit, and (ii) acknowledges that it and the other party have been induced to enter into this Agreement by, among other things, material reliance upon the mutual waivers, agreements, and certifications in the four Sections of this DISPUTE RESOLUTION PROVISION.

9.22 DOCUMENT IMAGING. Lender and Borrower shall be entitled, each in its sole discretion, to image or make copies of all or any selection of the agreements, instruments, documents and items and records governing, arising from or relating to any of Borrower's loans, including, without limitation, this document and the other Loan Documents, and either party may destroy or archive the paper originals. The parties hereto (i) waive any right to insist or require that the other party produce paper originals, (ii) agree that such images shall be accorded the same force and effect as the paper originals, (iii) agree that each party is entitled to use such images in lieu of destroyed or archived originals for any purpose, including as admissible

evidence in any demand, presentment or other proceedings, and (iv) further agree that any executed facsimile (faxed), scanned or other imaged copy of this document or any Loan Document shall be deemed to be of the same force and effect as the originally manually executed document. ORIGINALLY EXECUTED DOCUMENTS. As an express condition to Lender making the Loan and any Loan advance(s) to Borrower based upon Lender's receipt of fully-executed imaged copies of the Loan Documents, Borrower shall deliver to Lender fully-executed Loan Documents with original hand-written signatures (i.e., wet signatures) of all Loan Parties on or before 30 days from the date of this Agreement, and Borrower's failure to do so on or before such date shall constitute an Event of Default under this Agreement and the Loan Documents. Notwithstanding the foregoing, Borrower and Lender agree that the this Agreement and the Loan Documents may be signed and transmitted by electronic mail of a .PDF document and thereafter maintained in imaged or electronic form, and that such imaged or electronic record shall be valid and effective to bind the party so signing as a paper copy bearing such party's hand-written signature. Borrower and Lender further agree that the signatures appearing on this Agreement and the Loan Documents (whether in imaged or other electronic format) shall be treated, for purpose of validity, enforceability and admissibility, the same as hand-written signatures. This Agreement and the Loan Documents may be executed in one or more counterparts, each of which shall be an original, and all of which together shall constitute a single instrument. BENEFICIAL OWNERSHIP. Notwithstanding anything in the foregoing Agreement, Borrower agrees to promptly notify Lender (A) of any change in direct or indirect ownership interests in the Borrower as reported in any beneficial ownership certification provided to Lender in connection with the execution of this Agreement or the Loan (the "Certification"), or (B) if the individual with significant managerial responsibility identified in the Certification ceases to have that responsibility or if the information reported about that individual changes. Borrower hereby agrees to provide such information and documentation as Lender may request during the term of the Loan to confirm or update the continued accuracy of the any information provided in connection with the foregoing. UNLAWFUL USE MARIJUANA. CONTROLLED SUBSTANCES AND PROHIBITED ACTIVITIES. The undersigned shall not use, occupy, or permit the use or occupancy of any property or collateral by the undersigned or any lessee, tenant, licensee, permitee, agent, or any other person in any manner that would be a violation of any applicable federal, state or local law or regulation, regardless of whether such use or occupancy is lawful under any conflicting law, including without limitation any law relating to the use, sale, possession, cultivation, manufacture, distribution or marketing of any controlled substances or other contraband (whether for commercial, medical, or personal purposes), or any law relating to the use or distribution of marijuana (collectively, "Prohibited Activities"). Any lease, license, sublease or other agreement for use, occupancy or possession of any property or collateral (collectively a "lease") with any third person ("lessee") shall expressly prohibit the lessee from engaging or permitting others to engage in any Prohibited Activities. The undersigned shall upon demand provide Lender with a written statement setting forth its compliance with this section and stating whether any Prohibited Activities are or may be occurring in, on or around the collateral. If the undersigned becomes aware that any lessee is likely engaged in any Prohibited Activities, the undersigned shall, in compliance with applicable law, terminate the applicable lease and take all actions permitted by law to discontinue such activities. The undersigned shall keep Lender fully advised of its actions and plans to comply with this section and to prevent Prohibited Activities. This section is a material consideration and inducement upon which Lender relies in extending credit

4897573v4 | 031205-0098                              48

and other financial accommodations to the undersigned. Failure by the undersigned to comply with this section shall constitute a material non-curable Event of Default. Notwithstanding anything in this agreement, the Note or Loan Documents regarding rights to cure Events of Default, Lender is entitled upon breach of this section to immediately exercise any and all remedies under this agreement, the Note the Loan Documents, and by law. In addition and not by way of limitation, the undersigned shall indemnify, defend and hold Lender harmless from and against any loss, claim, damage, liability, fine, penalty, cost or expense (including attorneys' fees and expenses) arising from, out of or related to any Prohibited Activities at or on any collateral, Prohibited Activities by the undersigned or any lessee of any collateral, or the undersigned's breach, violation, or failure to enforce or comply with any of the covenants set forth in this section. This indemnity includes, without limitation any claim by any governmental entity or agency, any lessee, or any third person, including any governmental action for seizure or forfeiture of any collateral (with or without compensation to Lender, and whether or not collateral is taken free of or subject to Lender's lien or security interest). As used in this section, the word "undersigned" does not include Lender or any individual signing on behalf of Lender."
GENERAL RELEASE.

9.26.1 Except as to any obligations imposed upon Lender as provided herein, Borrower, on behalf of itself, its respective successors and assigns, and each of them, does each hereby forever relieve, release, acquit and discharge Lender, and its predecessors, successors and assigns, and its past and present attorneys, accountants, insurers, representatives, affiliates, partners, subsidiaries, officers, employees, directors, and shareholders, and each of them (collectively, the "Released Parties"), from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, costs and expenses (including, but not limited to, attorneys' fees), damages, injuries, actions and causes of action, of whatever kind or nature, whether legal or equitable, known or unknown, suspected or unsuspected, contingent or fixed, which Borrower now owns or holds or has at any time heretofore owned or held or may at any time hereafter own or hold against the Released Parties, or any of them, by reason of any acts, facts, transactions or any circumstances whatsoever occurring or existing through the date of this Agreement, including, but not limited to, those based upon, arising out of, appertaining to, or in connection with the Recitals above, the Loan, the Prior Agreement, the Loan Documents, the facts pertaining to this Agreement, any collateral heretofore granted to Lender or granted in connection herewith, or to any other obligations of Borrower to Lender.

9.26.2 As to the matters released herein, Borrower expressly waives any and all rights under Section 1542 of the Civil Code of the State of California, which provides as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

9.26.3 Borrower expressly waives and releases any right or benefit which it has or may have under Section 1542 of the Civil Code of the State of California, and any similar law

of any state, territory, commonwealth or possession of the United States, or the United States, to the full extent that they may waive all such rights and benefits pertaining to the matters released herein. In connection with such waiver and relinquishment, Borrower acknowledges that it is aware that it may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true. Nevertheless, it is the intention of Borrower through this Agreement to fully, finally and forever release all such matters, and all claims relative thereto, which do now exist, may exist, or heretofore have existed. In furtherance of such intention, the release herein given shall be and remain in effect as a full and complete release of such matters notwithstanding the discovery or existence of any such additional or different claims or facts relative thereto.

9.26.4 In entering into the release provided for in this Agreement, Borrower recognizes that no facts or representations are ever absolutely certain; accordingly, Borrower assumes the risk of any misrepresentation, concealment or mistake, and if Borrower should subsequently discover that any fact that it relied upon in entering into these releases was untrue, or that any fact was concealed from it, or that any understanding of the facts or of the law was incorrect, Borrower shall not be entitled to set aside these releases by reason thereof, regardless of any claims of fraud, misrepresentation, promise made without the intention of performing it, concealment of fact, mistake of fact or law, or any other circumstances whatsoever.

9.26.5 Borrower is the sole and lawful owner of all right, title and interest in and to every claim and other matter which it purports to release herein, and it has not heretofore assigned or transferred, or purported to assign or transfer to any person or any entity claims or other matters herein released. Borrower shall indemnify, defend and hold Lender, and each of the other Released Parties, harmless from and against any claims, liabilities, actions, causes of action, demands, injuries, costs, and expenses (including, but not limited to, attorneys' fees), based upon or arising in connection with any such prior assignment or transfer, or any such purported assignment or transfer, or any claims or other matters released herein.

[Signatures to follow]

4897573v4 | 031205-0098                                    50

**Page 202**

IN WITNESS WHEREOF, Borrower and Lender have hereunto caused this Agreement to be executed on the date first above written.

BORROWER:

CANTOR GROUP II,
a Delaware limited liability company

By: Cantor Group Manager, LLC,
    a Delaware limited liability company
Its: Managing Member

By: _____
Name: Deba Shyam
Its:     Manager

LENDER:

ZIONS BANCORPORATION, N.A.,
dba California Bank & Trust,

By: _____
Name: MATT BULLOCK
Title: EVP

EXHIBIT A

REQUEST FOR ADVANCE

[Please see attached]

## REQUEST FOR ADVANCE

Date: _____

To:    ZIONS BANCORPORATION, N.A., dba California Bank & Trust
1900 Von Karman, Ste 200
Irvine, CA 92614
Attention: Matt Bullock, First Vice President

From:   CANTOR GROUP II, LLC

Dear Mr. Bullock,

1. Reference is made to that certain Amended and Restated Business Loan and Security Agreement (Revolving Line of Credit) dated as of May 10, 2023 ("Loan Agreement"), executed by ZIONS BANCORPORATION, N.A., dba California Bank & Trust ("Lender"), and CANTOR GROUP II, LLC, a Delaware limited liability company ("Borrower"), and that certain Amended and Restated Promissory Note dated May 10, 2023, made by Borrower and payable to the order of Lender ("Note"). The Loan Agreement and Note evidence a revolving line of credit (the "Loan") heretofore made by Lender to Borrower in the maximum principal amount of $30,000,000.00. Capitalized terms not otherwise defined herein shall have the meanings set forth in the Loan Agreement and other Loan Documents.

2. We hereby request that Lender make an Advance to Borrower under, and pursuant to, the Loan Agreement and the other Loan Documents, described as follows:

| Details of Advance | |
|---|---|
| AMOUNT: | US $_____.00 |
| DATE OF ADVANCE REQUEST: | _____ |
| PURPOSE: | The Advance requested hereby is for the purpose of financing the acquisition of the Collateral Loans listed in Exhibit "A" attached hereto and incorporated herein by this reference. |

3.  We hereby certify that as of the date hereof and the Date of Advance set forth above (a) all conditions precedent in Section 4 of the Loan Agreement have been satisfied (or Lender has otherwise agreed to waive the same in writing with respect to the Advance being requested hereby), (b) all instruments and documents provided to Lender in connection with the Advance being requested hereby are true and correct in all material respects, and (c) the individual executing this Request For Advance is fully authorized and empowered to do so on behalf of Borrower.

Sincerely,

CANTOR GROUP II,
a Delaware limited liability company

By:     Cantor Group Manager, LLC,
        a Delaware limited liability company
        Its: Managing Member

By: _____
Name: Deba Shyam
Its:    Manager

EXHIBIT "A" to Request for Advance

<u>EXHIBIT B</u>

**ALLONGE**

   This Allonge and Endorsement is attached to and made a physical part of that certain Promissory Note dated _____, \_\_\_\_, in the principal amount of _____ ($_____), made by _____, _____ ("Maker") in favor of _____ (the "Note"). The undersigned is the holder and owner of the Note.

The Note is hereby endorsed as follows:

"Pay to the order of ZIONS BANCORPORATION, N.A., dba California Bank & Trust, pursuant to the Amended and Restated Business Loan and Security Agreement (Revolving Line of Credit), dated as of May 10, 2023 as the same may be modified, amended or supplemented from time to time."

Loan Number (if applicable):_____

Dated: _____

        CANTOR GROUP II,
        a Delaware limited liability company

        By: Cantor Group Manager, LLC,
          a Delaware limited liability company
        Its: Managing Member

        By:_____
        Name: Deba Shyam
        Its:  Manager

## EXHIBIT C

## COLLATERAL ASSIGNMENT OF MORTGAGE [DEED OF TRUST]

[See attached]

RECORDING REQUESTED BY
AND WHEN RECORDED, MAIL TO:

ZIONS BANCORPORATION, N.A.,
dba California Bank & Trust
1900 Von Karman, Ste 200
Irvine, CA 92614
Attention: Matt Bullock, First Vice President

Assessor's Parcel No(s).: _____

Loan Number (if applicable): _____

---

## COLLATERAL ASSIGNMENT OF MORTGAGE [DEED OF TRUST] AND RELATED LOAN DOCUMENTS

THIS COLLATERAL ASSIGNMENT OF MORTGAGE [DEED OF TRUST[1]] AND RELATED LOAN DOCUMENTS (this "Assignment") is made as of _____, ____, by CANTOR GROUP II, a Delaware limited liability company("Assignor" or "Borrower"), to ZIONS BANCORPORATION, N.A., dba California Bank & Trust ("Assignee").

1. Granting Clause. For value received, Assignor hereby grants, conveys, assigns and transfers to Assignee, for security purposes only, all of Assignor's right, title and interest in and to all beneficial interest under that certain mortgage dated _____, ____, by _____, as grantor ("Collateral Obligor"), [to _____, as trustee,] for the benefit of Assignor, as beneficiary, which was recorded on _____, ____, as Instrument No. _____, in the Official Records of _____ County, _____, and any and all amendments, modifications, renewals, supplements, extension or revisions thereof (the "Mortgage/Deed of Trust"), together with the promissory note and other agreements, instruments and documents relating thereto (collectively referred to hereinafter as the "Pledged Documents").

2. Secured Obligations. This Assignment is given for the purpose of securing payment and performance of the obligations of Assignor under that certain Amended and Restated Promissory Note executed by Assignor, among others, and payable to the order of Assignee dated as of May 10, 2023 in the maximum stated principal sum of Thirty Million and No/100 Dollars ($30,000,000.00) (the "Note"), that certain Amended and Restated Business Loan and Security Agreement (Revolving Line of Credit) executed by Assignor and Assignee dated May 10, 2023 ("Loan Agreement"), and all other agreements, instruments and documents relating thereto (collectively referred to hereinafter as the "Loan Documents").

---

[1] Revise if underlying security instrument is deed of trust.

4897573v4 | 031205-0098        58

3.     Enforcement.  Assignee may exercise its rights under the Loan Agreement and this Assignment in accordance with their terms, including, without limitation, the right to succeed to all of Assignor's right, title and interest in and to all beneficial interest under the Mortgage/Deed of Trust and the Pledged Documents.

4.     Property Encumbered.  The real property encumbered by the Mortgage/Deed of Trust is described in Exhibit A attached hereto and incorporated herein by this reference.

5.     Amendments.  This Assignment may not be amended, modified or waived except with the written consent of Assignor and Assignee.

6.     Termination.  This Assignment shall terminate upon (i) the indefeasible payment in full of the indebtedness owing to Assignee under the Note, the Loan Agreement and the Loan Documents, and (ii) the termination of any and all obligations of Assignee under the Note, the Loan Agreement or any Loan Documents to make any advances or disbursements of loan proceeds or other amounts to Assignor, unless prior to the termination of the Loan Agreement, Assignee has succeeded to beneficiary's interest under the Mortgage/Deed of Trust.

7.     Attorneys' Fees.   In the event of any dispute or litigation concerning the enforcement or validity of this Assignment, the losing party shall pay all charges, costs and expenses (including attorneys' fees) incurred by the prevailing party whether or not any action or proceeding is brought relative to such dispute and whether or not such litigation is prosecuted to judgment, and including post-judgment fees and costs.

8.     Successors and Assigns.  The terms of this Assignment shall bind and inure to the benefit of the respective successors and assigns of the parties hereto.


[SIGNATURE PAGE FOLLOWS]


4897573v4 | 031205-0098                                    59

**Page 211**

IN WITNESS WHEREOF, Assignor has caused this Assignment to be duly executed and delivered by its officer thereunto duly authorized as of the date first above written.


ASSIGNOR:

CANTOR GROUP II,
a Delaware limited liability company

By:  Cantor Group Manager, LLC,
      a Delaware limited liability company
Its:  Managing Member

      By: _____
      Name: Deba Shyam
      Its:     Manager

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of _____ )
County of _Santa Clara_ )

On _May 10th, 2023_, before me, _P. Singh (Notary public)_, a Notary Public, personally appeared _Deba Shyam_,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Arizona that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _P. Singh_

P. SINGH
COMM. # 2345774
NOTARY PUBLIC - CALIFORNIA
SANTA CLARA COUNTY
COMM. EXPIRES FEB. 8, 2025

EXHIBIT D

BORROWING BASE CERTIFICATE

[Please see attached]

EXHIBIT E

SCHEDULE OF INITIAL LOAN COLLATERAL

| Management: Historical Performance Address | Note / REO | Original Prom. | Purchase | Current | Adv. Amount | LTV | Appraisal |
|---|---|---|---|---|---|---|---|
| 314 Harvard Blvd & 4110 W 3rd St, Los Angeles, CA | Note | $8,960,000.00 | $8,960,000.00 | $8,960,000.00 | $1,479,352.83 | 16.5% | 12,800,000 |
| 688-690 S Coast Hwy, Laguna Beach, CA | Note | $9,100,000.00 | $9,100,000.00 | $9,100,000.00 | $2,000,000.00 | 22.0% | 13,000,000 |
| 2711 E. Coast Hwy, Newport Beach, CA | Note | $5,500,000.00 | $5,500,000.00 | $5,500,000.00 | $3,625,000.00 | 65.9% | 8,750,000 |
| 150 Cliff Dr, Laguna Beach, CA | Note | $2,900,000.00 | $2,900,000.00 | $2,900,000.00 | $1,925,000.00 | 66.4% | 4,500,000 |
| 153 Cedar Way, Laguna Beach, CA | Note | $1,700,000.00 | $1,700,000.00 | $1,700,000.00 | $1,025,000.00 | 60.3% | 4,500,000 |
| 397 N. Coast Hwy, Laguna Beach, CA | Note | $4,750,000.00 | $4,750,000.00 | $4,750,000.00 | $3,318,054.64 | 69.9% | 7,250,000 |
| 535 S. Coast Hwy, Laguna Beach, CA | Note | $11,250,000.00 | $11,250,000.00 | $11,250,000.00 | $5,000,000.00 | 44.4% | 15,000,000 |
| Loan Fee | | | | | $100,000.00 | | |
| Total Notes | | $44,160,000.00 | $44,160,000.00 | $44,160,000.00 | $18,372,407.47 | 41.6% | $65,800,000.00 |

4897573v4 | 031205-0098                                          63

# EXHIBIT 10

## AMENDED AND RESTATED PROMISSORY NOTE

**$30,000,000.00**                    IRVINE, CALIFORNIA                    May 10, 2023

FOR VALUE RECEIVED, CANTOR GROUP II, LLC, a Delaware limited liability company ("Borrower"), promises to pay to ZIONS BANCORPORATION, N.A., dba California Bank & Trust ("Lender"), or to its order, at its office located at 1900 Main Street Suite 200, Irvine, California 92614, or at such other place as the holder hereof may designate, in lawful money of the United States of America, in cash or immediately available funds acceptable to the holder hereof, the principal sum of THIRTY MILLION AND NO/100 Dollars ($30,000,000.00) or so much thereof as shall have been advanced and is outstanding together with interest, on the outstanding principal balance, until paid in full in accordance with the terms, conditions and provisions as hereinafter set forth in this Amended and Restated Promissory Note (this "Note").

**LOAN AGREEMENT**. This Note is the "Note" as defined in that certain Amended and Restated Business Loan and Security Agreement (Revolving Line of Credit) (the "Loan Agreement") dated May 10, 2023, entered into by and between Borrower and Lender, as it may have been amended from time to time, and is subject to all of the terms and conditions thereof. All terms not defined herein shall have the same meaning as in the Loan Agreement. In the event of a conflict between the terms of this Note and the Loan Agreement, the terms of this Note shall prevail.

**ADVANCES**. Advances hereunder shall be made in accordance with the Loan Agreement and may be made by Lender at the written request of Borrower. Any such Advance shall be conclusively presumed to have been made to or for the benefit of Borrower when made in accordance with such requests and directions, or when said Advances are deposited into or credited to the account(s) of Borrower with Lender.

**INTEREST RATE**. Interest on the outstanding principal balance of this Note shall be computed, calculated based upon a 360 day year and actual days elapsed, and shall accrue at the per annum rate (the "Note Rate") of the greater of (i) six percent (6.0%), or (ii) the sum of three and one-half percent (3.50%) over the BSBY Rate, which shall change immediately upon a     change in the BSBY Rate. Lender's BSBY Rate is to be strictly interpreted and is not intended to serve any purpose other than providing an index to determine the interest rate used herein. Lender's BSBY Rate may not necessarily be the same as the quoted offer side in any time deposit market by any particular institution or service applicable to any interest period. As used herein, Lender's "BSBY Rate" shall mean the rates per annum quoted by Lender as Lender's BSBY 1 Month rate based upon quotes from the Bloomberg 1 Month Short Term Bank Yield Index from the Bloomberg Indices, as quoted for U.S. Dollars by Bloomberg, or other comparable services selected by the Lender (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. Except as otherwise specifically provided herein, if the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current index rate upon Borrower's request. Borrower understands that Lender may make loans based on other rates as well.

If Lender determines, in its sole discretion, that the Index has been or imminently will be discontinued, then Lender may select an alternative reference rate, which may reflect

4898812v4                                       1

adjustments to the related spread or margin (collectively, the "Substitute Index Rate"), to be used in lieu of the interest rate set forth in this Note (the "Pre-Substitute Rate"). Lender and Borrower acknowledge that the discontinuation of the Index is a future event over which neither Lender nor Borrower has influence but which will necessarily affect the Pre-Substitute Rate. Accordingly, Lender shall select a Substitute Index Rate that Lender believes is a practical means of preserving the parties' intent relative to the economics of the Pre-Substitute Rate. Notwithstanding the foregoing, the parties acknowledge that, initially and/or over time, the Substitute Index Rate will differ from the Pre-Substitute Rate. In selecting the Substitute Index Rate, Lender shall consider to what extent and the manner in which industry-accepted substitutes for the Index have been established, and the parties acknowledge that different Substitute Index Rates may be selected for different types of loans and transactions. Borrower agrees that Lender shall not be liable in any manner for its selection of a Substitute Index Rate. The Substitute Index Rate shall be used in lieu of the Pre-Substitute Rate, and all references in this Note to the Pre-Substitute Rate shall be deemed to refer to the Substitute Index Rate, effective as of the date specified by Lender in a written notice given by Agent to Borrower. To the extent practicable, such notice shall be given at least 30 days prior to the effective date. The Substitute Index Rate shall remain in effect from the effective date set forth in such notice until the loan evidenced by this Note is paid in full, unless such an instance occurs where the Substitute Index Rate is no longer available, in which case the provisions of this section will again apply for purposes of replacing the Substitute Index Rate.

**INTEREST CALCULATION METHOD**. Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.

**PRINCIPAL AND INTEREST PAYMENTS**. Commencing on June 1, 2023, and continuing on the same day of each and every calendar month thereafter until the Maturity Date (as defined hereinafter), Borrower shall pay to Lender interest due, in arrears, based upon the actual number of days elapsed for that monthly period.

Principal payments may be due and payable subject to and in accordance with Section 4.1.1(a) of the Loan Agreement.

Upon the Maturity Date, the entire unpaid obligation outstanding under this Note, the Loan Agreement and any other Loan Documents shall become due and payable in full.

All payments due hereunder, including payments of principal and/or interest, shall be made to Lender in United States Dollars and shall be in the form of immediately available funds acceptable to the holder of this Note.

**APPLICATION OF PAYMENTS**. All payments received by Lender from, or for the account of Borrower, due hereunder shall be applied by Lender, in its sole and absolute discretion, in the following manner, or in any other order or manner as Lender chooses:

a.     First. To pay any and all interest due, owing and accrued;

4898812v4                                   2

b.      Second.  To pay any and all costs, advances, expenses or fees due, owing and payable to Lender, or paid or incurred by Lender, arising from or out of this Note, the Loan Agreement, and the other Loan Documents; and

c.      Third.  To pay the outstanding principal balance on this Note.

All records of payments received by Lender shall be maintained at Lender's office, and the records of Lender shall, absent manifest error, be binding and conclusive upon Borrower.  The failure of Lender to record any payment or expense shall not limit or otherwise affect the obligations of Borrower under this Note.

**MATURITY DATE**.  On May 1, 2026 ("Maturity Date"), the entire unpaid principal balance, and all unpaid accrued interest thereon, and all fees, costs, expenses, and other amounts, shall be due and payable without demand or notice, subject to acceleration as provided in this Note.  In the event that Borrower does not pay this Note in full on the Maturity Date then, as of the Maturity Date and thereafter until paid in full, the interest accruing on the outstanding principal balance hereunder shall be computed, calculated and accrued on a daily basis at the Default Rate (as defined hereinafter).  The Maturity Date may be extended pursuant to the terms and conditions of Section 4.1.2 of the Loan Agreement.

**UNPAID INTEREST, CHARGES AND COSTS**.  Interest, late charges, costs or expenses that are not received by Lender within ten (10) calendar days from the date such interest, late charges, costs, or expenses become due, shall, at the sole discretion of Lender, be added to the principal balance and shall from the date due bear interest at the Default Rate.

**HOLIDAY**.  Whenever any payment to be made under this Note shall be due on a day other than a Business Day, then the due date for such payment shall be automatically extended to the next succeeding Business Day, and such extension of time shall in such cases be included in the computation of the interest portion of any payment due hereunder.

**NO OFFSETS OR DEDUCTIONS**.  All payments under this Note shall be made by Borrower without any offset, decrease, reduction or deduction of any kind or nature whatsoever, including, but not limited to, any decrease, reduction or deduction for, or on account of, any offset, present or future taxes, present or future reserves, imposts or duties of any kind or nature, that are imposed or levied by or on behalf of any government or taxing agency, body or authority by or for any municipality, state or country.  If at any time, present or future, Lender shall be compelled, by any Law, rule, regulation or any other such requirement which on its face or by its application requires or establishes reserves, or payment, deduction or withholding of taxes, imposts or duties, to act such that it causes or results in a decrease, reduction or deduction (as described above) in payment received by Lender, then Borrower shall pay to Lender such additional amounts, as Lender shall deem necessary and appropriate, such that every payment received under this Note, after such decrease, reserve, reduction, deduction, payment or required withholding, shall not be reduced in any manner whatsoever.

**DEFAULT**.  An Event of Default under the Loan Agreement shall constitute a default under this Note (hereinafter "Default").

4898812v4                                    3

**REMEDIES**. Upon, or at any time after, the occurrence of a Default, or upon the occurrence of a breach or default under the Loan Documents, or under any other joint and/or several obligation or obligations of Borrower to Lender, Lender may, in its sole and absolute discretion declare the entire unpaid principal balance, together with all accrued and unpaid interest thereon, and all other amounts and payments due hereunder, immediately due and payable, without notice or demand.

**DEFAULT RATE**. From and after the occurrence of any Default in this Note whether by non-payment, maturity, acceleration, non-performance or otherwise, and until such Default has been cured, all outstanding amounts under this Note (including, but not limited to, interest, costs and late charges) shall bear interest at a per annum rate equal to five percent (5%) over the Note Rate ("Default Rate").

**PREPAYMENT**. Borrower shall have the right at any time, and from time to time, following five (5) calendar days prior written notice to Lender, to prepay all or any portion of the principal amount outstanding on the Note, without premium or penalty. Any partial prepayment shall not result in a re-amortization, deferral, postponement, suspension, or waiver of any other payments due under this Note.

**LATE CHARGES**. Time is of the essence for all payments and other obligations due under this Note. Borrower acknowledges that if any payment required under this Note is not received by Lender within ten (10) calendar days after the same becomes due and payable, Lender will incur extra administrative expenses (i.e., in addition to expenses incident to receipt of timely payment) and the loss of the use of funds in connection with the delinquency in payment. Because, from the nature of the case, the actual damages suffered by Lender by reason of such administrative expenses and loss of the use of funds would be impracticable or extremely difficult to ascertain, Borrower agrees that five percent (5%) of the amount of the delinquent payment, together with interest accruing on the entire principal balance of this Note at the Default Rate, as provided above, shall be the amount of damages which Lender is entitled to receive upon Borrower's failure to make a payment of principal or interest when due, in compensation therefor. Therefore, Borrower shall, in such event, without further demand or notice, pay to Lender, as Lender's monetary recovery for such extra administrative expenses and loss of use of funds, liquidated damages in the amount of five percent (5%) of the amount of the delinquent payment (in addition to interest at the Default Rate). The provisions of this paragraph are intended to govern only the determination of damages in the event of a breach in the performance of Borrower to make timely payments hereunder. Nothing in this Note shall be construed as in any way giving Borrower the right, express or implied, to fail to make timely payments hereunder, whether upon payment of such damages or otherwise. The right of Lender to receive payment of such liquidated and actual damages, and receipt thereof, are without prejudice to the right of Lender to collect such delinquent payments and any other amounts provided to be paid hereunder or under any of the Loan Documents, or to declare a default hereunder or under any of the Loan Documents.

**SECURITY**. This Note is secured by the Collateral (as defined in the Agreement).

**COSTS AND EXPENSES**. Borrower hereby agrees to pay any and all costs or expenses paid or incurred by Lender by reason of, as a result of, or in connection with, the enforcement of this Note or any other Loan Documents, including, but not limited to, any and all attorneys' fees and related costs whether such costs or expenses are paid or incurred in connection with the enforcement of

4898812v4 4

this Note and the other Loan Documents, or any of them, the protection or preservation of any collateral or security for this Note, or any other rights, remedies, or interests of Lender, whether or not suit is filed. Borrower's agreement to pay any and all such costs and expenses includes, but is not limited to, costs and expenses incurred in, or in connection with, any bankruptcy proceeding, in enforcing any judgment obtained by Lender, and in connection with any and all appeals therefrom, and in connection with the monitoring of any bankruptcy proceeding and its effect on Lender's rights and claims for recovery of the amounts due hereunder, any proceeding concerning relief from the automatic stay, use of cash collateral, proofs of claim, approval of a disclosure statement, or confirmation of, or objections to confirmation of, any plan of reorganization. All such costs and expenses are immediately due and payable to Lender by Borrower whether or not demand therefor is made by Lender.

**WAIVERS**. Borrower hereby waives grace, diligence, presentment, demand, notice of demand, dishonor, notice of dishonor, protest, notice of protest, any and all exemption rights against the indebtedness evidenced by this Note and the right to plead any statute of limitations as a defense to the repayment of all or any portion of this Note, and interest thereon, to the fullest extent allowed by law, and all compensation of cross-demands pursuant to California Code of Civil Procedure Section 431.70. No delay, omission or failure on the part of Lender in exercising any right or remedy hereunder shall operate as a waiver of such right or remedy or any other right or remedy of Lender.

**MAXIMUM LEGAL RATE**. This Note is subject to the express condition that at no time shall Borrower be obligated, or required, to pay interest on the principal balance at a rate which could subject Lender to either civil or criminal liability as a result of such rate being in excess of the maximum rate which Lender is permitted to charge. If, by the terms of this Note, Borrower is, at any time, required or obligated to pay interest on the principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate and interest payable hereunder shall be computed at such maximum rate and any portion of all prior interest payments in excess of such maximum rate shall be applied, or shall retroactively be deemed to have been payments made, in reduction of the principal balance, as the case may be.

**AMENDMENT; GOVERNING LAW**. This Note may be amended, changed, modified, terminated or canceled only by a written agreement signed by the party against whom enforcement is sought for any such action. This Note shall be governed by, and construed under the Laws of the State of California.

**AUTHORITY**. Borrower, and each person executing this Note on Borrower's behalf, hereby represents and warrants to Lender that, by its execution below, Borrower has the full power, authority and legal right to execute and deliver this Note and that the indebtedness evidenced hereby constitutes a valid and binding obligation of Borrower without exception or limitation. In the event that this Note is executed by more than one person or entity, the liability hereunder shall be joint and several. Any married person who is obligated on this Note, directly or indirectly, agrees that recourse may be had to such person's separate property in addition to any and all community property of such person.

4898812v4                                          5

**USA PATRIOT ACT NOTICE.** Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account or obtains a loan. Lender will ask for Borrower's legal name, address, tax ID number or social security number and other identifying information. Lender may also ask for additional information or documentation or take other actions reasonably necessary to verify the identity of Borrower, Guarantor or other related persons.

**DISHONORED ITEM CHARGE.** A dishonored item fee of $15.00 shall be charged for any dishonored item

**CREDIT REPORTING.** Lender may report negative information about the Borrower's account to credit bureaus.

**ON-LINE BANKING -- ADVANCES.** From time to time, Lender may (but shall not be required to) permit advances to be requested or drawn through its online banking website. Lender may impose and change limitations on online advance requests, such as minimum or maximum advance dollar amounts, and the types of accounts into which advances may be transferred. Whether online advances are permitted, and Lender's applicable terms and restrictions if such advances are permitted, will be reflected in the features available online when a user logs into the online banking website.

**ON-LINE BANKING -- LOAN PAYMENTS.** From time to time, Lender may (but shall not be required to) permit loan payments to be made through its online banking website. Lender may impose and change limitations on making online loan payments, such as minimum or maximum payment amounts, the types of accounts from which loan payments may be made, and the types of payments that may be made online (i.e., ordinary installment payments, principal-only payments, or other types of payments). Whether online payments are permitted, and Lender's applicable terms and restrictions if such payments are permitted, will be reflected in the features available online when a user logs into the online banking website.

**DOCUMENT IMAGING.** Lender shall be entitled, in its sole discretion, to image or make copies of all or any selection of the agreements, instruments, documents, and items and records governing, arising from or relating to any of Borrower's loans, including, without limitation, this Note and the Loan Documents, and Lender may destroy or archive the paper originals. The parties hereto (i) waive any right to insist or require that Lender produce paper originals, (ii) agree that such images shall be accorded the same force and effect as the paper originals, (iii) agree that Lender is entitled to use such images in lieu of destroyed or archived originals for any purpose, including as admissible evidence in any demand, presentment or other proceedings, and (iv) further agree that any executed facsimile (faxed), scanned, or other imaged copy of this document or any Related Document shall be deemed to be of the same force and effect as the original manually executed document.

**AMENDED AND RESTATED NOTE.** This Note amends, restates, supersedes and replaces in its entirety that certain Amended and Restated Promissory Note dated as of March 26, 2019, made in the original principal amount of $20,000,000.00 by the undersigned payable to the Lender (the "Prior Note"); provided, however, (i) the execution and delivery by the undersigned of this Note shall not, in any manner or circumstance, be deemed to be a payment of, a novation of or to have

4898812v4                                        6

Page 223

terminated, extinguished or discharged any of the undersigned's indebtedness evidenced by the Prior Note, all of which indebtedness shall continue under and shall hereinafter be evidenced and governed by this Note, and (ii) any and all Collateral securing the Prior Note shall continue to secure this Note.

[SIGNATURE PAGE FOLLOWS]

4898812v4                                 7

IN WITNESS WHEREOF, Borrower has executed this Note as of the day and year first above written.

BORROWER:

CANTOR GROUP II,
a Delaware limited liability company

By: Cantor Group Manager, LLC,
    a Delaware limited liability company
Its: Managing Member

    By: _____
    Name: Deba Shyam
    Its:     Manager

4898812v4                    8

# EXHIBIT 11

**AMENDED AND RESTATED BUSINESS LOAN AND SECURITY AGREEMENT
(REVOLVING LINE OF CREDIT)**

This AMENDED AND RESTATED BUSINESS LOAN AND SECURITY AGREEMENT (REVOLVING LINE OF CREDIT) (this "Agreement") is made as of March 25, 2024, by and between CANTOR GROUP IV LLC, a Delaware limited liability company ("Borrower"), and ZIONS BANCORPORATION, N.A., dba California Bank & Trust ("Lender"):

A.   Borrower is engaged in the business of acquiring (i) various performing and non-performing promissory notes and (ii) real estate, from third-party lenders.

B.   Lender heretofore extended to Borrower a revolving line of credit in the original maximum principal amount of Twenty Million and No/100 Dollars ($20,000,000.00) (the "Existing Loan") pursuant to that certain Business Loan Agreement (Revolving Line of Credit) dated as of July 18, 2017, between Borrower and Lender (together with any and all amendments thereto or modifications thereof, the "Prior Agreement").

C.   Borrower and Lender now desire, among other provisions, to (i) amend and restate the Prior Agreement and the related Loan Documents in their entirety, (ii) supersede and replace in its entirety the Prior Loan Agreement with this Agreement, and (iii) make certain other changes to the Existing Loan as more particularly set forth herein.

D.   As of the Effective Date, the outstanding principal amount of the Existing Loan is Twenty Million and 00/100 Dollars ($20,000,000).

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE 1.
## DEFINITIONS.

The definitions set forth in the Recitals are incorporated herein by reference. Capitalized terms not defined in this Agreement have the meanings given them in the California Uniform Commercial Code. For purposes of this Agreement, the following terms shall have the following meanings:

"Account" has the meaning set forth in Section 9102(a)(2) of the Code.

"Advance" means any advance or disbursement of Loan Proceeds pursuant to this Agreement.

"Advance Rate" shall mean the lesser of (i) the Applicable Advance Rate applied to the unpaid principal balance of the Eligible Receivables under the Borrowing Base, or (ii) 60% of the value of the Underlying Real Estate Collateral of the Eligible Receivables in the Borrowing Base as reflected in an Appraisal acceptable to Lender.

5174193v1 | 031205-0110

**Page 226**

"Applicable Advance Rate" shall mean:

70% where the Underlying Real Estate Collateral for the Eligible Receivable is single family investor property;

70% where the Underlying Real Estate Collateral for the Eligible Receivable is multi-family commercial property;

70% where the Underlying Real Estate Collateral for the Eligible Receivable is industrial, mixed-use, hospitality, and retail property; and

50% where the Underlying Real Estate Collateral for the Eligible Receivable is office property.

"Affiliate" means with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such Person, into which the Persons is merged, or which acquires all or substantially all of the assets of the Person.

"Allonge" means an attachment to a Collateral Loan Note (and included in the Collateral Loan Document Package) containing the endorsement by Borrower of the Collateral Loan Note, substantially in the form attached hereto as Exhibit B and incorporated herein by this reference, or in form otherwise approved by Lender in writing.

"Agreement" means this Amended and Restated Business Loan and Security Agreement (Revolving Line of Credit), as originally executed or as it may be modified, supplemented, extended, renewed or amended from time to time.

"Affiliate" means with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such Person, into which the Persons is merged, or which acquires all or substantially all of the assets of the Person.

"Anti-Money Laundering Laws" shall mean the USA Patriot Act of 2001, the Bank Secrecy Act, as amended through the date hereof, Executive Order 1 3324—Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, as amended through the date hereof, and other federal laws and regulations and executive orders administered by OFAC which prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals (such individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanction and embargo programs), and such additional laws and programs administered by OFAC which prohibit dealing with individuals or entities in certain countries regardless of whether such individuals or entities appear on any of the OFAC lists.

"Appraisal" means an appraisal or brokers opinion of value of the Underlying Real Estate Collateral, or such other report acceptable to Lender in its sole opinion and judgment, performed and prepared for Lender at Borrower's sole expense.  In the event an Appraisal is provided, it

2

shall be prepared by a duly licensed or certified appraiser approved by Lender and possessing all qualifications required by Lender and applicable Laws, setting forth the appraiser's opinion and determination of the fair market value of the Underlying Real Estate Collateral; said Appraisal shall be prepared in full narrative form meeting all requirements and approaches to value as shall be necessary or appropriate in order to comply with all customary and generally accepted appraisal standards within the appraisal industry and in accordance with Lender's requirements, and to Lender's satisfaction and all applicable Laws governing Lender's operations (including, but not limited to, the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA) and Uniform Standards of Professional Appraisal Practice (USPAP)).   In the event Lender accepts a brokers opinion of value of the Underlying Real Estate Collateral, such brokers opinion of value shall be acceptable to Lender in its sole and absolute opinion and judgment..

"Assets" has the meaning usually given that term in accordance with GAAP, including subordinated debts owed by a Person to holders of equity in the Person if the Person is a business entity, but excluding sums due to the Person from Affiliates.

"Assignment of Mortgage" means each Collateral Assignment of Mortgage [or Deed of Trust] and Related Documents, if required by Lender, executed and delivered by Borrower to Lender in connection with any Collateral Loan to be secured by real property and included in the Collateral Loan Document Package, substantially in the form attached hereto as Exhibit C and incorporated herein by this reference, or in form as otherwise approved by Lender in writing (with such modifications to such form as may be required in order for such form to be recorded in the real property records of the applicable jurisdiction).

"Authorized Person" shall mean any person duly authorized by a general borrowing resolution of the Borrower, or in the absence of such a resolution, board minutes.  As of the date hereof, the following persons currently, individually or collectively, are authorized to request Advances and authorize payments until the Lender receives from the Borrower, at the Lender's address, written notice of revocation of their authority:  Mahender Makhijani.

"Availability" means the lesser of (a) the Credit Limit, and (b) the Borrowing Base.

"Borrower's Loan Portfolio" means those Collateral Loans held by Borrower for Borrower's own account.

"Borrowing Base" shall mean the aggregate sum of the amounts calculated by Lender for each individual Eligible Receivable based on its Advance Rate.

"Borrowing Base Certificate" means a Borrowing Base Certificate substantially in the form of Exhibit D attached hereto.

"Business Day" means Monday through Friday, excluding any day of the year on which banks are required or authorized to close in California.

"Code" means the Uniform Commercial Code as adopted and in effect in the State of California, from time to time.

"Collateral" means all real property and personal property security for the Loan, including as more particularly described in Sections 4.10 and 5 herein.

"Collateral Loan" means any loan purchased by Borrower, and/or made by Borrower to third-party borrowers, and secured by real property collateral located in the States of California, Arizona, Nevada, Texas and Utah which Borrower has granted to Lender a security interest and has been pledged to Lender as Collateral.

"Collateral Loan Documents" means all instruments, agreements, and documents evidencing and securing all covenants, terms, and conditions of a Collateral Loan, in form and content satisfactory to Lender in its sole opinion and judgment, duly executed by a Collateral Loan Obligor to and in favor of Borrower and pledged to Lender as security for the obligations of Borrower hereunder and under the other Loan Documents.

"Collateral Loan Document Package" means all instruments, agreements, and documents evidencing and/or Securing a Collateral Loan, including, but not limited to , the Collateral Loan Note, an Assignment of Mortgage, Allonge, loan agreement, deed of trust, environmental agreement, environmental reports (only for Collateral Loans secured by commercial property) fixture filing, financing statement, borrowing authorization, loan application, title policy, certificates of insurance, escrow instructions, organizational documents for the Collateral Loan Obligor, flood search, and any other documents requested by Lender in its sole and absolute discretion, all in original form.

"Collateral Loan Note" means the promissory note executed or to be executed by each Collateral Loan Obligor to evidence a Collateral Loan, in form and content satisfactory to Lender in its sole opinion and judgment.

"Collateral Loan Obligor" means a Person which is obligated by contract or by operation of law to pay and/or perform any or all of the indebtedness and other obligations of the borrower under and arising out of a Collateral Loan and Collateral Loan Documents evidencing and securing the same, including, without limitation, a Person designated as borrower or co-borrower thereunder and a Person guaranteeing said indebtedness and/or other obligations, whether by pledge of collateral or by agreeing to be personally liable therefor.

"Collateral Mortgage" means any deed of trust or mortgage, as applicable, and assignment of rents executed and delivered by a Collateral Loan Obligor to secure repayment of a Collateral Loan, in form and content satisfactory to Lender in its sole opinion and judgment.

"Commitment Term" means that period during which Loan Proceeds may be disbursed under this Agreement, which is a period commencing on the date of this Agreement and expiring May 24, 2027.

"Continuing Guaranty"  shall mean that certain Second Amended and Restated Continuing Guaranty, duly executed by Guarantor, unconditionally and irrevocably guaranteeing payment and performance of Borrower's obligations to Lender in connection with the Loan, as such agreement or agreements are originally executed and as such agreement or agreements may from time to time be reaffirmed, supplemented, modified or amended.

5174193v1 | 031205-0110                    4

"Credit Limit" means Thirty Million and No/100 Dollars ($30,000,000.00).

"Eligible Receivables" means those Collateral Loans which Lender, in its sole and absolute opinion and judgment, shall deem eligible for inclusion in the Borrowing Base, based on such considerations as Lender may from time to time deem appropriate.  Without limitation, Eligible Receivables shall not include the following (with any receivable other than an Eligible Receivable being deemed an "Ineligible Receivable"):

(i)     Any Collateral Loan that is not secured by a deed of trust with a first (1st) lien priority on the Underlying Real Estate Collateral; provided, however, that not more than twenty-five percent (25%) of the Credit Limit may be utilized by Borrower to purchase Collateral Loans that are Eligible Receivables secured by a deed of trust (or mortgage) with a second (2nd) lien priority on the Underlying Real Estate Collateral;

(ii)    Any Collateral Loan which has Underlying Real Estate Collateral which is raw land or an owner-occupied single family residence;

(iii)   Any Collateral Loan which has incomplete loan documentation or for which any loan documentation is not fully executed;

(iv)    Any Collateral Loan in which Borrower is not the sole lender;

(v)     Any Collateral Loan in which the Underlying Real Estate Collateral for such Collateral Loan is not located in the States of California, Arizona, Nevada, Texas or Utah;

(vi)    Any Collateral Loan for which any executory obligation(s) remain to be performed by Borrower or any subsequent holder or assignee of the Collateral Loan Documents;

(vii)   Any Collateral Loan to any Affiliate or principal of Borrower, or to any other entities where any Affiliates of Borrower or principals of Borrower are the beneficial owners;

(viii)  Any Collateral Loan that has been included in the Borrowing Base for more than twenty-four (24) months;

(ix)    Any Collateral Loan which is deemed ineligible by Lender in its sole and absolute discretion; or

(x)     Any Collateral Loan that is required to be removed as part of the Borrowing Base pursuant to the terms of this Agreement.

"Equipment" has the meaning set forth in Section 9102(a)(33) of the Code and includes, without limitation, all of Borrower's furniture, fixtures, trade fixtures, tenant improvements owned by Borrower, all attachments, accessories, accessions, replacements, substitutions, additions or improvements to any of the foregoing, wherever located.

"Event of Default" means any of those occurrences specified in Section 7, or as otherwise specified in the Loan Documents.

"Financial Statements" means balance sheets, income statements, reconciliations of capital structure, statements of sources and applications of funds, and true and complete copies of income tax returns (bearing the original signature of the relevant taxpayer), all prepared in accordance with GAAP.

"Financing Statement" means one or more financing statements (Form UCC-1) given by Borrower to Lender covering the Collateral.

"GAAP" means generally accepted accounting principles consistently applied and maintained throughout the period indicated and consistent with the prior financial practice of Borrower, except for changes mandated by the Financial Accounting Standards Board or any similar accounting authority of comparable standing.

"General Intangibles" has the meaning set forth in Section 9102(a)(42) of the Code and shall include, without limitation, payment intangibles, all choses in action, causes of action, corporate or other business records, inventions, designs, drawings, blueprints, patents, patent applications, trademarks and the goodwill of the business symbolized thereby, names, trade names, trade secrets, goodwill, copyrights, registrations, licenses, franchises, customer lists, security and other deposits, rights in all litigation presently or hereafter pending for any cause or claim (whether in contract, tort or otherwise), and all judgments now or hereafter arising therefrom, all claims of Borrower against Lender, rights to purchase or sell real or personal property, rights as a licensor or licensee of any kind, royalties, telephone numbers, proprietary information, purchase orders, and all insurance policies and claims (including without limitation, life insurance, key man insurance, credit insurance, liability insurance, property insurance and other insurance), tax refunds and claims, software, discs, tapes and tape files, claims under guaranties, security interests or other security held by or granted to Borrower, all rights to indemnification and all other intangible property of every kind and nature (other than Receivables).

"Goods" has the meaning set forth in section 9102(a)(44) of the Code.

"Governmental Agency" means any federal, state or local governmental or quasi-governmental agency.

"Guarantor" shall mean, individually and collectively, (i) Andrew Stupin, an individual, (ii) Gerald Marcil, an individual, (iii) Deba Shyam, an individual, (iv) Gerald J. Marcil and Carol L. Marcil, Trustees, the Marcil Family Trust, dated May 9, 1997 and (v) Andrew Stupin and Julie K. Stupin, as Trustees of The Stupin Family Trust dated April 3, 2009.

"Initial Advance" means that certain advance or disbursement of Loan Proceeds by Lender to Borrower, in the amount specified in a Request for Advance, upon satisfaction of the terms and conditions in this Agreement for the making of the Initial Advance, including without limitation pledging the Initial Loan Collateral to Lender.

5174193v1 | 031205-0110

6

"Initial Loan Collateral" means those Collateral Loans set forth on Exhibit E attached hereto, which shall be pledged to Lender as Collateral for the Loan.

"Initial Loan Collateral Document Package" means, for the Initial Loan Collateral, applicable documents in the Collateral Loan Document Package.

"Inventory" means all of Borrower's now owned and hereafter acquired goods, including software embedded in such goods, merchandise or other personal property, wherever located, to be furnished under any contract of service or held for sale or lease (including without limitation all raw materials, work in process, finished goods and goods in transit, and, including without limitation, all farm products), and all materials and supplies of every kind, nature and description which are or might be used or consumed in Borrower's business or used in connection with the manufacture, packing, shipping, advertising, selling or finishing of such goods, merchandise or other personal property, and all warehouse receipts, documents of title and other documents representing any of the foregoing.

"Investment Property" has the meaning set forth in Section 9102(a)(49) of the Code.

"Laws" means all federal, state, and local laws, rules, regulations, ordinances, and codes.

"Loan" means the total amount of Advances, as described in Section 4 of this Agreement in a principal amount not to exceed the Availability at any one time.

"Loan Closing" shall mean the date on which of all covenants and conditions of the Loan as hereinafter provided are satisfied by Borrower.

"Loan Collateral" means all of the following real and personal property and related rights of Borrower, whether now existing or hereafter acquired or arising, whether now owned or hereafter acquired, and wherever located: (1) each Collateral Loan and all Collateral Loan Documents, (2) all of Borrower's right, title and interest in and to all Underlying Real Estate Collateral, including, without limitation, all Underlying Real Estate Collateral repossessed and acquired by Borrower by foreclosure or by transfer or retention in lieu of foreclosure, (3) the books, records and files pertaining to the Collateral Loan Documents and Underlying Real Estate Collateral, and (4) all proceeds of the foregoing, including, without limitation, all proceeds in the form of accounts, instruments, chattel paper, contract rights, general intangibles, deposit accounts, insurance policies, insurance proceeds and returned premiums for insurance.

"Loan Documents" means this Agreement, the Note, and such other documents as Lender may require Borrower to give to Lender as evidence of and/or security for the Loan, together with each Assignment of Mortgage, Allonge, Financing Statement, and all other instruments, agreements, and documents evidencing and securing the Advances made and to be made by Lender hereunder and all obligations of Borrower hereunder and herein described.

"Loan Fee" means the sum of $112,500.00 payable by Borrower to Lender for the making of the Loan, which shall be paid by Borrower to Lender prior to and as a condition precedent to Loan Closing and fully earned by Lender upon receipt.

"Loan Proceeds" means all funds advanced by Lender as an Advance to Borrower under this Agreement.

"Maturity Date" means April 15, 2027, but subject to earlier acceleration upon the terms and conditions provided in the Note.

"Mortgage" means each mortgage, assignment of rents, security agreement and fixture filing, or deed of trust, assignment of rents, security agreement and fixture filing, deed to secure debt, assignment of rents, security agreement and fixture filing, or similar instrument creating and evidencing a first lien on real property and other property and rights incidental thereto.

"Note" means the Amended and Restated Promissory Note of even date herewith, in the face amount of the Loan, executed by Borrower in favor of and payable to Lender, or order, which shall be in form and content satisfactory to Lender, in its sole discretion.

"Obligations" means all present and future Advances, loans, overdrafts, debts, liabilities, obligations, including, without limitation, all obligations of Borrower under any guaranties, covenants, duties and indebtedness at any time owing by Borrower to Lender, whether evidenced by this Agreement or any note or other instrument or document or the Loan Documents, whether arising from an extension of credit, opening of a letter of credit, banker's acceptance, trust receipt, loan, overdraft, guaranty, indemnification or otherwise, whether direct or indirect (including, without limitation, those acquired by assignment and any participation by Lender in Borrower's debts owing to others), absolute or contingent, due or to become due, including, without limitation, all interest, charges, expenses, fees, attorneys' fees (including attorneys' fees and expenses incurred in bankruptcy), expert witness fees and expenses, fees and expenses of consultants, audit fees, letter of credit fees, closing fees, facility fees, termination fees, and any other sums chargeable to Borrower under this Agreement or the Loan Documents.

"OFAC" shall mean the United States Department of the Treasury, Office of Foreign Assets Control.

"OFAC Prohibited Person" shall mean a country, territory, individual or person (i) listed on, included within or associated with any of the countries, territories, individuals or entities referred to on The Office of Foreign Assets Control's List of Specially Designated Nationals and Blocked Persons or any other prohibited person lists maintained by governmental authorities, or otherwise included within or associated with any of the countries, territories, individuals or entities referred to in or prohibited by OFAC or any other Anti-Money Laundering Laws, or (ii) which is obligated or has any interest to pay, donate, transfer or otherwise assign any property, money, goods, services, or other benefits from the Property directly or indirectly, to any countries, territories, individuals or entities on or associated with anyone on such list or in such laws.

"Operating Account" means, individually and collectively, Borrower's demand deposit accounts with Lender, bearing the account numbers to be advised by Lender, into which all of Borrower's receipts from its operations are deposited and from which all of Borrower's disbursements for its operations are made.

5174193v1 | 031205-0110                                    8

**Page 233**

"Outstanding Balance" means, as applicable to the credit facility described in this Agreement, the aggregate sum of (a) all outstanding, unpaid Advances due and owing under the Loan, plus (b) the aggregate amount(s) of all committed but undisbursed Advances to be made under this Agreement.

"Person" means an individual, corporation, partnership, limited liability company, joint venture, trust or unincorporated organization or a Governmental Agency.

"Receivables" means all of Borrower's now owned and hereafter acquired Accounts, letter of credit rights, license fees, contract rights, chattel paper (including tangible chattel paper, electronic chattel paper, and intangible chattel paper), instruments (including promissory notes), drafts, securities, documents, securities accounts, security entitlements, commodity contracts, commodity accounts, Investment Property, supporting obligations and all other forms of obligations at any time owing to Borrower, all guaranties and other security therefor, all merchandise returned to or repossessed by Borrower, and all rights of stoppage in transit and all other rights or remedies of an unpaid vendor, lienor or secured party.

"Request for Advance" means each request either written or via electronic mail, for an Advance under this Agreement delivered by Borrower to Lender in the form and with the information requested by Lender and substantially as set forth in the attached Exhibit A hereto, which request shall be deemed to constitute Borrower's representation and warranty to Lender that all conditions to the Advance therein requested have been satisfied.

"Section" means a numbered or lettered paragraph, sub-paragraph or other division of this Agreement, and all references in this Agreement to a Section (other than references to statutes) are to Sections of this Agreement.

"Underlying Real Estate Collateral" means the real property and any and all other assets of any Collateral Loan Obligor, or of other Persons, pledged or otherwise assigned to Borrower as collateral security for repayment of any Collateral Loan, as more fully described in the Collateral Loan Documents; and including all land and improvements described in the Collateral Loan Document Package, including, without limitation, all fixtures, rights, rights of way, easements, rents, income, and profits, and all policies and proceeds of insurance and other interests appurtenant thereto which shall be encumbered by a Collateral Mortgage constituting a valid and enforceable trust deed or mortgage lien of record thereon.

"Unused Fee" means that certain fee in the amount of one-half of one percent (0.50%) per annum (0.125% per quarterly period) multiplied by the amount equal to the difference between the Credit Limit and the "Average Annualized Semi-Annual Borrowed Loan Amount" (as hereinafter defined), if the Average Annualized Semi-Annual Borrowed Loan Amount falls below forty percent (40%) of the Credit Limit. The Unused Fee shall be calculated on a semi-annual basis (commencing from the first day of the seventh (7th) calendar month following the date of Loan Closing) and due and payable quarterly in arrears (i) within ten (10) days following the end of each applicable quarterly period, (ii) on the Maturity Date, and (iii) on the date the Loan has been terminated. As used herein "Average Annualized Semi-Annual Borrowed Loan Amount" shall mean, for each quarterly period (or portion thereof), the annualized average-daily cumulative Outstanding Balance under the Loan over the prior three (3) calendar months as

5174193v1 | 031205-0110

9

**Page 234**

determined by Lender in its reasonable discretion.  Lender's determination of the Average Annualized Semi-Annual Borrowed Loan Amount shall be conclusive against Borrower absent manifest error.  If the Unused Fee is being computed for less than a full three (3) month period, the percentages and figures used above will be computed on a daily basis for the number of days for which such fee is being computed.  The Unused Fee shall be payable as provided in Section 4.1.1(d).

**ARTICLE 2.**
**INTERPRETATIONS**

2.1     NUMBER, GENDER.  Any defined terms used in the plural shall include the singular and such terms shall encompass all members of the relevant class.

2.2     SCHEDULES AND EXHIBITS.  All schedules and exhibits to this Agreement are incorporated herein by reference.

2.3     OTHER TERMS.  Capitalized terms other than accounting terms, and not defined herein, have the meanings given them in the California Uniform Commercial Code. The term "document" is used in its broadest sense and encompasses agreements, certificates, opinions, consents, instruments and other written material of every kind.  The terms "including" and "include" mean "including (include), without limitation."

**ARTICLE 3.**
**REPRESENTATIONS AND WARRANTIES OF BORROWER**

Borrower hereby represents and warrants to Lender as of the date of this Agreement, the date any Loan Proceeds are disbursed to Borrower, and each and every date during the term of the Loan, or any portion thereof, as the context admits or requires, that:

3.1     BORROWER'S CAPACITY.  Borrower is a limited liability company, formed under the laws of Delaware and duly qualified to do business in the State of California and in any state in which the nature of its business requires it to be so qualified and is lawfully empowered and possesses the capacity to enter into and carry out the terms and provisions of this Agreement.

3.2     VALIDITY OF LOAN DOCUMENTS.  The Loan Documents are and shall continue to be in all respects valid and binding upon Borrower according to their terms, The execution and delivery by Borrower of and the performance by Borrower of all its obligations under the Loan Documents have been duly authorized by all necessary action and do not and will not:

3.2.1   Require any consent or approval not heretofore obtained or any other Person.

3.2.2   Violate any provision of other agreements to which Borrower is bound.

3.2.3   Result in or require the creation or imposition of any mortgage, deed of trust, pledge, lien, security interest, claim, charge, right of others or other encumbrance of any

5174193v1 | 031205-0110                          10

nature (other than under the Loan Documents) upon or with respect to any property now owned or leased or hereafter acquired by Borrower.

        3.2.4   Violate any provision of any Laws, or of any order, writ, judgment, injunction, decree, determination, or award.

        3.2.5   Result in a breach of or constitute a default under, cause or permit the acceleration of any obligation owed under, or require any consent under any indenture or loan or credit agreement or any other agreement, lease, or instrument to which Borrower is a party or by which Borrower or any property of Borrower is bound or affected

    3.3   BORROWER NOT IN DEFAULT OR VIOLATION.   Borrower is not in default under or in violation of any Laws, order, writ, judgment, injunction, decree, determination or award or  under any obligation, agreement, instrument, loan, or indenture, whether to Lender or otherwise, or any lease, and no event has occurred and is continuing, or would result from the making of any Advance, which constitutes an Event of Default, or would constitute an Event of Default but for the requirement that notice be given or time elapse or both.

    3.4   NO GOVERNMENTAL APPROVALS REQUIRED.   Borrower does not require any authorization, consent, approval, order, license, exemption from, or filing, registration, or qualification with, any Governmental Agency in connection with the execution and delivery by Borrower, and the performance by Borrower, of all or any of its obligations under the Loan Documents.

    3.5   TAX LIABILITY.   Borrower has filed and shall file all tax and related information returns (federal, state, and local) required to be filed and has paid and shall pay all taxes shown thereon to be due and all property taxes due, including interest and penalties, if any.

    3.6   FINANCIAL STATEMENTS.   All Financial Statements, tax returns and other financial information of Borrower and Guarantor which have heretofore been submitted to Lender fairly present the financial position of Borrower and Guarantor at the respective dates of their preparation.  Since the dates of such Financial Statements, tax returns and other financial information, there has been no material adverse change in the financial condition of Borrower and Guarantor.

    3.7   PENDING LITIGATION.   There are no actions, suits, or proceedings pending, or to the knowledge of Borrower threatened, against or affecting the Borrower, or involving the validity or enforceability of any of the Loan Documents, except actions, suits, and proceedings that are fully covered by insurance or which, if adversely determined, would not substantially impair the ability of Borrower to perform its obligations under the Loan Documents, and Borrower is not in default with respect to any order, writ, injunction, decree or demand of any court or any Governmental Agency.

    3.8   COMPLIANCE WITH ENVIRONMENTAL LAWS.   Borrower does not presently, and will not in the future, use, store, manufacture, generate, transport to or from, or dispose of any toxic substances, hazardous materials, hazardous wastes, radioactive materials, flammable explosives or related material on or in connection with any property, or the business of Borrower on any property.  Borrower does not presently, and will not in the future, permit any

5174193v1 | 031205-0110                               11

lessee on any property to use, including any Collateral Loan Obligor and any other occupancy of any Underlying Real Estate Collateral real property, store, manufacture, generate, transport to or from, or dispose of any hazardous materials on or in connection with any property, or the business on any property.  ("Hazardous materials," and "hazardous waste" shall include, but not be limited to, such substances, materials and wastes which are or become regulated under applicable Laws or which are classified as hazardous or toxic under applicable Laws.)

3.9     SOLVENCY.  Borrower is and shall continue to be able to pay its debts as they mature and the realizable value of its Assets is, and at all times that it may have obligations hereunder shall continue to be, sufficient to satisfy any and all obligations hereunder.

3.10    PRINCIPAL PLACE OF BUSINESS. If Borrower hereafter intends to move its principal place of business, it shall first give at least thirty (30) days' prior written notice to Lender of its intention so to move, the date that such move is anticipated, and its new address.

3.11    PERMITS.   Borrower possesses all licenses, permits, franchises, patents, copyrights, trademarks, and trade names, or rights thereto, that are necessary to conduct its business and Borrower is not in material violation of any valid rights of others with respect to any of the foregoing.

3.12    NO ERISA PLAN.   Borrower does not maintain a plan under the Employee Retirement Income Security Act of 1974.

3.13    FULL DISCLOSURE.   All information in the loan application, financial statements, certificates, or other documents and all information prepared and delivered by Borrower or its Affiliates to Lender in obtaining the Loan is correct and complete in all material respects, and there are no omissions therefrom that result in such information being incomplete, incorrect, or misleading in any material adverse respect as of the date thereof.  To the best knowledge of Borrower, all information in any loan application, financial statement, certificate or other document prepared and delivered to Lender on behalf of Borrower by Persons other than Borrower or its Affiliates, and all other information prepared and delivered to Lender on behalf of Borrower by Persons other than Borrower or its Affiliates in applying for the Loan is correct and complete in all material respects, and there are no omissions therefrom that result in any such information being incomplete, incorrect, or misleading in any material adverse respect as of the date thereof.

3.14    USE OF PROCEEDS; MARGIN STOCK.  The proceeds of each Advance will be used by Borrower solely for the purposes specified in this Agreement.  None of such proceeds will be used for the purpose of purchasing or carrying any "margin stock" as defined in Regulation U or G of the Board of Governors of the Federal Reserve System (12 C.F.R.  Part 221 and 207), or for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase or carry a margin stock or for any other purpose which might constitute this transaction a "purpose credit" within the meaning of such Regulation U or G.  Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock.  Neither Borrower nor any Person acting on behalf of Borrower has taken or will take any action which might cause any Loan Documents to violate Regulation U or G or any other regulations of the Board of Governors of the Federal Reserve System or to violate Section 7 of

the Securities Exchange Act of 1934, or any rule or regulation thereunder, in each case as now in effect or as the same may hereafter be in effect.  Borrower and Borrower's Affiliates own no "margin stock".

3.15    GOVERNMENTAL REGULATION.  Borrower is not subject to regulation under the Public Utility Holding Company Act of 1935, the Federal Power Act, the Investment Company Act of 1940, the Interstate Commerce Act (as any of the preceding have been amended), or any other Law which regulates the incurring by Borrower of indebtedness, including but not limited to laws relating to common or contract carriers or the sale of electricity, gas, steam, water, or other public utility services.

3.16    NO FURTHER ENCUMBRANCE.  There is not any mortgage, deed of trust, pledge, lien, hypothecation, charge (fixed or floating), security interest or other encumbrance whatsoever on any of the Collateral Loans or any interest therein, except as permitted pursuant to this Agreement.

## ARTICLE 4.
## THE LOAN

4.1    REVOLVING LINE OF CREDIT.

4.1.1    Revolving Line of Credit.  Upon the request of Borrower, in the form of a Request for Advance, made at any time and from time to time during the Commitment Term, and so long as there is no Event of Default under the Loan Documents, Lender shall make Advances to Borrower, subject to the covenants, terms and conditions of the Loan Documents; provided that Lender shall not be obligated to make (i) Advances to Borrower whenever the aggregate principal amount of all Advances outstanding at any time exceeds or would exceed, at any one time, the Availability, and (ii) an Advance on any single Collateral Loan in excess of $10,000,000.00.   Borrower may repay Advances and obtain new Advances within the Availability, subject to the provisions of this Agreement, provided such Advances are quested and complete Collateral Loan Document Packages are submitted to Lender prior to the expiration of the Commitment Term.  This is a revolving line of credit providing for Advances. During the Commitment Term, Borrower may repay principal amounts and re-borrow them. Borrower agrees not to permit the outstanding principal balance of Advances under the line of credit to exceed the Availability. Subject to the other terms and conditions of this Agreement, Borrower agrees as follows:

(a)    The total amount of Advances available to Borrower is limited to the Borrowing Base, which shall be calculated by Lender, in Lender's sole determination, upon receipt of the Borrowing Base Certificate as set forth herein. Borrower acknowledges that an Eligible Receivable may become an Ineligible Receivable as a result of events occurring after an Advance is made.  In the event that any Eligible Receivable used in calculating the Borrowing Base becomes an Ineligible Receivable, Lender may, at its option, and in its sole discretion, re-calculate the Borrowing Base.  At no time shall the aggregate outstanding Advances exceed the Availability. If, at any time, the aggregate outstanding amount of Advances exceeds the Borrowing Base or the Availability, then Borrower shall repay Lender within ten (10) days such amounts as may be necessary to eliminate such excess.

(b)    Each Request for an Advance under the Loan shall be made by an Authorized Person completing and delivering a Request for Advance to Lender.  Each Request for Advance shall be deemed delivered only upon actual receipt by Lender at the address specified herein of such Request for Advance.  Lender shall have the right, but not the obligation to conduct any preliminary due diligence desired by Lender, all at Borrower's expense.  If Lender makes a preliminary determination in Lender's sole and absolute opinion that (a) the requested Advance does not satisfy Lender's underwriting criteria or (b) any of the conditions precedent set forth in Section 4 or elsewhere in this Agreement have not been satisfied, Lender shall have no obligation to make the requested Advance.  From the Loan Closing to the Maturity Date, Borrower may borrow and repay the Advances in whole or in part, and re-borrow, all in accordance with the terms and conditions of this Agreement.  Borrower shall have no right to borrow on or after the Maturity Date.  The Lender shall incur no liability to the Borrower in acting upon any request referred to herein which the Lender believes in good faith to have been made by an Authorized Person.

(c)    From and after the expiration of the Commitment Term, Borrower shall not be entitled to request or obtain any Advances of Loan Proceeds.

(d)    Unused Fee.  For each three (3) month period during the term of the Loan, Borrower shall pay to Lender, from its own funds, the Unused Fee.  The Unused Fee shall be calculated on a quarterly basis by Bank for the preceding calendar quarter, and shall be due and payable by Borrower to Lender in arrears on the last day of February, May, August and November, commencing on June 1, 2024.  The Unused Fee shall be non-refundable, and shall be deemed fully earned by Lender upon the expiration of each three (3) month period during the term of the Loan.

4.2    NOTE; PAYMENTS; INTEREST RATE.

4.2.1    Each Advance shall be evidenced by the Note, and shall accrue interest at the rate provided therein.

4.2.2    Borrower shall timely make all payments of principal and interest when due under the terms of the Note.

4.2.3    Borrower will repay in full all principal under the Note and all interest accrued thereon on the Maturity Date, subject to earlier acceleration upon the terms and conditions set forth in the Note.

4.3    PURPOSE OF ADVANCES; LOAN FEE.

4.3.1    Loan Proceeds of each Advance under this Agreement shall be used by Borrower exclusively to purchase Collateral Loans by Borrower.

4.3.2    The Loan Fee shall be paid by Borrower to Lender at Loan Closing.  The Loan Fee will be in addition to all other fees mentioned in this Agreement, and shall be deemed fully earned and non refundable when paid, whether or not any Loan Proceeds are disbursed at any time.

5174193v1 | 031205-0110                                   14

4.4     CONDITIONS PRECEDENT.   In addition to all other conditions of the effectiveness of this Agreement, the obligations of Lender pursuant to this Agreement shall be subject to the satisfaction or waiver by Lender of the following conditions:

4.4.1   Borrower, at its sole expense, shall deliver to Lender, at its office located at 1900 Main Street, Suite 200, Irvine, California, on or before the date of the Loan Closing the following, in form and substance satisfactory to Lender, in Lender's sole opinion and judgment:

(a)     This Agreement;

(b)     The Note;

(c)     The Continuing Guaranty;

(d)     Resolutions and/or other authorizations of Borrower, Borrower's manager and such other Persons as Lender shall request, evidencing, without limitation, approval and authorization of the transactions contemplated hereunder and the documents and instruments to be executed by Borrower in connection herewith; and

(e)     Such additional assignment, agreements, certificates, reports, approvals, instruments, documents, financing statements, consents, and opinions as Lender may request.

4.4.2   Borrower shall have opened the Operating Account with Lender;

4.4.3   Lender shall have approved the Financial Statements of Borrower and Guarantor.

4.4.4   No suit, action, or other proceeding of material consequence shall be pending or threatened which seeks to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or to obtain damages or other relief in connection therewith.

4.4.5   Borrower shall have paid to Lender the Loan Fee and any and all other fees and charges due under the terms of the Loan Documents.

4.4.6   Lender's security interest in all Collateral then in existence shall have been perfected by the filing of the Financing Statement, the delivery of the original Collateral Loan Documents to Lender before the Document Delivery Deadline, and the recording of any recordable Collateral Loan Documents, and shall be and remain a first priority perfected security interest in and to all such Collateral, subject only to such action as may be required under applicable law to perfect Lender's security interest in collateral subsequently acquired by Borrower pursuant to each Collateral Loan;

4.4.7   There shall be no breach of any warranty or representation of Borrower.

4.4.8   There shall be no event or circumstance which constitutes, or would upon the giving of notice or passage of time, constitute an Event of Default under this Agreement.

5174193v1 | 031205-0110                                   15

4.5   CONDITIONS OF ADVANCES.   Lender's obligation to make each Advance shall be subject to the following additional conditions precedent, in addition to all other conditions of each Advance provided elsewhere in this Agreement and in the other Loan Documents:

4.5.1   All conditions to this Agreement under Section 4.4, above, shall be satisfied in full;

4.5.2   Borrower shall have delivered to Lender a Request for Advance;

4.5.3   Lender shall have determined that the Collateral Loan for which the Advance is sought is an Eligible Receivable;

4.5.4   Concurrent with each Request for an Advance, Borrower shall execute and deliver to Lender (i) a fully complete and executed Borrowing Base Certificate and (ii) an updated summary, in form and detail satisfactory to Lender, of the Collateral Loans in Borrower's Loan Portfolio detailing the status of such Collateral Loans, including without limitation, outstanding amounts due, status of performance, status of real property collateral and other information that may be required by Lender for each Collateral Loan;

4.5.5   No event or circumstance shall have occurred or be continuing which constitutes, or would upon the giving of notice or passage of time, constitute an Event of Default or failure of any condition under the Loan Documents; and

4.5.6   Lender shall have received payment of the fees and costs of Lender in connection with each Advance and the preparation of the Loan Documents, including, but not limited to, reasonable attorneys' fees.

4.6   ELIGIBLE RECEIVABLES.

4.6.1   Approval of Eligible Receivables.   Lender shall have no obligation to consider any Collateral Loan for approval as an Eligible Receivable unless and until the following conditions precedent are satisfied in Lender's sole and absolute opinion and judgment, in addition to all other conditions to approval of any Eligible Receivable provided elsewhere in this Agreement and in the other Loan Documents:

(a)   Borrower shall prepare and deliver to Lender, for Lender's review and approval, a complete Collateral Loan Document Package by the Document Delivery Deadline, in form and content acceptable to Lender in its sole opinion and judgment evidencing and otherwise pertaining to the Collateral Loan between Borrower and its Collateral Loan Obligor;

(b)   All terms and conditions of the Collateral Loan and all Collateral Loan Documents pertaining thereto shall comply with all requirements for Collateral Loans as provided in this Agreement;

(c)   Borrower's security interest in all Underlying Real Estate Collateral shall then, or thereafter concurrently with actual disbursement of Loan Proceeds to or

for the account of a Collateral Loan Obligor, constitute a valid, enforceable, and duly perfected security interest in the Underlying Real Estate Collateral, and all proceeds and products thereof;

(d) No event or circumstance shall have occurred or be continuing which constitutes, or would upon the giving of notice or passage of time, constitute an Event of Default or failure of any condition under the Loan Documents;

(e) Borrower shall deliver to Lender the Collateral Loan Document Package, including, without limitation, an executed Assignment of Mortgage, Allonge and any other documents related to or evidencing any Collateral Loan as requested by Lender in its reasonable discretion;

(f) Borrower shall execute and deliver to Lender an Allonge and an Assignment of Mortgage (which shall be retained by Lender and not recorded unless an Event of Default occurs under this Agreement or any other Loan Document, or Lender otherwise decides to record the Assignment of Mortgage, in its sole discretion) for each Collateral Loan, and Lender's security interest in all Loan Collateral and related rights of Borrower with respect to each Collateral Loan shall then, or thereafter concurrently with actual disbursement of Loan Proceeds to or for the account of Borrower, be a valid, enforceable and first priority perfected security interest in and to all such Loan Collateral, and all proceeds thereof;

(g) Any title policy included within any Collateral Loan Document Package shall include such endorsement(s) as Lender deems necessary or appropriate, in its reasonable judgment, including, without limitation, mechanic's lien coverage, insuring the validity, priority and enforceability of Borrower's security interest in the Collateral Mortgage; and

(h) All conditions of the funding of the Collateral Loan shall have been satisfied in accordance with the provisions of the Collateral Loan Documents and the Collateral Loan shall be fully funded, or the Loan Proceeds shall be used to fund the Collateral Loan.

4.6.2 <u>Review of Collateral Loan Document Package; Approval of Eligible Receivables</u>. Lender shall have a period of five (5) Business Days following submission by Borrower of a completed Collateral Loan Document Package for any Collateral Loan within which to review and approve, or not approve, Borrower's request to approve such Collateral Loan as an Eligible Receivable. If, within such five (5) Business Day period, Lender has not notified Borrower in writing that such Collateral Loan is approved as an Eligible Receivable, then Lender shall be deemed to have not approved such Collateral Loan and such Collateral Loan shall not be an Eligible Receivable at Lender's sole discretion.

4.6.3 <u>Withdrawal and Termination of Approval of Eligible Receivables</u>. Notwithstanding any approval by Lender of any Collateral Loan as an Eligible Receivable, any such approval shall be deemed withdrawn and terminated if, at any time, any such Collateral Loan fails to satisfy the conditions for being an Eligible Receivable (including, without limitation, if any default occurs in the payment or performance of any obligations of the Collateral Loan Obligor under the Collateral Loan Documents for such Collateral Loan). Upon

any such withdrawal and termination of an approval as an Eligible Receivable, the applicable Collateral Loan shall automatically cease to be an Eligible Receivable and be removed from the Borrowing Base and, Borrower shall, after notice from Lender, repay the Advances in such amount as may be required pursuant to Section 4.1.1(a).  Notwithstanding the removal of any such Collateral Loan from the Borrowing Base, such Collateral Loan shall remain a "Collateral Loan" until, and unless, such Collateral Loan is released pursuant to Section 4.7.

4.6.4    Appraisals. The initial Appraisal of any underlying real property collateral securing any Collateral Loan (including, without limitation, any Appraisals of the underlying real property collateral securing the Collateral Loans comprising the Initial Loan Collateral) shall be provided by Borrower to Lender, at Borrower's expense.

4.7    RELEASE OF COLLATERAL LOANS.  In the event a Collateral Loan is paid off by a Collateral Loan Obligor, or if a Collateral Loan is otherwise sold or disposed of by Borrower, Borrower may request that any Collateral Loan be released from Lender's liens and security interests therein, and, if such Collateral Loan is also an Eligible Receivable, that such Collateral Loan cease to be an Eligible Receivable, provided, that:

4.7.1    Borrower shall provide Lender a written request to remove such Collateral Loan, which request shall specify the requested date for the removal of such Collateral from Lender's lien and security interest;

4.7.2    Lender shall have received at least five (5) Business Days prior to the requested date of removal of such Collateral Loan from Lender's liens and security interests therein, a Borrowing Base Certificate presenting Borrower's computation of the Borrowing Base as of the requested date of removal and after giving effect to the removal of such Collateral Loan and, if such Collateral Loan is also an Eligible Receivable, after giving effect to such Collateral Loan ceasing to be an Eligible Receivable;

4.7.3    Any process from the payoff or sale of such Collateral Loan shall be paid to Lender and applied by Lender to the outstanding principal balance of the Loan.

4.7.4    After giving effect to the payment contemplated in Section 4.7.3 above, and the removal of such Collateral Loan from Lender's liens and security interests therein, and, if such Collateral Loan is also an Eligible Receivable, after giving effect to such Collateral Loan ceasing to be an Eligible Receivable, the outstanding Advances shall not exceed the Borrowing Base;

4.7.5    No event or circumstance which constitutes, or would upon the giving of notice or passage of time, constitute an Event of Default under this Agreement shall exist prior to or after giving effect to the removal of such Collateral Loan from Lender's liens and security interests therein;

4.7.6    Lender shall have received a certificate signed by an Authorized Person certifying that the conditions in subsections 4.7.1 through 4.7.5 of this Section 4.7 are satisfied; and

4.7.7    Borrower shall have provided to Lender such documents, in form and substance satisfactory to Lender in its reasonable discretion, as may be necessary to release Lender's liens and security interests in the Collateral Loan Documents.

4.8     [RESERVED].

4.9     REPAYMENT.  In addition to other provisions set forth herein, repayment of the Loan will be required as follows:

4.9.1    Interest and principal payments under the Loan shall be due and payable to Lender pursuant to the provisions of the Note.

4.9.2    Borrower hereby authorizes Lender, if and to the extent any payment of principal or interest or sum otherwise due hereunder is not promptly made pursuant to the Note, and to the extent of any obligation of Borrower to Lender under this Agreement or any other agreement, to charge against any account of Borrower with Lender an amount equal to the principal and accrued interest from time to time due and payable to Lender under the Note or otherwise; provided, however, that the foregoing shall not limit in any way Borrower's obligation to pay such amounts as and when due.

4.9.3    All payments hereunder or under the Note shall be made by Borrower without any offset or deduction for or on account of any present or future taxes, imposts or duties, of whatever nature, imposed or levied by or on behalf of any Governmental Agency.  If at any time, whether by reason of any present or future Law or other requirement, Borrower shall be compelled by such Law or other requirement to deduct or withhold such taxes, imposts or duties, Borrower shall pay such additional amounts to Lender as may be necessary such that every net payment under this Agreement and the Note on which Borrower is obligated, after such deduction or withholding, will not be less than the amount required hereunder or thereunder.

4.9.4    Whenever any payment to be made under this Agreement and the Note shall be due on a day other than a Business Day of Lender, such payment may be made on the next succeeding Business Day, and such extension of time shall in such cases be included in the computation of payment of interest hereunder and under the Note.

4.10    DEPOSIT ACCOUNTS.    Borrower hereby grants, assigns, pledges and hypothecates to Lender all of Borrower's right, title and interest in and to all deposit accounts maintained by Borrower with Lender, as security for each and all of the obligations of Borrower to Lender under the Loan Documents, including without limitation, the Operating Account.

4.11    NO AUTOMATIC SET-OFF.    The existence of any sum or sums being on deposit with Lender shall in no way constitute a set off against or be deemed to compensate the obligations of the Loan or any payment or performance due under the Loan Documents or this Agreement, unless and until Lender, by affirmative action, shall so apply said accounts or any portion thereof, and then only to the extent thereof as so designated by Lender.

4.12    RELIANCE BY LENDER AND ACQUITTANCE.   Lender may conclusively assume that the statements, facts, information, and representations contained herein and/or in any affidavits, orders, receipts, or other written instrument(s) that are filed with Lender or exhibited

5174193v1 | 031205-0110                    19

to it, are true and correct, and Lender may rely thereon without any investigation or inquiry, and any payment made by Lender in reliance thereon shall be a complete release in its favor for all sums so paid.

## ARTICLE 5.
## THE COLLATERAL

5.1 GRANT OF SECURITY INTEREST. To secure the payment and performance of all of the Obligations as and when due, Borrower hereby grants to Lender a first priority security interest in all Collateral.

5.2 COLLATERAL. The Collateral shall constitute all of Borrower's right, title and interest in all of the following assets whether now owned or hereafter acquired, and wherever located:

5.2.1 All Accounts, Receivables, Goods, contract rights, chattel paper, instruments, deposit accounts, letter of credit rights, payment intangibles and General Intangibles, including, without limitation, all of Borrower's cash, money, warehouse receipts, bills of lading, purchase orders, letters of credit, letter of credit rights, any client lists, any and all trade secrets, receipts of any kind or nature, documents, contracts and contract rights, invoices, licenses, insurance, and other tangible or intangible property of Borrower resulting from the sale or disposition of all of the foregoing, and all other personal property (including, without limitation, all of Borrower's money, all personal property now or at any time in the future in Lender's possession and credit balances); and all returned or repossessed goods which, on sale or lease, resulted in an account or chattel paper;

5.2.2 All Inventory, including all materials, work in process and finished goods;

5.2.3 All Equipment, including all machinery, furniture, and fixtures of every type now owned or hereafter acquired by Borrower;

5.2.4 All of Borrower's deposit accounts with Lender. The Collateral shall include any renewals or rollovers of the deposit accounts, any successor accounts, and any general intangibles and choses in action arising therefrom or related thereto;

5.2.5 All instruments, notes, chattel paper, documents, certificates of deposit, securities and Investment Property of every type. The Collateral shall include all liens, security agreements, leases and other contracts securing or otherwise relating to the foregoing;

5.2.6 (i) All patents, and all unpatented or unpatentable inventions; (ii) all trademarks, service marks, and trade names; (iii) all copyrights and literary rights; (iv) all computer software programs; (v) all mask works of semiconductor chip products; (vi) all trade secrets, proprietary information, customer lists, manufacturing, engineering and production plans, drawings, specifications, processes and systems. The Collateral shall include all good will connected with or symbolized by any of such general intangibles; all contract rights, documents, applications, licenses, materials and other matters related to such general intangibles; all tangible property embodying or incorporating any such general intangibles; and all chattel paper and instruments relating to such general intangibles;

5174193v1 | 031205-0110

20

5.2.7   All negotiable and nonnegotiable documents of title covering any Collateral;

5.2.8   All accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral;

5.2.9   All Supporting Obligations related to any of the foregoing;

5.2.10 All of Borrower's Collateral Loans and Collateral Loan Documents, including, without limitation, the right to receive all payments, proceeds, and recoveries thereunder, collections and cash collateral of the Collateral Loan Documents, any casualty insurance or condemnation proceeds payable to Borrower thereunder, any and all policies of title insurance issued in connection with any Collateral Mortgage, and the proceeds and products of any of the foregoing;

5.2.11 All substitutes or replacements for any Collateral, all cash or non-cash proceeds, product, rents and profits of any Collateral, all income, benefits and property receivable on account of the Collateral, all rights under warranties and insurance contracts, letters of credit, guaranties or other supporting obligations covering the Collateral, and any causes of action relating to the Collateral;

5.2.12 All proceeds and products of any of the foregoing (including proceeds of any insurance policies, proceeds of proceeds, and claims against third parties); and

5.2.13 All books and records related to any of the foregoing including but not limited to any computer-readable memory and any computer hardware or software necessary to process such memory (all of the foregoing, together with all other property in which Lender may now or in the future be granted a lien or security interest, is referred to herein, collectively, as the "Collateral").

5.3   PERFECTION.

5.3.1   Lender may file or amend one or more financing statements disclosing Lender's security interest in the Collateral.  Borrower agrees that a photographic, photostatic or other reproduction of this Agreement or of a financing statement is sufficient as a financing statement.  Borrower approves, authorizes and ratifies any filings or recordings made by or on behalf of Lender in connection with the perfection and continuation of Lender's security interest with respect to the Collateral.

5.3.2   Lender may file UCC-1 financing statements against specific items of Equipment, (or amend existing UCC-1 financing statements) in Lender's sole discretion, and Borrower agrees to furnish to Lender sufficient identifying information, such as make, model and serial numbers, as Lender may request. Lender may also file a fixture filing in the real property records of the applicable county in California, to perfect its security interest in such items of Equipment as are or become fixtures.

5.3.3   Upon demand, Borrower will deliver to Lender such other items of Collateral or will execute such documents as are appropriate to grant Lender possession or control of such Collateral as necessary to further perfect Lender's security interest therein.

5.4   THE COLLATERAL LOANS.

5.4.1   From and after the occurrence of an Event of Default and during the continuance thereof, Lender shall have the exclusive right to (a) receive and enforce the Collateral Loan Documents, (b) exercise the Borrower's decision-making authority as lender thereunder, and (c) collect all payments and recoveries thereon and all proceeds thereof, to be applied by Lender to payment of the Loan and all fees, costs, and expenses incurred by Lender in connection with the Loan.  Lender's rights hereunder shall include, from and after the occurrence of an Event of Default and only during the continuance thereof, the exclusive right to collect and receive all payments, proceeds, and recoveries under and with respect to the Collateral Loan Documents, including, without limitation, the exclusive right to enforce the provisions of the Collateral Loan Documents in any manner Lender shall determine to be necessary or appropriate, including, without limitation, by judicial action or nonjudicial proceedings, and to otherwise bill for and account to Borrower for any and all payments, proceeds, and recoveries thereon as herein provided.  Notwithstanding the foregoing assignment, Borrower, alone, and not Lender, shall be obligated to fulfill all of the monetary and non-monetary obligations of the lender to the Collateral Loan Obligor under the Collateral Note, Collateral Mortgage and additional Collateral Loan Documents.

5.4.2   Borrower shall fully and faithfully perform and satisfy all covenants and conditions of the Collateral Loan Documents, and Borrower shall, as of the closing of each Collateral Loan, take all steps necessary and appropriate in order to perfect Borrower's security interest in and lien upon all Underlying Real Estate Collateral and to perfect Lender's security interest in and lien upon all Loan Collateral.  Borrower shall service (or caused to be serviced) the Collateral Loans in accordance with this Agreement and all applicable Laws and, to the extent not expressly governed thereby, will, at a minimum, exercise the same degree of care as Borrower exercises with respect to the servicing and administration of loans held by Borrower for its own account.

5.4.3   Each Collateral Loan shall be identified by Lender with (i) the date and amount of each Collateral Note, (ii) the name of the Collateral Loan Obligor, (iii) the identification of the Collateral Mortgage, and (iv) the identification of the Collateral.  Such records of Collateral Loans shall be maintained at Lender's office, and the records of Lender shall, absent manifest error, be binding and conclusive upon Borrower.

5.4.4   Collection.   Borrower shall diligently and promptly take all steps necessary and/or appropriate under the circumstances to cause all Collateral Loan Obligors to make full and timely payment of all obligations due under the Collateral Loan Documents.

5.4.5   Monitoring Compliance; No Modifications.   Borrower shall at all times monitor and verify compliance by Collateral Loan Obligors with all obligations under the Collateral Loan Documents. Borrower shall service and administer (or caused to be serviced and administered by a servicer under a servicing agreement approved by Lender in writing, in

5174193v1 | 031205-0110                  22

Lender's reasonable discretion) the Collateral Loans in accordance with servicing practices and procedures (including collection procedures) that are in all respects legal, proper and customary in the mortgage servicing industry in accordance with (a) the accepted mortgage servicing practices of prudent mortgage lending institutions that service mortgage loans of the same type as the Collateral Loans in the jurisdiction where the real Property secured by the related Collateral Mortgage is located, (b) applicable law, (c) the terms of the related Collateral Loan Documents, and (d)  the servicing practices that Borrower customarily employs and exercises in servicing and administering mortgage loans of the same type as the Collateral Loans for its own account (to the extent not conflicting with clauses (a) through (c) above) and shall have full power and authority, acting alone or through subservicers or agents, to do or cause to be done any and all things in connection with such servicing and administration which Borrower may deem necessary or desirable and consistent with the terms of this Agreement.  Borrower hereby authorizes Lender, in Lender's reasonable discretion, to perform a collateral audit on any Collateral Loan upon reasonable notice during the term of the Loan, utilizing an auditor acceptable to Lender, and the audit shall be at Borrower's sole expense.

5.4.6   <u>Representations and Warranties Regarding Collateral Loans</u>.  Borrower makes the following representations and warranties to Lender with respect to each Collateral Loan as of the date such Collateral Loan is pledged as Collateral:

(a)   Subject to Permitted Exceptions (as defined below), the Mortgage creates a first lien or a first priority ownership interest in an estate in fee simple estate in real property securing the related Collateral Loan Note.

(b)   To the best of Borrower's knowledge, all buildings and improvements which were included for the purpose of determining the appraised value of the Underlying Real Estate Collateral lie wholly within the boundaries and building restriction lines of the Underlying Real Estate Collateral and no buildings or improvements on adjoining properties encroach upon the Mortgaged Property. No improvement located on or being part of the Underlying Real Estate Collateral is in violation of any applicable zoning law, subdivision law, ordinance or regulation.

(c)   The Collateral Loan is covered by an American Land Title Association or California Land Title Association mortgage title insurance policy, or such other generally acceptable form of policy or insurance pursuant to insurance policies, and the issuer thereof is qualified to do business in the jurisdiction where the Underlying Real Estate Collateral is located, and which insures the holder of such Collateral Loan, its successors and assigns, as to the first priority lien of the Collateral Mortgage in the original principal amount of the Collateral Loan and against any loss by reason of the invalidity or unenforceability of the lien resulting from the provisions of the Collateral Mortgage.

(d)   The Underlying Real Estate Collateral (including all buildings and improvements thereon) are insured by an insurer, against loss by fire, hazards of extended coverage and such other hazards as are customary in the area where the Underlying Real Estate Collateral is located.  If required by the Flood Disaster Protection Act of 1973 ("FDPA"), the Collateral Loan is covered by a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration, in an amount not less than the amount

required by the FDPA, with such flood policy being  issued by a generally acceptable insurer. The Collateral Mortgage obligates the Collateral Loan Obligor thereunder to maintain all such insurance at the Collateral Loan Obligor's cost and expense, and upon the Collateral Loan Obligor's failure to do so, authorizes the holder of the Mortgage to obtain and maintain such insurance at the Collateral Loan Obligor's cost and expense and to seek reimbursement therefore from the related Collateral Loan Obligor. Any such hazard insurance policy shall be a valid and binding obligation of the insurer, be in full force and effect, and be in full force and effect.

(e)     To the best of Borrower's knowledge, the Collateral Loan Note or Mortgage is not subject to any right of rescission, set-off, counterclaim or defense, including, without limitation, the defense of usury, nor will the operation of any of the terms of the Collateral Loan Note or the Mortgage, or the exercise of any right thereunder, render either the Collateral Loan Note or the Mortgage unenforceable, in whole or in part, or subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury, and no such right of rescission, set-off, counterclaim or defense has been asserted with respect thereto, and no Collateral Loan Obligor in respect of the Collateral Loan was a debtor in any state or federal bankruptcy or insolvency proceeding at the time the Collateral Loan was originated.

(f)     The Collateral Loans were, and will have been, at all times serviced in accordance with the terms of the related Collateral Loan Note and in accordance with applicable Law.  There exists no escrow deposit with respect to the Collateral Loan Note.

(g)     There is no action, suit, proceeding or investigation pending, or to the best of Borrower's knowledge threatened, that is related to the Collateral Loan and likely to affect materially and adversely such Collateral Loan.

(h)     The documents required to be delivered on or before the related closing date with respect to such Collateral Loan have been delivered to Lender.  The Collateral Loan Document Package contains each of the documents and instruments specified to be included therein duly executed and in due and proper form, and each such document or instrument is in form acceptable to the applicable federal or state regulatory agency.

(i)     The Collateral Loan Note, the related Mortgage and any intervening assignments of the Mortgage are genuine, and each is the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms, except as enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization or other similar Laws relating to or affecting the enforcement of creditors' rights and (ii) by general principles of equity. All parties to the Collateral Loan Note, the Mortgage and any intervening assignments had legal capacity to execute the Collateral Loan Note, the Mortgage and such assignments, and the Collateral Loan Note, Mortgage and such assignments have been duly and properly executed by such parties.

(j)     The related Mortgage is a valid, subsisting, enforceable and perfected first lien on the Underlying Real Estate Collateral, subject only to Permitted Exceptions, including all buildings on the Underlying Real Estate Collateral, and all mechanical, electrical, plumbing, heating and air conditioning systems affixed to such buildings. The Mortgage and the Collateral Loan Note do not contain any evidence of any security interest or

5174193v1 | 031205-0110                              24

**Page 249**

other interest or right thereto. Such lien is free and clear of all adverse clams, liens and encumbrances having priority over the first lien of the Mortgage subject only to (1) the lien of non-delinquent current real property taxes and assessments not yet due and payable, (2) covenants, conditions and restrictions, rights of way, easements and other matters of the public record as of the date of recording which are acceptable to mortgage lending institutions generally and specifically referred to in the lender's title insurance policy and either (A) which are referred to or otherwise considered in the appraisal made in connection with the origination of the Collateral Loan, or (B) which do not adversely affect the appraised value of the Underlying Real Estate Collateral as set forth in such appraisal and (3) other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Underlying Real Estate Collateral (collectively, "Permitted Exceptions").  Any security agreement, chattel mortgage or equivalent document related to and delivered in connection with the Collateral Loan establishes and creates a valid, subsisting, enforceable and perfected first lien and first priority security interest on the property described therein.

(k)    The Mortgage and the related Collateral Loan Note contain customary and enforceable provisions which render the rights and remedies of the holder thereof adequate for the realization against the Underlying Real Estate Collateral of the benefits of the security provided thereby, including, (i) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (ii) otherwise by judicial foreclosure, subject only to rights of redemption, seizure and other Laws that would not materially interfere with the ultimate realization of the benefits of the security.

(l)    Except as otherwise disclosed to Lender in writing, the terms of the Collateral Loan Note and the Mortgage have not been impaired, waived, altered or modified in any respect from the date of origination; except by a written agreement, which has been delivered to the Lender.  No Collateral Loan Obligor in respect of the Collateral Loan has been released, in whole or in part, except in connection with an assumption agreement approved by the title insurer, to the extent required by such policy, and which assumption agreement is part of the Collateral Loan Document Package delivered to the Lender.

(m)    To the best of Borrower's knowledge, there are no mechanics' or similar liens or claims which have been filed for work, labor or material (and no rights are outstanding that under law could give rise to such lien) materially and adversely affecting the Underlying Real Estate Collateral which are, or may be, liens prior or equal to, or coordinate with, the lien of the related Mortgage.

(n)    Except as otherwise disclosed to Lender in writing, there is no default, breach, violation or event of acceleration existing under the Mortgage or the related Collateral Loan Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration; and neither the Borrower nor any prior owner of such Collateral Loan has waived any default, breach, violation or event permitting acceleration.  Except as otherwise disclosed to Lender in writing, neither the Borrower nor any such prior owner has waived the performance by any Collateral Loan Obligor of any action, if such party's failure to perform such action would cause the Collateral Loan to be in default.  Except as otherwise disclosed to Lender in writing, no

5174193v1 | 031205-0110                                25

foreclosure action is currently threatened or has been commenced with respect to any Underlying Real Estate Collateral.

(o)	Each original Mortgage was recorded, and all subsequent assignments of the original Mortgage have been recorded in the appropriate jurisdictions in which such recordation is necessary to perfect the liens against each related Collateral Loan Obligor or are in the process of being recorded.

(p)	The Collateral Loan has been closed and the proceeds of the Collateral Loan have been fully disbursed, except for (a) advances to be made for any renovation of the Underlying Real Estate Collateral, and (b) monetary reserves being held back from being advanced to the Collateral Loan Obligor or otherwise being held by Borrower pursuant to the terms of the Collateral Loan. All costs, fees and expenses incurred in making or closing Collateral Loans and the recording of the Mortgage were paid, and each Collateral Loan Obligor is not entitled to any refund of any amounts paid or due under the Collateral Loan Note or Mortgage. All points and fees related to the Collateral Loan were disclosed in writing to each Collateral Loan Obligor in accordance with all applicable Laws.

(q)	No loan payment has been escrowed as part of the loan proceeds on behalf of the Collateral Loan Obligor.

(r)	To the best of Borrower's knowledge, all taxes, governmental assessments, insurance premiums and water, sewer and municipal charges which previously became due and owing have been paid by each Collateral Loan Obligor, or an escrow of funds from such Collateral Loan Obligor has been established in an amount sufficient to pay for every such item which remains unpaid and which has been assessed but is not yet due and payable.

(s)	To the best of Borrower's knowledge, all inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Underlying Real Estate Collateral and, with respect to the use and occupancy of the same, have been made or obtained from the appropriate authorities and the Underlying Real Estate Collateral is lawfully occupied under applicable Law.

(t)	In the event the Mortgage is a deed of trust, a trustee, authorized and duly qualified under applicable law to serve as such, has been properly designated, is named in the Mortgage and currently so serves, and no fees or expenses are or will become payable by the holder thereof to the trustee under the deed of trust, except in connection with a trustee's sale after default by the Collateral Loan Obligor.

(u)	Except as disclosed to Lender in writing, no Collateral Loan is secured by a leasehold interest.

(v)	The Borrower is the sole legal, beneficial and equitable owner and holder of the Collateral Loan and the indebtedness evidenced by the Collateral Loan Note. The Borrower has good, and marketable title to and is the sole owner thereof has full right and authority to pledge and assign the Collateral Loan to the Lender free and clear of any encumbrance, equity, lien, pledge, charge, claim (including, but not limited to, any preference or fraudulent transfer claim) or security interest.

5174193v1 | 031205-0110                                  26

(w)    All parties which have had any interest in the Collateral Loan, whether as mortgagee, assignee, pledgee or otherwise, are (or, during the period in which they held and disposed of such interest, were) in compliance with any and all applicable licensing requirements of the Laws of the state wherein the Underlying Real Estate Collateral is located, except to the extent that failure to be so licensed would not give rise to any claim against the holder.

5.4.7    <u>Maintenance of Insurance; Settlement</u>.    Borrower shall (a) cause the Collateral Loan Obligors to at all times insure the Underlying Real Estate Collateral against loss or damage by fire and other risks as shall be required pursuant to the Collateral Loan Documents, with Borrower to be the loss payable beneficiary and/or additional insured or (b) force place such insurance if any Collateral Loan Obligor fails to so comply with the Collateral Loan Documents. In the event of any damage or destruction of the Underlying Real Estate Collateral, or any taking of all or a portion of the Underlying Real Estate Collateral by power of eminent domain, Borrower shall take any and all action as may be necessary or appropriate to make a timely claim for proceeds or an award to which the holder of the Collateral Loan Documents is or may then be entitled; provided, however, that Borrower shall not settle or compromise the amount of any claim, settlement, payment, or award without the prior written approval of Lender, which approval Lender may give or withhold in its reasonable opinion and judgment, and the amount of such settlement or award shall be paid first to Lender to be applied to repay the Advances made by Lender with respect to the Underlying Real Estate Collateral which is the subject of such claim.

5.4.8    <u>Management of Property</u>.    If Borrower acquires title to the Underlying Real Estate Collateral, Borrower (i) shall take all commercially reasonable steps necessary to cause the Underlying Real Estate Collateral to be properly managed, maintained, repaired, and adequately insured, (ii) to the extent provided by Law, shall cause all rents and other income and proceeds and other rights generated from the Underlying Real Estate Collateral and any insurance proceeds to be properly collected and applied for the account and benefit of Borrower and/or Lender according to their respective interests in the Underlying Real Estate Collateral, and (iii) maintain insurance on the Underlying Real Estate Collateral consistent with Section 5.4.7.  If required by Lender, Lender shall obtain, at Borrower's expense, an updated Appraisal or broker's price opinion for such Underlying Real Estate Collateral and Borrower shall have paid to Lender, in addition to any other fees required under this Agreement or any of the other Loan Documents, an appraisal review fee in an amount to be determined by Lender in its sole discretion, for review of such updated Appraisal.

5.4.9    <u>Reporting</u>.  Should Borrower at any time become aware of the occurrence of any loss, damage, destruction, waste, presence or release of any hazardous substance, or nuisance upon or from the Underlying Real Estate Collateral, Borrower shall promptly report in writing to Lender Borrower's findings and such other information related to such occurrence as Lender may request.

5.4.10    <u>Maintenance of Security Interest in Collateral Loans</u>.    Borrower shall perfect, and maintain the perfected status and priority, of all security for the Collateral Loans, including, but not limited to, all security interests in personal property and real property security. Without limiting the generality of the foregoing, Borrower shall cause to be filed at all

5174193v1 | 031205-0110                              27

appropriate locations all such financing statements as shall be required or permitted pursuant to the Collateral Loan Documents, and all continuation statements extending the financing statements.

5.4.11 <u>Reporting and Remittance</u>. Within thirty (30) days following the end of each calendar month, Borrower shall prepare and deliver to Lender a written report of the status of each Collateral Loan as of the end of such calendar month, which report shall include the following and all other information regarding each Collateral Loan as Lender may request from time to time: (a) the name and address of the Collateral Loan Obligors, and the loan number; (b) the principal amount of all advances, and all accrued and unpaid interest, on each Collateral Loan, and the date last paid and next due date; and (c) the existence of any breach or default by Collateral Loan Obligors under the Collateral Loan Documents and, if so, any actions taken by Borrower to enforce the Collateral Loan Documents.

5.4.12 <u>Default by Collateral Loan Obligors; Third-Party Claims</u>.

(a) In the event of any breach or default by any Collateral Loan Obligor in the payment or performance of any obligations under the Collateral Loan Documents, then, so long as no Event of Default shall have then occurred and be continuing, Borrower shall have the right and obligation to promptly and diligently exercise and enforce any and all rights and remedies available to Borrower under the Collateral Loan Documents and by operation of law in order to collect all indebtedness thereunder and to realize upon and liquidate all Underlying Real Estate Collateral in payment thereof, including, without limitation, by commencing and pursuing to completion foreclosure, whether judicial or nonjudicial, of all liens and security interests encumbering the Underlying Real Estate Collateral. Borrower shall also timely file and pursue any and all claims which the holder of the Collateral Loan Documents shall be entitled to assert against third parties as may be necessary or appropriate in order to prevent losses to the Underlying Real Estate Collateral or to the Loan Collateral, including, without limitation, all claims against any title insurance company with respect to any policy of title insurance issued in connection with a Collateral Loan. All actions taken by Borrower in the exercise and enforcement of the Collateral Loan Documents shall be undertaken and carried out by Borrower at its sole expense and risk, and in full compliance with applicable Law and in a commercially reasonable manner. Borrower hereby indemnifies and shall defend and hold harmless Lender from and against any and all claims, liabilities, losses, actions, suits, proceedings, damages, and expense of whatever kind or description in connection with any and all actions taken by Borrower and its agents and attorneys in the exercise and enforcement of Borrower's rights, remedies, and obligations under this Agreement or as a result of any failure by Borrower to perform its obligations hereunder, including, without limitation, all related expenses and reasonable attorneys' fees incurred by Lender in connection with any such matters. Any and all payments, proceeds, and recoveries received and/or recovered by Borrower with respect to any and all such claims, actions and proceedings shall be paid first to Lender to the extent of the unpaid principal balance of any Collateral Loan Note which is the subject of any such matter; provided, however, Borrower shall not settle or compromise the amount of any claim, settlement, payment, or award without the prior written approval of Lender, which approval Lender may give or withhold its sole opinion and judgment.

5174193v1 | 031205-0110                    28

(b)    Notwithstanding anything herein to the contrary, in the event that any Collateral Loan that is an Eligible Receivable becomes an Ineligible Receivable, then (i) Lender's approval of such Collateral Loan as an Eligible Receivable shall automatically terminate, (ii) such Collateral Loan shall automatically cease to be an Eligible Receivable and shall be removed from the Borrowing Base, and (iii) Borrower shall make such repayment of the Loan as may be required pursuant to Sections 4.1.1(a) or 4.6.3.

(c)    Nothing herein contained shall be construed as a waiver by Lender of any obligation or duty of Borrower hereunder or under any other Loan Documents, including, without limitation, Borrower's duty to enforce all Collateral Loan Documents in a diligent and timely manner.

5.4.13  Continuous and Replacement Security.  In the event Borrower commences a judicial or nonjudicial foreclosure action or proceeding against a Collateral Loan Obligor pursuant to the provisions of Section 5.4.12 above, and intends to proceed to sell or otherwise dispose, or to cause a sale or other disposition to be made, of any Underlying Real Estate Collateral pursuant to any such action or proceedings in liquidation of the indebtedness under a Collateral Loan, then Borrower shall sell or cause a sale of the Underlying Real Estate Collateral in accordance with applicable Law and standards of commercial reasonableness.  If Borrower acquires title to the Underlying Real Estate Collateral in such a sale or through the acceptance of a deed in lieu ("DIL Transaction"), then Lender's security interest under the Loan Documents shall attach to, and continue in, all such property purchased by Borrower, and all such Underlying Real Estate Collateral purchased by Borrower shall automatically become and be deemed to constitute Collateral for any and all unpaid indebtedness and other obligations owing by Borrower to Lender hereunder or under the other Loan Documents, having a first lien priority and subject to the provisions of this Agreement.  Notwithstanding any provision to the contrary herein contained, and without limiting the validity and effectiveness of the foregoing provisions, Borrower shall notify Lender of each such proposed sale or DIL Transaction concerning Underlying Real Estate Collateral in writing at least ten (10) Business Days prior to the scheduled date of sale or DIL Transaction, and shall execute and deliver to Lender prior to such sale all such security instruments, in recordable form, as Lender shall require in order to create, continue, and perfect Lender's lien upon and security interest in such Underlying Real Estate Collateral, to be effective and perfected as of the time Borrower acquires title thereto as herein provided, including, without limitation, a deed of trust and assignment of rents (or mortgage, as applicable) in form and content required by Lender, encumbering any and all interests in real property which may then be the subject of such sale or DIL Transaction ("Lender Deed of Trust").  Lender may, in its sole discretion, cause such security agreements, financing statements or Lender Deeds of Trust to be duly filed or recorded prior to, concurrently with, or subsequent to, the completion of such sale or DIL Transaction and, in the case of any sale or DIL Transaction concerning Underlying Real Estate Collateral constituting interests in real property, may condition such sale or DIL Transaction and acquisition by Borrower upon the issuance of a title insurance policy to Lender, as the sole insured with respect to each Lender Deed of Trust, following Borrower's acquisition of title to said property and at Borrower's sole expense, in the amount of the then unpaid principal balance of the Collateral Loan Note secured thereby and in form and content otherwise substantially identical to the title insurance policy issued to Borrower in connection with the original Collateral Loan.

5174193v1 | 031205-0110                                     29

5.4.14 <u>Insurance</u>.  Borrower shall obtain and at all times maintain hazard and liability insurance with respect to any and all tangible Loan Collateral which may have been repossessed or otherwise acquired by Borrower in the exercise and enforcement of its rights under the Collateral Loan Documents, in amounts reasonably necessary to protect the interests of Borrower and Lender, as their interests may appear, and issued by companies acceptable to Lender in its sole discretion.  Upon Lender's request, a certificate of insurance acceptable to Lender shall be delivered to Lender together with evidence of payment of premium thereon and an agreement to give Lender at least thirty (30) Business Days' prior notice of any material changes, termination, or expiration of the policies.

5.4.15 <u>Right of Entry</u>.  Lender and Lender's employees or agents shall have the right at all times to enter upon any and all real property collateral repossessed or acquired by foreclosure or deed in lieu of foreclosure for whatever purpose Lender deems appropriate, including, without limitation, inspection of the premises and the posting of such notices and other written or printed material thereon as Lender may deem appropriate or desirable.

5.4.16 <u>Enforcement Upon Event of Default</u>.  Unless and until all obligations to Lender have been fully and finally satisfied and discharged (other than contingent indemnification obligations for which no claims have been asserted at the time the Loan is paid in full and the commitment of Lender to make any further Advances has been terminated (herein referred to as "<u>Surviving Indemnity Requirements</u>")), upon the occurrence of an Event of Default and only during the continuance thereof, Lender shall have the sole right to receive any and all payments, proceeds and recoveries under or in connection with the Collateral Loan, and Lender shall have the right to notify Collateral Loan Obligors to make all payments under the Collateral Loans to Lender.  Notwithstanding the foregoing or any other provision of this Agreement to the contrary, so long as there exists no uncured Event of Default, Borrower shall have the sole and exclusive right to bill and collect all payments due under and pursuant to all Collateral Loans and otherwise to communicate in any manner or for any purpose with any Collateral Loan Obligor or guarantors under the Collateral Loans.  Borrower shall observe reasonable loan servicing practices with respect to collection of such obligations in the ordinary course of its business. Borrower shall at all times diligently monitor and verify compliance by the Collateral Loan Obligor with all obligations under the Collateral Loan in accordance with reasonable loan servicing policies, practices, and procedures.

(a)     Lender shall have the right to take any and all other actions as Lender determines to be necessary or appropriate in order to establish and perfect its rights and interests in and to the Collateral Loan Documents and in all payments, proceeds, and recoveries thereon; provided, however, notwithstanding the foregoing or any other provision of this Agreement or applicable law to the contrary, no Assignment of Collateral Mortgage delivered by Borrower hereunder shall be recorded in the Official Records of any county unless and until there occurs an Event of Default that has not already been cured prior to such recordation.

(b)     In addition to any other power of attorney provided in the Loan Documents, Borrower hereby appoints Lender as Borrower's attorney in fact, with full power of substitution, to endorse and otherwise negotiate payment in any form made by Collateral Loan Obligor under the Collateral Loan to or for the account of Lender, subject to the provisions of this Agreement; provided, however, Lender shall only be entitled to exercise the appointment

from and after an Event of Default and during the continuance thereof. Collateral Loan Obligor may conclusively rely upon all instructions, notices, requests for payment, and receipts given by Lender in connection with collection of the Collateral Loan.

(c) In addition to any other indemnity herein provided, Borrower hereby indemnifies, releases and holds harmless Lender from and against any and all losses, damages, claims, costs, and expenses, including attorneys' fees and related costs, suffered or incurred by Lender as a result of any action or proceeding taken by Lender in the collection and enforcement of the provisions of the Collateral Loan Documents as herein provided, or as a result of any nonaction by Lender in connection therewith.

## ARTICLE 6.
## BORROWER'S COVENANTS

In addition to anything else herein stated:

6.1 LENDER MAY EXAMINE BOOKS AND RECORDS. Lender shall have the right, at any time, acting by and through its employees or agents, to examine the books, records, and accounting data of Borrower, and to make extracts therefrom or copies thereof. Borrower shall promptly (but in no event later than one (1) Business Day after the request) make such books, records, and accounting data available to Lender, as stated above, upon written request, and upon like request shall promptly advise Lender, in writing, of the location of such books, records, and accounting data. Borrower shall at all times permit Lender to review, audit and examine all such books and records, either directly or through one or more auditors designated by Lender, including independent contractors.

6.2 PAYMENT OF TAXES AND OTHER DEBT. Borrower shall pay, or cause to be paid, and discharge, or cause to be discharged, (a) before delinquency all taxes, assessments, and governmental charges or levies imposed upon it, upon its income or profits, or upon any property belonging to it (including, without limitation, the Collateral); (b) when due all lawful claims (including, without limitation, claims for labor, materials, and supplies), which, if unpaid, might become a lien, charge or encumbrance upon any of its assets or property (including, without limitation, the Collateral); and (c) all its other obligations and indebtedness when due; provided, however, that Borrower may contest any of the foregoing in good faith and by appropriate proceedings diligently prosecuted by Borrower as long as Borrower has adequate reserves to pay any adverse determination or has otherwise provided Lender evidence of a surety or bond to pay any adverse determination.

6.3 COMPLY WITH APPLICABLE LAWS. Borrower shall comply with all applicable Laws, including without limitation, all health and environmental Laws, and all other directions, orders and notices of violations issued by any Governmental Agency relating to or affecting Borrower, the Collateral Loans or the Collateral. Further, Borrower shall indemnify and hold Lender harmless from the failure by Borrower to comply with such Laws to the full extent provided for herein.

6.4 MAINTENANCE OF PROPERTIES AND PRESERVE EXISTENCE. Borrower shall use its best efforts to maintain and preserve, or cause to be maintained and preserved, all of

5174193v1 | 031205-0110

31

its properties, necessary or useful in the proper conduct of its business, including such as may be under lease, in good working order and condition, ordinary wear and tear excepted.  Borrower, so long as Borrower remains obligated on the Loan, shall do all things necessary to preserve and keep in full force and effect Borrower's organizational status, and will comply with all Laws, orders and decrees of any Governmental Agency or court applicable to Borrower or to the Collateral Loans.

6.5     REPORTING REQUIREMENTS.  So long as Borrower shall have any obligation to Lender under this Agreement and/or the Loan Documents, Borrower shall prepare, or cause to be prepared, and deliver, or cause to be delivered, to Lender the following Financial Statements and reports:

6.5.1    As soon as practicable and in any event within seven (7) days after Borrower knows or should have known of the commencement of any legal action against it, except actions seeking money judgment that are fully insured or bonded, a report of the commencement of such action containing a statement signed by the chief financial officer of Borrower setting forth details of such legal action and any action Borrower proposes to take with respect thereto;

6.5.2    Within seven (7) days of the occurrence of any Event of Default or event which, with the giving of notice or lapse of time, or both, would constitute an Event of Default, a report regarding such Event of Default or event setting forth details and describing any action which Borrower proposes to take with respect thereto, signed by the manager of Borrower;

6.5.3    Any change in name of Borrower or use of any trade names or trade styles;

6.5.4    As soon as available, and in any event no later than forty-five (45) days following the end of each calendar quarter (e.g. December 31, March 30, June 30, and September 31), commencing on the calendar quarter ending on March 31, 2024, Borrower shall deliver to Lender a quarterly Borrowing Base Certificate covering all Collateral Loans, which Borrowing Base Certificate shall be duly certified by the authorized representative of Borrower as to the completeness and accuracy of all information contained therein, without exception, and which Borrowing Base Certificate shall be accompanied by any and all other supporting documentation requested by Lender in its sole and absolute discretion, including without limitation, (a) the name and address of the Collateral Loan Obligors, and the loan number; (b) the principal amount of all advances, and all accrued and unpaid interest, on each Collateral Loan, and the date last paid and next due date, (c) any assertion by any Collateral Loan Obligator of a right of rescission, set-off, counterclaim or defense as to any Collateral Loan, (d) upon Borrower's knowledge, any mechanic's liens filed against any Underlying Collateral securing any Collateral Loan, and (e) the existence of any other breach or default by Collateral Loan Obligors under the Collateral Loan Documents and, if so, any actions taken by Borrower to enforce the Collateral Loan Documents

6.5.5    As soon as available, and in any event no later than forty-five (45) days following the end of each calendar quarter commencing on March 31, 2024, Borrower shall provide to Lender complete and accurate Financial Statements representing the financial condition of Borrower as of the date such Financial Statements are prepared and delivered to

Lender, including balance sheets, income statements, sources and uses of funds, detailed schedule of real estate of Borrower, and such other supplemental reports and schedules as Lender shall require, in its sole and absolute discretion.  All such Financial Statements may be company prepared and shall contain a certification signed by any individual providing a Financial Statement or by one or more authorized representatives of any corporation, partnership, limited liability company or other entity providing a Financial Statement, certifying to the completeness and accuracy of all information, without exception. All such Financial Statements shall be prepared and presented in accordance with GAAP, consistently applied, or in such other form and content as Lender may permit, in its sole and absolute opinion and judgment;

6.5.6   As soon as available, and in any event no later than one hundred twenty (120) days following the end of each calendar year commencing with the calendar year ending on December 31, 2024, Borrower shall provide to Lender complete and accurate Financial Statements representing the financial condition of Borrower as of the date such Financial Statements are prepared and delivered to Lender, including balance sheets, income statements, sources and uses of funds, detailed schedule of real estate of Borrower, and such other supplemental reports and schedules as Lender shall require, in its sole and absolute discretion. All such Financial Statements shall be prepared by an independent certified public accountant acceptable to Lender, and such Financial Statements shall be audited.  Such Financial Statements shall contain a certification signed by any individual providing a Financial Statement or by one or more authorized representatives of any corporation, partnership, limited liability company or other entity providing a Financial Statement, certifying to the completeness and accuracy of all information, without exception.  All such Financial Statements shall be prepared and presented in accordance with GAAP, consistently applied, or in such other form and content as Lender may permit, in its sole and absolute opinion and judgment;

6.5.7   Borrower shall cause each Guarantor to furnish to Lender within fifteen (15) calendar days of Lender's request, complete and accurate Financial Statements representing the financial condition of such Guarantor as of the date such Financial Statements are prepared and delivered to Lender, including, but not limited to, profit and loss statements, balance sheets, income statements, sources and uses of funds, real estate schedules and such other supplemental reports and schedules as Lender shall require, in its sole and absolute discretion.  All such Financial Statements may be self-prepared; and all such Financial Statements shall contain a certification signed by any individual providing a Financial Statement or by one or more authorized representatives of any corporation, partnership, limited liability company, trust or other entity providing a Financial Statement, certifying to the completeness and accuracy of all information, without exception. All such Financial Statements shall be prepared and presented in accordance with GAAP, consistently applied, or in such other form and content as Lender may permit, in its sole and absolute opinion and judgment;

6.5.8   Borrower shall furnish to Lender copies of all signed income tax returns (with all forms K-1 attached) of Borrower, together with any extensions if applicable, within fifteen (15) days after they are filed with the relevant taxing authorities, but in no event later than November 1 of each calendar year.  All such tax returns shall be prepared by an independent certified public accountant acceptable to Lender;

6.5.9    Borrower shall cause each Guarantor to furnish to Lender copies of (i) all signed income tax returns (with all forms K-1 attached) of such Guarantor within fifteen (15) days after they are filed with the relevant taxing authorities, but in no event later than November 1 of each calendar year and (ii) all signed income tax returns of each corporate entity in which any Guarantor owns an ownership interest within fifteen (15) days after they are filed with the relevant taxing authorities, but in no event later than November 1 of each calendar year. All such tax returns shall be prepared by an independent certified public accountant acceptable to Lender;

6.5.10  Promptly upon receipt thereof, one (1) copy of any other report submitted to Borrower by independent accountants in connection with any annual, interim or special audit made by them of the books of Borrower;

6.5.11  Within seven (7) days of (i) any contact from any Governmental Agency concerning any environmental protection Laws, including any notice of any proceeding or inquiry with respect to the presence of any hazardous materials on any Underlying Real Estate Collateral or the migration thereof from or to other property, (ii) any and all claims made or threatened by any third party against or relating to said property concerning any loss or injury resulting from hazardous materials, or (iii) Borrower's discovery of any occurrence or condition on any property adjoining or in the vicinity of said property that could cause said property, or any part thereof, to be subject to any restrictions on the ownership, occupancy, transferability, or loss of the property under any Law,  Borrower shall deliver to Lender a report regarding such contact and setting forth in detail and describing any action which Borrower proposes to take with respect thereto, signed by an officer of Borrower;

6.5.12  Within fifteen (15) days of the end of each calendar quarter (e.g., December 31, March 30, June 30, and September 31) commencing on March 31, 2024, an updated summary, in form and detail satisfactory to Lender, of the Collateral Loans owned by Borrower detailing the status of the Collateral Loans, including without limitation, (i) outstanding amounts due under each Collateral Loan, (ii) Borrower's cost of acquisition of each Collateral Loan, (iii) Borrower's estimate of value of the Underlying Real Estate Collateral for each Collateral Loan, (iv) status of performance of each Collateral Loan, and (v) address of Underlying Real Estate Collateral for each Collateral Loan, and other information that may be required by Lender for each Collateral Loan;

6.5.13  Within forty-five (45) days of the end of each calendar quarter (e.g., December 31, March 30, June 30, and September 31) commencing on March 31, 2024, Borrower shall cause each Guarantor to furnish to Lender bank and brokerage statements evidencing Liquidity of Guarantor;

6.5.14  Concurrently with the delivery of the Financial Statements set forth in Section 5.4.7 above, and at such intervals and in such format as Lender may require from time to time, Borrower shall delivery to Lender written certification(s) by Borrower and its attesting principal financial or accounting officer that (i) all representations and warranties under this Agreement continue to be true, accurate and complete in all material respects, (ii) Borrower is in compliance with all of its affirmative covenants, negative covenants, financial covenants, reporting covenants and other covenants in described in this Agreement, (iii) that the information in all of Borrower's Financial Statements submitted to Lender, and the computations provided

with Borrower's current and prior certificates accurately represent Borrower's financial position as of the dates thereof, (iv) Borrower's submitted financial statements were prepared in accordance with GAAP (except as otherwise disclosed to, and agreed by, Lender); and (v) no event has occurred and no condition exists that constitutes (or with the passage of time and giving of any necessary notice would constitute) an Event of Default.

6.5.15  Within seven (7) days of (i) any contact from any Governmental Agency concerning the condemnation or report deeming any Underlying Real Estate Collateral being deemed uninhabitable or the equivalent, Borrower shall deliver to Lender a report regarding such contact and setting forth in detail and describing any action which Borrower proposes to take with respect thereto, signed by an officer of Borrower.

6.6     DISTRIBUTIONS  Borrower shall not make, declare or permit any distribution to any officer, member, manager, partner or other direct or indirect beneficial owner of Borrower at any time that an Event of Default (or event that with the giving of notice or passage of time, or both, would constitute an Event of Default) has occurred and is continuing or if any such distribution would cause or contribute to an Event of Default (or event that with the giving of notice or passage of time, or both, would constitute an Event of Default).

6.7     TERRORISM AND ANTI-MONEY LAUNDERING.  Borrower warrants and agrees as follows:

6.7.1   As of the date hereof and throughout the term of the Loan: (i) Borrower; (ii) any Person controlled by Borrower; (iii) any Person for whom Borrower is acting as agent or nominee in connection with this transaction, is not an OFAC Prohibited Person.

6.7.2   To comply with applicable U.S. Anti-Money Laundering Laws and regulations, all payments by Borrower to Lender or from Lender to Borrower will only be made in Borrower's name and to and from a bank account of a bank based or incorporated in or formed under the laws of the United States or a bank that is not a "foreign shell bank " within the meaning of the U.S. Bank Secrecy Act (31 U.S.C. § 5311 et seq.), as amended, and the regulations promulgated thereunder by the U.S. Department of the Treasury, as such regulations may be amended from time to time.

6.7.3   To provide Lender at any time and from time to time during the term of the Loan with such information as Lender determines to be necessary or appropriate to comply with the Anti-Money Laundering Laws and regulations of any applicable jurisdiction, or to respond to requests for information concerning the identity of Borrower, or any Person controlled by Borrower, from any governmental authority, self-regulatory organization or financial institution in connection with its anti-money laundering compliance procedures, or to update such information.

6.7.4   The representations and warranties set forth in this Section 6.7 shall be deemed repeated and reaffirmed by Borrower as of each date that Lender makes an Advance to Borrower and each date that Borrower makes a payment to Lender under the Note, this Agreement and the other Loan Documents or receives any payment from Lender.  Borrower

agrees promptly to notify Lender in writing should Borrower become aware of any change in the information set forth in these representations.

6.8     CHANGE OF OWNERSHIP.   Borrower shall not cause, permit, or suffer any change, direct or indirect, in Borrower's capital ownership without Lender's prior written consent; provided, however, that membership interests constituting less than twenty-five percent (25%) of Borrower may be transferred without Lender's prior written consent but Borrower shall provide Lender with notice of any such transfers as soon as reasonably practicable following any such transfer; provided, further, that (i) Guarantor shall at all times during the term of the Loan maintain an ownership interest in Borrower and (ii) Mahender Makhijani shall at all times during the term of the Loan remain as sole member of Cantor Group Manager, LLC, the managing member of Borrower.

6.9     CHANGE OF MANAGEMENT.   Borrower shall not cause, permit or suffer any change in its present executive or management personnel.

6.10     COOPERATION.   Borrower shall take any and all action reasonably requested by Lender to carry out the intent of this Agreement.

6.11     SITE VISITS, OBSERVATIONS AND TESTING.   Subject to the terms of the Collateral Loan Documents, Lender and its agents and representatives will have the right at any reasonable time, after giving reasonable notice to Borrower, to enter and visit any Underlying Real Estate Collateral for any Collateral Loan for the purposes of observing such real estate.   No site visit, observation or testing or any report or findings made as a result thereof (a) will result in a waiver of any default of Borrower; (b) impose any liability on Lender; or be a representation or warranty of any kind regarding any Underlying Real Estate Collateral for any Collateral Loan (including its condition or value or compliance with any laws) or any environmental report (including its accuracy or completeness).

6.12     NO TRANSFER OR FURTHER ENCUMBRANCE.   Borrower shall not, without the prior written consent of Lender:

6.12.1 Create, incur, assume, permit or suffer to exist, any mortgage, deed of trust, pledge, lien, hypothecation, charge (fixed or floating), security interest or other encumbrance whatsoever on any Assets of Borrower, including, without limitation, the Collateral Loans, or any interest therein, except as permitted pursuant to this Agreement; provided, however, the foregoing shall not apply to taxes, assessments or governmental charges or levies on property of Borrower, or in respect of a judgment or award against Borrower, if the same shall not at the time be delinquent or thereafter can be paid without penalty, or if Borrower shall have set aside adequate reserves therefor as determined or approved by its certified independent accounting firm, or, if in the case of a judgments or award, execution on the same shall have been effectively stayed pending appeal or review or insured or bonded to the extent of Borrower's liability in respect thereof, and in the case of all of the foregoing, the same are being contested in good faith and by appropriate proceedings.

6.12.2 Permit the transfer, conveyance, hypothecation, or sale of any membership interest or any other interests in Borrower, except as specifically permitted herein; or

5174193v1 | 031205-0110                                      36

6.12.3  Permit the change in the manager or managing member of Borrower.

6.13    NAME, FISCAL YEAR, ACCOUNTING METHOD, AND LINES OF BUSINESS.  Borrower will not change its name, Fiscal Year, or method of accounting. Borrower will not directly or indirectly engage in any business other than the business in which Borrower is engaged on the date of this Agreement, discontinue any existing lines of business that are material to the business or operations of Borrower, or substantially alter its method of doing business.

6.14    LOANS.  Borrower will not directly or indirectly (a) make any loan or advance to any other Person other than advances made in the ordinary course of Borrower's business; (b) purchase or otherwise acquire any capital stock or any securities of any other Person, any limited liability company interest or partnership interest in any other Person, or any warrants or other options or rights to acquire any capital stock or securities of any other Person or any limited liability company interest or partnership interest in any other Person; (c) make any capital contribution to any other Person; (d) otherwise invest in or acquire any interest in any other Person or establish any subsidiaries,  or (e) subordinate any claim against or obligation of any other Person to Borrower to any other indebtedness of such Person.

6.15    INDEBTEDNESS.  Without Lender's prior written consent, Borrower shall not assume, create, incur, or permit to exist any obligations or indebtedness, including, without limitation, loan obligations, in favor of any Person (except trade obligations and normal accruals in the ordinary course of business not yet due and payable), and under no circumstances shall Borrower maintain or establish any credit facilities with any other Person.  Borrower shall not assume, create, incur, or permit to exist any contingent liabilities, including, without limitation, contingent reimbursement obligations under letters of credit.

6.16    TRANSACTIONS WITH AFFILIATES.  Borrower will not enter into, or cause, suffer or permit to exist, any arrangement or contract with any of its Affiliates, including, without limitation, any management contract, unless such transaction is on terms that are no less favorable to Borrower than those that could have been obtained in a comparable transaction on an arms' length basis from a Person that is not an Affiliate.

6.17    MINIMUM DEBT SERVICE COVERAGE RATIO.  At all times during the term of the Loan, Borrower shall maintain a Debt Service Coverage Ratio of not less than 1.25 to 1.00, measured as of the end of each calendar year during the term of the Loan, commencing on the calendar year ending on December 31, 2024.  For purposes of this Section 6.17, Borrower shall provide and shall cause Guarantor to provide to Lender such information and documentation as Lender may reasonably request, certified by Borrower, for the period required by Lender.  As used herein, "Debt Service Coverage Ratio" means the ratio of Borrower's net operating income over Borrower's aggregate debt service payments, all as determined by GAAP.

6.18    MAINTAINING MINIMUM LIQUIDITY.  Guarantor, on an aggregate basis, shall maintain Liquidity at a minimum of $10,000,000.00 tested by Lender on a quarterly basis as of March 31, June 30, September 30 and December 31 of each calendar year, as verified by Lender pursuant to bank and/or brokerage statements furnished to Lender by Guarantor. As used herein, minimum Liquidity will only be measured based on bank or brokerage accounts held

5174193v1 | 031205-0110

personally by Guarantor.  As used herein, "Liquidity" means, for any date of determination, an amount equal to the sum of Guarantor's aggregate (1) verifiable unencumbered and unrestricted cash, and (2) unencumbered and unrestricted cash equivalents (to the extent consisting of readily marketable securities (excluding "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System, restricted stock and stock subject to the provisions of Rule 144 of the Securities and Exchange Commission)), deemed by Lender in its sole and absolute discretion to be liquid.

6.19     MAXIMUM DEBT TO TANGIBLE NET WORTH.  At all times during the term of the Loan,  Borrower shall maintain a ratio of Debt to Tangible Net Worth of not more than 3.25 to 1.00, measured on a quarterly basis as of March 31, June 30, September 30 and December 31 of each calendar year, commencing on the calendar quarter ending March 31, 2024.  As used herein, "Debt" means the sum of Borrower's short term debt plus long term debt plus fixed payment obligations as of the date of measurement.  As used herein, "Tangible Net Worth" means the excess of Borrower's Assets over Liabilities, excluding, however, from the determination thereof: (a) all assets that would be classified as intangible assets under GAAP, including, without limitation, goodwill (whether representing the excess of cost over book value of assets acquired or otherwise), negative goodwill, patents, trademarks, trade names, copyrights, franchises and deferred charges (including, without limitation, unamortized debt discount and expense, organization costs and research and development costs); and (b) net related or subordinated debt owed to creditors other than Lender.

6.20     OPERATING ACCOUNT.

6.20.1 at all times during the term of the loan, Borrower shall maintain the Operating Account with Lender.

6.20.2  Borrower shall (i) use the Operating Account as the sole operating account for Borrower, (ii) deposit into the Operating Account, on a monthly or more frequent basis, any and all Net Income (as defined in GAAP) of Borrower, and (iii) pay from the Operating Account any and all Operating Expenses (as defined in GAAP) of Borrower.

6.21     ENVIRONMENTAL INDEMNITY.   Borrower does and shall at all times indemnify and hold harmless Lender against and from any and all claims, liability, suits, actions, debts, damages, costs, losses, obligations, judgments, charges, and expenses, of every and any nature whatsoever suffered or incurred by Lender in connection with the discharge of hazardous materials or hazardous waste, the presence of any hazardous materials or hazardous waste, or any violation of applicable Laws concerning hazardous materials or hazardous waste regarding or concerning any underlying real property serving as security for any Collateral Loan.

6.22     BENEFICIAL OWNERSHIP.  Borrower agrees to promptly notify Lender (A) of any change in direct or indirect ownership interests in the Borrower as reported in the Beneficial Ownership Certification or other similar certification provided to Lender prior to or in connection with the execution of this Agreement (the "Certification"), or (B) if the individual with significant managerial responsibility identified in the Certification ceases to have that responsibility or if the information reported about that individual changes.  Borrower hereby agrees to provide such information and documentation as Lender may request during the term of

the Loan to confirm or update the continued accuracy of the any information provided in connection with the foregoing.

## ARTICLE 7.
## EVENTS OF DEFAULT

There shall be an "Event of Default" under this Agreement if:

7.1     DEFAULT UNDER LOAN DOCUMENTS.   Borrower shall fail to pay any principal or interest, or both, when due under the terms of the Note; or Borrower shall fail to pay any other amount owing under this Agreement or any of the other Loan Documents when due; or Borrower shall fail to perform or observe any term, covenant, or agreement contained in this Agreement or in any of the other Loan Documents.

7.2     BREACH OF WARRANTY.   Any warranties or representations made or agreed to be made in this Agreement or in any of the other Loan Documents are breached in any material respect or shall prove to be false or misleading in any respect when made.

7.3     LITIGATION AGAINST BORROWER.   Any suit is filed against Borrower, which, if adversely determined against Borrower in a final non-appealable judgment, could substantially impair the ability of Borrower to perform any or all of its obligations under and by virtue of this Agreement or any of the other Loan Documents, unless Borrower's counsel furnishes to Lender its opinion, to the satisfaction of Lender and Lender's counsel, that, in its judgment the suit is essentially without merit.

7.4     ACCELERATION OF OTHER DEBTS.   Borrower does, or omits to do, any act, or any event occurs, as a result of which any material obligation of Borrower, including, but not limited to, the occurrence of any breach or default by Borrower under the terms of any other agreement between Lender and Borrower, whether or not arising hereunder and/or relating to Borrower's ability to perform hereunder, may be declared immediately due and payable by the holder thereof.

7.5     BANKRUPTCY.   Borrower fails to pay its debts as they become due, or makes an assignment for the benefit of its creditors, or admits, in writing, its inability to pay its debts as they become due, or files a petition under any chapter of the Federal Bankruptcy Code or any similar law, now or hereafter existing, or becomes "insolvent" as that term is generally defined under the Federal Bankruptcy Code, or shall in any involuntary bankruptcy case commenced against it file an answer admitting insolvency or inability to pay its debts as they become due, or fails to obtain a dismissal of such case within sixty (60) calendar days after its commencement or convert the case from one chapter of the Federal Bankruptcy Code to another chapter, or be the subject of an order for relief in such bankruptcy case, or be adjudged a bankrupt or insolvent, or has a custodian, trustee, or receiver appointed for, or has any court take jurisdiction of, its properties, or any part thereof, in any voluntary or involuntary proceeding, including those for the purpose of reorganization, arrangement, dissolution, or liquidation, and such custodian, trustee, or receiver shall not be discharged, or such jurisdiction shall not be relinquished, vacated, or stayed within sixty (60) days after the appointment.

5174193v1 | 031205-0110                    39

7.6     BORROWER STATUS.  Borrower is liquidated, dissolved, or fails to maintain its status as a going concern.

7.7     ATTACHMENT.  Any proceeding is brought to make any part of the Lender's commitment to make the Advances subject or liable to attachment or levy by any creditor of Borrower.

7.8     MISREPRESENTATION AND/OR NON-DISCLOSURE.  Borrower has made certain statements and disclosures in order to induce Lender to make the Loan and enter into this Agreement, and, if  Borrower has made material misrepresentations or failed to disclose any material fact, Lender may treat such misrepresentation or omission as a breach of this Agreement.

7.9     FINANCIAL CONDITION.  There is a material adverse change in Borrower's or Guarantor's financial condition.

7.10    CROSS DEFAULT; OTHER OBLIGATIONS. Borrower or Guarantor commits a breach or default in the payment or performance of any other obligation of Borrower or Guarantor, or breaches any warranty or representation of Borrower or Guarantor, under the provisions of any other instrument, agreement, guaranty, or document evidencing, supporting, or securing any other loan or credit extended by Lender, or by any Affiliate of Lender, to Borrower, Guarantor, or to any Affiliate of Borrower or Guarantor, including, but not limited to, any and all term loans, revolving credits, or lines of credit extended from time to time to Borrower or Guarantor (or any Person signing this Agreement on behalf of Borrower), or any other Person with which Borrower or Guarantor is affiliated.

7.11    GUARANTOR.  Guarantor defaults under the Guaranty or revokes or attempts to revoke the Guaranty.

## ARTICLE 8.
## REMEDIES

Upon an Event of Default Lender shall have the following remedies:

8.1     CEASE PAYMENT AND/OR ACCELERATE.  Upon, or at any time after, the occurrence of an Event of Default or upon the occurrence of a default in any other joint and/or several obligation or obligations of Borrower to Lender, Lender shall have no obligation to make any further Advances, all sums disbursed or advanced by Lender and all accrued and unpaid interest thereon shall, at the option of Lender, become immediately due and payable, and Lender shall be released from any and all obligations to Borrower under the terms of this Agreement.

8.2     ENFORCEMENT OF RIGHTS. Upon, or at any time after, the occurrence of an Event of Default, Lender may enforce any and all rights and remedies under the Loan Documents, and all other documents delivered in connection therewith and against any or all Collateral and may pursue all rights and remedies available at Law or in equity.  In addition to all the rights and remedies of a secured party under the UCC, Lender shall have the right, at any time and without demand of performance or other demand, advertisement or notice of any kind (except the notice specified below of time and place of public or private sale) to or upon

5174193v1 | 031205-0110                                 40

Borrower or any other person (all and each of which demand, advertisements and/or notices are hereby expressly waived to the extent permitted by law), to proceed immediately to collect, redeem, receive, appropriate, sell, or otherwise dispose of and deliver the Collateral or any part thereof in one or more lots at public or private sale or sales at Lender's offices or elsewhere at such prices and on such terms as Lender may deem commercially reasonable.  The foregoing disposition(s) must be for cash or on credit or for future delivery without assumption of any credit risk by Lender, with Lender having the right to purchase all or any part of said Collateral so sold at any such sale or sales, public or private, free of any right or equity of redemption in Borrower, which right or equity is hereby expressly waived or released by Borrower.  The proceeds of any such collection, redemption, recovery, receipt, appropriation, realization, sale or other disposition, after deducting all costs and expenses of every kind incurred relative thereto or incidental to the care, safekeeping or otherwise of any and all Collateral or in any way relating to the rights of Lender hereunder (including, without limitation, reasonable attorneys' fees and legal expenses, including, without limitation, an estimate of the allocated cost of Lender's in house counsel and legal staff) shall be applied first to the satisfaction of the Obligations (in such order as Lender may elect and whether or not due) and then to the payment of any amounts required by applicable law, including Section 9610 of the UCC.  Borrower shall be liable to Lender for the payment on demand of all such costs and expenses, together with interest at the default rate set forth in the Note, together with any attorneys' fees if placed with an attorney for collection or enforcement.  Borrower agrees that ten (10) days' prior notice by Lender of the date after which a private sale may take place or a public auction may be held is reasonable notification of such matters and shall be deemed commercially reasonable under the UCC.

8.3    RIGHTS AND REMEDIES NON-EXCLUSIVE. In addition to the specific rights and remedies hereinabove mentioned, Lender shall have the right to avail itself of any other rights or remedies to which it may be entitled, at Law or in equity, including, but not limited to, the right to have a receiver appointed over Borrower and/or its assets, the right to realize upon any or all of its security, and to do so in any order.  Furthermore, the rights and remedies set forth above are not exclusive, and Lender may avail itself of any individual right or remedy set forth in this Agreement, or available at Law or in equity, without utilizing any other right or remedy.

## ARTICLE 9.
## GENERAL CONDITIONS AND MISCELLANEOUS

9.1    NONLIABILITY OF LENDER.   Borrower acknowledges and agrees that by accepting or approving anything required to be observed, performed, fulfilled, or given to Lender pursuant to this Agreement or the other Loan Documents, including any certificate, Financial Statement, appraisal or insurance policy, Lender shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision, or condition thereof, and such acceptance or approval thereof shall not be or constitute any warranty or representation to anyone with respect thereto by Lender.

9.2    NO THIRD PARTIES BENEFITTED.  This Agreement is made for the purpose of defining and setting forth certain obligations, rights, and duties of Borrower and Lender in connection with the Loan.  It shall be deemed a supplement to each Note and the other Loan Documents, and shall not be construed as a modification of any Note or other Loan Documents,

except as provided herein.  It is made for the sole protection of Borrower and Lender, and Lender's successors and assigns.  No other person shall have any rights of any nature hereunder or by reason hereof or the right to rely hereon.

9.3    TIME IS OF THE ESSENCE.  Time is of the essence of this Agreement and of each and every provision hereof.  The waiver by Lender of any breach hereof shall not be deemed, nor shall the same constitute, a waiver of any subsequent breach or breaches.

9.4    NOTICES.  All notices, requests, demands, directions, and other communications provided for hereunder and under any other Loan Document (a "Notice"), must be in writing and must be mailed, personally delivered or sent by facsimile to the appropriate party at its respective address set forth below or, as to any party, at any other address as may be designated by it in a written notice sent to the other parties in accordance with this Section.

Any notice given by facsimile must be confirmed within forty-eight (48) hours by letter mailed or delivered to the appropriate party at its respective address.  If any notice is given by mail, it will be effective three (3) calendar days after being deposited in the mails with first- class or air mail postage prepaid; if given by facsimile when sent; or if given by personal delivery, when delivered.

Such notices will be given to the following:

> To Lender:    CALIFORNIA BANK & TRUST
> 1900 Main Street, Suite 200
> Irvine, California 92614
> Attention: Matt Bullock, Executive Vice President
> Facsimile: (949) 862-7333

> To Borrower:  CANTOR GROUP IV, LLC
> 520 Newport Center Drive, Suite 480
> Newport Beach, CA 92660
> Attention:  Mahender Makhijani

9.5    USA PATRIOT ACT NOTICE.  Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account or obtains a loan.  Lender will ask for Borrower's legal name, address, tax ID number or social security number and other identifying information.  Lender may also ask for additional information or documentation or take other actions reasonably necessary to verify the identity of Borrower, Guarantor or other related persons.

9.6    INDEMNITY BY BORROWER.  Borrower hereby indemnifies and agrees to hold Lender and its directors, officers, agents, attorneys, and employees (individually and collectively, the "Indemnitee(s)") harmless from and against:

9.6.1    Any and all claims, demands, actions, or causes of action that are asserted against any Indemnitee by any Person if the claim, demand, action, or cause of action, directly or

5174193v1 | 031205-0110                    42

indirectly, relates to a claim, demand, action, or cause of action that the Person has or asserts against Borrower; and

9.6.2   Any and all liabilities, losses, costs, or expenses (including court costs and reasonable attorneys' fees) that any Indemnitee suffers or incurs as a result of the assertion of any claim, demand, action, or cause of action specified in this Section 8.6.

9.7   CHANGE IN LAWS.   In the event of the enactment, after the date of this Agreement, of any Laws:  (a) deducting from the value of property for the purpose of taxation any lien or security interest thereon; (b) imposing upon Lender the payment of the whole or any part of the taxes or assessments or charges or liens herein required to be paid by Borrower; (c) changing in any way the Laws relating to the taxation of deeds of trust or mortgages or security agreements, or debts secured by deeds of trust or mortgages or security agreements, or the interest of the mortgagee or secured party in the property covered thereby; or (d) changing the manner of collection of such taxes; then, to the extent any of the foregoing may affect the Collateral or the indebtedness secured thereby or Lender, then, and in any such event, Borrower, upon demand by Lender, shall pay such taxes, assessments, charges, or liens, or reimburse Lender therefor.  If Borrower shall be prohibited from paying such tax or from reimbursing Lender for the amount thereof, Borrower shall execute a modification to the Loan Documents and the Note, which modification shall increase the interest rate payable pursuant to the Note so as to permit Lender to maintain its yield as if such tax had not been imposed.  If Borrower shall be prohibited from executing the above-referenced modifications, Lender may, in Lender's sole discretion, declare the principal of all amounts disbursed and owing under the Note, this Agreement, and the other Loan Documents (including all obligations secured by the Loan Documents) and all other indebtedness of Borrower to Lender, together with interest thereon, to be forthwith due and payable, regardless of any other specified maturity or due date.

9.8   POWER OF ATTORNEY.   Borrower does hereby irrevocably appoint, designate, empower, and authorize Lender, as Borrower's agent, under power of attorney, coupled with an interest, to sign and file for record any financing statements, notices of completion, notices of cessation of labor, or any other notice or written document that it may deem necessary to file or record to protect Lender's interests.

9.9   NONRESPONSIBILITY.   Lender shall in no way be liable for any acts or omissions of Borrower or Borrower's agents or employees.

9.10   TIME IS OF THE ESSENCE.   Time is of the essence of this Agreement and of each and every provision hereof.  The waiver by Lender of any breach or breaches hereof shall not be deemed, nor shall the same constitute, a waiver of any subsequent breach or breaches.

9.11   BINDING EFFECTS; ASSIGNMENT.   This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns, except that Borrower may not assign its rights hereunder or any interest herein without the prior written consent of Lender.  Lender shall have the right to assign its rights under this Agreement and to grant participations in the Loan to others, but all waivers or abridgements of Borrower's obligations that may be granted from time to time by Lender shall be binding upon such assignees or participants, but any such waivers or agreements, to be effective, must be in writing

5174193v1 | 031205-0110                         43

and signed by Lender.  In that regard, Borrower agrees that Lender may disclose to each prospective and actual transferee or participant any and all documents relating to the Loan and Borrower.  Borrower shall, promptly upon demand, provide Lender or any such purchaser or participant, one or more written statements confirming Borrower's indebtedness to Lender and all obligations in connection with the Loan, including the existence of any default thereunder.

9.12    EXECUTION IN COUNTERPARTS.  This Agreement and any other Loan Documents, except the Note, may be executed in any number of counterparts, and any party hereto or thereto may execute any counterpart, each of which, when executed and delivered, will be deemed to be an original, and all of which counterparts of this Agreement or any other Loan Document, as the case may be, taken together will be deemed to be but one and the same instrument.  The execution of this Agreement or any other Loan Document by any party or parties hereto or thereto will not become effective until counterparts hereof or thereof, as the case may be, have been executed by all the parties hereto or thereto.

9.13    INTEGRATION; AMENDMENTS; CONSENTS.  This Agreement, together with the documents referred to herein constitutes the entire agreement of the parties touching upon the subject matter hereof, and supersedes any prior negotiations or agreements on such subject matter.  No amendment, modification, or supplement of any provision of this Agreement or any of the other Loan Documents shall be effective unless in writing, signed by Lender and Borrower; and no waiver of any of Borrower's obligations under this Agreement or any of the other Loan Documents or consent to any departure by Borrower therefrom shall be effective unless in writing, signed by Lender, and then only in the specific instance and for the specific purpose given.

9.14    NEUTRAL INTERPRETATION.  This Agreement is the product of the negotiations between the parties, and in the interpretation and/or enforcement hereof is not to be interpreted more strongly in favor of one party or the other.

9.15    COSTS, EXPENSES, AND TAXES.  Borrower shall pay to Lender, on demand:

9.15.1 All reasonable attorneys' fees and out-of-pocket expenses incurred by Lender in connection with the negotiation, preparation, execution, delivery, and administration of this Agreement and any other Loan Document and any matter related thereto, including, but not limited to, any and all Appraisals of any Underlying Collateral, and any and all other appraisals, inspections, audits and/or examinations of or relating to any Collateral;

9.15.2 The costs and expenses of Lender in connection with the enforcement of this Agreement and any other Loan Document and any matter related thereto, including the out-of-pocket expenses and reasonable attorney's fees of any legal counsel, independent public accountants, and other outside experts retained by Lender and including all costs and expenses of enforcing any judgment or prosecuting any appeal of any judgment, order or award arising out of or in any way related to the Loan, this Agreement, or the Loan Documents; and

9.15.3 All costs, expenses, fees, premiums, and other charges relating to or arising from the Loan Documents or any transactions contemplated thereby or the compliance with any of the terms and conditions thereof, including, but not limited to, recording fees, filing

5174193v1 | 031205-0110                                    44

fees, credit report fees, release or reconveyance fees, title insurance premiums, audit fees and appraisal fees.

All sums paid or expended by Lender under the terms of this Agreement shall be considered to be, and shall be, a part of the Loan.  All such sums, together with all amounts to be paid by Borrower pursuant to this Agreement, shall bear interest from the date of expenditure at the rate provided in the Note, shall be secured by the Loan Documents, and shall be immediately due and payable by Borrower upon demand.

9.16   SURVIVAL OF REPRESENTATIONS AND WARRANTIES.   All representations and warranties of Borrower contained herein or in any and all other Loan Documents shall survive the making of the Loan and the execution and delivery of the Note, and are material and have been or will be relied upon by Lender, notwithstanding any investigation made by Lender or on behalf of Lender.  For the purpose of this Agreement, all statements contained in any certificate, agreement, financial statement, appraisal or other writing delivered by or on behalf of Borrower pursuant hereto or to any other Loan Document or in connection with the transactions contemplated hereby or thereby shall be deemed to be representations and warranties of Borrower contained herein or in the other Loan Documents, as the case may be.

9.17   FURTHER ASSURANCES.   Borrower shall, at its sole expense and without expense to Lender, do, execute, and deliver such further acts and documents as Lender from time to time may reasonably require for the purpose of assuring and confirming unto Lender the rights hereby created or intended, now or hereafter so to be, or for carrying out the intention or facilitating the performance of the terms of any Loan Document, or for assuring the validity of any security interest.

9.18   GOVERNING LAW.   The Loan shall be deemed to have been made in California, and the Loan Documents shall be governed by and construed and enforced in accordance with the Laws of the State of California.  If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts, state or federal, of Los Angeles County, California.

9.19   SEVERABILITY OF PROVISIONS.  Any provision in any Loan Document that is held to be inoperative, unenforceable, or invalid shall be inoperative, unenforceable, or invalid without affecting the remaining provisions, and to this end the provisions of all Loan Documents are declared to be severable.

9.20   JOINT AND SEVERAL OBLIGATIONS.  If this Agreement is executed by more than one Person as Borrower, the obligations of each of such Persons hereunder shall be joint and several obligations.

9.21   DISPUTE RESOLUTION PROVISION. **This Dispute Resolution Provision contains a jury waiver, a class action waiver, and an arbitration clause (or judicial reference agreement, as applicable), set out in three Sections.  READ IT CAREFULLY.**

9.21.1 General Provisions Governing All Disputes.

5174193v1 | 031205-0110                          45

(a)      This Dispute Resolution Provision shall supersede and replace any prior "Jury Waiver," "Judicial Reference," "Class Action Waiver," "Arbitration," "Dispute Resolution," or similar alternative dispute agreement or provision between or among the parties.

(b)      As used herein, the word "Dispute" includes, without limitation, any claim by either party against the other party related to this Agreement, any Loan Document, and the Loan evidenced hereby. In addition, **"Dispute" also includes any claim by either party against the other party <u>regarding any other agreement or business relationship between any of them, whether or not related to the Loan or other subject matter of this Agreement.</u>** "Dispute" includes, but is not limited to, matters arising from or relating to a deposit account, an application for or denial of credit, warranties and representations made by a party, the adequacy of a party's disclosures, enforcement of any and all of the obligations a party hereto may have to another party, compliance with applicable laws and/or regulations, performance or services provided under any agreement by a party, including without limitation disputes based on or arising from any alleged tort or matters involving the employees, officers, agents, affiliates, or assigns of a party hereto.

(c)      If a third party is a party to a Dispute (such as a credit reporting agency, merchant accepting a credit card, junior lienholder or title company), each party hereto agrees to consent to including that third party in any arbitration or judicial reference proceeding for resolving the Dispute with that party.

9.21.2 <u>Jury Trial Waiver</u>. Each party **<u>waives their respective rights to a trial before a jury in connection with any Dispute</u>**, and all **<u>Disputes shall be resolved by a judge sitting without a jury</u>**.   If a court determines that this jury trial waiver is not enforceable for any reason, then **at any time prior to trial of the Dispute, but not later than 30 days after entry of the order determining this provision is unenforceable**, any party shall be entitled to move the court for an order, as applicable: (A) compelling arbitration and staying or dismissing such litigation pending arbitration ("Arbitration Order") under Section 2 hereof, or (B) staying such litigation and compelling judicial reference under Section 9.21.5 hereof.

9.21.3 <u>Class Action Waiver</u>**.**  If permitted by applicable law, **<u>each party waives the right to litigate in court or an arbitration proceeding any Dispute as a class action, either as a member of a class or as a representative, or to act as a private attorney general.</u>**

9.21.4 <u>Judicial Reference if Jury Trial Waiver is Unenforcable</u>. If (but only if) a Dispute is filed in a state or federal court located within the state of California, and said court determines for any reason that the jury trial waiver in this Dispute Resolution Provision is not enforceable with respect to that Dispute, then any party hereto may require that Dispute be resolved by judicial reference in accordance with California Code of Civil Procedure, Sections 638, et seq., including without limitation whether the Dispute is subject to a judicial reference proceeding. **<u>By agreeing to resolve Disputes by judicial reference, each party is giving up any right that party may have to a jury trial</u>**. The referee shall be a retired judge, agreed upon by the parties, from either the American Arbitration Association (AAA) or Judicial Arbitration and Mediation Service, Inc. (JAMS). If the parties cannot agree on the referee, the party who initially selected the reference procedure shall request a panel of ten retired judges from either AAA or JAMS, and the court shall select the referee from that panel. (If AAA and JAMS are

unavailable to provide this service, the court may select a referee by such other procedures as are used by that court.) The referee shall be appointed to sit with all of the powers provided by law, including the power to hear and determine any or all of the issues in the proceeding, whether of fact or of law, and to report a statement of decision. The parties agree that time is of the essence in conducting the judicial reference proceeding set forth herein. The costs of the judicial reference proceeding, including the fee for the court reporter, shall be borne equally by the parties as the costs are incurred, unless otherwise awarded by the referee. The referee shall hear all pre-trial and post-trial matters (including without limitation requests for equitable relief), prepare a statement of decision with written findings of fact and conclusions of law, and apportion costs as appropriate. The referee shall be empowered to enter equitable relief as well as legal relief, provide all temporary or provisional remedies, enter equitable orders that are binding on the parties and rule on any motion that would be authorized in a trial, including without limitation motions for summary adjudication. Only for this Section 9.21.4, (i) "Dispute" includes matters regarding the validity, enforceability, meaning, or scope of this Section, and (ii) class action claims brought by either party as a class representative on behalf of others and claims by a class representative on either party's behalf as a class member. Judgment upon the award shall be entered in the court in which such proceeding was commenced and all parties shall have full rights of appeal. This provision will not be deemed to limit or constrain Lender's right of offset, to obtain provisional or ancillary remedies, to interplead funds in the event of a dispute, to exercise any security interest or lien Lender may hold in property or to comply with legal process involving accounts or other property held by Lender.

Nothing herein shall preclude a party from moving (prior to the court ordering judicial reference) to dismiss, stay or transfer the suit to a forum outside California on grounds that California is an improper, inconvenient or less suitable venue. If such motion is granted, this Section 9.21.4 shall not apply to any proceedings in the new forum.

This Section 9.21.4 may be invoked only with regard to Disputes filed in state or federal courts located in the State of California. In no event shall the provisions in this Section 2 diminish the force or effect of any venue selection or jurisdiction provision in this Agreement or any other Loan Document.

9.21.5 <u>Reliance</u>. Each party (i) certifies that no one has represented to such party that the other party would not seek to enforce a jury waiver, class action waiver, arbitration provision or judicial reference provision in the event of suit, and (ii) acknowledges that it and the other party have been induced to enter into this Agreement by, among other things, material reliance upon the mutual waivers, agreements, and certifications in the four Sections of this DISPUTE RESOLUTION PROVISION.

9.22 <u>DOCUMENT IMAGING</u>. Lender and Borrower shall be entitled, each in its sole discretion, to image or make copies of all or any selection of the agreements, instruments, documents and items and records governing, arising from or relating to any of Borrower's loans, including, without limitation, this document and the other Loan Documents, and either party may destroy or archive the paper originals. The parties hereto (i) waive any right to insist or require that the other party produce paper originals, (ii) agree that such images shall be accorded the same force and effect as the paper originals, (iii) agree that each party is entitled to use such images in lieu of destroyed or archived originals for any purpose, including as admissible

47

evidence in any demand, presentment or other proceedings, and (iv) further agree that any executed facsimile (faxed), scanned or other imaged copy of this document or any Loan Document shall be deemed to be of the same force and effect as the originally manually executed document.

9.23    ORIGINALLY EXECUTED DOCUMENTS.  As an express condition to Lender making the Loan and any Loan advance(s) to Borrower based upon Lender's receipt of fully-executed imaged copies of the Loan Documents, Borrower shall deliver to Lender fully-executed Loan Documents with original hand-written signatures (i.e., wet signatures) of all Loan Parties on or before 30 days from the date of this Agreement, and Borrower's failure to do so on or before such date shall constitute an Event of Default under this Agreement and the Loan Documents.  Notwithstanding the foregoing, Borrower and Lender agree that the this Agreement and the Loan Documents may be signed and transmitted by electronic mail of a .PDF document and thereafter maintained in imaged or electronic form, and that such imaged or electronic record shall be valid and effective to bind the party so signing as a paper copy bearing such party's hand-written signature. Borrower and Lender further agree that the signatures appearing on this Agreement and the Loan Documents (whether in imaged or other electronic format) shall be treated, for purpose of validity, enforceability and admissibility, the same as hand-written signatures. This Agreement and the Loan Documents may be executed in one or more counterparts, each of which shall be an original, and all of which together shall constitute a single instrument.

9.24    BENEFICIAL OWNERSHIP.   Notwithstanding anything in the foregoing Agreement, Borrower agrees to promptly notify Lender (A) of any change in direct or indirect ownership interests in the Borrower as reported in any beneficial ownership certification provided to Lender in connection with the execution of this Agreement or the Loan (the "Certification"), or (B) if the individual with significant managerial responsibility identified in the Certification ceases to have that responsibility or if the information reported about that individual changes.  Borrower hereby agrees to provide such information and documentation as Lender may request during the term of the Loan to confirm or update the continued accuracy of the any information provided in connection with the foregoing.

9.25    UNLAWFUL USE MARIJUANA, CONTROLLED SUBSTANCES AND PROHIBITED ACTIVITIES.

9.25.1 The undersigned shall not use, occupy, or permit the use or occupancy of any property or collateral by the undersigned or any lessee, tenant, licensee, permitee, agent, or any other person in any manner that would be a violation of any applicable federal, state or local law or regulation, regardless of whether such use or occupancy is lawful under any conflicting law, including without limitation any law relating to the use, sale, possession, cultivation, manufacture, distribution or marketing of any controlled substances or other contraband (whether for commercial, medical, or personal purposes), or any law relating to the use or distribution of marijuana (collectively, "Prohibited Activities").  Any lease, license, sublease or other agreement for use, occupancy or possession of any property or collateral (collectively a "lease") with any third person ("lessee") shall expressly prohibit the lessee from engaging or permitting others to engage in any Prohibited Activities.  The undersigned shall upon demand provide Lender with a written statement setting forth its compliance with this section and stating whether any

Prohibited Activities are or may be occurring in, on or around the collateral. If the undersigned becomes aware that any lessee is likely engaged in any Prohibited Activities, the undersigned shall, in compliance with applicable law, terminate the applicable lease and take all actions permitted by law to discontinue such activities. The undersigned shall keep Lender fully advised of its actions and plans to comply with this section and to prevent Prohibited Activities.

9.25.2 This section is a material consideration and inducement upon which Lender relies in extending credit and other financial accommodations to the undersigned. Failure by the undersigned to comply with this section shall constitute a material non-curable Event of Default. Notwithstanding anything in this agreement, the Note or Loan Documents regarding rights to cure Events of Default, Lender is entitled upon breach of this section to immediately exercise any and all remedies under this agreement, the Note the Loan Documents, and by law.

9.25.3 In addition and not by way of limitation, the undersigned shall indemnify, defend and hold Lender harmless from and against any loss, claim, damage, liability, fine, penalty, cost or expense (including attorneys' fees and expenses) arising from, out of or related to any Prohibited Activities at or on any collateral, Prohibited Activities by the undersigned or any lessee of any collateral, or the undersigned's breach, violation, or failure to enforce or comply with any of the covenants set forth in this section. This indemnity includes, without limitation any claim by any governmental entity or agency, any lessee, or any third person, including any governmental action for seizure or forfeiture of any collateral (with or without compensation to Lender, and whether or not collateral is taken free of or subject to Lender's lien or security interest). As used in this section, the word "undersigned" does not include Lender or any individual signing on behalf of Lender."

9.26    GENERAL RELEASE.

9.26.1 Except as to any obligations imposed upon Lender as provided herein, Borrower, on behalf of itself, its respective successors and assigns, and each of them, does each hereby forever relieve, release, acquit and discharge Lender, and its predecessors, successors and assigns, and its past and present attorneys, accountants, insurers, representatives, affiliates, partners, subsidiaries, officers, employees, directors, and shareholders, and each of them (collectively, the "Released Parties"), from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, costs and expenses (including, but not limited to, attorneys' fees), damages, injuries, actions and causes of action, of whatever kind or nature, whether legal or equitable, known or unknown, suspected or unsuspected, contingent or fixed, which Borrower now owns or holds or has at any time heretofore owned or held or may at any time hereafter own or hold against the Released Parties, or any of them, by reason of any acts, facts, transactions or any circumstances whatsoever occurring or existing through the date of this Agreement, including, but not limited to, those based upon, arising out of, appertaining to, or in connection with the Recitals above, the Loan, the Prior Agreement, the Loan Documents, the facts pertaining to this Agreement, any collateral heretofore granted to Lender or granted in connection herewith, or to any other obligations of Borrower to Lender.

9.26.2 As to the matters released herein, Borrower expressly waives any and all rights under Section 1542 of the Civil Code of the State of California, which provides as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

9.26.3 Borrower expressly waives and releases any right or benefit which it has or may have under Section 1542 of the Civil Code of the State of California, and any similar law of any state, territory, commonwealth or possession of the United States, or the United States, to the full extent that they may waive all such rights and benefits pertaining to the matters released herein. In connection with such waiver and relinquishment, Borrower acknowledges that it is aware that it may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true. Nevertheless, it is the intention of Borrower through this Agreement to fully, finally and forever release all such matters, and all claims relative thereto, which do now exist, may exist, or heretofore have existed. In furtherance of such intention, the release herein given shall be and remain in effect as a full and complete release of such matters notwithstanding the discovery or existence of any such additional or different claims or facts relative thereto.

9.26.4 In entering into the release provided for in this Agreement, Borrower recognizes that no facts or representations are ever absolutely certain; accordingly, Borrower assumes the risk of any misrepresentation, concealment or mistake, and if Borrower should subsequently discover that any fact that it relied upon in entering into these releases was untrue, or that any fact was concealed from it, or that any understanding of the facts or of the law was incorrect, Borrower shall not be entitled to set aside these releases by reason thereof, regardless of any claims of fraud, misrepresentation, promise made without the intention of performing it, concealment of fact, mistake of fact or law, or any other circumstances whatsoever.

9.26.5 Borrower is the sole and lawful owner of all right, title and interest in and to every claim and other matter which it purports to release herein, and it has not heretofore assigned or transferred, or purported to assign or transfer to any person or any entity claims or other matters herein released. Borrower shall indemnify, defend and hold Lender, and each of the other Released Parties, harmless from and against any claims, liabilities, actions, causes of action, demands, injuries, costs, and expenses (including, but not limited to, attorneys' fees), based upon or arising in connection with any such prior assignment or transfer, or any such purported assignment or transfer, or any claims or other matters released herein.

[Signatures to follow]

IN WITNESS WHEREOF, Borrower and Lender have hereunto caused this Agreement to be executed on the date first above written.

BORROWER:

CANTOR GROUP IV LLC,
a Delaware limited liability company

By:  Cantor Group Manager, LLC,
     a Delaware limited liability company
Its:  Managing Member


     By: _____
     Name: Deba Shyam
     Its:     Manager


LENDER:

ZIONS BANCORPORATION, N.A.,
dba California Bank & Trust


By:     _____
Name:   Matt Bullock
Title:    EVP

EXHIBIT A

REQUEST FOR ADVANCE

[Please see attached]

## REQUEST FOR ADVANCE

Date: _____

To:    ZIONS BANCORPORATION, N.A., dba California Bank & Trust
        1900 Von Karman, Ste 200
        Irvine, CA 92614
        Attention: Matt Bullock, Executive Vice President

**From:**    CANTOR GROUP IV LLC

Dear Mr. Bullock,

1. Reference is made to that certain Amended and Restated Business Loan and Security Agreement (Revolving Line of Credit) dated as of March 25, 2024 ("Loan Agreement"), executed by ZIONS BANCORPORATION, N.A., dba California Bank & Trust ("Lender"), and CANTOR GROUP IV LLC, a Delaware limited liability company ("Borrower"), and that certain Amended and Restated Promissory Note dated March 25, 2024, made by Borrower and payable to the order of Lender ("Note"). The Loan Agreement and Note evidence a revolving line of credit (the "Loan") heretofore made by Lender to Borrower in the maximum principal amount of $30,000,000.00. Capitalized terms not otherwise defined herein shall have the meanings set forth in the Loan Agreement and other Loan Documents.

2. We hereby request that Lender make an Advance to Borrower under, and pursuant to, the Loan Agreement and the other Loan Documents, described as follows:

| Details of Advance | |
| --- | --- |
| AMOUNT: | US $_____.00 |
| DATE OF ADVANCE REQUEST: | _____ |
| PURPOSE: | The Advance requested hereby is for the purpose of financing the acquisition of the Collateral Loans listed in Exhibit "A" attached hereto and incorporated herein by this reference. |

5174193v1 | 031205-0110        53

3.   We hereby certify that as of the date hereof and the Date of Advance set forth above (a) all conditions precedent in Section 4 of the Loan Agreement have been satisfied (or Lender has otherwise agreed to waive the same in writing with respect to the Advance being requested hereby), (b) all instruments and documents provided to Lender in connection with the Advance being requested hereby are true and correct in all material respects, and (c) the individual executing this Request For Advance is fully authorized and empowered to do so on behalf of Borrower.

Sincerely,

CANTOR GROUP IV LLC,
a Delaware limited liability company

By:    Cantor Group Manager, LLC,
       a Delaware limited liability company
       Its:   Managing Member

       By: _____
       Name: Deba Shyam
       Its:      Manager

5174193v1 | 031205-0110                         54

**EXHIBIT "A" to Request for Advance**

EXHIBIT B

**ALLONGE**

      This Allonge and Endorsement is attached to and made a physical part of that certain Promissory Note dated _____, ____, in the principal amount of _____ ($_____), made by _____, _____ ("Maker") in favor of _____ (the "Note").  The undersigned is the holder and owner of the Note.

      The Note is hereby endorsed as follows:

      "Pay to the order of ZIONS BANCORPORATION, N.A., dba California Bank & Trust, pursuant to the Amended and Restated Business Loan and Security Agreement (Revolving Line of Credit), dated as of March 25, 2024 as the same may be modified, amended or supplemented from time to time."

Loan Number (if applicable):_____


Dated:  _____


                 CANTOR GROUP IV LLC,
                 a Delaware limited liability company

                 By:  Cantor Group Manager, LLC,
                     a Delaware limited liability company
                 Its:  Managing Member

                     By: _____
                     Name: Deba Shyam
                     Its:     Manager

EXHIBIT C

COLLATERAL ASSIGNMENT OF MORTGAGE [DEED OF TRUST]

[See attached]

5174193v1 | 031205-0110 57

RECORDING REQUESTED BY
AND WHEN RECORDED, MAIL TO:

ZIONS BANCORPORATION, N.A.,
dba California Bank & Trust
1900 Von Karman, Ste 200
Irvine, CA 92614
Attention: Matt Bullock, Executive Vice President


Assessor's Parcel No(s).: _____

Loan Number (if applicable):_____

---

## COLLATERAL ASSIGNMENT OF MORTGAGE [DEED OF TRUST] AND RELATED LOAN DOCUMENTS


THIS COLLATERAL ASSIGNMENT OF MORTGAGE [DEED OF TRUST[1]] AND RELATED LOAN DOCUMENTS (this "Assignment") is made as of _____, ____, by CANTOR GROUP IV LLC, a Delaware limited liability company("Assignor" or "Borrower"), to ZIONS BANCORPORATION, N.A., dba California Bank & Trust ("Assignee").

1.      Granting Clause.  For value received, Assignor hereby grants, conveys, assigns and transfers to Assignee, for security purposes only, all of Assignor's right, title and interest in and to all beneficial interest under that certain mortgage dated _____, ____, by _____, as grantor ("Collateral Obligor"), [to _____, as trustee,] for the benefit of Assignor, as beneficiary, which was recorded on _____, ____, as Instrument No. _____, in the Official Records of _____ County, _____, and any and all amendments, modifications, renewals, supplements, extension or revisions thereof (the "Mortgage/Deed of Trust"), together with the promissory note and other agreements, instruments and documents relating thereto (collectively referred to hereinafter as the "Pledged Documents").

2.      Secured Obligations.  This Assignment is given for the purpose of securing payment and performance of the obligations of Assignor under that certain Amended and Restated Promissory Note executed by Assignor, among others, and payable to the order of Assignee dated as of March 25, 2024 in the maximum stated principal sum of Thirty Million and No/100 Dollars ($30,000,000.00) (the "Note"), that certain Amended and Restated Business Loan and Security Agreement (Revolving Line of Credit) executed by Assignor and Assignee dated March 25, 2024 ("Loan Agreement"), and all other agreements, instruments and documents relating thereto (collectively referred to hereinafter as the "Loan Documents").

---

[1] Revise if underlying security instrument is deed of trust.


5174193v1 | 031205-0110                     58

3.      Enforcement.  Assignee may exercise its rights under the Loan Agreement and this Assignment in accordance with their terms, including, without limitation, the right to succeed to all of Assignor's right, title and interest in and to all beneficial interest under the Mortgage/Deed of Trust and the Pledged Documents.

4.      Property Encumbered.  The real property encumbered by the Mortgage/Deed of Trust is described in Exhibit A attached hereto and incorporated herein by this reference.

5.      Amendments.  This Assignment may not be amended, modified or waived except with the written consent of Assignor and Assignee.

6.      Termination.  This Assignment shall terminate upon (i) the indefeasible payment in full of the indebtedness owing to Assignee under the Note, the Loan Agreement and the Loan Documents, and (ii) the termination of any and all obligations of Assignee under the Note, the Loan Agreement or any Loan Documents to make any advances or disbursements of loan proceeds or other amounts to Assignor, unless prior to the termination of the Loan Agreement, Assignee has succeeded to beneficiary's interest under the Mortgage/Deed of Trust.

7.      Attorneys' Fees.   In the event of any dispute or litigation concerning the enforcement or validity of this Assignment, the losing party shall pay all charges, costs and expenses (including attorneys' fees) incurred by the prevailing party whether or not any action or proceeding is brought relative to such dispute and whether or not such litigation is prosecuted to judgment, and including post-judgment fees and costs.

8.      Successors and Assigns.  The terms of this Assignment shall bind and inure to the benefit of the respective successors and assigns of the parties hereto.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Assignor has caused this Assignment to be duly executed and delivered by its officer thereunto duly authorized as of the date first above written.

**ASSIGNOR:**

CANTOR GROUP IV LLC,
a Delaware limited liability company

By: Cantor Group Manager, LLC,
     a Delaware limited liability company
Its: Managing Member

    By: _____
    Name: Deba Shyam
    Its:    Manager

5174193v1 | 031205-0110

60

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of _____ )
County of _____ )


On _____, before me, _____, a Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Arizona that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.



Signature     _____



5174193v1 | 031205-0110                         61

## EXHIBIT D

## BORROWING BASE CERTIFICATE

[Please see attached]

## EXHIBIT E

## SCHEDULE OF INITIAL LOAN COLLATERAL

| Borrowing Base - Cantor Group Fund IV | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Address | Acq. Type | DOT | Orig. Prom. Note Bal. | Purchase Price | Cur. Note Bal. | Adv. Amnt. Requested | LTV | Appraisal / BOV Value | Implied LTV on RE |
| 21301-21315 Saticoy St, Canoga Park, CA 91304 | Note | 1st | $10,125,000 | $10,125,000 | $10,125,000 | $5,685,000 | 56.1% | $13,500,000 | 42.1% |
| 600 Acacia Ave., Corona Del Mar, CA 92625 | Note | 1st | $3,150,000 | $3,150,000 | $3,150,000 | $2,205,000 | 70.0% | $4,100,000 | 53.8% |
| 424/424.5 Marguerite Ave., Corona Del Mar, CA 92625 | Note | 1st | $2,700,000 | $2,700,000 | $2,700,000 | $1,890,000 | 70.0% | $4,450,000 | 42.5% |
| 2115 Winnie St. Galveston, TX 77550 | Note | 1st | $8,750,000 | $8,750,000 | $8,750,000 | $6,125,000 | 70.0% | $12,700,000 | 48.2% |
| 73101 Highway 111, Palm Desert, CA | Note | 1st | $5,850,000 | $5,850,000 | $5,850,000 | $4,095,000 | 70.0% | $7,800,000 | 52.5% |
| Total | | | $30,575,000 | $30,575,000 | $30,575,000 | $20,000,000 | 65.4% | $42,550,000 | 47.0% |

5174193v1 | 031205-0110                                          63

## AMENDED AND RESTATED BUSINESS LOAN AND SECURITY AGREEMENT
## (REVOLVING LINE OF CREDIT)

This AMENDED AND RESTATED BUSINESS LOAN AND SECURITY AGREEMENT (REVOLVING LINE OF CREDIT) (this "Agreement") is made as of March 25, 2024, by and between CANTOR GROUP IV LLC, a Delaware limited liability company ("Borrower"), and ZIONS BANCORPORATION, N.A., dba California Bank & Trust ("Lender"):

A.   Borrower is engaged in the business of acquiring (i) various performing and non-performing promissory notes and (ii) real estate, from third-party lenders.

B.   Lender heretofore extended to Borrower a revolving line of credit in the original maximum principal amount of Twenty Million and No/100 Dollars ($20,000,000.00) (the "Existing Loan") pursuant to that certain Business Loan Agreement (Revolving Line of Credit) dated as of July 18, 2017, between Borrower and Lender (together with any and all amendments thereto or modifications thereof, the "Prior Agreement").

C.   Borrower and Lender now desire, among other provisions, to (i) amend and restate the Prior Agreement and the related Loan Documents in their entirety, (ii) supersede and replace in its entirety the Prior Loan Agreement with this Agreement, and (iii) make certain other changes to the Existing Loan as more particularly set forth herein.

D.   As of the Effective Date, the outstanding principal amount of the Existing Loan is Twenty Million and 00/100 Dollars ($20,000,000).

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE 1.
## DEFINITIONS.

The definitions set forth in the Recitals are incorporated herein by reference. Capitalized terms not defined in this Agreement have the meanings given them in the California Uniform Commercial Code. For purposes of this Agreement, the following terms shall have the following meanings:

"Account" has the meaning set forth in Section 9102(a)(2) of the Code.

"Advance" means any advance or disbursement of Loan Proceeds pursuant to this Agreement.

"Advance Rate" shall mean the lesser of (i) the Applicable Advance Rate applied to the unpaid principal balance of the Eligible Receivables under the Borrowing Base, or (ii) 60% of the value of the Underlying Real Estate Collateral of the Eligible Receivables in the Borrowing Base as reflected in an Appraisal acceptable to Lender.

5174193v1 | 031205-0110

**Page 289**

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

9.26.3 Borrower expressly waives and releases any right or benefit which it has or may have under Section 1542 of the Civil Code of the State of California, and any similar law of any state, territory, commonwealth or possession of the United States, or the United States, to the full extent that they may waive all such rights and benefits pertaining to the matters released herein.  In connection with such waiver and relinquishment, Borrower acknowledges that it is aware that it may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true.  Nevertheless, it is the intention of Borrower through this Agreement to fully, finally and forever release all such matters, and all claims relative thereto, which do now exist, may exist, or heretofore have existed.  In furtherance of such intention, the release herein given shall be and remain in effect as a full and complete release of such matters notwithstanding the discovery or existence of any such additional or different claims or facts relative thereto.

9.26.4 In entering into the release provided for in this Agreement, Borrower recognizes that no facts or representations are ever absolutely certain; accordingly, Borrower assumes the risk of any misrepresentation, concealment or mistake, and if Borrower should subsequently discover that any fact that it relied upon in entering into these releases was untrue, or that any fact was concealed from it, or that any understanding of the facts or of the law was incorrect, Borrower shall not be entitled to set aside these releases by reason thereof, regardless of any claims of fraud, misrepresentation, promise made without the intention of performing it, concealment of fact, mistake of fact or law, or any other circumstances whatsoever.

9.26.5 Borrower is the sole and lawful owner of all right, title and interest in and to every claim and other matter which it purports to release herein, and it has not heretofore assigned or transferred, or purported to assign or transfer to any person or any entity claims or other matters herein released.  Borrower shall indemnify, defend and hold Lender, and each of the other Released Parties, harmless from and against any claims, liabilities, actions, causes of action, demands, injuries, costs, and expenses (including, but not limited to, attorneys' fees), based upon or arising in connection with any such prior assignment or transfer, or any such purported assignment or transfer, or any claims or other matters released herein.

[Signatures to follow]

IN WITNESS WHEREOF, Borrower and Lender have hereunto caused this Agreement to be executed on the date first above written.

BORROWER:

CANTOR GROUP IV LLC,
a Delaware limited liability company

By:  Cantor Group Manager, LLC,
     a Delaware limited liability company
Its:  Managing Member

By: _____
Name: Deba Shyam
Its:     Manager


LENDER:

ZIONS BANCORPORATION, N.A.,
dba California Bank & Trust


By:     _____
Name:  _____
Title:   _____

5174193v1 | 031205-0110                    51

Page 292

EXHIBIT A

REQUEST FOR ADVANCE

[Please see attached]

**Page 292**

Page 293

## REQUEST FOR ADVANCE

Date: _____

To: ZIONS BANCORPORATION, N.A., dba California Bank & Trust
1900 Von Karman, Ste 200
Irvine, CA 92614
Attention: Matt Bullock, Executive Vice President

From: CANTOR GROUP IV LLC

Dear Mr. Bullock,

1. Reference is made to that certain Amended and Restated Business Loan and Security Agreement (Revolving Line of Credit) dated as of March 25, 2024 ("Loan Agreement"), executed by ZIONS BANCORPORATION, N.A., dba California Bank & Trust ("Lender"), and CANTOR GROUP IV LLC, a Delaware limited liability company ("Borrower"), and that certain Amended and Restated Promissory Note dated March 25, 2024, made by Borrower and payable to the order of Lender ("Note"). The Loan Agreement and Note evidence a revolving line of credit (the "Loan") heretofore made by Lender to Borrower in the maximum principal amount of $30,000,000.00. Capitalized terms not otherwise defined herein shall have the meanings set forth in the Loan Agreement and other Loan Documents.

2. We hereby request that Lender make an Advance to Borrower under, and pursuant to, the Loan Agreement and the other Loan Documents, described as follows:

| Details of Advance | |
|---|---|
| AMOUNT: | US $_____.00 |
| DATE OF ADVANCE REQUEST: | _____ |
| PURPOSE: | The Advance requested hereby is for the purpose of financing the acquisition of the Collateral Loans listed in Exhibit "A" attached hereto and incorporated herein by this reference. |

5174193v1 | 031205-0110         53

3. We hereby certify that as of the date hereof and the Date of Advance set forth above (a) all conditions precedent in Section 4 of the Loan Agreement have been satisfied (or Lender has otherwise agreed to waive the same in writing with respect to the Advance being requested hereby), (b) all instruments and documents provided to Lender in connection with the Advance being requested hereby are true and correct in all material respects, and (c) the individual executing this Request For Advance is fully authorized and empowered to do so on behalf of Borrower.

Sincerely,

CANTOR GROUP IV LLC,
a Delaware limited liability company

By:     Cantor Group Manager, LLC,
        a Delaware limited liability company
        Its:  Managing Member

By: _____
Name: Deba Shyam
Its:     Manager

5174193v1 | 031205-0110                    54

EXHIBIT "A" to Request for Advance

EXHIBIT B

ALLONGE

This Allonge and Endorsement is attached to and made a physical part of that certain Promissory Note dated _____, ____, in the principal amount of _____ ($_____), made by _____, _____ ("Maker") in favor of _____ (the "Note"). The undersigned is the holder and owner of the Note.

The Note is hereby endorsed as follows:

"Pay to the order of ZIONS BANCORPORATION, N.A., dba California Bank & Trust, pursuant to the Amended and Restated Business Loan and Security Agreement (Revolving Line of Credit), dated as of March 25, 2024 as the same may be modified, amended or supplemented from time to time."

Loan Number (if applicable):_____

Dated: _____

CANTOR GROUP IV LLC,
a Delaware limited liability company

By: Cantor Group Manager, LLC,
    a Delaware limited liability company
Its: Managing Member

By: _____
Name: Deba Shyam
Its:    Manager

5174193v1 | 031205-0110                          56

EXHIBIT C

COLLATERAL ASSIGNMENT OF MORTGAGE [DEED OF TRUST]

[See attached]

# EXHIBIT D

## BORROWING BASE CERTIFICATE

[Please see attached]

## EXHIBIT E

## SCHEDULE OF INITIAL LOAN COLLATERAL

| Borrowing Base - Cantor Group Fund IV | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Address | Acq. Type | DOT | Orig. Prom. Note Bal. | Purchase Price | Cur. Note Bal. | Adv. Amnt. Requested | LTV | Appraisal / BOV Value | Implied LTV on RE |
| 21301-21315 Saticoy St, Canoga Park, CA 91304 | Note | 1st | $10,125,000 | $10,125,000 | $10,125,000 | $5,685,000 | 56.1% | $13,500,000 | 42.1% |
| 600 Acacia Ave., Corona Del Mar, CA 92625 | Note | 1st | $3,150,000 | $3,150,000 | $3,150,000 | $2,205,000 | 70.0% | $4,100,000 | 53.8% |
| 424/424.5 Marguerite Ave., Corona Del Mar, CA 92625 | Note | 1st | $2,700,000 | $2,700,000 | $2,700,000 | $1,890,000 | 70.0% | $4,450,000 | 42.5% |
| 2115 Winnie St. Galveston, TX 77550 | Note | 1st | $8,750,000 | $8,750,000 | $8,750,000 | $6,125,000 | 70.0% | $12,700,000 | 48.2% |
| 73101 Highway 111, Palm Desert, CA | Note | 1st | $5,850,000 | $5,850,000 | $5,850,000 | $4,095,000 | 70.0% | $7,800,000 | 52.5% |
| Total | | | $30,575,000 | $30,575,000 | $30,575,000 | $20,000,000 | 65.4% | $42,550,000 | 47.0% |

# EXHIBIT 12

## AMENDED AND RESTATED PROMISSORY NOTE

**$30,000,000.00**                   IRVINE, CALIFORNIA                   March 25, 2024

FOR VALUE RECEIVED, CANTOR GROUP IV LLC, a Delaware limited liability company ("Borrower"), promises to pay to ZIONS BANCORPORATION, N.A., dba California Bank & Trust ("Lender"), or to its order, at its office located at 1900 Main Street Suite 200, Irvine, California 92614, or at such other place as the holder hereof may designate, in lawful money of the United States of America, in cash or immediately available funds acceptable to the holder hereof, the principal sum of THIRTY MILLION AND NO/100 Dollars ($30,000,000.00) or so much thereof as shall have been advanced and is outstanding together with interest, on the outstanding principal balance, until paid in full in accordance with the terms, conditions and provisions as hereinafter set forth in this Amended and Restated Promissory Note (this "Note").

**LOAN AGREEMENT**. This Note is the "Note" as defined in that certain Amended and Restated Business Loan and Security Agreement (Revolving Line of Credit) (the "Loan Agreement") dated March 25, 2024, entered into by and between Borrower and Lender, as it may have been amended from time to time, and is subject to all of the terms and conditions thereof. All terms not defined herein shall have the same meaning as in the Loan Agreement. In the event of a conflict between the terms of this Note and the Loan Agreement, the terms of this Note shall prevail.

**ADVANCES**. Advances hereunder shall be made in accordance with the Loan Agreement and may be made by Lender at the written request of Borrower. Any such Advance shall be conclusively presumed to have been made to or for the benefit of Borrower when made in accordance with such requests and directions, or when said Advances are deposited into or credited to the account(s) of Borrower with Lender.

**INTEREST RATE**. Interest on the outstanding principal balance of this Note shall be computed, calculated based upon a 360 day year and actual days elapsed, and shall accrue at the per annum rate (the "Note Rate") of the greater of (i) six percent (6.0%), or (ii) the sum of three and one-half percent (3.50%) over the Term SOFR 1 Month Rate, which shall change immediately upon a change in the Term SOFR 1 Month Rate. Lender's Term SOFR 1 Month Rate is to be strictly interpreted and is not intended to serve any purpose other than providing an index to determine the interest rate used herein. Lender's Term SOFR 1 Month Rate may not necessarily be the same as the quoted offer side in any time deposit market by any particular institution or service applicable to any interest period. As used herein, Lender's "Term SOFR 1 Month Rate" shall mean the rates per annum quoted by CME Group Benchmark Administration Limited as the CME Term SOFE 1 Month, as quoted for U.S. Dollars by Bloomberg, or other comparable services selected by Lender (the "Index"). Notwithstanding the foregoing, the Index shall never be less than two and one half percent (2.50%). The Index is not necessarily the lowest rate charged by Lender on its loans. Except as otherwise specifically provided herein, if the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current index rate upon Borrower's request.

If Lender determines, in its sole discretion, that the Index has been or imminently will be discontinued, then Lender may select an alternative reference rate, which may reflect

5174487v1                                   1

adjustments to the related spread or margin (collectively, the "Substitute Index Rate"), to be used in lieu of the interest rate set forth in this Note (the "Pre-Substitute Rate"). Lender and Borrower acknowledge that the discontinuation of the Index is a future event over which neither Lender nor Borrower has influence but which will necessarily affect the Pre-Substitute Rate. Accordingly, Lender shall select a Substitute Index Rate that Lender believes is a practical means of preserving the parties' intent relative to the economics of the Pre-Substitute Rate. Notwithstanding the foregoing, the parties acknowledge that, initially and/or over time, the Substitute Index Rate will differ from the Pre-Substitute Rate. In selecting the Substitute Index Rate, Lender shall consider to what extent and the manner in which industry-accepted substitutes for the Index have been established, and the parties acknowledge that different Substitute Index Rates may be selected for different types of loans and transactions. Borrower agrees that Lender shall not be liable in any manner for its selection of a Substitute Index Rate. The Substitute Index Rate shall be used in lieu of the Pre-Substitute Rate, and all references in this Note to the Pre-Substitute Rate shall be deemed to refer to the Substitute Index Rate, effective as of the date specified by Lender in a written notice given by Agent to Borrower. To the extent practicable, such notice shall be given at least 30 days prior to the effective date. The Substitute Index Rate shall remain in effect from the effective date set forth in such notice until the loan evidenced by this Note is paid in full, unless such an instance occurs where the Substitute Index Rate is no longer available, in which case the provisions of this section will again apply for purposes of replacing the Substitute Index Rate.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.

**PRINCIPAL AND INTEREST PAYMENTS.** Commencing on May 1, 2024 and continuing on the same day of each and every calendar month thereafter until the Maturity Date (as defined hereinafter), Borrower shall pay to Lender interest due, in arrears, based upon the actual number of days elapsed for that monthly period.

Principal payments may be due and payable subject to and in accordance with Section 4.1.1(a) of the Loan Agreement.

Upon the Maturity Date, the entire unpaid obligation outstanding under this Note, the Loan Agreement and any other Loan Documents shall become due and payable in full.

All payments due hereunder, including payments of principal and/or interest, shall be made to Lender in United States Dollars and shall be in the form of immediately available funds acceptable to the holder of this Note.

**APPLICATION OF PAYMENTS.** All payments received by Lender from, or for the account of Borrower, due hereunder shall be applied by Lender, in its sole and absolute discretion, in the following manner, or in any other order or manner as Lender chooses:

a.   First. To pay any and all interest due, owing and accrued;

5174487v1                           2

b.      Second.  To pay any and all costs, advances, expenses or fees due, owing and payable to Lender, or paid or incurred by Lender, arising from or out of this Note, the Loan Agreement, and the other Loan Documents; and

c.      Third.  To pay the outstanding principal balance on this Note.

All records of payments received by Lender shall be maintained at Lender's office, and the records of Lender shall, absent manifest error, be binding and conclusive upon Borrower.  The failure of Lender to record any payment or expense shall not limit or otherwise affect the obligations of Borrower under this Note.

**MATURITY DATE**.  On May 24, 2027 ("Maturity Date"), the entire unpaid principal balance, and all unpaid accrued interest thereon, and all fees, costs, expenses, and other amounts, shall be due and payable without demand or notice, subject to acceleration as provided in this Note.  In the event that Borrower does not pay this Note in full on the Maturity Date then, as of the Maturity Date and thereafter until paid in full, the interest accruing on the outstanding principal balance hereunder shall be computed, calculated and accrued on a daily basis at the Default Rate (as defined hereinafter).

**UNPAID INTEREST, CHARGES AND COSTS**.  Interest, late charges, costs or expenses that are not received by Lender within ten (10) calendar days from the date such interest, late charges, costs, or expenses become due, shall, at the sole discretion of Lender, be added to the principal balance and shall from the date due bear interest at the Default Rate.

**HOLIDAY**.  Whenever any payment to be made under this Note shall be due on a day other than a Business Day, then the due date for such payment shall be automatically extended to the next succeeding Business Day, and such extension of time shall in such cases be included in the computation of the interest portion of any payment due hereunder.

**NO OFFSETS OR DEDUCTIONS**.  All payments under this Note shall be made by Borrower without any offset, decrease, reduction or deduction of any kind or nature whatsoever, including, but not limited to, any decrease, reduction or deduction for, or on account of, any offset, present or future taxes, present or future reserves, imposts or duties of any kind or nature, that are imposed or levied by or on behalf of any government or taxing agency, body or authority by or for any municipality, state or country.  If at any time, present or future, Lender shall be compelled, by any Law, rule, regulation or any other such requirement which on its face or by its application requires or establishes reserves, or payment, deduction or withholding of taxes, imposts or duties, to act such that it causes or results in a decrease, reduction or deduction (as described above) in payment received by Lender, then Borrower shall pay to Lender such additional amounts, as Lender shall deem necessary and appropriate, such that every payment received under this Note, after such decrease, reserve, reduction, deduction, payment or required withholding, shall not be reduced in any manner whatsoever.

**DEFAULT**.  An Event of Default under the Loan Agreement shall constitute a default under this Note (hereinafter "Default").

**REMEDIES**.  Upon, or at any time after, the occurrence of a Default, or upon the occurrence of a breach or default under the Loan Documents, or under any other joint and/or several obligation

5174487v1                                      3

or obligations of Borrower to Lender, Lender may, in its sole and absolute discretion declare the entire unpaid principal balance, together with all accrued and unpaid interest thereon, and all other amounts and payments due hereunder, immediately due and payable, without notice or demand.

**DEFAULT RATE**. From and after the occurrence of any Default in this Note whether by non-payment, maturity, acceleration, non-performance or otherwise, and until such Default has been cured, all outstanding amounts under this Note (including, but not limited to, interest, costs and late charges) shall bear interest at a per annum rate equal to five percent (5%) over the Note Rate ("Default Rate").

**PREPAYMENT**. Borrower shall have the right at any time, and from time to time, following five (5) calendar days prior written notice to Lender, to prepay all or any portion of the principal amount outstanding on the Note, without premium or penalty. Any partial prepayment shall not result in a re-amortization, deferral, postponement, suspension, or waiver of any other payments due under this Note.

**LATE CHARGES**. Time is of the essence for all payments and other obligations due under this Note. Borrower acknowledges that if any payment required under this Note is not received by Lender within ten (10) calendar days after the same becomes due and payable, Lender will incur extra administrative expenses (i.e., in addition to expenses incident to receipt of timely payment) and the loss of the use of funds in connection with the delinquency in payment. Because, from the nature of the case, the actual damages suffered by Lender by reason of such administrative expenses and loss of the use of funds would be impracticable or extremely difficult to ascertain, Borrower agrees that five percent (5%) of the amount of the delinquent payment, together with interest accruing on the entire principal balance of this Note at the Default Rate, as provided above, shall be the amount of damages which Lender is entitled to receive upon Borrower's failure to make a payment of principal or interest when due, in compensation therefor. Therefore, Borrower shall, in such event, without further demand or notice, pay to Lender, as Lender's monetary recovery for such extra administrative expenses and loss of use of funds, liquidated damages in the amount of five percent (5%) of the amount of the delinquent payment (in addition to interest at the Default Rate). The provisions of this paragraph are intended to govern only the determination of damages in the event of a breach in the performance of Borrower to make timely payments hereunder. Nothing in this Note shall be construed as in any way giving Borrower the right, express or implied, to fail to make timely payments hereunder, whether upon payment of such damages or otherwise. The right of Lender to receive payment of such liquidated and actual damages, and receipt thereof, are without prejudice to the right of Lender to collect such delinquent payments and any other amounts provided to be paid hereunder or under any of the Loan Documents, or to declare a default hereunder or under any of the Loan Documents.

**SECURITY**. This Note is secured by the Collateral (as defined in the Agreement).

**COSTS AND EXPENSES**. Borrower hereby agrees to pay any and all costs or expenses paid or incurred by Lender by reason of, as a result of, or in connection with, the enforcement of this Note or any other Loan Documents, including, but not limited to, any and all attorneys' fees and related costs whether such costs or expenses are paid or incurred in connection with the enforcement of this Note and the other Loan Documents, or any of them, the protection or preservation of any collateral or security for this Note, or any other rights, remedies, or interests of Lender, whether or

5174487v1

4

not suit is filed. Borrower's agreement to pay any and all such costs and expenses includes, but is not limited to, costs and expenses incurred in, or in connection with, any bankruptcy proceeding, in enforcing any judgment obtained by Lender, and in connection with any and all appeals therefrom, and in connection with the monitoring of any bankruptcy proceeding and its effect on Lender's rights and claims for recovery of the amounts due hereunder, any proceeding concerning relief from the automatic stay, use of cash collateral, proofs of claim, approval of a disclosure statement, or confirmation of, or objections to confirmation of, any plan of reorganization. All such costs and expenses are immediately due and payable to Lender by Borrower whether or not demand therefor is made by Lender.

**WAIVERS**. Borrower hereby waives grace, diligence, presentment, demand, notice of demand, dishonor, notice of dishonor, protest, notice of protest, any and all exemption rights against the indebtedness evidenced by this Note and the right to plead any statute of limitations as a defense to the repayment of all or any portion of this Note, and interest thereon, to the fullest extent allowed by law, and all compensation of cross-demands pursuant to California Code of Civil Procedure Section 431.70. No delay, omission or failure on the part of Lender in exercising any right or remedy hereunder shall operate as a waiver of such right or remedy or any other right or remedy of Lender.

**MAXIMUM LEGAL RATE**. This Note is subject to the express condition that at no time shall Borrower be obligated, or required, to pay interest on the principal balance at a rate which could subject Lender to either civil or criminal liability as a result of such rate being in excess of the maximum rate which Lender is permitted to charge. If, by the terms of this Note, Borrower is, at any time, required or obligated to pay interest on the principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate and interest payable hereunder shall be computed at such maximum rate and any portion of all prior interest payments in excess of such maximum rate shall be applied, or shall retroactively be deemed to have been payments made, in reduction of the principal balance, as the case may be.

**AMENDMENT; GOVERNING LAW**. This Note may be amended, changed, modified, terminated or canceled only by a written agreement signed by the party against whom enforcement is sought for any such action. This Note shall be governed by, and construed under the Laws of the State of California.

**AUTHORITY**. Borrower, and each person executing this Note on Borrower's behalf, hereby represents and warrants to Lender that, by its execution below, Borrower has the full power, authority and legal right to execute and deliver this Note and that the indebtedness evidenced hereby constitutes a valid and binding obligation of Borrower without exception or limitation. In the event that this Note is executed by more than one person or entity, the liability hereunder shall be joint and several. Any married person who is obligated on this Note, directly or indirectly, agrees that recourse may be had to such person's separate property in addition to any and all community property of such person.

**USA PATRIOT ACT NOTICE**. Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account or obtains a loan. Lender will ask for Borrower's legal name, address, tax ID number or social security number and other

5174487v1      5

identifying information.  Lender may also ask for additional information or documentation or take other actions reasonably necessary to verify the identity of Borrower, Guarantor or other related persons.

**DISHONORED ITEM CHARGE**.  A dishonored item fee of $15.00 shall be charged for any dishonored item

**CREDIT REPORTING**.  Lender may report negative  information about the Borrower's account to credit bureaus.

**ON-LINE BANKING -- ADVANCES**. From time to time, Lender may (but shall not be required to) permit advances to be requested or drawn through its online banking website.  Lender may impose and change limitations on online advance requests, such as minimum or maximum advance dollar amounts, and the types of accounts into which advances may be transferred.  Whether online advances are permitted, and Lender's applicable terms and restrictions if such advances are permitted, will be reflected in the features available online when a user logs into the online banking website.

**ON-LINE BANKING -- LOAN PAYMENTS**. From time to time, Lender may (but shall not be required to) permit loan payments to be made through its online banking website.  Lender may impose and change limitations on making online loan payments, such as minimum or maximum payment amounts, the types of accounts from which loan payments may be made, and the types of payments that may be made online (i.e., ordinary installment payments, principal-only payments, or other types of payments).  Whether online payments are permitted, and Lender's applicable terms and restrictions if such payments are permitted, will be reflected in the features available online when a user logs into the online banking website.

**DOCUMENT IMAGING**. Lender shall be entitled, in its sole discretion, to image or make copies of all or any selection of the agreements, instruments, documents, and items and records governing, arising from or relating to any of Borrower's loans, including, without limitation, this Note and the Loan Documents, and Lender may destroy or archive the paper originals.  The parties hereto (i) waive any right to insist or require that Lender produce paper originals, (ii) agree that such images shall be accorded the same force and effect as the paper originals, (iii) agree that Lender is entitled to use such images in lieu of destroyed or archived originals for any purpose, including as admissible evidence in any demand, presentment or other proceedings, and (iv) further agree that any executed facsimile (faxed), scanned, or other imaged copy of this document or any Related Document shall be deemed to be of the same force and effect as the original manually executed document.

**AMENDED AND RESTATED NOTE**.  This Note amends, restates, supersedes and replaces in its entirety that certain Amended and Restated Promissory Note dated as of July 18, 2017, made in the original principal amount of $20,000,000.00 by the undersigned payable to the Lender (the "Prior Note"); provided, however, (i) the execution and delivery by the undersigned of this Note shall not, in any manner or circumstance, be deemed to be a payment of, a novation of or to have terminated, extinguished or discharged any of the undersigned's indebtedness evidenced by the Prior Note, all of which indebtedness shall continue under and shall hereinafter be evidenced and

governed by this Note, and (ii) any and all Collateral securing the Prior Note shall continue to secure this Note.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Borrower has executed this Note as of the day and year first above written.

BORROWER:

CANTOR GROUP IV LLC,
a Delaware limited liability company

By: Cantor Group Manager, LLC,
    a Delaware limited liability company
Its: Managing Member

By: _____
Name: Deba Shyam
Its:    Manager

5174487v1                                          8

# EXHIBIT 13

**CALIFORNIA BANK**
TRUST

Zions Bancorporation, N.A. dba California Bank & Trust

September 24, 2025

Cantor Group II, LLC
520 Newport Center Drive, Suite 480
Newport Beach, CA 92660
Attn: Mahender Makhijani

Andrew Stupin
215 5th Street, Apt A
Huntington Beach, CA 92648-8101

Andrew Stupin
11 Offshore Drive
Newport Drive, CA 92657

Gerald Marcil
43 Malaga Cove Plaza, Suite D
Palos Verdes Estates, CA 90274

Gerald Marcil
544 Paseo Del Mar
Palos Verdes Estates, CA 90274

Gerald J. Marcil and Carol L. Marcil,
As Trustees of The Marcil Family Trust
Dated May 9, 1997
43 Malaga Cove Plaza, Suite D
Palos Verdes Estates, CA 90274

Gerald J. Marcil and Carol L. Marcil,
As Trustees of The Marcil Family Trust
Dated May 9, 1997
544 Paseo Del Mar
Palos Verdes Estates, California 90274

Re:  Demand for Compliance

Dear Borrower and Guarantors:

I am the Bank officer now assigned to this credit.  Please direct your communications with the Bank to me.  Reference is made to that certain Amended and Restated Business Loan and Security Agreement (Revolving Line of Credit) dated May 10, 2023 (as amended or modified from time to time, the "Loan Agreement"), between Zions Bancorporation, N.A. dba California Bank & Trust ("Lender") and Cantor Group II, LLC (the "Borrower"), and guaranteed by Mssrs. Stupin and Marcil and The Marcil Family Trust (collectively "Guarantors").  All capitalized terms used but not defined in this letter have the meanings ascribed to such terms in the Loan Agreement. Upon review of the status of this credit, a number of deficiencies have been noted.

<u>Loan Non-Compliance</u>

Section 6.5 of the Loan Agreement requires the Borrower and Guarantors to provide certain information to Lender, including financial information and information related to the Collateral Loans.  Borrower and Guarantors have failed to comply with these reporting requirements by failing to timely provide the following documents and information:

4924-9148-4267\4

**Page 310**

- No later than forty five following the end of each calendar quarter: Complete and accurate Financial Statements representing the financial condition of the Borrower as of the date such Financial Statements are prepared and delivered to Lender, including balance sheets, income statements, sources and uses of funds, detailed schedule of real estate of Borrower, and such other supplements and reports and schedules as Lender shall require, in its sole and absolute discretion. The second quarter 2025 ended June 30, 2025. This information was due no later than August 15, 2025, and has not been received. The Financial Statements of Borrower must be provided by no later than 15 days from the date hereof.

- Within 15 days of Lender's request: Complete and accurate Financial Statements representing the financial condition of such Guarantor as of the date such Financial Statements are prepared and delivered to Lender, including, but not limited to, profit and loss statements, balance sheets, income statements, sources and uses of funds, real estate schedules and such other supplemental reports and schedules as Lender shall require, in its sole and absolute discretion. Bank requests that each Guarantor provide current Financial Statements through June 30, 2025, by no later than 15 days from the date hereof.

- Within 15 days after tax returns are filed, but in no event no later than November 1 of each calendar year: Copies of all signed income tax returns (with all forms K-1 attached) of Borrower and each Guarantor. Borrower provided its 2023 tax returns, but such returns were incomplete and failed to include any forms K-1 as required. Borrower has failed to provide 2024 tax returns. The complete 2023 and 2024 tax returns of Borrower and each Guarantor must be provided within 15 days of the date hereof.

- Within 15 days of the end of each calendar quarter: An updated summary, in form and detail satisfactory to Lender, of the Collateral Loans owned by Borrower detailing the status of the Collateral Loans, including without limitation, (i) outstanding amounts due under each Collateral Loan, (ii) Borrower's cost of acquisition of each Collateral Loan, (iii) Borrower's estimate of value of the Underlying Real Estate Collateral for each Collateral Loan, (iv) status of performance of each Collateral Loan, and (v) address of Underlying Real Estate Collateral for each Collateral Loan, and other information that may be required by Lender for each Collateral Loan. Borrower last provided some of this information for the period ending March 31, 2025 but has failed to provide the information as to the status of the Collateral Loans and status of the performance of each Collateral Loan. In addition, Borrower has failed to provide this information for the second quarter of 2025. Borrower must provide this information as of June 30, 2025, including

**Page 311**

the status of the Borrower's liens and their priority as to each property within 15 days of the date hereof.

- Within 45 days of the end of each calendar quarter:  Bank and brokerage statements evidencing Liquidity of each Guarantor.  This information as of June 30, 2025, must be provided within 15 days of the date hereof.

- Concurrently with delivery of the Financial Statements:  Certifications by Borrower and its attesting principal financial or accounting officer that (i) all representations and warranties under the Loan Agreement continue to be true, accurate and complete in all material respects, (ii) Borrower is in compliance with all of its affirmative covenants, negative covenants, financial covenants, reporting covenants and other covenants in described in the Loan Agreement, (iii) that the information in all of Borrower's Financial Statements submitted to Lender, and the computations provided with Borrower's current and prior certificates accurately represent Borrower's financial position as of the dates thereof, (iv) Borrower's submitted financial statements were prepared in accordance with GAAP (except as otherwise disclosed to, and agreed by, Lender); and (v) no event has occurred and no condition exists that constitutes (or with the passage of time and giving of any necessary notice would constitute) an Event of Default.  These certificates must be provided with your responses to the above requests.

Under Section 5.4.11 of the Loan Agreement, Borrower is required to provide Lender with a written report of the status of each Collateral Loan as of the end of such calendar month, which report shall include the following and all other information regarding each Collateral Loan as Lender may request from time to time: (a) the name and address of the Collateral Loan Obligors, and the loan number; (b) the principal amount of all advances, and all accrued and unpaid interest, on each Collateral Loan, and the date last paid and next due date; and (c) the existence of any breach or default by Collateral Loan Obligors under the Collateral Loan Documents and, if so, any actions taken by Borrower to enforce the Collateral Loan Documents.  In addition, Bank requests that Borrower provide the lender's title insurance policy obtained reflecting the first lien position of Borrower as to the real estate collateral.  It appears that one or more of the Collateral Loan Notes have matured, yet no information regarding any extension of the Collateral Loan Notes has been provided to Lender.  Please provide this information as of August 31, 2025 within 15 days of the date hereof.  Updated information as of September 30, 2025 must be provided no later than October 15, 2025.

Borrower has failed to provide Lender with certain Collateral Loan Documents as required under Section 4.6.1, including (1) recorded copies of the Collateral Loan Mortgages for all Collateral Loans, (2) the title policy obtained by Borrower related to each Collateral Loan Mortgage; and (3) the original Collateral Loan Notes for each of the Collateral Loans.  Please provide such documents within 15 days of the date hereof.

## Demand for Compliance

Demand is hereby made that Borrower and each Guarantor provide Lender with the information and documents set forth above no later than 15 days of the date hereof.

## Reservation of Rights

Lender reserves all rights, powers and remedies available to it under the Loan Documents and applicable law including as to any event of default or any other event which, with notice or passage of time, would cause an Event of Default to exist, whether or not such events are specifically identified herein. Lender may exercise any or all such rights, powers and remedies without further notice. Further, any single or partial exercise by Lender of any of its rights and remedies does not preclude any other or further exercise by Lender of any available rights and remedies.

Any forbearance by Lender is, and will be, discretionary, and forbearance by Lender will not constitute a waiver of the any Event of Default or rights or remedies available to Lender under the Loan Documents or applicable law.

Sincerely,

Andrew Johnston, Senior Vice President
Zions Bancorporation, N.A. dba California Bank & Trust

andrew.johnston@zionsbancorp.com

713-232-1793

c/o Amegy Bank of Texas

1717 West Loop South

Houston, Texas 77027

# EXHIBIT 14

**C B** **CALIFORNIA BANK**
TRUST

Zions Bancorporation, N.A. dba California Bank & Trust

September 24, 2025

Cantor Group IV, LLC
520 Newport Center Drive, Suite 480
Newport Beach, CA 92660
Attn: Mahender Makhijani

Andrew Stupin
215 5th Street, Apt A
Huntington Beach, CA 92648-8101

Andrew Stupin
11 Offshore Drive
Newport Drive, CA 92657

Andrew Stupin and Julie K. Stupin,
As Trustees of the Stupin Family Trust
Dated April 3, 2009
215 5th Street, Apt A
Huntington Beach, CA 92648-8101

Andrew Stupin and Julie K. Stupin,
As Trustees of the Stupin Family Trust
Dated April 3, 2009
11 Offshore Drive
Newport Drive, CA 92657

Gerald Marcil
43 Malaga Cove Plaza, Suite D
Palos Verdes Estates, CA 90274

Gerald Marcil
544 Paseo Del Mar
Palos Verdes Estates, CA 90274

Gerald J. Marcil and Carol L. Marcil,
As Trustees of The Marcil Family Trust
Dated May 9, 1997
43 Malaga Cove Plaza, Suite D
Palos Verdes Estates, CA 90274

Gerald J. Marcil and Carol L. Marcil,
As Trustees of The Marcil Family Trust
Dated May 9, 1997
544 Paseo Del Mar
Palos Verdes Estates, California 90274

Deba Shyam
568 Monterey Terrace
Sunnyvale, CA 94089-1596

Re: Demand for Compliance

Dear Borrower and Guarantors:

I am the Bank officer now assigned to this credit. Please direct your communications with the Bank to me. Reference is made to that certain Amended and Restated Business Loan and Security Agreement (Revolving Line of Credit) dated March 25, 2024 (as amended or modified from time to time, the "Loan Agreement"), between Zions Bancorporation, N.A. dba California Bank & Trust ("Lender") and Cantor Group IV LLC (the "Borrower"), and guaranteed by Mssrs. Stupin, Marcil, Shyam, The Stupin Family Trust, and The Marcil Family Trust (collectively "Guarantors"). All capitalized terms used but not defined in this letter have the meanings ascribed

4933-9038-8587\4

to such terms in the Loan Agreement.  Upon review of the status of this credit, a number of deficiencies have been noted.

<u>Loan Non-Compliance</u>

Section 6.5 of the Loan Agreement requires the Borrower and Guarantors to provide certain information to Lender, including financial information and information related to the Collateral Loans.  Borrower and Guarantors have failed to comply with these reporting requirements by failing to timely provide the following documents and information:

- No later than forty five following the end of each calendar quarter: Complete and accurate Financial Statements representing the financial condition of the Borrower as of the date such Financial Statements are prepared and delivered to Lender, including balance sheets, income statements, sources and uses of funds, detailed schedule of real estate of Borrower, and such other supplements and reports and schedules as Lender shall require, in its sole and absolute discretion. The second quarter 2025 ended June 30, 2025.  This information was due no later than August 15, 2025, and has not been received.  The Financial Statements of Borrower must be provided by no later than 15 days from the date hereof.

- Within 15 days of Lender's request: Complete and accurate Financial Statements representing the financial condition of such Guarantor as of the date such Financial Statements are prepared and delivered to Lender, including, but not limited to, profit and loss statements, balance sheets, income statements, sources and uses of funds, real estate schedules and such other supplemental reports and schedules as Lender shall require, in its sole and absolute discretion. Bank requests that each Guarantor provide current Financial Statements through June 30, 2025, by no later than 15 days from the date hereof.

- Within 15 days after tax returns are filed, but in no event no later than November 1 of each calendar year: Copies of all signed income tax returns (with all forms K-1 attached) of Borrower and each Guarantor. Borrower provided its 2023 tax returns, but such returns were incomplete and failed to include any forms K-1 as required.  Borrower has failed to provide 2024 tax returns.  The complete 2023 and 2024 tax returns of Borrower and each Guarantor must be provided within 15 days of the date hereof.

- Within 15 days of the end of each calendar quarter: An updated summary, in form and detail satisfactory to Lender, of the Collateral Loans owned by Borrower detailing the status of the Collateral Loans, including without limitation, (i) outstanding amounts due under each

Collateral Loan, (ii) Borrower's cost of acquisition of each Collateral Loan, (iii) Borrower's estimate of value of the Underlying Real Estate Collateral for each Collateral Loan, (iv) status of performance of each Collateral Loan, and (v) address of Underlying Real Estate Collateral for each Collateral Loan, and other information that may be required by Lender for each Collateral Loan. Borrower last provided some of this information for the period ending March 31, 2025 but has failed to provide the information as to the status of the Collateral Loans and status of the performance of each Collateral Loan. In addition, Borrower has failed to provide this information for the second quarter of 2025. Borrower must provide this information as of June 30, 2025, including the status of the Borrower's liens and their priority as to each property within 15 days of the date hereof.

- Within 45 days of the end of each calendar quarter: Bank and brokerage statements evidencing Liquidity of each Guarantor. This information as of June 30, 2025, must be provided within 15 days of the date hereof.

- Concurrently with delivery of the Financial Statements: Certifications by Borrower and its attesting principal financial or accounting officer that (i) all representations and warranties under the Loan Agreement continue to be true, accurate and complete in all material respects, (ii) Borrower is in compliance with all of its affirmative covenants, negative covenants, financial covenants, reporting covenants and other covenants in described in the Loan Agreement, (iii) that the information in all of Borrower's Financial Statements submitted to Lender, and the computations provided with Borrower's current and prior certificates accurately represent Borrower's financial position as of the dates thereof, (iv) Borrower's submitted financial statements were prepared in accordance with GAAP (except as otherwise disclosed to, and agreed by, Lender); and (v) no event has occurred and no condition exists that constitutes (or with the passage of time and giving of any necessary notice would constitute) an Event of Default. These certificates must be provided with your responses to the above requests.

Under Section 5.4.11 of the Loan Agreement, Borrower is required to provide Lender with a  written report of the status of each Collateral Loan as of the end of such calendar month, which report shall include the following and all other information regarding each Collateral Loan as Lender may request from time to time: (a) the name and address of the Collateral Loan Obligors, and the loan number; (b) the principal amount of all advances, and all accrued and unpaid interest, on each Collateral Loan, and the date last paid and next due date; and (c) the existence of any breach or default by Collateral Loan Obligors under the Collateral Loan Documents and, if so, any actions taken by Borrower to enforce the Collateral Loan Documents. In addition, Bank requests that Borrower provide the lender's title insurance policy obtained reflecting the first lien position of Borrower as to the real estate collateral. It appears that one or

**Page 317**

more of the Collateral Loan Notes have matured, yet no information regarding any extension of the Collateral Loan Notes has been provided to Lender. Please provide this information as of August 31, 2025, within 15 days of the date hereof. Updated information as of September 30, 2025 must be provided no later than October 15, 2025.

Borrower has failed to provide Lender with certain Collateral Loan Documents as required under Section 4.6.1, including (1) recorded copies of the Collateral Loan Mortgages for all Collateral Loans, (2) the title policy obtained by Borrower related to each Collateral Loan Mortgage; and (3) the original Collateral Loan Notes for each of the Collateral Loans. Please provide such documents within 15 days of the date hereof.

### Demand for Compliance

Demand is hereby made that Borrower and each Guarantor provide Lender with the information and documents set forth above no later than 15 days of the date hereof.

### Reservation of Rights

Lender reserves all rights, powers and remedies available to it under the Loan Documents and applicable law including as to any event of default or any other event which, with notice or passage of time, would cause an Event of Default to exist, whether or not such events are specifically identified herein. Lender may exercise any or all such rights, powers and remedies without further notice. Further, any single or partial exercise by Lender of any of its rights and remedies does not preclude any other or further exercise by Lender of any available rights and remedies.

Any forbearance by Lender is, and will be, discretionary, and forbearance by Lender will not constitute a waiver of the any Event of Default or rights or remedies available to Lender under the Loan Documents or applicable law.

Sincerely,

Andrew Johnston, Senior Vice President
Zions Bancorporation, N.A. dba California Bank & Trust

andrew.johnston@zionsbancorp.com

Phone 713-232-1793

c/o Amegy Bank

1717 West Loop South

Houston, Texas 77027

**Page 318**

# EXHIBIT 15

# MILLER BARONDESS, LLP

ATTORNEYS AT LAW
2121 AVENUE OF THE STARS
26TH FLOOR
LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400
FAX: (310) 552-8400
WWW.MILLERBARONDESS.COM

October 3, 2025

A. SASHA FRID
DIRECT DIAL: (310) 552-5228
SFRID@MILLERBARONDESS.COM

***VIA OVERNIGHT DELIVERY AND CERTIFIED MAIL***

**BORROWER:**

Cantor Group II, LLC
520 Newport Center Drive, Suite 480
Newport Beach, CA 92660
Attn: Mahender Makhijani

**GUARANTORS:**

| | |
|---|---|
| Andrew Stupin<br>215 5th Street, Apt A<br>Huntington Beach, CA 92648-8101 | Andrew Stupin<br>11 Offshore Drive<br>Newport Drive, CA 92657 |
| Gerald Marcil<br>43 Malaga Cove Plaza, Suite D<br>Palos Verdes Estates, CA 90274 | Gerald Marcil<br>544 Paseo Del Mar<br>Palos Verdes Estates, CA 90274 |
| Gerald J. Marcil and Carol L. Marcil,<br>As Trustees of The Marcil Family Trust<br>Dated May 9, 1997<br>43 Malaga Cove Plaza, Suite D<br>Palos Verdes Estates, CA 90274 | Gerald J. Marcil and Carol L. Marcil,<br>As Trustees of The Marcil Family Trust<br>Dated May 9, 1997<br>544 Paseo Del Mar<br>Palos Verdes Estates, California 90274 |

> Re:    *Notice of Events of Default under Amended and Restated Business Loan and*
> *Security Agreement (Revolving Line of Credit)*

All:

This law firm represents Zions Bancorporation, N.A., dba California Bank & Trust ("CB&T" or "Lender").  The purpose of this letter is to place the Guarantors on notice that you are in default of your obligations under the various agreements with Lender, as set forth herein. Unless you comply with the demands contained in this letter and remit all amounts owed in full, Lender will have no alternative but to initiate legal action against you.

**Page 320**

MILLER BARONDESS, LLP

October 3, 2025
Page 2

Reference is made to the following agreements (together, the "Loan Agreements")[1]:

1.  the Amended and Restated Business Loan and Security Agreement (Revolving Line of Credit), dated May 10, 2023 (the "Security Agreement"), by and between Lender and Cantor Group II, LLC ("Borrower");

2.  the Amended and Restated Promissory Note, dated May 10, 2023 (the "Note"), made by Borrower, in favor of Lender;

3.  the Amended and Restated Continuing Guaranty, dated May 10, 2023 (the "Stupin Guaranty"), by Andrew Stupin ("Stupin");

4.  the Amended and Restated Continuing Guaranty, dated May 10, 2023 (the "Marcil Guaranty"), by Gerald J. Marcil ("Marcil"); and

5.  the Amended and Restated Continuing Guaranty, dated May 10, 2023 (the "Marcil Family Trust Guaranty")[2], by Gerald J. Marcil and Carol J. Marcil, as Trustees of the Marcil Family Trust ("Marcil Family Trust")[3].

## A.     Defaults Under the Security Agreement

Pursuant to Article 7 of the Security Agreement, notice is hereby given that, as a result of Borrower's failure to fulfill its obligations under the Loan Documents as set forth below, multiple Events of Default have occurred and are continuing.

Under the Security Agreement, an Event of Default occurs, among other events, if: (i) Borrower fails to perform or observe any term, covenant, or agreement contained in the Security Agreement or in any of the other Loan Documents [Security Agreement § 7.1]; (ii) any warranty or representation made, or agreed to be made, in the Security Agreement or in any of the other Loan Documents is breached in any material respect or proves to be false or misleading in any material respect [*id.* § 7.2]; and/or (iii) Borrower makes material misrepresentations or fails to disclose any material fact to induce Lender to make the Loan or enter into the Security Agreement [*id.* § 7.8].

---

[1] Any capitalized terms used herein without definition shall have the meanings ascribed to them in the Loan Agreements.

[2] The Stupin Guaranty, the Marcil Guaranty and the Marcil Family Trust Guaranty are each referred to herein as a "Guaranty" and collectively, the "Guaranties."

[3] Stupin, Marcil, and the Marcil Family Trust are each referred to herein as a "Guarantor" and collectively, the "Guarantors."

MILLER BARONDESS, llp

October 3, 2025
Page 3

As a condition precedent to the Security Agreement, and as a continuing obligation throughout the Commitment Term, Borrower was required to perfect Lender's security interest in all Collateral; such security interest was to be, and remain at all times, a first-priority perfected interest.  [*Id.* §§ 4.4.6, 5.4.10 ("Borrower shall perfect, and maintain the perfected status and priority, of all security for the Collateral Loans, including, but not limited to, all security interests in personal property and real property security.").]  This critical obligation is emphasized repeatedly throughout the Security Agreement.  [*See id.* § 5.1 (requiring Borrower to grant Lender a first-priority security interest in all Collateral to secure the payment and performance of all the Obligations as and when due); *see also id.* § 5.4.2 (requiring Borrower, as of the closing of each Collateral Loan, to take all steps necessary and appropriate in order to perfect Borrower's security interest in and lien upon all Underlying Real Estate Collateral, and to perfect Lender's security interest and lien upon all Loan Collateral).]

In order to determine whether Borrower has complied with this critical obligation, Lender conducted a preliminary investigation into the status of the Underlying Real Estate Collateral.  That investigation revealed that, with respect to each of the real properties pledged as Underlying Real Estate Collateral, Lender's security interest is not a first-priority perfected interest.  In fact, several of the properties have already been foreclosed upon or are presently the subject of foreclosure proceedings, as summarized in the chart below:

| Collateral Loan Obligor | Underlying Real Estate Collateral | Status |
|---|---|---|
| 1. 314 S Harvard DE, LLC and 4110 W 3rd St DE, LLC | 314 Harvard Blvd and 4110 West 3rd Street, Los Angeles CA 90020 | Property has been foreclosed and is no longer owned by Collateral Loan Obligor. |
| 2. Laguna HW, LLC | 688-690 S Coast Hwy, Laguna Beach, CA 92651 | The Deed of Trust in favor of Borrower was released on December 14, 2022.  Subsequently, a Deed of Trust in favor of Wilshire Quinn Income Fund, LLC, in the original principal amount of $12,550,000, was recorded against the property. A Notice of Default under this Deed of Trust was recorded on August 29, 2025. |
| 3. The Masters Building, LLC | 2711 & 2713 E Coast Hwy, Corona Del Mar, CA 92625 | No Deed of Trust has been recorded in favor of Borrower.  Instead, current Deeds of Trust are of record |

MILLER BARONDESS, LLP

October 3, 2025
Page 4

| | | in favor of PMF CA REIT, L.L.C. in the original principal amount of $6,540,000, and Specialty DIP LLC in the original principal amount of $1,165,000.  A Notice of Default has been filed by PMF CA REIT, L.L.C |
|---|---|---|
| 4. Cliff Drive Properties DE, LLC | 150 Cliff Drive, Laguna Beach, CA 92651 | No Deed of Trust has been recorded in favor of Borrower.  Deeds of Trust are currently of record in favor of First Choice Bank in the original principal amount of $5,583,600, and Specialty DIP LLC in the original principal amount of $1,165,000. First Choice Bank has issued a Notice of Trustee's Sale scheduled for October 1, 2025. |
| 5. Cliff Drive Properties DE, LLC | 153 Cedar Way, Laguna Beach, CA 92651 | No Deed of Trust has been recorded in favor of Borrower.  Deeds of Trust are currently of record in favor of First Choice Bank in the original principal amount of $5,583,600, and Specialty DIP LLC in the original principal amount of $1,165,000. First Choice Bank has issued a Notice of Trustee's Sale scheduled for October 1, 2025. |
| 6. Heisler Laguna, LLC | 397 N Coast Hwy, Laguna Beach, CA | No Deed of Trust has been recorded in favor of Borrower.  Deeds of Trust are currently of record in favor of First Choice Bank (now Enterprise Bank) and Coastline Loans (owned by Andrew Stupin). First Choice Bank has issued a Notice of Trustee's Sale scheduled for October 1, 2025. |

**MILLER BARONDESS, LLP**

October 3, 2025
Page 5

| 7. Cliff Village, LLC | 535 S Coast Hwy, Laguna Beach, CA 92651 | The property is not owned by the Collateral Loan Obligor.  A Deed of Trust is of record in favor of Cantor Group V, LLC, which has been assigned to Nano Banc. |
|---|---|---|
| 8. Cedar Street Group, LLC | 9826 Cedar St, Bellflower, CA 90706 | A Deed of Trust originally in favor of Borrower has been assigned to Cantor Group V, LLC, and subsequently assigned to Western Alliance Bank.  In addition, prior Deeds of Trust are of record in favor of Nano Banc and UMPQUA Bank. |

Borrower's failure to perfect, and to maintain the perfected status and priority, of all security for the Collateral Loans—including the security interests in the Underlying Real Estate Collateral as set forth above—constitutes an Event of Default pursuant to Section 7.1 of the Security Agreement.  This failure further constitutes a breach of Borrower's representations and warranties under Sections 3.13, 3.16, 5.4.6(a), 5.4.6(j), and 5.4.6(o) of the Security Agreement, and accordingly gives rise to additional Events of Default under Section 7.2.  [*See* Security Agreement § 3.13 (all documents and information prepared and delivered by Borrower in obtaining the Loan are correct and complete in all material respects); *id* § 3.16 ("There is not any mortgage, deed of trust, pledge, lien, hypothecation, charge (fixed or floating), security interest or other encumbrance whatsoever on any of the Collateral Loans or any interest therein, except as permitted pursuant to this Agreement."); *id* § 5.4.6(a) ("Subject to Permitted Exceptions…, the Mortgage creates a first lien or first priority ownership interest in an estate in fee simple estate in real property securing the related Collateral Loan Note."); *id.* § 5.4.6(j) ("The related Mortgage is a valid, subsisting, enforceable and perfected first lien on the Underlying Real Estate Collateral."); *id.* § 5.4.6(o) ("Each original Mortgage was recorded, and all subsequent assignments of the original Mortgage have been recorded in the appropriate jurisdictions in which such recordation is necessary to perfect the liens against each related Collateral Loan Obligor or are in the process of being recorded.").]  Borrower's failure to disclose the true priority status of the Deeds of Trust on the Underlying Real Estate Collateral constitutes both a breach of the foregoing representations and warranties and a failure to disclose material facts.  These actions give rise to additional Events of Default under Sections 7.2 and 7.8 of the Security Agreement.

Borrower has also breached its representation and warranty under Section 5.4.6(n) of the Security Agreement.  Several of the properties pledged as Underlying Real Estate Collateral have

MILLER BARONDESS, LLP

October 3, 2025
Page 6

either already been foreclosed upon or are currently subject to foreclosure proceedings, and Borrower failed to disclose this material fact to Lender. [*Id.* § 5.4.6(n) ("Except as otherwise disclosed to Lender in writing, no foreclosure action is currently threatened or has been commenced with respect to any Underlying Real Estate Collateral.")][4] This breach constitutes an additional Event of Default under Sections 7.2 and 7.8 of the Security Agreement.

In addition, Borrower's failure to grant Lender a first-priority security interest in all Collateral causes the Collateral Loans to be deemed "Ineligible Receivables," as defined in Article 1 of the Security Agreement. [*Id.* Art. 1 (An "Ineligible Receivable" is "[a]ny Collateral Loan that is not secured by a deed of trust with a first (1st) lien priority on the Underlying Real Estate Collateral."); *see also id.* § 4.6.1(b) (Lender shall have no obligation to consider any Collateral Loan for approval as an Eligible Receivable unless and until "[a]ll terms and conditions of the Collateral Loan and all Collateral Loan Documents pertaining thereto shall comply with all requirements for Collateral Loans as provided in [the Security] Agreement.").] Pursuant to Section 5.4.12(b) of the Security Agreement, each Collateral Loan must be removed from the Borrowing Base, and Borrower must repay the Loan as may be required pursuant to Sections 4.1.1(a) or 4.6.3. [*Id.* § 5.4.12(b).]

**B.       Borrower Submitted Inaccurate and Improper Borrowing Base Certificates**

Under Section 4.5.4 of the Security Agreement, as a condition of Lender's obligation to make each Advance, Borrower must execute and deliver to Lender "a fully complete and executed Borrowing Base Certificate," substantially in the form of Exhibit D attached to the Security Agreement. [*Id.* Art. 1; *id.* § 4.5.4.] Further, as soon as available, but in no event later than forty-five (45) days following the end of each calendar quarter, Borrower is required to "deliver to Lender a quarterly Borrowing Base Certificate covering all Collateral Loans, which Borrowing Base Certificate shall be duly certified by the authorized representative of Borrower as to the completeness and accuracy of all information contained therein, without exception." [*Id.* § 6.5.4.] The Borrowing Base Certificate must also be accompanied by "any and all other supporting documentation requested by Lender in its sole and absolute discretion." [*Id.*]

Borrower has not complied with these obligations. Instead, Borrower has delivered inaccurate and deficient Borrowing Base Certificates, thereby preventing Lender from accurately calculating the Borrowing Base and, in turn, the Advances available to Borrower. [*See id.* § 4.1.1(a).] Borrower's failure to provide fully complete and accurate Borrowing Base Certificates as required under the Security Agreement constitutes an Event of Default under Section 7.1.

---

[4] Further, if any of the Underlying Real Estate Collateral has been foreclosed or is subject to foreclosure proceedings due to Borrower's default, Borrower is in breach of its representation and warranty under Section 3.3. [Security Agreement § 3.3 ("Borrower is not in default under … any obligation, agreement, instrument, loan, or indenture, whether to Lender or otherwise.")].

MILLER BARONDESS, LLP

October 3, 2025
Page 7

C.      **Borrower Failed to Comply with Its Reporting Obligations**

Furthermore, Borrower has failed to comply with its reporting obligations under Section 6.5 of the Security Agreement, including, without limitation, its failure to timely deliver the following required documents and information:

- No later than forty-five (45) days after the end of each calendar quarter, Borrower is required to deliver to Lender complete and accurate Financial Statements reflecting Borrower's financial condition as of the date such statements are prepared. [Security Agreement § 6.5.5.] The second quarter of 2025 ended on June 30, 2025; accordingly, these Financial Statements were due no later than August 15, 2025. To date, Lender has not received the required statements.

- Within fifteen (15) days after filing, but in no event later than November 1 of each calendar year, Borrower is required to deliver to Lender copies of all signed income tax returns (together with all required Schedules K-1) of Borrower and each Guarantor. [*Id*. § 6.5.8.] Borrower provided its 2023 tax returns; however, those returns were incomplete and failed to include the required K-1 forms. Borrower has also failed to provide its 2024 tax returns.

- Within fifteen (15) days after the end of each calendar quarter, Borrower is required to deliver to Lender an updated summary of the Collateral Loans it owns, detailing both the status of the Collateral Loans and the performance of each such loan. [Id. § 6.5.12.] Borrower last provided partial information for the period ending March 31, 2025, but failed to provide the required status and performance information. Borrower has also failed to provide this report for the second quarter of 2025.

- Within forty-five (45) days after the end of each calendar quarter, Borrower is required to deliver to Lender bank and brokerage statements evidencing the Liquidity of each Guarantor. [*Id*. § 6.5.13.] Borrower has failed to provide these statements to Lender.

- Concurrently with the delivery of the Financial Statements, Borrower is required to provide certifications executed by Borrower and its attesting principal financial or accounting officer, as required under Section 6.5.14 of the Security Agreement. [*Id*. § 6.5.14.] As with the Financial Statements required under Section 6.5.5, Borrower has failed to provide these certifications.

MILLER BARONDESS, LLP

October 3, 2025
Page 8

Borrower's failure to comply with each of the reporting obligations set forth above constitutes additional Events of Default under Section 7.1 of the Security Agreement.[5]  Further, pursuant to Section 5.4.11, Borrower is required to provide Lender with a written report reflecting the status of each Collateral Loan as of the end of each calendar month.  [*Id.* § 5.4.11.] Borrower has failed to provide the required reports, which constitutes yet another Event of Default under Section 7.1 of the Security Agreement.

Other Events of Default under the Loan Documents may exist.  The Events of Default described above are not intended to be exhaustive and do not constitute a waiver of any other Event of Default that may have occurred, or that may now be continuing, under the Loan Documents but is not specifically identified herein.

**D.**      **<u>Guarantors Are Liable for All Amounts Due</u>**

As a result of the foregoing Events of Default, and pursuant to Section 8.1 of the Security Agreement, Lender has no further obligation to make any additional Advances.  All sums previously disbursed or advanced by Lender, together with all accrued and unpaid interest thereon, are immediately due and payable by the Guarantors.  [*Id.* § 8.1.]  Pursuant to the Note, Lender hereby declares "the entire unpaid principal balance, together with all accrued and unpaid interest thereon, and all other amounts and payments due hereunder, immediately due and payable."  [Note p. 4.]

The Guarantors' liability under the Guaranties is expressly ***"unlimited."***  [Guaranties § 3.]  Pursuant to the Guaranties, the Guarantors unconditionally guarantee and agree to pay to Lender, on demand, an amount equal to the amount of the Credit, together with all fees, expenses, interest, and other amounts and charges specified in the Guaranties and described herein.  "Credit" is defined in the Guaranties "in its most comprehensive sense and means and includes, without limitation, any and all loans, advances, debts, obligations and liabilities of any kind or nature owed by Borrower to Lender."  In addition, the Guarantors are responsible for paying any and all costs and expenses incurred by Lender in connection with the enforcement of any of the Loan Documents, including, without limitation, all attorneys' fees and related costs, whether or not suit is filed.  [*Id.* § 4; *see also id.* § 21; Note pp. 4-5.][6]

---

[5] On September 24, 2025, pursuant to Section 6.5.7 of the Security Agreement, Lender requested that each Guarantor provide current Financial Statements through June 30, 2025, by no later than October 9, 2025.  [Security Agreement § 6.5.7.]  If Guarantors fail to provide the required information by October 9, 2025, such failure shall constitute an additional Event of Default under Section 7.1 of the Security Agreement.

[6] Notably, Lendor may collect from the Guarantors without first foreclosing on any real or personal property collateral pledged or assigned by Borrower [Guaranties § 7], and the liabilities of all Guarantors are joint and several.  [*Id.* § 2.]

# Miller Barondess, llp

October 3, 2025
Page 9

The Guarantors' prompt attention to these matters is critical.  While the Guaranties do not require specific notice, Lender provides this notice as a courtesy.  ***Accordingly, Lender hereby demands that the Guarantors cure the Events of Default described herein by paying the entire Credit amount due to Lender no later than the close of business on Friday, October 10, 2025***.  If you fail to do so, Lender will initiate legal action for breach of the Loan Agreements and other claims and reserves the right to seek immediate injunctive and other provisional relief.

Lender hereby expressly reserves all of its rights, powers, and remedies under the Loan Documents, at law, in equity, or otherwise, with respect to the Collateral Loans and Credit.  Such rights and remedies include, without limitation, Lender's right to recover any and all fees, expenses, and costs incurred in connection with the collection of amounts due under the Loan Documents.

Sincerely,

A. Sasha Frid

cc:   Jeffrey Hill
      Andy Johnston

# EXHIBIT 16

# MILLER BARONDESS, LLP

ATTORNEYS AT LAW
2121 AVENUE OF THE STARS
26TH FLOOR
LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400
FAX: (310) 552-8400
WWW.MILLERBARONDESS.COM

October 3, 2025

**A. SASHA FRID**
DIRECT DIAL: (310) 552-5228
SFRID@MILLERBARONDESS.COM

*VIA OVERNIGHT DELIVERY AND CERTIFIED MAIL*

**BORROWER:**

Cantor Group IV LLC
520 Newport Center Drive, Suite 480
Newport Beach, CA 92660
Attn: Mahender Makhijani

**GUARANTORS:**

| | |
|---|---|
| Andrew Stupin<br>215 5th Street, Apt A<br>Huntington Beach, CA 92648-8101 | Andrew Stupin<br>11 Offshore Drive<br>Newport Drive, CA 92657 |
| Andrew Stupin and Julie K. Stupin,<br>As Trustees of the Stupin Family Trust<br>Dated April 3, 2009<br>215 5th Street, Apt A<br>Huntington Beach. CA 92648-8101 | Andrew Stupin and Julie K. Stupin,<br>As Trustees of the Stupin Family Trust<br>Dated April 3, 2009<br>11 Offshore Drive<br>Newport Drive, CA 92657 |
| Gerald Marcil<br>43 Malaga Cove Plaza, Suite D<br>Palos Verdes Estates, CA 90274 | Gerald Marcil<br>544 Paseo Del Mar<br>Palos Verdes Estates, CA 90274 |
| Gerald J. Marcil and Carol L. Marcil,<br>As Trustees of The Marcil Family Trust<br>Dated May 9, 1997<br>43 Malaga Cove Plaza, Suite D<br>Palos Verdes Estates, CA 90274 | Gerald J. Marcil and Carol L. Marcil,<br>As Trustees of The Marcil Family Trust<br>Dated May 9, 1997<br>544 Paseo Del Mar<br>Palos Verdes Estates, California 90274 |
| Deba Shyam<br>568 Monterey Terrace<br>Sunnyvale, CA 94089-1596 | |

757022.3

**Page 330**

MILLER BARONDESS, LLP

October 3, 2025
Page 2

      *Re:*    *Notice of Events of Default under Amended and Restated Business Loan and Security Agreement (Revolving Line of Credit)*

All:

      This law firm represents Zions Bancorporation, N.A., dba California Bank & Trust ("CB&T" or "Lender").  The purpose of this letter is to place the Guarantors on notice that you are in default of your obligations under the various agreements with Lender, as set forth herein. Unless you comply with the demands contained in this letter and remit all amounts owed in full, Lender will have no alternative but to initiate legal action against you.

      Reference is made to the following agreements (together, the "Loan Agreements")[1]:

      1.  the Amended and Restated Business Loan and Security Agreement (Revolving Line of Credit), dated March 25, 2024 (the "Security Agreement"), by and between Lender and Cantor Group IV LLC ("Borrower");

      2.  the Amended and Restated Promissory Note, dated March 25, 2024 (the "Note"), made by Borrower, in favor of Lender;

      3.  the Second Amended and Restated Continuing Guaranty, dated March 25, 2024 (the "Shyam Guaranty"), by Deba Shyam ("Shyam");

      4.  the Second Amended and Restated Continuing Guaranty, dated March 25, 2024 (the "Stupin Guaranty"), by Andrew Stupin ("Stupin");

      5.  the Continuing Guaranty, dated March 25, 2024 (the "Stupin Family Trust Guaranty"), by Andrew Stupin and Julie K. Stupin, as Trustees of the Stupin Family Trust ("Stupin Family Trust");

      6.  the Second Amended and Restated Continuing Guaranty, dated March 25, 2024 (the "Marcil Guaranty"), by Gerald J. Marcil ("Marcil"); and

---

[1] Any capitalized terms used herein without definition shall have the meanings ascribed to them in the Loan Agreements.

MILLER BARONDESS, LLP

October 3, 2025
Page 3

7. the Second Amended and Restated Continuing Guaranty, dated March 25, 2024 (the "Marcil Family Trust Guaranty")[2], by Gerald J. Marcil, as Trustee of the Marcil Family Trust ("Marcil Family Trust")[3].

## A.    Defaults Under the Security Agreement

Pursuant to Article 7 of the Security Agreement, notice is hereby given that, as a result of Borrower's failure to fulfill its obligations under the Loan Documents as set forth below, multiple Events of Default have occurred and are continuing.

Under the Security Agreement, an Event of Default occurs, among other events, if: (i) Borrower fails to perform or observe any term, covenant, or agreement contained in the Security Agreement or in any of the other Loan Documents [Security Agreement § 7.1]; (ii) any warranty or representation made, or agreed to be made, in the Security Agreement or in any of the other Loan Documents is breached in any material respect or proves to be false or misleading in any material respect [*id.* § 7.2]; and/or (iii) Borrower makes material misrepresentations or fails to disclose any material fact to induce Lender to make the Loan or enter into the Security Agreement [*id.* § 7.8].

As a condition precedent to the Security Agreement, and as a continuing obligation throughout the Commitment Term, Borrower was required to perfect Lender's security interest in all Collateral; such security interest was to be, and remain at all times, a first-priority perfected interest. [*Id.* §§ 4.4.6, 5.4.10 ("Borrower shall perfect, and maintain the perfected status and priority, of all security for the Collateral Loans, including, but not limited to, all security interests in personal property and real property security.").] This critical obligation is emphasized repeatedly throughout the Security Agreement. [*See id.* § 5.1 (requiring Borrower to grant Lender a first-priority security interest in all Collateral to secure the payment and performance of all the Obligations as and when due); *see also id.* § 5.4.2 (requiring Borrower, as of the closing of each Collateral Loan, to take all steps necessary and appropriate in order to perfect Borrower's security interest in and lien upon all Underlying Real Estate Collateral, and to perfect Lender's security interest and lien upon all Loan Collateral).]

In order to determine whether Borrower has complied with this critical obligation, Lender conducted a preliminary investigation into the status of the Underlying Real Estate Collateral. That investigation revealed that, with respect to each of the real properties pledged as Underlying Real Estate Collateral, Lender's security interest is not a first-priority perfected interest. In fact,

---

[2] The Shyam Guaranty, the Stupin Guaranty, the Stupin Family Trust Guaranty, the Marcil Guaranty and the Marcil Family Trust Guaranty are each referred to herein as a "Guaranty" and collectively, the "Guaranties."

[3] Shyam, Stupin, the Stupin Family Trust, Marcil, and the Marcil Family Trust are each referred to herein as a "Guarantor" and collectively, the "Guarantors."

MILLER BARONDESS, LLP

October 3, 2025
Page 4

at least one of the properties is presently the subject of pre-foreclosure proceedings, as summarized in the chart below:

| Collateral Loan Obligor | Underlying Real Estate Collateral | Status |
| --- | --- | --- |
| 1. Gurdip S. Malik and Nirmaljeet K. Malik, Trustees of the Malik Family Living Trust Dated August 10, 1994 | 3220 S Main St, Los Angeles, CA 90007 | The Deed of Trust originally in favor of the Borrower was assigned to Cantor Group V, LLC ("Cantor V") on February 8, 2022.  The Collateral Loan Obligor no longer owns the property, which was transferred to MF Downtown Properties LLC on October 14, 2022. |
| 2. Gurdip S. Malik and Nirmaljeet K. Malik, Trustees of the Malik Family Living Trust dated August 10, 1994 | 1201-1205 W Washington Blvd, Los Angeles, CA 90007 | No Deed of Trust has been recorded in favor of the Borrower.  Instead, a Deed of Trust was recorded in favor of Nuvision Credit Union in the original principal amount of $1,000,000.  The Collateral Loan Obligor no longer owns the property, which was transferred to MF Downtown Properties LLC on October 14, 2022. |
| 3. Vismaad LLC | 600 N Arrowhead Ave, San Bernadino, CA 92401 | The Deed of Trust in favor of the Borrower has been released and reconveyed.  A Deed of Trust is currently of record in favor of Golden 1 Credit Union, securing an original principal amount of $3,657,000 (signed by Deba Shyam). |
| 4. Cauchy Group, LLC | 21301-21315 Saticoy St., Canoga Park, CA 91304 | A Deed of Trust is currently of record in favor of Cantor V.  The assignment of this Deed of Trust to the Borrower has not been recorded. Subsequently, a Deed of Trust was recorded in favor of Secured Income |

MILLER BARONDESS, LLP

October 3, 2025
Page 5

| | | Fund-II, LLC, securing an original principal amount of $7,000,000 (signed by Deba Shyam). |
|---|---|---|
| 5. 424 Marguerite Ave., LLC | 600 Acacia Ave, Corona Del Mar, CA 92625 | A Deed of Trust in favor of the Borrower was recorded on February 23, 2022. However, a prior Deed of Trust remains of record in favor of Banc of California, securing an original principal amount of $2,436,000. The Collateral Loan Obligor is presently engaged in litigation involving allegations of fraud and the improper encumbrance of the property. The validity of the Deed of Trust in favor of the Borrower is invalid. |
| 6. 424 Marguerite Ave., LLC | 424-424.5 Marguerite, Corona Del Mar, CA 92625 | Two Deeds of Trust in favor of the Borrower were recorded on December 20, 2021, and September 29, 2022, respectively. Each was subsequently assigned to Cantor V on December 20, 2021, and September 30, 2022. A prior Deed of Trust remains of record in favor of Banc of California, securing an original principal amount of $1,260,000. The Collateral Loan Obligor is presently engaged in litigation involving allegations of fraud and the improper encumbrance of the property. The Deeds of Trust assigned by the Borrower to Cantor V are invalid, and the property is currently in pre-foreclosure. |
| 7. Sifat LLC | 2115 Winnie St., Galveston, TX 77550 | No Deed of Trust has been recorded in favor of the Borrower. Instead, a Deed of Trust is currently of record in favor of Standard Insurance |

MILLER BARONDESS, LLP

October 3, 2025
Page 6

| | | Company, securing an original principal amount of $7,400,000. |
|---|---|---|
| 8. Sifat LLC | 73101 Highway 111, Palm Desert, CA 92260 | The property was transferred from the Collateral Loan Obligor to Rec5 Holdings LLC on June 4, 2025.  No Deed of Trust has been recorded in favor of the Borrower.  A Deed of Trust is of record in favor of Evergreen Advantage, LLC, securing an original principal amount of $4,000,000.  The Borrower is presently in bankruptcy proceedings. |

Borrower's failure to perfect, and to maintain the perfected status and priority, of all security for the Collateral Loans—including the security interests in the Underlying Real Estate Collateral as set forth above—constitutes an Event of Default pursuant to Section 7.1 of the Security Agreement.  This failure further constitutes a breach of Borrower's representations and warranties under Sections 3.13, 3.16, 5.4.6(a), 5.4.6(j), and 5.4.6(o) of the Security Agreement, and accordingly gives rise to additional Events of Default under Section 7.2.  [*See* Security Agreement § 3.13 (all documents and information prepared and delivered by Borrower in obtaining the Loan are correct and complete in all material respects); *id* § 3.16 ("There is not any mortgage, deed of trust, pledge, lien, hypothecation, charge (fixed or floating), security interest or other encumbrance whatsoever on any of the Collateral Loans or any interest therein, except as permitted pursuant to this Agreement."); *id* § 5.4.6(a) ("Subject to Permitted Exceptions…, the Mortgage creates a first lien or first priority ownership interest in an estate in fee simple estate in real property securing the related Collateral Loan Note."); *id.* § 5.4.6(j) ("The related Mortgage is a valid, subsisting, enforceable and perfected first lien on the Underlying Real Estate Collateral."); *id.* § 5.4.6(o) ("Each original Mortgage was recorded, and all subsequent assignments of the original Mortgage have been recorded in the appropriate jurisdictions in which such recordation is necessary to perfect the liens against each related Collateral Loan Obligor or are in the process of being recorded.").]  Borrower's failure to disclose the true priority status of the Deeds of Trust on the Underlying Real Estate Collateral constitutes both a breach of the foregoing representations and warranties and a failure to disclose material facts.  These actions give rise to additional Events of Default under Sections 7.2 and 7.8 of the Security Agreement.

MILLER BARONDESS, LLP

October 3, 2025
Page 7

Borrower has also breached its representation and warranty under Section 5.4.6(n) of the Security Agreement.  At least one of the properties pledged as Underlying Real Estate Collateral is currently subject to pre-foreclosure proceedings, and Borrower failed to disclose this material fact to Lender.  [*Id.* § 5.4.6(n) ("Except as otherwise disclosed to Lender in writing, no foreclosure action is currently threatened or has been commenced with respect to any Underlying Real Estate Collateral.")][4]  This breach constitutes an additional Event of Default under Sections 7.2 and 7.8 of the Security Agreement.

In addition, Borrower's failure to grant Lender a first-priority security interest in all Collateral causes the Collateral Loans to be deemed "Ineligible Receivables," as defined in Article 1 of the Security Agreement.  [*Id.* Art. 1 (An "Ineligible Receivable" is "[a]ny Collateral Loan that is not secured by a deed of trust with a first (1st) lien priority on the Underlying Real Estate Collateral."); *see also id.* § 4.6.1(b) (Lender shall have no obligation to consider any Collateral Loan for approval as an Eligible Receivable unless and until "[a]ll terms and conditions of the Collateral Loan and all Collateral Loan Documents pertaining thereto shall comply with all requirements for Collateral Loans as provided in [the Security] Agreement.").]  Pursuant to Section 5.4.12(b) of the Security Agreement, each Collateral Loan must be removed from the Borrowing Base, and Borrower must repay the Loan as may be required pursuant to Sections 4.1.1(a) or 4.6.3.  [*Id.* § 5.4.12(b).]

**B.**      **Borrower Submitted Inaccurate and Improper Borrowing Base Certificates**

Under Section 4.5.4 of the Security Agreement, as a condition of Lender's obligation to make each Advance, Borrower must execute and deliver to Lender "a fully complete and executed Borrowing Base Certificate," substantially in the form of Exhibit D attached to the Security Agreement.  [*Id.* Art. 1; *id.* § 4.5.4.]  Further, as soon as available, but in no event later than forty-five (45) days following the end of each calendar quarter, Borrower is required to "deliver to Lender a quarterly Borrowing Base Certificate covering all Collateral Loans, which Borrowing Base Certificate shall be duly certified by the authorized representative of Borrower as to the completeness and accuracy of all information contained therein, without exception."  [*Id.* § 6.5.4.]  The Borrowing Base Certificate must also be accompanied by "any and all other supporting documentation requested by Lender in its sole and absolute discretion."  [*Id.*]

Borrower has not complied with these obligations.  Instead, Borrower has delivered inaccurate and deficient Borrowing Base Certificates, thereby preventing Lender from accurately calculating the Borrowing Base and, in turn, the Advances available to Borrower.  [*See id.* §

---

[4] Further, if any of the Underlying Real Estate Collateral has been foreclosed or is subject to foreclosure proceedings due to Borrower's default, Borrower is in breach of its representation and warranty under Section 3.3.  [Security Agreement § 3.3 ("Borrower is not in default under … any obligation, agreement, instrument, loan, or indenture, whether to Lender or otherwise.")].

MILLER BARONDESS, LLP

October 3, 2025
Page 8

4.1.1(a).]  Borrower's failure to provide fully complete and accurate Borrowing Base Certificates as required under the Security Agreement constitutes an Event of Default under Section 7.1.

**C.**      **Borrower Failed to Comply with Its Reporting Obligations**

Furthermore, Borrower has failed to comply with its reporting obligations under Section 6.5 of the Security Agreement, including, without limitation, its failure to timely deliver the following required documents and information:

- No later than forty-five (45) days after the end of each calendar quarter, Borrower is required to deliver to Lender complete and accurate Financial Statements reflecting Borrower's financial condition as of the date such statements are prepared.  [Security Agreement § 6.5.5.]  The second quarter of 2025 ended on June 30, 2025; accordingly, these Financial Statements were due no later than August 15, 2025.  To date, Lender has not received the required statements.

- Within fifteen (15) days after filing, but in no event later than November 1 of each calendar year, Borrower is required to deliver to Lender copies of all signed income tax returns (together with all required Schedules K-1) of Borrower and each Guarantor. [*Id*. § 6.5.8.]  Borrower provided its 2023 tax returns; however, those returns were incomplete and failed to include the required K-1 forms. Borrower has also failed to provide its 2024 tax returns.

- Within fifteen (15) days after the end of each calendar quarter, Borrower is required to deliver to Lender an updated summary of the Collateral Loans it owns, detailing both the status of the Collateral Loans and the performance of each such loan.  [Id. § 6.5.12.]  Borrower last provided partial information for the period ending March 31, 2025, but failed to provide the required status and performance information.  Borrower has also failed to provide this report for the second quarter of 2025.

- Within forty-five (45) days after the end of each calendar quarter, Borrower is required to deliver to Lender bank and brokerage statements evidencing the Liquidity of each Guarantor.  [*Id*. § 6.5.13.]  Borrower has failed to provide these statements to Lender.

- Concurrently with the delivery of the Financial Statements, Borrower is required to provide certifications executed by Borrower and its attesting principal financial or accounting officer, as required under Section 6.5.14 of the Security Agreement. [*Id*. § 6.5.14.]  As with the Financial Statements required under Section 6.5.5, Borrower has failed to provide these certifications.

**Page 337**

MILLER BARONDESS, LLP

October 3, 2025
Page 9

Borrower's failure to comply with each of the reporting obligations set forth above constitutes additional Events of Default under Section 7.1 of the Security Agreement.[5]  Further, pursuant to Section 5.4.11, Borrower is required to provide Lender with a written report reflecting the status of each Collateral Loan as of the end of each calendar month.  [*Id.* § 5.4.11.] Borrower has failed to provide the required reports, which constitutes yet another Event of Default under Section 7.1 of the Security Agreement.

Other Events of Default under the Loan Documents may exist.  The Events of Default described above are not intended to be exhaustive and do not constitute a waiver of any other Event of Default that may have occurred, or that may now be continuing, under the Loan Documents but is not specifically identified herein.

**D.      Guarantors Are Liable for All Amounts Due**

As a result of the foregoing Events of Default, and pursuant to Section 8.1 of the Security Agreement, Lender has no further obligation to make any additional Advances.  All sums previously disbursed or advanced by Lender, together with all accrued and unpaid interest thereon, are immediately due and payable by the Guarantors.  [*Id.* § 8.1.]  Pursuant to the Note, Lender hereby declares "the entire unpaid principal balance, together with all accrued and unpaid interest thereon, and all other amounts and payments due hereunder, immediately due and payable."  [Note p. 4.]

The Guarantors' liability under the Guaranties is expressly ***"unlimited."***  [Guaranties § 3.]  Pursuant to the Guaranties, the Guarantors unconditionally guarantee and agree to pay to Lender, on demand, an amount equal to the amount of the Credit, together with all fees, expenses, interest, and other amounts and charges specified in the Guaranties and described herein.  "Credit" is defined in the Guaranties "in its most comprehensive sense and means and includes, without limitation, any and all loans, advances, debts, obligations and liabilities of any kind or nature owed by Borrower to Lender."  In addition, the Guarantors are responsible for paying any and all costs and expenses incurred by Lender in connection with the enforcement of any of the Loan Documents, including, without limitation, all attorneys' fees and related costs, whether or not suit is filed.  [*Id.* § 4; *see also id.* § 21; Note pp. 4-5.][6]

---

[5] On September 24, 2025, pursuant to Section 6.5.7 of the Security Agreement, Lender requested that each Guarantor provide current Financial Statements through June 30, 2025, by no later than October 9, 2025.  [Security Agreement § 6.5.7.]  If Guarantors fail to provide the required information by October 9, 2025, such failure shall constitute an additional Event of Default under Section 7.2 of the Security Agreement.

[6] Notably, Lendor may collect from the Guarantors without first foreclosing on any real or personal property collateral pledged or assigned by Borrower [Guaranties § 7], and the liabilities of all Guarantors are joint and several.  [*Id.* § 2.]

MILLER BARONDESS, LLP

October 3, 2025
Page 10

The Guarantors' prompt attention to these matters is critical.  While the Guaranties do not require specific notice, Lender provides this notice as a courtesy.  ***Accordingly, Lender hereby demands that the Guarantors cure the Events of Default described herein by paying the entire Credit amount due to Lender no later than the close of business on Friday, October 10, 2025***.  If you fail to do so, Lender will initiate legal action for breach of the Loan Agreements and other claims and reserves the right to seek immediate injunctive and other provisional relief.

Lender hereby expressly reserves all of its rights, powers, and remedies under the Loan Documents, at law, in equity, or otherwise, with respect to the Collateral Loans and Credit.  Such rights and remedies include, without limitation, Lender's right to recover any and all fees, expenses, and costs incurred in connection with the collection of amounts due under the Loan Documents.

Sincerely,

A. Sasha Frid

cc:     Jeffrey Hill
        Andrew L. Johnston

| | |
|---|---|
| *Attorney or Party without Attorney:*<br>LOUIS R. MILLER (SBN 54141)<br>MILLER BARONDESS, LLP<br>2121 Avenue of the Stars, Suite 2600<br>Los Angeles, California, 90067<br>  *Telephone No:*  (310) 552-4400 | *For Court Use Only* |
| *Attorney For:*  Plaintiff        *Ref. No. or File No.:*<br>                              1196-015 | **Electronically FILED by<br>Superior Court of California,<br>County of Los Angeles<br>10/20/2025 9:19 AM<br>David W. Slayton,<br>Executive Officer/Clerk of Court,<br>By M. Saxon, Deputy Clerk** |
| *Insert name of Court, and Judicial District and Branch Court:*<br>SUPERIOR COURT OF THE STATE OF CALIFORNIA COUNTY OF LOS ANGELES | |
| *Plaintiff:*  ZIONS BANCORPORATION, NATIONAL ASSOCIATION, dba CALIFORNIA<br>            BANK & TRUST<br>*Defendant:*  ANDREW STUPIN, an individual., et al | |

| **PROOF OF SERVICE<br>SUMMONS** | *Hearing Date:* | *Time:* | *Dept/Div:* | *Case Number:*<br>25STCV30165 |
|---|---|---|---|---|

1. *At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the Summons and Complaint; Civil Case Cover Sheet, Civil Case Cover Sheet Addendum and Statement of Location (Certificate of Grounds for Assignment to Courthouse Location); Alternative Dispute Resolution (ADR) Information Package; Notice of Case Assignment- Unlimited Civil Case

3. a.   *Party served:*    ANDREW STUPIN, an individual.
   b.   *Person served:*   Party in item 3.a.

4. *Address where the party was served:*    215 5th Street Apt A, Huntington Beach, CA 92648

5. *I served the party:*
   a. **by personal service.**    I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*: Thu, Oct 16 2025 (2) at *(time)*: 04:51 PM
   (1) ☐  **(business)**
   (2) **X**  **(home)**
   (3) ☐  **(other)** :

6. The "Notice to the Person Served" (on the summons) was completed as follows:
   a. **X**   as an individual defendant.
   b. ☐   as the person sued under the fictitious name of *(specify)*:
   c. ☐   as occupant.
   d. ☐   On behalf of *(specify)*:
      under the following Code of Civil Procedure section:
      ☐  416.10 (corporation)            ☐  415.95 (business organization, form unknown)
      ☐  416.20 (defunct corporation)    ☐  416.60 (minor)
      ☐  416.30 (joint stock company/association)  ☐  416.70 (ward or conservatee)
      ☐  416.40 (association or partnership)  ☐  416.90 (authorized person)
      ☐  416.50 (public entity)          ☐  415.46 (occupant)
      ☐  other:



| | | |
|---|---|---|
| *Plaintiff:* | ZIONS BANCORPORATION, NATIONAL ASSOCIATION, dba CALIFORNIA BANK & TRUST | *Case Number:* 25STCV30165 |
| *Defendant:* | ANDREW STUPIN, an individual., et al | |

Recoverable cost Per CCP 1033.5(a)(4)(B)

7. **Person who served papers**
- a. Name: Paul Flynn
- b. Address: **FIRST LEGAL**
  1517 W. Beverly Blvd.
  LOS ANGELES, CA 90026
- c. Telephone number: (213) 250-1111
- d. **The fee** for service was: $439.69
- e. I am:
  - (1) ☐ not a registered California process server.
  - (2) ☐ exempt from registration under Business and Professions Code section 22350(b).
  - (3) ☒ a registered California process server:
    - (i) ☐ owner ☐ employee ☒ independent contractor
    - (ii) Registration No: PS-6527
    - (iii) County: Orange

8. *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

| | |
|---|---|
| 10/17/2025 | *Paul Flynn* |
| *(Date)* | *Paul Flynn* |

Judicial Council Form POS-010
Rule 2.150.(a)&(b) Rev January 1, 2007

**PROOF OF
SERVICE
SUMMONS**

*14388103*
*(17499178)*
**Page 2 of 2**

| Attorney or Party without Attorney:<br>LOUIS R. MILLER (SBN 54141)<br>MILLER BARONDESS, LLP<br>2121 Avenue of the Stars, Suite 2600<br>Los Angeles, California, 90067<br>  *Telephone No:*  (310) 552-4400 | *For Court Use Only* |
|---|---|
| *Attorney For:*  Plaintiff   \| *Ref. No. or File No.:* 1196-015 | **Electronically FILED by Superior Court of California, County of Los Angeles 10/20/2025 9:19 AM David W. Slayton, Executive Officer/Clerk of Court, By M. Saxon, Deputy Clerk** |

*Insert name of Court, and Judicial District and Branch Court:*
SUPERIOR COURT OF THE STATE OF CALIFORNIA COUNTY OF LOS ANGELES

*Plaintiff:*  ZIONS BANCORPORATION, NATIONAL ASSOCIATION, dba CALIFORNIA BANK & TRUST
*Defendant:*  ANDREW STUPIN, an individual., et al

| **PROOF OF SERVICE SUMMONS** | *Hearing Date:* | *Time:* | *Dept/Div:* | *Case Number:*<br>25STCV30165 |
|---|---|---|---|---|

1. *At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the Summons and Complaint; Civil Case Cover Sheet, Civil Case Cover Sheet Addendum and Statement of Location (Certificate of Grounds for Assignment to Courthouse Location); Alternative Dispute Resolution (ADR) Information Package; Notice of Case Assignment- Unlimited Civil Case

3.   *a.*  *Party served:*   ANDREW STUPIN AND JULIE K. STUPIN, as trustees of The Stupin Family Trust dated April 3, 2009
  *b.*  *Person served:*  Andrew Stupin, Trustee, Authorized to Accept

4. *Address where the party was served:*  215 5th Street, Apt A, Huntington Beach, CA 92648

5. *I served the party:*
  a. **by personal service.**   I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*: Thu, Oct 16 2025 (2) at *(time)*: 04:51 PM
  (1)  ☐  **(business)**
  (2)  **X**  **(home)**
  (3)  ☐  **(other)** :

6. The "Notice to the Person Served" (on the summons) was completed as follows:
  a.  ☐  as an individual defendant.
  b.  ☐  as the person sued under the fictitious name of *(specify)*:
  c.  ☐  as occupant.
  d.  **X**  On behalf of *(specify)*:  ANDREW STUPIN AND JULIE K. STUPIN, as trustees of The Stupin Family Trust dated April 3, 2009
    under the following Code of Civil Procedure section:

| | | |
|---|---|---|
| ☐ 416.10 (corporation) | | ☐ 415.95 (business organization, form unknown) |
| ☐ 416.20 (defunct corporation) | | ☐ 416.60 (minor) |
| ☐ 416.30 (joint stock company/association) | | ☐ 416.70 (ward or conservatee) |
| ☐ 416.40 (association or partnership) | | ☐ 416.90 (authorized person) |
| ☐ 416.50 (public entity) | | ☐ 415.46 (occupant) |
| **X** other:  Trustees of the trust | | |

| **FL** FIRSTLEGAL | Judicial Council Form POS-010<br>Rule 2.150.(a)&(b) Rev January 1, 2007 | **PROOF OF SERVICE SUMMONS** | *14388148*<br>*(17499200 )*<br>**Page 1 of 2** |
|---|---|---|---|

| *Plaintiff:* ZIONS BANCORPORATION, NATIONAL ASSOCIATION, dba CALIFORNIA BANK & TRUST<br><br>*Defendant:* ANDREW STUPIN, an individual., et al | *Case Number:*<br>25STCV30165 |
| --- | --- |

Recoverable cost Per CCP 1033.5(a)(4)(B)

7. **Person who served papers**
   a.   Name:           Paul Flynn
   b.   Address:       **FIRST LEGAL**
                            1517 W. Beverly Blvd.
                            LOS ANGELES, CA 90026
   c.   Telephone number:   (213) 250-1111
   d.   **The fee** for service was:   $347.69
   e.   I am:
       (1)   ☐   not a registered California process server.
       (2)   ☐   exempt from registration under Business and Professions Code section 22350(b).
       (3)   ☒   a registered California process server:
           (i)   ☐ owner   ☐ employee   ☒ independent contractor
           (ii)   Registration No:   PS-6527
           (iii)   County:   Orange

8. ***I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.***

       10/17/2025                            *Paul Flynn*
         *(Date)*                                   *Paul Flynn*

| FL FIRST LEGAL | Judicial Council Form POS-010<br>Rule 2.150.(a)&(b) Rev January 1, 2007 | **PROOF OF<br>SERVICE<br>SUMMONS** | *14388148*<br>*(17499200 )*<br>**Page 2 of 2** |
| --- | --- | --- | --- |

STEVEN T. GUBNER - Bar No. 156593
JERROLD L. BREGMAN - Bar No. 149896
JASON B. KOMORSKY - Bar No. 155677
BG LAW LLP
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone:  (818) 827-9000
Facsimile:  (818) 827-9099
Email:    sgubner@bg.law
          jbregman@bg.law
          jkomorsky@bg.law

Electronically FILED by
Superior Court of California,
County of Los Angeles
1/05/2026 12:03 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By R. Sanchez, Deputy Clerk

Attorneys for Defendants and Cross-Complainants Gerald J. Marcil,
Individually, and together with Carol L. Marcil as Trustees of The Marcil Family Trust

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| ZIONS BANCORPORATION, NATIONAL ASSOCIATION, dba CALIFORNIA BANK & TRUST,<br><br>Plaintiff,<br><br>v.<br><br>ANDREW STUPIN, an individual; ANDREW STUPIN AND JULIE K. STUPIN, as trustees of The Stupin Family Trust dated April 3, 2009; GERALD J. MARCIL, an individual; GERALD J. MARCIL AND CAROL L. MARCIL, as trustees of The Marcil Family Trust dated May 9, 1997; DEBA SHYAM, an individual; and DOES 1-10, inclusive,<br><br>Defendants. | Case No. 25STCV30165<br><br>**CROSS-COMPLAINT AGAINST: ZIONS BANCORPORATION, NATIONAL ASSOCIATION, DBA CALIFORNIA BANK & TRUST; CANTOR GROUP II, LLC; CANTOR GROUP IV, LLC; CANTOR GROUP MANAGER, LLC; AND DEBA SHYAM**<br><br>Action Filed:    October 15, 2025<br><br>Judicial Referee:  Hon. Mitchell L. Beckloff (Ret.)<br><br>Discovery Cutoff:  Not Yet Set<br>Motion Cutoff:    Not Yet Set<br>Trial Date:        None Set |
| GERALD J. MARCIL, an individual, GERALD J. MARCIL AND CAROL L. MARCIL, as trustees of The Marcil Family Trust dated May 9, 1997,<br><br>Cross-Complainants,<br><br>v.<br><br>ZIONS BANCORPORATION, NATIONAL ASSOCIATION, dba CALIFORNIA BANK & TRUST; CANTOR GROUP II, LLC, a Delaware limited liability company; CANTOR | |

GROUP IV, LLC, a Delaware limited liability company; CANTOR GROUP MANAGER, LLC, a Delaware limited liability company; DEBA SHYAM, an individual; and ROES 1-10, inclusive,

Cross-Defendants.

and

CANTOR GROUP II, LLC; CANTOR GROUP IV, LLC; AND CANTOR MANAGER GROUP, LLC,

Nominal Defendants

## CROSS-COMPLAINT

Cross-claimants, Gerald, J. Marcil, and Gerald J. Marcil and Carol L. Marcil as trustees of the Marcil Family Trust dated May 9, 1997, complaining of Cross-defendants Zions Bancorporation, National Association, dba California Bank & Trust, Cantor Group II, LLC, Cantor Group IV, LLC, Cantor Group Manager, LLC, and Deba Shyam, allege as follows:

## PARTIES

1.      Cross-claimant Gerald J. Marcil ("Mr. Marcil") is an individual who resides in California.

2.      Cross-claimant Gerald J. Marcil and Carol L. Marcil are the trustees of The Marcil Family Trust dated May 9, 1997 (the "Marcil Trust" and, together with Mr. Marcil, "Marcil" or "Cross Complainants").

3.      Cross-defendant Zions Bancorporation, National Association, dba California Bank & Trust ("CB&T"), is, upon information and belief, a national banking association organized under the laws of the United States, with its principal place of business in Salt Lake City, Utah, and is authorized to do business in the State of California and transact business in Los Angeles County.

4.      Cross Defendant Cantor Group II, LLC ("Cantor II") is a limited liability company that was, on information and belief, organized under Delaware law on or about October 29, 2015.

5.      Cross Defendant Cantor Group IV LLC ("Cantor IV") is a limited liability company that was, on information and belief, organized under Delaware law on or about May 31, 2017.

6. Cross Defendant Cantor Group Manager, LLC ("Cantor Manager") is a limited liability company that was, on information and belief, organized under Delaware law on or about October 29, 2015.

7. Cross Defendant Deba Shyam ("Shyam), on information and belief, is an individual who is domiciled in California. At all relevant times, Shyam was the managing member of the Cantor Manager Group, LLC, which in turn was the managing member of the various Cantor entities, including Cantor II and Cantor IV.

8. Marcil is unaware of the true names, capacities, relationships and extent of participation in the conduct herein alleged of defendants sued herein as ROES 1 through 10, inclusive, but on information and belief alleges that said defendants are legally responsible to it. Marcil will amend this Cross-Complaint to allege the true names and capacities of the ROE cross-defendants when ascertained.

## JURISDICTION AND VENUE

9. The Referee has jurisdiction over this Cross-Complaint insofar as it arises from the same transaction, occurrence, or series of transactions or occurrences as the cause of action which CB&T, as plaintiff, alleges in its complaint.

10. Unlimited jurisdiction is proper in this proceeding as the amount in controversy exceeds $35,000.

11. California's jurisdiction over each cross defendant is permissible because each cross defendant is either a resident of California or has otherwise consented to litigate in California.

12. Venue in the County of Los Angeles is proper because one or more parcels of real property at issue in this action are located there, some or all of the performance of the obligations at issue was to occur there, and certain of the cross-defendants on information and belief reside there.

13. Jurisdiction and venue are also proper as cross-defendants Shyam and CB&T have already appeared in this action.

14. This matter was judicially referred to The Honorable Mitchell Beckloff (Ret.), pursuant to an order by the Los Angeles Superior Court, Honorable Stephen I. Goorvitch presiding.

///

**FACTUAL BACKGROUND**

15.    On May 3, 2016, CB&T entered into a Business Loan Agreement (Revolving Line of Credit) with Cantor Group II (hereinafter, the "Cantor II Initial Loan").  The Cantor II Initial Loan provided credit up to $15,000,000 for the purchase of various performing and non-performing promissory notes and real estate from third-parties subject to certain restrictions and requirements.

16.    As part of the loan and security agreement for the Cantor II Initial Loan (the "Cantor II Business Loan Agreement"), Marcil provided a guaranty of Cantor II's payment obligations.

17.    Although the Cantor II Initial Loan was not a secured loan, in that Cantor II was not required to record and perfect an assignment of its perfected rights in property to CB&T, the right to any advances under the Cantor II Initial Loan was restricted by, among other things, the definition of Eligible Receivables, Ineligible Receivables and Re-Margining Base, among other restrictions, and required CB&T to know whether the receivable was secured or not in order to calculate available funds.

18.    By definition, Cantor II was required to have a perfected security interest in the asset in order for the asset to qualify as an Eligible Receivable (as defined in the Cantor II Initial Loan) and, thus, be eligible for an advance on the loan.  Specifically, by definition "eligible" receivables did not include (and, thus, were deemed an "Ineligible Receivable"):

(a) Any Borrower Loan *that is not secured by a deed of trust* with a first (1st) lien priority on the Underlying Real Estate Collateral; provided, however, that not more than ten percent (10%) of the Credit Limit may be utilized by Borrower to purchase Borrower Loans that are Eligible Receivables secured by a deed of trust with a second (2nd) lien priority on the Underlying Real Estate Collateral….

(c)  Collateral Loans which have incomplete loan documentation or for which any loan documentation is not fully executed;

(d)  Any Collateral Loan in which Borrower is not the sole lender.

19.    In turn, as a condition to any advance and pursuant to Section 4.5.3, CB&T was required to "determine[] that the Borrower Loan or REO Property for which the Advance is sought is an Eligible Receivable."

20.    Further, as set forth in Section 4.1 of the Cantor II Initial Loan Agreement, Cantor II was required to provide certain documentation in order to draw funds under the loan.  If Cantor II

sought to purchase a Borrower Loan (as defined in the Cantor II Initial Loan) that exceeded $5,000,000, Cantor II was required to provide a promissory note evidencing the loan, a deed of trust evidencing Cantor II's perfected security interests in the underling real estate, an appraisal for the real estate, and a title policy for the real estate that was to serve as collateral for the Cantor II Initial Loan (collectively, the "Required Draw Request Documents").

21.     Based upon the requests for advance provided by Cantor II to CB&T, as produced by CB&T to Marcil in this action, Cantor II did not provide and CB&T did not receive the Required Draw Request Documents, let alone conduct the required review thereof, before funding loans to Cantor II to ensure that Cantor II had a perfected security interest in the assets pledged.  On information and belief, CB&T never received the Required Draw Request Documents which were necessary for CB&T to determine whether Cantor II was eligible for loans under the Cantor II Initial Loan Agreement.  CB&T nevertheless made such advances.

22.     CB&T never informed Marcil that it was giving advances to Cantor II on Ineligible Receivables that did not qualify under the Cantor II Initial Loan Agreement, including for Cantor II's failure to deliver the Required Draw Request Documents required for such advances inclusive of evidence of perfected security interests and which deviation from CB&T's underwriting guidelines as set forth in the Cantor II Initial Loan Agreement materially altered the risk guaranteed by Marcil.

23.     CB&T knew, based upon Cantor II's corporate documents provided, that Marcil was not a manager of Cantor II and that he was not copied on any of the communications wherein Cantor II made loan advance requests and CB&T conveyed its responses and decisions thereon. On the other hand, at all relevant times Shyam acted as the manager of Cantor II with oversight and control over Cantor II by means of his roles as the managing member of the entity, Cantor Group Manager, which controlled Cantor II.  At no time did Shyam ever advise Marcil that Cantor II had not complied with the requirements of the Cantor II Initial Loan and that Cantor II did not have a perfected security interest in the assets used as collateral for advances under the Cantor II Initial Loan that Marcil guarantee.

24.     Notwithstanding that Marcil was not aware of this material deviation by CB&T of its own underwriting guidelines in the Cantor II Initial Loan, and the fact that Matthew Bullock

("Bullock"), CB&T's relationship partner for Cantor II, knew that Marcil had guaranteed the Cantor II loan and had had discussions with him prior to Marcil agreeing to guaranty the Cantor II Initial Loan, Bullock (nor anyone else at CB&T) ever advised Marcil of CB&T's deviation from the underwriting guidelines set forth in the Cantor II Initial Loan.

25.     In 2017, CB&T entered into a secured loan with Cantor IV Group, LLC ("Cantor IV") in the form of a Business Loan Agreement (Revolving Line of Credit) (the "Cantor IV Initial Loan" and with the Cantor II Initial Loan, the "Initial Loans").

26.     The Cantor IV Initial Loan provided credit up to $20,000,000 that, like the Cantor II Initial Loan, was for the purchase of various performing and non-performing promissory notes and real estate from third parties subject to certain restrictions and requirements.

27.     As part of the Cantor IV Business Loan Agreement, Marcil provided a guaranty of Cantor IV's payment obligations.

28.     Unlike the Cantor II Initial Loan, the Cantor IV Initial Loan provided not only that Cantor IV have a secured interest (as the Cantor II Initial Loan provided) but that such security be pledged and perfected in CB&T.  To ensure this protocol, Cantor IV, like Cantor II, was required to provide Collateral Loan Documents and Collateral Loan Document Packages (as those phrases are defined in the Cantor IV Initial Loan), which evidence not only Cantor IV's perfection but also that of CB&T's security interest.

Consistent with the prior Cantor II Initial Loan, the Cantor IV Initial Loan defined the term Ineligible Receivable to exclude from funding any advance on unsecured collateral.

29.     Specifically, and as a condition precedent to the initial advance (and any subsequent advances) under the Cantor IV Initial Loan, among other things, Cantor II was required to provide the following documentation as a condition precedent to advances:

> 4.4.7     Lender's security interest in all Collateral then in existence shall have been perfected by the filing of the Financing Statement, delivery of the original Collateral Loan Documents, ***recording of any recordable Collateral Loan Documents and shall be and remain a first priority perfected security interest in and to all such Collateral***, subject only to such action as may be required under applicable Law to perfect Lender's security interest in collateral subsequently acquired by Borrower pursuant to each Collateral Loan.

CROSS-COMPLAINT AGAINST ZIONS BANCORPORATION, ET AL.

6

30. The requirement of perfected first priority security was reinforced through the Cantor IV Initial Loan, including in the section on Eligible Receivables, at 4.6.1(c):

> (c) Borrower's security interest in all Underlying Collateral shall then, or thereafter concurrently with actual disbursement of Loan Proceeds to or for the account of a Collateral Loan Obligor, constitute a valid, enforceable, and ***duly perfected security interest in the Underlying Collateral in a first priority position***, and all proceeds thereof.

31. Notwithstanding this requirement and based upon the loan files produced by CB&T to date, Cantor IV did not provide the required Collateral Loan Documents to CB&T and by the terms of the Cantor IV Initial Loan the properties for which Cantor IV sought advances were not eligible receivables.

32. In turn, the Cantor IV Initial Loan provided for an affirmative five-day review process by CB&T to confirm that it had received the documents required to constitute the Collateral Loan Document Package and, in turn, to approve the accompanying requested advance under the Cantor IV Initial Loan set forth in Section 4.6.2, as follows:

> 4.6.2 Review of Collateral Loan Document Package; Approval of Eligible Receivables. Lender shall have a period of five (5) Business Days following submission by Borrower of a completed Collateral Loan Document Package for any Collateral Loan within which to review and approve, or not approve, Borrower's request to approve such Collateral Loan as an Eligible Receivable. If, within such five (5) Business Day period, Lender has not notified Borrower in writing that such Collateral Loan is approved as an Eligible Receivable, then Lender shall be deemed to have not approved such Collateral Loan and such Collateral Loan shall not be an Eligible Receivable.

33. As written, if CB&T did not respond within the five-day period, the advance was deemed denied. Accordingly, CB&T had to both affirmatively review the documents provided by Cantor IV to ensure that they met the requirements for an advance and then affirmatively approve the advance.

34. In addition to the prohibition against any loan advances on an Ineligible Receivable, the Cantor IV Initial Loan also provided that if an otherwise Eligible Receivable became an Ineligible Receivable, CB&T's "approval of such Collateral Loan as an Eligible Receivable shall automatically terminate. Cantor IV Initial Loan, at § 5.8.2.

CROSS-COMPLAINT AGAINST ZIONS BANCORPORATION, ET AL.

7

35. Nevertheless, CB&T made advances to Cantor IV even though Cantor IV and the properties for which it sought advances did not qualify for said advances in light of the fact that Cantor IV had not provided the requisite documentation for the Collateral Loan Document Package, including, without limitation, evidence of perfected (filed and/or recorded) security interests in the collateral and that none of the Collateral qualified as an Eligible Receivable upon which any advance could be made.  Given the admissions of CB&T and its agents cited herein that the documentation was at all time deficient, CB&T has confessed it approved loan advances to Cantor IV without conducting the requisite review and knowing, as reflected in its loan files that the properties for which it was providing advances were unsecured and constituted Ineligible Receivables.

36. By making loan advances to Cantor IV even though Cantor IV and the properties in question did not qualify for said advances in light of the fact that Cantor IV had not provided CB&T with the requisite documentation for the Collateral Loan Document Package, including, without limitation, evidence of perfected (filed and/or recorded) security interests in the collateral, CB&T thereby exposed Marcil to a materially different and altogether greater risk on its guarantee because the activity failures and omissions as suggested by CB&T's failure to insure it received the required documents and advancing on knowingly Ineligible Receivables allowed the opportunity for Cantor IV to obtain unsecured loans under the Cantor IV Initial Loan and then to sell, pledge or otherwise dispose of the property financed with such loan proceeds which could thereby increase Cantor IV's leverage position (more debt relative to its assets) and thereby increase the prospect of its default which would result in a call on the Marcil Guarantees.

37. CB&T never informed Marcil that it was giving advances to Cantor IV even though Cantor IV and the properties in question did not qualify for said advances in light of the fact that Cantor IV had not provided CB&T with the requisite documentation for the Collateral Loan Document Package, including, without limitation, evidence of perfected (filed and/or recorded) security interests in the collateral.

38. CB&T knew, based upon Cantor IV corporate documents in its possession, that Marcil was not a manager or even a member of Cantor IV, and that Marcil was not copied on any of the Cantor IV advance requests or CB&T's decisions thereon or related correspondence.  Rather, as

CROSS-COMPLAINT AGAINST ZIONS BANCORPORATION, ET AL.

8

with Cantor II, Shyam exercised control over Cantor IV through his role as the Managing Member of the Cantor Control Group. At no time, did Shyam ever advise Marcil that Cantor IV had not complied with the requirements of the Cantor IV Initial Loan. At no time, did Shyam ever advise Marcil that Cantor IV had not complied with the requirements of the Cantor IV Initial Loan and that Cantor IV did not have a perfected security interest (nor did CB&T) in the assets used as collateral for advances under the Cantor IV Initial Loan that Marcil guarantee.

39.    Notwithstanding the fact that Marcil was not aware of CB&T's material deviation from the terms and conditions of the Cantor IV Initial Loan and its own assumed underwriting guidelines, which made the debt Marcil guaranteed more risky and therefore more likely to default, and the fact that CB&T, through its agent Bullock, knew that Marcil had guaranteed the Cantor IV loan and had had discussions with him prior to Marcil agreeing to guaranty the loan, neither Bullock nor anyone else at CB&T ever advised Marcil of CB&T's determination to make loan advances to Cantor IV that did not comply with the securitization terms and conditions specified in the Cantor IV Initial Loan and assumed to exist in CB&T's underwriting guidelines.

40.    Both the Cantor II Initial Loan and the Cantor IV Initial Loan were amended from time to time, and in connection with each amendment CB&T asked Marcil to sign an amendment agreement as guarantor, which he dutifully did.   At no time when presenting Marcil with amendments to the Cantor II Initial Loan or the Cantor IV Initial Loan did CB&T ever disclose to Marcil that CB&T had materially altered the riskiness of the loan being guaranteed by Marcil by making loan advances to the Borrowers that did not comply with the terms and conditions of their loan documents in ways that substantially increased the risk profile of the debt Marcil guaranteed. Likewise, Shyam made no representations to Marcil that Cantor II, Cantor IV and CB&T had deviated from the Initial Loans' requirement of perfected security interests.

41.    In 2023, CB&T and Cantor II entered into an Amended and Restated Business Loan and Security Agreement (the "Cantor II Loan Agreement"). By CB&T's own acknowledgement, this dramatically changed the riskiness of the debt because the credit limit was doubled from $15 million to $30 million, and, on information and belief, CB&T believed changed the structure of the loan from one that was "guarantor reliant" to one that was fully secured by collateral pledged to CB&T

by Cantor II (even though the Cantor IV Initial Loan was also designed to be fully secured and Cantor II was required to have a perfected security interest in the assets it pledged in seeking loans under the Cantor II Initial Loan).

42.     As with the Cantor II Initial Loan, Marcil guaranteed performance by Cantor II under the Cantor II Loan Agreement (the "Marcil Cantor II Loan Agreement Guaranty").

43.     Unlike the Cantor II Initial Loan, there were additional conditions precedent to Cantor II's receipt of any advances under the Cantor II Loan Agreement, including at the inception of said loan, that in large measure mirrored those found in the Cantor IV Initial Loan.

44.     The Cantor II Loan Agreement under Section 4, Conditions Precedent, required, among other things, that Cantor II provide proof of the following to CB&T:

> 4.4.6. Lender's security interest in all Collateral then in existence shall have been perfected by the filing of the Financing Statement, the ***delivery of the original Collateral Loan Documents*** to Lender before the Document Delivery Deadline, and ***the recording of any recordable Collateral Loan Documents, and shall be and remain a first priority perfected security interest in and to all such Collateral***, subject only to such action as may be required under applicable law to perfect Lender's security interest in collateral subsequently acquired by Borrower pursuant to each Collateral Loan.

(emphasis added)

45.     For each advance on a property sought by Cantor II, it was required, at a minimum, to provide a "Collateral Loan Document Package" which included numerous specific documents designed to achieve, or provide proof of, the perfection of the respective security interests in the asset(s) being purchased by the subject draw, with the first perfected security interest to be held by Cantor II and then by CB&T, specified in the Cantor II Loan Agreement as follows:

> "Collateral Loan Document Package;" means all instruments, agreements, and documents evidencing and/or Securing a Collateral Loan, including, but not limited to, the Collateral Loan Note, an Assignment of Mortgage, Allonge, loan agreement, deed of trust, environmental agreement, environmental reports (only for Collateral Loans secured by commercial prope1ty) fixture filing, financing statement, borrowing authorization, loan application, title policy, certificates of insurance, escrow instructions, organizational documents for the Collateral Loan Obligor, flood search, and any other documents requested by Lender in its sole and absolute discretion, all in original form.

46.    The mandated requirements for any advance request were reiterated in Section 4.6, entitled Eligible Receivables, of the Cantor II Loan Agreement (which mirrored, in material respects, the requirements in the Cantor IV Initial Loan), which required among other things that:

[4.6.1](c) Borrower's security interest in all Underlying Real Estate Collateral shall then, or thereafter concurrently with actual disbursement of Loan Proceeds to or for the account of a Collateral Loan Obliger, constitute a valid, enforceable, and duly perfected security interest in the Underlying Real Estate Collateral, and all proceeds and products thereof;

[4.6.1](f) ***Borrower shall*** execute and ***deliver to Lender an Allonge and an Assignment of Mortgage*** (which shall be retained by Lender and not recorded unless an Event of Default occurs under this Agreement or any other Loan Document, or Lender otherwise decides to record the Assignment of Mortgage, in its sole discretion) for each Collateral Loan, and Lender's security interest in all Loan Collateral and related rights of Borrower with respect to each Collateral Loan shall then, or thereafter concurrently with actual disbursement of Loan Proceeds to or for the account of Borrower, be a valid, enforceable and first priority perfected security interest in and to all such Loan Collateral, and all proceeds thereof;[1]

47.    The Cantor II Loan Agreement, like the Cantor IV Initial Loan quoted above, provided in Section 4.6.2 thereof for and required CB&T to review the Collateral Loan Document Package for each advance.  If not approved in writing by CB&T within five days, CB&T will have been deemed to have not approved the Collateral Loan requested.

48.    In the case of the Cantor II Loan Agreement, among other things, Cantor II was required to provide evidence of perfected security interests, collateral assignments, title reports and insurance, among other documents (defined as the "Initial Loan Collateral") prior to the "Initial Advance" under the Cantor II Loan Agreement.  It a condition precedent to any advance that said documentation be provided at the inception of the loan for a series of properties identified in the

---

[1] Note to which no response is required:  Recordation of the Assignment of Mortgage was not required in order to perfect CB&T's security interest in the asset being purchased by Cantor II and Cantor IV (together, the "Borrowers") where the asset was a promissory note in favor of another lender (the seller to the Borrower) secured by the deed of trust that is subject of the Assignment of Mortgage.  This is because the asset is the promissory note; the deed of trust is collateral security for that promissory note.  Therefore under Article 9 of the Uniform Commercial Code, CB&T perfects its security interest in the asset merely by taking possession of the promissory note without the need of a financing statement or for any filing whatsoever. The underlying deed of trust (in favor of the seller) must have been recorded to have perfected the seller's security interest in the real estate securing the promissory note, which deed of trust is then assigned to the purchaser which assignment may but is not required to be recorded and in either case will continue to serve its purpose of collateralizing the debt reflected by the promissory note.

CROSS-COMPLAINT AGAINST ZIONS BANCORPORATION, ET AL.

11

Schedule of Initial Collateral (Exhibit E to the Cantor II Loan Agreement), as follows:  314 Harvard Blvd & 4110 W. 3rd Street, Los Angeles, CA; 688 690 S. Coast Hwy, Laguna Beach, CA; 2711 E. Coast Hwy, Newport Beach, CA; 150 Cliff Drive, Laguna Beach, CA; 153 Cedar Way, Laguna Beach, CA; 397 N. Coast Hwy, Laguna Beach, CA; and 535 S. Coast Hwy, Laguna Beach, CA.

49.     These materials were necessary to confirm that the Collateral qualified as an Eligible Receivable—*i.e.*, a receivable for which Cantor II and, in turn, CB&T, had a perfected first priority secured interest.

50.     As confirmed recently in writing by CB&T, CB&T never received the condition precedent documentation relating to these properties or, for that matter, any other properties, as it admitted in a demand letter that CB&T sent to Marcil:

> ***Borrower has failed to provide Lender with certain Collateral Loan Documents as required under Section 4.6.1, including (1 ) recorded copies of the Collateral Loan Mortgages for all Collateral Loans, (2) the title policy obtained by Borrower related to each Collateral Loan Mortgage; and (3) the original Collateral Loan Notes for each of the Collateral Loans.*** Please provide such documents within 15 days of the date hereof.

(Emphasis added.)

51.     Counsel for CB&T also confirmed that for many of the promissory notes secured by deeds of trust on various properties, "no deed of trust" had been recorded in favor of Cantor II, which of course was self-evident from CB&T's own files, as such recordation was required to be provided by Cantor II to CB&T.

52.     In fact, CB&T never received the documentation required at the outset of the Cantor II Loan Agreement (defined as the Initial Loan Collateral" and the Initial Loan Collateral Document Package, which was required for the Initial Advance), and which documentation was identified as a condition precedent to the funding of such loan advances, and CB&T did not thereafter receive such documentation.

53.     That admission also concedes that CB&T abdicated its obligation to review the Collateral Loan Document Package, inclusive of the Initial Collateral Loan Document Package, for each requested loan advance and to provide approvals, notwithstanding the fact that Cantor II never provided the requisite documents necessary for the approval of any advance, which by definition

rendered the Collateral an Ineligible Receivable and which scant documentation further reaffirmed that the proposed collateral constituted an Ineligible Receivable for absence of a perfected first priority security interest.

54. As respects the Schedule of Initial Collateral, the loan files produced by CB&T reflected that CB&T received incomplete submissions and no evidence of title insurance on a single property, preliminary title reports on only some of the properties, and none of the perfected security (either in Cantor II or, in turn, CB&T), as follows:

a. 314 S. Harvard Blvd. Unrecorded deed of trust in favor of Cantor V, unrecorded assignment of deed of trust from Cantor V to Cantor II, unrecorded collateral assignment from Cantor II to CB&T, and a preliminary title report that post-dates the transfer from Cantor V to Cantor II that confirms that none of the deeds of trust or assignments were recorded;

b. 688-690 South Coast Highway. Unrecorded deed of trust in favor of Cantor V, unrecorded assignment of deed of trust from Cantor V to Cantor II, unrecorded collateral assignment from Cantor II to CB&T and an outdated preliminary title report from 2021;

c. 2711-2713 East Coast Highway. Recorded deed of trust in favor of Cantor IV (not Cantor II), unrecorded assignment from Cantor V (not Cantor IV) to Cantor II, unrecorded collateral assignment from Cantor II to CB&T and an outdated 2021 preliminary title report;

d. 150 Cliff Drive. Unrecorded deed of trust in favor of Cantor V, unrecorded assignment of deed of trust from Cantor V to Cantor II, unrecorded collateral assignment from Cantor II to CBB&T, and a preliminary title report that post-dates the transfer from Cantor V to Cantor II that confirms that none of the deeds of trust or assignments were recorded;

e. 153 Cedar Way. Unrecorded deed of trust in favor of Cantor V, unrecorded assignment from Cantor V to Cantor II, unrecorded collateral assignment from Cantor II to CB&T, and a preliminary title report that post-dates the transfer from Cantor V to Cantor II that confirms that none of the deeds of trust or assignments were recorded;

f. 391-397 North Coast Highway. No deed of trust, an unrecorded assignment of deed of trust from Cantor V to Cantor II dated on December 29, 2022, unrecorded collateral assignment from Cantor II to CB&T, and no preliminary title report; and

CROSS-COMPLAINT AGAINST ZIONS BANCORPORATION, ET AL.

13

g.      535 S. Coast Highway.  Unrecorded deed of trust in favor of Cantor V, unrecorded assignment of deed of trust from Cantor V to Cantor II, unrecorded collateral assignment from Cantor II to CB&T, and no preliminary title report.

55.     On its face as confirmed by CB&T's loan files, Cantor II failed to provide the mandated documentation identified as a condition precedent to any advances that would have allowed CB&T to make the determination that the Collateral was an Eligible Receivable, the documentation provided was patently deficient on the face of the documents and for the absence of required documents, and therefore CB&T knowingly and intentionally materially increased the risk profile of the debt Marcil was guaranteeing by advancing monies to Cantor II for Ineligible Receivables where CB&T knew that Cantor II and, in turn, CB&T had no perfected security interest in the assets to be purchased with the loan proceeds, and Cantor II did not qualify for such advances.

56.     In short, CB&T materially altered the nature of the risk by eliminating, in its own words, an essential or "chief" element of the secured loan it provided to Cantor II: to wit, the perfected security interest, and nevertheless advanced monies on Ineligible Receivables.

57.     Notwithstanding the unambiguous conditions precedent to any advances under the Cantor II Loan Agreement—and, most notably, evidence of a perfected security interest—the admission by CB&T and its counsel that no such documentation was received by CB&T from Cantor II (insofar as they sent identical letters to Cantor II claiming that Cantor II had failed to provide any of the documentation required pursuant to, among other provisions, Section 4.6.1 of the Cantor II Loan Agreement), and the fact that Cantor II thereby did not qualify for a single advance, CB&T advanced approximately $30,000,000 to Cantor II for which it received no perfected security interest and it is therefore in an unsecured position.

58.     As with the Cantor II Initial Loan and Cantor IV Initial Loan, CB&T never informed Marcil that it was giving advances to Cantor II under the Cantor II Loan Agreement that did not comport with the requirements for such advances—and, specifically, was advancing monies on Ineligible Receivables—and which deviation from CB&T's underwriting guidelines as set forth in the Cantor II Loan Agreement materially increased the risk profile of the obligations being

guaranteed by Marcil. Likewise, Shyam never advised Marcil that Cantor II and CB&T had deviated from the perfected security interests mandated by the Cantor II Loan Agreement.

59. CB&T knew, based upon Cantor II documents in its possession, that Marcil was not a manager or authorized signatory of Cantor II and that Marcil was not copied on any of the Cantor II advance requests or CB&T's decisions thereon and simply was not privy to CB&T's underwriting decisions or any of the communications with Cantor II regarding same. Rather, at all relevant times Shyam was the Managing Member with authority to bind Cantor II.

60. In furtherance of his role as the agent for Cantor II, Shyam signed the Cantor II Initial Loan, the Cantor II Loan Agreement, all assignments of deeds of trust from other Cantor entities to Cantor II, all collateral assignments from Cantor II to CB&T, and even some of the requests for advance on behalf of Cantor II.

61. Marcil had no involvement in any of the operations of Cantor II nor did he have any involvement in any advances, any provision of loan related documents, or any compliance with any of the loan requirements.

62. Notwithstanding the fact that Marcil was not aware of this material deviation by CB&T and Cantor II from compliance with the Cantor II Loan Agreement requirements which increased the risk profile of the debt Marcil guaranteed, and the fact that CB&T, through its agent Bullock, knew that Marcil had guaranteed the Cantor II loan and had had discussions with him prior to Marcil agreeing to guaranty the loan, neither Bullock nor anyone else at CB&T ever advised Marcil of CB&T's deviation from compliance with the Cantor II Loan Agreement conditions which increased the risk profile of the debt Marcil guaranteed.

63. Like the Cantor II Initial Loan, in 2024 CB&T and Cantor IV entered into an Amended and Restated Business Loan and Security Agreement (Revolving Line of Credit) (the "Cantor IV Loan Agreement" and with the Cantor II Loan Agreement, collectively, the "Loan Agreements") that superseded the Cantor IV Initial Loan and, which like the Cantor IV Initial Loan and Cantor II Loan Agreement, was designed to be fully secured and documented before any advances were made by CB&T to Cantor IV.

64. As with the Cantor IV Initial Loan, Marcil guaranteed performance by Cantor IV under the Cantor IV Loan Agreement.

65. The security requirements and evidence thereof identified above with respect to the Cantor II Loan Agreement applied with equal force to the Cantor IV Loan Agreement, which contained the identical condition precedent language, the identical requirement for delivery of documents to achieve perfection and/or to provide evidence of perfected security interests, the identical requirements as a condition precedent to any advances—*i.e.*, evidence of an Eligible Receivable—and the identical requirement for CB&T's review and approval.

66. Notwithstanding the unambiguous conditions precedent to any advance under the Cantor IV Loan Agreement, the admission by CB&T and its counsel that no such documentation was received by CB&T from Cantor IV (insofar as they sent identical letters to Cantor IV claiming that Cantor IV had failed to provide any of the documentation required pursuant to, among other provisions, Section 4.6.1 of the Cantor IV Loan Agreement), and the fact that Cantor IV thereby did not qualify for a single advance, CB&T advanced approximately $30,000,000 to Cantor IV.

67. As respects the Schedule of Initial Collateral required by the Cantor IV Loan Agreement, the loan files produced by CB&T reflected that CB&T received no evidence of title insurance on a single property and evidence of a perfected security in Cantor IV for some properties, which was then transferred away and which transfer would have been evidenced from a title report that was required but not provided by Cantor IV, as follows:

a. 21301-21315 Saticoy Street. Unrecorded deed of trust to Cantor V, unrecorded assignment from Cantor V to Cantor IV, unrecorded collateral assignment from Cantor IV to CB&T, and an outdated preliminary title report;

b. 600 Acacia Avenue. Recorded deed of trust in favor of Cantor IV, unrecorded collateral assignment from Cantor IV to CB&T and no title report. The Cantor IV deed of trust is a subordinate security interest, which would have been evident if a title report had been produced;

c. 424-424.5 Marguerite Avenue. Unrecorded deed of trust in favor of Cantor IV, unrecorded collateral assignment from Cantor IV to CB&T, and no title report;

d.   2115 Winnie Street.  Unrecorded deed of trust in favor of Cantor IV, unrecorded collateral assignment from Cantor IV to CB&T, and no title report; and

e.   73101 Highway 111.  Unrecorded deed of trust to Cantor IV, Recorded deed of trust to Cantor IV, unrecorded collateral assignment from Cantor IV to CB&T, and no title report.

68.   On its face as confirmed by CB&T's loan files, Cantor IV failed to provide the mandated documentation identified as a condition precedent to any advances, presumably CB&T did not conduct a reasonable review of the documentation, which was patently deficient, and CB&T knowingly and materially altered the risk by advancing monies to Cantor IV even though Cantor IV and, in turn, CB&T, had no perfected security interest in the properties and Cantor IV did not qualify for such an advance.

69.   In short, CB&T materially altered the nature of the risk by eliminating, in its own words, an essential element of the secured loan it provided to Cantor IV: to wit, the perfected security interest and, instead, advanced monies to Cantor IV on knowingly Ineligible Receivables.

70.   In furtherance of his role as the agent for Cantor IV, on information and belief Shyam signed the Cantor IV Initial Loan, the Cantor IV Loan Agreement, all assignments of deeds of trust from other Cantor entities to Cantor IV, all collateral assignments from Cantor IV to CB&T, and even some of the requests for advance on behalf of Cantor IV.

71.   Marcil had no involvement in any of the operations of Cantor IV nor did he have any involvement in any advances, any provision of loan related documents, or any compliance with any of the loan requirements.

72.   Notwithstanding the unambiguous conditions precedent to any advance under the Cantor IV Loan Agreement—and, most notably, evidence of a perfected security interest—the admission by CB&T and its counsel that no such documentation was received by CB&T from Cantor IV (insofar as they sent identical letters to Cantor IV claiming that Cantor IV had failed to provide any of the documentation required pursuant to, among other provisions, Section 4.6.1 of the Cantor IV Loan Agreement), and the fact that Cantor IV thereby did not qualify for a single advance, CB&T advanced approximately $30,000,000 to Cantor IV in an unsecured position.

CROSS-COMPLAINT AGAINST ZIONS BANCORPORATION, ET AL.

17

73.     As with the Cantor II Initial Loan, the Cantor IV Initial Loan, and the Cantor II Loan Agreement, CB&T never informed Marcil that it was giving advances to Cantor IV under the Cantor IV Loan Agreement that did not comport with the requirements for such advances and which deviation from CB&T's conditions set forth in the Cantor IV Loan Agreement materially increased the risk guaranteed by Marcil.

74.     CB&T knew, based upon Cantor IV corporate documents in its possession, that Marcil was not a manager, authorized signatory, or even a member of Cantor IV, and that Marcil was not copied on any of the Cantor IV advance requests or CB&T's decisions thereon, or any of the related correspondence, and was not privy to CB&T's underwriting decisions or communications regarding same.

75.     Subsequent to entering into the Loan Agreements, CB&T claims to have received request for advances on four additional properties, which properties did not qualify for advances based upon the documents received by CB&T from Cantor II and Cantor IV, as follows:

a.     9826 Cedar Street (Cantor II). Unrecorded deed of trust in favor of Cantor IV, unrecorded assignment of deed of trust from Cantor IV to Cantor II, unrecorded collateral assignment from Cantor II to CB&T, and an outdated title report.

b.     3220 South Main Street (Cantor IV).  Unrecorded deed of trust in favor of Cantor IV, unrecorded collateral assignment from Cantor IV to CB&T, and no title report;

c.     1201-1205 West Washington Blvd., Los Angeles, CA 90007 (Cantor IV). Unrecorded deed of trust to Cantor IV, unrecorded collateral assignment, and no title report; and

d.     600 N. Arrowhead, San Bernardino, CA 92401 (Cantor IV).  No deeds of trust, assignments thereof, or other documents were produced with respect to this property.

76.     Notwithstanding the fact that Marcil was not aware of this material deviation by CB&T of its own lending conditions as stated in the Cantor IV Loan Agreement, and the fact that CB&T, through its agent Bullock, knew that Marcil had guaranteed the Cantor IV loan and had had discussions with him prior to Marcil agreeing to guaranty the loan, neither Bullock nor anyone else at CB&T ever advised Marcil of CB&T's deviation from the conditions for advances stated in the Cantor IV Loan.  Specifically, at no point in inducing Marcil to provide a guaranty for any of the

loans, but specifically the Loan Agreements, did CB&T ever advise Marcil that CB&T had made the decision to advance monies to Cantor II and Cantor IV on Ineligible Receivables in contravention of the entirety of the Loan Agreements.

77. Recently, Shyam testified by declaration under penalty of perjury that at all times CB&T knew that the advances were not subject to any perfected security, including that CB&T conducted audits and received documents reflecting this, and that CB&T agreed to waive said requirements. That waiver was never disclosed to Marcil.

Even without Shyam's testimony, that CB&T knew that the advances were not subject to any perfected security and that CB&T was advancing on Ineligible Receivables, was evident from CB&T's own loan files, which reflected incomplete documentation, other liens on the properties in question, and no perfected security interests in the Borrowers and, in turn, CB&T.

78. Having received inadequate documentation from Cantor II and Cantor IV at inception evidencing that they and the properties did not qualify and were ineligible for loan advances under the Initial Loans IV or the Loan Agreements, having ignored and failed to comply with its own obligations to review the documents provided by Cantor II and Cantor IV to determine their sufficiency and the Borrowers' respective qualification for any loan advances, having nevertheless approved and made advances to both Cantor II and Cantor IV despite that CB&T had not received the required documentation and, specifically, evidence of perfected security interests, and having thereby materially increased the risk of default on the debt guaranteed by Marcil without informing Marcil of same (notwithstanding the fact that Marcil would not be privy to this material modification by CB&T), CB&T now seeks to enforce the Marcil Guarantees, which by CB&T's own actions have been discharged and cannot be enforced in light of the admitted material alteration to the underlying risk, CB&T's fraud in inducing Marcil to provide said guaranties (given CB&T's knowledge), and CB&T's gross negligence. At all times, CB&T had a continuing duty of good faith and fair dealing, which it breached by failing to disclose to Marcil the fact that Cantor II and Cantor IV were ineligible for any loan advances, that CB&T was providing loan advances notwithstanding the fact that Cantor II and Cantor IV (and, in turn, CB&T) were unsecured, and that the underlying riskiness of default on the debt guaranteed by Marcil had been materially altered by CB&T.

CROSS-COMPLAINT AGAINST ZIONS BANCORPORATION, ET AL.

19

79.     On information and belief, Shyam and Cantor Manager without limitation had the power to manage Cantor II's business, to make decisions about purchasing mortgage loans, to carry out contracts needed for Cantor II's business, and to have Cantor II borrow funds which would be secured by mortgage loans.

80.     On information and belief, Shyam and Cantor Manager had day-to-day control over Cantor II and were responsible for Cantor II's providing CB&T a first-priority lien in the notes and collateral for the mortgage loans purchased using the Cantor II Loan proceeds.

81.     On information and belief, Shyam and Cantor Manager failed to provide CB&T with the required first priority lien in the notes and collateral for the mortgage loans purchased using the Cantor II Loan proceeds.

82.     Based upon CB&T's loan files produced to date, CB&T was provided documents that Cantor II had signed before notaries which, had the documents been recorded, could have protected CB&T's interest in the mortgage loans purchased with the Cantor II loan proceeds.

83.     Based upon CB&T's Cantor II loan files produced to date, CB&T knew that Cantor II did not qualify for a single advance for any of the 16 properties, as all were Ineligible Receivables.

84.     Notwithstanding the incomplete and unrecorded documents provided by Cantor II, CB&T never reviewed and performed an eligibility test to determine whether the Collateral pledged constituted an Eligible Receivable, and never reviewed the actual documentation to determine whether it comported with the requirements to be considered an Eligible Receivable.

85.     Based upon CB&T's loan files produced to date, no one at CB&T advised Cantor II that any of the Collateral for which it sought advances constituted Ineligible Receivables and were not eligible for advances.

86.     Based upon CB&T's loan files produced to date, CB&T failed to monitor whether the Cantor II loan documents were ever recorded by Cantor II or Cantor Manager prior to disbursing funds to Cantor II.

87.     On its face, the Cantor II Loan Agreement prohibited CB&T from extending credit to Cantor II until the Cantor II Collateral Loan Documents were recorded.

On information and belief, CB&T's internal lending policies prohibited CB&T from extending credit to Cantor II until the Cantor II Collateral Loan Documents were recorded.

88. On information and belief, Shyam and Cantor Manager without limitation had the power to manage Cantor IV's business, to make decisions about purchasing mortgage loans, to carry out contracts needed for Cantor IV's business, and to have Cantor IV borrow funds which would be secured by mortgage loans.

89. On information and belief, Shyam and Cantor Manager had day-to-day control over Cantor IV and were responsible for Cantor IV's providing CB&T a first-priority lien in the notes and collateral for the mortgage loans purchased using the Cantor IV loan proceeds.

90. On information and belief, Shyam and Cantor Manager failed to provide CB&T with the required first-priority lien in the notes and collateral for the mortgage loans purchased using the Cantor IV loan proceeds.

91. Based upon CB&T's loan files produced to date,, CB&T was provided documents that Cantor IV had signed before notaries which, had the documents been recorded, could have protected CB&T's interest in the mortgage loans purchased with the Cantor IV loan proceeds.

92. Based upon CB&T's Cantor IV loan files produced to date, CB&T knew that Cantor IV did not qualify for a single advance for any of the sixteen properties, as all were Ineligible Receivables.

93. CB&T never reviewed and performed an eligibility test to determine whether the Collateral pledged constituted an Eligible Receivable, and never reviewed the actual documentation to determine whether it comported with the requirements to be considered an Eligible Receivable.

94. Based upon CB&T's loan files produced to date, no one at CB&T advised Cantor IV that any of the Collateral for which it sought advances constituted Ineligible Receivables and were not eligible for advances.

95. Based upon CB&T's loan files produced to date, CB&T failed to monitor whether the Cantor IV loan documents were ever recorded by Cantor IV or Cantor Manager prior to disbursing funds to Cantor IV.

96.     On its face, the Cantor II Loan Agreement prohibited CB&T from extending credit to Cantor II until the Cantor II Collateral Loan Documents were recorded.

On information and belief, CB&T's internal lending policies prohibited CB&T from extending credit to Cantor II until the Cantor II Collateral Loan Documents were recorded.

97.     On information and belief, Cantor Manager and Shyam obtained the Marcil Guarantees.

98.     On information and belief, when Cantor Manager and Shyam obtained the Marcil Guarantees, both of them knew that Cantor II and Cantor IV, respectively, had failed to provide CB&T with a first priority lien interest in the mortgage loans that Cantor II and Cantor IV, respectively, had purchased with the proceeds of their loans.

99.     Based upon its loan files produced to date, CB&T, when it accepted the Marcil Guarantees of the Borrowers' loans, knew that CB&T did not have a first priority lien interest in the mortgage loans that Borrowers had purchased with the proceeds of their guarantees loans and never disclosed same to Marcil when it induced him to enter into the guaranty.

100.    On information and belief, CB&T continued to make new extensions of credit to the Borrowers' after accepting the Marcil Guarantees, even though CB&T knew throughout that its interest in the mortgage loans purchased with the proceeds of the loans was legally imperiled.

101.    On information and belief, CB&T when it accepted Marcil Guarantees, knew that Marcil would be unaware that CB&T did not have a first priority lien interest in the mortgage loans that had been purchased with the Borrowers' loan proceeds, or that the collateral had otherwise been diverted or had become the subject of foreclosure proceedings.

**FIRST CAUSE OF ACTION**

(Declaratory Relief against CB&T)

102.    Cross Complainants reallege and incorporate herein by this reference each and every one of the foregoing paragraphs, from paragraph number 1 to and including the immediately preceding numbered paragraph, as though each such paragraph were set forth herein in full.

103.    An actual controversy has arisen and now exists between Marcil and CB&T.  Marcil believes that the Marcil Guarantees he executed with respect to the Cantor II Loan Agreements and

CROSS-COMPLAINT AGAINST ZIONS BANCORPORATION, ET AL.

22

the Cantor IV Loan Agreements (which supersede the guaranties with respect to the Initial Loans) were discharged or otherwise are unenforceable for, among other reasons, (i) CB&T materially increased the underlying risk guaranteed by converting secured loans into unsecured loans without informing Marcil even though CB&T recognized the material alteration of the risk, knew or should have known that Marcil was not privy to this information and given that a security interest was "essential" to these loans the information was material, (ii) CB&T breached the implied covenant of good faith and fair dealing by not advising Marcil of CB&T's material alteration of the underlying risk each and every time CB&T made an advance, including the very first advance made under either loan, (iii) CB&T knew at all relevant times that it had not received the mandated documentation to create and or perfect security interests in the underlying assets intended as collateral, including prior to Marcil providing said guaranties, and CB&T withheld this material information from Marcil in order to induce Marcil to enter into the guaranties, (iv) CB&T committed gross negligence by abdicating its affirmative obligation to review the Collateral Loan Document Package before approving any loan advance and nevertheless approving said loan advances without conducting any of the contemplated due diligence, and (v) irrespective of any waives of any rights contained in any guaranty executed by Marcil, Marcil could not and did not waive any equitable and public policy defenses to the enforcement of the guaranties, including the aforementioned.

104.    On information and belief, Marcil alleges that CB&T disputes and denies each of Marcil's contentions and believes that the Marcil Guarantees waived any and all defenses, not merely statutory and legal defenses, notwithstanding California law prohibiting such waivers.

105.    Because CB&T failed to maintain the required first priority perfected security interest in the mortgage loans and the collateral affected by them, the nature of the risk that Marcil agreed to guarantee was drastically transformed.

106.    As a result of CB&T's failure to maintain the required first priority perfected security interest in the mortgage loans and the collateral affected by them, the obligations of Cantor II and Cantor IV that Marcil was guaranteeing were changed from being obligations supported by assets that could if necessary be liquidated in order to pay CB&T what CB&T was owed, into obligations that were unsecured.

107.	Marcil never agreed to guarantee the Cantor II loan and the Cantor IV loan on the basis that the repayment of such indebtedness was unsecured.

108.	Because of CB&T's failure to maintain the required first priority perfected security interest in the mortgage loans and the collateral affected by them, Marcil became liable for an entirely new and different set of contractual obligations that imposed fundamentally different risks upon them without consulting them, much less obtaining their consent.

109.	Because the terms of the Cantor II loan and the Cantor IV loan were varied by CB&T without the consent of Marcil, the Marcil Guaranties should be deemed to have been discharged and to no longer be valid and enforceable.

110.	A judicial determination that the Marcil Guarantees have been discharged based on CB&T's conduct is necessary and appropriate at this time, as CB&T is currently attempting to enforce rights under the guaranties. Second cause of action for elder financial abuse

## SECOND CAUSE OF ACTION

(Financial Elder Abuse against Shyam, Cantor Manager, CB&T and ROES 1-10)

111.	Cross Complainants reallege and incorporate herein by this reference each and every one of the foregoing paragraphs, from paragraph number 1 to and including the immediately preceding numbered paragraph, as though each such paragraph were set forth herein in full.

112.	At all relevant times from the inception of the Cantor II Loan Agreement and Cantor IV Loan Agreement and the Marcil Guarantees, Marcil was over the age of 65.

113.	CB&T deliberately and intentionally took action and participated in, or otherwise assisted in, the transactions described herein pursuant to which it acquired the Marcil Guarantees and enriched itself through interest payments and reimbursements of fees and costs from Cantor II and Cantor IV all to Marcil's detriment.

114.	On information and belief, CB&T, Shyam, and Cantor Manager, in obtaining the Marcil Guaranties, took advantage of Marcil because CB&T, Shyam, and Cantor Manager knew that CB&T required but lacked a perfected first priority security interest in the mortgage loans purchased with the Cantor II loan proceeds and the Cantor IV loan proceeds

115. On information and belief, CB&T, Shyam, and Cantor Manager obtained the Marcil Guaranties for a wrongful use and with the intent to defraud, because they did so while knowing that Marcil and the Marcil Trust were unaware that they would necessarily become liable on the guarantees due to the fact that Cantor II and Cantor IV had failed to provide CB&T with the perfected first priority security interest in the mortgage loans that CB&T was supposed to have.

116. In the event that CB&T's allegations of defaults by Cantor II and Cantor IV are found to be true, then Marcil and the Marcil Trust will have been harmed as a result of CB&T, Shyam, and Cantor Manager having obtained the Marcil Guaranties.

117. In the event that CB&T's allegations of defaults by Cantor II and Cantor IV are found to be true, then CB&T, Shyam, and Cantor Manager's conduct will have been a substantial factor in causing harm to Marcil and the Marcil Trust.

118. CB&T has asserted rights over Marcil's property through the Marcil Guarantees, which Marcil Guarantees were obtained through fraud and material non-disclosures, and as against Marcil, an elder, to a wrongful use or with the intent to defraud or by undue influence within the meaning of Welfare & Institutions Code § 15610.30;

119. In engaging in such conduct, CB&T intended to defraud Cross-Claimant within the meaning of Welfare & Institutions Code § 15610.30.

120. In engaging in such conduct, CB&T used "undue influence" over Marcil to act or refrain from acting by overcoming Marcil's free will resulting in inequity, within the meaning of Welfare & Institutions Code § 15610.70(a).

121. On information and belief, CB&T, Shyam, and Cantor Manager knew or should have known that its conduct was likely to be harmful to Marcil.

122. As a direct and proximate cause of CB&T's conduct, Marcil has been deprived of his property and has sustained related damages of loss of income on his interest thereon, has incurred attorneys' fees and costs, and will incur additional expenses connected with this litigation, which Marcil believes to be in excess of $60,000,000.

123. CB&T's conduct was a substantial factor in causing Marcil to suffer the harm of which he complains herein.

CROSS-COMPLAINT AGAINST ZIONS BANCORPORATION, ET AL.

25

124. In addition to all other remedies provided by law, Marcil is entitled to recover reasonable attorneys' fees and costs for financial abuse pursuant to Welfare & Institutions Code § 15657.5.

125. The conduct of CB&T constituted recklessness, oppression, fraud and/or malice in the commission of the financial abuse and Marcil is entitled to recover punitive and exemplary damages for the sake of example and by way of punishing CB&T for financial elder abuse pursuant to Welfare & Institutions Code § 15657.5 and Civil Code § 3294.

## THIRD CAUSE OF ACTION

(Breach of the Implied Covenant of Good Faith and Fair Dealing against CB&T)

126. Cross Complainants reallege and incorporate herein by this reference each and every one of the foregoing paragraphs, from paragraph number 1 to and including the immediately preceding numbered paragraph, as though each such paragraph were set forth herein in full.

127. CB&T had reason to believe its decision to make, and action in making, loan advances to Cantor II and Cantor IV pursuant to the Cantor II Loan Agreement and the Cantor IV Loan Agreement, respectively, despite that neither Cantor II nor Cantor IV had provided the documentation that was required by such loan agreements, the provision of which was a condition to being eligible for such advances, and which documentation was necessary for CB&T to conduct a good faith determination of the borrowers' compliance with the preconditions for such advances under their respective loan agreements and to determine whether, or if, the Collateral constituted an Eligible Receivable upon which advance could be made or, conversely, an Ineligible Receivable upon which advances were prohibited (collectively, the "Risk Alteration Decision"), had the effect of allowing the subject loans to be unsecured rather than secured from the inception, which materially increased the underlying risk of default on the indebtedness guaranteed by the Marcil Guarantees relative to the risk of default on the guaranteed indebtedness that would have existed had CB&T performed its obligations under the loan agreements to receive and review such documentation and to make good faith determinations about whether to approve or not approve the Borrowers' respective loan advance requests (collectively, the "Resulting Increased Risk").

CROSS-COMPLAINT AGAINST ZIONS BANCORPORATION, ET AL.

26

At all times, CB&T knew and has admitted that the change in risk from a first- priority fully secured position to fully unsecured, was material to risks embodied in the Loan Agreements and, in turn, the Marcil Guaranties.

128. CB&T had reason to believe that the Risk Alteration Decision was unknown to Marcil, including because the operative loan documents were not thereafter amended and also because Marcil was neither a manager nor an authorized signatory for either entity and because Marcil was not copied on or otherwise involved in any discussions or correspondence concerning Cantor II's and Cantor IV's requests for loan advances or CB&T's decisions to grant those requests.

129. CB&T had a reasonable opportunity to communicate with Marcil, including to provide notice to him of the Risk Alteration Decision, as demonstrated by CB&T's admission that its loan officer had met with Marcil in-person on at least two occasions and had communicated with Marcil by email, which proves CB&T had Marcil's contact information and readily available means of communicating with Marcil.

130. CB&T had a duty to disclose the Risk Alteration Decision to Marcil in light of its materiality, CB&T's knowledge that the Risk Alteration Decision was unknown to Marcil, and CB&T's opportunity to disclose the Risk Alteration Decision to Marcil.

131. By failing to give Marcil notice of the Risk Alteration Decision, CB&T breached its duty of disclosure and exposed Marcil to the Resulting Increased Risk without his knowledge and thereby gave Marcil a false impression as to the nature of the risk being assumed by the Marcil Guarantees, and CB&T thereby violated its covenant of good faith and fair dealing with Marcil.

132. Had CB&T informed Marcil of the Risk Alteration Decision, Marcil would not have provided the Marcil Guarantees to CB&T.

133. As a consequence of CB&T's violation of its covenant of good faith and fair dealing, as set forth herein, the Marcil Guarantees should be deemed to have been discharged, cancelled, and otherwise of no further force or affect.

**FOURTH CAUSE OF ACTION**

(Fraud in the Inducement against Shyam, Cantor Manager,

CB&T and ROES 1-10)

CROSS-COMPLAINT AGAINST ZIONS BANCORPORATION, ET AL.

27

134. Cross Complainants reallege and incorporate herein by this reference each and every one of the foregoing paragraphs, from paragraph number 1 to and including the immediately preceding numbered paragraph, as though each such paragraph were set forth herein in full.

135. In requesting that Marcil sign the amended and restated guarantees for the Cantor II Loan Agreement and the Cantor IV Loan Agreement, respectively, Shyam, Cantor Manager, CB&T and ROES 1-10 did not provide Marcil with notice of its Risk Alteration Decision despite their recognition of the Resulting Increased Risk and materiality thereof, their reasons to believe Marcil was not aware of the Risk Alteration, and their opportunity to have provided such notice to Marcil.

136. Shyam, Cantor Manager, CB&T and ROES 1-10 had a duty to disclose the Risk Alteration Decision to Marcil in light of its materiality, their knowledge that the Risk Alteration Decision was unknown to Marcil, and their opportunity to disclose the Risk Alteration Decision to Marcil.

137. Shyam, Cantor Manager, CB&T and ROES 1-10 intentionally concealed the Risk Alteration Decision from Marcil in order to induce them to provide the Marcil Guarantees at the outset and then to not terminate the Marcil Guarantees thereafter.

138. In providing the Marcil Guarantees, and allowing them to remain extant while the Borrowers continued to borrow under their respective loans, Marcil reasonably relied on the assumption that Shyam, Cantor Manager, CB&T and ROES 1-10 would perform their obligations in good faith under the Cantor II Loan Agreement and the Cantor IV Loan Agreement, including, without limitation, to require that the respective Borrowers be eligible for the loan advances that they would request from time to time under the respective loan documentation as a condition to CB&T approving and funding any such loan advance requests (collectively, the "Risk Reliance Assumptions").

139. The Risk Alteration Decision conflicted with and subverted the Risk Reliance Assumptions.

140. Had Shyam, Cantor Manager, CB&T or ROES 1-10 informed Marcil of the Risk Alteration Decision, Marcil would not have provided the Marcil Guarantees to CB&T.

CROSS-COMPLAINT AGAINST ZIONS BANCORPORATION, ET AL.

28

141.    Maril has been damaged by Shyam's, Cantor Manager's, CB&T's and ROES 1-10's conduct as described herein in substantial amounts, to be proven at trial, including, without limitation, legal fees and costs as well as any damages resulting from any and all action that CB&T has taken and may take in the future in respect of the Marcil Guarantees.

142.    Maril has suffered consequential damages proximately caused by Shyam's, Cantor Manager's, CB&T's and ROES 1-10's conduct as described herein, including the losses Marcil has suffered as an investor in Cantor II because the value of such investment has been materially adversely affected by the Risk Alteration Decision because it enabled the Borrowers to leverage or otherwise dispose of the assets purchased with proceeds of the respective loans which thereby enabled those in control of the Borrowers to abscond with additional capital to Marcil's detriment.

143.    In the event that CB&T's allegations of defaults by Cantor II and Cantor IV are found to be true, then on information and belief Shyam, Cantor Manager, CB&T and ROES 1-10, knew that Marcil and the Marcil Trust were themselves unaware that CB&T lacked a perfected first-priority security interest in the mortgage loans purchased with the Cantor II loan proceeds and the Cantor IV loan proceeds, because CB&T required Cantor II and Cantor IV to agree that only Shyam and Cantor Manager would be authorized to act for Cantor II and Cantor IV, respectively.

144.    On information and belief, CB&T as a federally chartered bank that itself had determined that collateral was required in exchange for extensions of credit under the Cantor II loan and the Cantor IV loan, knows that if it lacks a perfected first-priority security interest in the mortgage loans purchased with the Cantor II loan proceeds and the Cantor IV loan proceeds, such an absence of security would fundamentally alter the nature of the risk that Marcil and the Marcil Trust agreed to guarantee by substantially increasing the risk.

145.    On information and belief, CB&T lacked a perfected first-priority security interest in the mortgage loans purchased with the Cantor II loan proceeds and the Cantor IV loan proceeds.

146.    On information and belief, CB&T knew that it lacked a perfected first-priority security interest in the mortgage loans purchased with the Cantor II loan proceeds and the Cantor IV loan proceeds because the documents what were supposed to be recorded to perfect that first priority

lien interest were, on their face, to be returned to CB&T after their recording; CB&T's loan files show that it had in its possession notarized but unrecorded copies of those instruments.

147.    In the event that CB&T's allegations of defaults by Cantor II and Cantor IV are found to be true, then on information and belief CB&T desired that Marcil and the Marcil Trust agree to guarantee the Cantor II loan and the Cantor IV loan in reliance on the false understanding that CB&T had a perfected first-priority security interest in the mortgage loans.

148.    CB&T had a duty to disclose to Marcil that CB&T did not have a perfected first-priority security interest in the mortgage loans before Marcil agreed to guarantee the Cantor II loan and the Cantor IV loan whose proceeds were used to purchase the mortgage loans.

149.    In the event that CB&T's allegations of defaults by Cantor II and Cantor IV are found to be true, then on information and belief CB&T failed to disclose to Marcil that CB&T's security interest in the mortgage loans was not perfected as required.

150.    It was reasonable of Marcil to rely on the understanding that CB&T had a perfected first-priority security interest in the mortgage loans.

151.    In reliance on these representations, the Marcil agreed to sign the Marcil Guaranties.

152.    In the event that CB&T's allegations of defaults by Cantor II and Cantor IV are found to be true, then on information and belief CB&T's misrepresentation concerning the type of loans being guaranteed (secured) vs. what they really were (unsecured) was a material misrepresentation designed to induce the Marcil to enter into the subject guarantees.

153.    In the event that CB&T's allegations of defaults by Cantor II and Cantor IV are found to be true, then on information and belief Marcil will have been harmed as a result of CB&T's misrepresentation as Marcil signed a guarantee for a completely different risk than what CB&T had represented.

154.    In the event that CB&T's allegations of defaults by Cantor II and Cantor IV are found to be true, then Marcil's reliance on CB&T's misrepresentation will have been a substantial factor in causing Marcil harm.

155.    The conduct of CB&T constituted fraud and/or malice and Marcil is entitled to recover punitive and exemplary damages for the sake of example and by way of punishing CB&T.

CROSS-COMPLAINT AGAINST ZIONS BANCORPORATION, ET AL.

30

**FIFTH CAUSE OF ACTION**

(Gross Negligence against CB&T)

156.    Cross Complainants reallege and incorporate herein by this reference each and every one of the foregoing paragraphs, from paragraph number 1 to and including the immediately preceding numbered paragraph, as though each such paragraph were set forth herein in full.

157.    To the extent CB&T claims that it did not knowingly and intentionally make loans to Cantor II and to Cantor IV despite that neither of them qualified for advances under the Cantor II Loan Agreement and the Cantor IV Loan Agreement, respectively, for their failure to provide the required documentation concerning the promised perfected security interests the provision of which was a condition to their eligibility to borrow under their respective loans, then CB&T conduct in making such loans was the result of CB&T's gross negligence, including its conscious indifference to, or its reckless disregard of, Marcil's rights and interests as a guarantor.

158.    In requesting that Marcil sign the Marcil Guarantees for the Cantor II Loan Agreement and the Cantor IV Loan Agreement, respectively, CB&T did not provide Marcil with notice of its Risk Alteration Decision despite its recognition of the Resulting Increased Risk, its reasons to believe Marcil was not aware of the Risk Alteration Decision, and its opportunity to have provided such notice to Marcil.

159.    In breaching its duty of care to disclose the Risk Alteration Decision to Marcil as described herein, to the extent CB&T claims that it did not make a knowing and intentional decision to not disclose the Risk Alteration Decision to Marcil, then its decision to not disclose the Risk Alteration Decision to Marcil was the result of CB&T's gross negligence, including its conscious indifference to, or its reckless disregard of, Marcil's rights and interests as a guarantor.

160.    Had Marcil been aware of the Risk Alteration Decision, Marcil would not have provided the Marcil Guarantees to CB&T.

161.    Maril has been damaged by CB&T's conduct as described herein in substantial amounts, to be proven at trial, including, without limitation, legal fees and costs as well as any damages resulting from any and all action that CB&T has taken and may take in the future in respect of the Marcil Guarantees.

## SIXTH CAUSE OF ACTION

(Implied Equitable Indemnity against Shyam, Cantor Manager, and ROES 1-10)

162.    Cross Complainants reallege and incorporate herein by this reference each and every one of the foregoing paragraphs, from paragraph number 1 to and including the immediately preceding numbered paragraph, as though each such paragraph were set forth herein in full.

163.    At all relevant times, Shyam managed the Cantor entities, including Cantor II and Cantor IV, in his capacity as the manager of the Cantor Group Manager, the managing member of all Cantor entities.

164.    In this capacity, Shyam and Cantor Manager knew that the terms of the Loan Agreements required perfected security interest in CB&T or, as Shyam recently testified, said Loan Agreements had been radically altered to eliminate the requirement of perfected security interests by means of an implied waiver by CB&T.

165.    At no time did Shyam ever disclose to Marcil that either Cantor II or Cantor IV were not complying with the stated terms of the Loan Agreements or that CB&T had waived those requirements.

166.    The requirement of perfected security interests in the assets pledged by Cantor II and Cantor IV by way of the Loan Agreements was material to Marcil insofar as such perfected interests protected Marcil from any losses relating to his guaranties.

167.    Unlike Marcil, who had no role in ensuring Cantor II or Cantor IV's requirements under the Loan Agreement, Shyam held such a position at all relevant times.

168.    By way of this lawsuit, CB&T seeks to hold Marcil liable under guaranties he provided with respect to the Loan Agreements, Loan Agreements that Marcil understood were to be fully secured and such security perfected.  As a result of Shyam's failure to perfect such security notwithstanding the obligation of Cantor II and Cantor IV to do so and notwithstanding Shyam's managerial role over these entities, including specifically his involvement in executing requests for advance, executing the Loan Agreements, and executing all assignments and collateral assignment, Shyam failed to use reasonable care, which failure has exposed Marcil to potential liability.

CROSS-COMPLAINT AGAINST ZIONS BANCORPORATION, ET AL.

32

169.     Additionally, and notwithstanding their knowledge of the pledge of at least sixteen assets to CB&T relating to Cantor II and Cantor IV, Shyam and Cantor Manager sought and obtained additional financing on these properties without disclosing the existence of the deeds of trust in favor of CB&T to the new lenders, allowing the new lenders to perfect their security, and in a manner that rendered CB&T, which is unsecured, subordinate to these new lenders.

170.     In addition to managing Cantor II and Cantor IV through his position as the manager of Cantor II and Cantor IV's managing member, Shyam also guaranteed the Cantor IV Loan Agreement.

171.     Shyam's failure to perfect security interests in the Cantor entities and, in turn, in CB&T was a substantial factor in causing CB&T harm and a substantial factor in CB&T seeking to exercise its rights in the Marcil Guaranties and potentially causing Marcil at least $60 million in damages.

172.     Setting aside whether the Marcil Guaranties are enforceable in light of the material and adverse change in risk that was not disclosed to Marcil by CB&T or Shyam, to the extent Marcil is found to have any liability under either or both of the Marcil Guaranties, such liability should be borne entirely by Shyam and Cantor Manager as a result of (i) their control of and failure as a manager of Cantor II and Cantor IV to ensure perfected interests in CB&T's favor and (ii) their failure to disclose the material and adverse change in risk to the Cantor II and Cantor IV Loan Agreements and, in turn, the Marcil Guaranties.  Additionally, Shyam and Cantor Manager, and not Marcil, should be found to be 100% liable on the Cantor IV Loan Agreement, to the extent any of the Defendants are found liable, in light of the above facts and the fact that Shyam provided a guaranty as well and, unlike, Marcil was aware of the material change in risk and was in control of Cantor IV at all relevant times

173.     On information and belief, Shyam and Cantor Manager controlled Cantor II and Cantor IV and because of their control, among other things, they were required to see to it that CB&T had a perfected first-priority security interest in the mortgage loans that were purchased with the proceeds of the Cantor II loan and the Cantor IV loan.

CROSS-COMPLAINT AGAINST ZIONS BANCORPORATION, ET AL.

33

174.    In the event that CB&T's allegations of defaults by Cantor II and Cantor IV are found to be true, then on information and belief Shyam and Cantor Manager failed to see to it that CB&T had a perfected first-priority security interest in the mortgage loans that were purchased with the proceeds of the Cantor II loan and the Cantor IV loan.

175.    In the event that CB&T's allegations of defaults by Cantor II and Cantor IV are found to be true, then Marcil will have been damaged by the failure of Shyam and Cantor Manager to see to it that CB&T had a perfected first-priority security interest in the mortgage loans that were purchased with the proceeds of the Cantor II loan and the Cantor IV loan, because CB&T has sued Marcil and the Marcil Trust on their guarantees of the Cantor II loan and the Cantor IV loan.

176.    In the event that CB&T's allegations of defaults by Cantor II and Cantor IV are found to be true, then had Shyam and Cantor Manager properly exercised their control over Cantor II and Cantor IV as to the Cantor II loan and the Cantor IV loan, Marcil and the Marcil Trust would never have been sued by CB&T.

177.    In the event that CB&T's allegations of defaults by Cantor II and Cantor IV are found to be true, then on information and belief Shyam and Cantor Manager breached fiduciary duties that they owe to Cantor II and Cantor IV as a result of their failing to see to it that CB&T had a perfected first-priority security interest in the mortgage loans that were purchased with the proceeds of the Cantor II loan and the Cantor IV loan, and on that basis should be required to pay Marcil and the Marcil Trust any damages that they may be required to pay to CB&T as a result of Shyam and Cantor Manager's breaches.

178.    In the event that CB&T's allegations of defaults by Cantor II and Cantor IV are found to be true, then Shyam and Cantor Manager will be unjustly enriched unless they are required to pay CB&T all amounts that Marcil and the Marcil Trust are determined to owe CB&T on their guarantees, should such determinations be made.

179.    In the event that CB&T's allegations of defaults by Cantor II and Cantor IV are found to be true, then Marcil is entitled to be made whole by Shyam and Cantor Manager for any amounts that Marcil and the Marcil Trust are required to pay CB&T on their guarantees, should they be so required.

## **SEVENTH CAUSE OF ACTION**

(Breach of Fiduciary Duty Owed to Cantor II as Derivative Claim - Cantor II,

Cantor Manager and Shyam)

180. Cross Complainants reallege and incorporate herein by this reference each and every one of the foregoing paragraphs, from paragraph number 1 to and including the immediately preceding numbered paragraph, as though each such paragraph were set forth herein in full.

181. On information and belief, Marcil was a member of Cantor II from its formation onward, including without limitation at the time of the Cantor II loan.

182. Because Marcil was a member, but not a manager, of Cantor II, the knowledge that Shyam and Cantor Manager had as manager of Cantor II cannot be imputed to Marcil.

183. Marcil as a member of Cantor II may assert a cause of action in the name of Cantor II as permitted by Corporations Code § 17709.02.

184. Marcil brings the within cause of action for breach of fiduciary duties owed to Cantor II on the grounds that, if CB&T's allegations that Cantor II and Cantor IV were in default to CB&T are found to be true, then Cantor II will need to vindicate its rights as against those persons who may have breached fiduciary duties owed to Cantor II and, in so doing, caused Cantor II to default on its obligations to CB&T (assuming *arguendo* any such default occurred).

185. Marcil believes that if CB&T's allegations that Cantor II was in default to CB&T are found to be true, it is uncertain whether or not Cantor II will pursue relief against persons who may be legally responsible for having caused the defaults.

186. Shyam and Cantor Manager owe a duty of loyalty to Cantor II is defined without limitation in Corporations Code § 17704.09 and which requires Shyam and Cantor Manager to refrain from dealing with Cantor II in the conduct of its business as or on behalf parties having an interest adverse to Cantor II.

187. In the event that CB&T's allegations of defaults by Cantor II are found to be true, then on information and belief Shyam and Cantor Manager are responsible for such defaults because they caused Cantor II to fail in fulfilling the requirement that CB&T have a perfected first priority

interest in the mortgage loans that were purchased using the Cantor II loan proceeds, and such failure was adverse to Cantor II because it exposed it to liability to CB&T.

188.    Shyam and Cantor Manager owe a duty of care to Cantor II that is defined without limitation in Corporations Code § 17704.09 and which requires Shyam and Cantor Manager to refrain from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

189.    In the event that CB&T's allegations of defaults by Cantor II are found to be true, then on information and belief the failure of Shyam and Cantor Manager to see to it that CB&T had a perfected first priority lien interest in the mortgage loans that were purchased using the Cantor II loan proceeds constitutes the lack of any care, whatsoever, or at least an extreme departure from what a reasonably careful person in their positions as manager of Cantor II would do to prevent harm to Cantor II and CB&T.

190.    In the event that CB&T's allegations of defaults by Cantor II are found to be true, then on information and belief it will have been the failure of Shyam and Cantor Manager to see to it that CB&T had a perfected first priority security interest in the mortgage loans that were purchased using the Cantor II loan proceeds that caused Cantor II to be in breach of its obligations to CB&T on the Cantor II loan.

191.    In the event that CB&T's allegations of defaults by Cantor II are found to be true, then as a result of the breaches of Cantor II obligations to CB&T on the Cantor II, there will be damages incurred because, at a minimum, Cantor II and Cantor IV will be required to indemnify those who guaranteed the Cantor II loan and the Cantor IV loan.

192.    Marcil has not demanded that Cantor II seek redress from Cantor Manager and Shyam for breaches of the duties of loyalty and care.

193.    On information and belief, Cantor Manager and Shyam at all times have had exclusive control over Cantor II and Cantor IV and are themselves responsible for evaluating and deciding whether or not Cantor II and Cantor IV should sue any persons on the grounds that such persons breached fiduciary duties owed to Cantor II and Cantor IV.

CROSS-COMPLAINT AGAINST ZIONS BANCORPORATION, ET AL.

36

194.    Marcil has not demanded that Cantor II and Cantor IV seek redress from Cantor Manager and Shyam for their breaches of the duties of loyalty and care because it has yet to be determined whether CB&T's allegations that Cantor II and Cantor IV were in default to CB&T are true, and even if those allegations are determined to be true it would be futile to make such a demand because it would be unreasonable to believe that the potential targets of a breach of fiduciary duty claim to be pursued by the entity that such targets control would be capable of making a disinterested determination of whether the entity should pursue the targets.

195.    On information and belief, Marcil has not demanded that Cantor II and Cantor IV seek redress from Cantor Manager and Shyam for their breaches of the duties of loyalty and care because it has yet to be determined whether CB&T's allegations that Cantor II and Cantor IV were in default to CB&T are true, and because even if CB&T's allegations in that regard are found to be true, there are not enough independent members of Cantor II and Cantor IV who could cause Cantor II and Cantor IV to take legal action against Cantor Manager and Shyam.

196.    Marcil has not demanded that Cantor II and Cantor IV seek redress from Cantor Manager and Shyam for their breaches of the duties of loyalty and care because it has yet to be determined whether CB&T's allegations that Cantor II and Cantor IV were in default to CB&T are true and because Marcil is not a controlling member of Cantor II and he was only very recently made aware of the alleged conduct by Cantor II and Cantor IV such that there has been insufficient opportunity for Marcil to make the demand.

197.    It is unnecessary for Marcil to send a copy of this Cross Complaint to Cantor II, Cantor IV, Shyam, and Cantor Manager before it is filed because Shyam is in control of Cantor II, Cantor IV, and Cantor Manager and is already a defendant such that Shyam has been on notice since CB&T commenced its action of the possibility that Shyam might become subject to breach of fiduciary duty claims.  In addition, Marcil will need to pursue breach of fiduciary duty claims against Shyam only if it is first determined that CB&T's allegations of defaults by Cantor II and Cantor IV are found to be true.

///

CROSS-COMPLAINT AGAINST ZIONS BANCORPORATION, ET AL.

37

## **EIGHTH CAUSE OF ACTION**

(Breach of Fiduciary Duty Owed to Marcil as Direct Claim - Cantor II,

Cantor Manager, Shyam, and ROES 1-10)

198.    Cross Complainants reallege and incorporate herein by this reference each and every one of the foregoing paragraphs, from paragraph number 1 to and including the immediately preceding numbered paragraph, as though each such paragraph were set forth herein in full.

199.    On information and belief, Marcil was a member of Cantor II from its formation onward.

200.    On information and belief, the extent of Marcil's membership interest in Cantor II was such that Marcil at all times held a non-controlling interest in Cantor II.

201.     Because Marcil was a member, but not a manager, of Cantor II, the knowledge that Shyam and Cantor Manager had as managers of Cantor II cannot be imputed to Marcil.

202.    Shyam and Cantor Manager owe duties of loyalty and care to Marcil.

203.    The duty of loyalty that Shyam and Cantor Manager owe to Marcil is defined without limitation in Corporations Code § 17704.09 and requires Shyam and Cantor Manager to refrain from dealing with Cantor II in the conduct of their business as or on behalf parties having an interest adverse to Cantor II.

204.    On information and belief, Shyam and Cantor Manager caused Cantor II to fail in fulfilling the requirement that CB&T have a perfected first-priority interest in the mortgage loans that were purchased using the Cantor II loan proceeds, and that such failure was adverse to Cantor II because it exposed it to liability to CB&T.

205.    The duty of care that Shyam and Cantor Manager owe to Marcil is defined without limitation in Corporations Code § 17704.09 and requires Shyam and Cantor Manager to refrain from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violations of law.

206.    On information and belief, the failure of Shyam and Cantor Manager to see to it that CB&T had a perfected first-priority security interest in the mortgage loans that were purchased using the Cantor II loan proceeds constitutes the lack of any care, whatsoever, or at least an extreme

departure from what a reasonably careful person in their positions as managers of Cantor II would do to prevent harm to Marcil, Cantor II, Cantor IV, and CB&T.

207.    In the event that CB&T's allegations of defaults by Cantor II and Cantor IV are found to be true, then the failure of Shyam and Cantor Manager to see to it that CB&T had a perfected first- priority security interest in the mortgage loans that were purchased using the Cantor II loan proceeds and the Cantor IV loan proceeds will have caused Cantor II and Cantor IV to be in breach of their obligations to CB&T on the Cantor II loan and the Cantor IV loan, respectively.

208.    In the event that CB&T's allegations of defaults by Cantor II and Cantor IV are found to be true, then as a result of the breaches of Cantor II and Cantor IV's obligations to CB&T on the Cantor II loan and the Cantor IV loan, respectively, there will be damages incurred because, at a minimum, Cantor II and Cantor IV will be required to indemnify those who guaranteed the Cantor II loan and the Cantor IV loan.

## NINTH CAUSE OF ACTION

(Express Indemnity - Cantor II, Cantor IV, and ROES 1-10 )

209.    Cross Complainants reallege and incorporate herein by this reference each and every one of the foregoing paragraphs, from paragraph number 1 to and including the immediately preceding numbered paragraph, as though each such paragraph were set forth herein in full.

210.    On information and belief, the documents that govern Cantor II and Cantor IV, respectively, require them to, without limitation, indemnify and hold harmless any individual, trust, or other entity that that provides a guaranty of any obligation of Cantor II and Cantor IV from and against all losses arising from any and all actions brought under such guaranty.

211.    Marcil provided guarantees of the Cantor II loan and the Cantor IV loan and CB&T has sued Marcil on those guarantees.

212.    In the event that CB&T's allegations that Cantor II and Cantor IV defaulted on their obligations to CB&T are found to be true such that the liability of Marcil and the Marcil Trust to CB&T under their guarantees is implicated, then Marcil is entitled to be made whole by Cantor II and Cantor IV for any amounts that Marcil and the Marcil Trust are required to pay CB&T on their guarantees, should they be so required.

**TENTH CAUSE OF ACTION**

(Breach of Contract – CB&T and ROES 1-10 )

213.    Cross Complainants reallege and incorporate herein by this reference each and every one of the foregoing paragraphs, from paragraph number 1 to and including the immediately preceding numbered paragraph, as though each such paragraph were set forth herein in full.

214.    CB&T, on the one hand, and Marcil on the other hand, entered into the contracts (the Marcil Guaranties) by which Marcil agreed to guarantee payment of the Cantor II loan and the Cantor IV loan.

215.    Marcil did what was required of Marcil under the Marcil Guaranties.

216.    Pursuant to § 4.4.6 of the loan and security agreements with respect to the Cantor II loan and the Cantor IV loan, CB&T was subject to a condition precedent to CB&T's disbursement of funds that required CB&T – before CB&T disbursed any funds under the Cantor II loan and the Cantor IV loan – to review, approve, and then maintain records evidencing perfected security interests in the collateral purchased with the proceeds of such loans.

217.    CB&T disbursed funds under the Cantor II loan and the Cantor IV loan without obtaining evidence of the firs- priority perfected security interest as required.

218.    In the event that CB&T's allegations of defaults by Cantor II and Cantor IV are found to be true, then CB&T's disbursement of funds under the Cantor II loan and the Cantor IV loan without receiving and reviewing documents evidencing the first-priority perfected security interest as required, will have been a violation of the Marcil Guaranties.

219.    In the event that CB&T's allegations of defaults by Cantor II and Cantor IV are found to be true, then CB&T's failure to receive, review and maintain documentary evidence of the required first priority perfected security interest as required before disbursing funds under the Cantor II loan and the Cantor IV loan will have harmed Marcil by exposing Marcil to potential liability to which Marcil would not have been exposed had CB&T done what CB&T was supposed to have done pursuant to the Loan Agreements.

///

CROSS-COMPLAINT AGAINST ZIONS BANCORPORATION, ET AL.

40

220.    In the event that CB&T's allegations of defaults by Cantor II and Cantor IV are found to be true, then CB&T's breach of contract will have been a substantial factor in causing Marcil's harm.

## PRAYER FOR RELIEF

**WHEREFORE**, Gerald Marcil respectfully prays for judgment as follows:

1.    For judgment in Marcil's favor and against CB&T on all causes of action asserted by CB&T against Marcil arising from or relating to the Marcil Guaranties;

2.    On the first cause of action of Marcil's cross-complaint, for declaratory relief, for a judgment declaring that the Marcil Guarantees shall be for all purposes deemed discharged, cancelled, and otherwise of no further force or effect;

3.    On the second cause of action of Marcil's cross-complaint, for financial elder abuse, for a judgment for actual, consequential, general, special and punitive damages where appropriate, in an amount to be proven at trial;

4.    On the third cause of action of Marcil's cross-complaint, for breach of the implied covenant of good faith and fair dealing, for a judgment that the Marcil Guarantees shall be for all purposes deemed discharged, cancelled, and otherwise of no further force or effect;

5.    On the fourth cause of action of Marcil's cross-complaint, for fraud in the inducement, for a judgment that the Marcil Guarantees shall be for all purposes deemed discharged, cancelled, and otherwise of no further force or effect, and for actual, consequential, general, special and punitive damages where appropriate, in an amount to be proven at trial;

6.    On the fifth cause of action of Marcil's cross-complaint, for gross negligence, for a judgment that the Marcil Guarantees shall be for all purposes deemed discharged, cancelled, and otherwise of no further force or effect, and for actual, consequential, and general damages in an amount to be proven at trial;

7.    On the sixth cause of action of Marcil's cross-complaint, for implied or equitable indemnity, for a judgment that Shyam, Cantor Manager, and ROES 1-10, are financially responsible for any liability of Marcil arising from the causes of action asserted against Marcil by CB&T, if any;

8.       On the seventh cause of action of Marcil's cross-complaint, for breach of fiduciary duty owed to Cantor II as a derivative claim, for compensatory damages in an amount to be proven at trial;

9.       On the eighth cause of action of Marcil's cross-complaint, for breach of fiduciary duty owed to Marcil as a direct claim, for compensatory damages in an amount to be proven at trial;

10.     On the ninth cause of action of Marcil's cross-complaint, for express indemnity owing by Cantor II, Cantor IV, and ROES 1-10, for compensatory damages in an amount to be proven at trial;

11.     On the tenth cause of action of Marcil's cross-complaint, for breach of contract against CB&T and ROES 1-10, for compensatory damages in an amount to be proven at trial;

12.     On all causes of action, for prejudgment interest as allowed by law;

13.     On all causes of action, for costs of suit incurred herein as allowed by law;

14.     On all causes of action, for reasonable attorneys' fees and costs as allowed by law in the total amount to be determined after trial; and

15.     For such other and further relief for Marcil's benefit as the Court deems to be just and proper.

DATED:  January 5, 2026                          **BG LAW LLP**


By:_____
Steven T. Gubner
Jerrold L. Bregman
Jason B. Komorsky
*Attorneys for Defendant Gerald J. Marcil,*
*Individually, and together with Carol L.*
*Marcil as Trustees of The Marcil Family Trust*

CROSS-COMPLAINT AGAINST ZIONS BANCORPORATION, ET AL.

42

## PROOF OF SERVICE

At the time of service I was over 18 years of age and not a party to this action.  My business address is 21650 Oxnard Street Suite 500 Woodland Hills, CA 91367.

On January 5, 2026, I served the following document described as: **CROSS-COMPLAINT AGAINST ZIONS BANCORPORATION, NATIONAL ASSOCIATION, DBA CALIFORNIA BANK & TRUST AND DEBA SHYAM**
on the persons listed below:

### SEE ATTACHED LIST

☐ **By United States mail:**  I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses listed above and placed the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with this business's practice for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.  I am a resident or employed in the county where the mailing occurred.  The envelope or package was placed in the mail at Woodland Hills, CA.

☐ **By overnight delivery:**  I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses listed above.  I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

☐ **By messenger service:**  I served the documents by placing them in an envelope or package addressed to the persons at the addresses listed above and providing them to a professional messenger service for service.

☒ **By e-mail or electronic transmission:**  Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct.

Executed on January 5, 2026, at Woodland Hills, CA.

_____
Nikola A. Fields

CROSS-COMPLAINT AGAINST ZIONS BANCORPORATION, ET AL.

43

## <u>SERVICE LIST</u>

*ZIONS BANCORPORATION, NATIONAL ASSOCIATION, DBA CALIFORNIA BANK & TRUST vs.
ANDREW STUPIN; GERALD J. MARCIL, ET AL.*
Case No. 25STCV30156

| | |
|---|---|
| **SIGNATURE RESOLUTION – Century City**<br>Hon. Mitchell L. Beckloff (Ret.)<br>Sandra Estropia, Associate Case Administration<br>2049 Century Park East, Suite 620<br>Los Angeles, CA 90067<br>Telephone: (213) 433-5740<br>Email: mbeckloff@signatureresolution.com<br>        sestropia@signatureresolution.com | *Judicial Referee*<br><br><br>*VIA E-MAIL & UPLOADED TO PORTAL* |
| **MILLER BARONDESS, LLP**<br>Louis R. Miller, Esq.<br>A. Sasha Frid, Esq.<br>Jeffery B. White, Esq.<br>2121 Avenue of the Stars, Suite 2600<br>Los Angeles, California 90067<br>Email: smiller@millerbarondess.com<br>        sfrid@millerbarondess.com<br>        jwhite@millerbarondess.com | *Attorneys for Plaintiff*<br>ZIONS BANCORPORATION, N.A., dba<br>CALIFORNIA BANK & TRUST<br><br><br>*VIA E-MAIL ONLY* |
| **LEVENE, NEALE, BENDER, YOO & GOLUBCHIK LLP**<br>David B. Golubchik, Esq.<br>Joseph Rothberg, Esq.<br>2818 La Cienega Avenue<br>Los Angeles, California 90034<br>Telephone: (310) 229-1234<br>Email: dbg@LNBYG.com<br>        jmr@LNBYG.com | *Attorneys for Defendants*<br>Andrew Stupin and Andrew Stupin and Julie K. Stupin, As Trustees of the Stupin Family Trust Dated April 3, 2009<br><br><br>*VIA E-MAIL ONLY* |
| **LARLAW, a Professional Law Corp.**<br>Larry A. Rothstein, Esq.<br>2625 Townsgate Road, Suite 330<br>Westlake Village, CA 91361<br>E-mail: lar@larlaw.net | *Attorneys for Defendant*<br>Deba Shyam<br><br>*VIA E-MAIL ONLY* |

LEVENE, NEALE, BENDER, YOO & GOLUBCHIK LLP
DAVID B. GOLUBCHIK (State Bar No. 185520)
JOSEPH ROTHBERG (State Bar No. 286363)
MICHAEL G. D'ALBA (State Bar No. 264403)
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone:    (310) 229-1234
Email: dbg@LNBYG.com; jmr@LNBYG.com;
        mgd@LNBYG.com

Electronically FILED by
Superior Court of California,
County of Los Angeles
12/19/2025 4:11 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By R. Sanchez, Deputy Clerk

Attorneys for Defendants and Cross Complainants
Andrew Stupin, individually, and Andrew Stupin and
Julie K. Stupin as Trustees of the Stupin Family Trust dated April 3, 2009

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES, CENTRAL DISTRICT

| | |
|---|---|
| ZIONS BANCORPORATION, N.A., dba CALIFORNIA BANK & TRUST, a National Association<br><br>          Plaintiff,<br><br>     vs.<br><br>ANDREW STUPIN, an individual, ANDREW STUPIN AND JULIE K. STUPIN, as trustees of The Stupin Family Trust dated April 3, 2009; GERALD J. MARCIL, an individual; GERALD J. MARCIL AND CAROL J. MARCIL, as trustees of The Marcil Family Trust dated May 9, 1997; DEBA SHYAM, an individual and DOES 1 – 10;<br><br>          Defendants. | Case No.:  25STCV30165<br><br>Assigned To: The Hon. Wendy Chang<br><br>Judicial Referee:  The Hon. Mitchell Beckloff (Ret.)<br><br>**CROSS-COMPLAINT BY ANDREW STUPIN, AND ANDREW STUPIN AND JULIE K. STUPIN, AS TRUSTEES OF THE STUPIN FAMILY TRUST DATED APRIL 3, 2009 FOR:**<br><br>1) **BREACH OF FIDUCIARY DUTY [Derivatively Through Cantor Group II, LLC and Cantor Group IV LLC as to Deba Shyam and Cantor Group Manager, LLC];**<br><br>2) **BREACH OF FIDUCIARY DUTY [Directly As to Deba Shyam and Cantor Group Manager, LLC];**<br><br>3) **EXPRESS INDEMNITY [As to Cantor Group II, LLC and Cantor Group IV LLC];**<br><br>4) **EQUITABLE INDEMNITY [As to Deba Shyam and Cantor Group Manager, LLC];** |

1

ANDREW STUPIN, an individual; ANDREW STUPIN AND JULIE K. STUPIN, as trustees of The Stupin Family Trust dated April 3, 2009,

Cross-Complainants,

vs.

CANTOR GROUP II, LLC, a Delaware limited liability company; CANTOR GROUP IV LLC, a Delaware limited liability company; CANTOR GROUP MANAGER, LLC, a Delaware limited liability company; DEBA SHYAM, an individual; ZIONS BANCORPORATION, N.A., dba CALIFORNIA BANK & TRUST, a National Association; and ROES 1 – 80;

Cross-Defendants.

5) **FRAUD IN THE INDUCMENT**
   **[As to Zions Bancorporation];**

6) **BREACH OF CONTRACT**
   **[As to Zions Bancorporation];**

7) **DECLARATORY RELIEF**
   **[As to Zions Bancorporation];**

8) **FINANCIAL ELDER ABUSE**
   **(Cal. Welfare & Institutions Code § 15600 *et seq.*)**
   **[As to Deba Shyam and Cantor Group Manager, LLC]**

Complaint Filed: October 25, 2025

Andrew Stupin, and Andrew Stupin and Julie K. Stupin, as trustees of The Stupin Family Trust dated April 3, 2009, hereby allege the following against Cross-Defendants Cantor Group II, LLC, Cantor Group IV LLC, Cantor Group Manager, LLC, Deba Shyam, Zions Bancorporation N.A. dba California Bank and Trust and ROES 1 – 80:

## JURISDICTION AND VENUE

1. This Court may exercise jurisdiction on any basis not inconsistent with the constitution of this state or of the United States.

2. Unlimited jurisdiction is proper in this proceeding as the amount in controversy exceeds $35,000.

3. California's jurisdiction over each cross defendant is permissible because each cross defendant is either a resident of California or has otherwise consented to litigate in California.

4. Venue in the County of Los Angeles is proper because one or more parcels of real property at issue in this action are located there, some or all of the performance of the obligations

at issue was to occur there, and certain of the Cross Defendants on information and belief reside there.

5.    Jurisdiction and venue are also proper as Cross-Defendants Deba Shyam and Zions Bancorporation have already appeared in this action.

6.    This matter was judicially referred to The Honorable Mitchell Beckloff (Ret.), pursuant to an order by the Los Angeles Superior Court, Honorable Stephen I. Goorvitch presiding.  The Stupin Parties, Defendant Gerald J. Marcil, individually ("Marcil"), Defendants Gerald J. Marcil and  Carol J. Marcil as trustees of the Marcil Family Trust Dated May 9, 1997, Defendant Deba Shyam, and Plaintiff Zions Bancorporation N.A. dba California Bank and Trust, stipulated to the Hon. Judge Beckloff acting as a general judicial referee in this action.

**PARTIES TO THE CROSS-COMPLAINT**

7.    Cross Complainant Andrew Stupin ("Andrew") is an individual residing in the state of California.

8.    Cross Complainants Andrew Stupin and Julie K. Stupin ("Julie") are the trustees of The Stupin Family Trust dated April 3, 2009 (the "Stupin Trust").  Andrew, individually, and Andrew and Julie as the Trustee of the Stupin Trust shall be referred to collectively herein as the ("Stupin Parties" or the "Cross-Complainants").

9.    Cross Defendant Cantor Group II, LLC ("Cantor II") is a limited liability company that was organized under Delaware law on or about October 29, 2015.

10.    Cross Defendant Cantor Group IV LLC ("Cantor IV") is a limited liability company that was organized under Delaware law on or about May 31, 2017.

11.    Cross Defendant Cantor Group Manager, LLC ("Cantor Manager") is a limited liability company that was organized under Delaware law on or about October 29, 2015.

12.    On information and belief, Defendant and Cross-Defendant Deba Shyam ("Shyam") is an individual who resides in the State of California.

13.    Plaintiff and Cross-Defendant Zions Bancorporation N.A. dba California Bank & Trust ("Zions") is a national banking association having its principal place of business in Salt Lake City, Utah, that is authorized to do business in the State of California.

STUPIN PARTIES' CROSS-COMPLAINT

14.     Cross-Defendants ROES 1 through 80, inclusive, are corporations or other entities and/or individuals organized and existing under one of the states of the United States, or by a foreign state and/or country, and authorized to do business and doing business in Los Angeles County, California.  Cross-Complainants do not presently know the true names and capacities of the defendants sued herein as ROES 1 through 80, inclusive.  Cross-Complainants will seek leave of court to amend this complaint to allege said Cross-Defendants' true names and capacities as soon as Cross-Complainants ascertain them.  Cross-Complainants allege that each of the Cross-Defendants and ROES 1 through 80, and each of them, are tortiously responsible in some manner for the damages hereafter alleged in that Cross-Defendants and ROES 1 through 80 caused them.

15.     Cross-Complainants are informed and believe, and thereon allege that at all times mentioned herein, each of the Cross-Defendants named ROES 1 through 80, was and is the agent, servant, employee, representative and/or alter ego of each of the remaining Cross-Defendants and/or otherwise was acting in concert with them, aided and abetted, and in doing the things alleged herein, was acting within the scope of their authority as such agent, servant, employee, representative, alter ego and/or aider and abettor, with the advance knowledge, acquiescence, or subsequent ratification of each Cross-Defendant.

## GENERAL ALLEGATIONS

16.     On information and belief, Cantor Manager has been the manager or managing member of Cantor II since Cantor II was formed.

17.     On information and belief, Cantor Manager has been the manager or managing member of Cantor IV since Cantor IV was formed.

18.     On information and belief, Defendant Shyam has been the manager or managing member of Cantor Manager since Cantor Manager was formed.

**A.     The Cantor II Loan**

19.     On information and belief, Cantor II borrowed funds from Zions starting in 2016 (the "Cantor II Loan") to purchase mortgage loans.

20.     On information and belief, the various agreements for the Cantor II Loan required Cantor II to take actions to ensure that Zions had a first priority lien in the notes and collateral for

4

the mortgage loans that Cantor IU purchased using the Cantor II Loan proceeds, as a condition precedent to Zions advancing Cantor II funds.

21.     On information and belief, Shyam and Cantor Manager had the power to manage Cantor II's business, to make decisions about purchasing mortgage loans, to carry out contracts needed for Cantor II's business, and to have Cantor II borrow funds which would be secured by mortgage loans.

22.     On information and belief, Shyam and Cantor Manager had day-to-day control over Cantor II and were responsible for Cantor II's providing Zions a first priority lien in the notes and collateral for the mortgage loans purchased using the Cantor II Loan proceeds.

23.     On information and belief, Shyam and Cantor Manager failed to provide Zions with the required first priority lien in the notes and collateral for the mortgage loans purchased using the Cantor II Loan proceeds.

24.     On information and belief, Zions was provided documents that Cantor II had signed before notaries which, had the documents (the "Cantor II Loan Documents") been recorded, could have protected Zions' interest in the mortgage loans purchased with the Cantor II Loan proceeds.

25.     On information and belief, Zions failed, *inter alia*, to record the Cantor II Loan Documents that were required to be recorded to grant Zions a perfected first priority security interest in the Cantor II collateral.

26.     On information and belief, Zions failed to monitor whether the Cantor II Loan Documents were ever recorded by Cantor II or Cantor Manager prior to disbursing funds to Cantor II.

27.     On information and belief, the loan agreements between Zions and Cantor II as well as Zions' internal lending policies prohibited Zions from extending credit to Cantor II until the Cantor II Loan Documents were recorded.

28.     On information and belief, the loan agreements between Zions and Cantor II as well as Zions' internal lending policies required Zions to continually check whether Zions'

5

interest in the mortgage loans that Cantor II purchased using the Cantor II Loan proceeds, was protected.

29.     On information and belief, Zions failed to record, or otherwise ensure or verify that the Cantor II Loan Documents that were required to be recorded were properly recorded to grant Zions a perfected first priority security interest in the Cantor II collateral, prior to Zions disbursing funds to Cantor II.

30.     On information and belief, Zions failed to carry out the required continuing checks of whether Zions' interest in the mortgage loans that Cantor II purchased using the Cantor II Loan proceeds, was protected.

**B.     The Cantor IV Loan**

31.     On information and belief, Cantor IV borrowed funds from Zions starting in 2017 (the "Cantor IV Loan") to purchase mortgage loans.

32.     On information and belief, the various agreements for the Cantor IV Loan required Cantor IV to take actions to ensure that Zions had a first priority lien in the notes and collateral for the mortgage loans that Cantor IV purchased using the Cantor IV Loan proceeds, as a condition precedent to Zions advancing Cantor IV funds.

33.     On information and belief, Shyam and Cantor Manager without limitation had the power to manage Cantor IV's business, to make decisions about purchasing mortgage loans, to carry out contracts needed for Cantor IV's business, and to have Cantor IV borrow funds which would be secured by mortgage loans.

34.     On information and belief, Shyam and Cantor Manager had day-to-day control over Cantor IV and were responsible for Cantor IV's providing Zions a first priority lien in the notes and collateral for the mortgage loans purchased using the Cantor IV Loan proceeds.

35.     On information and belief, Shyam and Cantor Manager failed to provide Zions with the required first priority lien in the notes and collateral for the mortgage loans purchased using the Cantor IV Loan proceeds.

36.     On information and belief, Zions was provided documents that Cantor IV had signed before notaries which, had the documents (the "Cantor IV Loan Documents") been

recorded, could have protected Zions' interest in the mortgage loans purchased with the Cantor IV Loan proceeds.

37. On information and belief, Zions failed, *inter alia*, to record, or otherwise ensure or verify that the Cantor IV Loan Documents that were required to be recorded were properly recorded to grant Zions a perfected first priority security interest in the Cantor IV collateral, prior to Zions disbursing funds to Cantor IV.

38. On information and belief, Zions failed to monitor whether the Cantor IV Loan Documents were ever recorded by Cantor IV or Cantor Manager prior to disbursing funds to Cantor IV.

39. On information and belief, the loan agreements between Zions and Cantor IV as well as Zions' internal lending policies prohibited Zions from extending credit to Cantor IV until the Cantor IV Loan Documents were recorded.

40. On information and belief, the loan agreements between Zions and Cantor IV as well as Zions' internal lending policies required Zions to continually check whether Zions' interest in the mortgage loans that Cantor IV purchased using the Cantor IV Loan proceeds, was protected.

41. On information and belief, Zions failed to carry out the required continuing checks of whether Zions' interest in the mortgage loans that Cantor IV purchased using the Cantor IV Loan proceeds, was protected.

**C.** **Zions Disburses Funds To Cantor II And Cantor IV Despite The Lack of Secured Collateral And Tries To Hold The Stupin Parties Responsible As Guarantors**

42. On information and belief, Zions in or about 2023 required that Cantor II provide a guarantee in order for additional credit to be extended under the Cantor II Loan.

43. On information and belief, Cantor Manager and Shyam obtained a continuing guarantee of the Cantor II Loan from Stupin.

44. On information and belief, when Cantor Manager and Shyam obtained Stupin's continuing guarantee of the Cantor II Loan, both of them knew that Cantor II had failed to

7

provide Zions with a first priority lien interest in the mortgage loans that Cantor II had purchased with the proceeds of the Cantor II Loan.

45. On information and belief, Zions when it accepted Stupin's guarantee of the Cantor II Loan, knew that Zions did not have a first priority lien interest in the mortgage loans that Cantor II had purchased with the proceeds of the Cantor II Loan.

46. On information and belief, Zions continued to make new extensions of credit and disbursements of funds under the Cantor II Loan after accepting the guarantee of the Cantor II Loan from Stupin, even though Zions knew throughout that its interest in the mortgage loans purchased with the proceeds of the Cantor II Loan was legally imperiled.

47. On information and belief, Zions when it accepted Stupin's guarantee of the Cantor II Loan, knew that Stupin would be unaware that Zions did not have a first priority lien interest in the mortgage loans that had been purchased with the Cantor II Loan proceeds, or that the collateral had otherwise been diverted or had become the subject of foreclosure proceedings.

48. On information and belief, Zions in or about 2024 required that Cantor IV provide a guarantee in order for additional credit to be extended under the Cantor IV Loan.

49. On information and belief, Cantor Manager and Shyam obtained continuing guarantees of the Cantor IV Loan from Stupin and the Stupin Trust.

50. On information and belief, when Cantor Manager and Shyam obtained Stupin and the Stupin Trust's continuing guarantees of the Cantor IV Loan, Cantor Manager and Shyam both knew that Cantor IV had failed to provide Zions with a first priority lien interest in the mortgage loans that Cantor IV had purchased with the proceeds of the Cantor IV Loan.

51. On information and belief, Zions when it accepted Stupin and the Stupin Trust's guarantees of the Cantor IV Loan, knew that Zions did not have a first priority lien interest in the mortgage loans that Cantor IV had purchased with the proceeds of the Cantor IV Loan.

52. On information and belief, Zions continued to make new extensions of credit and disbursements of funds under the Cantor IV Loan after accepting the guarantees of the Cantor IV Loan from Stupin and the Stupin Trust, even though Zions knew throughout that its interest in the mortgage loans purchased with the proceeds of the Cantor IV Loan was legally imperiled.

STUPIN PARTIES' CROSS-COMPLAINT

53.     On information and belief, Zions when it accepted Stupin and the Stupin Trust's guarantee of the Cantor IV Loan, knew that Stupin, individually, and Stupin and Julie, as trustees of the Stupin Trust, would be unaware that Zions did not have a first priority lien interest in the mortgage loans that had been purchased with the Cantor IV Loan proceeds, or that the collateral had otherwise been diverted or had become the subject of foreclosure proceedings.

54.     On information and belief, each of Shyam, Cantor Manager, and Zions knew when they obtained guarantees of the Cantor II Loan and the Cantor IV Loan from Stupin, individually, and from Stupin and Julie, as trustees of the Stupin Trust, that their understanding of and ability to inquire whether or not Zions had been granted a first priority lien interest in the mortgage loans that had been purchased with the Cantor II Loan proceeds and the Cantor IV Loan proceeds and to otherwise protect their rights individually and as trustees of the Stupin Trust, were limited.

55.     On information and belief, Shyam and Cantor Manager obtained guarantees of the Cantor II Loan and the Cantor IV Loan from Stupin, individually, and the Stupin Trust because Shyam and Cantor knew that Stupin and the Stupin Trust were incapable of inquiring into whether Zions had a first priority interest in the mortgage loans purchased using the proceeds of the Cantor II Loan and Cantor IV Loan, such that Shyam and Cantor Manager could put to their own uses the collateral that should have secured the debt owed to Zions by Cantor II and Cantor IV.

56.     On information and belief, Zions obtained guarantees of the Cantor II Loan and the Cantor IV Loan from Stupin, individually, and the Stupin Trust because even though Zions knew that they were unaware that Zions did not have a first priority interest in the mortgage loans purchased using the proceeds of the Cantor II Loan and the Cantor IV Loan, Zions had determined that it was economically more efficient to look to the guarantees of Stupin and the Stupin Trust for payment than to continually monitor whether Zions' interest in the mortgage loans was protected and/or to pursue foreclosure remedies in the event the mortgage loans failed.

57.     The true names and capacities, whether individual, corporate, associate or otherwise of Cross Defendants ROES 1 through 80, inclusive, are unknown to Cross Complainants who therefore sue said Cross Defendants by such fictitious names. Cross

Complainants are informed and believe and thereon allege that each of the Cross Defendants designated herein as a fictitiously named Cross Defendant is in some manner responsible for the events and happenings herein referred to, either contractually or tortiously, and caused the damage to Cross Complainants as herein alleged, and Cross Complainants will amend this cross complaint to allege such true name and capacities when same are ascertained.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**(Breach of Fiduciary Duty Owed to Cantor II and Cantor IV as Derivative Claim - Cantor II, Cantor IV, Cantor Manager and Shyam and ROES 1 - 10)**

58.     Cross Complainants reallege all of the prior allegations of this Cross Complaint as if set forth fully herein.

59.     On information and belief, Stupin was a member of Cantor II from its formation onward, including without limitation at the time of the Cantor II Loan.

60.     On information and belief, Stupin was a member of Cantor IV from its formation onward, including without limitation at the time of the Cantor IV Loan.

61.     Because Stupin was a member, but not a manager, of Cantor II and Cantor IV, the knowledge that Shyam and Cantor Manager had as managers of Cantor II and Cantor IV cannot be imputed to Stupin.

62.     Stupin as a member of Cantor II and Cantor IV may assert a cause of action in the name of Cantor II and Cantor IV as contemplated by Corporations Code § 17709.02.

63.     Stupin brings the within cause of action for breach of fiduciary duties owed to Cantor II and Cantor IV on the grounds that, if Zions' allegations that Cantor II and Cantor IV were in default to Zions are found to be true, then Cantor II and Cantor IV will need to vindicate their rights as against those persons who may have breached fiduciary duties owed to Cantor II and Cantor IV and, in so doing, caused Cantor II and Cantor IV to default on their obligations to Zions.

64.     Stupin believes that if Zions' allegations that Cantor II and Cantor IV were in default to Zions are found to be true, it is uncertain whether or not Cantor II and Cantor IV will pursue relief against persons who may be legally responsible for having caused the defaults.

65.     Shyam and Cantor Manager owe a duty of loyalty to Cantor II and Cantor IV that is defined without limitation in Corporations Code § 17704.09 and which requires Shyam and Cantor Manager to refrain from dealing with Cantor II and Cantor IV in the conduct of their business as or on behalf parties having an interest adverse to Cantor II and Cantor IV.

66.     In the event that Zions' allegations of defaults by Cantor II and Cantor IV are found to be true, then on information and belief Shyam and Cantor Manager are responsible for such defaults because they caused Cantor II and Cantor IV to fail in fulfilling the requirement that Zions have a first priority interest in the mortgage loans that were purchased using the Cantor II Loan proceeds and the Cantor IV Loan proceeds, and such failure was adverse to Cantor II and Cantor IV because it exposed them to liability to Zions.

67.     Shyam and Cantor Manager owe a duty of care to Cantor II and Cantor IV that is defined without limitation in Corporations Code § 17704.09 and which requires Shyam and Cantor Manager to refrain from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

68.     In the event that Zions' allegations of defaults by Cantor II and Cantor IV are found to be true,  then on information and belief the failure of Shyam and Cantor Manager to see to it that Zions had a first priority lien interest in the mortgage loans that were purchased using the Cantor II Loan proceeds and the Cantor IV Loan proceeds constitutes the lack of any care, whatsoever, or at least an extreme departure from what a reasonably careful person in their positions as managers of Cantor II and Cantor IV would do to prevent harm to Cantor II, Cantor IV, and Zions.

69.     In the event that Zions' allegations of defaults by Cantor II and Cantor IV are found to be true,  then on information and belief it will have been the failure of Shyam and Cantor Manager to see to it that Zions had a first priority lien interest in the mortgage loans that were purchased using the Cantor II Loan proceeds and the Cantor IV Loan proceeds that caused Cantor

II and Cantor IV to be in breach of their obligations to Zions on the Cantor II Loan and the Cantor IV Loan, respectively.

70. In the event that Zions' allegations of defaults by Cantor II and Cantor IV are found to be true, then as a result of the breaches of Cantor II and Cantor IV's obligations to Zions on the Cantor II Loan and the Cantor IV Loan, respectively, damages will be incurred because, at a minimum, Cantor II and Cantor IV will be required to indemnify those who guaranteed the Cantor II Loan and the Cantor IV Loan.

71. Stupin has not demanded that Cantor II and Cantor IV seek redress from Cantor Manager and Shyam for breaches of the duties of loyalty and care.

72. On information and belief, Cantor Manager and Shyam at all times have had exclusive control over Cantor II and Cantor IV and are themselves responsible for evaluating and deciding whether or not Cantor II and Cantor IV should sue any persons on the grounds that such persons breached fiduciary duties owed to Cantor II and Cantor IV.

73. Stupin has not demanded that Cantor II and Cantor IV seek redress from Cantor Manager and Shyam for their breaches of the duties of loyalty and care because it has yet to be determined whether Zions' allegations that Cantor II and Cantor IV were in default to Zions are true, and even if those allegations are determined to be true it would be futile to make such a demand because it would be unreasonable to believe that the potential targets of a breach of fiduciary duty claim to be pursued by the entity that such targets control would be capable of making a disinterested determination of whether the entity should pursue the targets.

74. On information and belief, Stupin has not demanded that Cantor II and Cantor IV seek redress from Cantor Manager and Shyam for their breaches of the duties of loyalty and care because it has yet to be determined whether Zions' allegations that Cantor II and Cantor IV were in default to Zions are true, and because even if Zions' allegations in that regard are found to be true, there are not enough independent members of Cantor II and Cantor IV who could cause Cantor II and Cantor IV to take legal action against Cantor Manager and Shyam.

75. Stupin has not demanded that Cantor II and Cantor IV seek redress from Cantor Manager and Shyam for their breaches of the duties of loyalty and care because it has yet to be

determined whether Zions' allegations that Cantor II and Cantor IV were in default to Zions are true and because Stupin is a minority member of Cantor II and Cantor IV who was only very recently made aware of the alleged conduct by Cantor II and Cantor IV such that there has been insufficient opportunity for Stupin to make the demand.

76.    It is unnecessary for Stupin to send a copy of this Cross Complaint to Cantor II, Cantor IV, Shyam, and Cantor Manager before it is filed because Shyam is in control of Cantor II, Cantor IV, and Cantor Manager and is already a defendant such that Shyam has been on notice since Zions commenced its action of the possibility that Shyam might become subject to breach of fiduciary duty claims.  In addition, Stupin will need to pursue breach of fiduciary duty claims against Shyam only if it is first determined that Zions' allegations of defaults by Cantor II and Cantor IV are found to be true.

## SECOND CAUSE OF ACTION

**(Breach of Fiduciary Duty Owed to Stupin as Direct Claim - Shyam, Cantor Manager and ROES 11 - 20)**

77.    Cross Complainants reallege all of the prior allegations of this Cross Complaint as if set forth fully herein.

78.    On information and belief, Stupin was a member of Cantor II from its formation onward.

79.    On information and belief, the extent of Stupin's membership interest in Cantor II was such that Stupin at all times held a minority interest in Cantor II.

80.    On information and belief, Stupin was a member of Cantor IV from its formation onward.

81.    On information and belief, the extent of Stupin's membership interest in Cantor IV was such that Stupin at all times held a minority interest in Cantor IV.

82.    Because Stupin was a member, but not a manager, of Cantor II and Cantor IV, the knowledge that Shyam and Cantor Manager had as managers of Cantor II and Cantor IV cannot be imputed to Stupin.

83.    Shyam and Cantor Manager owe duties of loyalty and care to Stupin.

84. The duty of loyalty that Shyam and Cantor Manager owe to Stupin is defined without limitation in Corporations Code § 17704.09 and requires Shyam and Cantor Manager to refrain from dealing with Cantor II and Cantor IV in the conduct of their business as or on behalf parties having an interest adverse to Cantor II and Cantor IV.

85. In the event that Zions' allegations of defaults by Cantor II and Cantor IV are found to be true, on information and belief Shyam and Cantor Manager caused Cantor II and Cantor IV to fail in fulfilling the requirement that Zions have a first priority interest in the mortgage loans that were purchased using the Cantor II Loan proceeds and the Cantor IV Loan proceeds, and such failure was adverse to Cantor II and Cantor IV because it exposed them to liability to Zions.

86. The duty of care that Shyam and Cantor Manager owe to Stupin is defined without limitation in Corporations Code § 17704.09 and requires Shyam and Cantor Manager to refrain from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

87. In the event that Zions' allegations of defaults by Cantor II and Cantor IV are found to be true, on information and belief the failure of Shyam and Cantor Manager to see to it that Zions had a first priority lien interest in the mortgage loans that were purchased using the Cantor II Loan proceeds and the Cantor IV Loan proceeds constitutes the lack of any care, whatsoever, or at least an extreme departure from what a reasonably careful person in their positions as managers of Cantor II and Cantor IV would do to prevent harm to Stupin, Cantor II, Cantor IV, and Zions.

88. In the event that Zions' allegations of defaults by Cantor II and Cantor IV are found to be true, then the failure of Shyam and Cantor Manager to see to it that Zions had a first priority lien interest in the mortgage loans that were purchased using the Cantor II Loan proceeds and the Cantor IV Loan proceeds will have caused Cantor II and Cantor IV to be in breach of their obligations to Zions on the Cantor II Loan and the Cantor IV Loan, respectively.

89. In the event that Zions' allegations of defaults by Cantor II and Cantor IV are found to be true, then as a result of the breaches of Cantor II and Cantor IV's obligations to Zions

on the Cantor II Loan and the Cantor IV Loan, respectively, damages will be incurred because, at a minimum, Cantor II and Cantor IV will be required to indemnify those who guaranteed the Cantor II Loan and the Cantor IV Loan

### THIRD CAUSE OF ACTION

**(Express Indemnity - Cantor II and Cantor IV and ROES 21 - 30)**

90.     Cross Complainants reallege all of the prior allegations of this Cross Complaint as if set forth fully herein.

91.     On information and belief, the documents that govern Cantor II and Cantor IV require them to, without limitation, indemnify and hold harmless any individual, trust, or other entity that that provides a guaranty of any obligation of Cantor II and Cantor IV from and against all losses arising from any and all actions brought under such guaranty.

92.     Stupin provided guarantees of the Cantor II Loan and the Cantor IV Loan and Zions has sued Stupin on those guarantees.

93.      The Stupin Trust provided a guarantee of the Cantor IV Loan and Zions has sued the Stupin Trust on that guarantee.

94.     In the event that Zions' allegations that Cantor II and Cantor IV defaulted on their obligations to Zions are found to be true such that the liability of Stupin and the Stupin Trust to Zions under their guarantees to Zions is implicated, then Stupin and the Stupin Trust are entitled to be made whole by Cantor II and Cantor IV for any amounts that Stupin and the Stupin Trust are required to pay Zions on their guarantees, should they be so required.

### FOURTH CAUSE OF ACTION

**(Equitable Indemnity - Shyam and Cantor Manager and ROES 31 - 40)**

95.     Cross Complainants reallege all of the prior allegations of this Cross Complaint as if set forth fully herein.

96.     On information and belief, Shyam and Cantor Manager controlled Cantor II and Cantor IV and because of their control, among other things, they were required to see to it that Zions had a first priority lien interest in the mortgage loans that were purchased with the proceeds of the Cantor II Loan and the Cantor IV Loan.

97. In the event that Zions' allegations of defaults by Cantor II and Cantor IV are found to be true, then on information and belief Shyam and Cantor Manager failed to see to it that Zions had a first priority lien interest in the mortgage loans that were purchased with the proceeds of the Cantor II Loan and the Cantor IV Loan.

98. In the event that Zions' allegations of defaults by Cantor II and Cantor IV are found to be true, then Stupin and the Stupin Trust will have been damaged by the failure of Shyam and Cantor Manager to see to it that Zions had a first priority lien interest in the mortgage loans that were purchased with the proceeds of the Cantor II Loan and the Cantor IV Loan, because Zions has sued Stupin and the Stupin Trust on their guarantees of the Cantor II Loan and the Cantor IV Loan.

99. In the event that Zions' allegations of defaults by Cantor II and Cantor IV are found to be true, then it will have been the failure of Shyam and Cantor Manager to properly exercise their control over Cantor II and Cantor IV as to the Cantor II Loan and the Cantor IV Loan that caused the defaults and the subsequent legal action by Zions against Stupin and the Stupin Trust.

100. In the event that Zions' allegations of defaults by Cantor II and Cantor IV are found to be true, then on information and belief Shyam and Cantor Manager breached fiduciary duties that they owe to Cantor II and Cantor IV as a result of their failing to see to it that Zions had a first priority lien interest in the mortgage loans that were purchased with the proceeds of the Cantor II Loan and the Cantor IV Loan, and on that basis should be required to pay Stupin and the Stupin Trust any damages that they may be required to pay to Zions as a result of Shyam and Cantor Manager's breaches.

101. In the event that Zions' allegations of defaults by Cantor II and Cantor IV are found to be true, then Shyam and Cantor Manager will be unjustly enriched unless they are required to pay Zions all amounts that Stupin and the Stupin Trust are determined to owe Zions on their guarantees, should such determinations be made.

102. In the event that Zions' allegations of defaults by Cantor II and Cantor IV are found to be true, then Stupin and the Stupin Trust are entitled to be made whole by Shyam and

STUPIN PARTIES' CROSS-COMPLAINT

Cantor Manager for any amounts that Stupin and the Stupin Trust are required to pay Zions on their guarantees, should they be so required.

### FIFTH CAUSE OF ACTION

**(Fraud in the Inducement - Zions and ROES 41 - 50)**

103. Cross Complainants reallege all of the prior allegations of this Cross Complaint as if set forth fully herein.

104. A guarantor is relieved of liability where the terms of the contract being guaranteed are modified without the guarantor's consent.

105. Zions owes to Stupin and the Stupin Trust an ongoing duty of good faith and fair dealing that, without limitation, requires Zions not to misrepresent or conceal facts so as to induce or permit Stupin and the Stupin Trust to carry on in their relationship with Zions in reliance on false impressions as to the nature of the risk at issue on their guarantees to Zions.

106. Zions' duty to Stupin and the Stupin Trust includes, without limitation, the duty to disclose to Stupin and the Stupin Trust those facts known to Zions that Zions also had reason to believe were unknown to Stupin and the Stupin Trust and that Zions had reason to believe would materially increase the risk beyond that which Stupin and the Stupin Trust intended to assume.

107. In the event that Zions' allegations of defaults by Cantor II and Cantor IV are found to be true, then on information and belief Zions knew that Zions did not have a first priority lien interest in the mortgage loans that were purchased with the Cantor II Loan proceeds and the Cantor IV Loan proceeds because, among other things:

    a. Zions permitted its own files to accumulate with unrecorded deeds of trust and collateral assignments and then failed to timely follow up by inquiring as to the state of its interests;

    b. Zions failed to monitor whether deeds of trust that had been recorded in favor of Cantor II and/or Cantor IV had been assigned to others;

    c. Zions failed to monitor whether collateral for the mortgage loans had become the subject of foreclosure proceedings by, without limitation,

recording requests to be notified by foreclosing parties of notices of default and notices of trustee sales;

d. Zions failed to monitor whether deeds of trust that had been recorded in favor of Cantor II and/or Cantor IV had been reconveyed as a matter of record;

e. Zions failed to monitor whether deeds of trust in favor of Cantor II and/or Cantor IV had been recorded and the priority of those deeds of trust, by obtaining preliminary title reports that would disclose such information;

f. Zions failed to monitor whether the names of entities related to Cantor II and/or Cantor IV appeared as a matter of record with respect to the collateral for the mortgage loans; and

g. Zions failed to monitor whether the manager or managing member of Cantor II and/or Cantor IV, or persons known to be in control of the manager or managing member of Cantor II and/or Cantor IV appeared as a matter of record with respect to the collateral for the mortgage loans.

108. In the event that Zions' allegations of defaults by Cantor II and Cantor IV are found to be true, then on information and belief Zions knew that Stupin and the Stupin Trust were themselves unaware that Zions lacked a first priority lien interest in the mortgage loans purchased with the Cantor II Loan proceeds and the Cantor IV Loan proceeds, because Zions required Cantor II and Cantor IV to agree that only Shyam and Cantor Manager would be authorized to act for Cantor II and Cantor IV.

109. In the event that Zions' allegations of defaults by Cantor II and Cantor IV are found to be true, on information and belief, Zions as a federally chartered bank that itself had determined that collateral was required in exchange for extensions of credit under the Cantor II Loan and the Cantor IV Loan, knows that if it lacks a first priority lien interest in the mortgage loans purchased with the Cantor II Loan proceeds and the Cantor IV Loan proceeds, such an absence of security would fundamentally alter the nature of the risk that Stupin and the Stupin Trust agreed to guarantee by substantially increasing the risk.

110. On information and belief, Zions lacked a first priority lien interest in the mortgage loans purchased with the Cantor II Loan proceeds and the Cantor IV Loan proceeds.

111. On information and belief, Zions knew that it lacked a first priority lien interest in the mortgage loans purchased with the Cantor II Loan proceeds and the Cantor IV Loan proceeds because the documents what were supposed to be recorded to perfect that first priority lien interest were, on their face, to be returned to Zions after their recording, but Zions' loan files show that it had in its possession notarized but unrecorded copies of those instruments.

112. In the event that Zions' allegations of defaults by Cantor II and Cantor IV are found to be true, then on information and belief Zions desired that Stupin and the Stupin Trust agree to guarantee the Cantor II Loan and the Cantor IV Loan in reliance on the false understanding that Zions had a first priority lien interest in the mortgage loans.

113. Zions had a duty to disclose to Stupin and the Stupin Trust that Zions did not have a first priority lien interest in the mortgage loans before Stupin and the Stupin Trust agreed to guarantee the Cantor II Loan and the Cantor IV Loan whose proceeds were used to purchase the mortgage loans.

114. In the event that Zions' allegations of defaults by Cantor II and Cantor IV are found to be true, then on information and belief Zions failed to disclose to Stupin and the Stupin Trust that Zions' interest in the mortgage loans was not secured as required.

115. It was reasonable of Stupin and the Stupin Trust to rely on the understanding that Zions had a first priority lien interest in the mortgage loans.

116. In reliance on these representations, the Stupin Parties agreed to sign the guaranty agreements in favor of Zions, guaranteeing Cantor II and Cantor IV's performance under the loans issued to them by Zions.

117. In the event that Zions' allegations of defaults by Cantor II and Cantor IV are found to be true, then on information and belief Zions' misrepresentation concerning the type of loans being guaranteed (secured) vs. what they really were (unsecured) was a material misrepresentation designed to induce the Stupin Parties to enter into the subject guarantees.

118.    In the event that Zions' allegations of defaults by Cantor II and Cantor IV are found to be true, then on information and belief Stupin and the Stupin Trust will have been harmed as a result of Zions' misrepresentation as the Stupin Parties signed a guarantee for a completely different risk than what Zions had represented.

119.    In the event that Zions' allegations of defaults by Cantor II and Cantor IV are found to be true, then Stupin and the Stupin Trust's reliance on Zions' misrepresentation will have been a substantial factor in causing Stupin and the Stupin Trust's harm.

### SIXTH CAUSE OF ACTION

### (Breach of Contract - Zions and ROES 51 - 60)

120.    Cross Complainants reallege all of the prior allegations of this Cross Complaint as if set forth fully herein.

121.    Zions, on the one hand, and Stupin and the Stupin Trust, on the other hand, entered into a contract by which Stupin and the Stupin Trust agreed to guarantee payment of the Cantor II Loan and the Cantor IV Loan.

122.    Stupin and the Stupin Trust did what was required of them under the guarantees to Zions.

123.    Zions, pursuant to § 4.4.6 of the loan and security agreements with respect to the Cantor II Loan and the Cantor IV Loan, was subject to a condition precedent to Zions' disbursement of funds that required Zions – before Zions disbursed any funds under the Cantor II Loan and the Cantor IV Loan – to review, approve, and then maintain records evidencing perfected security interests in the collateral affected by such loans.

124.    Zions disbursed funds under the Cantor II Loan and the Cantor IV Loan without maintaining the first priority perfected security interest as required.

125.    In the event that Zions' allegations of defaults by Cantor II and Cantor IV are found to be true, then Zions' disbursement of funds under the Cantor II Loan and the Cantor IV Loan without maintaining the first priority perfected security interest as required, will have been a violation of the guarantee agreement between Zions and the Stupin Parties.

STUPIN PARTIES' CROSS-COMPLAINT

126.     In the event that Zions' allegations of defaults by Cantor II and Cantor IV are found to be true, then Zions' failure to maintain the required first priority perfected security interest as required before disbursing funds under the Cantor II Loan and the Cantor IV Loan will have harmed the Stupin Parties by exposing them to potential liability to which they would not have been exposed, had Zions did what Zions was supposed to do pursuant to the loan and security agreements.

127.     In the event that Zions' allegations of defaults by Cantor II and Cantor IV are found to be true, then Zions' breach of contract will have been a substantial factor in causing the Stupin Parties' harm.

### SEVENTH CAUSE OF ACTION

### (Declaratory Relief - Zions and ROES 61 - 70)

128.     Cross Complainants reallege all of the prior allegations of this Cross Complaint as if set forth fully herein.

129.     An actual controversy exists as to the validity and enforceability of the Stupin Parties' guarantees to Zions.

130.     The Stupin Parties assert that the guarantees to Zions are void or voidable because of the failure of Zions to maintain the required first priority perfected security interest in the mortgage loans and the collateral affected by them before Zions disbursed funds under the Cantor II Loan and the Cantor IV Loan.

131.     Because Zions failed to require before advancing funds, or otherwise maintain the required first priority perfected security interest in the mortgage loans and the collateral affected by them, the nature of the risk that Stupin and the Stupin Defendants agreed to guarantee was drastically transformed.

132.     As a result of Zions' failure to require before advancing funds, or otherwise to maintain the required first priority perfected security interest in the mortgage loans and the collateral affected by them, the obligations of Cantor II and Cantor IV that Stupin and the Stupin Trust were guaranteeing were changed from being obligations supported by assets that could if

necessary be liquidated in order to pay Zions what Zions was owed, into obligations that were unsecured.

133. Stupin and the Stupin Trust never agreed to guarantee the Cantor II Loan and the Cantor IV Loan on the basis that the repayment of such indebtedness was unsecured.

134. Because of Zions' failure to maintain the required first priority perfected security interest in the mortgage loans and the collateral affected by them, Stupin and the Stupin Trust became liable for an entirely new and different set of contractual obligations that imposed fundamentally different risks upon them without consulting them, much less obtaining their consent.

135. Because the terms of the Cantor II Loan and the Cantor IV Loan were varied by Zions without the consent of Stupin and the Stupin Trust, the guarantees that Stupin and the Stupin Trust made to Zions should be deemed to have been discharged and no longer be valid and enforceable.

136. In the event that Zions' allegations of defaults by Cantor II and Cantor IV are found to be true, then the Stupin Parties pray for a judicial determination that the guarantees to Zions are void or voidable.

### EIGHTH CAUSE OF ACTION

**(Financial Elder Abuse - Shyam, Cantor Manager, Zions, and ROES 71 - 80)**

137. Cross Complainants reallege all of the prior allegations of this Cross Complaint as if set forth fully herein.

138. On information and belief, in obtaining guarantees of the Cantor II Loan and the Cantor IV Loan from Stupin and the Stupin Trust, Zions, Shyam, and Cantor Manager appropriated property of Stupin and the Stupin Trust.

139. On information and belief, Zions, Shyam, and Cantor Manager, in obtaining guarantees of the Cantor II Loan and the Cantor IV Loan from Stupin and the Stupin Trust, took advantage of them because Zions, Shyam, and Cantor Manager knew that Zions required but lacked a first priority interest in the mortgage loans purchased with the Cantor II Loan proceeds

STUPIN PARTIES' CROSS-COMPLAINT

and the Cantor IV Loan proceeds and that Stupin and the Stupin Trust had resources to pay for Zions' losses if the mortgage loans failed.

140. On information and belief, at the time when Zions, Shyam, and Cantor Manager obtained the guarantees of the Cantor II Loan and the Cantor IV Loan from Stupin and the Stupin Trust, Stupin was an elder as defined by statute and Zions, Shyam, and Cantor Manager were aware of such status.

141. On information and belief, Zions, Shyam, and Cantor Manager obtained guarantees of the Cantor II Loan and the Cantor IV Loan from Stupin and the Stupin Trust for a wrongful use and the intent to defraud, because they did so while knowing that Stupin and the Stupin Trust were unaware that they could become liable on the guarantees, if in fact Cantor II and Cantor IV failed to provide Zions with the first priority lien interest in the mortgage loans that Zions was supposed to have.

142. In the event that Zions' allegations of defaults by Cantor II and Cantor IV are found to be true, then Stupin and the Stupin Trust will have been harmed as a result of Zions, Shyam, and Cantor Manager having obtained their guarantees of the Cantor II Loan and the Cantor IV Loan.

143. In the event that Zions' allegations of defaults by Cantor II and Cantor IV are found to be true, then Zions, Shyam, and Cantor Manager's conduct will have been a substantial factor in causing harm to Stupin and the Stupin Trust.

144. Zions, Shyam and Cantor Manager, in obtaining guarantees of the Cantor II Loan and the Cantor IV Loan from Stupin and the Stupin Trust while knowing that Zions required but lacked a first priority interest in the mortgage loans purchased with the Cantor II Loan proceeds and the Cantor IV Loan proceeds, engaged in conduct that constitutes recklessness, oppression, fraud, and/or malice.

///

///

///

///

STUPIN PARTIES' CROSS-COMPLAINT

## **PRAYER FOR RELIEF**

WHEREFORE, Cross Complainants pray for judgment against Cross Defendants and ROE 1 through ROE 80, inclusive, and each of them, as follows:

**A.    On the First Cause of Action for Breach of Fiduciary Duty as to Shyam, Cantor Manager, and ROES 1 – 10:**

   1.    For compensatory damages;

   2.    For reasonable attorney's fees provided by agreement or statute according to proof; and

   3.    For costs of suit herein incurred.

**B.    On the Second Cause of Action For Breach of Fiduciary Duty As to Shyam, Cantor Manager, and ROES 11 – 20:**

   1.    For compensatory damages;

   2.    For reasonable attorney's fees provided by agreement or statute according to proof; and

   3.    For costs of suit herein incurred.

**C.    On the Third Cause of Action for Express Indemnity as to Shyam, Cantor Manager, and ROES 21 – 30:**

   1.    For compensatory damages;

   2.    For reasonable attorney's fees provided by agreement or statute according to proof; and

   3.    For costs of suit herein incurred.

**D.    On the Fourth Cause of Action for Equitable Indemnity as to Shyam, Cantor Manager, and ROES 31 – 40:**

   1.    For compensatory damages;

   2.    For reasonable attorney's fees provided by agreement or statute according to proof; and

   3.    For costs of suit herein incurred.

STUPIN PARTIES' CROSS-COMPLAINT

**E.** **On the Fifth Cause of Action for Fraud In The Inducement as to Zions and ROES 41 – 50:**

    1.    For rescission of the Guarantees signed by the Stupin Parties in favor of Zions related to Zions' loans to Cantor II and Cantor IV.

    2.    For costs of suit herein incurred.

**F.** **On the Sixth Cause of Action for Breach of Contract as to Zions and ROES 51 – 60:**

    1.    For compensatory damages;

    2.    For reasonable attorney's fees provided by agreement  according to proof; and

    3.    For costs of suit herein incurred.

**G.** **On the Seventh Cause of Action For Declaratory Relief as to Zions and ROES 61 – 70:**

    1.    For an order from this Court declaring the Guarantees signed by the Stupin Parties in favor of Zions related to Zions' loans to Cantor II and Cantor IV to be voidable and/or void as a matter of law.

**H.** **On the Eighth Cause of Action For Elder Abuse As to Shyam, Cantor Manager, and ROES 71 – 80:**

    1.    For compensatory damages;

    2.    For punitive and exemplary damages;

    3.    For reasonable attorney's fees and costs provided by Cal. Welfare and Institutions Code §15657.5  according to proof; and

    4.    For costs of suit herein incurred.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

STUPIN PARTIES' CROSS-COMPLAINT

**I.**    **On All Causes of Action:**

1.    For costs of suit herein incurred.

2.    For such other and further relief as the court may deem proper.

Dated: December 19, 2025            LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.

By: _____
David B. Golubchik
Michael G. D'Alba
Joseph M. Rothberg
Attorneys for Defendants Andrew Stupin,
individually, and Andrew Stupin and Julie K. Stupin as
Trustees of the Stupin Family Trust dated April 3, 2009

STUPIN PARTIES' CROSS-COMPLAINT

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am an employee in the County of Los Angeles, State of California.  I am over the age of 18 and am not a party to the within action; my business address is: Levene, Neale, Bender, Yoo & Golubchik L.L.P, 2818 La Cienega Avenue, Los Angeles, California 90034.

On **December 19, 2025**, I served the following document(s):

**ANSWER TO PLAINTIFF'S UNVERIFIED COMPLAINT BY DEFENDANTS ANDREW STUPIN, AND ANDREW STUPIN AND JULIE K. STUPIN AS TRUSTEES OF THE STUPIN FAMILY TRUST DATED APRIL 3, 2009**

**CROSS-COMPLAINT BY ANDREW STUPIN, AND ANDREW STUPIN AND JULIE K. STUPIN, AS TRUSTEES OF THE STUPIN FAMILY TRUST DATED APRIL 3, 2009 FOR: (1)BREACH OF FIDUCIARY DUTY [Derivatively Through Cantor Group II, LLC and Cantor Group IV LLC as to Deba Shyam and Cantor Group Manager, LLC];(2)BREACH OF FIDUCIARY DUTY [Directly As to Deba Shyam and Cantor Group Manager, LLC];(3)EXPRESS INDEMNITY[As to Cantor Group II, LLC and Cantor Group IV LLC];(4)EQUITABLE INDEMNITY [As to Deba Shyam and Cantor Group Manager, LLC];(5) FRAUD IN THE INDUCMENT[As to Zions Bancorporation];(6)BREACH OF CONTRACT[As to Zions Bancorporation];(7)DECLARATORY RELIEF [As to Zions Bancorporation]; (8)FINANCIAL ELDER ABUSE(Cal. Welfare & Institutions Code § 15600 *et seq.*) [As to Deba Shyam and Cantor Group Manager, LLC]**

☒      by electronic transmission for immediate receipt on the same day of this Declaration by the parties on the below e-mail service list

| *Appointed Judicial Referee:* | *Counsel for Plaintiff Zions Bancorporation* |
|---|---|
| The Hon. Judge Mitchell Beckloff (Ret.) | Sasha Frid, Esq. |
| Signature Resolution | Jeffrey B. White, Esq. |
| 2049 Century Park East | Jacquelyn N. Crawley, Esq. |
| Suite 620 | MILLER BARONDESS LLP |
| Los Angeles, California 90067 | 2121 Avenue of the Stars |
| mbeckloff@signatureresolution.com | Suite 2600 |
| sestropia@signatureresolution.com | Los Angeles, CA 90067 |
| | sfrid@millerbarondess.com |
| | jwhite@millerbarondess.com |
| | jcrawley@millerbarondess.com |

1

**PROOF OF SERVICE**

*Counsel for Defendants Gerald J. Marcil,*
*individually, and as trustee, and Carol L*
*Marcil as trustee of the Marcil Family Trust*
*dated May 9, 1997*
Steven T. Gubner, Esq.
Jason B. Komorsky, Esq.
Jerrold L. Bregman, Esq.
BG LAW
21650 West Oxnard Street
Suite 500
Woodland Hills, CA 91367
sgubner@bg.law
jkomorsky@bg.law
jbregman@bg.law

*Counsel for Defendant Deba Shyam*
Larry A. Rothstein, Esq.
LARLAW, A PROFESSIONAL LAW CORP.
2945 Townsgate Road
Suite 200
Westlake Village, CA 91361
lar@larlaw.net

☒  (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_Rebecka Merritt_
_____
REBECKA MERRITT

2

**PROOF OF SERVICE**

**LARLAW, A PROFESSIONAL LAW CORPORATION**
**LARRY A. ROTHSTEIN, State Bar No. 082746**
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361
Telephone:  (818) 348-7000
Facsimile:   (818) 348-0700
Email: lar@larlaw.net

Attorney for Defendant Deba Shyam

## SUPERIOR COURT FOR THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES, CENTRAL DISTRICT

| | |
|---|---|
| ZIONS BANCORPORATION, NATIONAL ASSOCIATION, dba CALIFORNIA BANK & TRUST,.,<br><br>                    Plaintiff,<br><br>        vs.<br><br>ANDREW STUPIN, an individual; ANDREW STUPIN AND JULIE K. STUPIN, as trustees of The Stupin Family Trust dated April 3, 2009; GERALD J. MARCIL, an individual; GERALD J. MARCIL AND CAROL L. MARCIL, as trustees of The Marcil Family Trust dated May 9, 1997; DEBA SHYAM, an individual; and DOES 1-10,<br><br>CANTOR GROUP II, LLC, CANTOR GROUP IV, LLC, CANTOR GROUP MANAGER, LLC AND DEBA SHYAM,<br><br>                Cross Complainants<br><br>ZIONS BANCORPORATION, NATIONAL ASSOCIATION, DBA CALIFORNIA BANK AND TRUST; ANDREW STUPIN, an ndividual; ANDREW STUPIN AND JULIE STUPIN. AS TRUSTEES OF THE | Case No.:  25STCV30165<br><br>Hon. Wendy Chang, Dept. 36<br><br>**CROSS COMPLAINT OF CANTOR GROUP II, LLC, CANTOR GROUP IV, LLC, CANTOR GROUP MANAGER, LLC AND DEBA SHYAM AGAINST ZIONS BANCORPORATION, NATIONAL ASSOCIATION, DBA CALIFORNIA BANK AND TRUST; ANDREW STUPIN, ANDREW STUPIN AND JULIE STUPIN, AS TRUSTEES OF THE STUPIN FAMILY TRUST DATED APRIL 3, 2009; GERALD J. MARCIL, AN INDIVIDUAL; GERALD J. MARCIL AND CAROL L. MARCIL, AS TRUSTEES OF THE MARCIL FAMILY TRUST DATED MAY 9, 1997 FOR:**<br><br>**1. DECLARATORY RELIEF AGAINST CB&T**<br>**2. DECLARATORY RELIEF AGAINST CO-GUARANTORS**<br><br>Action Filed: October 15, 2025<br>Trial Date: None Set |

1

**CROSS COMPLAINT**

STUPIN FAMILY TRUST DATED APRIL 3, 2009; GERALD J. MARCIL, an individual; GERALD J. MARCIL AND CAROL L. MARCIL, AS TRUSTEES OF THE MARCIL FAMILY TRUST DATED MAY 9, 1997; DOES 101-120,

Cross Defendants.

Comes now Cross Complainants Cantor Group II, LLC ("CG II"), Cantor Group IV, LLC ("CG IV"), Cantor Group Manager, LLC ("CGM") (Collectively "Cantor Parties") and Deba Shyam (Shyam) and allege against cross defendants as follows:

**General Allegations**

1.      Cantor Parties are Delaware Limited Liability Companies in good standing and doing business in California.  Shyam is an individual residing in Newport Beach, California.  Shyam is a defendant in the main action.  He and Cantor Parties are cross defendants in the cross actions brought by Stupin Parties and Marcil Parties

2.      Cross defendant Zions Bancorporation, National Association, dba California Bank and Trust ("CB&T") is a banking corporation with its principal place of business in Utah.  CB&T is authorized to transact banking business in California and the plaintiff in the main action.

3.      Cross defendants Andrew Stupin, an Individual; Andrew Stupin and Julie Stupin, as Trustees of the Stupin Family Trust Dated April 3, 2009 ("Stupin Parties") and Gerald J. Marcil, an Individual; Gerald J. Marcil and Carol L. Marcil, as Trustees of the Marcil Family Trust dated May 9, 1997 ("Marcil Parties") are individuals or trustees of their respective family trusts.  Collectively, the Stupin and Marcil Parties are referred to herein as "Co-Guarantors."

CROSS COMPLAINT

4.     Cross defendants Does 101-120 are persons or entities whose identities are unknown to cross complainants, but who are responsible ins some manner for the events and happenings described herein.  Cross complainants will seek leave to amend their cross complaint to allege the true names and capacities of said Doe Defendants when they are ascertained.

5.     As described in great detail in the main action and Co-Guarantors' respective cross complaints, CB&T entered into Business Loan Agreements with CG II and CG IV as follows:

- 2016 BLA with CG II.
- 2017 BLA with CG IV.
- 2023 Amended and Restated BLA with CG II.
- 2024 Amended and Restated BLA with CG IV.

Unless otherwise distinguished, these BLA's are referred to collectively as "the BLA's."

6.     CGM is not a party to the BLA's.

7.     Shyam and Co-Guarantors executed continuing guarantees in favor of CB&T for each of the BLA's described above.  CGM is not a party to any guarantee.

8.     The BLA's required CB&T to extend credit only for "Eligible Receivables," that is, where CB&T had a first priority secured deed of trust in the underlying collateral loans.  Unless CB&T had a first priority secured deed of trust at the time credit was extended, the BLA's define the underlying collateral loans as "Ineligible Receivables."

9.     Further, the BLA's required complete loan documentation, including documentation showing that the asset qualified as an Eligible Receivable.  Without complete documentation, CB&T could not extend credit because it would have to treat the incomplete documentation as an Ineligible Receivable.

3
CROSS COMPLAINT

10.    The Co-Guarantor cross defendants have alleged in their respective cross complaints that CB&T extended credit to the borrowers (CG II and CG IV) based on Ineligible Receivables.

11.    Co-Guarantors also allege in their respective cross complaints that by extending credit based on Ineligible Receivables, it constituted a material alteration of the BLA's, materially increased the risk to the guarantors and otherwise discharged them from their respective guarantees and rendered them unenforceable.

12.    CB&T denies these allegations.

### FIRST CAUSE OF ACTION

### For Declaratory Relief Against CB&T and Does 101-110

13.    Cross complainants repeat and reallege the allegations in ¶¶1-12 as though fully set forth herein.

14.    An actual controversy now exists as between Cantor Parties and CB&T insofar as their respective liabilities may exist, may be reduced or may be discharged and exonerated under the BLA's and between Shyam and CB&T on the guarantees as a result of CB&T's lending against Ineligible Receivables.

15.    Therefore, a judicial determination is necessary and appropriate to determine the nature and extent of the Cantor Parties liability under the BLA's and Shyma's under the continuing guarantees.

### SECOND CAUSE OF ACTION

### For Declaratory Relief Against Co-Guarantors and Does 111-120

16.    Cross Complainants repeat and reallege the allegations in ¶¶1-15 as though fully set forth herein.

17.    Co-Guarantors have cross complained against Cross Complainants Shyam and CGM for Implied Equitable Indemnity.  Co-Guarantors and Shyam, but not CGM, are guarantors under various continuing guarantees in favor of CB&T.

4

CROSS COMPLAINT

18.     In the event that Stupin and/or Marcil Parties and Shyma are found jointly and severally liable to CB&T under their respective guarantees, and may satisfy any judgment against them, each may have rights of implied equitable indemnity and/or contribution under Civ. Code §1432, against the others.

19.     Therefore, an actual controversy now exists as among Co-Guarantors and Shyam and CGM as to their respective liability to CB&T and a judicial determination is necessary and appropriate to determine the nature and extent of their proportionate liability to CB&T or to each other.

Wherefore, Cross Complainants pray judgment as follows:

1.  On the First Cause of Action:

    For a judicial determination of the extent of liability Cantor Parties have to CB&T under the BLA's and Shyam and CGM may have under the continuing guarantees.

2.  On the Secord Cause of Action:

    For a judicial determination as to the nature and extent of Shyam's and CGM's proportionate liability to CB&T or to each other.

3.  For reasonable attorney's fees and costs.

4.  For such other and further relief as the court deems just and proper.

LARLAW, A Professional Law Corporation

Dated: March 27, 2026

By_____
Larry A. Rothstein
Attorney for Defendants Deba Shyam;
Cantor Group II, LLC; Cantor Group IV,
LLC and Cantor Group Manager, LLC

5
CROSS COMPLAINT

## <u>PROOF OF SERVICE</u>

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 1801 Century Park East, 16th Floor, Los Angeles, CA 90067-2367.

On March 27, 2026, I served the within document(s) described as:

CROSS COMPLAINT OF CANTOR GROUP II, LLC, CANTOR GROUP IV, LLC, CANTOR GROUP MANAGER, LLC AND DEBA SHYAM AGAINST ZIONS BANCORPORATION, NATIONAL ASSOCIATION, DBA CALIFORNIA BANK AND TRUST; ANDREW STUPIN, ANDREW STUPIN AND JULIE STUPIN, AS TRUSTEES OF THE STUPIN FAMILY TRUST DATED APRIL 3, 2009; GERALD J. MARCIL, AN INDIVIDUAL; GERALD J. MARCIL AND CAROL L. MARCIL, AS TRUSTEES OF THE MARCIL FAMILY TRUST DATED MAY 9, 1997

on the interested parties in this action as stated below:

Louis R. Miller
A. Sasha Frid
Jeffery B. White
**MILLER BARONDESS, LLP**
2121 Avenue of the Stars, Suite 2600
Los Angeles, California 90067
Emails: jwhite@millerbarondess.com;
sfrid@millerbarondess.com ;
smiller@millerbarondess.com

*Attorneys for Plaintiff*

Steven Todd Gubner
**BG LAW LLP**
21650 Oxnard St Ste 500
Woodland Hills, CA 91367-4911
sgubner@bg.law

*Attorney for Defendants Gerald J. Marcil and Gerald J. Marcil and Carol L. Marcil, as trustees of the Marcil Family Trust dated May 9, 1997*

Dmitry Golubchik
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK LLP
2818 La Cienega Ave.
Los Angeles, CA 90034-2618
dbg@lnbyg.com

*Attorney for Defendants Andrew Stupin and Andrew Stupin and Julin K. Stupin, as trustees of the Stupin Family Trust dated April 3, 2009*

Hon. Mitchell L. Beckloff (Ret.)
Sandra Estropia, Associate – Case Administration
SIGNATURE RESOLUTION -Century City
2049 Century Park East, Suite 620
Los Angeles, CA 90067
*mbeckloff@signatureresolution.com*
*sestropia@signatureresolution.com*

*Judicial Referee*

[X]    (BY E-MAIL) By transmitting a true copy of the foregoing document(s) to the e-mail addresses set forth above.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 27, 2026, at Prosper, Texas.

Shirley Cervantes
(Type or print name)

_____
(Signature)

6

CROSS COMPLAINT